No. 22-55873

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, DBA
(doing business as) Labcorp,

*Defendant-Appellant.*

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:20-cv-00893-FMO-KS · The Honorable Fernando M. Olguin

## APPELLANT LABORATORY CORPORATION OF AMERICA
## HOLDING'S OPENING BRIEF

Robert I. Steiner
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
212-808-7800

Becca J. Wahlquist
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, California 90071
213-547-4900

Glenn T. Graham
ggraham@kelleydrye.com
KELLEY DRYE & WARREN LLP
One Jefferson Road, 2nd Floor
Parsippany New Jersey 07054
973-503-5917

Attorneys for Appellant
LABORATORY CORPORATION OF AMERICA HOLDINGS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Defendant-Appellant LABORATORY CORPORATION OF AMERICA HOLDINGS d/b/a Labcorp, a nongovernmental, publicly traded, corporate party, certifies that no publicly held corporate parent owns more than 10% of its stock.

Date: March 31, 2023                    Respectfully submitted,

                                        */s/ Robert I. Steiner*
                                        Robert I. Steiner
                                        Becca Wahlquist
                                        Glenn T. Graham

                                        *Counsel for Defendant-Appellant
                                        Laboratory Corporation of America
                                        Holdings*

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION.........................................................4

STATUTORY AND REGULATORY AUTHORITIES ...........................5

STATEMENT OF ISSUES PRESENTED.................................................5

STATEMENT OF THE CASE..................................................................6

I.     Labcorp's Patient Service Centers and the Check-in Process.......................6

II.    Plaintiffs' ADA Claim.................................................................9

III.   Plaintiffs' Individual PSC Experiences and Personal Preferences..............11

         A.     American Council of the Blind.................................................11

         B.     Plaintiff Vargas ...................................................................13

         C.     Plaintiff Davis ....................................................................15

IV.   Expert Testimony At Issue In Certification Motion....................................16

         A.     Plaintiffs' Accessibility Expert – Rachel Bradley Montgomery............16

         B.     Plaintiffs' Numerosity Expert – Sean Chasworth....................17

         C.     Defendant's Rebuttal Expert – Bruce Deal...............................18

V.     Relevant Procedural History.........................................................19

VI.   The Final Class Definitions ........................................................21

SUMMARY OF ARGUMENT ...............................................................22

STANDARD OF REVIEW .....................................................................25

ARGUMENT ..........................................................................................25

I.     THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING THE UNRUH ACT DAMAGES CLASS BECAUSE MANY CLASS MEMBERS LACK ARTICLE III STANDING AND BECAUSE COMMON ISSUES DO NOT PREDOMINATE........................................25

i

A.    The District Court Manifestly Erred In Failing To Consider Evidence That Many Rule 23(b)(3) Damages Class Members Would Lack Standing To Proceed. .....................................25

B.    The District Court Misapprehended The Facts Showing That Common Issues Do Not Predominate. .................................29

      1.    Unruh Act actions require individualized proof. ...................29

      2.    The record demonstrates the need for individualized proof. .......................................................................33

      3.    The District Court's analysis ignored Unruh Act case law demonstrating that an Unruh Act damages claims require individualized proof. ................................................36

      4.    The District Court's factual findings based on mere allegations are contradicted by evidence on record. ...............39

C.    The District Court Failed To Apply The Correct Law To The Facts When Finding That Plaintiffs Met The Typicality and Adequacy Requirements For Class Certification. .............................41

D.    The District Court Misapplied The Law When Finding That Plaintiff Vargas' Damages Class Met Rule 23(b)(3)'s Superiority Requirements. ..................................................45

II.    THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING THE NATIONWIDE INJUNCTIVE RELIEF CLASS. .............................46

III.    THE DISTRICT COURT MANIFESTLY ERRED BY CERTIFYING FAIL-SAFE CLASSES. ........................................................48

CONCLUSION ......................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
2012 WL 3762440 (S.D. Cal. 2012)......................................................31, 32, 36

*Arthur v. United Industries Corp.*,
2018 WL 2276636 (C.D. Cal. May 17, 2018)..................................................44

*Botosan v. Paul McNally Realty*,
216 F.3d 827 (9th Cir. 2000) ..............................................................................30

*Bowerman v. Field Asset Services, Inc.*,
60 F.4th 459 (9th Cir. 2023) ...............................................................................41

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011) ..............................................................................27

*Doran v. 7-Eleven, Inc.*,
509 F. App'x 647 (9th Cir. 2013)........................................................................30

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)......................................................................................41, 44

*Arizona ex rel. Goddard v. Harkins Amusement Enters.*,
603 F.3d 666 (9th Cir. 2010) ..............................................................................10

*Gomez v. Como*,
2022 WL 1082016 (C.D. Cal. Apr. 11, 2022)..................................................27

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ............................................................................25

*Kamar v. RadioShack Corp.*
375 Fed. App'x 734 (9th Cir. 2010) ............................................................49, 50

*Lara v. First Nat'l Ins. Co. of Am.*,
25 F.4th 1134 (9th Cir. 2022) .............................................................................45

*Mielo v. Bob Evans Farms, Inc.*,
    2015 WL 1299815 (W.D. Pa. Mar. 23, 2015) ..............................................41, 46

*Moeller v. Taco Bell Corp.*,
    2012 WL 3070863 (N.D. Cal. 2012) ...........................................30, 30, 32, 33, 36

*Nat. Fed. Of the Blind, Inc. v. Wal-Mart Assocs., Inc.*,
    2021 WL 4750521 (D. Md. Oct. 12, 2021) .......................................................10

*Nevarez v. Forty Niners Football Co., LLC*,
    326 F.R.D. 562 (N.D. Cal. 2018)..........................................................36, 37, 38

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ..........................................................................*passim*

*Reycraft v. Lee*,
    177 Cal. App. 4th 1211 (Cal. Ct. App. 2009)....................................................31

*Russell v. Tyson Farms, Inc*.,
    2020 WL 3051241 (N.D. Ala. Jun. 8, 2020) .....................................................50

*Sandoval v. Cnty. of Sonoma*,
    912 F.3d 509 (9th Cir. 2018) ...........................................................................25

*Senne v. Kansas City Royals Baseball Corp.*,
    934 F.3d 918 (9th Cir. 2019) ...........................................................................25

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................................27

*Strojnik v. Xenia Hotels & Resorts, Inc.*,
    2020 WL 3060761 (N.D. Cal. June 9, 2020).....................................................31

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).................................................................................*passim*

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) .........................................................................25

*Urhausen v. Longs Drugs Stores Cal., Inc.*,
    155 Cal. App. 4th 254 (Cal. Ct. App. 2007).....................................................30

ii

*Van v. LLR, Inc,*
    61 F.4th 1053 (9th Cir. 2023) ............................................................40

*Vargas v. Quest Diagostics,*
    No. 19-cv-8108, 2021 WL 5989958 (C.D. Cal. Dec. 2, 2021) .................*passim*

*Vondersaar v. Starbucks Corp.,*
    2015 WL 629437 (C.D. Cal. Feb. 12, 2015) ...................................29, 33, 34, 36

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)....................................................................*passim*

*Walker v. Life Ins. Co. of the Sw.,*
    953 F.3d 624 (9th Cir. 2020) ............................................................36

*Yokoyama v. Midland Nat. Life Ins. Co.,*
    594 F.3d 1087 (9th Cir. 2010) ..........................................................25

*Young v. Nationwide Mut. Ins. Co.,*
    693 F.3d 532 (6th Cir. 2012) ............................................................49

## Statutes

28 U.S.C. § 1331 .................................................................................5

28 U.S.C. § 1367 .................................................................................5

29 U.S.C. § 794 ..................................................................................5

42 U.S.C. §§ 12101, *et seq.*.....................................................................4, 5

42 U.S.C. § 12103(1)(B).........................................................................10

42 U.S.C. § 12182(b)(2)(A)(iii)..................................................................10

42 U.S.C. § 12188................................................................................5

42 U.S.C. § 18116................................................................................5

Cal. Civ. Code §§ 51, *et seq.* ...................................................................5

Cal. Civ. Code §§ 54, *et seq.* ...................................................................5

Cal. Civ. Code § 55.56(c) .......................................................................2

iii

**Other Authorities**

28 C.F.R. § 36.303(c)(1) .......................................................................10

Fed. R. App. P. 5 ...................................................................................5

Fed. R. Civ. P. 23 ..........................................................................*passim*

iv

## **INTRODUCTION**

The District Court abused its discretion and committed legal error when it certified damages and injunctive relief classes in this lawsuit, brought under the California Unruh Civil Rights Act ("Unruh Act") and the Americans with Disabilities Act ("ADA"). Because the class certification order fundamentally conflicts with precedent from the United States Supreme Court and this Court, as well as with another District Court order denying certification of an Unruh Act class in a similar case brought by one of the same plaintiffs, it must be reversed.

Appellant Labcorp is a leading clinical laboratory, which operates roughly 2,000 patient service centers (each a "PSC") across the country that collectively service tens of millions of patients each year. These PSCs are staffed by personnel who collect samples from patients (*e.g.*, blood and urine) so that Labcorp can perform diagnostic testing. When a doctor orders bloodwork for a patient, the patient can check-in at a PSC in several ways: (i) in advance online, using the patient's own device; (ii) through an electronic kiosk at the PSC; or (iii) with staff at the front desk of the PSC. The check-in option best suited for each patient depends on that individual's abilities and preferences – that is why Labcorp provides multiple choices.

The three named Plaintiffs (Luke Davis, Julian Vargas, and the American Counsel of the Blind ("ACB")) brought suit to challenge Labcorp's check-in

procedures, alleging that because their visual impairment rendered them unable to check-in using one of the options – the electronic kiosks – they suffered harm. But whether any Plaintiff has suffered concrete injury, let alone the distinct personal harm required to sustain an Unruh Act damages claim, is an issue that is inescapably individualized. Among just the three named Plaintiffs, the record before the trial court was clear that circumstances differ materially: Plaintiff Vargas never attempted to check-in at a kiosk, was promptly checked-in by a person at the front desk after a short wait, and received the bloodwork his doctor ordered; Plaintiff Davis alleges he was directed to use a kiosk (which, if accurate, would violate Labcorp policy), but then shifted to checking-in online, and always received the testing his doctor ordered; and Plaintiff ACB acknowledges that checking-in through a person at the front desk is a preferred option. These individualized differences expand exponentially when applied to a class that, in California alone, is claimed by Plaintiffs' expert to encompass potentially over 110,000 patients per year.

United States Supreme Court precedent does not allow certification in these circumstances. *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2208 (2021) requires that all class members have Article III standing to pursue their damages claims, and damages claims under the Unruh Act require each claimant to prove they "experienced difficulty, discomfort, or embarrassment because of the violation." Cal. Civ. Code §55.56(c). The record below does not support even a technical ADA

violation because Labcorp provides in-person check-in as a reasonable accommodation. But if a trier of fact were to disagree, it could only be because of the specific, individualized experience of a patient who visited one of the thousands of PSCs on one of the thousands of days in the class period. For each class member the questions that would need to be addressed include, among others, how did Labcorp staff interact with that patient, did that patient wait in an unreasonable line, how busy was the PSC at that time? The list goes on. For this reason, a different court below declined to certify the Unruh Act damages class in a similar case brought by Plaintiff Vargas against one of Labcorp's competitors, Quest Diagnostics. *See Vargas v. Quest Diagostics*, No. 19-cv-8108, 2021 WL 5989958 (C.D. Cal. Dec. 2, 2021); 2-ER-0222-0223.

The injunctive class is equally flawed. Supreme Court precedent forbids the certification of a Rule 23(b)(2) injunction class unless a single injunction can provide relief to all class members. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction"). But both Plaintiff ACB and Plaintiffs' retained accessibility expert conceded that no single accommodation will satisfy all class members. This is another reflection of the same core problem with the classes certified below: there

is no uniform harm suffered by all class members (if there is any harm at all), and certainly there is no record evidence supporting any single classwide remedy. A practical solution for patients who are unable or prefer not to use the kiosks is to check-in with a person at the front desk; that solution is already in place at Labcorp.

The District Court's certification order manifestly erred on each of these points in its certification order. The order did not address the standing issue under *TransUnion*, though Labcorp raised it. It did not address the evidence of the varying circumstances of the three named Plaintiffs, let alone how those issues would be managed across an entire class. It based its commonality findings on a mistaken finding that Labcorp compels all PSC visitors to check-in through the electronic kiosk despite abundant contrary record evidence, including the testimony of Plaintiff Vargas regarding his own front-desk check-in and the record evidence that a significant percentage of Labcorp PSC customers (almost 25% of all PSC visitors during one recent six-month window) check-in at the front desk. And the District Court certified classes defined to include only those persons who are able to prove their claims, a classic impermissible "fail-safe" definition that cannot be corrected.

Thus, the certification order should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs' First Amended Complaint asserts claims against Labcorp for alleged violations of (1) the American with Disabilities Act ("ADA"), 42 U.S.C. §§

12101, *et seq.*, (2) California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51, *et seq.*, (3) California's Disabled Persons Act, Cal. Civ. Code §§ 54 *et seq.*,[1] (4) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and (5) Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116. The District Court exercised federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188 over Plaintiffs' three federal law claims and supplemental jurisdiction over Plaintiffs' related state claims pursuant to 28 U.S.C. § 1367.

On September 22, 2022, this Court granted Labcorp's Rule 23(f) petition for permission to appeal the District Court's class certification order. 8-ER-1923. This Court thus has jurisdiction to hear Labcorp's interlocutory appeal of the District Court's class certification order pursuant to Federal Rule of Civil Procedure 23(f) and Federal Rule of Appellate Procedure 5. *See id.*

## **STATUTORY AND REGULATORY AUTHORITIES**

All relevant statutory and regulatory authorities appear in the Addendum.

## **STATEMENT OF ISSUES PRESENTED**

I. Whether the District Court manifestly erred in certifying Plaintiff Vargas's California Unruh Act damages subclass when predominance, typicality,

---

[1] Because Plaintiffs conceded in summary judgment briefing that the CDPA cause of action cannot be maintained, the Court's certification order does not address the CDPA cause of action. *See* 1-ER-0018.

5

manageability, and superiority are lacking, and when there is no evidence that even a meaningful portion of class members would have standing to proceed.

II. Whether the District Court manifestly erred in certifying the ADA nationwide injunctive relief class pursuant to Rule 23(b)(2) when there is no evidence that an injunction would provide a remedy to even a meaningful portion of class members.

III. Whether the District Court manifestly erred in certifying two fail-safe classes.

## STATEMENT OF THE CASE

### I. Labcorp's Patient Service Centers and the Check-in Process

Labcorp is one of the leading clinical diagnostic laboratories in the United States. About 20% of Labcorp's diagnostic testing[2] is performed on samples collected at approximately 2,000 PSCs located throughout the United States, around 300 of which are located in California. 3-ER-0364, 3-ER-0519.[3] The service provided by Labcorp phlebotomists at the PSCs is the collection of samples (e.g., blood and urine) for testing. 3-ER-0364 at 36:2-19; 3-ER-0369-0370 at 47:25-48:4. Tens of millions of patients visit Labcorp PSCs annually. 3-ER-0441-0444; 3-ER-

---

[2] Approximately 80% of Labcorp's sample collection is performed at locations other than its PSCs, such as at hospitals and physicians' offices, and sent to Labcorp.

[3] Citations to "ER" refer to the Excerpts of Record submitted herewith.

6

0447-0448 (61,522,195 PSC visits between January 1, 2018 and December 30, 2020.) Between January 2018 and December 2020 alone, California PSCs received over 10.29 million visits. 3-ER-0506. And while Labcorp knows the identities of individuals who have had samples collected at a PSC, Labcorp has no information as to which of the millions of PSC visitors are legally blind. 2-ER 0420-0421.

Before October 2017, all patients visiting Labcorp PSCs checked in with an employee at the front desk. 3-ER-0367; 3-ER-0373. Then, Labcorp began rolling out touchscreen iPad kiosks to provide another check-in option. *Id.* Installing kiosks in over 90% of PSCs took nearly a year, and continued thereafter. 3-ER-0508.

As part of the same project, Labcorp improved its front desk check-in capabilities so that the same technology was available for both in-person check-in options. 3-ER-0386-0387. Labcorp took this step because it was aware that some patients could not, or simply preferred not to, check-in at a PSC using a kiosk. As a Labcorp corporate representative explained:

> We found it not at all physically practical within our design constraints to service blind people, **and we designed the solutions so that blind people could be serviced at the desk, because we also built the solution to operate behind the desk in the same efficient way that it operated on the tablet.** So we had to make design decisions to make [the kiosk] accessible to wheelchair-bound people and low vision people, but we explicitly recognized that the device could not service a blind person, and they would have to be serviced by the Express solution behind the desk.

*Id.* at 39:18-40:3 (emphasis added). After the upgrade to the front desk check-in

7

Express system, the check-in technology available at the kiosk and the front desk became essentially the same. 3-ER-0376.

The kiosks do not provide test results and are not used for ordering testing services. 3-ER-0374-0375 at 94:9-18, 97:14-16; 3-ER-0379-0383 at 167:22-168:14, 169:9-16, 170:6-25, 171:1-19. All tasks that can be performed at the kiosk (scanning IDs, check-in and payment of past invoices) can also be performed at the front desk with PSC staff, who use a similar software (known as Express Admin) as that housed in the kiosk. 3-ER-0367-0368; 3-ER-0376 at 43:14-44:2, 111:9-20. When a kiosk at a PSC is not operational (which can happen for a variety of reasons), all on-site check-ins take place at the front desk. 3-ER-0439-0440; 3-ER-0445-0446; 3-ER-0449-0450.

Although all PSCs have at least one employee present who can check-in patients at the front desk, PSC staffing varies across the approximately 2,000 PSCs. 3-ER-0367-0368 at 43:6-44:2. Some locations have a dedicated patient intake representative ("PIR"), who sits full time at the front desk to check in patients; some locations employ numerous phlebotomists who conduct both check-in and testing; some PSCs are located inside Walgreens stores, where there is always a dedicated Walgreens staff member to assist patients with check-in; and for any given PSC, staffing may vary depending on the day of the week and the time of day. 3-ER-0369-0372 at 47:22-48:4, 78:3-8, 79:12-21. Staffing practices are based on a PSC's

8

location, traffic, and size, and thus may fluctuate over time. 3-ER-0369-0372 at 47:22-48:4, 78:3-8, 79:12-21.

Labcorp's policy is that for check-ins at the PSC, patients may check-in either at the kiosk or in-person at the front desk. As Labcorp's representative explained:

> Q: To your knowledge, does LabCorp ever indicate to its employees that all patients must use the self-check-in kiosk and that it was not optional?
>
> A: Every patient must go through the check-in process that's part of **either the tablet or behind the counter**. That's our communication. I'm not aware of anything that says every patient has to use the tablet itself.
>
> Q: The express kiosk?
>
> A: Correct. **We've always provided ourselves to be part of that process**.

3-ER-0377 at 113:8-19 (emphasis added). *See also* 4-ER-0909.

A significant portion of Labcorp patients continued to check-in at the desk, even after the kiosk option was put in place. For example, record evidence showed that during one six-month period in 2021, approximately one-fourth (24.5%) of Labcorp PSC visitors opt to check in at the front and approximately 10% of patients checked in online. 3-ER-0509.

## II.   Plaintiffs' ADA Claim

Plaintiffs' ADA claims require them to establish: (1) they are disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated

9

against Plaintiffs because of their disability. *Arizona ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 670 (9th Cir. 2010). Plaintiff Vargas's California Unruh Act claim is predicated on a violation of the ADA and will fail if the ADA claim fails.

Because Plaintiffs' ADA claims regarding the kiosk[4] are based on a communication-related disability, the "auxiliary aids and services" standard applies. 42 U.S.C. § 12182(b)(2)(A)(iii). A business satisfies this standard by providing "effective communication" and "furnish[ing] appropriate auxiliary aids and services where necessary". 28 C.F.R. § 36.303(c)(1). One effective auxiliary aid is providing a "qualified reader," such as having someone available to assist with check-in at the front desk. *See* 42 U.S.C. § 12103(1)(B) (defining auxiliary aids and services to include "qualified readers"); *Nat. Fed. Of the Blind, Inc. v. Wal-Mart Assocs., Inc.,* 2021 WL 4750521, at *11 (D. Md. Oct. 12, 2021) ("Staff assistance is sufficient to provide effective communication[.]").[5]

---

[4] Plaintiffs argue that the kiosk is a "service" to be accessed. No one, however, visits a PSC to use a kiosk. The service offered at PSCs is sample collection for medical testing by Labcorp.

[5] Labcorp believes that all of Plaintiffs' claims ultimately will fail because they were not discriminated against as a result of their disability, and because Labcorp's use of employees to check-in individuals at the front desk satisfies the ADA's "reasonable accommodation" requirement, if the ADA requirement applies here.

### III. Plaintiffs' Individual PSC Experiences and Personal Preferences

The record before the District Court reflected that the three named Plaintiffs encountered different and individualized check-in experiences.

#### A. American Council of the Blind

Plaintiff American Council of the Blind ("ACB") is an affinity group of approximately 20,000 persons. 3-ER-0395-0396 at 20:24-21:8. ACB provided testimony through a corporate representative, and also sent a survey to a portion of its membership soliciting information about their experience at Labcorp PSCs. 3-ER-0394 at 8:12-18; 3-ER-0455.

During her deposition, ACB's corporate representative voiced her (mistaken) belief that Labcorp requires all patients to use the kiosk to announce their arrival and sign in. *Id*. at 60:10-15.[6] The record evidence, as discussed above and below, establishes that belief is not accurate. ACB's representative also acknowledged that if Labcorp allows patients to check in at the front desk, **it would not be discriminatory**. 3-ER-0402 at 57:19-23. In fact, ACB's *preferred* option is to have

---

[6] The District Court appears to have shared this misapprehension about "mandatory kiosk check-in" – a factual inference that the District Court specifically noted was at the core of its commonality findings (*see* 1-ER-0011 at 8:18-22) but that is clearly inaccurate in the face of the undisputed and significant use of front-desk check in at Labcorp PSCs, as well as by the testimony of Mr. Harden and Plaintiff Vargas (as discussed below), both of whom checked in at the front desk.

11

a staff member available to check-in blind or visually impaired patients in person. 3-ER-0406 at 78:6-9.

ACB recognizes that the accommodations preferred by various visually impaired patients are individualized. ACB testified that "[n]o two people with a visual impairment need the same accommodation" (3-ER-0397 at 22:21-22) and that **no remedy would be needed for visually disabled persons who have been able to check in at the PSC front desk**. 3-ER-0406 at 78:17-24. Thus, ACB recognized that a technical upgrade to a kiosk to include something such as speech output technology would not resolve the accessibility concerns of everyone who is blind or visually impaired; different patients have different comfort levels with various technologies. 3-ER-0404-0405 at 72:20-73:4.

Shortly before it joined this lawsuit, ACB surveyed 4,542 members about their kiosk check-in experiences at Labcorp's PSCs. 3-ER-0455. Twelve (12) of its members responded with information about their kiosk experiences. Other than those twelve, ACB does not know whether any of its members have visited a Labcorp PSC. 3-ER-0398-0399 at 26:24-27:9.

One legally blind ACB member, John Harden, responded and informed ACB that whenever he visited a PSC in South Daytona, Florida, a PSC employee checked him in at the front desk for service. 3-ER-0452. Mr. Harden stated that he always checked in with the front desk, commenting: "ADA states that a business needs to

12

make reasonable accommodations for the disabled. They certainly do that." 3-ER-0413 at 23:3-17. At his deposition, Mr. Harden testified that he is "totally blind," visits a PSC every three months, and has never been denied goods or services from Labcorp at a PSC. 3-ER-0409 at 16:12-20; 3-ER-0411-0412 at 21:20-22:11. He added that his wife, who is also legally blind, visits every three months, has also never been asked to use the kiosk, and also checks in with the front desk. 3-ER-0414-0415 at 25:5-26:19.

### B. Plaintiff Vargas

Plaintiff Vargas's two visits to a Labcorp PSC in California are the sole basis for the claim brought on behalf of the California sub-class. In January 2020, months after he had already brought a kiosk-related lawsuit against Quest Diagnostics, Plaintiff Vargas visited a Labcorp PSC in Van Nuys, California, to familiarize himself with the check-in procedures at the facility. 6-ER-1366 at 21:3-25; 6-ER-1368 at 23:2-4. During this visit, he went to the front desk, asked about using the kiosk for his next-day appointment, and was told by Labcorp's staff that he would be able to be checked in by a staff member at the front desk. 6-ER-1367 at 22:1-13; 6-ER-1379-1381 at 34:4-35:6, 35:21-36:5.

The next day, Plaintiff Vargas returned for his scheduled blood test and went to the front desk to be checked in for service. 6-ER-1367 at 22:14-19. He waited in a short line at the counter (6-ER-1370 at 25:3-17; 6-ER-1374 at 29:6-9), explained

13

he would need assistance with check-in, and then someone asked for his ID and insurance card and checked him in at the counter.  6-ER-1371-1372 at 26:18-27:22. He was taken to a private testing room a few minutes later. 6-ER-1374 at 29:2-16.

Mr. Vargas received the blood testing services that he sought from Labcorp, and he was never told he needed to check in at the kiosk:

> Q:      And is it fair to say that on the date you visited the Labcorp facility with your prescription, they provided you with medical diagnostic testing services?
>
> A.      Yes.
>
> Q.      And no one at Labcorp ever refused to provide you with those services; is that correct?
>
> A.      Correct.
>
> **Q.      And no one at Labcorp told you that checking in at the kiosk was the only option for checking in; is that correct?**
>
> **A.      No, I just understand it to be one of two options available.**
>
> **Q.      And the other option is to check in with a person at the desk, correct?**
>
> **A.      Yes.**
>
> **Q.      And so you were never told that the only option for checking in at Labcorp was to check in at the kiosk, correct?**
>
> **A.      Correct.**

6-ER-1382-1383 at 37:13-38:6 (emphasis added). The District Court's order ignores this testimony.[7]

### C. Plaintiff Davis

Plaintiff Davis visited Labcorp PSCs in Philadelphia prior to the kiosk rollout and had no issues checking in at the front desk. 6-ER-1443-1444 at 20:24-21:7; 6-ER-1449 at 26:5-22. Plaintiff Davis claims that he visited Labcorp's PSCs in Philadelphia, Pennsylvania on multiple occasions—including on October 11, 2016, December 23, 2017, and March 28, 2018—and attempted to check-in at the desk on each occasion but was told by an employee that he needed to use the kiosk for check-in. 6-ER-1476-1477 at 53:10-16, 54:8-12. Plaintiff Davis's recollection cannot be wholly accurate: on October 11, 2016, for example, no Labcorp PSC had introduced a kiosk for check-in. 3-ER-0373 at 83:3-11. If a PSC employee in fact told Mr. Davis he must use the kiosk to check in on the other two instances, those individual instances would have violated Labcorp policy. *See* 3-ER-0378.

Plaintiff Davis does not dispute that each time he visited a Labcorp PSC, he was able to receive the medical diagnostic testing services his doctor ordered. 6-ER-1500 at 77:18-22. Moreover, since 2019, Davis has been checking in online before

---

[7] Labcorp moved for summary judgment as to Plaintiff Vargas's claims for lack of standing. *See* 2-ER-0152; 2-ER-0162; 2-ER-0187-0189. Determination on that motion has been stayed, along with the underlying case, pending this appeal.

he arrives at a PSC, and no longer needs to check in at the PSC. 6-ER-1482-1483 at 59:17-60:3. The District Court's order ignores the point that Davis, and likely many members of the certified Unruh Act damages class, check-in prior to arrival at a PSC and thus have no need to check-in at a kiosk or at the desk.

## IV. Expert Testimony At Issue In Certification Motion

The District Court also had before it testimony from three expert witnesses that should have led it to deny certification.

### A. Plaintiffs' Accessibility Expert – Rachel Bradley Montgomery

On behalf of Plaintiffs, Ms. Montgomery opined that the Labcorp check-in kiosks are not independently accessible to blind users because the kiosks do not provide for audio alternatives to access visual content. 4-ER-0682-0685. According to Ms. Montgomery, adding technologies such as VoiceOver application and AudioNav keyboards, would help with "**increasing** the accessibility for blind users." *See* 4-ER-0683 (emphasis added). In her deposition, however, Ms. Montgomery admitted that the technologies she proposed would not make the kiosks fully and independently accessible for all legally blind persons. 3-ER-0424-0425 at 106:3-17, 109:12-21.

Further, Ms. Montgomery conceded that she has no information as to the actual preferences of legally blind persons for checking in at PSCs (3-ER-0425 at 109:4-14), and conceded that she has no information that checking in via kiosk

16

would be faster than checking in with the front desk, given that individual situations would vary.  3-ER-0426 at 144:6-10.

### B.    Plaintiffs' Numerosity Expert – Sean Chasworth

Plaintiffs proffered Mr. Chasworth regarding the number of legally blind patients in Plaintiffs' proposed classes.  Mr. Chasworth did not present any facts or methodology to identify legally blind persons in general, let alone to identify legally blind persons who visited a PSC when that PSC had an operational check-in kiosk. *See* 3-ER-0431 at 53:19-55:19.  He lacked any methodology to show how any legally blind person checked-in (or attempted to check-in) for his or her appointment. 3-ER-0435-0436 at 131:3-132:5; 3-ER-0437-0438 at 185:20-186:19.

Uninhibited by a baseline of facts or methodology, Mr. Chasworth opined that approximately 87,500 legally blind persons per year nationally, and potentially 8,861 legally blind persons per year in California, were denied independent access to PSC check-in kiosks. 3-ER-0551-0557.  He then made a "conservative" estimate that there would be at least a $35.4 million dollar **per year** statutory penalty (at $4,000 per customer) for each year of the class period under the Unruh Act. 3-ER-0557.  Mr. Chasworth also opined that there might be far more legally blind PSC patients, guessing that there could be as many as 112,400 California legally blind residents in any particular year who would be entitled to Unruh Act statutory

17

damages. If it were accurate, this would increase the projected damages demanded by Plaintiffs twelve-fold, to almost half a billion dollars a year. *Id.*

### C. Defendant's Rebuttal Expert – Bruce Deal

Rebuttal expert Bruce Deal found that Mr. Chasworth overstated likely class membership with flawed statistical modeling and assumptions. 3-ER-0513-0514, ¶¶ 4-6. For example, Mr. Deal found:

- Despite available evidence that different individuals had different experiences, all of Mr. Chasworth's estimates assume that any legally blind individual visiting a Labcorp PSC necessarily would have attempted to use the check-in kiosk, been unable to do so, and been harmed as a result. 3-ER-0514, ¶ 5.

- All of Mr. Chasworth's estimates assume that any legally blind individual visiting a Labcorp PSC would necessarily visit a PSC with a functioning kiosk; however, kiosks were rolled out at PSCs over time; some PSCs do not have kiosks; and that there were periods of time where certain kiosks were not operational. *Id.*

- Even though there are numerous options for diagnostic testing (including other laboratories, physician groups, hospitals, etc.), for half his estimates Mr. Chasworth (without support) assumes that every single presumed blind person living in the same geographic area where at least one Labcorp PSC is located, visited a Labcorp PSC every year. *Id.*

As to the California sub-class particularly, Mr. Deal found that Mr. Chasworth's wide range of potential class membership stemmed from the unexplained application of different methodologies (3-ER-0514-0516, ¶¶ 7-13), the reliance on faulty assumptions (3-ER-0517-0519, ¶¶ 15-21), a failure to account for variation in kiosk availability (3-ER-0519-0521, ¶¶ 22-25), and a failure to consider

18

patients' individualized check-in experiences. 3-ER-0521-0522, ¶¶ 26-29. Mr. Deal's report was not referenced by the District Court in its certification orders.

## V.    Relevant Procedural History

Plaintiffs filed their initial Complaint on January 1, 2020, and the First Amended Complaint on September 3, 2020. 7-ER-1670-1731. After the close of discovery, on April 26, 2021, Plaintiffs filed a motion for class certification seeking to certify a nationwide injunctive relief class and a California-only damages class. Pursuant to the District Court's Standing Order, the motion was filed with Defendant's Opposition in a joint format. 7-ER-1605-1669. The parties provided supplemental briefs on May 13, 2021. 2-ER-0294-0317. Labcorp provided the District Court with notice of supplemental authority on July 2, 2021 (2-ER-0262-0293) and December 10, 2021 (2-ER-0222-0261).

On May 23, 2022, without holding oral argument on the certification motion, the District Court issued an order granting Plaintiffs' motion for class certification. 1-ER-0042-0066. The District Court initially certified the following classes (8-ER-1835):

> **Nationwide Injunctive Class:**  All legally blind individuals in the United States who visited a LabCorp patient service center in the United States during the applicable limitations period and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.

19

**California Class:** All legally blind individuals in California who visited a LabCorp patient service center in California during the applicable limitations period and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals.

On June 6, 2022, Labcorp timely petitioned this Court pursuant to Federal Rule of Civil Procedure 23(f) to appeal the District Court's class certification order. 8-ER-1782-1808. A week later, on June 13, 2022, the District Court issued an amended certification order that added a footnote stating it did "not constitute a material change in the court's Order Re: Motion for Class Certification." 1-ER-0016-0041. Three days after that, on June 16, 2022, Plaintiffs filed a motion with the trial court asking it to "refine" their class definitions (2-ER-0123-0147), and on August 4, 2022, the District Court modified the class definitions to those described in Part VI below. 1-ER-0004-0015.

In its August 4, 2022 Order, the District Court stated that "this [refinement] Order does not materially alter the composition of the class or materially change in any matter the Amended Order Re: Motion for Class Certification" that is the subject of this appeal. 1-ER-0014.[8] On August 8, 2022, Labcorp provided this Court with

---

[8] In "further refining the class definition," the District Court expressly "incorporate[d] its Order of June 13, 2022". 1-ER-0004. That June 13, 2022 order, in turn, expressly incorporated the May 23, 2022 Order on Class Certification that was the foundation of this appeal.

20

a Notice Regarding District Court's Order Re: Motion to Refine Class Definition (7-ER-1732-1748) and requested that this Court exercise its discretion under Rule 23(f) and grant review of the District Court's May 23, 2022 class certification order, as amended on June 13, 2022 and refined on August 4, 2022. 7-ER-1733.

On September 22, 2022, this Court granted Labcorp's petition for permission to appeal the District Court's certification order. 8-ER-1923. On September 28, 2022, the District Court entered an order staying the action pending a final ruling from this Court on Labcorp's Rule 23(f) appeal of the class certification order. 1-ER-0002-0003. The parties were released from the Ninth Circuit's mediation program on March 9, 2023. Dkt. 19.

## VI. The Final Class Definitions

The class definitions as modified by the Court on August 4, 2022, and that are subject to this appeal, are as follows:

### Nationwide Class

All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, and who, due to their disability, were unable to use the LabCorp Express Self-Service kiosk.

### California Subclass

All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period and who, due

> to their disability, were unable to use the LabCorp Express Self-Service kiosk.

1-ER-0014. In settling on these definitions, which modified Plaintiffs' proposed new definitions, the District Court held that "the revised class definition does not impact the court's determinations regarding class certification." 1-ER-0011.

## <u>SUMMARY OF ARGUMENT</u>

**<u>First</u>**, the District Court manifestly erred in certifying Plaintiff Vargas's California damages class because the record evidence establishes that a substantial portion of the subclass, including Vargas himself, lacks Article III and Unruh Act standing. Moreover, as is evident from the experiences of just the three named Plaintiffs, individualized issues will predominate, as another district court correctly recognized when assessing similar California damages claims brought by Plaintiff Vargas against Labcorp's competitor, Quest Diagnostics. *See Quest Diagnostics Clinical Labs., Inc.,* 2021 WL 5989958, at *9 (C.D. Cal. Dec. 2, 2021) (denying certification of the California 23(b)(3) damages class after coming "to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class").

The certified class includes any legally blind Californian who would not be able to use the stand-alone kiosk "due to their disability," whether or not that inability to use a kiosk embarrassed or discomforted the person or created a difficulty with checking in. As the *Quest* judge correctly recognized, the Unruh Act provides

22

statutory damages only if plaintiffs were **actually injured** by the alleged ADA violation, and individual determinations will abound regarding whether a legally blind person actually encountered difficulty, discomfort, or embarrassment by not being able to use the kiosk to check in.

The 23(b)(3) damages class also fails on grounds of adequacy, typicality, and superiority, and further is not certifiable under recent Supreme Court precedent, ignored by the District Court, that precludes certification when class members' actual injury and Article III standing cannot be assessed without individualized inquiries. *See* Argument Part I.

<u>**Second**</u>, the District Court manifestly erred in certifying an ADA injunctive relief class under Rule 23(b)(2) because Plaintiffs did not establish that their claims are typical of other class members, and did not meet their burden of showing that a common remedy exists to support an injunctive relief class. Plaintiffs' own accessibility expert conceded that Plaintiff Vargas's and Plaintiff Davis's personal technological software/hardware preferences are not "fixes" for the legally blind community. Plaintiffs made no showing that they could seek a single injunction with regards to the kiosks that can render such technology independently accessible to all (or even a large majority) of legally blind individuals. Further, Plaintiff ACB's corporate representative admitted that ACB's preference would be to retain a front-

23

desk check in process—which is what Labcorp already does.[9]  Where a separate

front-desk check-in with a PSC employee is available, and when there is no common

remedy involving the kiosk alone that can render it fully accessible to all (or even

most) legally blind persons, the 23(b)(2) injunctive relief class should not have been

certified.  *See* Argument Part II.

**Third**, in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,

this Court held that "[a district] court may not . . . create a 'fail safe' class that is

defined to include only those individuals who were injured by the allegedly unlawful

conduct."  31 F.4th 651, 669 n.14 (9th Cir. 2022) ("*Olean*").  The District Court did

precisely that.  While the District Court in its August 4, 2022 order modified the

previously certified fail-safe class definitions to try to avoid the fail-safe issue, the

continued and improper fail-safe nature of both certified classes is apparent.  The

certification order should be reversed for this reason as well.  *See* Argument Part III.

---

[9] The facts on this point thus are very different from those at issue in the *Quest* litigation (where the judge certified an injunctive relief class), given that the court there found that **Quest PSCs do not have a separate front-desk check in option.** There, Plaintiff Vargas was required to check in at a kiosk, without any assistance. *See Quest*, 2001 WL 5989958 at *6.  The District Court below, which had clearly reviewed the *Quest* order, appears confused throughout its order about the very different facts here:  not only does Labcorp have a front desk check in option, but also front desk check in is used by a significant number of PSC customers and was used by Plaintiff Vargas, who checked in at the front desk.  *See* 6-ER-1382-1383 at 37:13-38:6.

## STANDARD OF REVIEW

A district court's grant or denial of class certification is reviewed for abuse of discretion. *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018). A class certification order is an abuse of discretion if the district court applied an incorrect legal rule or if its application of the correct legal rule was based on a "factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014).

Any underlying determinations of law are reviewed *de novo, Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010), and any underlying determinations of fact are reviewed for clear error. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 926 (9th Cir. 2019).

## ARGUMENT

I.  **THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING THE UNRUH ACT DAMAGES CLASS BECAUSE MANY CLASS MEMBERS LACK ARTICLE III STANDING AND BECAUSE COMMON ISSUES DO NOT PREDOMINATE.**

    A.  **The District Court Manifestly Erred In Failing To Consider Evidence That Many Rule 23(b)(3) Damages Class Members Would Lack Standing To Proceed.**

As the United States Supreme Court recently held, "under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely*

25

*harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC*, 141 S. Ct. at 2205 (emphasis in original). This Court recently recognized *TransUnion*'s directive that "[e]very class member must have Article III standing in order to recover individual damages," and cautioned: "Rule 23 also requires a district court to determine whether individualized inquiries into this standing issue would predominate over common questions." *Olean*, 31 F.4th at 669 n.12 (quoting *TransUnion*, 141 S. Ct. at 2208).[10] These principles present two insurmountable hurdles for Plaintiffs. First, the record evidence establishes that Plaintiff Vargas, and many class members, were not concretely harmed and thus lack standing. Second, any inquiry into whether each class member suffered concrete harm required for standing to claim Unruh Act damages is inherently individualized and thus not susceptible to class-wide proof.

Plaintiff Vargas—the sole representative of the Unruh Act subclass— experienced no cognizable injury related to the kiosk: he never even attempted to interact with the kiosk and instead checked-in in person at the front desk. *See* 6-ER-

---

[10] In *Olean*, the *en banc* majority upheld a certification order, finding that Plaintiff's expert had offered sufficient evidence of classwide injury in an antitrust case to get past the certification stage. *See Olean*, 31 F.4th at 680-682. Three justices dissented, opining that the defense expert was credible, and had offered evidence that 28% of class members were not injured; that anything more than a *de minimus* amount of persons lacking Article III standing should doom certification; and that the district court should have addressed this "battle of the experts" during the certification proceedings. *Id.* at 692 (dissent).

1382-1383 at 37:13-38:6. "[A] plaintiff in an ADA case may establish standing 'either by demonstrating deterrence or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility.'" *Gomez v. Como*, 2022 WL 1082016, *1 (C.D. Cal. Apr. 11, 2022) (quoting *Chapman v. Pier 1 Imports (U.S.) Inc*., 631 F.3d 939, 944 (9th Cir. 2011)). In *Chapman*, the Ninth Circuit explained that to establish an injury-in-fact, a plaintiff must encounter a barrier that "affects the plaintiff's full and equal enjoyment of the facility on account of his particular disability." *Id*. at 947. Vargas was neither deterred from using Labcorp's testing services nor suffered any injury-in-fact that is "concrete and particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Without standing to assert his own claims (*see* fn. 7 *supra*), Vargas cannot represent a damages sub-class.

This problem, moreover, does not end with Vargas. There is no record evidence that *anyone* in the Unruh Act class was deprived of accessing Labcorp's medical testing services. And even if the kiosk itself is considered a "service," Plaintiffs' evidence is limited to **19 complaints** attributable to California PSCs, when it is known that there were more than **10.29 million visits** to California PSCs just in one three-year portion of the class period. 3-ER-0506. On the other hand, the record establishes that during the six months between August 2020 and February 2021, 24.5% of PSC visitors checked-in at the desk with a PSC employee and 10% of patients checked-in online before arriving at a PSC. 3-ER-0509. Plaintiff ACB

27

prefers an in-person check-in option, and ACB member Mr. Harden similarly prefers in-person check-in. 3-ER-00406 at 78:6-9. This record simply cannot support a finding that all class members – or even a substantial portion of them – suffered concrete injury, and thus meet the *TransUnion* standard or Unruh Act requirements.

Notably, this problem would not go away even if Plaintiffs had adduced additional record evidence of harm (which they did not). As this Court has recognized, standing issues may require "individualized inquiries [that] predominate over common questions." *Olean*, 31 F.4th at 669 n.12. Such is the case here. If each class member brought individual cases, Labcorp would be entitled to evidence on whether the plaintiff visited a Labcorp PSC (versus had a sample collected elsewhere), how the plaintiff checked in (online, kiosk, at the desk), whether the plaintiff encountered any difficulties in checking in (which might vary with staffing levels, time of day, how busy the PSC was, etc.), and whether the plaintiff received the testing services ordered. Each of these standing issues is individualized; none can be adjudicated on a classwide basis.

The District Court did not address *TransUnion* or *Olean*'s standing analysis, or the Article III standing issue generally – even though Labcorp specifically addressed the anticipated *TransUnion* decision in its briefing (1-ER-0042-0066; 7-ER-1635 at 28:26-28), and provided the decision to the District Court when it issued. 2-ER-0262-0293. But the import of these cases are clear: when it is likely that a

28

vast majority of putative class members have no actual injury, and proving otherwise requires an individualized inquiry, a damages class cannot be certified.

### B. The District Court Misapprehended The Facts Showing That Common Issues Do Not Predominate.

California law requires an individualized inquiry to determine whether a claimant is entitled to recover statutory damages under the Unruh Act. Settled law forbids class certification over these individualized issues. And while the District Court certified the class based on applying one, outlier precedent, that precedent does not fit the facts here—a conclusion supported by the *Quest* court's decision rejecting certification of a damages class on similar facts. Further, the District Court's analysis was predicated on allegations from Plaintiffs' complaint that are contradicted by admissible record facts. The individualized issues of proof in this case render class wide adjudication impossible and the District Court manifestly erred in certifying the California subclass.

### 1. Unruh Act actions require individualized proof.

As courts in this circuit have explained, an ADA violation alone does not entitle a putative class member to statutory damages under California's own disability laws. *See Vondersaar v. Starbucks Corp.*, 2015 WL 629437, at *3 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018) ("each class member must show how he or she was personally affected and was denied full and equal access by the defendant."); *see also Moeller v. Taco Bell* Corp., 2012 WL 3070863

at *5 (N.D. Cal. Jul. 26, 2012); *Botosan v. Paul McNally Realty,* 216 F.3d 827, 835 (9th Cir. 2000) ("[I]n order to maintain an action for damages under the Unruh Civil Rights Act, 'an individual must take the additional step of establishing that he or she was denied access on a particular occasion.'") (quoting *Donald v. Cafe Royale, Inc*., 266 Cal.Rptr. 804, 813 (1990)).

Here, Plaintiff Vargas seeks to represent a subclass of California legally blind persons who were unable to check in at Labcorp's kiosks due to their disability. But even if Vargas presented evidence that checking in at the front desk caused him difficulty, discomfort, or embarrassment (which he did not), his own experience cannot be imputed to other California residents. California residents can be entitled to Unruh Act statutory damages only if they personally encountered the ADA violation and experienced difficulty, discomfort, or embarrassment. *See, e.g., Doran v. 7-Eleven, Inc*., 509 F. App'x 647, 648 (9th Cir. 2013) (affirming denial of statutory damages under the Unruh Act because the plaintiff did not prove he personally encountered violation and experienced difficulty, discomfort, or embarrassment). The individualized inquiries required to ascertain whether each class member is entitled to seek damages under the Unruh Act preclude certification here.

As explained by the court in *Urhausen v. Longs Drugs Stores Cal., Inc.*, an Unruh Act damages claim must be tied to an actual impairment from the alleged ADA violation: "Plaintiff's attempt to equate a denial of access with the presence

30

of a violation of federal or state regulations would nullify the standing requirement of Section 54.3, since any disabled person could sue for statutory damages whenever he or she encountered noncompliant facilities, **regardless of whether the lack of compliance actually impaired the plaintiff's access to those facilities**." 155 Cal. App. 4th 254, 265-66 (Cal. Ct. App. 2007) (emphasis added); *see also Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1223 (Cal. Ct. App. 2009) (same). Thus, not every denial of "full and equal access" can give rise to a cause of action for damages, which has a separate standing requirement relying on the individual facts of the encounter. *See, e.g., Strojnik v. Xenia Hotels & Resorts, Inc.,* 2020 WL 3060761, at *5 (N.D. Cal. June 9, 2020) (where plaintiff claimed hotel doors were not compliant with ADA, but did not allege that was the only entrance, "[a]t most, Strojnik merely alleged that Xenia's hotels were not fully compliant with the ADA. This, however, is insufficient to establish statutory standing for damages.").

In *Antoninetti v. Chipotle Mexican Grill, Inc*., the plaintiffs sought to certify Unruh Act statutory damages claims, alleging that wheelchair users were unable to participate equally in the "Chipotle experience" because defendant's service counters were too high and blocked their view of the food preparation. 2012 WL 3762440, *1 (S.D. Cal. 2012). The court denied class certification with respect to the plaintiffs' claim for damages under the Unruh Act because the plaintiffs could not meet the predominance requirements of Rule 23(b)(3) when damages were

inextricably intertwined with individualized liability questions: "It requires each class member to establish which Chipotle restaurant he visited, when he visited it, and whether he traveled the food service line -- all as to each particular occasion for which that class member seeks damages. . . . . Even if some of the factual issues could be resolved on a class-wide basis (e.g., if Plaintiffs could establish that all high counter walls were the exact same height), the issues regarding individualized proof would still predominate." *Id.* at *6.

Similarly, in *Moeller*, the court decertified a class action for damages under the Unruh Act which had previously been certified under F.R.C.P. 23(b)(2) in light of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*. 2012 WL 3070863 at *4 (citing *Wal-Mart Stores,* 564 U.S. at 359-60). The *Moeller* court found that the alleged California statutory damages were inextricably intertwined with individualized liability questions:

> An individual class member's claim for damages cannot be adjudicated simply by demonstrating the mere presence of an alleged non-compliant feature. **Each class member must show how she or he was personally affected and was denied full and equal access by the defendant**. . . . It is not only damages that are individualized, but also liability and causation, because the issue is whether an individual class member has any claim at all. Such fact-specific individual liability and damages questions cannot be determined on a classwide basis.

*Id.* at *5 (emphasis added).

32

When individualized experiences abound, courts in this circuit have properly denied certification of damages classes seeking statutory damages premised on alleged ADA violations. *See, e.g., Vondersaar*, 2015 WL 629437 at *4 (denying certification of Unruh damages class because "each class member must show how he or she was personally affected and was denied full and equal access by the defendant."), *aff'd*, 719 F. App'x at 659 ("class-wide issues do not predominate over the numerous individual questions posed by plaintiffs' Unruh Act claims, including whether a class member is disabled, which Starbucks store or stores he visited, how many visits he made, . . .and whether the class member was actually denied full and equal access."). *See also Moeller*, 2012 WL 3070863 at *14 (individual questions to assess availability of statutory damages would predominate).

These cases recognize a fundamental point: eligibility for statutory damages under California's disability laws depends on individualized proof because individual experiences are determinative of Unruh claims.

## 2. The record demonstrates the need for individualized proof.

The record reflects varying and individualized experiences, even among the three named Plaintiffs and Mr. Harden, an ACB member. For example, Plaintiff Vargas did not encounter a check-in kiosk at all, was checked-in in person by the PSC staff, received the testing his doctor ordered, but appears to assert that he was entitled to use the kiosk as a stand-alone service; Mr. Harden has no desire to use

33

the kiosk and regularly checks-in through staff at the front desk, which is his preference; Plaintiff ACB also prefers a front-desk check-in option; Plaintiff Davis alleges he was directed to use a kiosk (contrary to Labcorp policy), but received the services his doctor ordered, and has since regularly checked-in through an online option. *See, generally,* Statement of the Case Parts I-IV above. Determining whether any of these varying experiences constituted an ADA violation, let alone satisfied the higher bar posed by an Unruh Act damages claim, cannot be performed on a class wide basis. *See Vondersaar*, 2015 WL 629437 at *3 (denying certification of Unruh damages class because "each class member must show how he or she was personally affected and was denied full and equal access by the defendant.").

If class certification were upheld, the individualized inquiries posed by these handful of claimants would be magnified enormously. More than 10.29 million visits occurred at California PSCs just between January 2018 and December 2020. *See* 3-ER-0506. Each of those visits presented its own facts: some patients, like Mr. Harden, have no interest in using a kiosk and prefer to check-in with a person; not all California PSCs had operational kiosks at all times during the class period (3-ER-0366 at 40:3-12); staffing varies widely depending on location and a PSC's size, so that some locations have a dedicated patient intake representative ("PIR") who sits full time at the front desk to check in patients while others have a varying number of phlebotomists to conduct both check in and testing (3-ER-0369-0372 at 47:22-

48:4, 78:3-8; 79:12-21), and some PSCs are located inside Walgreens stores where there is always a dedicated Walgreens staff member to assist patients. *Id*. Moreover, upwards of 10% of PSC patients check-in online before arriving at the PSC, and would not need to check in at the PSC at all. 3-ER-0509.

The varied experiences at PSCs would require detailed and individualized findings to assess whether any claimant was entitled to Unruh Act damages. At a minimum, Labcorp would be entitled to explore with each class member:

- whether he or she is legally blind,

- which PSC(s) he or she visited,

- when he or she visited,

- how many times he or she visited the PSC(s),

- whether a check-in kiosk was operational during each visit,

- whether he or she attempted to use the kiosk to check-in or intended all along to check in at the front desk, or even knew that a kiosk existed at the PSC,

- whether he or she was embarrassed or discomforted in trying to use the kiosk, which in turn could depend on how many and what other patients were present, and

- whether he or she was actually denied full and equal access to the PSC's goods and services during the visit due to his or her disability.

35

Just like in *Moeller*, *Antoninetti*, *Vondersaar* and *Quest* (on claims by the same Plaintiff), the individualized inquiries necessary to examine each of these issues defeats predominance for Plaintiff Vargas's statutory damages class.[11]

### 3. The District Court's analysis ignored Unruh Act case law demonstrating that an Unruh Act damages claims require individualized proof.

Despite the abundant relevant Unruh Act case law, the District Court instead followed one outlier decision from the Northern District, in which a court certified an Unruh Act class (albeit at a time when fail-safe class definitions were permitted, and long before *TransUnion* issued): *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562 (N.D. Cal. 2018). The *Nevarez* case, however, involved claims of physical barriers to entry in a single location (the 49ers stadium) by a defined group of ticket-holders who had purchased specific, accessible seating. *Id*. at 586. Thus, *Nevarez* dealt with a single facility and a set of identifiable class members who sought the same kind of physical access to that facility.

---

[11] Such predominance considerations based on individualized inquiries remain crucial to consider in the certification phase, even though this Circuit does not have freestanding administrative feasibility requirement. *See Walker v. Life Ins. Co. of the Sw.,* 953 F.3d 624, 633 (9th Cir. 2020) ("*Briseno* [*v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017)] was narrow in focus. The case does not expressly excuse a district court from considering exposure under the predominance rubric. *Briseno*, in fact, did not directly bear on predominance at all.").

By contrast, Plaintiffs' claims here deal with hundreds of locations (in California alone), an unidentified set of visits by legally blind patients that are tucked somewhere within the broader tens of millions of PSC visitors, and varying accommodation preferences within that undefined group. The *Nevarez* court did not need to grapple with hundreds of locations, each with their own staffing and kiosks. It did not need to somehow identify who fit within the class, with no non-speculative record evidence to support that point. And it was not forced to confront a situation where the alleged *violation claimed* by a named Plaintiff (checking in through a person at the front desk instead of through an electronic kiosk), is the *accommodation preferred* by another named Plaintiff and untold numbers of the class. The District Court's reliance on *Nevarez* and rejection of the prevailing Unruh Act case law was error.

For similar reasons, the *Quest* Court rejected Plaintiffs' reliance on *Nevarez*:

> The critical facts that allowed for class certification in *Nevarez,* however, are not present here. Unlike in *Nevarez*, this case does not involve one big building; it involves hundreds of small ones. . . . Issues such as whether a patient service center had a fully operative kiosk on the date of a putative class member's visit will therefore require individualized inquiries. . . .
>
> Under Vargas's theory of the case each putative class member must show only (1) that he or she is legally blind and (2) that he or she visited a patient service center with a kiosk and without a staffed desk (3) during the class period. Under these circumstances, however, demonstrating these basic factual elements will still essentially require each putative class member to litigate her own individual Unruh Act case. Vargas's expert

37

> estimates that, at a minimum, nearly three million patients attempted to use a Quest kiosk each year of the class period. Vargas's expert likewise estimates that fewer than .5% of these patients are putative class members. **Without at least a proxy for determining class membership to narrow the scope of the individualized inquiry, the Court comes to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class.**

*Quest,* 2021 WL 5989958 at \*9 (emphasis added). As Labcorp noted in its Rule 23(f) petition, two district courts considering Unruh Act claims in such similar situations cannot both be correct on the law, when one judge finds that predominance has been met and one does not. Labcorp submits that it was the District Court in its case that erred in applying the law to the facts before it.

Moreover, under the *Quest* Court's analysis and interpretation of the law, Labcorp's facts present even more significant hurdles to class certification (and liability) than the facts underlying the *Quest* Court denial of certification. *Compare Quest*, 2021 WL 5989958 at \*6 ("Vargas, like other putative class members who filed complaints with Quest and with the American Council for the Blind, encountered an inaccessible kiosk and was not offered an auxiliary aid or service— even assistance from a Quest phlebotomist—to allow him equal access to Quest's services.") *with* 6-ER-1382-1383 at 37:13-38:6 (Vargas's testimony here, stating he was advised by Labcorp, "[a]ll I needed to do was come to the window or the desk at the date of the appointment, you know, the day that I needed the service, and that they would make someone available to help me with the check-in process," and

38

further admitting "no one at Labcorp told [him] that checking in at the kiosk was the only option for checking in" and "the other option is to check in with a person at the desk.").

### 4. The District Court's factual findings based on mere allegations are contradicted by evidence on record.

In issuing its certification order, the District Court also improperly accepted allegations **from Plaintiffs' complaint** that were contradicted by the actual record evidence. That is not proper. *See Wal-Mart Stores*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule"). For example, the District Court cited to allegations in Plaintiffs' complaint that personal information must be provided at check in, and that legally blind persons are required to "divulge their personal information to [a] sighted person in a nonconfidential setting in order to register." 1-ER-0018-0019. The record evidence, however, entirely refutes that finding. Indeed, Plaintiff Vargas testified that he was not required to provide his personal information in a non-confidential way in order to check-in. (6-ER-1367 at 22:14-19; 6-ER-1371-1373 at 26:3-28:10.) Similarly, the District Court accepted **as fact** Plaintiffs' assertion that Labcorp trained its employees that all patients must check-in through the kiosk. 1-ER-0024. In reality, the record is clear that a substantial number of visitors to Labcorp PSCs check in with a person at the front desk, including Mr. and Mrs. Harden and Plaintiff Vargas, and that Plaintiff Davis

has been checking in online since 2019.  3-ER-00406 at 78:6-9; 6-ER-1382-1383 at 37:13-38:6.

A large part of the District Court's commonality analysis came from its mistaken belief that there was evidence that "Labcorp trained its employees that the use of the kiosks to check-in was mandatory" (*see* 1-ER-0009; 1-ER-0011, noting that "mandatory kiosk check-in" was part of its commonality finding), even though the evidence before the Court was that Labcorp's policy is that Plaintiff Vargas checked in at the front desk and that patients may check-in either at the kiosk or with a person at the front desk.  *See* Part III.C above; *see also* 4-ER-0909 (front desk check-in is provided for persons who did not, cannot, or will not use kiosk).

The District Court's class certification order thus is at odds with Supreme Court precedent which requires Plaintiffs to affirmatively demonstrate through evidence their compliance with Rule 23.  *See Wal-Mart Stores,* 564 U.S. at 350. Pulling facts central to the class certification order out of unsupported allegations and assertions, while overlooking actual record facts which contradict those allegations, is a manifestly erroneous way to certify a class.

For all the reasons detailed above, the District Court manifestly erred in finding that common issues predominated, and the order certifying an Unruh Act class should be reversed.  *See, e.g., Van v. LLR, Inc*, 61 F.4th 1053, 1067 (9th Cir. 2023) (vacating certification order and remanding action for district court to re-

assess whether plaintiff proved preponderance of the evidence when defendant provided evidence showing there "could be a class-member-by-class-member adjudication"); *see also Bowerman v. Field Asset Services, Inc*., 60 F.4th 459, 469 (9th Cir. 2023) (ordering the de-certification of a class action where the trial of the individualized issues would be "prohibitively cumbersome" and the plaintiff had failed to prove that the class issues nevertheless predominated over the individualized issues).

### C. The District Court Failed To Apply The Correct Law To The Facts When Finding That Plaintiffs Met The Typicality and Adequacy Requirements For Class Certification.

To satisfy Rule 23's typicality and adequacy of representation requirements, Plaintiffs must demonstrate (and the District Court was required to find) that they are "part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 156 (1982) (quotation omitted); *Mielo v. Bob Evans Farms, Inc.*, 2015 WL 1299815, at *9-10 (W.D. Pa. Mar. 23, 2015) (finding that variations in class member experiences at Bob Evans' parking lots meant that plaintiff was not typical because some plaintiffs would not have the same claimed injury). Because the experiences of the named Plaintiffs and class members varied significantly, Plaintiffs did not meet this standard.

First, as already detailed above, the named Plaintiffs did not "suffer the same injury" as each other, let alone the various class members. Plaintiff Vargas never

41

interacted with a kiosk; Plaintiff Davis has checked-in online since 2019; Plaintiff ACB prefers the in-person check-in option already offered by Labcorp; ACB-member Mr. Harden similarly prefers Labcorp's existing check-in methods. There is no evidence in the record indicating that the accommodations preferred by class members are more uniform, and common sense dictates that a class of thousands of individuals will reflect far more individualized variation than exist among a handful of named Plaintiffs. Indeed, Plaintiff ACB acknowledges that having a check-in kiosk is just one possible option as a reasonable accommodation, another being front desk check in. 3-ER-0406. The named Plaintiffs' experiences and "injury" are not typical even of each other, and cannot by typical of an entire class.

Liability facts similarly render the named Plaintiffs atypical. Take Plaintiff Vargas, for example, who did not approach a kiosk, but rather was checked-in at the desk after waiting in a short line. Even if this experience gives rise to a technical ADA violation, which it does not, liability would still turn on his (and every other class member's) precise experience – how long was his wait; what exactly did the phlebotomist say to him; what other patients surrounded him, potentially contributing to any discomfort or embarrassment? Each of these questions will have different answers, depending on the PSC in question, the time of day, how busy the PSC happened to be, the specific staff member working that day, and a host of other questions. *See Wal-Mart Stores*, 564 U.S. at 350 ("What matters to class

42

certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to general common *answers* to apt to drive the resolution of the litigation.") (citation omitted). In this varied, individualized context, the named Plaintiffs' experiences cannot be typical.

The membership of the classes the District Court certified confirms these points. Under the District Court's order, the certified classes would include legally blind patients who, like Mr. Harden, preferred to and did check-in with a person at the front desk; who checked-in online; and who visited a PSC during a time when the kiosks were not working. These class members suffered no injury attributable to a kiosk, and thus cannot be said to have "suffered the same injury" as any named Plaintiff (if any Plaintiff can be said to have suffered injury).

To be sure, the *Quest* court found that the plaintiffs in that case satisfied typicality for certification of an ADA class because Plaintiff Vargas "like other putative class members who filed complaints with Quest and with the American Council for the Blind, encountered an inaccessible kiosk ***and was not offered an auxiliary aid or service—even assistance from a Quest phlebotomist***—to allow him equal access to Quest's services." *Quest*, 2021 WL 5989958 at *6 (emphasis added). But this only highlights a crucial distinction: **in this case, Plaintiff Vargas was checked in at the front desk by a Labcorp phlebotomist**. Unlike in Quest service centers, all Labcorp PSCs have PIRs and/or phlebotomists available to check-in

patients who cannot or prefer not to use the kiosks – and the record shows that 24.5% of PSC visitors in at least one six month timeframe checked-in at the desk. The *Quest* decision magnifies why Plaintiffs cannot satisfy typicality on this record.

Thus, applying the law to the record facts here, it is clear that the District Court erred in finding that Plaintiffs met their typicality requirement for certification under Rule 23. Because they did not meet typicality requirements, Plaintiffs are inadequate class representatives as well. *See Falcon,* 457 U.S. at 156 (commonality and typicality "both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement"); *Arthur v. United Industries Corp.*, 2018 WL 2276636, at *10 (C.D. Cal. May 17, 2018) (plaintiff inadequate representative where "plaintiff's injury appears distinct from the proposed class members' injuries, and insofar as it is unclear whether certain proposed class members suffered injury at all"). Thus, the certification order should be reversed.

### D. The District Court Misapplied The Law When Finding That Plaintiff Vargas' Damages Class Met Rule 23(b)(3)'s Superiority Requirements.

There is no record evidence regarding which persons visiting California PSCs during the multi-year class period (other than Plaintiff Vargas) are legally blind. Plaintiffs have proposed no way of identifying this population, and Labcorp is not aware of any method. The District Court brushed off this concern, stating that these issues can be determined "at a later stage of the proceedings" and "would not be an unduly burdensome task." 1-ER-0040. But it was Plaintiffs' burden to demonstrate that class procedures are superior. "Whether a class action will be manageable 'is, by . . . far, the most critical concern in determining whether a class action is a superior means of adjudication.'" *Lara v. First Nat'l Ins. Co. of Am.,* 25 F.4th 1134, 1138 (9th Cir. 2022) (quoting *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016)). And as the *Quest* court recognized, when a company knows who has visited, but does not have records "regarding its patients' visual impairments" (2021 WL 5989958 at *9), there is no manageable way to locate class members.

Further, the District Court erred in holding that, as a matter of law, the Unruh Act's statutory damages of $4,000 **per incident** were minimal and weighed in favor of certification, so as to make class procedures superior. 1-ER-0064. (citing *Nevarez,* 326 F.R.D. at 577). However, the *Quest* court, and other California district courts it cited (*see* 2021 WL 5989958 at *10) held the opposite, finding that $4,000

45

per incident statutory damages (with attorneys' fees available as well) were sufficient damages as a matter of law to weigh against a superiority finding. This is a question of law on which the District Court erred, and that requires reversal.

## II. THE DISTRICT COURT MANIFESTLY ERRED IN CERTIFYING THE NATIONWIDE INJUNCTIVE RELIEF CLASS.

Two errors infect the District Court's certification of a nationwide injunctive class under Rule 23(b)(2). First, for the reasons explained above, Plaintiffs cannot satisfy typicality or adequacy of representation. Second, there is no injunction – and Plaintiffs have not proposed one – that would provide a remedy to all class members.

Under settled Supreme Court precedent, an injunctive class cannot be certified when there is no injunction that will provide a remedy to all class members. *See Wal-Mart Stores*, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction … would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."); *Mielo*, 2015 WL 1299815 at *11 (Rule 23(b)(2) injunctive class could not be certified where "[plaintiff's] claims conflict with those of other class members who may not have suffered any injury" and where "[Defendant's] conduct is not such that it can be enjoined or declared unlawful only as to all of the class members or as to none of

46

them, nor can it answer the common question in one stroke."). Plaintiffs cannot meet this standard.

Plaintiff ACB, an advocate for over 20,000 members, has acknowledged repeatedly that a single injunction will not provide a relief to each member of the class, as *Walmart* requires:

> A:    No two people with a visual impairment need the same accommodation.
>
> …
>
> Q:    Is providing speech output, will that resolve the accessibility concerns of everyone that is blind or visually impaired?
>
> A:    No one accommodation is going to accommodate every person everywhere.
>
> Q:    Okay. Because everyone has different levels of impairment and different comfort levels with the technology that might be offered to accommodate their disability, correct?
>
> A:    Correct.

3-ER-0404-0405 at 22:21-22, 72:20-73:4. Plaintiffs' expert agreed, testifying that Plaintiffs' proposed technological changes would not create the "full and equal enjoyment" of the check-in kiosks. 3-ER-0424-0425 at 106:3-17, 109:12-21. Without more, these stark admissions defeat Plaintiffs' injunction class.

But there *is* more: the record is replete with evidence that check-in accommodations are an individualized and personal issue. What Plaintiff ACB and

47

Mr. Harden prefer (check-in with a person at the desk) differs from what Plaintiffs Vargas and Davis appear to prefer. Thus, if a single injunction mandated that Labcorp adopt a particular technology across the board in lieu of an in-person check-in option, that injunction would actually cause harm to some number of class members. Worse, absent an individualized inquiry into each class member (a set of people that Plaintiff cannot even identify), the Court could not even determine who would be harmed by the injunction.

Labcorp is a clinical laboratory that provides diagnostic testing to patients. There is no record evidence – none – that any legally blind patient was unable to obtain diagnostic testing as a result of Labcorp's existing check-in procedures. In this context, an injunctive class cannot provide a uniform, helpful remedy.

### III. THE DISTRICT COURT MANIFESTLY ERRED BY CERTIFYING FAIL-SAFE CLASSES.

Finally, the District Court's order must be reversed because the class definitions remain impermissibly fail-safe. In the Ninth Circuit, a "court may not . . . create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean*, 31 F.4th 651 at 669 n.14. A class definition is impermissibly "fail-safe" if it is defined so that "a class member either wins, or by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* at 669 n.14 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)). Stated differently, a fail-safe

48

class is "one that includes only those who are entitled to relief." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (emphasis omitted). A fail-safe class is "prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment." *Id.* (citation omitted). Accordingly, such classes are "palpably unfair to the defendant." *Kamar v. RadioShack Corp.*, 375 Fed. App'x 734, 736 (9th Cir. 2010).

After Plaintiffs recognized that the originally certified classes were fail-safe (2-ER-0123-0124) they proposed amended class definitions. The District Court crafted then its own new class definitions to encompass "All legally blind individuals . . . who, **due to their disability**, were unable to use the Labcorp Express Self-Service kiosk." 1-ER-0014. (emphasis added).

Plaintiffs' legal theory is that the ADA requires an independently accessible kiosk, and that desk check-in is not a reasonable accommodation. The new classes are designed to include **only** those persons who would succeed under this theory and "either win[] or, by virtue of losing, [are] defined out of the class and [are] therefore not bound by the judgment." *Olean*, 31 F.4th at n.14. For example, if members of the California class are shown to have no Unruh Act claim (because they never tried to use or wanted to use the kiosk, and so do not fit into a class of persons "who were unable to use" the kiosk), they will fall out of the proposed definition of persons "**unable to use**" the kiosk "due to their disability." That is precisely what is

49

forbidden by *Olean*'s fail-safe class proscription due to the "palpably unfair" result to Labcorp. *Kamar*, 375 Fed. App'x at 736.

The core of the new class membership is an inability "to use" a kiosk, so that any class member—particularly one asserting Unruh Act claims—would fall out of the class if he or she was unable to prove damage and proximate causation, and therefore ultimate liability. That is the definition of an impermissible fail-safe class. *See, e.g., Russell v. Tyson Farms, Inc*., 2020 WL 3051241, at *2 (N.D. Ala. Jun. 8, 2020), (striking fail-safe class definitions after noting, "[b]ecause the plaintiffs will be required to prove damages and proximate causation at trial, there runs the possibility of a set of plaintiffs who, unable to provide damages and proximate causation – and therefore ultimate liability – would, by virtue of that failure, not be included in the class. Consequently, those plaintiffs would not be bound by the judgment."). Under *TransUnion* and *Olean*, the District Court's fail-safe class definitions are an independent error of law, requiring reversal.

## **CONCLUSION**

For the foregoing reasons, Defendant-Appellant respectfully requests that the Order of the District Court granting class certification be reversed, in its entirety, and that this case be remanded for further proceedings.

Date: March 31, 2023          Respectfully submitted,

*/s/ Robert I. Steiner*

Robert I. Steiner
Becca Wahlquist
Glenn T. Graham

*Counsel for Defendant-Appellant*
*Laboratory Corporation of America*
*Holdings*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  22-55873

I am the attorney or self-represented party.

**This brief contains 11,952 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[XX] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [  ] it is a joint brief submitted by separately represented parties.

  [  ] a party or parties are filing a single brief in response to multiple briefs.

  [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Signature: */s/ Robert I. Steiner*            Dated: March 31, 2023

52

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**  22-55873

The undersigned attorney or self-represented party states the following:

[XX]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Signature: */s/ Robert I. Steiner*                    Dated: March 31, 2023

53

# ADDENDUM

## TABLE OF CONTENTS

| Statues And Regulations | |
|---|---|
| Title | Page Begin |
| **Federal Statues** | |
| **28 U.S.C.** | |
| § 1331 | ADD-1 |
| § 1367 | ADD-2 |
| **29 U.S.C.** | |
| § 794 | ADD-4 |
| **42 U.S.C.** | |
| § 12101 | ADD-5 |
| § 12103(1)(B) | ADD-7 |
| § 12182(b)(2)(A)(III) | ADD-8 |
| § 12188 | ADD-12 |
| § 18116 | ADD-15 |
| **Federal Regulations** | |
| **28 C.F.R.** | |
| § 36.303(C)(1) | ADD-17 |
| **Federal Rules** | |
| **Federal Rules of Appellate Procedure** | |
| Rule 5 | ADD-24 |

| | |
|---|---|
| **Federal Rules of Civil Procedure** | |
| Rule 23(b)(2) | ADD-29 |
| Rule 23(b)(3) | ADD-30 |
| Rule 23(f) | ADD-34 |
| **California Civil Code** | |
| § 51 | ADD-66 |
| § 54 | ADD-94 |
| § 55.56(C) | ADD-115 |

United States Code Annotated
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
Part IV. Jurisdiction and Venue (Refs & Annos)
Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1331

§ 1331. Federal question

Currentness

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 930; Pub.L. 85-554, § 1, July 25, 1958, 72 Stat. 415; Pub.L. 94-574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub.L. 96-486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

28 U.S.C.A. § 1331, 28 USCA § 1331
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-1

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  In re Mid-Continent Electric, Inc.,  Bkrtcy.M.D.Fla.,   Apr. 11, 2002

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1367

§ 1367. Supplemental jurisdiction

Currentness

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

**(b)** In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

  **(1)** the claim raises a novel or complex issue of State law,

  **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

  **(3)** the district court has dismissed all claims over which it has original jurisdiction, or

  **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

**(d)** The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

ADD-2

**(e)** As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

**CREDIT(S)**

(Added Pub.L. 101-650, Title III, § 310(a), Dec. 1, 1990, 104 Stat. 5113.)

28 U.S.C.A. § 1367, 28 USCA § 1367
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-3

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 29. Labor
        Chapter 16. Vocational Rehabilitation and Other Rehabilitation Services (Refs & Annos)
            Subchapter V. Rights and Advocacy (Refs & Annos)

29 U.S.C.A. § 794a

§ 794a. Remedies and attorney fees

Effective: January 29, 2009
Currentness

**(a)(1)** The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k)) (and the application of section 706(e)(3) (42 U.S.C. 2000e-5(e)(3)) to claims of discrimination in compensation), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

**(2)** The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

**(b)** In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

**CREDIT(S)**

(Pub.L. 93-112, Title V, § 505, as added Pub.L. 95-602, Title I, § 120(a), Nov. 6, 1978, 92 Stat. 2982; amended Pub.L. 111-2, § 5(c)(1), Jan. 29, 2009, 123 Stat. 6.)

Notes of Decisions (377)

29 U.S.C.A. § 794a, 29 USCA § 794a
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-4

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)

42 U.S.C.A. § 12101

§ 12101. Findings and purpose

Effective: January 1, 2009

Currentness

**(a) Findings**

The Congress finds that--

**(1)** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

**(2)** historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

**(3)** discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

**(4)** unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

**(5)** individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

**(6)** census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

**(7)** the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

ADD-5

**(8)** the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

**(b) Purpose**

It is the purpose of this chapter--

**(1)** to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

**(2)** to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

**(3)** to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

**(4)** to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

**CREDIT(S)**

(Pub.L. 101-336, § 2, July 26, 1990, 104 Stat. 328; Pub.L. 110-325, § 3, Sept. 25, 2008, 122 Stat. 3554.)

42 U.S.C.A. § 12101, 42 USCA § 12101
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

*End of Document*          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.          2

ADD-6

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)

42 U.S.C.A. § 12103

§ 12103. Additional definitions

Effective: January 1, 2009

Currentness

As used in this chapter:

**(1) Auxiliary aids and services**

The term "auxiliary aids and services" includes--

**(A)** qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

**(B)** qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;

**(C)** acquisition or modification of equipment or devices; and

**(D)** other similar services and actions.

**(2) State**

The term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands of the United States, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.

**CREDIT(S)**

(Pub.L. 101-336, § 4, as added Pub.L. 110-325, § 4(b), Sept. 25, 2008, 122 Stat. 3556.)

42 U.S.C.A. § 12103, 42 USCA § 12103
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.



ADD-7

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter III. Public Accommodations and Services Operated by Private Entities (Refs & Annos)

42 U.S.C.A. § 12182

§ 12182. Prohibition of discrimination by public accommodations

Currentness

**(a) General rule**

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

**(b) Construction**

**(1) General prohibition**

**(A) Activities**

**(i) Denial of participation**

It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

**(ii) Participation in unequal benefit**

It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

**(iii) Separate benefit**

It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such

ADD-8

action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.

### (iv) Individual or class of individuals

For purposes of clauses (i) through (iii) of this subparagraph, the term "individual or class of individuals" refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement.

### (B) Integrated settings

Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.

### (C) Opportunity to participate

Notwithstanding the existence of separate or different programs or activities provided in accordance with this section, an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different.

### (D) Administrative methods

An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration--

(i) that have the effect of discriminating on the basis of disability; or

(ii) that perpetuate the discrimination of others who are subject to common administrative control.

### (E) Association

It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

## (2) Specific prohibitions

### (A) Discrimination

For purposes of subsection (a), discrimination includes--

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges,



ADD-9

advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

**(ii)** a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

**(iii)** a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

**(iv)** a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

**(v)** where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

**(B) Fixed route system**

**(i) Accessibility**

It shall be considered discrimination for a private entity which operates a fixed route system and which is not subject to section 12184 of this title to purchase or lease a vehicle with a seating capacity in excess of 16 passengers (including the driver) for use on such system, for which a solicitation is made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

**(ii) Equivalent service**

If a private entity which operates a fixed route system and which is not subject to section 12184 of this title purchases or leases a vehicle with a seating capacity of 16 passengers or less (including the driver) for use on such system after the effective date of this subparagraph that is not readily accessible to or usable by individuals with disabilities, it shall be considered discrimination for such entity to fail to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities.

**(C) Demand responsive system**

ADD-10

For purposes of subsection (a), discrimination includes--

**(i)** a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities; and

**(ii)** the purchase or lease by such entity for use on such system of a vehicle with a seating capacity in excess of 16 passengers (including the driver), for which solicitations are made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities (including individuals who use wheelchairs) unless such entity can demonstrate that such system, when viewed in its entirety, provides a level of service to individuals with disabilities equivalent to that provided to individuals without disabilities.

**(D) Over-the-road buses**

**(i) Limitation on applicability**

Subparagraphs (B) and (C) do not apply to over-the-road buses.

**(ii) Accessibility requirements**

For purposes of subsection (a), discrimination includes (I) the purchase or lease of an over-the-road bus which does not comply with the regulations issued under section 12186(a)(2) of this title by a private entity which provides transportation of individuals and which is not primarily engaged in the business of transporting people, and (II) any other failure of such entity to comply with such regulations.

**(3) Specific construction**

Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

**CREDIT(S)**

(Pub.L. 101-336, Title III, § 302, July 26, 1990, 104 Stat. 355.)

42 U.S.C.A. § 12182, 42 USCA § 12182
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-11

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
            Subchapter III. Public Accommodations and Services Operated by Private Entities (Refs & Annos)

42 U.S.C.A. § 12188

§ 12188. Enforcement

Currentness

**(a) In general**

**(1) Availability of remedies and procedures**

The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

**(2) Injunctive relief**

In the case of violations of sections 12182(b)(2)(A)(iv) and section [1] 12183(a) of this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.

**(b) Enforcement by Attorney General**

**(1) Denial of rights**

**(A) Duty to investigate**

**(i) In general**

The Attorney General shall investigate alleged violations of this subchapter, and shall undertake periodic reviews of compliance of covered entities under this subchapter.

ADD-12

**(ii) Attorney General certification**

On the application of a State or local government, the Attorney General may, in consultation with the Architectural and Transportation Barriers Compliance Board, and after prior notice and a public hearing at which persons, including individuals with disabilities, are provided an opportunity to testify against such certification, certify that a State law or local building code or similar ordinance that establishes accessibility requirements meets or exceeds the minimum requirements of this chapter for the accessibility and usability of covered facilities under this subchapter. At any enforcement proceeding under this section, such certification by the Attorney General shall be rebuttable evidence that such State law or local ordinance does meet or exceed the minimum requirements of this chapter.

**(B) Potential violation**

If the Attorney General has reasonable cause to believe that--

**(i)** any person or group of persons is engaged in a pattern or practice of discrimination under this subchapter; or

**(ii)** any person or group of persons has been discriminated against under this subchapter and such discrimination raises an issue of general public importance,

the Attorney General may commence a civil action in any appropriate United States district court.

**(2) Authority of court**

In a civil action under paragraph (1)(B), the court--

**(A)** may grant any equitable relief that such court considers to be appropriate, including, to the extent required by this subchapter--

**(i)** granting temporary, preliminary, or permanent relief;

**(ii)** providing an auxiliary aid or service, modification of policy, practice, or procedure, or alternative method; and

**(iii)** making facilities readily accessible to and usable by individuals with disabilities;

**(B)** may award such other relief as the court considers to be appropriate, including monetary damages to persons aggrieved when requested by the Attorney General; and

**(C)** may, to vindicate the public interest, assess a civil penalty against the entity in an amount--

**(i)** not exceeding $50,000 for a first violation; and

ADD-13

**(ii)** not exceeding $100,000 for any subsequent violation.

**(3) Single violation**

For purposes of paragraph (2)(C), in determining whether a first or subsequent violation has occurred, a determination in a single action, by judgment or settlement, that the covered entity has engaged in more than one discriminatory act shall be counted as a single violation.

**(4) Punitive damages**

For purposes of subsection (b)(2)(B), the term "monetary damages" and "such other relief" does not include punitive damages.

**(5) Judicial consideration**

In a civil action under paragraph (1)(B), the court, when considering what amount of civil penalty, if any, is appropriate, shall give consideration to any good faith effort or attempt to comply with this chapter by the entity. In evaluating good faith, the court shall consider, among other factors it deems relevant, whether the entity could have reasonably anticipated the need for an appropriate type of auxiliary aid needed to accommodate the unique needs of a particular individual with a disability.

**CREDIT(S)**

(Pub.L. 101-336, Title III, § 308, July 26, 1990, 104 Stat. 363.)

**Footnotes**

1        So in original. The word "section" probably should not appear.

42 U.S.C.A. § 12188, 42 USCA § 12188
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-14

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted   Negative Treatment Reconsidered by   Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services, 11th Cir.(Fla.),   Aug. 12, 2011

---

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 157. Quality Affordable Health Care for All Americans
      Subchapter VI. Miscellaneous Provisions

---

42 U.S.C.A. § 18116

§ 18116. Nondiscrimination

Effective: March 23, 2010
Currentness

**(a) In general**

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

**(b) Continued application of laws**

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975, or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

**(c) Regulations**

The Secretary may promulgate regulations to implement this section.

**CREDIT(S)**

(Pub.L. 111-148, Title I, § 1557, Mar. 23, 2010, 124 Stat. 260.)

---

ADD-15

Notes of Decisions (94)

42 U.S.C.A. § 18116, 42 USCA § 18116
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-16

Code of Federal Regulations
  Title 28. Judicial Administration
    Chapter I. Department of Justice
      Part 36. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial
      Facilities (Refs & Annos)
        Subpart C. Specific Requirements

28 C.F.R. § 36.303

§ 36.303 Auxiliary aids and services.

Effective: January 17, 2017
Currentness

(a) General. A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.

(b) Examples. The term "auxiliary aids and services" includes—

(1) Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;

(2) Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision;

(3) Acquisition or modification of equipment or devices; and

(4) Other similar services and actions.

(c) Effective communication.

ADD-17

(1) A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities.

(i) For purposes of this section, "companion" means a family member, friend, or associate of an individual seeking access to, or participating in, the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such individual, is an appropriate person with whom the public accommodation should communicate.

(ii) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

(2) A public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her.

(3) A public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication, except—

(i) In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or

(ii) Where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances.

(4) A public accommodation shall not rely on a minor child to interpret or facilitate communication, except in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available.

(d) Telecommunications.

(1) When a public accommodation uses an automated-attendant system, including, but not limited to, voicemail and messaging, or an interactive voice response system, for receiving and directing incoming telephone calls, that system must provide effective real-time communication with individuals using auxiliary

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-18

aids and services, including text telephones (TTYs) and all forms of FCC–approved telecommunications relay systems, including Internet-based relay systems.

(2) A public accommodation that offers a customer, client, patient, or participant the opportunity to make outgoing telephone calls using the public accommodation's equipment on more than an incidental convenience basis shall make available accessible public telephones, TTYs, or other telecommunications products and systems for use by an individual who is deaf or hard of hearing, or has a speech impairment.

(3) A public accommodation may use relay services in place of direct telephone communication for receiving or making telephone calls incident to its operations.

(4) A public accommodation shall respond to telephone calls from a telecommunications relay service established under title IV of the ADA in the same manner that it responds to other telephone calls.

(5) This part does not require a public accommodation to use a TTY for receiving or making telephone calls incident to its operations.

(e) Closed caption decoders. Places of lodging that provide televisions in five or more guest rooms and hospitals that provide televisions for patient use shall provide, upon request, a means for decoding captions for use by an individual with impaired hearing.

(f) Video remote interpreting (VRI) services. A public accommodation that chooses to provide qualified interpreters via VRI service shall ensure that it provides—

(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;

(2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;

(3) A clear, audible transmission of voices; and

(4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

(g) Movie theater captioning and audio description—

(1) Definitions. For the purposes of this paragraph (g)—

(i) Analog movie means a movie exhibited in analog film format.

(ii) Audio description means the spoken narration of a movie's key visual elements, such as the action, settings, facial expressions, costumes, and scene changes. Audio description generally requires the use of an audio description device for delivery to a patron.

(iii) Audio description device means the individual device that a patron may use at any seat to hear audio description.

(iv) Captioning device means the individual device that a patron may use at any seat to view closed movie captioning.

(v) Closed movie captioning means the written display of a movie's dialogue and non-speech information, such as music, the identity of the character who is speaking, and other sounds or sound effects. Closed movie captioning generally requires the use of a captioning device for delivery of the captions to the patron.

(vi) Digital movie means a movie exhibited in digital cinema format.

(vii) Movie theater means a facility, other than a drive-in theater, that is owned, leased by, leased to, or operated by a public accommodation and that contains one or more auditoriums that are used primarily for the purpose of showing movies to the public for a fee.

(viii) Open movie captioning means the written on-screen display of a movie's dialogue and non-speech information, such as music, the identity of the character who is speaking, and other sounds and sound effects.

(2) General. A public accommodation shall ensure that its movie theater auditoriums provide closed movie captioning and audio description whenever they exhibit a digital movie that is distributed with such features. Application of the requirements of paragraph (g) of this section is deferred for any movie theater auditorium that exhibits analog movies exclusively, but may be addressed in a future rulemaking.

(3) Minimum requirements for captioning devices. A public accommodation shall provide a minimum number of fully operational captioning devices at its movie theaters in accordance with the following Table:

| Number of movie theater auditoriums exhibiting digital movies | Minimum required number of captioning devices |
| --- | --- |
| 1............................................................................. | 4 |
| 2-7.......................................................................... | 6 |
| 8-15........................................................................ | 8 |
| 16 +........................................................................ | 12 |

ADD-20

(4) Minimum requirements for audio description devices.

(i) A public accommodation shall provide at its movie theaters a minimum of one fully operational audio description device for every two movie theater auditoriums exhibiting digital movies and no less than two devices per movie theater. When calculation of the required number of devices results in a fraction, the next greater whole number of devices shall be provided.

(ii) A public accommodation may comply with the requirements in paragraph (g)(4)(i) of this section by using the existing assistive listening receivers that the public accommodation is already required to provide at its movie theaters in accordance with Table 219.3 of the 2010 Standards, if those receivers have a minimum of two channels available for sound transmission to patrons.

(5) Performance requirements for captioning devices and audio description devices. Each captioning device and each audio description device must be properly maintained by the movie theater to ensure that each device is fully operational, available to patrons in a timely manner, and easily usable by patrons. Captioning devices must be adjustable so that the captions can be viewed as if they are on or near the movie screen, and must provide clear, sharp images in order to ensure readability of captions.

(6) Alternative technologies.

(i) A public accommodation may meet its obligation to provide captioning and audio description in its movie theaters to persons with disabilities through any technology so long as that technology provides communication as effective as that provided to movie patrons without disabilities.

(ii) A public accommodation may use open movie captioning as an alternative to complying with the requirements specified in paragraph (g)(3) of this section, either by providing open movie captioning at all showings of all movies available with captioning, or whenever requested by or for an individual who is deaf or hard of hearing prior to the start of the movie.

(7) Compliance date for providing captioning and audio description.

(i) A public accommodation must comply with the requirements in paragraphs (g)(2)-(6) of this section in its movie theaters that exhibit digital movies by June 2, 2018.

(ii) If a public accommodation converts a movie theater auditorium from an analog projection system to a system that allows it to exhibit digital movies after December 2, 2016, then that auditorium must comply with the requirements in paragraph (g) of this section by December 2, 2018, or within 6 months of that auditorium's complete installation of a digital projection system, whichever is later.

ADD-21

(8) Notice. On or after January 17, 2017, whenever a public accommodation provides captioning and audio description in a movie theater auditorium exhibiting digital movies, it shall ensure that all notices of movie showings and times at the box office and other ticketing locations, on Web sites and mobile apps, in newspapers, and over the telephone, inform potential patrons of the movies or showings that are available with captioning and audio description. This paragraph does not impose any obligation on third parties that provide information about movie theater showings and times, so long as the third party is not part of or subject to the control of the public accommodation.

(9) Operational requirements. On or after January 17, 2017, whenever a public accommodation provides captioning and audio description in a movie theater auditorium exhibiting digital movies, it shall ensure that at least one employee is available at the movie theater to assist patrons seeking or using captioning or audio description whenever a digital movie is exhibited with these features. Such assistance includes the ability to—

(i) Locate all necessary equipment that is stored and quickly activate the equipment and any other ancillary systems required for the use of the captioning devices and audio description devices;

(ii) Operate and address problems with all captioning and audio description equipment prior to and during the movie;

(iii) Turn on open movie captions if the movie theater is relying on open movie captioning to meet the requirements of paragraph (g)(3) of this section; and

(iv) Communicate effectively with individuals with disabilities, including those who are deaf or hard of hearing or who are blind or have low vision, about how to use, operate, and resolve problems with captioning devices and audio description devices.

(10) This section does not require the use of open movie captioning as a means of compliance with paragraph (g) of this section, even if providing closed movie captioning for digital movies would be an undue burden.

(h) Alternatives. If provision of a particular auxiliary aid or service by a public accommodation would result in a fundamental alteration in the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or in an undue burden, i.e., significant difficulty or expense, the public accommodation shall provide an alternative auxiliary aid or service, if one exists, that would not result in an alteration or such burden but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the goods, services, facilities, privileges, advantages, or accommodations offered by the public accommodation.

**Credits**
[Order No. 3181–2010, 75 FR 56253, Sept. 15, 2010; Order No. 3779–2016, 81 FR 87378, Dec. 2, 2016]

SOURCE: 56 FR 35592, July 26, 1991; 58 FR 17522, April 5, 1993; 59 FR 2675, Jan. 18, 1994; 59 FR 17446, April 12, 1994; Order No. 2249–99, 64 FR 47103, Aug. 30, 1999; Order No. 3181–2010, 75 FR 56250, Sept. 15,

ADD-22

2010; Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016; Order No. 3779–2016, 81 FR 87378, Dec. 2, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12186(b), 12205a.

Notes of Decisions (125)

Current through March 27, 2023, 88 FR 18075. Some sections may be more current. See credits for details.

ADD-23

United States Code Annotated
  Federal Rules of Appellate Procedure (Refs & Annos)
    Title II. Appeal from a Judgment or Order of a District Court

Federal Rules of Appellate Procedure Rule 5, 28 U.S.C.A.

Rule 5. Appeal by Permission

Currentness

**(a) Petition for Permission to Appeal.**

**(1)** To request permission to appeal when an appeal is within the court of appeals' discretion, a party must file a petition with the circuit clerk and serve it on all other parties to the district-court action.

**(2)** The petition must be filed within the time specified by the statute or rule authorizing the appeal or, if no such time is specified, within the time provided by Rule 4(a) for filing a notice of appeal.

**(3)** If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met, the district court may amend its order, either on its own or in response to a party's motion, to include the required permission or statement. In that event, the time to petition runs from entry of the amended order.

**(b) Contents of the Petition; Answer or Cross-Petition; Oral Argument.**

**(1)** The petition must include the following:

**(A)** the facts necessary to understand the question presented;

**(B)** the question itself;

**(C)** the relief sought;

**(D)** the reasons why the appeal should be allowed and is authorized by a statute or rule; and

**(E)** an attached copy of:

**(i)** the order, decree, or judgment complained of and any related opinion or memorandum, and

**(ii)** any order stating the district court's permission to appeal or finding that the necessary conditions are met.

ADD-24

**(2)** A party may file an answer in opposition or a cross-petition within 10 days after the petition is served.

**(3)** The petition and answer will be submitted without oral argument unless the court of appeals orders otherwise.

**(c) Form of Papers; Number of Copies; Length Limits.** All papers must conform to Rule 32(c)(2). An original and 3 copies must be filed unless the court requires a different number by local rule or by order in a particular case. Except by the court's permission, and excluding the accompanying documents required by Rule 5(b)(1)(E):

**(1)** a paper produced using a computer must not exceed 5,200 words; and

**(2)** a handwritten or typewritten paper must not exceed 20 pages.

**(d) Grant of Permission; Fees; Cost Bond; Filing the Record.**

**(1)** Within 14 days after the entry of the order granting permission to appeal, the appellant must:

**(A)** pay the district clerk all required fees; and

**(B)** file a cost bond if required under Rule 7.

**(2)** A notice of appeal need not be filed. The date when the order granting permission to appeal is entered serves as the date of the notice of appeal for calculating time under these rules.

**(3)** The district clerk must notify the circuit clerk once the petitioner has paid the fees. Upon receiving this notice, the circuit clerk must enter the appeal on the docket. The record must be forwarded and filed in accordance with Rules 11 and 12(c).

CREDIT(S)

(As amended Apr. 30, 1979, eff. Aug. 1, 1979; Apr. 29, 1994, eff. Dec. 1, 1994; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2016, eff. Dec. 1, 2016; Apr. 25, 2019, eff. Dec. 1, 2019.)

**ADVISORY COMMITTEE NOTES**
**1967 Adoption**

This rule is derived in the main from Third Circuit Rule 11(2), which is similar to the rule governing appeals under 28 U.S.C. § 1292(b) in a majority of the circuits. The second sentence of subdivision (a) resolves a conflict over the question of whether the district court can amend an order by supplying the statement required by § 1292(b) at any time after entry of the order, with the result that the time fixed by the statute commences to run on the date of entry of the order as amended. Compare *Milbert v. Bison Laboratories*, 260 F.2d 431 (3d Cir., 1958) with *Sperry Rand Corporation v. Bell Telephone Laboratories*, 272 F.2d 29 (2d Cir., 1959), *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697 (5th Cir., 1961) and *Houston Fearless Corporation v. Teter*, 313

ADD-25

F.2d 91 (10th Cir., 1962). The view taken by the Second, Fifth and Tenth Circuits seems theoretically and practically sound, and the rule adopts it. Although a majority of the circuits now require the filing of a notice of appeal following the grant of permission to appeal, filing of the notice serves no function other than to provide a time from which the time for transmitting the record and docketing the appeal begins to run.

### 1979 Amendment

The proposed amendment [to subdivision (d) ] adapts to the practice in appeals from interlocutory orders under 28 U.S.C. § 1292(b) the provisions of proposed Rule 3(e) above, requiring payment of all fees in the district court upon the filing of the notice of appeal. See Note to proposed amended Rule 3(e), *supra*.

### 1994 Amendments

**Subdivision (c).** The amendment makes it clear that a court may require a different number of copies either by rule or by order in an individual case. The number of copies of any document that a court of appeals needs varies depending upon the way in which the court conducts business. The internal operation of the courts of appeals necessarily varies from circuit to circuit because of differences in the number of judges, the geographic area included within the circuit, and other such factors. Uniformity could be achieved only by setting the number of copies artificially high so that parties in all circuits file enough copies to satisfy the needs of the court requiring the greatest number. Rather than do that, the Committee decided to make it clear that local rules may require a greater or lesser number of copies and that, if the circumstances of a particular case indicate the need for a different number of copies in that case, the court may so order.

### 1998 Amendments

In 1992 Congress added subsection (e) to 28 U.S.C. § 1292. Subsection (e) says that the Supreme Court has power to prescribe rules that "provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for" in section 1292. The amendment of Rule 5 was prompted by the possibility of new rules authorizing additional interlocutory appeals. Rather than add a separate rule governing each such appeal, the Committee believes it is preferable to amend Rule 5 so that it will govern all such appeals.

In addition the Federal Courts Improvement Act of 12996, Pub.L. 104-317, abolished appeals by permission under 28 U.S.C. § 636(c)(5), making Rule 5.1 obsolete.

This new Rule 5 is intended to govern all discretionary appeals from district-court orders, judgments, or decrees. At this time that includes interlocutory appeals under 28 U.S.C. § 1292(b), (c)(1), (d)(1) & (2). If additional interlocutory appeals are authorized under § 1292(e), the new Rule is intended to govern them if the appeals are discretionary.

**Subdivision (a).** Paragraph (a)(1) says that when granting an appeal is within a court of appeals' discretion, a party may file a petition for permission to appeal. The time for filing provision states only that the petition must be filed within the time provided in the statute or rule authorizing the appeal or, if no such time is specified, within the time provided by Rule 4(a) for filing a notice of appeal.

Section 1292(b), (c), and (d) provide that the petition must be filed within 10 days after entry of the order containing the statement prescribed in the statute. Existing Rule 5(a) provides that if a district court amends an order to contain the prescribed statement, the petition must be filed within 10 days after entry of the amended order. The new rule similarly says that if a party cannot petition without the district court's permission or statement that necessary circumstances are present, the district court may amend its order to include such a statement and the time to petition runs from entry of the amended order.


ADD-26

The provision that the Rule 4(a) time for filing a notice of appeal should apply if the statute or rule is silent about the filing time was drawn from existing Rule 5.1

**Subdivision (b).** The changes made in the provisions in paragraph (b)(1) are intended only to broaden them sufficiently to make them appropriate for all discretionary appeals.

In paragraph (b)(2) a uniform time--7 days--is established for filing an answer in opposition or cross-petition. Seven days is the time for responding under existing Rule 5 and is an appropriate length of time when dealing with an interlocutory appeal. Although existing Rule 5.1 provides 14 days for responding, the Committee does not believe that the longer response time is necessary.

**Subdivision (c).** Subdivision (c) is substantively unchanged.

**Subdivision (d).** Paragraph (d)(2) is amended to state that "the date when the order granting permission to appeal is entered serves as the date of the notice of appeal" for purposes of calculating time under the rules. That language simply clarifies existing practice.

**2002 Amendments**

**Subdivision (c).** A petition for permission to appeal, a cross-petition for permission to appeal, and an answer to a petition or cross-petition for permission to appeal are all "other papers" for purposes of Rule 32(c)(2), and all of the requirements of Rule 32(a) apply to those papers, except as provided in Rule 32(c)(2). During the 1998 restyling of the Federal Rules of Appellate Procedure, Rule 5(c) was inadvertently changed to suggest that only the requirements of Rule 32(a)(1) apply to such papers. Rule 5(c) has been amended to correct that error.

Rule 5(c) has been further amended to limit the length of papers filed under Rule 5.

**Changes Made After Publication and Comments** No changes were made to the text of the proposed amendment or to the Committee Note.

**2009 Amendments**

**Subdivision (b)(2).** Subdivision (b)(2) is amended in the light of the change in Rule 26(a)'s time computation rules. Subdivision (b)(2) formerly required that an answer in opposition to a petition for permission to appeal, or a cross-petition for permission to appeal, be filed "within 7 days after the petition is served." Under former Rule 26(a), "7 days" always meant at least 9 days and could mean as many as 11 or even 13 days. Under current Rule 26(a), intermediate weekends and holidays are counted. Changing the period from 7 to 10 days offsets the change in computation approach. See the Note to Rule 26.

**Subdivision (d)(1).** The time set in the former rule at 10 days has been revised to 14 days. See the Note to Rule 26.

**2016 Amendments**

The page limits previously employed in Rules 5, 21, 27, 35, and 40 have been largely overtaken by changes in technology. For papers produced using a computer, those page limits are now replaced by word limits. The word limits were derived from the current page limits using the assumption that one page is equivalent to 260 words. Papers produced using a computer must include the certificate of compliance required by Rule 32(g); Form 6 in the Appendix of Forms suffices to meet that requirement. Page limits are retained for papers prepared without the aid of a computer (i.e., handwritten or typewritten papers). For both the word limit and the page limit, the calculation excludes the accompanying documents required by Rule 5(b)(1)(E) and any items listed in Rule 32(f).



ADD-27

**2019 Amendments**

Subdivision (a)(1) is amended to delete the reference to "proof of service" to reflect amendments to Rule 25(d) that eliminate the requirement of a proof of service when service is completed using a court's electronic filing system.

Notes of Decisions (33)

F. R. A. P. Rule 5, 28 U.S.C.A., FRAP Rule 5
Including Amendments Received Through 3-1-23

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-28

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>     Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
>         Title IV. Parties

Federal Rules of Civil Procedure Rule 23

Rule 23. Class Actions [Rule Text & Notes of Decisions subdivisions I to VII]

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 23 are displayed in multiple documents. >

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

ADD-29

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1)** *Certification Order.*

**(A)** *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

**(B)** *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

**(C)** *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

**(2)** *Notice.*

**(A)** *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

**(B)** *For (b)(3) Classes.* For any class certified under Rule 23(b)(3)--or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)--the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language:

ADD-30

**(i)** the nature of the action;

**(ii)** the definition of the class certified;

**(iii)** the class claims, issues, or defenses;

**(iv)** that a class member may enter an appearance through an attorney if the member so desires;

**(v)** that the court will exclude from the class any member who requests exclusion;

**(vi)** the time and manner for requesting exclusion; and

**(vii)** the binding effect of a class judgment on members under Rule 23(c)(3).

**(3)** *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

**(A)** for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

**(B)** for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

**(4)** *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

**(5)** *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

**(1)** *In General.* In conducting an action under this rule, the court may issue orders that:

**(A)** determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

**(B)** require--to protect class members and fairly conduct the action--giving appropriate notice to some or all class members of:

---

ADD-31

**(i)** any step in the action;

**(ii)** the proposed extent of the judgment; or

**(iii)** the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

**(C)** impose conditions on the representative parties or on intervenors;

**(D)** require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

**(E)** deal with similar procedural matters.

**(2)** *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class--or a class proposed to be certified for purposes of settlement--may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

**(1)** *Notice to the Class.*

**(A)** *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

**(B)** *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

**(i)** approve the proposal under Rule 23(e)(2); and

**(ii)** certify the class for purposes of judgment on the proposal.

**(2)** *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

---

**(A)** the class representatives and class counsel have adequately represented the class;

**(B)** the proposal was negotiated at arm's length;

**(C)** the relief provided for the class is adequate, taking into account:

    **(i)** the costs, risks, and delay of trial and appeal;

    **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and

    **(iv)** any agreement required to be identified under Rule 23(e)(3); and

**(D)** the proposal treats class members equitably relative to each other.

**(3)** *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

**(4)** *New Opportunity to be Excluded.* If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

**(5)** *Class-Member Objections.*

    **(A)** *In General.* Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

    **(B)** *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

        **(i)** forgoing or withdrawing an objection, or

        **(ii)** forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

**(C)** *Procedure for Approval After an Appeal.* If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered, or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

**(1)** *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

**(A)** must consider:

**(i)** the work counsel has done in identifying or investigating potential claims in the action;

**(ii)** counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

**(iii)** counsel's knowledge of the applicable law; and

**(iv)** the resources that counsel will commit to representing the class;

**(B)** may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

**(C)** may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

**(D)** may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

**(E)** may make further orders in connection with the appointment.

ADD-34

**(2)** *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

**(3)** *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

**(4)** *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h) Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

**(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

**(2)** A class member, or a party from whom payment is sought, may object to the motion.

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

**CREDIT(S)**

(Amended February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 24, 1998, effective December 1, 1998; March 27, 2003, effective December 1, 2003; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009; April 26, 2018, effective December 1, 2018.)

**ADVISORY COMMITTEE NOTES**

1937 Adoption

**Note to Subdivision (a).** This is a substantial restatement of [former] Equity Rule 38 (Representatives of Class) as that rule has been construed. It applies to all actions, whether formerly denominated legal or equitable. For a general analysis of class actions, effect of judgment, and requisites of jurisdiction see Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Georgetown L.J. 551, 570 et seq. (1937); Moore and Cohn, *Federal Class Actions,* 32 Ill.L.Rev. 307 (1937); Moore and Cohn, *Federal Class Actions-- Jurisdiction and Effect of Judgment,* 32 Ill.L.Rev. 555-567 (1938); Lesar, *Class Suits and the Federal Rules,* 22 Minn.L.Rev. 34 (1937); cf. Arnold and James, *Cases on Trials, Judgments and Appeals* (1936) 175; and see Blume, *Jurisdictional Amount in Representative Suits,* 15 Minn.L.Rev. 501 (1931).

The general test of [former] Equity Rule 38 (Representatives of Class) that the question should be "one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court," is a common test. For states which require the two elements of a common or general interest and numerous persons, as provided for in [former] Equity Rule 38, see Del.Ch. Rule 113; Fla.Comp.Gen.Laws Ann. (Supp., 1936) § 4918(7); Georgia Code (1933) § 37-1002, and see *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 16, r. 9. For statutory provisions providing for class actions when the question is one of common or general interest or when the parties are numerous, see Ala.Code Ann. (Michie, 1928) § 5701; 2 Ind.Stat.Ann. (Burns, 1933) § 2-220; N.Y.C.P.A. (1937) 195; Wis.Stat. (1935) § 260.12. These statutes have, however, been uniformly construed as though phrased in the conjunctive. See *Garfein v. Stiglitz,* 260 Ky. 430, 86 S.W.2d 155 (1935). The rule adopts the test of [former] Equity Rule 38, but defines what constitutes a "common or general interest". Compare with code provisions which make the action dependent upon the propriety of joinder of the parties. See Blume, *The "Common Questions" Principle in the Code Provision for Representative Suits,* 30 Mich.L.Rev. 878 (1932). For discussion of what constitutes "numerous persons" see Wheaton, *Representative Suits Involving Numerous Litigants,* 19 Corn.L.Q. 399 (1934); Note, 36 Harv.L.Rev. 89 (1922).

**Clause (1), Joint, Common, or Secondary Right.** This clause is illustrated in actions brought by or against representatives of an unincorporated association. See *Oster v. Brotherhood of Locomotive Firemen and Enginemen,* 271 Pa. 419, 114 Atl. 377 (1921); *Pickett v. Walsh,* 192 Mass. 572, 78 N.E. 753, 6 L.R.A., N.S., 1067 (1906); *Colt v. Hicks,* 97 Ind.App. 177, 179 N.E. 335 (1932). Compare Rule 17(b) as to when an unincorporated association has capacity to sue or be sued in its common name; *United Mine Workers of America v. Coronado Coal Co.,* 42 S.Ct. 570, 259 U.S. 344, 66 L.Ed. 975, 27 A.L.R. 762 (1922) (an unincorporated association was sued as an entity for the purpose of enforcing against it a federal substantive right); Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Georgetown L.J. 551, 566 (for discussion of jurisdictional requisites when an unincorporated association sues or is sued in its common name and jurisdiction is founded upon diversity of citizenship). For an action brought by representatives of one group against representatives of another group for distribution of a fund held by an unincorporated association, see *Smith v. Swormstedt,* 16 How. 288, 14 L.Ed. 942 (U.S. 1853). Compare *Christopher, et al. v. Brusselback,* 1938, 58 S.Ct. 350, 302 U.S. 500, 82 L.Ed. 388.

For an action to enforce rights held in common by policyholders against the corporate issuer of the policies, see *Supreme Tribe of Ben Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). See also *Terry v. Little,* 101 U.S. 216, 25 L.Ed. 864 (1880); *John A. Roebling's Sons Co. v. Kinnicutt,* 248 Fed. 596 (D.C.N.Y., 1917) dealing with the right held in common by creditors to enforce the statutory liability of stockholders.

Typical of a secondary action is a suit by stockholders to enforce a corporate right. For discussion of the general nature of these actions see *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Glenn, *The Stockholder's Suit--Corporate and Individual Grievances,* 33 Yale L.J. 580 (1924); McLaughlin, *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit,* 46 Yale L.J. 421 (1937). See also Subdivision (b) of this rule which deals with Shareholder's Action; Note, 15 Minn.L.Rev. 453 (1931).

**Clause (2).** A creditor's action for liquidation or reorganization of a corporation is illustrative of this clause. An action by a stockholder against certain named defendants as representatives of numerous claimants presents a situation converse to the creditor's action.

**Clause (3).** See *Everglades Drainage League v. Napoleon Broward Drainage Dist.,* 253 Fed. 246 (D.C.Fla., 1918); *Gramling v. Maxwell,* 52 F.2d 256 (D.C.N.C., 1931), approved in 30 Mich.L.Rev. 624 (1932); *Skinner v. Mitchell,* 108 Kan. 861, 197 Pac. 569 (1921); *Duke of Bedford v. Ellis* (1901) A.C. 1, for class actions when there were numerous persons and there was only a question of law or fact common to them; and see Blume, *The "Common Questions" Principle in the Code Provision for Representative Suits,* 30 Mich.L.Rev. 878 (1932).

ADD-36

**Note to Subdivision (b).** This is [former] Equity Rule 27 (Stockholder's Bill) with verbal changes. See also *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed. 827 (1882) and former Equity Rule 94, promulgated January 23, 1882, 104 U.S. IX.

**Note to Subdivision (c).** See McLaughlin, Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit, 46 Yale L.J. 421 (1937).

Supplementary Note

**Note.** Subdivision (b), relating to secondary actions by shareholders, provides among other things, that in such an action the complainant "shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law * * *."

As a result of the decision in *Erie R. Co. v. Tompkins,* 1938, 304 U.S. 64, 58 S.Ct. 817 (decided April 25, 1938, after this rule was promulgated by the Supreme Court, though before it took effect) a question has arisen as to whether the provision above quoted deals with a matter of substantive right or is a matter of procedure. If it is a matter of substantive law or right, then under *Erie R. Co. v. Tompkins* clause (1) may not be validly applied in cases pending in states whose local law permits a shareholder to maintain such actions, although not a shareholder at the time of the transactions complained of. The Advisory Committee, believing the question should be settled in the courts, proposes no change in Rule 23 but thinks rather that the situation should be explained in an appropriate note.

The rule has a long history. In *Hawes v. Oakland,* 1882, 104 U.S. 450, the Court held that a shareholder could not maintain such an action unless he owned shares at the time of the transactions complained of, or unless they devolved on him by operation of law. At that time the decision in *Swift v. Tyson,* 1842, 16 Peters 1, was the law, and the federal courts considered themselves free to establish their own principles of equity jurisprudence, so the Court was not in 1882 and has not been, until *Erie R. Co. v. Tompkins* in 1938, concerned with the question whether *Hawes v. Oakland* dealt with substantive right or procedure.

Following the decision in *Hawes v. Oakland,* and at the same term, the Court, to implement its decision, adopted [former] Equity Rule 94, which contained the same provision above quoted from Rule 23 F.R.C.P. The provision in [former] Equity Rule 94 was later embodied in [former] Equity Rule 27, of which the present Rule 23 is substantially a copy.

In *City of Quincy v. Steel,* 1887, 120 U.S. 241, 245, 7 S.Ct. 520, the Court referring to *Hawes v. Oakland* said: "In order to give effect to the principles there laid down, this Court at that term adopted Rule 94 of the rules of practice for courts of equity of the United States."

Some other cases dealing with [former] Equity Rules 94 or 27 prior to the decision in *Erie R. Co. v. Tompkins* are *Dimpfel v. Ohio & Miss. R.R.,* 1884, 3 S.Ct. 573, 110 U.S. 209, 28 L.Ed. 121; *Illinois Central R. Co. v. Adams,* 1901, 21 S.Ct. 251, 180 U.S. 28, 34, 45 L.Ed. 410; *Venner v. Great Northern Ry.,* 1908, 28 S.Ct. 328, 209 U.S. 24, 30, 52 L.Ed. 666; *Jacobson v. General Motors Corp.,* S.D.N.Y.1938, 22 F.Supp. 255, 257. These cases generally treat *Hawes v. Oakland* as establishing a "principle" of equity, or as dealing not with jurisdiction but with the "right" to maintain an action, or have said that the defense under the equity rule is analogous to the defense that the plaintiff has no "title" and results in a dismissal "for want of equity."

Those state decisions which held that a shareholder acquiring stock after the event may maintain a derivative action are founded on the view that it is a right belonging to the shareholder at the time of the transaction and which passes as a right to the subsequent purchaser. See *Pollitz v. Gould*, 1911, 202 N.Y. 11, 94 N.E. 1088.

ADD-37

The first case arising after the decision in *Erie R. Co. v. Tompkins,* in which this problem was involved, was *Summers v. Hearst,* S.D.N.Y.1938, 23 F.Supp. 986. It concerned [former] Equity Rule 27, as Federal Rule 23 was not then in effect. In a well considered opinion Judge Leibell reviewed the decisions and said: "The federal cases that discuss this section of [former] Rule 27 support the view that it states a principle of substantive law." He quoted *Pollitz v. Gould,* 1911, 202 N.Y. 11, 94 N.E. 1088, as saying that the United States Supreme Court "seems to have been more concerned with establishing this rule as one of practice than of substantive law" but that "whether it be regarded as establishing a principle of law or a rule of practice, this authority has been subsequently followed in the United States courts."

He then concluded that, although the federal decisions treat the equity rule as "stating a principle of substantive law", if "[former] Equity Rule 27 is to be modified or revoked in view of *Erie R. Co. v. Tompkins,* it is not the province of this Court to suggest it, much less impliedly to follow that course by disregarding the mandatory provisions of the Rule."

In *Piccard v. Sperry Corporation,* S.D.N.Y.1941, 36 F.Supp. 1006, 1009-10, affirmed without opinion, C.C.A.2d 1941, 120 F.2d 328, a shareholder, not such at the time of the transactions complained of, sought to intervene. The court held an intervenor was as much subject to Rule 23 as an original plaintiff; and that the requirement of Rule 23(b) was "a matter of practice," not substance, and applied in New York where the state law was otherwise, despite *Erie R. Co. v. Tompkins.* In *New York v. Guaranty Trust Co. of New York,* C.C.A.2, 1944, 143 F.2d 503, rev'd on other grounds, 1945, 65 S.Ct. 1464, the court said: "Restrictions on the bringing of stockholders' actions, such as those imposed by F.R.C.P. 23(b) or other state statutes are procedural," citing the *Piccard* and other cases.

Some other federal decisions since 1938 touch the question.

In *Gallup v. Caldwell,* C.C.A.3, 1941, 120 F.2d 90, 95 arising in New Jersey, the point was raised but not decided, the court saying that it was not satisfied that the then New Jersey rule differed from Rule 23(b), and that "under the circumstances the proper course was to follow Rule 23(b)."

In *Mullins v. DeSoto Securities Co.,* W.D.La.1942, 45 F.Supp. 871, 878, the point was not decided, because the court found the Louisiana rule to be the same as that stated in Rule 23(b).

In *Toebelman v. Missouri-Kansas Pipe Line Co.,* D.Del.1941, 41 F.Supp. 334, 340, the court dealt only with another part of Rule 23(b), relating to prior demands on the stockholders and did not discuss *Erie R. Co. v. Tompkins,* or its effect on the rule.

In *Perrott v. United States Banking Corp.,* D.Del.1944, 53 F.Supp. 953, it appeared that the Delaware law does not require the plaintiff to have owned shares at the time of the transaction complained of. The court sustained Rule 23(b), after discussion of the authorities, saying:

"It seems to me the rule does not go beyond procedure. * * * Simply because a particular plaintiff cannot qualify as a proper party to maintain such an action does not destroy or even whittle at the cause of action. The cause of action exists until a qualified plaintiff can get it started in a federal court."

In *Bankers Nat. Corp. v. Barr,* S.D.N.Y.1945, 9 Fed.Rules Serv. 23b.11, Case 1, the court held Rule 23(b) to be one of procedure, but that whether the plaintiff was a stockholder was a substantive question to be settled by state law.

The New York rule, as stated in *Pollitz v. Gould,* supra, has been altered by an act of the New York Legislature, Chapter 667, Laws of 1944, effective April 9, 1944, General Corporation Law, § 61, which provides that "in any action brought by a shareholder in the right of a * * * corporation, it must appear that the plaintiff was a stockholder

ADD-38

at the time of the transaction of which he complains, or that his stock thereafter devolved upon him by operation of law." At the same time a further and separate provision was enacted, requiring under certain circumstances the giving of security for reasonable expenses and attorney's fees, to which security the corporation in whose right the action is brought and the defendants therein may have recourse. (Chapter 668, Laws of 1944, effective April 9, 1944, General Corporation Law, § 61-b.) These provisions are aimed at so-called "strike" stockholders' suits and their attendant abuses. *Shielcrawt v. Moffett,* Ct.App.1945, 294 N.Y. 180, 61 N.E.2d 435, rev'g 51 N.Y.S.2d 188, aff'g 49 N.Y.S.2d 64; *Noel Associates, Inc. v. Merrill,* Sup.Ct.1944, 184 Misc. 646, 63 N.Y.S.2d 143.

Insofar as § 61 is concerned, it has been held that the section is procedural in nature. *Klum v. Clinton Trust Co.,* Sup.Ct.1944, 183 Misc. 340, 48 N.Y.S.2d 267; *Noel Associates, Inc. v. Merrill,* supra. In the latter case the court pointed out that "The 1944 amendment to Section 61 rejected the rule laid down in the Pollitz case and substituted, in place thereof, in its precise language, the rule which has long prevailed in the Federal Courts and which is now Rule 23(b) * * *." There is, nevertheless, a difference of opinion regarding the application of the statute to pending actions. See *Klum v. Clinton Trust Co.*, supra (applicable); *Noel Associates, Inc. v. Merrill,* supra (inapplicable).

With respect to § 61-b, which may be regarded as a separate problem, *Noel Associates, Inc. v. Merrill,* supra, it has been held that even though the statute is procedural in nature--a matter not definitely decided--the Legislature evinced no intent that the provisions should apply to actions pending when it became effective. *Shielcrawt v. Moffett,* supra. As to actions instituted after the effective date of the legislation, the constitutionality of § 61-b is in dispute. See *Wolf v. Atkinson,* Sup.Ct.1944, 182 Misc. 675, 49 N.Y.S.2d 703 (constitutional); *Citron v. Mangel Stores Corp.,* Sup.Ct.1944, 50 N.Y.S.2d 416 (unconstitutional); Zlinkoff, *The American Investor and the Constitutionality of § 61-b of the New York General Corporation Law,* 1945, 54 Yale L.J. 352.

New Jersey also enacted a statute, similar to Chapters 667 and 668 of the New York law. See P.L.1945, Ch. 131, R.S.Cum.Supp. 14:3-15. The New Jersey provision similar to Chapter 668, § 61-b, differs, however, in that it specifically applies retroactively. It has been held that this provision is procedural and hence will not govern a pending action brought against a New Jersey corporation in the New York courts. *Shielcrawt v. Moffett,* Sup.Ct.N.Y.1945, 184 Misc. 1074, 56 N.Y.S.2d 134.

See, also generally, 2 Moore's *Federal Practice,* 1938, 2250-2253, and Cum.Supplement § 23.05.

The decisions here discussed show that the question is a debatable one, and that there is respectable authority for either view, with a recent trend towards the view that Rule 23(b)(1) is procedural. There is reason to say that the question is one which should not be decided by the Supreme Court ex parte, but left to await a judicial decision in a litigated case, and that in the light of the material in this note, the only inference to be drawn from a failure to amend Rule 23(b) would be that the question is postponed to await a litigated case.

The Advisory Committee is unanimously of the opinion that this course should be followed.

If, however, the final conclusion is that the rule deals with a matter of substantive right, then the rule should be amended by adding a provision that Rule 23(b)(1) does not apply in jurisdictions where state law permits a shareholder to maintain a secondary action, although he was not a shareholder at the time of the transactions of which he complains.

1966 Amendment

**Difficulties with the original rule.** The categories of class actions in the original rule were defined in terms of the abstract nature of the rights involved: the so-called "true" category was defined as involving "joint, common, or secondary rights"; the "hybrid" category, as involving "several" rights related to "specific property"; the

ADD-39

"spurious" category, as involving "several" rights affected by a common question and related to common relief. It was thought that the definitions accurately described the situations amenable to the class-suit device, and also would indicate the proper extent of the judgment in each category, which would in turn help to determine the res judicata effect of the judgment if questioned in a later action. Thus the judgments in "true" and "hybrid" class actions would extend to the class (although in somewhat different ways); the judgment in a "spurious" class action would extend only to the parties including intervenors. See Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Geo.L.J. 551, 570-76 (1937).

In practice the terms "joint," "common," etc., which were used as the basis of the Rule 23 classification proved obscure and uncertain. See Chafee, *Some Problems of Equity* 245-46, 256-57 (1950); Kalven & Rosenfield, *The Contemporary Function of the Class Suit,* 8 U. of Chi.L.Rev. 684, 707 & n. 73 (1941); Keeffe, Levy & Donovan, *Lee Defeats Ben Hur,* 33 Corn.L.Q. 327, 329-36 (1948); *Developments in the Law: Multiparty Litigation in the Federal Courts,* 71 Harv. L.Rev. 874, 931 (1958); Advisory Committee's Note to Rule 19, as amended. The courts had considerable difficulty with these terms. See, e.g., *Gullo v. Veterans' Coop. H. Assn.,* 13 F.R.D. 11 (D.D.C.1952); *Shipley v. Pittsburgh & L.E.R. Co.,* 70 F.Supp. 870 (W.D.Pa.1947); *Deckert v. Independence Shares Corp.,* 27 F.Supp. 763 (E.D.Pa.1939), rev'd 108 F.2d 51 (3d Cir. 1939), rev'd, 311 U.S. 282 (1940), on remand, 39 F.Supp. 592 (E.D.Pa.1941), rev'd sub nom. *Pennsylvania Co. for Ins. on Lives v. Deckert,* 123 F.2d 979 (3d Cir.1941) (see Chafee, supra, at 264-65).

Nor did the rule provide an adequate guide to the proper extent of the judgments in class actions. First, we find instances of the courts classifying actions as "true" or intimating that the judgments would be decisive for the class where these results seemed appropriate but were reached by dint of depriving the word "several" of coherent meaning. See, e.g., *System Federation No. 91 v. Reed,* 180 F.2d 991 (6th Cir.1950); *Wilson v. City of Paducah,* 100 F.Supp. 116 (W.D.Ky.1951); *Citizens Banking Co. v. Monticello State Bank,* 143 F.2d 261 (8th Cir.1944); *Redmond v. Commerce Trust Co.,* 144 F.2d 140 (8th Cir.1944), cert. denied, 323 U.S. 776 (1944); *United States v. American Optical Co.,* 97 F.Supp. 66 (N.D.Ill.1951); *National Hairdressers' & C. Assn. v. Philad Co.,* 34 F.Supp. 264 (D.Del.1940); 41 F.Supp. 701 (D.Del.1940), aff'd mem., 129 F.2d 1020 (3d Cir.1942). Second, we find cases classified by the courts as "spurious" in which, on a realistic view, it would seem fitting for the judgments to extend to the class. See, e.g., *Knapp v. Bankers Sec. Corp.,* 17 F.R.D. 245 (E.D.Pa.1954), aff'd 230 F.2d 717 (3d Cir.1956); *Giesecke v. Denver Tramway Corp.,* 81 F.Supp. 957 (D.Del.1949); *York v. Guaranty Trust Co.,* 143 F.2d 503 (2d Cir.1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945) (see Chafee, supra, at 208); cf. *Webster Eisenlohr, Inc. v. Kalodner,* 145 F.2d 316, 320 (3d Cir.1944), cert. denied, 325 U.S. 867 (1945). But cf. the early decisions, *Duke of Bedford v. Ellis,* [1901] A.C. 1; *Sheffield Waterworks v. Yeomans,* L.R. 2 Ch.App. 8 (1866); *Brown v. Vermuden,* 1 Ch.Cas. 272, 22 Eng.Rep. 796 (1676).

The "spurious" action envisaged by original Rule 23 was in any event an anomaly because, although denominated a "class" action and pleaded as such, it was supposed not to adjudicate the rights or liabilities of any person not a party. It was believed to be an advantage of the "spurious" category that it would invite decisions that a member of the "class" could, like a member of the class in a "true" or "hybrid" action, intervene on an ancillary basis without being required to show an independent basis of Federal jurisdiction, and have the benefit of the date of the commencement of the action for purposes of the statute of limitations. See 3 Moore's *Federal Practice,* pars. 23.10[1], 23.12 (2d ed.1963). These results were attained in some instances but not in others. On the statute of limitations, see *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir.1961), pet. cert. dism., 371 U.S. 801 (1963); but cf. *P. W. Husserl, Inc. v. Newman,* 25 F.R.D. 264 (S.D.N.Y.1960); *Athas v. Day,* 161 F.Supp. 916 (D.Colo.1958). On ancillary intervention, see *Amen v. Black,* 234 F.2d 12 (10th Cir.1956), cert. granted, 352 U.S. 888 (1956), dism. on stip., 355 U.S. 600 (1958); but cf. *Wagner v. Kemper,* 13 F.R.D. 128 (W.D.Mo.1952). The results, however, can hardly depend upon the mere appearance of a "spurious" category in the rule; they should turn on more basic considerations. See discussion of subdivision (c)(1) below.

ADD-40

Finally, the original rule did not squarely address itself to the question of the measures that might be taken during the course of the action to assure procedural fairness, particularly giving notice to members of the class, which may in turn be related in some instances to the extension of the judgment to the class. See Chafee, supra, at 230-31; Keeffe, Levy & Donovan, supra; *Developments in the law,* supra, 71 Harv.L.Rev. at 937-38; Note, *Binding Effect of Class Actions,* 67 Harv.L.Rev. 1059, 1062-65 (1954); Note, *Federal Class Actions: A Suggested Revision of Rule 23,* 46 Colum.L.Rev. 818, 833-36 (1946); Mich.Gen.Court R. 208.4 (effective Jan. 1, 1963); Idaho R.Civ.P. 23(d); Minn.R.Civ.P. 23.04; N.Dak.R.Civ.P. 23(d).

*The amended rule* describes in more practical terms the occasions for maintaining class actions; provides that all class actions maintained to the end as such will result in judgments including those whom the court finds to be members of the class, whether or not the judgment is favorable to the class; and refers to the measures which can be taken to assure the fair conduct of these actions.

**Subdivision (a)** states the prerequisites for maintaining any class action in terms of the numerousness of the class making joinder of the members impracticable, the existence of questions common to the class, and the desired qualifications of the representative parties. See Weinstein, *Revision of Procedure: Some Problems in Class Actions,* 9 Buffalo L.Rev. 433, 458-59 (1960); 2 Barron & Holtzoff, *Federal Practice & Procedure* § 562, at 265, § 572, at 351-52 (Wright ed. 1961). These are necessary but not sufficient conditions for a class action. See, e.g., *Giordano v. Radio Corp. of Am.,* 183 F.2d 558, 560 (3d Cir.1950); *Zachman v. Erwin,* 186 F.Supp. 681 (S.D.Tex.1959); *Baim & Blank, Inc. v. Warren-Connelly Co., Inc.,* 19 F.R.D. 108 (S.D.N.Y.1956). Subdivision (b) describes the additional elements which in varying situations justify the use of a class action.

**Subdivision (b)(1).** The difficulties which would be likely to arise if resort were had to separate actions by or against the individual members of the class here furnish the reasons for, and the principal key to, the propriety and value of utilizing the class-action device. The considerations stated under clauses (A) and (B) are comparable to certain of the elements which define the persons whose joinder in an action is desirable as stated in Rule 19(a), as amended. See amended Rule 19(a)(2)(i) and (ii), and the Advisory Committee's Note thereto; Hazard, *Indispensable Party: The Historical Origin of a Procedural Phantom,* 61 Colum.L.Rev. 1254, 1259-60 (1961); cf. 3 Moore, supra, par. 23.08, at 3435.

**Clause (A):** One person may have rights against, or be under duties toward, numerous persons constituting a class, and be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to obviate the actual or virtual dilemma which would thus confront the party opposing the class. The matter has been stated thus: "The felt necessity for a class action is greatest when the courts are called upon to order or sanction the alteration of the status quo in circumstances such that a large number of persons are in a position to call on a single person to alter the status quo, or to complain if it is altered, and the possibility exists that [the] actor might be called upon to act in inconsistent ways." Louisell & Hazard, *Pleading and Procedure: State and Federal* 719 (1962); see *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 366-67 (1921). To illustrate: Separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment, might create a risk of inconsistent or varying determinations. In the same way, individual litigations of the rights and duties of riparian owners, or of landowners' rights and duties respecting a claimed nuisance, could create a possibility of incompatible adjudications. Actions by or against a class provide a ready and fair means of achieving unitary adjudication. See *Maricopa County Mun. Water Con. Dist. v. Looney,* 219 F.2d 529 (9th Cir.1955); *Rank v. Krug,* 142 F.Supp. 1, 154-59 (S.D.Calif.1956), on app., *State of California v. Rank,* 293 F.2d 340, 348 (9th Cir.1961); *Gart v. Cole,* 263 F.2d 244 (2d Cir.1959), cert. denied 359 U.S. 978 (1959); cf. *Martinez v. Maverick Cty. Water Con. & Imp. Dist.,* 219 F.2d 666 (5th Cir.1955); 3 Moore, supra, par. 23.11[2], at 3458-59.

ADD-41

**Clause (B):** This clause takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit. In an action by policy holders against a fraternal benefit association attacking a financial reorganization of the society, it would hardly have been practical, if indeed it would have been possible, to confine the effects of a validation of the reorganization to the individual plaintiffs. Consequently a class action was called for with adequate representation of all members of the class. See *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356 (1921); *Waybright v. Columbian Mut. Life Ins. Co.,* 30 F.Supp. 885 (W.D.Tenn.1939); cf. *Smith v. Swormstedt,* 16 How. (57 U.S.) 288 (1853). For much the same reason actions by shareholders to compel the declaration of a dividend[,] the proper recognition and handling of redemption or pre-emption rights, or the like (or actions by the corporation for corresponding declarations of rights), should ordinarily be conducted as class actions, although the matter has been much obscured by the insistence that each shareholder has an individual claim. See *Knapp v. Bankers Securities Corp.,* 17 F.R.D. 245 (E.D.Pa.1954), aff'd, 230 F.2d 717 (3d Cir.1956); *Giesecke v. Denver Tramway Corp.,* 81 F.Supp. 957 (D.Del.1949); *Zahn v. Transamerica Corp.,* 162 F.2d 36 (3d Cir.1947); *Speed v. Transamerica Corp.,* 100 F.Supp. 461 (D.Del.1951); *Sobel v. Whittier Corp.,* 95 F.Supp. 643 (E.D.Mich.1951), app. dism., 195 F.2d 361 (6th Cir.1952); *Goldberg v. Whittier Corp.,* 111 F.Supp. 382 (E.D.Mich.1953); *Dann v. Studebaker-Packard Corp.,* 288 F.2d 201 (6th Cir.1961); *Edgerton v. Armour & Co.,* 94 F.Supp. 549 (S.D.Calif.1950); *Ames v. Mengel Co.,* 190 F.Supp. 344 (2d Cir.1951). (These shareholders' actions are to be distinguished from derivative actions by shareholders dealt with in new Rule 23.1). The same reasoning applies to an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust. See *Boesenberg v. Chicago T. & T. Co.,* 128 F.2d 245 (7th Cir.1942); *Citizens Banking Co. v. Monticello State Bank,* 143 F.2d 261 (8th Cir.1944); *Redmond v. Commerce Trust Co.,* 144 F.2d 140 (8th Cir.1944), cert. denied, 323 U.S. 776 (1944); cf. *York v. Guaranty Trust Co.,* 143 F.2d 503 (2d Cir.1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945).

In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem. Cf. *Dickinson v. Burnham,* 197 F.2d 973 (2d Cir.1952), cert. denied, 344 U.S. 875 (1952); 3 Moore, supra, at par. 23.09. The same reasoning applies to an action by a creditor to set aside a fraudulent conveyance by the debtor and to appropriate the property to his claim, when the debtor's assets are insufficient to pay all creditors' claims. See *Heffernan v. Bennett & Armour,* 110 Cal.App.2d 564, 243 P.2d 846 (1952); cf. *City & County of San Francisco v. Market Street Ry.,* 95 Cal.App.2d 648, 213 P.2d 780 (1950). Similar problems, however, can arise in the absence of a fund either present or potential. A negative or mandatory injunction secured by one of a numerous class may disable the opposing party from performing claimed duties toward the other members of the class or materially affect his ability to do so. An adjudication as to movie "clearances and runs" nominally affecting only one exhibitor would often have practical effects on all the exhibitors in the same territorial area. Cf. *United States v. Paramount Pictures, Inc.,* 66 F.Supp. 323, 341-46 (S.D.N.Y.1946); 334 U.S. 131, 144-48 (1948). Assuming a sufficiently numerous class of exhibitors, a class action would be advisable. (Here representation of subclasses of exhibitors could become necessary; see subdivision (c)(3)(B).)

**Subdivision (b)(2).** This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively

ADD-42

or predominantly to money damages. Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration. See *Potts v. Flax,* 313 F.2d 284 (5th Cir. 1963); *Bailey v. Patterson,* 323 F.2d 201 (5th Cir. 1963), cert. denied, 376 U.S. 910, (1964); *Brunson v. Board of Trustees of School District No. 1, Clarendon Cty., S.C.,* 311 F.2d 107 (4th Cir. 1962), cert. denied, 373 U.S. 933 (1963); *Green v. School Bd. of Roanoke, Va.,* 304 F.2d 118 (4th Cir. 1962); *Orleans Parish School Bd. v. Bush,* 242 F.2d 156 (5th Cir. 1957), cert. denied, 354 U.S. 921 (1957); *Mannings v. Board of Public Inst. of Hillsborough County, Fla.,* 277 F.2d 370 (5th Cir. 1960); *Northcross v. Board of Ed. of City of Memphis,* 302 F.2d 818 (6th Cir. 1962), cert. denied, 370 U.S. 944 (1962); *Frasier v. Board of Trustees of Univ. of N.C.,* 134 F.Supp. 589 (M.D.N.C.1955, 3-judge court), aff'd 350 U.S. 979 (1956). Subdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential. So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition.

**Subdivision (b)(3).** In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf. Chafee, supra, at 201.

The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. See *Oppenheimer v. F. J. Young & Co., Inc.,* 144 F.2d 387 (2d Cir. 1944); *Miller v. National City Bank of N.Y.,* 166 F.2d 723 (2d Cir. 1948); and for like problems in other contexts, see *Hughes v. Encyclopaedia Britannica,* 199 F.2d 295 (7th Cir. 1952); *Sturgeon v. Great Lakes Steel Corp.,* 143 F.2d 819 (6th Cir. 1944). A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. See *Pennsylvania R.R. v. United States,* 111 F.Supp. 80 (D.N.J.1953); cf. Weinstein, supra, 9 Buffalo L.Rev. at 469. Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. See *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); cf. *Weeks v. Bareco Oil Co.,* 125 F.2d 84 (7th Cir. 1941); *Kainz v. Anheuser-Busch, Inc.,* 194 F.2d 737 (7th Cir. 1952); *Hess v. Anderson, Clayton & Co.,* 20 F.R.D. 466 (S.D.Calif.1957).

ADD-43

That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages. Thus one or more actions agreed to by the parties as test or model actions may be preferable to a class action; or it may prove feasible and preferable to consolidate actions. Cf. Weinstein, supra, 9 Buffalo L.Rev. at 438-54. Even when a number of separate actions are proceeding simultaneously, experience shows that the burdens on the parties and the courts can sometimes be reduced by arrangements for avoiding repetitious discovery or the like. Currently the Coordinating Committee on Multiple Litigation in the United States District Courts (a subcommittee of the Committee on Trial Practice and Technique of the Judicial Conference of the United States) is charged with developing methods for expediting such massive litigation. To reinforce the point that the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy, subdivision (b)(3) requires, as a further condition of maintaining the class action, that the court shall find that that procedure is "superior" to the others in the particular circumstances.

Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings. The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. See *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 88-90, 93-94 (7th Cir. 1941) (anti-trust action); see also *Pentland v. Dravo Corp.*, 152 F.2d 851 (3d Cir. 1945), and Chafee, supra, at 273-75, regarding policy of Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C. § 216(b), prior to amendment by Portal-to-Portal Act of 1947, § 5(a). [The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended.]

In this connection the court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable. The burden that separate suits would impose on the party opposing the class, or upon the court calendars, may also fairly be considered. (See the discussion, under subdivision (c)(2) below, of the right of members to be excluded from the class upon their request.)

Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought. Finally, the court should consider the problems of management which are likely to arise in the conduct of a class action.

**Subdivision (c)(1).** In order to give clear definition to the action, this provision requires the court to determine, as early in the proceedings as may be practicable, whether an action brought as a class action is to be so maintained. The determination depends in each case on satisfaction of the terms of subdivision (a) and the relevant provisions of subdivision (b).

An order embodying a determination can be conditional; the court may rule, for example, that a class action may be maintained only if the representation is improved through intervention of additional parties of a stated type. A determination once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the original determination appears unsound. A negative determination means that the action should be stripped of its character as a class action. See subdivision (d)(4). Although an action thus becomes a nonclass action, the court may still be receptive to interventions before the decision on the merits so that the litigation may cover as many interests as can be conveniently handled; the questions whether the intervenors in the nonclass action shall be permitted to claim "ancillary" jurisdiction or the benefit of the date of the commencement of the action for purposes of the statute of limitations are to be decided by reference to the laws governing jurisdiction and limitations as they apply in particular contexts.

ADD-44

Whether the court should require notice to be given to members of the class of its intention to make a determination, or of the order embodying it, is left to the court's discretion under subdivision (d)(2).

**Subdivision (c)(2)** makes special provision for class actions maintained under subdivision (b)(3). As noted in the discussion of the latter subdivision, the interests of the individuals in pursing their own litigations may be so strong here as to warrant denial of a class action altogether. Even when a class action is maintained under subdivision (b)(3), this individual interest is respected. Thus the court is required to direct notice to the members of the class of the right of each member to be excluded from the class upon his request. A member who does not request exclusion may, if he wishes, enter an appearance in the action through his counsel; whether or not he does so, the judgment in the action will embrace him.

The notice[,] setting forth the alternatives open to the members of the class, is to be the best practicable under the circumstances, and shall include individual notice to the members who can be identified through reasonable effort. (For further discussion of this notice, see the statement under subdivision (d)(2) below.)

**Subdivision (c)(3).** The judgment in a class action maintained as such to the end will embrace the class, that is, in a class action under subdivision (b)(1) or (b)(2), those found by the court to be class members; in a class action under subdivision (b)(3), those to whom the notice prescribed by subdivision (c)(2) was directed, excepting those who requested exclusion or who are ultimately found by the court not to be members of the class. The judgment has this scope whether it is favorable or unfavorable to the class. In a (b)(1) or (b)(2) action the judgment "describes" the members of the class, but need not specify the individual members; in a (b)(3) action the judgment "specifies" the individual members who have been identified and described the others.

Compare subdivision (c)(4) as to actions conducted as class actions only with respect to particular issues. Where the class-action character of the lawsuit is based solely on the existence of a "limited fund," the judgment, while extending to all claims of class members against the fund, has ordinarily left unaffected the personal claims of nonappearing members against the debtor. See 3 Moore, supra, par. 23.11[4].

Hitherto, in a few actions conducted as "spurious" class actions and thus nominally designed to extend only to parties and others intervening before the determination of liability, courts have held or intimated that class members might be permitted to intervene after a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision. See, as to the propriety of this so-called "one-way" intervention in "spurious" actions, the conflicting views expressed in *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); *York v. Guaranty Trust Co.,* 143 F.2d 503, 529 (2d Cir. 1944), rev'd on grounds not here relevant, 326 U.S. 99 (1945); *Pentland v. Dravo Corp.,* 152 F.2d 851, 856 (3d Cir. 1945); *Speed v. Transamerica Corp.,* 100 F.Supp. 461, 463 (D.Del.1951); *State Wholesale Grocers v. Great Atl. & Pac. Tea Co.,* 24 F.R.D. 510 (N.D.Ill.1959); *Alabama Ind. Serv. Stat. Assn. v. Shell Pet. Corp.,* 28 F.Supp. 386, 390 (N.D.Ala.1939); *Tolliver v. Cudahy Packing Co.,* 39 F.Supp. 337, 339 (E.D.Tenn.1941); Kalven & Rosenfield, supra, 8 U. of Chi.L.Rev. 684 (1941); Comment, 53 Nw.U.L.Rev. 627, 632-33 (1958); *Developments in the Law,* supra, 71 Harv.L.Rev. at 935; 2 Barron & Holtzoff, supra, § 568; but cf. *Lockwood v. Hercules Powder Co.,* 7 F.R.D. 24, 28-29 (W.D.Mo.1947); *Abram v. San Joaquin Cotton Oil Co.,* 46 F.Supp. 969, 976-77 (S.D.Calif.1942); Chafee, supra, at 280, 285; 3 Moore, supra, par. 23.12, at 3476. Under proposed subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or nonclass action, and in the former case the judgment, whether or not favorable, will include the class, as above stated.

Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the *res judicata* effect


ADD-45

of the judgment; this can be tested only in a subsequent action. See Restatement, Judgments § 86, comment (h), § 116 (1942). The court, however, in framing the judgment in any suit brought as a class action, must decide what its extent or coverage shall be, and if the matter is carefully considered, questions of *res judicata* are less likely to be raised at a later time and if raised will be more satisfactorily answered. See Chafee, supra, at 294; Weinstein, supra, 9 Buffalo L.Rev. at 460.

**Subdivision (c)(4).** This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Two or more classes may be represented in a single action. Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class.

**Subdivision (d)** is concerned with the fair and efficient conduct of the action and lists some types of orders which may be appropriate.

The court should consider how the proceedings are to be arranged in sequence, and what measures should be taken to simplify the proof and argument. See subdivision (d)(1). The orders resulting from this consideration, like the others referred to in subdivision (d), may be combined with a pretrial order under Rule 16, and are subject to modification as the case proceeds.

**Subdivision (d)(2)** sets out a non-exhaustive list of possible occasions for orders requiring notice to the class. Such notice is not a novel conception. For example, in "limited fund" cases, members of the class have been notified to present individual claims after the basic class decision. Notice has gone to members of a class so that they might express any opposition to the representation, see *United States v. American Optical Co.,* 97 F.Supp. 66 (N.D.Ill.1951), and 1950-51 CCH Trade Cases 64573-74 (par. 62869); cf. *Weeks v. Bareco Oil Co.,* 125 F.2d 84, 94 (7th Cir. 1941), and notice may encourage interventions to improve the representation of the class. Cf. *Oppenheimer v. F. J. Young & Co.,* 144 F.2d 387 (2d Cir. 1944). Notice has been used to poll members on a proposed modification of a consent decree. See record in *Sam Fox Publishing Co. v. United States,* 366 U.S. 683 (1961).

Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion. In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum. These indicators suggest that notice under subdivision (d)(2) may be particularly useful and advisable in certain class actions maintained under subdivision (b)(3), for example, to permit members of the class to object to the representation. Indeed, under subdivision (c)(2), notice must be ordered, and is not merely discretionary, to give the members in a subdivision (b)(3) class action an opportunity to secure exclusion from the class. This mandatory notice pursuant to subdivision (c)(2), together with any discretionary notice which the court may find it advisable to give under subdivision (d)(2), is designed to fulfill requirements of due process to which the class action procedure is of course subject. See *Hansberry v. Lee,* 311 U.S. 32 (1940); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950); cf. *Dickinson v. Burnham,* 197 F.2d 973, 979 (2d Cir. 1952), and studies cited at 979 in 4; see also *All American Airways, Inc. v. Elderd,* 209 F.2d 247, 249 (2d Cir. 1954); *Gart v. Cole,* 263 F.2d 244, 248-49 (2d Cir. 1959), cert. denied, 359 U.S. 978 (1959).

Notice to members of the class, whenever employed under amended Rule 23, should be accommodated to the particular purpose but need not comply with the formalities for service of process. See Chafee, supra, at 230-31; *Brendle v. Smith,* 7 F.R.D. 119 (S.D.N.Y.1946). The fact that notice is given at one stage of the action does not mean that it must be given at subsequent stages. Notice is available fundamentally "for the protection of the members


ADD-46

of the class or otherwise for the fair conduct of the action" and should not be used merely as a device for the undesirable solicitation of claims. See the discussion in *Cherner v. Transitron Electronic Corp.,* 201 F.Supp. 934 (D.Mass.1962); *Hormel v. United States,* 17 F.R.D. 303 (S.D.N.Y.1955).

In appropriate cases the court should notify interested government agencies of the pendency of the action or of particular steps therein.

**Subdivision (d)(3)** reflects the possibility of conditioning the maintenance of a class action, e.g., on the strengthening of the representation, see subdivision (c)(1) above; and recognizes that the imposition of conditions on intervenors may be required for the proper and efficient conduct of the action.

As to orders under subdivision (d)(4), see subdivision (c)(1) above.

**Subdivision (e)** requires approval of the court, after notice, for the dismissal or compromise of any class action.

1987 Amendment

The amendments are technical. No substantive change is intended.

1998 Amendment

**Subdivision (f).** This permissive interlocutory appeal provision is adopted under the power conferred by 28 U.S.C. § 1292(e). Appeal from an order granting or denying class certification is permitted in the sole discretion of the court of appeals. No other type of Rule 23 order is covered by this provision. The court of appeals is given unfettered discretion whether to permit the appeal, akin to the discretion exercised by the Supreme Court in acting on a petition for certiorari. This discretion suggests an analogy to the provision in 28 U.S.C. § 1292(b) for permissive appeal on certification by a district court. Subdivision (f), however, departs from the § 1291(b) model in two significant ways. It does not require that the district court certify the certification ruling for appeal, although the district court often can assist the parties and court of appeals by offering advice on the desirability of appeal. And it does not include the potentially limiting requirements of § 1292(b) that the district court order "involve[ ] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

The courts of appeals will develop standards for granting review that reflect the changing areas of uncertainty in class litigation. The Federal Judicial Center study supports the view that many suits with class-action allegations present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings. Yet several concerns justify expansion of present opportunities to appeal. An order denying certification may confront the plaintiff with a situation in which the only sure path to appellate review is by proceeding to final judgment on the merits of an individual claim that, standing alone, is far smaller than the costs of litigation. An order granting certification, on the other hand, may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability. These concerns can be met at low cost by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues.

Permission to appeal may be granted or denied on the basis of any consideration that the court of appeals finds persuasive. Permission is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation.

ADD-47

The district court, having worked through the certification decision, often will be able to provide cogent advice on the factors that bear on the decision whether to permit appeal. This advice can be particularly valuable if the certification decision is tentative. Even as to a firm certification decision, a statement of reasons bearing on the probably benefits and costs of immediate appeal can help focus the court of appeals decision, and may persuade the disappointed party that an attempt to appeal would be fruitless.

The 10-day period for seeking permission to appeal is designed to reduce the risk that attempted appeals will disrupt continuing proceedings. It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal. Permission to appeal does not stay trial court proceedings. A stay should be sought first from the trial court. If the trial court refuses a stay, its action and any explanation of its views should weigh heavily with the court of appeals.

Appellate Rule 5 has been modified to establish the procedure for petitioning for leave to appeal under subdivision (f).

2003 Amendment

**Subdivision (c).** Subdivision (c) is amended in several respects. The requirement that the court determine whether to certify a class "as soon as practicable after commencement of an action" is replaced by requiring determination "at an early practicable time." The notice provisions are substantially revised.

**Paragraph (1).** Subdivision (c)(1)(A) is changed to require that the determination whether to certify a class be made "at an early practicable time." The "as soon as practicable" exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision. See Willging, Hooper & Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 26-36* (Federal Judicial Center 1996).

Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof. See Manual For Complex Litigation Third, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215.

Other considerations may affect the timing of the certification decision. The party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified. Time may be needed to explore designation of class counsel under Rule 23(g), recognizing that in many cases the need to progress toward the certification determination may require designation of interim counsel under Rule 23(g)(2)(A).

Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.

ADD-48

Subdivision (c)(1)(C) reflects two amendments. The provision that a class certification "may be conditional" is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met. The provision that permits alteration or amendment of an order granting or denying class certification is amended to set the cut-off point at final judgment rather than "the decision on the merits." This change avoids the possible ambiguity in referring to "the decision on the merits." Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. In this setting the final judgment concept is pragmatic. It is not the same as the concept used for appeal purposes, but it should be flexible, particularly in protracted litigation.

The authority to amend an order under Rule 23(c)(1) before final judgment does not restore the practice of "one-way intervention" that was rejected by the 1966 revision of Rule 23. A determination of liability after certification, however, may show a need to amend the class definition. Decertification may be warranted after further proceedings.

If the definition of a class certified under Rule 23(b)(3) is altered to include members who have not been afforded notice and an opportunity to request exclusion, notice--including an opportunity to request exclusion--must be directed to the new class members under Rule 23(c)(2)(B).

**Paragraph (2).** The first change made in Rule 23(c)(2) is to call attention to the court's authority--already established in part by Rule 23(d)(2)--to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.

The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. For several reasons, there may be less need for notice than in a (b)(3) class action. There is no right to request exclusion from a (b)(1) or (b)(2) class. The characteristics of the class may reduce the need for formal notice. The cost of providing notice, moreover, could easily cripple actions that do not seek damages. The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice.

When the court does direct certification notice in a (b)(1) or (b)(2) class action, the discretion and flexibility established by subdivision (c)(2)(A) extend to the method of giving notice. Notice facilitates the opportunity to participate. Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods may prove effective. A simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice. The court should consider the costs of notice in relation to the probable reach of inexpensive methods.

If a Rule 23(b)(3) class is certified in conjunction with a (b)(2) class, the (c)(2)(B) notice requirements must be satisfied as to the (b)(3) class.

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.

ADD-49

**Subdivision (e).** Subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. Settlement may be a desirable means of resolving a class action. But court review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.

**Paragraph (1).** Subdivision (e)(1)(A) expressly recognizes the power of a class representative to settle class claims, issues, or defenses.

Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be--and at times was--read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, § 30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; notice is not required when the settlement binds only the individual class representatives. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed simultaneously.

Reasonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class. Individual notice is appropriate, for example, if class members are required to take action--such as filing claims--to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3).

Subdivision (e)(1)(C) confirms and mandates the already common practice of holding hearings as part of the process of approving settlement, voluntary dismissal, or compromise that would bind members of a class.

Subdivision (e)(1)(C) states the standard for approving a proposed settlement that would bind class members. The settlement must be fair, reasonable, and adequate. A helpful review of many factors that may deserve consideration is provided by *In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 316-324 (3d Cir. 1998). Further guidance can be found in the Manual for Complex Litigation.

The court must make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard.

Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses. Redefinition of a class certified under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B). See Rule 23(c)(1)(C).

**Paragraph (2).** Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement. This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1). It aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors. The court may direct the parties to provide to the court or other parties a summary or copy


ADD-50

of the full terms of any agreement identified by the parties. The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement. In exercising discretion under this rule, the court may act in steps, calling first for a summary of any agreement that may have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review. A direction to disclose a summary or copy of an agreement may raise concerns of confidentiality. Some agreements may include information that merits protection against general disclosure. And the court must provide an opportunity to claim work-product or other protections.

**Paragraph (3).** Subdivision (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords class members a new opportunity to request exclusion from a class certified under Rule 23(b)(3) after settlement terms are known. An agreement by the parties themselves to permit class members to elect exclusion at this point by the settlement agreement may be one factor supporting approval of the settlement. Often there is an opportunity to opt out at this point because the class is certified and settlement is reached in circumstances that lead to simultaneous notice of certification and notice of settlement. In these cases, the basic opportunity to elect exclusion applies without further complication. In some cases, particularly if settlement appears imminent at the time of certification, it may be possible to achieve equivalent protection by deferring notice and the opportunity to elect exclusion until actual settlement terms are known. This approach avoids the cost and potential confusion of providing two notices and makes the single notice more meaningful. But notice should not be delayed unduly after certification in the hope of settlement.

Rule 23(e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class. Exclusion may be requested only by individual class members; no class member may purport to opt out other class members by way of another class action.

The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.

The terms set for permitting a new opportunity to elect exclusion from the proposed settlement of a Rule 23(b)(3) class action may address concerns of potential misuse. The court might direct, for example, that class members who elect exclusion are bound by rulings on the merits made before the settlement was proposed for approval. Still other terms or conditions may be appropriate.

**Paragraph (4).** Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).

Subdivision (e)(4)(B) requires court approval for withdrawal of objections made under subdivision (e)(4)(A). Review follows automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class. Review also is required if the objector formally withdraws the objections. If the objector simply abandons pursuit of the objection, the court may inquire into the circumstances.


ADD-51

Approval under paragraph (4)(B) may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members. Different considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass. Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay. If such objections are surrendered on terms that do not affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the objections without elaborate inquiry.

Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement.

**Subdivision (g).** Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

**Paragraph (1)** sets out the basic requirement that class counsel be appointed if a class is certified and articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members. It also sets out the factors the court should consider in assessing proposed class counsel.

**Paragraph (1)(A)** requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.

Paragraph (1)(A) does not apply if "a statute provides otherwise." This recognizes that provisions of the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), contain directives that bear on selection of a lead plaintiff and the retention of counsel. This subdivision does not purport to supersede or to affect the interpretation of those provisions, or any similar provisions of other legislation.

**Paragraph 1(B)** recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel. In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

ADD-52

**Paragraph (1)(C)** articulates the basic responsibility of the court to appoint class counsel who will provide the adequate representation called for by paragraph (1)(B). It identifies criteria that must be considered and invites the court to consider any other pertinent matters. Although couched in terms of the court's duty, the listing also informs counsel seeking appointment about the topics that should be addressed in an application for appointment or in the motion for class certification.

The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic. For example, the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel. The court might also direct that potential class counsel indicate how parallel litigation might be coordinated or consolidated with the action before the court.

The court may also direct counsel to propose terms for a potential award of attorney fees and nontaxable costs. Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel. Because there will be numerous class actions in which this information is not likely to be useful, the court need not consider it in all class actions.

Some information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality.

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. For example, the resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

If, after review of all applicants, the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.

**Paragraph (2).** This paragraph sets out the procedure that should be followed in appointing class counsel. Although it affords substantial flexibility, it provides the framework for appointment of class counsel in all class actions. For counsel who filed the action, the materials submitted in support of the motion for class certification may suffice to justify appointment so long as the information described in paragraph (g)(1)(C) is included. If there are other applicants, they ordinarily would file a formal application detailing their suitability for the position.

In a plaintiff class action the court usually would appoint as class counsel only an attorney or attorneys who have sought appointment. Different considerations may apply in defendant class actions.

The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

**Paragraph (2)(A)** authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class. Rule 23(c)(1)(B) directs that the order certifying the class include appointment of class counsel. Before class certification, however, it will usually be important for an attorney

ADD-53

to take action to prepare for the certification decision. The amendment to Rule 23(c)(1) recognizes that some discovery is often necessary for that determination. It also may be important to make or respond to motions before certification. Settlement may be discussed before certification. Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate. Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made. Failure to make the formal designation does not prevent the attorney who filed the action from proceeding in it. Whether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-certification settlement must seek a settlement that is fair, reasonable, and adequate for the class.

Rule 23(c)(1) provides that the court should decide whether to certify the class "at an early practicable time," and directs that class counsel should be appointed in the order certifying the class. In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel. The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel. Examples might include instances in which more than one class action has been filed, or in which other attorneys have filed individual actions on behalf of putative class members. The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class. Another possible reason for deferring appointment would be that the initial applicant was found inadequate, but it seems appropriate to permit additional applications rather than deny class certification.

**Paragraph (2)(B)** states the basic standard the court should use in deciding whether to certify the class and appoint class counsel in the single applicant situation--that the applicant be able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C).

If there are multiple adequate applicants, paragraph (2)(B) directs the court to select the class counsel best able to represent the interests of the class. This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants. As with the decision whether to appoint the sole applicant for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants. The fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision if that lawyer had not done significant work identifying or investigating claims. Depending on the nature of the case, one important consideration might be the applicant's existing attorney-client relationship with the proposed class representative.

**Paragraph (2)(C)** builds on the appointment process by authorizing the court to include provisions regarding attorney fees in the order appointing class counsel. Courts may find it desirable to adopt guidelines for fees or nontaxable costs, or to direct class counsel to report to the court at regular intervals on the efforts undertaken in the action, to facilitate the court's later determination of a reasonable attorney fee.

**Subdivision (h).** Subdivision (h) is new. Fee awards are a powerful influence on the way attorneys initiate, develop, and conclude class actions. Class action attorney fee awards have heretofore been handled, along with all other attorney fee awards, under Rule 54(d)(2), but that rule is not addressed to the particular concerns of class actions. This subdivision is designed to work in tandem with new subdivision (g) on appointment of class counsel, which may afford an opportunity for the court to provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action.

Subdivision (h) applies to "an action certified as a class action." This includes cases in which there is a simultaneous proposal for class certification and settlement even though technically the class may not be certified


ADD-54

unless the court approves the settlement pursuant to review under Rule 23(e). When a settlement is proposed for Rule 23(e) approval, either after certification or with a request for certification, notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself.

This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

This subdivision authorizes an award of "reasonable" attorney fees and nontaxable costs. This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the "common fund" theory that applies in many class actions, and is used in many fee-shifting statutes. Depending on the circumstances, courts have approached the determination of what is reasonable in different ways. In particular, there is some variation among courts about whether in "common fund" cases the court should use the lodestar or a percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question whether the lodestar or percentage approach should be viewed as preferable.

Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility. In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.

Courts discharging this responsibility have looked to a variety of factors. One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). For a percentage approach to fee measurement, results achieved is the basic starting point.

In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer some portion of the fee award until actual payouts to class members are known. Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class. On occasion the court's Rule 23(e) review will provide a solid basis for this sort of evaluation, but in any event it is also important to assessing the fee award for the class.

At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award. Cf. *Blanchard v. Bergeron,* 489 U.S. 87, 95 (1989) (cautioning in an individual case against an "undesirable emphasis" on "the importance of the recovery of damages in civil rights litigation" that might "shortchange efforts to seek effective injunctive or declaratory relief").


ADD-55

Any directions or orders made by the court in connection with appointing class counsel under Rule 23(g) should weigh heavily in making a fee award under this subdivision.

Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion. Rule 54(d)(2)(B) provides: "If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made." The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. "Side agreements" regarding fees provide at least perspective pertinent to an appropriate fee award.

In addition, courts may take account of the fees charged by class counsel or other attorneys for representing individual claimants or objectors in the case. In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class. In some circumstances individual fee agreements between class counsel and class members might have provisions inconsistent with those goals, and the court might determine that adjustments in the class fee award were necessary as a result.

Finally, it is important to scrutinize separately the application for an award covering nontaxable costs. If costs were addressed in the order appointing class counsel, those directives should be a presumptive starting point in determining what is an appropriate award.

**Paragraph (1).** Any claim for an award of attorney fees must be sought by motion under Rule 54(d)(2), which invokes the provisions for timing of appeal in Rule 58 and Appellate Rule 4. Owing to the distinctive features of class action fee motions, however, the provisions of this subdivision control disposition of fee motions in class actions, while Rule 54(d)(2) applies to matters not addressed in this subdivision.

The court should direct when the fee motion must be filed. For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). In cases litigated to judgment, the court might also order class counsel's motion to be filed promptly so that notice to the class under this subdivision (h) can be given.

Besides service of the motion on all parties, notice of class counsel's motion for attorney fees must be "directed to the class in a reasonable manner." Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances. In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e). In adjudicated class actions, the court may calibrate the notice to avoid undue expense.

**Paragraph (2).** A class member and any party from whom payment is sought may object to the fee motion. Other parties--for example, nonsettling defendants--may not object because they lack a sufficient interest in the amount the court awards. The rule does not specify a time limit for making an objection. In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion.

The court may allow an objector discovery relevant to the objections. In determining whether to allow discovery, the court should weigh the need for the information against the cost and delay that would attend discovery. See Rule 26(b)(2). One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard applicable to the case. If


ADD-56

the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information.

**Paragraph (3).** Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee. The rule does not require a formal hearing in all cases. The form and extent of a hearing depend on the circumstances of the case. The rule does require findings and conclusions under Rule 52(a).

**Paragraph (4).** By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

2007 Amendment

The language of Rule 23 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Amended Rule 23(d)(2) carries forward the provisions of former Rule 23(d) that recognize two separate propositions. First, a Rule 23(d) order may be combined with a pretrial order under Rule 16. Second, the standard for amending the Rule 23(d) order continues to be the more open-ended standard for amending Rule 23(d) orders, not the more exacting standard for amending Rule 16 orders.

As part of the general restyling, intensifiers that provide emphasis but add no meaning are consistently deleted. Amended Rule 23(f) omits as redundant the explicit reference to court of appeals discretion in deciding whether to permit an interlocutory appeal. The omission does not in any way limit the unfettered discretion established by the original rule.

2009 Amendment

The time set in the former rule at 10 days has been revised to 14 days. See the Note to Rule 6.

**2018 Amendments**

Rule 23 is amended mainly to address issues related to settlement, and also to take account of issues that have emerged since the rule was last amended in 2003.

**Subdivision (c)(2).** As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of class certification and approval of the proposed settlement justifies giving notice. This decision has been called "preliminary approval" of the proposed class certification in Rule 23(b)(3) actions. It is common to send notice to the class simultaneously under both Rule 23(e)(1) and Rule 23(c)(2)(B), including a provision for class members to decide by a certain date whether to opt out. This amendment recognizes the propriety of this combined notice practice.

Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. Since *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), interpreted the individual notice requirement for class members in Rule 23(b)(3) class actions, many courts have read the rule to require notice by first class mail in every case. But technological change since 1974 has introduced other means of communication that may sometimes provide



ADD-57

a reliable additional or alternative method for giving notice. Although first class mail may often be the preferred primary method of giving notice, courts and counsel have begun to employ new technology to make notice more effective. Because there is no reason to expect that technological change will cease, when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology.

Rule 23(c)(2)(B) is amended to take account of these changes. The rule continues to call for giving class members "the best notice that is practicable." It does not specify any particular means as preferred. Although it may sometimes be true that electronic methods of notice, for example email, are the most promising, it is important to keep in mind that a significant portion of class members in certain cases may have limited or no access to email or the Internet.

Instead of preferring any one means of notice, therefore, the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court. The court should exercise its discretion to select appropriate means of giving notice. In providing the court with sufficient information to enable it to decide whether to give notice to the class of a proposed class-action settlement under Rule 23(e)(1), it would ordinarily be important to include details about the proposed method of giving notice and to provide the court with a copy of each notice the parties propose to use.

In determining whether the proposed means of giving notice is appropriate, the court should also give careful attention to the content and format of the notice and, if notice is given under both Rule 23(e)(1) and Rule 23(c)(2)(B), any claim form class members must submit to obtain relief.

Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the "traditional" methods are best may disregard contemporary communication realities. The ultimate goal of giving notice is to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims. Rule 23(c)(2)(B) directs that the notice be "in plain, easily understood language." Means, format, and content that would be appropriate for class members likely to be sophisticated, for example in a securities fraud class action, might not be appropriate for a class having many members likely to be less sophisticated. The court and counsel may wish to consider the use of class notice experts or professional claims administrators.

Attention should focus also on the method of opting out provided in the notice. The proposed method should be as convenient as possible, while protecting against unauthorized opt-out notices.

**Subdivision (e).** The introductory paragraph of Rule 23(e) is amended to make explicit that its procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court. The notice required under Rule 23(e)(1) then should also satisfy the notice requirements of amended Rule 23(c)(2)(B) for a class to be certified under Rule 23(b)(3), and trigger the class members' time to request exclusion. Information about the opt-out rate could then be available to the court when it considers final approval of the proposed settlement.

**Subdivision (e)(1).** The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. The parties must provide the court with information sufficient to determine whether notice should be sent. At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members. The amended rule also specifies the standard the court should use in deciding whether to send notice--that it likely will be able both to approve the settlement

ADD-58

proposal under Rule 23(e)(2) and, if it has not previously certified a class, to certify the class for purposes of judgment on the proposal.

The subjects to be addressed depend on the specifics of the particular class action and proposed settlement. But some general observations can be made.

One key element is class certification. If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted. But if a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class. Although the standards for certification differ for settlement and litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record. The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement. If the settlement is not approved, the parties' positions regarding certification for settlement should not be considered if certification is later sought for purposes of litigation.

Regarding the proposed settlement, many types of information might appropriately be provided to the court. A basic focus is the extent and type of benefits that the settlement will confer on the members of the class. Depending on the nature of the proposed relief, that showing may include details of the contemplated claims process and the anticipated rate of claims by class members. Because some funds are frequently left unclaimed, the settlement agreement ordinarily should address the distribution of those funds.

The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation. Information about the extent of discovery completed in the litigation or in parallel actions may often be important. In addition, as suggested by Rule 23(b)(3)(B), the parties should provide information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal.

The proposed handling of an award of attorney's fees under Rule 23(h) ordinarily should be addressed in the parties' submission to the court. In some cases, it will be important to relate the amount of an award of attorney's fees to the expected benefits to the class. One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results.

Another topic that normally should be considered is any agreement that must be identified under Rule 23(e)(3).

The parties may supply information to the court on any other topic that they regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate. The court may direct the parties to supply further information about the topics they do address, or to supply information on topics they do not address. The court should not direct notice to the class until the parties' submissions show it is likely that the court will be able to approve the proposal after notice to the class and a final approval hearing.

**Subdivision (e)(2).** The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.



A lengthy list of factors can take on an independent life, potentially distracting attention from the central concerns that inform the settlement-review process. A circuit's list might include a dozen or more separately articulated factors. Some of those factors--perhaps many--may not be relevant to a particular case or settlement proposal. Those that are relevant may be more or less important to the particular case. Yet counsel and courts may feel it necessary to address every factor on a given circuit's list in every case. The sheer number of factors can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2).

This amendment therefore directs the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal.

Approval under Rule 23(e)(2) is required only when class members would be bound under Rule 23(c)(3). Accordingly, in addition to evaluating the proposal itself, the court must determine whether it can certify the class under the standards of Rule 23(a) and (b) for purposes of judgment based on the proposal.

**Paragraphs (A) and (B).** These paragraphs identify matters that might be described as "procedural" concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement. If the court has appointed class counsel or interim class counsel, it will have made an initial evaluation of counsel's capacities and experience. But the focus at this point is on the actual performance of counsel acting on behalf of the class.

The information submitted under Rule 23(e)(1) may provide a useful starting point in assessing these topics. For example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base. The pendency of other litigation about the same general subject on behalf of class members may also be pertinent. The conduct of the negotiations may be important as well. For example, the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests. Particular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms.

**Paragraphs (C) and (D).** These paragraphs focus on what might be called a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process; directing that the parties report back to the court about actual claims experience may be important. The contents of any agreement identified under Rule 23(e)(3) may also bear on the adequacy of the proposed relief, particularly regarding the equitable treatment of all members of the class.

Another central concern will relate to the cost and risk involved in pursuing a litigated outcome. Often, courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results. That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure.

If the class has not yet been certified for trial, the court may consider whether certification for litigation would be granted were the settlement not approved.

Examination of the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement. Ultimately, any award of attorney's fees must be evaluated under Rule 23(h), and no rigid limits exist for such awards. Nonetheless, the relief actually delivered to the class can be a significant factor in determining the appropriate fee award.



ADD-60

Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.

Paragraph (D) calls attention to a concern that may apply to some class action settlements--inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.

**Subdivisions (e)(3) and (e)(4).** Headings are added to subdivisions (e)(3) and (e)(4) in accord with style conventions. These additions are intended to be stylistic only.

**Subdivision (e)(5).** The submissions required by Rule 23(e)(1) may provide information critical to decisions whether to object or opt out. Objections by class members can provide the court with important information bearing on its determination under Rule 23(e)(2) whether to approve the proposal.

**Subdivision (e)(5)(A).** The rule is amended to remove the requirement of court approval for every withdrawal of an objection. An objector should be free to withdraw on concluding that an objection is not justified. But Rule 23(e)(5)(B)(i) requires court approval of any payment or other consideration in connection with withdrawing the objection.

The rule is also amended to clarify that objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them. One feature required of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members. Beyond that, the rule directs that the objection state its grounds "with specificity." Failure to provide needed specificity may be a basis for rejecting an objection. Courts should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards.

**Subdivision (e)(5)(B).** Good-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2). It is legitimate for an objector to seek payment for providing such assistance under Rule 23(h).

But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process. At least in some instances, it seems that objectors--or their counsel--have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements. And class counsel sometimes may feel that avoiding the delay produced by an appeal justifies providing payment or other consideration to these objectors. Although the payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes.

The court-approval requirement currently in Rule 23(e)(5) partly addresses this concern. Because the concern only applies when consideration is given in connection with withdrawal of an objection, however, the amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved. Although such payment is usually made to objectors or their counsel, the rule also requires court approval if a payment in connection with forgoing or withdrawing an objection or appeal is instead to another recipient. The term "consideration" should be broadly interpreted, particularly when the withdrawal includes some arrangements beneficial to objector counsel. If the consideration involves a payment to counsel for an objector, the proper procedure is by motion under Rule 23(h) for an award of fees.



ADD-61

Rule 23(e)(5)(B)(ii) applies to consideration in connection with forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal. Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court-approval requirement to apply in the appellate context. The district court is best positioned to determine whether to approve such arrangements; hence, the rule requires that the motion seeking approval be made to the district court.

Until the appeal is docketed by the circuit clerk, the district court may dismiss the appeal on stipulation of the parties or on the appellant's motion. See Fed. R. App. P. 42(a). Thereafter, the court of appeals has authority to decide whether to dismiss the appeal. This rule's requirement of district court approval of any consideration in connection with such dismissal by the court of appeals has no effect on the authority of the court of appeals to decide whether to dismiss the appeal. It is, instead, a requirement that applies only to providing consideration in connection with forgoing, dismissing, or abandoning an appeal.

**Subdivision (e)(5)(C).** Because the court of appeals has jurisdiction over an objector's appeal from the time that it is docketed in the court of appeals, the procedure of Rule 62.1 applies. That procedure does not apply after the court of appeals' mandate returns the case to the district court.

**Subdivision (f).** As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of eventual class certification justifies giving notice. But this decision does not grant or deny class certification, and review under Rule 23(f) would be premature. This amendment makes it clear that an appeal under this rule is not permitted until the district court decides whether to certify the class.

The rule is also amended to extend the time to file a petition for review of a class-action certification order to 45 days whenever a party is the United States, one of its agencies, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. In such a case, the extension applies to a petition for permission to appeal by any party. The extension recognizes--as under Rules 4(i) and 12(a) and Appellate Rules 4(a)(1)(B) and 40(a)(1)--that the United States has a special need for additional time in regard to these matters. It applies whether the officer or employee is sued in an official capacity or an individual capacity. An action against a former officer or employee of the United States is covered by this provision in the same way as an action against a present officer or employee. Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time.

Notes of Decisions (4594)

Fed. Rules Civ. Proc. Rule 23, 28 U.S.C.A., FRCP Rule 23
Including Amendments Received Through 3-1-23

ADD-62

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted   Limited on Preemption Grounds by   National Federation of the Blind v. United Airlines Inc.,   9th Cir.(Cal.), Jan. 19, 2016

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Annotated California Codes
  Civil Code (Refs & Annos)
    Division 1. Persons (Refs & Annos)
      Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51

§ 51. Unruh Civil Rights Act; equal rights; business establishments;
violations of federal Americans with Disabilities Act

Effective: January 1, 2016
Currentness

(a) This section shall be known, and may be cited, as the Unruh Civil Rights Act.

(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

(c) This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, sexual orientation, citizenship, primary language, or immigration status, or to persons regardless of their genetic information.

(d) Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall anything in this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

(e) For purposes of this section:

(1) "Disability" means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code.

ADD-63

(2)(A) "Genetic information" means, with respect to any individual, information about any of the following:

(i) The individual's genetic tests.

(ii) The genetic tests of family members of the individual.

(iii) The manifestation of a disease or disorder in family members of the individual.

(B) "Genetic information" includes any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

(C) "Genetic information" does not include information about the sex or age of any individual.

(3) "Medical condition" has the same meaning as defined in subdivision (i) of Section 12926 of the Government Code.

(4) "Religion" includes all aspects of religious belief, observance, and practice.

(5) "Sex" includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth. "Sex" also includes, but is not limited to, a person's gender. "Gender" means sex, and includes a person's gender identity and gender expression. "Gender expression" means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth.

(6) "Sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status" includes a perception that the person has any particular characteristic or characteristics within the listed categories or that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics within the listed categories.

(7) "Sexual orientation" has the same meaning as defined in subdivision (s) of Section 12926 of the Government Code.

(f) A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) [1] shall also constitute a violation of this section.

(g) Verification of immigration status and any discrimination based upon verified immigration status, where required by federal law, shall not constitute a violation of this section.

ADD-64

(h) Nothing in this section shall be construed to require the provision of services or documents in a language other than English, beyond that which is otherwise required by other provisions of federal, state, or local law, including Section 1632.

**Credits**

(Added by Stats.1905, c. 413, p. 553, § 1. Amended by Stats.1919, c. 210, p. 309, § 1; Stats.1923, c. 235, p. 485, § 1; Stats.1959, c. 1866, p. 4424, § 1; Stats.1961, c. 1187, p. 2920, § 1; Stats.1974, c. 1193, p. 2568, § 1; Stats.1987, c. 159, § 1; Stats.1992, c. 913 (A.B.1077), § 3; Stats.1998, c. 195 (A.B.2702), § 1; Stats.2000, c. 1049 (A.B.2222), § 2; Stats.2005, c. 420 (A.B.1400), § 3; Stats.2011, c. 261 (S.B.559), § 3; Stats.2011, c. 719 (A.B.887), § 1.5; Stats.2015, c. 303 (A.B.731), § 25, eff. Jan. 1, 2016; Stats.2015, c. 282 (S.B.600), § 1, eff. Jan. 1, 2016.)

Notes of Decisions (883)

**Footnotes**

1        For public law sections classified to the U.S.C.A., see USCA-Tables.

West's Ann. Cal. Civ. Code § 51, CA CIVIL § 51
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-65

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.1

§ 51.1. Mandatory service on State Solicitor General of each party's brief or
petition and brief in causes of action based on violation of civil rights statutes

Effective: January 1, 2003
Currentness

If a violation of Section 51, 51.5, 51.7, 51.9, or 52.1 is alleged or the application or construction of any of these sections is in issue in any proceeding in the Supreme Court of California, a state court of appeal, or the appellate division of a superior court, each party shall serve a copy of the party's brief or petition and brief, on the State Solicitor General at the Office of the Attorney General. No brief may be accepted for filing unless the proof of service shows service on the State Solicitor General. Any party failing to comply with this requirement shall be given a reasonable opportunity to cure the failure before the court imposes any sanction and, in that instance, the court shall allow the Attorney General reasonable additional time to file a brief in the matter.

**Credits**

(Added by Stats.2002, c. 244 (A.B.2524), § 1.)

Notes of Decisions (1)

West's Ann. Cal. Civ. Code § 51.1, CA CIVIL § 51.1
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

*End of Document*      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-66

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.2

§ 51.2. Age discrimination in sale or rental of housing prohibited; housing designed to meet physical and social needs of senior citizens; exceptions; intent; age preferences in federally approved housing programs

Effective: January 1, 2011
Currentness

(a) Section 51 shall be construed to prohibit a business establishment from discriminating in the sale or rental of housing based upon age. Where accommodations are designed to meet the physical and social needs of senior citizens, a business establishment may establish and preserve that housing for senior citizens, pursuant to Section 51.3, except housing as to which Section 51.3 is preempted by the prohibition in the federal Fair Housing Amendments Act of 1988 (Public Law 100-430)[1] and implementing regulations against discrimination on the basis of familial status. For accommodations constructed before February 8, 1982, that meet all the criteria for senior citizen housing specified in Section 51.3, a business establishment may establish and preserve that housing development for senior citizens without the housing development being designed to meet physical and social needs of senior citizens.

(b) This section is intended to clarify the holdings in Marina Point, Ltd. v. Wolfson (1982) 30 Cal.3d 72 and O'Connor v. Village Green Owners Association (1983) 33 Cal.3d 790.

(c) This section shall not apply to the County of Riverside.

(d) A housing development for senior citizens constructed on or after January 1, 2001, shall be presumed to be designed to meet the physical and social needs of senior citizens if it includes all of the following elements:

(1) Entryways, walkways, and hallways in the common areas of the development, and doorways and paths of access to and within the housing units, shall be as wide as required by current laws applicable to new multifamily housing construction for provision of access to persons using a standard-width wheelchair.

(2) Walkways and hallways in the common areas of the development shall be equipped with standard height railings or grab bars to assist persons who have difficulty with walking.

(3) Walkways and hallways in the common areas shall have lighting conditions which are of sufficient brightness to assist persons who have difficulty seeing.

ADD-67

(4) Access to all common areas and housing units within the development shall be provided without use of stairs, either by means of an elevator or sloped walking ramps.

(5) The development shall be designed to encourage social contact by providing at least one common room and at least some common open space.

(6) Refuse collection shall be provided in a manner that requires a minimum of physical exertion by residents.

(7) The development shall comply with all other applicable requirements for access and design imposed by law, including, but not limited to, the Fair Housing Act (42 U.S.C. Sec. 3601 et seq.), the Americans with Disabilities Act (42 U.S.C. Sec. 12101 et seq.), and the regulations promulgated at Title 24 of the California Code of Regulations that relate to access for persons with disabilities or handicaps. Nothing in this section shall be construed to limit or reduce any right or obligation applicable under those laws.

(e) Selection preferences based on age, imposed in connection with a federally approved housing program, do not constitute age discrimination in housing.

**Credits**
(Added by Stats.1984, c. 787, § 1. Amended by Stats.1989, c. 501, § 1; Stats.1993, c. 830 (S.B.137), § 1, eff. Oct. 6, 1993; Stats.1996, c. 1147 (S.B.2097), § 2; Stats.1999, c. 324 (S.B.382), § 1; Stats.2000, c. 1004 (S.B.2011), § 2; Stats.2002, c. 726 (A.B.2787), § 2; Stats.2010, c. 524 (S.B.1252), § 2.)

Notes of Decisions (4)

## Footnotes

1       Public law sections classified to the U.S.C.A., see USCA-Tables.

West's Ann. Cal. Civ. Code § 51.2, CA CIVIL § 51.2
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-68

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.3

§ 51.3. Housing; age limitations; necessity for senior citizen housing

Effective: January 1, 2017
Currentness

(a) The Legislature finds and declares that this section is essential to establish and preserve specially designed accessible housing for senior citizens. There are senior citizens who need special living environments and services, and find that there is an inadequate supply of this type of housing in the state.

(b) For the purposes of this section, the following definitions apply:

(1) "Qualifying resident" or "senior citizen" means a person 62 years of age or older, or 55 years of age or older in a senior citizen housing development.

(2) "Qualified permanent resident" means a person who meets both of the following requirements:

(A) Was residing with the qualifying resident or senior citizen prior to the death, hospitalization, or other prolonged absence of, or the dissolution of marriage with, the qualifying resident or senior citizen.

(B) Was 45 years of age or older, or was a spouse, cohabitant, or person providing primary physical or economic support to the qualifying resident or senior citizen.

(3) "Qualified permanent resident" also means a disabled person or person with a disabling illness or injury who is a child or grandchild of the senior citizen or a qualified permanent resident as defined in paragraph (2) who needs to live with the senior citizen or qualified permanent resident because of the disabling condition, illness, or injury. For purposes of this section, "disabled" means a person who has a disability as defined in subdivision (b) of Section 54. A "disabling injury or illness" means an illness or injury which results in a condition meeting the definition of disability set forth in subdivision (b) of Section 54.

(A) For any person who is a qualified permanent resident under this paragraph whose disabling condition ends, the owner, board of directors, or other governing body may require the formerly disabled resident to cease residing in the development upon receipt of six months' written notice; provided, however, that the owner, board of directors, or other governing body may allow the person to remain a resident for up to one year after the disabling condition ends.

ADD-69

(B) The owner, board of directors, or other governing body of the senior citizen housing development may take action to prohibit or terminate occupancy by a person who is a qualified permanent resident under this paragraph if the owner, board of directors, or other governing body finds, based on credible and objective evidence, that the person is likely to pose a significant threat to the health or safety of others that cannot be ameliorated by means of a reasonable accommodation; provided, however, that the action to prohibit or terminate the occupancy may be taken only after doing both of the following:

(i) Providing reasonable notice to and an opportunity to be heard for the disabled person whose occupancy is being challenged, and reasonable notice to the coresident parent or grandparent of that person.

(ii) Giving due consideration to the relevant, credible, and objective information provided in the hearing. The evidence shall be taken and held in a confidential manner, pursuant to a closed session, by the owner, board of directors, or other governing body in order to preserve the privacy of the affected persons.

The affected persons shall be entitled to have present at the hearing an attorney or any other person authorized by them to speak on their behalf or to assist them in the matter.

(4) "Senior citizen housing development" means a residential development developed, substantially rehabilitated, or substantially renovated for, senior citizens that has at least 35 dwelling units. Any senior citizen housing development which is required to obtain a public report under Section 11010 of the Business and Professions Code and which submits its application for a public report after July 1, 2001, shall be required to have been issued a public report as a senior citizen housing development under Section 11010.05 of the Business and Professions Code. No housing development constructed prior to January 1, 1985, shall fail to qualify as a senior citizen housing development because it was not originally developed or put to use for occupancy by senior citizens.

(5) "Dwelling unit" or "housing" means any residential accommodation other than a mobilehome.

(6) "Cohabitant" refers to persons who live together as spouses or persons who are domestic partners within the meaning of Section 297 of the Family Code.

(7) "Permitted health care resident" means a person hired to provide live-in, long-term, or terminal health care to a qualifying resident, or a family member of the qualifying resident providing that care. For the purposes of this section, the care provided by a permitted health care resident must be substantial in nature and must provide either assistance with necessary daily activities or medical treatment, or both.

A permitted health care resident shall be entitled to continue his or her occupancy, residency, or use of the dwelling unit as a permitted resident in the absence of the senior citizen from the dwelling unit only if both of the following are applicable:

(A) The senior citizen became absent from the dwelling unit due to hospitalization or other necessary medical treatment and expects to return to his or her residence within 90 days from the date the absence began.

ADD-70

(B) The absent senior citizen or an authorized person acting for the senior citizen submits a written request to the owner, board of directors, or governing board stating that the senior citizen desires that the permitted health care resident be allowed to remain in order to be present when the senior citizen returns to reside in the development.

Upon written request by the senior citizen or an authorized person acting for the senior citizen, the owner, board of directors, or governing board shall have the discretion to allow a permitted health care resident to remain for a time period longer than 90 days from the date that the senior citizen's absence began, if it appears that the senior citizen will return within a period of time not to exceed an additional 90 days.

(c) The covenants, conditions, and restrictions and other documents or written policy shall set forth the limitations on occupancy, residency, or use on the basis of age. Any such limitation shall not be more exclusive than to require that one person in residence in each dwelling unit may be required to be a senior citizen and that each other resident in the same dwelling unit may be required to be a qualified permanent resident, a permitted health care resident, or a person under 55 years of age whose occupancy is permitted under subdivision (h) of this section or under subdivision (b) of Section 51.4. That limitation may be less exclusive, but shall at least require that the persons commencing any occupancy of a dwelling unit include a senior citizen who intends to reside in the unit as his or her primary residence on a permanent basis. The application of the rules set forth in this subdivision regarding limitations on occupancy may result in less than all of the dwellings being actually occupied by a senior citizen.

(d) The covenants, conditions, and restrictions or other documents or written policy shall permit temporary residency, as a guest of a senior citizen or qualified permanent resident, by a person of less than 55 years of age for periods of time, not less than 60 days in any year, that are specified in the covenants, conditions, and restrictions or other documents or written policy.

(e) Upon the death or dissolution of marriage, or upon hospitalization, or other prolonged absence of the qualifying resident, any qualified permanent resident shall be entitled to continue his or her occupancy, residency, or use of the dwelling unit as a permitted resident. This subdivision shall not apply to a permitted health care resident.

(f) The condominium, stock cooperative, limited-equity housing cooperative, planned development, or multiple-family residential rental property shall have been developed for, and initially been put to use as, housing for senior citizens, or shall have been substantially rehabilitated or renovated for, and immediately afterward put to use as, housing for senior citizens, as provided in this section; provided, however, that no housing development constructed prior to January 1, 1985, shall fail to qualify as a senior citizen housing development because it was not originally developed for or originally put to use for occupancy by senior citizens.

(g) The covenants, conditions, and restrictions or other documents or written policies applicable to any condominium, stock cooperative, limited-equity housing cooperative, planned development, or multiple-family residential property that contained age restrictions on January 1, 1984, shall be enforceable only to the extent permitted by this section, notwithstanding lower age restrictions contained in those documents or policies.

(h) Any person who has the right to reside in, occupy, or use the housing or an unimproved lot subject to this section on January 1, 1985, shall not be deprived of the right to continue that residency, occupancy, or use as the result of the enactment of this section.

(i) The covenants, conditions, and restrictions or other documents or written policy of the senior citizen housing development shall permit the occupancy of a dwelling unit by a permitted health care resident during any period that the person is actually providing live-in, long-term, or hospice health care to a qualifying resident for compensation. For purposes of this subdivision, the term "for compensation" shall include provisions of lodging and food in exchange for care.

(j) Notwithstanding any other provision of this section, this section shall not apply to the County of Riverside.

**Credits**

(Added by Stats.1984, c. 1333, § 1. Amended by Stats.1985, c. 1505, § 2; Stats.1989, c. 190, § 1; Stats.1994, c. 464 (S.B.1560), § 1; Stats.1995, c. 147 (S.B.332), § 1; Stats.1996, c. 1147 (S.B.2097), § 3; Stats.1999, c. 324 (S.B.382), § 2; Stats.2000, c. 1004 (S.B.2011), § 3; Stats.2016, c. 50 (S.B.1005), § 5, eff. Jan. 1, 2017.)

Notes of Decisions (9)

West's Ann. Cal. Civ. Code § 51.3, CA CIVIL § 51.3
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-72

---

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
           Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.3.5

§ 51.3.5. Intergenerational housing developments; legislative
findings and declarations; conditions for establishment

Effective: January 1, 2022
Currentness

(a) The Legislature finds and declares that this section is essential to establish and preserve specially designed, accessible, intergenerational housing for senior citizens. There are senior citizens who need special living environments and services and benefit from intergenerational housing environments, and find that there is an inadequate supply of this type of housing in the state.

(b) An intergenerational housing development may be established to provide intergenerational housing consisting of units for senior citizens, caregivers, or transition age youths if all of the following conditions are satisfied:

(1)(A) At least 80 percent of the occupied dwelling units are occupied by at least one senior citizen. This requirement shall commence when at least 25 percent of the units are occupied. A dwelling unit is occupied by at least one senior citizen if, on the date the exemption for housing designed for intergenerational housing is claimed, one of the following conditions is satisfied:

(i) At least one occupant of the dwelling unit is a senior citizen.

(ii) If the dwelling unit is temporarily vacant, at least one of the occupants immediately prior to the date on which the unit was temporarily vacated was a senior citizen.

(B) Up to 20 percent of the occupied dwelling units are occupied by at least one caregiver or transition age youth. A dwelling unit is occupied by at least one caregiver or transition age youth if, on the date the exemption for housing designed for intergenerational housing is claimed, one of the following conditions is satisfied:

(i) At least one occupant of the dwelling unit is a caregiver or transition age youth.

(ii) If the dwelling unit is temporarily vacant, at least one of the occupants immediately prior to the date on which the unit was temporarily vacant was a caregiver or transition age youth.

---

ADD-73

(2) The development is affordable to lower income households as defined in Section 50079.5 of the Health and Safety Code.

(3)(A) If a unit that is identified for occupancy by a caregiver or transition age youth ceases to house a caregiver or transition age youth, the owner, board of directors, or other governing body may require, at their discretion, the household in that unit to cease residing in the development upon receipt of a minimum of six months written notice, for the sole purpose of ensuring that the unit may be made available to a qualifying caregiver or transition age youth. This action shall not constitute a violation of Section 51 or of Article 2 (commencing with Section 12955) of Chapter 6 of Part 2.8 of Division 3 of Title 2 of the Government Code (California Fair Employment and Housing Act).

(B) The housing facility or community shall not evict or terminate the lease of a family with children in order to comply with the requirement that at least 80 percent of the occupied units be occupied by at least one senior citizen. This provision does not otherwise alter or affect applicable protections for tenants.

(C) The covenants, conditions, and restrictions and other documents or written policy for the development shall set forth the limitations on occupancy, residency, or use consistent with this section.

(4) Housing established pursuant to this section shall comply with all applicable fair housing laws, including, but not limited to, the California Fair Employment and Housing Act (Part 2.8 (commencing with Section 12900) of Division 3 of Title 2 of the Government Code) and the Fair Housing Act (42 U.S.C. Sec. 3601).

(5) Notwithstanding any other law, any occupied dwelling units within an intergenerational housing development established pursuant to this section that are occupied by caregivers or transition age youth as described in subparagraph (B) of paragraph (1) shall not count toward the housing type goal for seniors under the qualified allocation plan adopted by the California Tax Credit Allocation Committee in accordance with Section 50199.14 of the Health and Safety Code.

(c) This section specifically creates a state policy supporting intergenerational housing for senior citizens, caregivers, and transition age youth, as described in Section 42(g)(9) of the Internal Revenue Code, [1] and, further, permits developers in receipt of local or state funds or tax credits designated for affordable rental housing to restrict occupancy to senior citizens, caregivers, and transition age youth, including permitting developers in receipt of tax credits designated for affordable rental housing to retain the right to prioritize and restrict occupancy, so long as that housing does not violate any other applicable laws.

(d) For the purposes of this section, the following terms have the following meanings:

(1) "Caregiver" means a person responsible for meeting the daily care needs of a senior citizen, or a person hired to provide live-in, long-term, or terminal health care to a qualifying resident, or a family member of the qualifying resident providing that care. For purposes of this section, the care provided shall be substantial in nature and shall include either assistance with necessary daily activities or medical treatment, or both.

ADD-74

(2) "Senior citizen" or "resident" means a person 55 years of age or older.

(3) "Transition age youth" means a person who is 18 to 24 years of age, inclusive, and who is either of the following:

(A) A current or former foster youth who has been adjudged a ward or dependent of the juvenile court pursuant to Section 300, 601, or 602 of the Welfare and Institutions Code.

(B) A homeless youth or former homeless youth, who has met the McKinney-Vento Homeless Assistance Act of 1987 definition of "homeless children and youths," as that term is defined in Section 11434a of Title 42 of the United States Code.

**Credits**
(Added by Stats.2021, c. 364 (S.B.591), § 3, eff. Jan. 1, 2022.)

## Footnotes

1      Internal Revenue Code sections are in Title 26 of the U.S.C.A.

West's Ann. Cal. Civ. Code § 51.3.5, CA CIVIL § 51.3.5
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   3

ADD-75

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.4

§ 51.4. Exemption from special design requirement

Effective: January 1, 2007
Currentness

(a) The Legislature finds and declares that the requirements for senior housing under Sections 51.2 and 51.3 are more stringent than the requirements for that housing under the federal Fair Housing Amendments Act of 1988 (P.L. 100-430) in recognition of the acute shortage of housing for families with children in California. The Legislature further finds and declares that the special design requirements for senior housing under Sections 51.2 and 51.3 may pose a hardship to some housing developments that were constructed before the decision in Marina Point, Ltd. v. Wolfson (1982) 30 Cal.3d 721. The Legislature further finds and declares that the requirement for specially designed accommodations in senior housing under Sections 51.2 and 51.3 provides important benefits to senior citizens and also ensures that housing exempt from the prohibition of age discrimination is carefully tailored to meet the compelling societal interest in providing senior housing.

(b) Any person who resided in, occupied, or used, prior to January 1, 1990, a dwelling in a senior citizen housing development that relied on the exemption to the special design requirement provided by this section prior to January 1, 2001, shall not be deprived of the right to continue that residency, occupancy, or use as the result of the changes made to this section by the enactment of Chapter 1004 of the Statutes of 2000.

(c) This section shall not apply to the County of Riverside.

**Credits**
(Added by Stats.1989, c. 501, § 2. Amended by Stats.1991, c. 59 (A.B.125), § 1, eff. June 17, 1991; Stats.1996, c. 1147 (S.B.2097), § 4; Stats.2000, c. 1004 (S.B.2011), § 4; Stats.2006, c. 538 (S.B.1852), § 37.)

West's Ann. Cal. Civ. Code § 51.4, CA CIVIL § 51.4
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-76

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
           Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.5

§ 51.5. Discrimination, boycott, blacklist, etc.; business establishments; equal rights

Effective: January 1, 2006
Currentness

(a) No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics.

(b) As used in this section, "person" includes any person, firm, association, organization, partnership, business trust, corporation, limited liability company, or company.

(c) This section shall not be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

**Credits**
(Added by Stats.1976, c. 366, p. 1013, § 1. Amended by Stats.1987, c. 159, § 2; Stats.1992, c. 913 (A.B.1077), § 3.2; Stats.1994, c. 1010 (S.B.2053), § 28; Stats.1998, c. 195 (A.B.2702), § 2; Stats.1999, c. 591 (A.B.1670), § 2; Stats.2000, c. 1049 (A.B.2222), § 3; Stats.2005, c. 420 (A.B.1400), § 4.)

Notes of Decisions (41)

West's Ann. Cal. Civ. Code § 51.5, CA CIVIL § 51.5
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

*End of Document*          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

ADD-77

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.6

§ 51.6. Gender Tax Repeal Act of 1995

Effective: January 1, 2020
Currentness

(a) This section shall be known, and may be cited, as the Gender Tax Repeal Act of 1995.

(b) No business establishment of any kind whatsoever may discriminate, with respect to the price charged for services of similar or like kind, against a person because of the person's gender.

(c) Nothing in subdivision (b) prohibits price differences based specifically upon the amount of time, difficulty, or cost of providing the services.

(d) Except as provided in subdivision (f), the remedies for a violation of this section are the remedies provided in subdivision (a) of Section 52. However, an action under this section is independent of any other remedy or procedure that may be available to an aggrieved party.

(e) This act does not alter or affect the provisions of the Health and Safety Code, the Insurance Code, or other laws that govern health care service plan or insurer underwriting or rating practices.

(f)(1) The following business establishments shall clearly and conspicuously disclose to the customer in writing the pricing for each standard service provided:

(A) Tailors or businesses providing aftermarket clothing alterations.

(B) Barbers or hair salons.

(C) Dry cleaners and laundries providing services to individuals.

(2) The price list shall be posted in an area conspicuous to customers. Posted price lists shall be in no less than 14-point boldface type and clearly and completely display pricing for every standard service offered by the business under paragraph (1).

ADD-78

(3) The business establishment shall provide the customer with a complete written price list upon request.

(4) The business establishment shall display in a conspicuous place at least one clearly visible sign, printed in no less than 24-point boldface type, which reads: "CALIFORNIA LAW PROHIBITS ANY BUSINESS ESTABLISHMENT FROM DISCRIMINATING, WITH RESPECT TO THE PRICE CHARGED FOR SERVICES OF SIMILAR OR LIKE KIND, AGAINST A PERSON BECAUSE OF THE PERSON'S GENDER. A COMPLETE PRICE LIST IS AVAILABLE UPON REQUEST."

(5) A business establishment that fails to correct a violation of this subdivision within 30 days of receiving written notice of the violation is liable for a civil penalty of one thousand dollars ($1,000).

(6) For the purposes of this subdivision, "standard service" means the 15 most frequently requested services provided by the business.

(g)(1) Commencing January 1, 2021, a city, county, or city and county that issues business licenses shall provide a business, at the time the business is issued the license or when the license is renewed, written notice of these provisions in English, Spanish, Chinese, Tagalog, Vietnamese, and Korean. In order to comply with this paragraph, a city, county, or city and county may provide the business with the notice created by the Department of Consumer Affairs under subdivision (b) of Section 55.63.

(2) A city, county, or city and county that issues business licenses may increase the fee for that license in an amount not to exceed the reasonable costs of providing the written notice above.

(h) The Legislature finds and declares that this section addresses a matter of statewide concern rather than a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. Therefore, this section applies to all cities, including charter cities.

**Credits**
(Added by Stats.1995, c. 866 (A.B.1100), § 1. Amended by Stats.2001, c. 312 (A.B.1088), § 1; Stats.2019, c. 293 (A.B.1607), § 1, eff. Jan. 1, 2020.)

Notes of Decisions (7)

West's Ann. Cal. Civ. Code § 51.6, CA CIVIL § 51.6
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-79

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Limited on Preemption Grounds by   Saheli v. White Memorial Medical Center,   Cal.App. 2
Dist.,   Mar. 14, 2018

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.7

§ 51.7. Ralph Civil Rights Act of 1976

Effective: June 30, 2022
Currentness

(a) This section shall be known, and may be cited, as the Ralph Civil Rights Act of 1976.

(b)(1) All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

(2) For purposes of this subdivision, "intimidation by threat of violence" includes, but is not limited to, making or threatening to make a claim or report to a peace officer or law enforcement agency that falsely alleges that another person has engaged in unlawful activity or in an activity that requires law enforcement intervention, knowing that the claim or report is false, or with reckless disregard for the truth or falsity of the claim or report.

(c)(1) A person shall not require another person to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, as a condition of entering into a contract for goods or services, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any court or other governmental entity.

(2) A person shall not refuse to enter into a contract with, or refuse to provide goods or services to, another person on the basis that the other person refuses to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any other governmental entity.

(3) Any waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section, including the right to file and pursue a civil action or complaint with, or otherwise notify, the Attorney General or any other public prosecutor, or law enforcement agency, the Civil Rights Department, or any other governmental entity shall

ADD-80

be knowing and voluntary, in writing, and expressly not made as a condition of entering into a contract for goods or services or as a condition of providing or receiving goods and services.

(4) Any waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section that is required as a condition of entering into a contract for goods or services shall be deemed involuntary, unconscionable, against public policy, and unenforceable. This subdivision does not affect the enforceability or validity of any other provision of the contract.

(5) A person who seeks to enforce a waiver of any legal right, penalty, remedy, forum, or procedure for a violation of this section has the burden of proving that the waiver was knowing and voluntary and not made as a condition of the contract or of providing or receiving the goods or services.

(6) The exercise of a person's right to refuse to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including a rejection of a contract requiring a waiver, does not affect any otherwise legal terms of a contract or an agreement.

(7) This subdivision does not apply to an agreement to waive any legal rights, penalties, remedies, forums, or procedures for a violation of this section after a legal claim has arisen.

(8) This subdivision applies to an agreement to waive any legal right, penalty, remedy, forum, or procedure for a violation of this section, including an agreement to accept private arbitration, entered into, altered, modified, renewed, or extended on or after January 1, 2015.

(d) This section does not apply to statements concerning positions in a labor dispute that are made during otherwise lawful labor picketing.

(e) The Legislature finds and declares that this section was enacted as part of the Ralph Civil Rights Act of 1976, in Chapter 1293 of the Statutes of 1976.

(f) This section does not negate or otherwise abrogate the provisions of Sections 1668, 1953, and 3513.

**Credits**

(Added by Stats.1976, c. 1293, p. 5778, § 2. Amended by Stats.1984, c. 1437, § 1; Stats.1985, c. 497, § 1; Stats.1987, c. 1277, § 2; Stats.1994, c. 407 (S.B.1595), § 1; Stats.2005, c. 420 (A.B.1400), § 5; Stats.2014, c. 910 (A.B.2617), § 2, eff. Jan. 1, 2015; Stats.2018, c. 776 (A.B.3250), § 3, eff. Jan. 1, 2019; Stats.2020, c. 327 (A.B.1775), § 3, eff. Jan. 1, 2021; Stats.2022, c. 48 (S.B.189), § 4, eff. June 30, 2022.)

Notes of Decisions (115)

West's Ann. Cal. Civ. Code § 51.7, CA CIVIL § 51.7

Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

ADD-81

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-82

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.8

§ 51.8. Discrimination; franchises

Effective: January 1, 2006
Currentness

(a) No franchisor shall discriminate in the granting of franchises solely on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 of the franchisee and the composition of a neighborhood or geographic area reflecting any characteristic listed or defined in subdivision (b) or (e) of Section 51 in which the franchise is located. Nothing in this section shall be interpreted to prohibit a franchisor from granting a franchise to prospective franchisees as part of a program or programs to make franchises available to persons lacking the capital, training, business experience, or other qualifications ordinarily required of franchisees, or any other affirmative action program adopted by the franchisor.

(b) Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall anything in this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

**Credits**

(Added by Stats.1980, c. 1303, § 1. Amended by Stats.1987, c. 159, § 3; Stats.1992, c. 913 (A.B.1077), § 3.4; Stats.1998, c. 195 (A.B.2702), § 3; Stats.2005, c. 420 (A.B.1400), § 6.)

Notes of Decisions (3)

West's Ann. Cal. Civ. Code § 51.8, CA CIVIL § 51.8
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

ADD-83

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
           Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.9

§ 51.9. Sexual harassment; business, service and professional relationships

Effective: January 1, 2019
Currentness

(a) A person is liable in a cause of action for sexual harassment under this section when the plaintiff proves all of the following elements:

(1) There is a business, service, or professional relationship between the plaintiff and defendant or the defendant holds himself or herself out as being able to help the plaintiff establish a business, service, or professional relationship with the defendant or a third party. Such a relationship may exist between a plaintiff and a person, including, but not limited to, any of the following persons:

(A) Physician, psychotherapist, or dentist. For purposes of this section, "psychotherapist" has the same meaning as set forth in paragraph (1) of subdivision (c) of Section 728 of the Business and Professions Code.

(B) Attorney, holder of a master's degree in social work, real estate agent, real estate appraiser, investor, accountant, banker, trust officer, financial planner loan officer, collection service, building contractor, or escrow loan officer.

(C) Executor, trustee, or administrator.

(D) Landlord or property manager.

(E) Teacher.

(F) Elected official.

(G) Lobbyist.

(H) Director or producer.

(I) A relationship that is substantially similar to any of the above.

ADD-84

(2) The defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe.

(3) The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of the conduct described in paragraph (2).

(b) In an action pursuant to this section, damages shall be awarded as provided by subdivision (b) of Section 52.

(c) Nothing in this section shall be construed to limit application of any other remedies or rights provided under the law.

(d) The definition of sexual harassment and the standards for determining liability set forth in this section shall be limited to determining liability only with regard to a cause of action brought under this section.

**Credits**
(Added by Stats.1994, c. 710 (S.B.612), § 2. Amended by Stats.1996, c. 150 (S.B.195), § 1; Stats.1999, c. 964 (A.B.519), § 1; Stats.2018, c. 951 (S.B.224), § 1, eff. Jan. 1, 2019.)

Notes of Decisions (31)

West's Ann. Cal. Civ. Code § 51.9, CA CIVIL § 51.9
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-85

West's Annotated California Codes
  Civil Code (Refs & Annos)
    Division 1. Persons (Refs & Annos)
      Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.10

§ 51.10. Age discrimination in sale or rental of housing prohibited; construction of Unruh Civil Rights Act; senior housing; intent; age preferences in federally approved housing programs; application of section

Effective: January 1, 2011
Currentness

(a) Section 51 shall be construed to prohibit a business establishment from discriminating in the sale or rental of housing based upon age. A business establishment may establish and preserve housing for senior citizens, pursuant to Section 51.11, except housing as to which Section 51.11 is preempted by the prohibition in the federal Fair Housing Amendments Act of 1988 (Public Law 100-430) [1] and implementing regulations against discrimination on the basis of familial status.

(b) This section is intended to clarify the holdings in Marina Point, Ltd. v. Wolfson (1982) 30 Cal.3d 721, and O'Connor v. Village Green Owners Association (1983) 33 Cal.3d 790.

(c) Selection preferences based on age, imposed in connection with a federally approved housing program, do not constitute age discrimination in housing.

(d) This section shall only apply to the County of Riverside.

**Credits**
(Added by Stats.1996, c. 1147 (S.B.2097), § 5. Amended by Stats.2004, c. 183 (A.B.3082), § 23; Stats.2010, c. 524 (S.B.1252), § 3.)

**Footnotes**

1        Public law sections classified to the U.S.C.A., see USCA-Tables.

West's Ann. Cal. Civ. Code § 51.10, CA CIVIL § 51.10
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

ADD-86

---

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.11

§ 51.11. Riverside County; establishment or preservation of senior housing; legislative findings and declarations; definitions; requirements; qualification of development; application of section

Effective: January 1, 2017
Currentness

(a) The Legislature finds and declares that this section is essential to establish and preserve housing for senior citizens. There are senior citizens who need special living environments, and find that there is an inadequate supply of this type of housing in the state.

(b) For the purposes of this section, the following definitions apply:

(1) "Qualifying resident" or "senior citizen" means a person 62 years of age or older, or 55 years of age or older in a senior citizen housing development.

(2) "Qualified permanent resident" means a person who meets both of the following requirements:

(A) Was residing with the qualifying resident or senior citizen prior to the death, hospitalization, or other prolonged absence of, or the dissolution of marriage with, the qualifying resident or senior citizen.

(B) Was 45 years of age or older, or was a spouse, cohabitant, or person providing primary physical or economic support to the qualifying resident or senior citizen.

(3) "Qualified permanent resident" also means a disabled person or person with a disabling illness or injury who is a child or grandchild of the senior citizen or a qualified permanent resident as defined in paragraph (2) who needs to live with the senior citizen or qualified permanent resident because of the disabling condition, illness, or injury. For purposes of this section, "disabled" means a person who has a disability as defined in subdivision (b) of Section 54. A "disabling injury or illness" means an illness or injury which results in a condition meeting the definition of disability set forth in subdivision (b) of Section 54.

(A) For any person who is a qualified permanent resident under paragraph (3) whose disabling condition ends, the owner, board of directors, or other governing body may require the formerly disabled resident to cease residing in the development upon receipt of six months' written notice; provided, however, that the owner, board of directors, or other governing body may allow the person to remain a resident for up to one year, after the disabling condition ends.

---

ADD-87

(B) The owner, board of directors, or other governing body of the senior citizen housing development may take action to prohibit or terminate occupancy by a person who is a qualified permanent resident under paragraph (3) if the owner, board of directors, or other governing body finds, based on credible and objective evidence, that the person is likely to pose a significant threat to the health or safety of others that cannot be ameliorated by means of a reasonable accommodation; provided, however, that action to prohibit or terminate the occupancy may be taken only after doing both of the following:

(i) Providing reasonable notice to and an opportunity to be heard for the disabled person whose occupancy is being challenged, and reasonable notice to the coresident parent or grandparent of that person.

(ii) Giving due consideration to the relevant, credible, and objective information provided in that hearing. The evidence shall be taken and held in a confidential manner, pursuant to a closed session, by the owner, board of directors, or other governing body in order to preserve the privacy of the affected persons.

The affected persons shall be entitled to have present at the hearing an attorney or any other person authorized by them to speak on their behalf or to assist them in the matter.

(4) "Senior citizen housing development" means a residential development developed with more than 20 units as a senior community by its developer and zoned as a senior community by a local governmental entity, or characterized as a senior community in its governing documents, as these are defined in Section 4150, or qualified as a senior community under the federal Fair Housing Amendments Act of 1988,[1] as amended. Any senior citizen housing development which is required to obtain a public report under Section 11010 of the Business and Professions Code and which submits its application for a public report after July 1, 2001, shall be required to have been issued a public report as a senior citizen housing development under Section 11010.05 of the Business and Professions Code.

(5) "Dwelling unit" or "housing" means any residential accommodation other than a mobilehome.

(6) "Cohabitant" refers to persons who live together as spouses or persons who are domestic partners within the meaning of Section 297 of the Family Code.

(7) "Permitted health care resident" means a person hired to provide live-in, long-term, or terminal health care to a qualifying resident, or a family member of the qualifying resident providing that care. For the purposes of this section, the care provided by a permitted health care resident must be substantial in nature and must provide either assistance with necessary daily activities or medical treatment, or both.

A permitted health care resident shall be entitled to continue his or her occupancy, residency, or use of the dwelling unit as a permitted resident in the absence of the senior citizen from the dwelling unit only if both of the following are applicable:

(A) The senior citizen became absent from the dwelling unit due to hospitalization or other necessary medical treatment and expects to return to his or her residence within 90 days from the date the absence began.

(B) The absent senior citizen or an authorized person acting for the senior citizen submits a written request to the owner, board of directors, or governing board stating that the senior citizen desires that the permitted health care resident be allowed to remain in order to be present when the senior citizen returns to reside in the development.

Upon written request by the senior citizen or an authorized person acting for the senior citizen, the owner, board of directors, or governing board shall have the discretion to allow a permitted health care resident to remain for a time period longer than 90 days from the date that the senior citizen's absence began, if it appears that the senior citizen will return within a period of time not to exceed an additional 90 days.

(c) The covenants, conditions, and restrictions and other documents or written policy shall set forth the limitations on occupancy, residency, or use on the basis of age. Any limitation shall not be more exclusive than to require that one person in residence in each dwelling unit may be required to be a senior citizen and that each other resident in the same dwelling unit may be required to be a qualified permanent resident, a permitted health care resident, or a person under 55 years of age whose occupancy is permitted under subdivision (g) of this section or subdivision (b) of Section 51.12. That limitation may be less exclusive, but shall at least require that the persons commencing any occupancy of a dwelling unit include a senior citizen who intends to reside in the unit as his or her primary residence on a permanent basis. The application of the rules set forth in this subdivision regarding limitations on occupancy may result in less than all of the dwellings being actually occupied by a senior citizen.

(d) The covenants, conditions, and restrictions or other documents or written policy shall permit temporary residency, as a guest of a senior citizen or qualified permanent resident, by a person of less than 55 years of age for periods of time, not more than 60 days in any year, that are specified in the covenants, conditions, and restrictions or other documents or written policy.

(e) Upon the death or dissolution of marriage, or upon hospitalization, or other prolonged absence of the qualifying resident, any qualified permanent resident shall be entitled to continue his or her occupancy, residency, or use of the dwelling unit as a permitted resident. This subdivision shall not apply to a permitted health care resident.

(f) The covenants, conditions, and restrictions or other documents or written policies applicable to any condominium, stock cooperative, limited-equity housing cooperative, planned development, or multiple-family residential property that contained age restrictions on January 1, 1984, shall be enforceable only to the extent permitted by this section, notwithstanding lower age restrictions contained in those documents or policies.

(g) Any person who has the right to reside in, occupy, or use the housing or an unimproved lot subject to this section on or after January 1, 1985, shall not be deprived of the right to continue that residency, occupancy, or use as the result of the enactment of this section by Chapter 1147 of the Statutes of 1996.

(h) A housing development may qualify as a senior citizen housing development under this section even though, as of January 1, 1997, it does not meet the definition of a senior citizen housing development specified in subdivision (b), if the development complies with that definition for every unit that becomes occupied after January 1, 1997, and if the development was once within that definition, and then became noncompliant with the definition as the result of any one of the following:

(1) The development was ordered by a court or a local, state, or federal enforcement agency to allow persons other than qualifying residents, qualified permanent residents, or permitted health care residents to reside in the development.

(2) The development received a notice of a pending or proposed action in, or by, a court, or a local, state, or federal enforcement agency, which action could have resulted in the development being ordered by a court or a state or federal enforcement agency to allow persons other than qualifying residents, qualified permanent residents, or permitted health care residents to reside in the development.

(3) The development agreed to allow persons other than qualifying residents, qualified permanent residents, or permitted health care residents to reside in the development by entering into a stipulation, conciliation agreement, or settlement agreement with a local, state, or federal enforcement agency or with a private party who had filed, or indicated an intent to file, a complaint against the development with a local, state, or federal enforcement agency, or file an action in a court.

(4) The development allowed persons other than qualifying residents, qualified permanent residents, or permitted health care residents to reside in the development on the advice of counsel in order to prevent the possibility of an action being filed by a private party or by a local, state, or federal enforcement agency.

(i) The covenants, conditions, and restrictions or other documents or written policy of the senior citizen housing development shall permit the occupancy of a dwelling unit by a permitted health care resident during any period that the person is actually providing live-in, long-term, or hospice health care to a qualifying resident for compensation.

(j) This section shall only apply to the County of Riverside.

**Credits**

(Added by Stats.1996, c. 1147 (S.B.2097), § 6. Amended by Stats.1999, c. 324 (S.B.382), § 3; Stats.2000, c. 1004 (S.B.2011), § 5; Stats.2012, c. 181 (A.B.806), § 19, operative Jan. 1, 2014; Stats.2016, c. 50 (S.B.1005), § 6, eff. Jan. 1, 2017.)

**Editors' Notes**

### LAW REVISION COMMISSION COMMENTS

2012 Amendment

Subdivision (b)(4) of Section 51.11 is amended to correct a cross-reference to former Section 1351(j).

Subdivision (c) is amended to make a stylistic revision. [40 Cal.L.Rev.Comm. Reports 235 (2010)].

Notes of Decisions (1)

ADD-90

**Footnotes**

1      See Short Title note under 42 U.S.C.A. § 3601 for classification of the Act to the Code.

West's Ann. Cal. Civ. Code § 51.11, CA CIVIL § 51.11
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-91

---

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.12

§ 51.12. Riverside County; senior housing; legislative findings and
declarations; right of residency, occupancy, or use; application of section

Effective: January 1, 2001
Currentness

(a) The Legislature finds and declares that the requirements for senior housing under Sections 51.10 and 51.11 are more stringent than the requirements for that housing under the federal Fair Housing Amendments Act of 1988 (Public Law 100-430). [1]

(b) Any person who resided in, occupied, or used, prior to January 1, 1990, a dwelling in a senior citizen housing development which relied on the exemption to the special design requirement provided by Section 51.4 as that section read prior to January 1, 2001, shall not be deprived of the right to continue that residency, or occupancy, or use as the result of the changes made to this section by the enactment of Senate Bill 1382 or Senate Bill 2011 at the 1999-2000 Regular Session of the Legislature.

(c) This section shall only apply to the County of Riverside.

**Credits**
(Added by Stats.1996, c. 1147 (S.B.2097), § 7. Amended by Stats.2000, c. 1004 (S.B.2011), § 6.)

**Footnotes**

1      See Short Title note under 42 U.S.C.A. § 3601 for classification of the Act to the Code.

West's Ann. Cal. Civ. Code § 51.12, CA CIVIL § 51.12
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

*End of Document*                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

ADD-92

West's Annotated California Codes
  Civil Code (Refs & Annos)
    Division 1. Persons (Refs & Annos)
      Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51.13

§ 51.13. Discounts or other benefits conferred on consumers
who have suffered loss or reduction of employment or wages

Effective: November 2, 2009
Currentness

Any discount or other benefit offered to or conferred on a consumer or prospective consumer by a business because the consumer or prospective consumer has suffered the loss or reduction of employment or reduction of wages shall not be considered an arbitrary discrimination in violation of Section 51.

**Credits**

(Added by Stats.2009, c. 641 (S.B.367), § 1, eff. Nov. 2, 2009.)

West's Ann. Cal. Civ. Code § 51.13, CA CIVIL § 51.13
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

ADD-93

West's Annotated California Codes
Civil Code (Refs & Annos)
Division 1. Persons (Refs & Annos)
Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54

§ 54. Right to streets, highways, and other public places; disability

Effective: January 1, 2001
Currentness

(a) Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places.

(b) For purposes of this section:

(1) "Disability" means any mental or physical disability as defined in Section 12926 of the Government Code.

(2) "Medical condition" has the same meaning as defined in subdivision (h) of Section 12926 of the Government Code.

(c) A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section.

**Credits**
(Added by Stats.1968, c. 461, p. 1024, § 1. Amended by Stats.1992, c. 913 (A.B.1077), § 4; Stats.1994, c. 1257 (S.B.1240), § 1; Stats.1996, c. 498 (S.B.1687), § 1; Stats.2000, c. 1049 (A.B.2222), § 4.)

Notes of Decisions (157)

West's Ann. Cal. Civ. Code § 54, CA CIVIL § 54
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

*End of Document*

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-94

⚑ KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Limited on Preemption Grounds by   National Federation of the Blind v. United Airlines Inc.,
9th Cir.(Cal.),  Jan. 19, 2016

West's Annotated California Codes
  Civil Code (Refs & Annos)
    Division 1. Persons (Refs & Annos)
      Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.1

§ 54.1. Access to public conveyances, places of public
accommodation, amusement or resort, and housing accommodations

Effective: January 1, 2017
Currentness

(a)(1) Individuals with disabilities shall be entitled to full and equal access, as other members of the general
public, to accommodations, advantages, facilities, medical facilities, including hospitals, clinics, and physicians'
offices, and privileges of all common carriers, airplanes, motor vehicles, railroad trains, motorbuses, streetcars,
boats, or any other public conveyances or modes of transportation (whether private, public, franchised, licensed,
contracted, or otherwise provided), telephone facilities, adoption agencies, private schools, hotels, lodging places,
places of public accommodation, amusement, or resort, and other places to which the general public is invited,
subject only to the conditions and limitations established by law, or state or federal regulation, and applicable
alike to all persons.

(2) As used in this section, "telephone facilities" means tariff items and other equipment and services that have
been approved by the Public Utilities Commission to be used by individuals with disabilities in a manner feasible
and compatible with the existing telephone network provided by the telephone companies.

(3) "Full and equal access," for purposes of this section in its application to transportation, means access that
meets the standards of Titles II and III of the Americans with Disabilities Act of 1990 (Public Law 101-336) [1]
and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards,
it shall mean access that meets those higher standards.

(b)(1) Individuals with disabilities shall be entitled to full and equal access, as other members of the general public,
to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and
limitations established by law, or state or federal regulation, and applicable alike to all persons.

(2) "Housing accommodations" means any real property, or portion of real property, that is used or occupied, or
is intended, arranged, or designed to be used or occupied, as the home, residence, or sleeping place of one or more
human beings, but shall not include any accommodations included within subdivision (a) or any single-family
residence the occupants of which rent, lease, or furnish for compensation not more than one room in the residence.

ADD-95

(3)(A) A person renting, leasing, or otherwise providing real property for compensation shall not refuse to permit an individual with a disability, at that person's expense, to make reasonable modifications of the existing rented premises if the modifications are necessary to afford the person full enjoyment of the premises. However, any modifications under this paragraph may be conditioned on the disabled tenant entering into an agreement to restore the interior of the premises to the condition existing before the modifications. No additional security may be required on account of an election to make modifications to the rented premises under this paragraph, but the lessor and tenant may negotiate, as part of the agreement to restore the premises, a provision requiring the disabled tenant to pay an amount into an escrow account, not to exceed a reasonable estimate of the cost of restoring the premises.

(B) A person renting, leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises.

(4) This subdivision does not require a person renting, leasing, or providing for compensation real property to modify his or her property in any way or provide a higher degree of care for an individual with a disability than for an individual who is not disabled.

(5) Except as provided in paragraph (6), this part does not require a person renting, leasing, or providing for compensation real property, if that person refuses to accept tenants who have dogs, to accept as a tenant an individual with a disability who has a dog.

(6)(A) It shall be deemed a denial of equal access to housing accommodations within the meaning of this subdivision for a person, firm, or corporation to refuse to lease or rent housing accommodations to an individual who is blind or visually impaired on the basis that the individual uses the services of a guide dog, an individual who is deaf or hard of hearing on the basis that the individual uses the services of a signal dog, or to an individual with any other disability on the basis that the individual uses the services of a service dog, or to refuse to permit such an individual who is blind or visually impaired to keep a guide dog, an individual who is deaf or hard of hearing to keep a signal dog, or an individual with any other disability to keep a service dog on the premises.

(B) Except in the normal performance of duty as a mobility or signal aid, this paragraph does not prevent the owner of a housing accommodation from establishing terms in a lease or rental agreement that reasonably regulate the presence of guide dogs, signal dogs, or service dogs on the premises of a housing accommodation, nor does this paragraph relieve a tenant from any liability otherwise imposed by law for real and personal property damages caused by such a dog when proof of the damage exists.

(C)(i) As used in this subdivision, "guide dog" means a guide dog that was trained by a person licensed under Chapter 9.5 (commencing with Section 7200) of Division 3 of the Business and Professions Code or as defined in the regulations implementing Title III of the Americans with Disabilities Act of 1990 (Public Law 101-336).

(ii) As used in this subdivision, "signal dog" means a dog trained to alert an individual who is deaf or hard of hearing to intruders or sounds.

ADD-96

(iii) As used in this subdivision, "service dog" means a dog individually trained to the requirements of the individual with a disability, including, but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items.

(7) It shall be deemed a denial of equal access to housing accommodations within the meaning of this subdivision for a person, firm, or corporation to refuse to lease or rent housing accommodations to an individual who is blind or visually impaired, an individual who is deaf or hard of hearing, or other individual with a disability on the basis that the individual with a disability is partially or wholly dependent upon the income of his or her spouse, if the spouse is a party to the lease or rental agreement. This subdivision does not prohibit a lessor or landlord from considering the aggregate financial status of an individual with a disability and his or her spouse.

(c) Visually impaired or blind persons and persons licensed to train guide dogs for individuals who are visually impaired or blind pursuant to Chapter 9.5 (commencing with Section 7200) of Division 3 of the Business and Professions Code or guide dogs as defined in the regulations implementing Title III of the Americans with Disabilities Act of 1990 (Public Law 101-336), and persons who are deaf or hard of hearing and persons authorized to train signal dogs for individuals who are deaf or hard of hearing, and other individuals with a disability and persons authorized to train service dogs for individuals with a disability, may take dogs, for the purpose of training them as guide dogs, signal dogs, or service dogs in any of the places specified in subdivisions (a) and (b). These persons shall ensure that the dog is on a leash and tagged as a guide dog, signal dog, or service dog by identification tag issued by the county clerk, animal control department, or other agency, as authorized by Chapter 3.5 (commencing with Section 30850) of Division 14 of the Food and Agricultural Code. In addition, the person shall be liable for any provable damage done to the premises or facilities by his or her dog.

(d) A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section, and this section does not limit the access of any person in violation of that act.

(e) This section does not preclude the requirement of the showing of a license plate or disabled placard when required by enforcement units enforcing disabled persons parking violations pursuant to Sections 22507.8 and 22511.8 of the Vehicle Code.

**Credits**

(Added by Stats.1968, c. 461, p. 1092, § 1. Amended by Stats.1969, c. 832, p. 1664, § 1; Stats.1972, c. 819, p. 1465, § 1; Stats.1974, c. 108, p. 223, § 1; Stats.1976, c. 971, p. 2269, § 1; Stats.1976, c. 972, p. 2272, § 1.5; Stats.1977, c. 700, p. 2256, § 1; Stats.1978, c. 380, p. 1128, § 12; Stats.1979, c. 293, p. 1092, § 1; Stats.1980, c. 773, § 1; Stats.1988, c. 1595, § 2; Stats.1992, c. 913 (A.B.1077), § 5; Stats.1993, c. 1149 (A.B.1419), § 4; Stats.1993, c. 1214 (A.B.551), § 1.5; Stats.1994, c. 1257 (S.B.1240), § 2; Stats.1996, c. 498 (S.B.1687), § 1.5; Stats.2016, c. 94 (A.B.1709), § 1, eff. Jan. 1, 2017.)

Notes of Decisions (101)

ADD-97

**Footnotes**

1        42 U.S.C.A. § 12101 et seq.

West's Ann. Cal. Civ. Code § 54.1, CA CIVIL § 54.1

Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-98

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.2

§ 54.2. Guide, signal or service dogs; right to accompany individuals with a disability and trainers; damages

Effective: January 1, 2017
Currentness

(a) Every individual with a disability has the right to be accompanied by a guide dog, signal dog, or service dog, especially trained for the purpose, in any of the places specified in Section 54.1 without being required to pay an extra charge or security deposit for the guide dog, signal dog, or service dog. However, the individual shall be liable for any damage done to the premises or facilities by his or her dog.

(b) Individuals who are blind or otherwise visually impaired and persons licensed to train guide dogs for individuals who are blind or visually impaired pursuant to Chapter 9.5 (commencing with Section 7200) of Division 3 of the Business and Professions Code or as defined in regulations implementing Title III of the Americans with Disabilities Act of 1990 (Public Law 101-336), [1] and individuals who are deaf or hard of hearing and persons authorized to train signal dogs for individuals who are deaf or hard of hearing, and individuals with a disability and persons who are authorized to train service dogs for the individuals with a disability may take dogs, for the purpose of training them as guide dogs, signal dogs, or service dogs in any of the places specified in Section 54.1 without being required to pay an extra charge or security deposit for the guide dog, signal dog, or service dog. However, the person shall be liable for any damage done to the premises or facilities by his or her dog. These persons shall ensure the dog is on a leash and tagged as a guide dog, signal dog, or service dog by an identification tag issued by the county clerk, animal control department, or other agency, as authorized by Chapter 3.5 (commencing with Section 30850) of Title 14 of the Food and Agricultural Code.

(c) A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section, and this section does not limit the access of any person in violation of that act.

(d) As used in this section, the terms "guide dog," "signal dog," and "service dog" have the same meanings as defined in Section 54.1.

(e) This section does not preclude the requirement of the showing of a license plate or disabled placard when required by enforcement units enforcing disabled persons parking violations pursuant to Sections 22507.8 and 22511.8 of the Vehicle Code.

ADD-99

**Credits**

(Added by Stats.1968, c. 461, p. 1092, § 1. Amended by Stats.1972, c. 819, p. 1466, § 2; Stats.1979, c. 293, p. 1092, § 2; Stats.1980, c. 773, § 2; Stats.1988, c. 1595, § 3; Stats.1992, c. 913 (A.B.1077), § 6; Stats.1994, c. 1257 (S.B.1240), § 3; Stats.1996, c. 498 (S.B.1687), § 2; Stats.2016, c. 94 (A.B.1709), § 2, eff. Jan. 1, 2017.)

Notes of Decisions (14)

**Footnotes**

1      42 U.S.C.A. § 12101 et seq.

West's Ann. Cal. Civ. Code § 54.2, CA CIVIL § 54.2
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

ADD-100

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.25

§ 54.25. Peace officer or firefighter assigned to canine unit; handler of search
and rescue dog; duty away from home jurisdiction; discrimination; civil fine

Effective: January 1, 2011
Currentness

(a)(1) A peace officer or firefighter assigned to a canine unit or the handler of a search and rescue dog assigned to duty away from his or her home jurisdiction because of a declared federal, state, or local emergency, or an official mutual aid request or training, and in the course and scope of his or her duties shall not be denied service based on the presence of the dog or discriminated against in hotels, lodging establishments, eating establishments, or public transportation by being required to pay an extra charge or security deposit for the dog. However, the peace officer's law enforcement agency, the firefighter's fire agency, or the handler of a search and rescue dog shall be liable for any damages to the premises or facilities caused by the dog.

(2) Any person, firm, association, or corporation, or the agent of any person, firm, association, or corporation that prevents a peace officer or a firefighter assigned to a canine unit and his or her dog or the handler of a search and rescue dog and his or her dog from exercising, or interferes in the exercise of, the rights specified in this section is subject to a civil fine not exceeding one thousand dollars ($1,000).

(b) For purposes of this section, the following definitions apply:

(1) "Declared emergency" is any emergency declared by the President of the United States, the Governor of a state, or local authorities.

(2) "Handler of a search and rescue dog" means a person in possession of a dog that is in training to become registered and approved as a search and rescue dog, or that is currently registered and approved for tasks, including, but not limited to, locating missing persons, discovering controlled substances, explosives, or cadavers, or locating victims in collapsed structures, and assisting with peace officer on-command searches for suspects and victims at crime scenes.

(3) "Peace officer's or firefighter's dog" means a dog owned by a public law enforcement agency or fire department and under the control of a peace officer or firefighter assigned to a canine unit that has been trained in matters, including, but not limited to, discovering controlled substances, explosives, cadavers, victims in collapsed structures, and peace officer on-command searches for suspects and victims at crime scenes.

ADD-101

(4) "Search and rescue dog" means a dog that is officially affiliated with, or sponsored by, a governmental agency and that has been trained and approved as a search and rescue dog, or that is currently registered and approved for search and rescue work with a search and rescue team affiliated with the California Emergency Management Agency. The term also includes a dog that is in training to become registered and approved for that work.

(c) Nothing in this section is intended to affect any civil remedies available for a violation of this section.

(d) This section is intended to provide accessibility without discrimination to a peace officer or firefighter with a peace officer's or firefighter's dog or a handler of a search and rescue dog with a search and rescue dog in hotels, lodging places, eating establishments, and public transportation.

(e) Nothing in this section is intended to prevent the removal of the search and rescue dog in the event the search and rescue dog creates an excessive disturbance to the quiet enjoyment of the property. In the event of an excessive disturbance, the peace officer, firefighter, or handler of the search and rescue dog shall be given a minimum of one warning notice of the excessive disturbance and an opportunity to correct the disturbance. The mere presence of the dog within the hotel, lodging establishment, food establishment, or public transportation shall not be considered an excessive disturbance.

**Credits**

(Added by Stats.2008, c. 226 (A.B.2131), § 1. Amended by Stats.2010, c. 92 (A.B.2243), § 1.)

West's Ann. Cal. Civ. Code § 54.25, CA CIVIL § 54.25

Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   2

ADD-102

West's Annotated California Codes
  Civil Code (Refs & Annos)
    Division 1. Persons (Refs & Annos)
      Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.27

§ 54.27. Prelitigation letters and complaints to education entities; requirements; discipline

Effective: January 1, 2018
Currentness

(a) An attorney who provides a prelitigation letter to an education entity shall do both of the following:

(1) Include the attorney's State Bar license number in the prelitigation letter.

(2) Within five business days of providing the prelitigation letter, send a copy of the prelitigation letter to the California Commission on Disability Access.

(b) An attorney who sends or serves a complaint against an education entity shall do both of the following:

(1) Send a copy of the complaint and submit information about the complaint in a standard format specified by the California Commission on Disability Access to the commission within five business days of sending or serving the complaint.

(2) Notify the California Commission on Disability Access within five business days of judgment, settlement, or dismissal of the claim or claims alleged in the complaint of the following information in a standard format specified by the commission:

(A) The date of the judgment, settlement, or dismissal.

(B) Whether or not the construction-related accessibility violations alleged in the complaint were remedied in whole or in part after the plaintiff filed a complaint.

(C) If the construction-related accessibility violations alleged in the complaint were not remedied in whole or in part after the plaintiff filed a complaint, whether or not another favorable result was achieved after the plaintiff filed the complaint.

(c) A violation of paragraph (2) of subdivision (a) or subdivision (b) shall constitute cause for the imposition of discipline of an attorney if a copy of the prelitigation letter, complaint, or notification of a case outcome is not sent to the California Commission on Disability Access within five business days. In the event the State

ADD-103

Bar of California receives information indicating that an attorney has failed to send a copy of the prelitigation letter, complaint, or notification of a case outcome to the California Commission on Disability Access within five business days, the State Bar of California shall investigate to determine whether paragraph (2) of subdivision (a) or subdivision (b) has been violated.

(d) Notwithstanding subdivisions (a) and (b), an attorney is not required to send to the California Commission on Disability Access a copy of any subsequent prelitigation letter or amended complaint in the same dispute following the initial prelitigation letter or complaint, unless that subsequent prelitigation letter or amended complaint alleges a new construction-related accessibility claim.

(e) A prelitigation letter or notification of a case outcome sent to the California Commission on Disability Access shall be for the informational purposes of Section 8299.08 of the Government Code.

(f) The California Commission on Disability Access shall review and report on the prelitigation letters, complaints, and notifications of case outcomes it receives in the same manner as provided in Section 8299.08 of the Government Code.

(g) Paragraph (2) of subdivision (a) and subdivision (b) does not apply to a prelitigation letter or complaint sent or filed by an attorney employed or retained by a qualified legal services project or a qualified support center, as defined in Section 6213 of the Business and Professions Code, when acting within the scope of employment in asserting a construction-related accessibility claim. The Legislature finds and declares that qualified legal services projects and support centers are extensively regulated by the State Bar of California, and that there is no evidence of any abusive use of demand letters or complaints by these organizations. The Legislature further finds that, in light of the evidence of the extraordinarily small number of construction-related accessibility cases brought by regulated legal services programs, and given the resources of those programs, exempting regulated legal services programs from the requirements of this section to report to the California Commission on Disability Access will not affect the purpose of the reporting to, and tabulation by, the commission of all other construction-related accessibility claims.

(h) This section does not apply to a claim for money or damages against a public entity governed by Division 3.6 (commencing with Section 810) of Title 1 of the Government Code or make the requirements of this section applicable to such a claim.

(i) For purposes of this section, the following terms have the following meanings:

(1) "Complaint" means a civil complaint that is filed or is to be filed with a court and is sent to or served upon a defendant on the basis of one or more construction-related accessibility claims.

(2) "Construction-related accessibility claim" or "claim" means any claim of a violation of any construction-related accessibility standard, as defined in paragraph (6) of subdivision (a) of Section 55.52, with respect to a public building, public facility, or other public place of an education entity. "Construction-related accessibility claim" does not include a claim of interference with housing within the meaning of paragraph (2) of subdivision (b)

ADD-104

of Section 54.1, or any claim of interference caused by something other than the construction-related accessibility condition of the property, including, but not limited to, the conduct of any person.

(3) "Education entity" means the Regents of the University of California, the Trustees of the California State University and the California State University, the office of the Chancellor of the California Community Colleges, a K-12 school district, or any local education agency.

(4) "Prelitigation letter" means a prelitigation written document that alleges the site is in violation of one or more construction-related accessibility standards, as defined in paragraph (6) of subdivision (a) of Section 55.52 and is provided to the education entity whether or not the attorney intends to file a complaint, or eventually files a complaint, in state or federal court. A prelitigation letter does not include a claim for money or damages against a local public entity governed by Division 3.6 (commencing with Section 810) of Title 1 of the Government Code.

**Credits**

(Added by Stats.2016, c. 892 (S.B.1406), § 1, eff. Jan. 1, 2017. Amended by Stats.2017, c. 561 (A.B.1516), § 16, eff. Jan. 1, 2018.)

West's Ann. Cal. Civ. Code § 54.27, CA CIVIL § 54.27

Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

End of Document                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-105

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.3

§ 54.3. Violations; liability

Effective: June 30, 2022
Currentness

(a) Any person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 or otherwise interferes with the rights of an individual with a disability under Sections 54, 54.1 and 54.2 is liable for each offense for the actual damages and any amount as may be determined by a jury, or the court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($1,000), and attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights provided in Sections 54, 54.1, and 54.2. "Interfere," for purposes of this section, includes, but is not limited to, preventing or causing the prevention of a guide dog, signal dog, or service dog from carrying out its functions in assisting a disabled person.

(b) Any person who claims to be aggrieved by an alleged unlawful practice in violation of Section 54, 54.1, or 54.2 may also file a verified complaint with the Civil Rights Department pursuant to Section 12948 of the Government Code. The remedies in this section are nonexclusive and are in addition to any other remedy provided by law, including, but not limited to, any action for injunctive or other equitable relief available to the aggrieved party or brought in the name of the people of this state or of the United States.

(c) A person may not be held liable for damages pursuant to both this section and Section 52 for the same act or failure to act.

**Credits**
(Added by Stats.1968, c. 461, p. 1092, § 1. Amended by Stats.1976, c. 971, p. 2270, § 2; Stats.1976, c. 972, p. 2274, § 2.5; Stats.1977, c. 881, p. 2650, § 1; Stats.1981, c. 395, § 1; Stats.1992, c. 913 (A.B.1077), § 7; Stats.1994, c. 1257 (S.B.1240), § 4; Stats.1996, c. 498 (S.B.1687), § 2.3; Stats.2022, c. 48 (S.B.189), § 6, eff. June 30, 2022.)

Notes of Decisions (77)

West's Ann. Cal. Civ. Code § 54.3, CA CIVIL § 54.3
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.   1

ADD-106

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.4

§ 54.4. Blind or visually impaired pedestrian; failure to carry cane or use guide dog

Currentness

A blind or otherwise visually impaired pedestrian shall have all of the rights and privileges conferred by law upon other persons in any of the places, accommodations, or conveyances specified in Sections 54 and 54.1, notwithstanding the fact that the person is not carrying a predominantly white cane (with or without a red tip), or using a guide dog. The failure of a blind or otherwise visually impaired person to carry such a cane or to use such a guide dog shall not constitute negligence per se.

**Credits**

(Added by Stats.1968, c. 461, p. 1092, § 1. Amended by Stats.1994, c. 1257 (S.B.1240), § 5.)

West's Ann. Cal. Civ. Code § 54.4, CA CIVIL § 54.4
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-107

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.5

§ 54.5. White cane safety day; proclamation

Currentness

Each year, the Governor shall publicly proclaim October 15 as White Cane Safety Day. He or she shall issue a proclamation in which:

(a) Comments shall be made upon the significance of this chapter.

(b) Citizens of the state are called upon to observe the provisions of this chapter and to take precautions necessary to the safety of disabled persons.

(c) Citizens of the state are reminded of the policies with respect to disabled persons declared in this chapter and he urges the citizens to cooperate in giving effect to them.

(d) Emphasis shall be made on the need of the citizenry to be aware of the presence of disabled persons in the community and to keep safe and functional for the disabled the streets, highways, sidewalks, walkways, public buildings, public facilities, other public places, places of public accommodation, amusement and resort, and other places to which the public is invited, and to offer assistance to disabled persons upon appropriate occasions.

(e) It is the policy of this state to encourage and enable disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment.

**Credits**
(Added by Stats.1968, c. 461, p. 1092, § 1. Amended by Stats.1994, c. 1257 (S.B.1240), § 6.)

Notes of Decisions (1)

West's Ann. Cal. Civ. Code § 54.5, CA CIVIL § 54.5
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

ADD-108

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.6

§ 54.6. Visually impaired

Effective: January 1, 2007
Currentness

As used in this part, "visually impaired" includes blindness and means having central visual acuity not to exceed $^{20}/_{200}$ in the better eye, with corrected lenses, as measured by the Snellen test, or visual acuity greater than $^{20}/_{200}$, but with a limitation in the field of vision such that the widest diameter of the visual field subtends an angle not greater than 20 degrees.

**Credits**

(Added by Stats.1968, c. 461, p. 1092, § 1. Amended by Stats.1994, c. 1257 (S.B.1240), § 7; Stats.2006, c. 538 (S.B.1852), § 38.)

West's Ann. Cal. Civ. Code § 54.6, CA CIVIL § 54.6

Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

ADD-109

---

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.7

§ 54.7. Zoos or wild animal parks; facilities for guide, service
or signal dogs accompanying individuals with a disability

Currentness

(a) Notwithstanding any other provision of law, the provisions of this part shall not be construed to require zoos or wild animal parks to allow guide dogs, signal dogs, or service dogs to accompany individuals with a disability in areas of the zoo or park where zoo or park animals are not separated from members of the public by a physical barrier. As used in this section, "physical barrier" does not include an automobile or other conveyance.

(b) Any zoo or wild animal park that does not permit guide dogs, signal dogs, or service dogs to accompany individuals with a disability therein shall maintain, free of charge, adequate kennel facilities for the use of guide dogs, signal dogs, or service dogs belonging to these persons. These facilities shall be of a character commensurate with the anticipated daily attendance of individuals with a disability. The facilities shall be in an area not accessible to the general public, shall be equipped with water and utensils for the consumption thereof, and shall otherwise be safe, clean, and comfortable.

(c) Any zoo or wild animal park that does not permit guide dogs to accompany blind or visually impaired persons therein shall provide free transportation to blind or visually impaired persons on any mode of transportation provided for members of the public.

Each zoo or wild animal park that does not permit service dogs to accompany individuals with a disability shall provide free transportation to individuals with a disability on any mode of transportation provided for a member of the public in cases where the person uses a wheelchair and it is readily apparent that the person is unable to maintain complete or independent mobility without the aid of the service dog.

(d) Any zoo or wild animal park that does not permit guide dogs to accompany blind or otherwise visually impaired persons therein shall provide sighted escorts for blind or otherwise visually impaired persons if they are unaccompanied by a sighted person.

(e) As used in this section, "wild animal park" means any entity open to the public on a regular basis, licensed by the United States Department of Agriculture under the Animal Welfare Act as an exhibit, and operating for the primary purposes of conserving, propagating, and exhibiting wild and exotic animals, and any marine, mammal, or aquatic park open to the general public.

---

ADD-110

**Credits**

(Added by Stats.1979, c. 525, p. 1718, § 1. Amended by Stats.1988, c. 1595, § 4; Stats.1994, c. 1257 (S.B.1240), § 8.)

West's Ann. Cal. Civ. Code § 54.7, CA CIVIL § 54.7

Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.   2

ADD-111

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.8

§ 54.8. Individuals who are deaf or hard of hearing; assistive listening systems
in civil or criminal proceedings; notice of need; availability; use in proceedings

Effective: January 1, 2019
Currentness

(a) In any civil or criminal proceeding, including, but not limited to, traffic, small claims court, family court proceedings and services, and juvenile court proceedings, in any court-ordered or court-provided alternative dispute resolution, including mediation and arbitration, or in any administrative hearing of a public agency, where a party, witness, attorney, judicial employee, judge, juror, or other participant who is deaf or hard of hearing, the individual who is deaf or hard of hearing, upon his or her request, shall be provided with a functioning assistive listening system or a computer-aided transcription system. Any individual requiring this equipment shall give advance notice of his or her need to the appropriate court or agency at the time the hearing is set or not later than five days before the hearing.

(b) Assistive listening systems include, but are not limited to, special devices which transmit amplified speech by means of audio-induction loops, radio frequency systems (AM or FM), or infrared transmission. Personal receivers, headphones, and neck loops shall be available upon request by individuals who are deaf or hard of hearing.

(c) If a computer-aided transcription system is requested, sufficient display terminals shall be provided to allow the individual who is deaf or hard of hearing to read the real-time transcript of the proceeding without difficulty.

(d) A sign shall be posted in a prominent place indicating the availability of, and how to request, an assistive listening system and a computer-aided transcription system. Notice of the availability of the systems shall be posted with notice of trials.

(e) Each superior court shall have at least one portable assistive listening system for use in any court facility within the county. When not in use, the system shall be stored in a location determined by the court.

(f) The Judicial Council shall develop and approve official forms for notice of the availability of assistive listening systems and computer-aided transcription systems for individuals who are deaf or hard of hearing. The Judicial

ADD-112

Council shall also develop and maintain a system to record utilization by the courts of these assistive listening systems and computer-aided transcription systems.

(g) If the individual who is deaf or hard of hearing is a juror, the jury deliberation room shall be equipped with an assistive listening system or a computer-aided transcription system upon the request of the juror.

(h) A court reporter may be present in the jury deliberating room during a jury deliberation if the services of a court reporter for the purpose of operating a computer-aided transcription system are required for a juror who is deaf or hard of hearing.

(i) In any of the proceedings referred to in subdivision (a), or in any administrative hearing of a public agency, in which the individual who is deaf or hard of hearing is a party, witness, attorney, judicial employee, judge, juror, or other participant, and has requested use of an assistive listening system or computer-aided transcription system, the proceedings shall not commence until the system is in place and functioning.

(j) As used in this section, "individual who is deaf or hard of hearing" means an individual with a hearing loss, who, with sufficient amplification or a computer-aided transcription system, is able to fully participate in the proceeding.

(k) In no case shall this section be construed to prescribe a lesser standard of accessibility or usability than that provided by Title II of the Americans with Disabilities Act of 1990 (Public Law 101-336) [1] and federal regulations adopted pursuant to that act.

**Credits**

(Added by Stats.1989, c. 1002, § 1. Amended by Stats.1992, c. 913 (A.B.1077), § 8; Stats.1993, c. 1214 (A.B.551), § 2; Stats.2001, c. 824 (A.B.1700), § 1; Stats.2018, c. 776 (A.B.3250), § 5, eff. Jan. 1, 2019.)

Notes of Decisions (3)

**Footnotes**

1       For public law sections classified to the U.S.C.A., see USCA-Tables.

West's Ann. Cal. Civ. Code § 54.8, CA CIVIL § 54.8
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-113

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2.5. Blind and Other Physically Disabled Persons (Refs & Annos)

West's Ann.Cal.Civ.Code § 54.9

§ 54.9. Touch-screen self-service check-in devices at hotels or facilities providing passenger transportation services; manufacturers and distributors to offer devices containing necessary technology

Effective: January 1, 2007
Currentness

(a) On and after January 1, 2009, a manufacturer or distributor of touch-screen devices used for the purpose of self-service check-in at a hotel or at a facility providing passenger transportation services shall offer for availability touch-screen self-service check-in devices that contain the necessary technology.

(b) For purposes of this section, "necessary technology" means technology that enables a person with a visual impairment to do the following:

(1) Enter any personal information necessary to process a transaction in a manner that ensures the same degree of personal privacy afforded to those without visual impairments.

(2) Use the device independently and without the assistance of others in the same manner afforded to those without visual impairments.

(c) For purposes of this section, "hotel" means any hotel, motel, bed and breakfast inn, or other similar transient lodging establishment, but it does not include any residential hotel as defined in Section 50519 of the Health and Safety Code.

(d) This section shall not be construed to preclude or limit any other existing right or remedy as it pertains to self-service check-in devices and accessibility.

**Credits**
(Added by Stats.2006, c. 546 (A.B.768), § 2.)

West's Ann. Cal. Civ. Code § 54.9, CA CIVIL § 54.9
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

*End of Document*         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-114

West's Annotated California Codes
  Civil Code (Refs & Annos)
    Division 1. Persons (Refs & Annos)
      Part 2.53. Attorney's Fees and Statutory Damages in Construction-Related Accessibility Standards Claims (Refs & Annos)

West's Ann.Cal.Civ.Code § 55.56

§ 55.56. Statutory damages awards; grounds; rebuttable presumptions; exemption from liability

Effective: May 10, 2016
Currentness

(a) Statutory damages under either subdivision (a) of Section 52 or subdivision (a) of Section 54.3 may be recovered in a construction-related accessibility claim against a place of public accommodation only if a violation or violations of one or more construction-related accessibility standards denied the plaintiff full and equal access to the place of public accommodation on a particular occasion.

(b) A plaintiff is denied full and equal access only if the plaintiff personally encountered the violation on a particular occasion, or the plaintiff was deterred from accessing a place of public accommodation on a particular occasion.

(c) A violation personally encountered by a plaintiff may be sufficient to cause a denial of full and equal access if the plaintiff experienced difficulty, discomfort, or embarrassment because of the violation.

(d) A plaintiff demonstrates that he or she was deterred from accessing a place of public accommodation on a particular occasion only if both of the following apply:

(1) The plaintiff had actual knowledge of a violation or violations that prevented or reasonably dissuaded the plaintiff from accessing a place of public accommodation that the plaintiff intended to use on a particular occasion.

(2) The violation or violations would have actually denied the plaintiff full and equal access if the plaintiff had accessed the place of public accommodation on that particular occasion.

(e)(1) The following technical violations are presumed to not cause a person difficulty, discomfort, or embarrassment for the purpose of an award of minimum statutory damages in a construction-related accessibility claim, as set forth in subdivision (c), where the defendant is a small business, as described by subparagraph (B) of paragraph (2) of subdivision (g), the defendant has corrected, within 15 days of the service of a summons and complaint asserting a construction-related accessibility claim or receipt of a written notice, whichever is earlier, all of the technical violations that are the basis of the claim, and the claim is based on one or more of the following violations:

(A) Interior signs, other than directional signs or signs that identify the location of accessible elements, facilities, or features, when not all such elements, facilities, or features are accessible.

(B) The lack of exterior signs, other than parking signs and directional signs, including signs that indicate the location of accessible pathways or entrance and exit doors when not all pathways, entrance and exit doors are accessible.

(C) The order in which parking signs are placed or the exact location or wording of parking signs, provided that the parking signs are clearly visible and indicate the location of accessible parking and van-accessible parking.

(D) The color of parking signs, provided that the color of the background contrasts with the color of the information on the sign.

(E) The color of parking lot striping, provided that it exists and provides sufficient contrast with the surface upon which it is applied to be reasonably visible.

(F) Faded, chipped, damaged, or deteriorated paint in otherwise fully compliant parking spaces and passenger access aisles in parking lots, provided that it indicates the required dimensions of a parking space or access aisle in a manner that is reasonably visible.

(G) The presence or condition of detectable warning surfaces on ramps, except where the ramp is part of a pedestrian path of travel that intersects with a vehicular lane or other hazardous area.

(2) The presumption set forth in paragraph (1) affects the plaintiff's burden of proof and is rebuttable by evidence showing, by a preponderance of the evidence, that the plaintiff did, in fact, experience difficulty, discomfort, or embarrassment on the particular occasion as a result of one or more of the technical violations listed in paragraph (1).

(3) This subdivision shall apply only to claims filed on or after the effective date of Senate Bill 269 of the 2015-16 Regular Session.

(f) Statutory damages may be assessed pursuant to subdivision (a) based on each particular occasion that the plaintiff was denied full and equal access, and not upon the number of violations of construction-related accessibility standards identified at the place of public accommodation where the denial of full and equal access occurred. If the place of public accommodation consists of distinct facilities that offer distinct services, statutory damages may be assessed based on each denial of full and equal access to the distinct facility, and not upon the number of violations of construction-related accessibility standards identified at the place of public accommodation where the denial of full and equal access occurred.

(g)(1) Notwithstanding any other law, a defendant's liability for statutory damages in a construction-related accessibility claim against a place of public accommodation is reduced to a minimum of one thousand dollars ($1,000) for each offense if the defendant demonstrates that it has corrected all construction-related violations that are the basis of a claim within 60 days of being served with the complaint, and the defendant demonstrates any of the following:

(A) The structure or area of the alleged violation was determined to be "CASp-inspected" or "meets applicable standards" and, to the best of the defendant's knowledge, there were no modifications or alterations that impacted compliance with construction-

ADD-116

related accessibility standards with respect to the plaintiff's claim that were completed or commenced between the date of that determination and the particular occasion on which the plaintiff was allegedly denied full and equal access.

(B) The structure or area of the alleged violation was the subject of an inspection report indicating "CASp determination pending" or "Inspected by a CASp," and the defendant has either implemented reasonable measures to correct the alleged violation before the particular occasion on which the plaintiff was allegedly denied full and equal access, or the defendant was in the process of correcting the alleged violation within a reasonable time and manner before the particular occasion on which the plaintiff was allegedly denied full and equal access.

(C) For a claim alleging a construction-related accessibility violation filed before January 1, 2018, the structure or area of the alleged violation was a new construction or an improvement that was approved by, and passed inspection by, the local building department permit and inspection process on or after January 1, 2008, and before January 1, 2016, and, to the best of the defendant's knowledge, there were no modifications or alterations that impacted compliance with respect to the plaintiff's claim that were completed or commenced between the completion date of the new construction or improvement and the particular occasion on which the plaintiff was allegedly denied full and equal access.

(D) The structure or area of the alleged violation was new construction or an improvement that was approved by, and passed inspection by, a local building department official who is a certified access specialist, and, to the best of the defendant's knowledge, there were no modifications or alterations that affected compliance with respect to the plaintiff's claim that were completed or commenced between the completion date of the new construction or improvement and the particular occasion on which the plaintiff was allegedly denied full and equal access.

(2) Notwithstanding any other law, a defendant's liability for statutory damages in a construction-related accessibility claim against a place of public accommodation is reduced to a minimum of two thousand dollars ($2,000) for each offense if the defendant demonstrates both of the following:

(A) The defendant has corrected all construction-related violations that are the basis of a claim within 30 days of being served with the complaint.

(B) The defendant is a small business that has employed 25 or fewer employees on average over the past three years, or for the years it has been in existence if less than three years, as evidenced by wage report forms filed with the Economic Development Department, and has average annual gross receipts of less than three million five hundred thousand dollars ($3,500,000) over the previous three years, or for the years it has been in existence if less than three years, as evidenced by federal or state income tax returns. The average annual gross receipts dollar amount shall be adjusted biannually by the Department of General Services for changes in the California Consumer Price Index for All Urban Consumers, as compiled by the Department of Industrial Relations. The Department of General Services shall post that adjusted amount on its Internet Web site.

(3)(A) Notwithstanding any other law, a defendant shall not be liable for minimum statutory damages in a construction-related accessibility claim, with respect to a violation noted in a report by a certified access specialist (CASp), for a period of 120 days following the date of the inspection if the defendant demonstrates compliance with each of the following:

ADD-117

(i) The defendant is a business that, as of the date of inspection, has employed 50 or fewer employees on average over the past three years, or for the years it has been in existence if less than three years, as evidenced by wage report forms filed with the Employment Development Department.

(ii) The structure or area of the alleged violation was the subject of an inspection report indicating "CASp determination pending" or "Inspected by a CASp."

(iii) The inspection predates the filing of the claim by, or receipt of a demand letter from, the plaintiff regarding the alleged violation of a construction-related accessibility standard, and the defendant was not on notice of the alleged violation prior to the CASp inspection.

(iv) The defendant has corrected, within 120 days of the date of the inspection, all construction-related violations in the structure or area inspected by the CASp that are noted in the CASp report that are the basis of the claim.

(B) Notwithstanding any other law, a defendant who claims the benefit of the reduction of, or protection from liability for, minimum statutory damages under this subdivision shall disclose the date and findings of any CASp inspection to a plaintiff if relevant to a claim or defense in an action.

(4) A defendant may claim the protection from liability for minimum statutory damages under paragraph (3) only once for each structure or area inspected by a CASp, unless the inspected structure or area has undergone modifications or alterations that affect the compliance with construction-related accessibility standards of those structures or areas after the date of the last inspection, and the defendant obtains an additional CASp inspection within 30 days of final approval by the building department or certificate of occupancy, as appropriate, regarding the modification or alterations.

(5) If the defendant has failed to correct, within 120 days of the date of the inspection, all construction-related violations in the structure or area inspected by the CASp that are noted in the CASp report, the defendant shall not receive any protection from liability for minimum statutory damages pursuant to paragraph (3), unless a building permit is required for the repairs which cannot reasonably be completed by the defendant within 120 days and the defendant is in the process of correcting the violations noted in the CASp report, as evidenced by having, at least, an active building permit necessary for the repairs to correct the violation that was noted, but not corrected, in the CASp report and all of the repairs are completed within 180 days of the date of the inspection.

(6) This subdivision shall not be applicable to intentional violations.

(7) Nothing in this subdivision affects the awarding of actual damages, or affects the awarding of treble actual damages.

(8) This subdivision shall apply only to claims filed on or after the effective date of Chapter 383 of the Statutes of 2012, except for paragraphs (3), (4), and (5), which shall apply only to claims filed on or after the effective date of Senate Bill 269 of the 2015-16 Regular Session. Nothing in this subdivision is intended to affect a complaint filed before those dates, as applicable.

ADD-118

(h) This section does not alter the applicable law for the awarding of injunctive or other equitable relief for a violation or violations of one or more construction-related accessibility standards, nor alter any legal obligation of a party to mitigate damages.

(i) In assessing liability under subdivision (d), in an action alleging multiple claims for the same construction-related accessibility violation on different particular occasions, the court shall consider the reasonableness of the plaintiff's conduct in light of the plaintiff's obligation, if any, to mitigate damages.

(j) For purposes of this section, the "structure or area inspected" means one of the following: the interior of the premises, the exterior of the premises, or both the interior and exterior.

**Credits**

(Added by Stats.2008, c. 549 (S.B.1608), § 4. Amended by Stats.2012, c. 383 (S.B.1186), § 11, eff. Sept. 19, 2012; Stats.2013, c. 76 (A.B.383), § 9; Stats.2016, c. 13 (S.B.269), § 2, eff. May 10, 2016.)

**Editors' Notes**

OPERATIVE EFFECT

<For operative effect of this section, see Stats.2008, c. 549 (S.B.1608), § 12.>

Notes of Decisions (16)

West's Ann. Cal. Civ. Code § 55.56, CA CIVIL § 55.56
Current with urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

*End of Document*                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD-119

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2023, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for

the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Dated: March 31, 2023

<u> /s/ Kirstin E. Largent  </u>