No. 22-55873

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, DBA
(doing business as) Labcorp,

*Defendant-Appellant.*

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:20-cv-00893-FMO-KS · The Honorable Fernando M. Olguin

## EXCERPTS OF RECORD
## VOLUME 2 OF 8 – Pages 67 to 357

Robert I. Steiner
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
212-808-7800

Becca J. Wahlquist
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, California 90071
213-547-4900

Glenn T. Graham
ggraham@kelleydrye.com
KELLEY DRYE & WARREN LLP
One Jefferson Road, 2nd Floor
Parsippany New Jersey 07054
973-503-5917

Attorneys for Appellant
LABORATORY CORPORATION OF AMERICA HOLDINGS

Robert I. Steiner (admitted *pro hac vice*)
rsteiner@kelleydrye.com
Glenn T. Graham (State Bar. No. 338995)
ggraham@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone:  (212) 808-7800
Facsimile:   (212) 808-7897

Becca Wahlquist (State Bar No. 215948)
bwahlquist@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
350 South Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone:  (213) 547-4900
Facsimile:   (213) 547-4901

*Attorneys for Defendant*
*Laboratory Corporation of America Holdings*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, et al.<br><br>                    Plaintiffs,<br><br>        v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS, et al.<br><br>                    Defendants. | CASE NO. 2:20-CV-00893-FMO-KS<br><br>**DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS' NOTICE OF RELATED AUTHORITY REGARDING ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Hon.  Fernando Olguin |

1       Defendant Laboratory Corporation of America Holdings ("Labcorp") hereby

2   provides notice to the Court of Judge Gee's summary judgment decision in *Vargas*

3   *v. Quest Diagnostics Labs., Inc.*, No. 2:19-cv-08108 (C.D. Cal. Aug. 12, 2022),

4   which is attached hereto as Exhibit A.

6   DATED:  August 16, 2022           KELLEY DRYE & WARREN LLP

8                       By: */s/ Becca J. Wahlquist*
                    Becca Wahlquist (State Bar No. 215948)

9                       Robert I. Steiner (admitted *pro hac vice*)
                    Glenn T. Graham (State Bar No. 338995)

10                      *Attorneys for Defendant*

11                      *Laboratory Corporation of America*
                    *Holdings*

1

69

# Exhibit A

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL FOR THE BLIND, individual and on behalf of themselves and all others similar situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. CV 19-8108-DMG (MRWx)<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT [207] [212]** |

This matter is before the Court on a Motion for Summary Judgment brought by Plaintiffs Julian Vargas, the American Council for the Blind ("ACB"), and the certified Class ("PMSJ") [Doc. # 207] and Defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated's ("Quest") Motion for Partial Summary Judgment ("DMSJ") [Doc. # 233].[1]  Both motions are fully

---

[1] Quest's MSJ was initially filed on May 12, 2022, but was amended after the Court issued its order changing the class definition.  [Doc. # 212.]  The Court refers to the amended filing herein.

-1-

71

briefed. [Doc. ## 236 ("PMSJ Opp."), 239 ("DMSJ Opp."), 241 ("DMSJ Reply"), 242 ("PMSJ Reply").] The Court held a hearing on August 5, 2022. Having duly considered the parties' arguments, the Court **GRANTS in part** and **DENIES in part** Quest's MSJ and **DENIES** Plaintiffs' MSJ.

## I.

## PROCEDURAL BACKGROUND

The Court has already resolved a previous motion for summary judgment, filed by Quest. Order re Defendants' Motion for Summary Judgment ("First MSJ Order") [Doc. # 144].[2] Since the Court issued the First MSJ Order, the Court certified a class, appointing Vargas the Class Representative, and subsequently revised the class definition. *See* Order re Plaintiff's Motion for Class Certification [Doc. # 190], Order Modifying Class Definition [Doc. # 228]. Plaintiffs' remaining claims are (a) a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, asserted by all Plaintiffs, including the Class; and (b) derivative claims under California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code § 51 *et seq.*, and California's Disabled Persons Act ("DPA"), Cal. Civ. Code §§ 54-54.3, asserted only by Vargas individually.

The Class is defined as follows:

> All legally blind individuals who visited a Quest patient service center in
> the United States between January 1, 2018 through December 31, 2019
> (the "Class Period") at which the e-check-in self-service kiosk was the
> primary method for check-in and who, due to their disability, could not use
> all the functions of the kiosks.

Plaintiffs move for summary judgment on the ground that there is no dispute of material fact that (1) Quest failed to provide Plaintiffs with effective communication in violation of the ADA during the Class Period, (2) Quest failed to provide Vargas with

---

[2] The Court granted Quest leave to file a second motion for partial summary judgment in order to resolve an issue that the Court did not need to reach in its First MSJ Order, but which the Court concluded could help to narrow the issues for trial. [*See* Doc. # 211.]

-2-

1 effective communication in violation of the Unruh Act and the DPA, (3) Quest's
2 implementation of the "three-finger swipe" ("TFS") did not moot Plaintiffs' claims, and
3 (4) Quest cannot support an undue administrative burden affirmative defense. *See* PMSJ
4 at 2-3.[3]

5      Quest moves for summary adjudication on 10 discrete "conclusions" regarding the
6 scope and the requirements of the ADA. Quest's tenth proposed "conclusion" is a request
7 to strike Plaintiffs' prayer for relief for an independently accessible self-service check-in
8 kiosk. *See* DMSJ at 3-4.

<center>**II.**</center>

<center>**FACTUAL BACKGROUND**</center>

11      The Court described the factual background of this case in its First MSJ Order, and
12 incorporates that description herein. Much of the evidence is identical to that presented in
13 support of and opposition to the First MSJ Order. The Court will address the parties'
14 evidence as relevant to the instant motions.

15 **A.    Kiosks**

16      This action concerns Quest's use of touchscreen tablets mounted on posts ("kiosks")
17 to permit patients to check in at patient service centers ("PSCs") operated by Quest
18 throughout the country. Use of the touchscreens requires the ability to see text on the
19 screen, which makes it impossible for blind users to navigate the tablets.[4] Some PSCs have
20 receptionists or attendants present at check-in. Pursuant to the current class definition,
21 locations with check-in attendants or receptionists are not locations "at which the e-check-

---

[3] Page citations herein refer to the page numbers inserted by the CM/ECF system.

[4] The parties dispute whether Quest knew at the time it rolled out the kiosks that they would be inaccessible to blind patients. *See* PSUF A5. Quest's intent is not legally relevant under the ADA, so the Court does not address this evidence.

Quest also offers evidence that "legally blind" users have a wide range of visual ability. Because there is no dispute that completely blind users are unable to use the kiosks, however, this evidence is irrelevant.

<center>-3-</center>

<center>73</center>

in self-service kiosk was the primary method for check-in" and are not at issue in this litigation.[5]

Before the kiosks were introduced at PSCs, Quest used a paper sign-in sheet for check-in. *See* Reilly Decl. ¶ 4 [Doc. # 236-8]. When the kiosks were first introduced in 2016, there was no way for blind patients to use the kiosks to indicate that they had arrived at the PSC. Beginning in August 2020, however, Quest pushed out a change to its kiosks: the "three-finger swipe" ("TFS").[6] An audio loop plays at PSCs to inform patients that they should use TFS if they are unable to use the kiosk.[7] TFS permits users to swipe the screen with three fingers, which will place the patient on the list to be seen by a phlebotomist and announce the patient's number (much like taking a number to order in a bakery). TFS also notifies the phlebotomist that a visually impaired patient has arrived.

Quest's Rule 30(b)(6) witness, Marc Yarrison, testified that during the rollout process, Quest "trained all our staff to watch" for individuals with disabilities. Yarrison Depo. at 4:16-17 [Doc. # 236-31]. This training was introduced in March 2021. Yarrison continued that "they've always been trained that way, but, you know, we continued to make an emphasis to them that they are to—every time they are in the waiting area, they are to

---

[5] At the hearing on these motions, Quest argued that the "primary method for check-in" for blind patients is never a kiosk, even where the primary method for check-in for sighted patients *is* a kiosk. In referring to locations at which the "primary method for check-in" is a kiosk, the Court is referring to locations at which the primary method for sighted patients to check in is a kiosk. In other words, the Court is referring to locations without a permanent receptionist or attendant.

[6] The parties dispute whether TFS was implemented in response to this litigation, but Quest's motivation is irrelevant for purposes of this motion.

[7] The audio message says "Welcome to Quest Diagnostics. If you are a patient who is blind or visually impaired, you can automatically check in by swiping or dragging three fingers in any direction across the screen of our check-in Kiosk without providing any additional information. Once you have successfully done so, the Kiosk will play a short audio message informing you that you have checked in and assigning you a patient ID. Please take a seat and your patient ID will be verbally called by a Quest team member. The Quest team member may collect additional information from you at that time. If you need assistance with locating, using or checking in at the Kiosk, our Quest team member will be happy to assist you. If you don't have an appointment or would like to make one, please call 888-277-8772. Thank you for choosing Quest Diagnostics." Sawczyn Report at 6 [Doc. # 236-18]. This message began to be played in January 2021.

look out for anybody that needs help.  That would include people with disabilities of all types." *Id.* at 4:17-22; *accord id.* at 11:3-7 ("our staff is trained to always look for anybody in the waiting area that needs help and to help them"); *id.* at 21:20-23 ("our staff was trained to watch for people that needed help and, if they couldn't check in, to provide that help to them").

Quest's Director of Technical Excellence for National Patient Services, Jody Reilly, testifies that Quest staff member training instructs phlebotomists to pay attention to who is in the waiting room in order to identify patients, including those with visual impairments, who may need assistance, and to make themselves available to such patients.  *See* Reilly Decl. ¶¶ 7-8; *see also* Managing Every Patient's Needs (revised March 4, 2021) at 42, 45 [Doc. # 235-3 (under seal)].  A Quest phlebotomist, Prudencia Magana, testified that phlebotomists are trained to "always help every patient who needs help with any service they are looking for from Quest at the PSCs," and that whenever they go to the waiting room, they are supposed to look at all the people in the waiting room to see if anyone needs assistance.  Magana Decl. ¶ 3 [Doc. # 236-11].[8]

A pre-TFS version of Quest's ADA training module, Managing Every Patient's Needs, emphasized that phlebotomists should "always demonstrate sensitivity and understanding" when working with disabled patients.  *See* 2010 Managing Every Patient's Needs at 8 [Doc. # 94-11 (under seal)].  The training instructs phlebotomists that they can "avoid awkward situations by always being prepared for the arrival of a disabled person." *Id.* at 9.  The training provides that phlebotomists should "assist [legally blind patients] to the collection room," "maintain a steady stream of verbal communication with the patient to put him or her at least, and "always tell them what you are doing and describe what you are about to do before you do it." *Id.* at 10.  The training instructs that the ADA "gives

---

[8] Plaintiffs adduce evidence showing that Quest projected that the kiosks would save Quest money by reducing the amount of time phlebotomists spend on check in.  Quest argues in opposition that the evidence shows that phlebotomists would spend less time on check in, allowing them to spend *more* time on patients.  Quest does not provide, however, any evidence that was the actual effect of the change.  Quest's argument is not evidence, and Plaintiffs' evidence is only marginally relevant.

disabled patients the right to equal service." *Id*. at 12. Quest staff were trained that "the biggest frustrations for many disabled persons occur with ordinary tasks such as entering buildings and offices and using restroom facilities. . . . the efforts and attitude of our staff are what really make the difference. Always be sensitive to any difficulty a person with a disability may encounter in the facility." *Id*. at 15. Staff were specifically instructed to offer assistance to visually impaired patients who seemed unsure where to go. *See id.* at 15. Later, staff were instructed to "be prepared to read or provide other assistance in completing forms," and to be sensitive to privacy concerns if asked to read aloud to a patient. *Id*. at 19. The training included extensive information about service animals. *Id*. at 20-27.

The record before the Court shows the experiences of blind Quest patients varied widely during the pre-TFS period. Claire Stanley, a Quest patient, apparently waited only a few minutes before a phlebotomist came out to assist her. *See* Stanley Depo. at 28:2-14 [Doc. # 236-35]. Mary Haroyan, another Quest patient, testified that on one occasion, when she arrived shortly after the PSC opened, the phlebotomist was "made aware very quickly that [she] was there, and [she] asked [the phlebotomist] for help to check in." Haroyan Depo. at 72:12-14 [Doc. # 236-37]. Regina Brink testified that on her visits between 2012 and 2018, there was no one at the front desk, but she needed to wait only about five minutes for someone to return. Brink Depo. at 39:1-21 [Doc. # 236-37].[9] Other ACB members indicated that Quest staff members helped them check in. *See* ACB Interrogatory Responses at 5 [Doc. # 236-14] (patients waited for a staff member to come to get another patient, then asked the staff member to help them check in)[10]; Stanley Depo.,

---

[9] It is not clear from the deposition excerpt cited whether this is relevant, since it appears to cover a period starting long before the kiosks were rolled out. Plaintiffs assert that this answer concerned only pre-kiosk visits. Plaintiffs do not point to a record citation for this assertion, however, so the Court accepts Quest's evidence for the limited proposition that for at last some of the period when the kiosk was available, Ms. Brink did not wait more than about five minutes to be assisted.

[10] This evidence appears to be hearsay. Although neither party objects to its use (and both sides rely on it), the Court notes that "at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible

-6-

Ex. 111 at 39 (on one occasion, the kiosk "wasn't even there and someone outside was checking people in"; on another occasion, patient "had to yell for someone to come and assist me which they [the staff member] didn't mind and it was an employee so I let them do it"). A number of other ACB members indicated that they brought family members along to their appointments to help them check in, or asked for help from other patients. *See, e.g.*, Brink Depo. at 185-86 (patient who was unable to use the kiosk, who was accompanied by her daughter, spoke to a Quest employee who asked if her daughter could help her); Grahmann Depo. at 164-65 (patient who was unable to use the kiosk asked another person in line to help her); Haroyan Depo. at 141 (has had another patient assist with check-in); *id*. at 144, 157 (had her father help with check-in).

In addition to TFS, Quest has implemented new features since the kiosks were first introduced. These have included a "wait where you want" feature, rolled out during the pandemic to allow patients to wait outside the waiting room, and a COVID-19 symptom checker, which notified patients with COVID symptoms to leave the PSC. *See* Walsh Decl. ¶ 7 [Doc. # 236-10]. The symptom checker has apparently been removed. *Id*.; *see also* Yarrison Decl. ¶¶ 18-19 [Doc. # 236-9] (stating the features of the kiosk are likely to change over time). Quest asserts that "nearly all" of the kiosk's features can be used on the internet. Carr Decl. ¶ 24 [Doc. # 236-6].[11]

An investigator hired by Plaintiffs visited 24 PSCs from June to August 2021 and found that not all of the kiosks were set up with TFS. *See* Derry Report at 296, 298-300

---

form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1110 (9th Cir. 2016). The patients whose statements are identified by name could testify at trial.

[11] Plaintiffs contend that the "wait where you want" feature is not available on Quest's website. *See* Request for Judicial Notice ¶ 1, Ex. 1 [Doc. # 243]. The Court **GRANTS** Plaintiffs' Request for Judicial Notice, which contains screenshots from Quest's website. It is not clear how a patient could sign up for the "wait where you want" feature, but it is likewise not obvious that such a feature would be available on the appointment scheduling page.

1  [Doc. # 207-2].[12]  The audio message instructing visitors to use the TFS did not play at
2  some locations, and played only every 15 minutes at others.  *Id.* at 296.  Quest presents
3  contrary evidence that, as of May 23, 2022, TFS has been used tens of thousands of times,
4  at 2,168 PSCs. Carr Decl. ¶¶ 11-12.[13]

5      Taylor Carr, Quest's Director of Experience and Innovation, provided a declaration
6  explaining the administrative difficulty of adding a headphone jack and other tactile
7  functions, Plaintiffs' preferred method of communication, to all the kiosks.  Carr asserts
8  that providing a headphone jack and tactile functions would increase the wear and tear on
9  the tablets.  Carr Decl. ¶ 13.a.  Carr also asserts that the existing tablets have only a single
10  headphone jack, which Quest prefers to use as a data port to plug in the camera needed to
11  scan insurance cards and driver's licenses using the kiosks, rather than preserving it for use
12  by visually impaired customers who need to plug in headphones.  *Id.* at ¶ 13.b.  Quest
13  understands Apple and Android intend to phase out headphone jacks over time, and Quest
14  uses an Apple tablet for its kiosks.  *Id.* at ¶ 13.c.  In addition, rolling out new kiosks across
15  all PSCs (more than 2,100) would require substantial staff time, logistical planning, and
16  new training.  *Id.* at ¶ 13.d-f.

17  **B.**  **Vargas's Experience**

18      Vargas is legally blind, and uses a screen reader to help him understand information
19  displayed on screens.  SUF A2.[14]  Vargas testified in his deposition that he has some vision,

20
21      [12] Quest objects to the Derry Report on the basis that it was produced only three days before the
    discovery deadline.  Three days before the discovery deadline is *before* the discovery deadline.  The Court
22  **DENIES** Quest's request to exclude this evidence as untimely.

23      [13] There is no evidence in the record to show if these swipes were performed by visually impaired
    people.  The evidence does support Quest's contention that TFS is widely available at Quest PSCs.
24
25      [14] The Court cites to Plaintiffs' Statement of Undisputed Facts ("SUF") submitted in support of
    their Reply.  [Doc. # 242-1.]  To the extent the parties' purportedly disputed facts are not in fact
26  controverted by any cited evidence, the Court treats them as uncontroverted facts.

27      The Court has reviewed the parties' evidentiary objections.  To the extent the Court does not
    address any of them, it is because the Court did not rely on the objected-to evidence in reaching its ruling.
28  Any objections to such evidence are **OVERRULED** as moot.

1  and can sometimes make out shapes and colors.  Vargas Depo. at 55:17-56:4 [Doc. # 113-
2  2].[15]  His vision has decreased with time.  For example, although he had the ability to read
3  large print when he was young, that has become increasingly difficult.  *Id.* at 75:13-22.  He
4  uses various assistive technologies, including a cane to navigate physical spaces, a screen
5  reader on his iPhone, GPS to orient himself when traveling, and optical character
6  recognition technology to read his mail.  *Id.* at 70:13-71:10.

7      On June 15, 2019, Vargas took paratransit to a Quest PSC near his home.  SUF A14.
8  He did not have an appointment.  Vargas Depo. at 132:25-133:1.  There was no greeter or
9  receptionist.  *Id.* at 140:2-6.  He found a window and said hello a couple of times, but
10 nobody responded.  *Id.* at 140:7-141:2.  After 10 to 15 minutes, Prudencia Magana, a
11 phlebotomist, came out to help another patient.  *Id.* at 141:3-23.  Magana said something
12 like "hi, sir, can I help you?"  *Id.* at 143:3-12.  Vargas told her he was there to have blood
13 work done.  *Id.* at 143:14-15.  He was holding a white cane in his hand, but he did not tell
14 her he was blind.  *Id.* at 260:10-18.  Vargas says Magana directed him to the kiosk, guiding
15 him by his elbow, and told him, "this is where you check in."  *Id.* at 143:16-144:3.  Magana
16 does not recall meeting Vargas, and does not remember saying this, or anything about the
17 visit.  Magana Decl. ¶ 7; *see also* Magana Depo. at 3:24-4:22 (repeatedly stating "I don't
18 remember" when asked if she helped Vargas that day), 5:9-17 (she does not remember
19 directing Vargas to the kiosk), 8:7-9 (she remembers nothing at all regarding Vargas or his
20 visit).

21     Vargas checked the kiosk for tactile markings, a headphone jack, or a tactile
22 keyboard, all features that signal to him that a device is accessible.  Vargas Depo. at 144:11-
23 14.[16]  Finding none, he told Magana the kiosk was not accessible to blind people so he

---

24  [15] Citations to the Vargas Deposition refer to the page numbers of the full Vargas deposition, which
25  was submitted in support of Plaintiffs' opposition to Quest's First MSJ, rather than to the excerpts
    submitted in support of Plaintiffs' MSJ.
26

27  [16] Elsewhere in his deposition, Vargas described how he uses accessibility features on other
    touchscreen devices.  For example, he explained that at voting booths in Los Angeles County, he is able
28  to plug in his headphones and the touchscreen device "instantly recognizes that accessibility is going to
    be used."  A voice speaks through the headphones, describing how to use the accessibility features and

1   would need help signing in. Vargas Depo. at 144:11-22. He later testified that he "was

2   not able to do any kind of transacting via that kiosk because it required a sighted person to

3   operate it." *Id*. at 237:8-10. Vargas testified that Magana took another patient back for lab

4   work, then came back approximately five minutes later to take Vargas back to the draw

5   room. Vargas Depo. at 145:3-22. She took his information at the window in the waiting

6   room. *Id*. at 147:2-148:10. Vargas testified that after being checked in, he waited about

7   five more minutes before Magana came back out and took him in for the blood draw. *Id*.

8   at 150:25-151:5. Vargas says he made a point to mention to Magana that the kiosk was

9   inaccessible, and suggested she talk to someone about making the kiosks accessible. *Id*. at

10  152:19-153:4. Vargas testified that he "believe[s]" he asked to be contacted by someone

11  from Quest about the kiosk. *Id*. at 154:13-23.

12      Magana testified that she "thinks" she is trained to document patient complaints by

13  informing her supervisor, but that she cannot remember having documented or reviewed

14  any complaints she recorded regarding Vargas's June 25, 2019 visit. Magana Depo. at 6:4-

15  7:4; *see also* Magana Decl. ¶ 7 (asserting she does not remember if Vargas ever

16  complained, but that if he had, she would have reported the complaint to her supervisor,

17  and she sees no record that she reported such a complaint). Vargas testified that "being

18  told that [he] had to use a kiosk to check in only to find that it's inaccessible" was a

19  "frustrating experience." Vargas Depo. at 226:17-19. He said the experience was

20  embarrassing, humiliating, and made him feel like a "third-class citizen of some kind." *Id*.

21  at 238:24-239:6. He also felt foolish trying to interact with the machine. *Id*. at 239:13-17.

22      Vargas returned to a Quest PSC on June 10, 2021. SUF A43.[17] He heard the tail

23  end of the audio announcement describing how to use TFS. SUF A44. Next, he heard an

24

25  _____

26  how to use gestures (such as taps and swipes) to vote. *See* Vargas Depo. at 84:4-18. He described
    encountering similar features on a touchscreen used to order and pay at a restaurant. *See id*. at 87:9-89:23.

27  [17] Quest objects to Vargas's evidence of this visit on the basis that it was not disclosed until three
    days before the discovery cutoff. The Court declines to exclude as untimely discovery which was
28  produced before the cutoff.

-10-

announcement about the "wait where you want" option. SUF A45. About 8-10 minutes later, he heard the full announcement describing how to use TFS. SUF A46. The announcement did not tell Vargas where the kiosk was located, but instructed patients to ask a Quest team member for help if needed; no staff members were, however, in the waiting room. SUF A47-49. The kiosk told Vargas he would wait three minutes, but in reality, he waited 17 minutes. SUF A51.

## III.

## EVIDENTIARY ISSUES

Plaintiffs seek to strike several of Quest's declarations as sham affidavits. The sham affidavit rule provides that a party cannot simply avoid summary judgment by submitting an affidavit that directly contradicts his own prior deposition testimony. *See Yaeger v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact [at summary judgment] by an affidavit contradicting his prior deposition testimony."). The rule should be "applied with caution," and the inconsistency between prior testimony and the declaration "must be clear and unambiguous to justify striking the affidavit." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009). "[T]he district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* (citation omitted). The rule may not apply if the affiant provides a "reasonable explanation" for the discrepancy. *See Yeager*, 693 F.3d at 1081.

Plaintiffs seek to strike affiant Prudencia Magana's statement that she was trained to scan the waiting room for patients who might need assistance, on the basis that the statement contradicts her prior deposition testimony. At her deposition, Magana was asked: "Were you ever trained by Quest to scan the waiting room for patients requiring assistance?" Magana Depo. at 255:19-20 [Doc. # 207-2]. Magana asked Plaintiffs' counsel to repeat the question. After he did, Magana answered "not that I remember." *Id.* at 255:24. Plaintiffs also seek to strike Magana's statement that if Vargas had complained,

-11-

1  she would have notified her supervisor, because she testified at her deposition that she did

2  not remember.

3        In her declaration submitted in support of Quest's opposition to Plaintiffs' MSJ,

4  Magana asserts that she misunderstood the question. Magana Decl. ¶ 8 (stating she

5  "thought the lawyer asking the question was referring to the scanning function on the

6  Kiosk, like to scan in a QR Code. So, I answered that I had not been trained on how to use

7  the scanner because I have not been."). From the limited context of Magana's deposition

8  available to the Court, it appears plausible that Magana misunderstood the question:

9  Plaintiffs' counsel's previous question was about a phlebotomist's ability to view patients'

10  prior test results in Quanum, a Quest program used by phlebotomists; given this context,

11  the question regarding "scanning" was worded in such a way that Magana could have

12  misunderstood what Plaintiffs' counsel was asking. The Court therefore declines to strike

13  the declaration on this basis, and concludes that the apparent contradiction would instead

14  be a proper subject for impeachment at trial. Likewise, Magana's statement that she does

15  not remember assisting Vargas does not contradict her statement in her declaration that she

16  would have reported Vargas's complaint had he made one. Indeed, the statement in her

17  declaration is consistent with her deposition testimony regarding customer complaints.

18  The Court thus declines to strike her declaration on this basis as well.

19        Plaintiffs ask the Court to strike much of the Carr Declaration as a sham affidavit.

20  The Court relies only on several paragraphs of the Carr Declaration. The deposition

21  testimony that purportedly contradicts paragraph 9 and 10, regarding use of TFS in recent

22  months, shows that Carr testified he was not involved with implementing TFS after 2020.

23  Plaintiffs contend that Carr thus cannot have personal knowledge of how TFS has been

24  used since then. This contention is meritless: Carr testifies in his declaration that he asked

25  for information in 2022 about the use of TFS. There is no contradiction between this

26  statement and his prior testimony that he was not involved in implementing TFS after a

27  certain point. Likewise, there is no contradiction between paragraph 24, stating that many

28  kiosk features are also available online, and Carr's deposition testimony, which states that

-12-

82

the "wait where you want" feature is available on the kiosk.[18]  Similarly, although Carr repeatedly testified at his deposition that he did not know whether the addition of a headphone jack and tactile features would impose an undue financial burden on Quest, this testimony does not contradict his statements in his declaration regarding the *administrative burden* these features would impose.  The Court declines to strike the declaration on these bases.

Plaintiffs ask to exclude the declaration of Jody Reilly regarding Quest training, on the basis (in relevant part) that she was unable to confirm at her deposition whether all Quest staff members complete the "Managing Every Patient's Needs" training.  This is not a direct contradiction, but rather a subject for cross-examination, and the Court declines to strike the declaration on this basis.

## IV.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

---

[18] Plaintiffs separately dispute that Carr's declaration is accurate.

-13-

1  genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)). "In judging
2  evidence at the summary judgment stage, the court does not make credibility
3  determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509
4  F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable
5  to the nonmoving party." *Id.*

6  <center>**V.**</center>
7  <center>**DISCUSSION**</center>

8  **A.    Quest's MSJ**

9       Quest seeks summary judgment on the question of whether the ADA contains an
10  independent requirement that its self-service check-in kiosks be independently accessible
11  to blind users.[19]

12       Applicable ADA regulations require that Quest provide "appropriate auxiliary aids
13  and services where necessary to ensure effective communication with individuals with
14  disabilities." 28 C.F.R. § 36.303(c). The same regulations further provide that:

15       The type of auxiliary aid or service necessary to ensure effective
16       communication will vary in accordance with the method of communication
17       used by the individual; the nature, length, and complexity of the
18       communication involved; and the context in which the communication is
19       taking place. A public accommodation should consult with individuals with
20       disabilities whenever possible to determine what type of auxiliary aid is
21       needed to ensure effective communication, but the ultimate decision as to
22       what measures to take rests with the public accommodation, provided that the
23       method chosen results in effective communication. In order to be effective,

24  _____

25  [19] "Independent accessibility" is not a term of art under the ADA, and neither party explains exactly
26  what they mean by it. The Court understands Plaintiffs to be primarily referring to the use of headphone
    jacks, tactile markings, and tactile keyboards that would make the kiosks usable for individuals using a
27  screen reader, including a screen reader built into the kiosk. The Court uses the term to refer to the ability
    for a blind user to access all the features of the kiosk without the assistance of a phlebotomist or
28  receptionist.

<center>-14-</center>

<center>84</center>

1  auxiliary aids and services must be provided in accessible formats, in a timely
2  manner, and in such a way as to protect the privacy and independence of the
3  individual with a disability.

4  *Id.* at § 36.303(c)(1)(ii). The Ninth Circuit has reiterated that, while a public
5  accommodation should consult with a disabled individual to identify the auxiliary aid or
6  service that would provide effective communication, "the public accommodation itself is
7  independently responsible for making the ultimate decision as to what measures to take."
8  *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 964 (9th Cir. 2019) (citing 28
9  C.F.R. § 36.303(c)). As the Ninth Circuit's formulation makes clear, the public
10  accommodation has both the latitude and the responsibility to ensure that whatever services
11  it provides ensure effective communication for customers. Thus, the touchstone is
12  "effective communication."

13  Plaintiffs do not argue in their opposition to Quest's MSJ that the failure to provide
14  independently accessible kiosks is in itself an ADA violation. Indeed, Plaintiffs appear to
15  have abandoned this theory of Quest's *liability*, and instead focus on Quest's alleged failure
16  to actually provide phlebotomist assistance. Since the Court redefined the class definition,
17  the question of whether the ADA requires independently-accessible kiosks is also less
18  central to the case. The Court thus assumes for purposes of this action that Quest's failure
19  to make its kiosks independently accessible is not in itself an ADA violation, provided it
20  is not the primary method for check-in. In some ways, Quest's motion for summary
21  judgment on this issue is a straw man. The class definition, as currently formulated, focuses
22  the ultimate inquiry on whether the kiosks are the primary method of check-in and, if so,
23  whether it provides effective communication.

24  Quest also seeks, however, to strike Plaintiffs' request for an injunction requiring
25  Quest to provide independently accessible kiosks as an equitable remedy. The question of
26  remedy is separate from the question of liability. *See, e.g.*, *Robles v. Domino's Pizza, LLC*,
27  913 F.3d 898, 907 (9th Cir. 2019) ("we agree" with plaintiff's argument that, if liability
28  was established, a district court could order compliance with private industry standards for

-15-

1    website compliance as a remedy in an ADA case, even though failure to comply with those

2    standards would not necessarily serve as an independent basis for liability).[20]   The Ninth

3    Circuit has previously emphasized that public accommodations need only make

4    "reasonable" accommodations, not "any and all possible accommodations that would

5    provide full and equal access to disabled patrons."   Still, public accommodations "must

6    also take into account evolving technology that might make it cheaper and easier to

7    ameliorate the plight of the disabled."   *Baughman v. Walt Disney World Co.*, 685 F.3d

8    1131, 1135 (9th Cir. 2012).   The court of appeals has also rejected the argument that

9    offering the auxiliary aids and services identified in the ADA and associated regulations

10    will *per se* satisfy the ADA, reasoning that "assistive technology is not frozen in time:  as

11    technology advances, [. . .] accommodations should advance as well."   *Enyart v. Nat'l Conf.*

12    *of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).   This case law makes clear

13    that mere compliance with the minimum standards established in ADA regulations will not

14    necessarily satisfy the statute where rapidly-evolving technology may have advanced

15    beyond what was contemplated at the time the regulations were promulgated.   Therefore,

16    even if Quest's failure to provide an independently accessible kiosk cannot serve as a stand-

17    alone basis for liability, that fact would not preclude this Court from ordering provision of

18    an "independently accessible" kiosk (however that may be defined technologically) as an

19    equitable remedy if Plaintiffs can establish a basis for liability.   The Court concludes that

20    the available equitable remedies remaining to Plaintiffs include, among others, the

21

22    ———————————

[20] Quest attempts to distinguish *Robles* on the ground that DOJ's posture toward websites is

23    different than its posture toward "interactive transaction machines" like the kiosk.   Quest argues that DOJ

24    has previously indicated that the ADA *applies* to websites, but has not promulgated rules governing the

*standards* that websites must follow.   On the other hand, DOJ *has* promulgated standards that apply to

25    certain interactive transaction machines:  ATMs.   DOJ has stated, however, that these standards do not

apply to any other interactive transaction machines.   *See* DMSJ Reply at 13; *see also* 2010 Americans

26    with Disabilities Act Standards for Accessible Design, § 707, available at http://www.ada.gov/regs2010/

2010ADAStandards/2010ADAstandards.htm#pgfId–1006537.   For purposes of this motion, this is a

27    distinction without a difference:  *Robles*, *Baughman*, and *Enyart* all make clear that the fact that ADA

regulations do not specifically require a particular technology in *all* circumstances does not prevent courts

28    from requiring them in *specific* circumstances.

-16-

provision of headphone jacks and/or tactile keyboards or markings if Plaintiffs can establish liability at trial.

The Court **GRANTS** Quest's MSJ as to Plaintiffs' freestanding "independent accessibility" theory of liability, where the kiosk is not the primary method for check-in.[21] To the extent Quest also seeks summary judgment, however, on the scope of the injunctive relief available to the Class (should the Class prevail at trial), Quest's MSJ is **DENIED**.[22]

## B.    Plaintiffs' MSJ

### 1.    Vargas's Individual Claims

Vargas moves for summary judgment on his individual Unruh Act and DPA claims. A plaintiff may establish a violation of the Unruh Act by establishing a violation of the ADA. *See* Cal. Civ. Code 51(f). Like the Unruh Act, California's DPA incorporates the standards of the ADA. Cal. Civ. Code § 54.1(a)(3); *see also Cohen v. City of Culver City*, 754 F.3d 690, 701 (9th Cir. 2014) ("A violation of the ADA constitutes a violation of the California DPA.")

When pursuing claims under Title III of the ADA, a plaintiff must prove "(1) [he] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied accommodation by the defendant because of his disability." *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2011) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007)).

---

[21] The Court rejects Plaintiffs' assertion that Quest's MSJ is procedurally improper. Quest moved for summary judgment on a "part" of Plaintiffs' claim. *See* Fed. R. Civ. P. 56(a) (permitting motion for summary judgment on "part of [a] claim or defense"). Although it was a part of Plaintiffs' legal theory at the inception of this litigation, that theory has evolved away from that position. Nonetheless, Quest is entitled to lay that claim to rest even if it is not case dispositive.

[22] The Court likewise denies as premature Quest's preemptive request to stay implementation of a theoretical injunction requiring independently accessible kiosks pursuant to the doctrine of primary jurisdiction. A DOJ rulemaking regarding this issue appears to be imminent, but a final rule is not imminent. To the extent the rulemaking appears likely to impact the scope of Quest's obligations under the ADA, the Court will revisit Quest's request as necessary at a later date.

-17-

1    It is undisputed here that Vargas is disabled and that Quest operates a place of public

2    accommodation.  The question here is whether Vargas was denied accommodation by

3    Quest because of his disability upon his first visit to a Quest PSC, on June 15, 2019.  It is

4    uncontroverted that Vargas visited a Quest PSC without an attendant; a kiosk was present;

5    when Magana visited the waiting room, she directed Vargas to the kiosk; he discovered

6    that the kiosk lacked accessibility features; Magana helped him check in approximately

7    five minutes later.[23]  It is apparent from these facts that Vargas did, eventually, receive

8    assistance with checking in.  The question is whether that assistance constituted "effective

9    communication."

10    The Ninth Circuit instructs that, in contemplating how to comply with the ADA,

11    "[p]ublic accommodations must start by considering how their facilities are used by non-

12    disabled guests and then take reasonable steps to provide disabled guests with a like

13    experience." *Baughman*, 685 F.3d at 1135.  In *Baughman*, the court concluded that Disney

14    was required to permit a disabled individual to use a Segway, a standing motorized scooter,

15    to navigate the park, even where she could potentially have used a wheelchair (which was

16    permitted under Disney policy).  The court reasoned that "if [the defendant] can make [the

17    plaintiff's] experience less onerous and more akin to that enjoyed by its able-bodied

18    patrons, it must take reasonable steps to do so." *Id*. at 1136.

19    Still, a number of other district courts around the country have concluded that the

20    provision of employee assistance satisfies the ADA's effective communication

21    requirement in the context of a retail transaction.  In *National Federation of the Blind, Inc.*

22    *v. Wal-Mart Associates, Inc.*, a district court joined several other district courts in

23    concluding that "[s]taff assistance is sufficient to provide effective communication in a

24

---

25    [23] Vargas did not testify at his deposition that he was actually unable to use the kiosk because of

26    his blindness.  It is reasonable to infer from his other testimony, however, that he was unable to use the

kiosk: he testified, for example, that he was unable to see Magana well enough to discern her height, and

27    he testified that he was able to read large-print type when he was younger, but that his ability to do so has

diminished with age.  Still, drawing all inferences in the light most favorable to Quest, as the Court must

28    on Plaintiffs' motion, the Court concludes that this remains a triable issue of material fact.

-18-

retail transaction," and rejecting the plaintiffs' contention that touchscreen retail checkout stations must be independently accessible. *See Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.*, 566 F. Supp. 3d 383, 399 (D. Md. 2021); *see also West v. Moe's Franchisor, LLC*, No. 15CV2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) (dismissing plaintiffs' complaint asserting that fast-food restaurant's use of touchscreen soda fountain violated the ADA, and rejecting plaintiffs' contention that, because the restaurant had "voluntarily entered the digital platform," the restaurant must make the soda fountain independently accessible); *West v. Five Guys Enterprises, LLC*, No. 15-CV-2845 (JPO), 2016 WL 482981, at *2 (S.D.N.Y. Feb. 5, 2016) (dismissing complaint alleging denial of assistance by fast-food restaurant's employees in operating touchscreen soda fountain, because denial of assistance on a single occasion is insufficient to state a claim, but noting that "[i]f Plaintiffs alleged that they were denied assistance repeatedly at [the restaurant's] locations, they would state an ADA claim"). The only district court in this circuit to have considered the issue found that a restaurant's failure to *affirmatively* offer assistance with operating a touchscreen soda fountain violates the ADA. *See Boyer v. Five Guys Enterprises, LLC*, No. 15-CV-1417-L-JLB, 2018 WL 4680007, at *1 (S.D. Cal. Sept. 28, 2018) (granting plaintiff's motion for summary judgment where the plaintiff, who used a white cane and whose disability was thus apparent, received a cup from an employee but was not offered assistance with using the soda fountain, and did not request such assistance).

The district court in *Boyer* did not analyze whether employee assistance would satisfy the ADA. Instead, it assumed for purposes of Boyer's summary judgment motion that it would. Other courts have concluded that, where heightened privacy concerns were implicated, employee assistance might be insufficient. *See, e.g.*, *National Federation of the Blind*, 566 F. Supp. 3d 383 at 400 (noting that "in circumstances with heightened expectations of privacy, assistance from a qualified reader may not be sufficient" and distinguishing cases finding that touchscreen voting machines must be independently accessible); *see also California Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d

-19-

1229, 1245 (N.D. Cal. 2013) (denying motion to dismiss claim that county's failure to reliably provide independently accessible voting machines violated Title II of the ADA). As discussed above, Plaintiffs here no longer contend that the ADA requires "independently accessible" kiosks in this context.

There are sufficient facts in the record before the Court for a reasonable trier of fact to conclude that Vargas was offered assistance with checking in, and thus that Vargas received effective communication. Vargas testified that, when Magana came out to help another patient, she asked him "can I help you?" Vargas Depo. at 143:3-12. While Magana's declaration is not entirely clear, she appears to assert that if Vargas had told her the kiosk was not accessible, she would have informed her supervisor. *See* Magana Decl. ¶ 7 ("I don't remember if Mr. Vargas complained about the Kiosk during the visit, but what I do know if that, if he had, we are trained to inform our supervisor of **any** patient complaint we receive, and I have always done that."). It is uncontroverted that Magana did check Vargas in. There is also evidence in the record before the Court that, even before the implementation of TFS, Quest trained its staff to offer extra assistance to patients with disabilities, including visually impaired patients. Drawing all inferences in the light most favorable to Quest, as the Court must, the Court concludes that a triable issue of fact remains as to whether Magana offered, or Vargas requested, assistance with check-in.

In addition, assuming that personal assistance was available, a question remains whether a 17-minute wait for assistance violates the ADA under the circumstances of this case. *See, e.g., Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (an hour-long delay in correcting the accidental assignment of a disabled patron to an inaccessible hotel room did not support standing); *O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 904 (D. Ariz. 2012), *adhered to on reconsideration*, No. CV11-2264-PHX-JAT, 2012 WL 2106365 (D. Ariz. June 11, 2012), and *aff'd*, 582 F. App'x 695 (9th Cir. 2014) (dismissing for lack of standing a claim that hospital security guard's refusal to allow visitor to enter with her service dog violated the ADA, where after a 40-minute delay, the guard's supervisor allowed the visitor to enter with her dog); *Frankeberger v.*

-20-

1  *Starwood Hotels & Resorts Worldwide, Inc.*, No. C09-1827RSL, 2010 WL 2217871, at *4

2  (W.D. Wash. June 1, 2010) ("a wait of less than sixteen minutes for assistance was neither

3  unreasonable nor reflective of discrimination" where the plaintiffs, who were legally blind

4  and one of whom used a wheelchair, were unable to read the instructions to operate a

5  wheelchair lift at a secondary entrance to a hotel and needed to ask for assistance with the

6  lift). The Court thus **DENIES** Plaintiffs' MSJ as to Vargas's individual claim.

7      **2.    Plaintiffs' and Class ADA Claims**

8      The Court also finds that a triable issue of fact remains as to whether Quest provided

9  effective communication to the Class during the Class Period. Plaintiffs assert that the

10  Court previously held that Quest's kiosks, as originally rolled out, failed to provide

11  effective communication to blind individuals. The Court previously determined that,

12  although the original version of the kiosks did not *themselves* satisfy the ADA, a genuine

13  factual dispute remained regarding whether Quest had satisfied the ADA through its

14  provision of phlebotomist assistance, and denied Quest's MSJ as to this issue. *See* First

15  MSJ Order at 13. Plaintiffs now move themselves for summary judgment on this issue.

16      There is no question that, as a Quest staff member put it in an internal email, "the

17  staff is servicing the patients and cannot always be in front of the 'house' tending to folks

18  that are struggling with registration." *See* [Doc. # 206-3 at 8]. Still, the Court concludes

19  that, viewing the evidence in the light most favorable to Quest, a reasonable trier of fact

20  could find that Quest's provision of phlebotomist assistance provided effective

21  communication to blind class members during the Class Period. Quest has training

22  materials that could lead a reasonable factfinder to conclude that Quest trained its staff to

23  watch for, and proactively provide assistance to, visually impaired patients. *See* Part II,

24  *supra* (describing pre-TFS training materials). Vargas's own experience indicates that he

25  was eventually assisted with check in by a staff member. Members of Plaintiff ACB had

26  a range of experiences, with many blind patients indicating that they were assisted

27  relatively quickly. This evidence creates a triable issue of fact as to the effectiveness of

28  Quest's provision of staff assistance. The Court thus **DENIES** Plaintiffs' MSJ as to

-21-

1    effective communication during the Class Period.

2    **C.    Mootness**

3         Plaintiffs also move for summary judgment, seeking an order that TFS does not moot

4    Plaintiffs' ADA claims.  Quest asserts TFS allows blind patients to check in for their visits

5    independently, and thus contends (and has contended throughout this action) that Plaintiffs'

6    ADA claim is moot.

7         To have standing to seek an injunction—the only form of relief available under the

8    ADA—there must be a chance that the plaintiff will face the complained-of conduct in the

9    future.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–106 (1983).  In the ADA

10   context, if the plaintiff has already received everything to which he would be entitled, then

11   his claims are moot unless there is evidence the plaintiff will be subjected to the same

12   wrongful conduct by the same defendant.  *Parr v. L&L Drive-Inn Rest.*, 96 F. Supp. 2d

13   1065, 1087 (D. Haw. 2000); *Johnson v. Oishi*, 362 F. Supp. 3d 843, 848 (E.D. Cal. 2019)

14   ("[B]ecause a plaintiff can only obtain injunctive relief under the ADA, the defendant's

15   voluntary cessation of an ADA violation may effectively moot a plaintiff's ADA claim.")

16   (internal citation omitted).  In such cases, defendants bear the burden to show that "the

17   challenged conduct cannot be reasonably expected to recur."  *Oishi*, 362 F. Supp. 3d at

18   848.

19        Triable issues of material fact remain as to whether TFS moots Plaintiffs' claim for

20   injunctive relief.  TFS creates a method for giving notice to phlebotomists located behind

21   a closed door that a visually impaired individual has arrived.  New training, implemented

22   in association with TFS, instructs staff members to identify patients who might need

23   additional assistance, and to make themselves available to assist such patients.[24]  A

24   ───────────────

25   [24] Plaintiffs contend that, even if TFS does address Plaintiffs' claim that check-in was inaccessible,
     Quest has added additional features that TFS does not render independently accessible.  Since "effective

26   communication" and not "independent accessibility" is the touchstone of this action, this argument is, to
     some degree, beside the point.  Still, Quest argues in opposition that Plaintiffs did not plead these

27   "additional" barriers to access in their First Amended Complaint ("FAC"), and that failure to do so places
     them outside the scope of this action.  The Court disagrees.  Plaintiffs' FAC broadly alleges that Quest

28   violated the ADA by failing to make its "check-in system" accessible to blind users.  *See* FAC ¶¶ 4-7.
     The new functions of which Plaintiffs complain—in particular, the "wait where you want feature," added

-22-

1  reasonable trier of fact could conclude, based on this evidence, that when coupled with

2  Quest staff assistance, TFS does provide effective communication for blind patients in

3  compliance with the ADA.  The Court thus **DENIES** Plaintiffs' MSJ as to mootness.

4  **D.  Undue Burden**

5       Plaintiffs move for summary judgment on the ground that Quest has not proven that

6  implementing independently accessible kiosks would be an undue administrative burden.

7  Quest contends that replacing the existing kiosks with new kiosks, outfitted with different

8  accessibility hardware, would constitute an undue administrative burden.[25]  Quest presents

9  evidence that providing this hardware would increase the wear and tear on the kiosks, limit

10 Quest's ability to offer other functions through the kiosks, and potentially require Quest to

11 find a different source for its tablets at some point in the future.  *See* Carr Decl. ¶ 13.  Quest

12 also presents evidence that switching out the existing kiosks for new ones would involve

13 additional staff time, logistical planning, and new training.  *Id*.  This evidence creates a

14 triable issue of fact as to whether provision of these features would impose an undue burden

15 on Quest.  The Court thus **DENIES** Plaintiffs' MSJ as to Quest's undue burden affirmative

16 defense.

**VI.**

**CONCLUSION**

19      For the reasons stated herein, the Court:

20    1.  **GRANTS** Quest's MSJ as to Plaintiffs' freestanding "independent

21        accessibility" theory of liability;

22    2.  **DENIES** Quest's MSJ to the extent it seeks to preemptively limit the scope

23        of potential injunctive relief; and

---

25 during the COVID-19 pandemic after Plaintiffs filed their FAC—are obviously part of Quest's "check-in

26 system."  To the extent Quest contends that such a reading of Plaintiffs' FAC creates a moving target for
Quest, the Court is unpersuaded.  Quest itself has moved the target, by adding new check-in features to

27 the kiosks.

28     [25] Quest does not argue that it would constitute an undue financial burden.

-23-

3.  **DENIES** Plaintiffs' MSJ.

**IT IS SO ORDERED.**

DATED:  August 12, 2022

_____

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

-24-

94

1   Jonathan D. Miller (Bar No. 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (Bar No. 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE & MILLER, LLP
    33 West Mission Street, Suite 201
4   Santa Barbara, California 93101
    Telephone: (805) 963-2345
5   Facsimile: (805) 284-9590

6   Attorneys for Plaintiffs, LUKE DAVIS,
    JULIAN VARGAS, AMERICAN
7   COUNCIL OF THE BLIND, and the
    Certified Class
8
9   *Additional counsel for Plaintiffs listed on*
    *signature page.*

10

11              **UNITED STATES DISTRICT COURT**
                **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12

13  LUKE DAVIS, JULIAN VARGAS, and      CASE NO.: 2:20-cv-00893-FMO-KS
    AMERICAN COUNCIL OF THE
14  BLIND, individually and on behalf of all   **PLAINTIFFS' REPLY TO**
    others similarly situated,                 **DEFENDANT'S OPPOSITION**
15                                             **TO PLAINTIFFS' MOTION TO**
            Plaintiffs,                        **REFINE CLASS DEFINITIONS**
16
        v.
17                                             Hon.  Fernando Olguin
    LABORATORY CORPORATION OF          Date: July 21, 2022
18  AMERICA HOLDINGS,                    Ctrm: 6D
                                         Time: 10:00 a.m.
19
                                         FAC Filed: September 3, 2020
20          Defendant.                   Trial Date: Not yet set

21

22

23

24

25

26

27

28

                              1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I.    INTRODUCTION

In opposing Plaintiffs' Motion to Refine the Class Definitions (Dkt. 107-1) in light of *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ("*Olean*"), Defendant Laboratory Corporation of America Holdings ("LabCorp" or "Defendant") does not dispute (and therefore concedes): (1) this Court has broad authority under Rule 23(c)(1)(c) to refine the certified class definitions to remove any potentially fail-safe language; (2) the current certified Class definitions are arguably fail-safe; (3) the Ninth Circuit in *Olean* stated for the first time that fail-safe classes are impermissible; or (4) *Olean* expressly instructs that the appropriate remedy for an infirm class definition is class definition refinement - not decertification or dismissal. (*See* Dkt. 110, LabCorp's Opposition to Plaintiffs' Motion to Refine the Class Definitions, at pp. 1-13.)

Rather, the sole issue LabCorp appears to have with the proposed refined class definitions is its hollow claim that they continue to be arguably fail-safe. But LabCorp never explains exactly *how* the proposed class definitions are fail-safe. In fact, the proposed refined class definitions are not fail-safe because each of the requirements for class membership are susceptible to objective criteria, the standard employed by the Seventh Circuit Court of Appeals from which the *Olean* court borrowed heavily. *See Olean,* 31 F.4th at 669 n.14, citing *Messner v. Northshore U. HealthSystem,* 669 F.3d 802, 824 (7th Cir. 2012).

Instead of explaining the rationale for its argument that the proposed refined class definitions are infirm, LabCorp improperly uses the majority of its brief in opposition to re-argue the predominance and superiority elements of Rule 23(b)(3) Unruh Act class certification. (Dkt. 110, at pp. 8-13.) Yet, as another court in this District recently held on a different motion to refine a certified class definition, such arguments on a motion to refine must be treated as arguments for reconsideration— subject to Local Rule 7-18's stringent standard. *See Vargas v. Quest Diagnostics*

2

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1   *Clinical Labs, Inc.*, No. 2:19-cv-0818-DMG-MRW, Dkt. 228 (C.D. Cal. June 17,

2   2022) ("the Court construes their request to 'revisit' the Court's Class Certification

3   Order as a request for reconsideration."). As explained in Section II.C., *infra*, against

4   this exacting legal standard, LabCorp's reconsideration arguments fall flat.

5   Accordingly, the Court should decline LabCorp's invitation to relitigate the class

6   certification issues.[1] Rather, this Court should appropriately limit its review to the two

7   issues properly before it: 1) whether to refine the existing class definitions to remove

8   any arguably fail-safe language, and 2) whether the proposed refined class definitions

9   are fail-safe.[2]

10      As Judge Dolly Gee's recent order in *Vargas v. Quest Diagnostics Clinical*

11   *Labs, Inc.*, acknowledges, refinement is the appropriate remedy to resolve any fail-

12   safe claims following the Ninth Circuit's decision in *Olean. See Vargas v. Quest*

13   *Diagnostics Clinical Labs, Inc.*, No. 2:19-cv-0818-DMG-MRW, Dkt. 228 (C.D. Cal.

14   June 17, 2022) (order refining the certified class definition). Because the proposed

15   refined definitions are not fail-safe, Plaintiffs respectfully urge this Court to adopt the

16   same to avoid unnecessary argument and appeals and "secure the just, speedy, and

17   inexpensive determination" of this action. Fed. R. Civ. P. 1. For these reasons, and

18   as further explained below, Plaintiffs' Motion should be granted.

19   **II.    ARGUMENT**

20          **A.    *LabCorp Concedes This Court Has Broad Authority to Refine the***

21                 ***Class Definitions and That Refinement—and Not Decertification—Is***

22                 ***the Ninth Circuit's Preferred Remedy***

23      Importantly, LabCorp does not dispute this Court has broad discretion to refine

---

[1] If the Court does opt to hear LabCorp's arguments on reconsideration (which it
should not), they must be rejected for the reasons set forth in Section II.C. below.

[2] Should the Court deem the proposed class definitions insufficient for any reason,
Plaintiffs are open to any commonsense modifications the Court may wish to make.

3

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

the certified class definitions as it sees fit. As Plaintiffs' opening brief noted, this broad authority is found both in Federal Rule of Civil Procedure 23(c)(1)(C), which states, "[a]n order that grants or denies class certification may be altered or amended before final judgment[,]" and in Supreme Court case law. *See generally Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.") "In considering the appropriateness of [modification or] decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met.'" *Roy v. County of Los Angeles*, No. CV 13-04416-AB (FFMx), 2018 WL 3435417, at *2 (C.D. Cal. July 11, 2018) (quoting *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 479 (C.D. Cal. 2008)); *see also Lyon v. U.S. Immigration & Customs Enforcement*, 308 F.R.D. 203, 210-11 (N.D. Cal. 2015); *Astiana v. Kashi Co.*, 295 F.R.D. 490, 492 (S.D. Cal. 2013) (same).

Nor does LabCorp dispute that *Olean* expressly instructs that the precise remedy Plaintiffs seek here - refinement of a certified class definition—not decertification or dismissal - is the appropriate remedy where, as here, a class definition is found to be potentially infirm, but where the elements necessary for class certification are otherwise established. *Olean*, 31 F. 4th at 669, n.14.

**B.     *The Proposed Class Definitions Are Not Fail-Safe***

LabCorp's sole remaining contention that the proposed refined class definitions are fail-safe is similarly without merit. Plaintiffs proposed the following refined certified class definitions:

**California Damages Class:**
All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

**Nationwide Injunctive Relief Class:**
All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

4

REPLY TO OPPOSITION TO MOTION TO REFINE CLASS DEFINITIONS

1   (Dkt. 107 at p. 8.) These definitions require only that a series of objective factual

2   determinations be made to determine an individual's membership in the classes:

3   specifically, that the individual: (1) is legally blind; (2) visited a LabCorp patient

4   service center with a LabCorp Express Self-Service kiosk; (3) during the limitations

5   period; and (4) was unable to use the kiosk. As Plaintiff's moving papers note, the

6   *Olean* court rested its holding in regard to "fail-safe" classes on the Seventh Circuit's

7   decision in *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir.

8   2012). A later Seventh Circuit opinion, *Mullins v. Direct Digital, LLC*, 795 F.3d 654,

9   660-61 (7th Cir. 2015) held that a class definition is not fail-safe when "[i]t identifies

10  a particular group of individuals [ ] harmed in a particular way [ ] during a specific

11  period in particular areas."). *Id.* Put another way, *Mullins* defines a non-fail-safe class

12  definition as one that is subject to objective criteria. *Id.* at 657. The proposed Classes

13  here easily meet the *Mullins* objective criteria standard—and, tellingly, LabCorp

14  never explains how they do not.

15      LabCorp nevertheless seeks to align the proposed definitions here with courts

16  where obviously fail-safe classes were certified to argue that "Plaintiffs are trying to

17  avoid more obvious fail-safe language while still seeking certification of the same

18  fail-safe class of persons who Plaintiffs believe have ADA claims …" (Dkt. 110 at

19  pp. 6:27-7:2.) It is unclear, however, where LabCorp finds support for its contention

20  given that the proposed definitions here clearly do not define class members based on

21  any violation of state or federal law, but rather upon objective criteria.

22      More puzzlingly, the pre-*Olean* case upon which LabCorp largely rests its

23  argument - *Gannon v. Network Telephone Services, Inc.*, No., 12-cf-9777, 2013 WL

24  2450199 (C.D. Cal, June 5, 2013) - involved a class whose membership was expressly

25  defined around a ***violation*** of the Telephone Consumer Protection Act ("TCPA").

26  Specifically, that class consisted of "all persons in the United States who received at

27  least one or more **'unauthorized'** text messages sent by or on behalf of Defendants."

28  (*See* Dkt. 110 at p. 4.) The contrast to the proposed class definitions here is readily

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

5

REPLY TO OPPOSITION TO MOTION TO REFINE CLASS DEFINITIONS

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1    apparent - as Plaintiffs' proposed definitions do not speak in terms of any

2    "unauthorized" conduct nor of any violation of state or federal law.

3        In fact, in LabCorp's view of the world, it is unclear what class definition - if

4    any - would not be fail-safe. It misleadingly quotes from Judge Gee's June 17, 2022,

5    discussion of the **pre-*Olean***, certified class definition that was not properly before

6    that court on the motion to refine the class definition in that case. (*See* Dkt. 110 at p.

7    7.) The pre-*Olean* certified class definition in Quest - in compliance with the law of

8    this Circuit at the time it was proposed - utilized language that defined membership

9    based, in part, around experiencing a violation of the ADA and that, accordingly, "any

10   class member who did not suffer a legal injury would be defined out." *See Vargas v.*

11   *Quest Diagnostics Clinical Labs, Inc.*, No. 2:19-cv-0818-DMG-MRW, Dkt. 228

12   (C.D. Cal. June 17, 2022).

13       In response to *Olean*, the plaintiffs in Quest – as Plaintiffs have done here –

14   proposed class definition language which removed any even potentially fail-safe

15   language. *See Vargas v. Quest Diagnostics Clinical Labs, Inc.*, No. 2:19-cv-0818-

16   DMG-MRW, Dkt. 220. What LabCorp never mentions to this Court is that Judge Gee

17   did precisely what Plaintiffs are asking this Court to do here:  she refined the certified

18   class definition to remove any potentially fail-safe language. Specifically, Judge

19   Gee's Order in *Quest* certified the following modified class definition:

20       All legally blind individuals who visited a Quest patient service center
         in the United States between January 1, 2018 through December 31,
21       2019 (the "Class Period") at which the e-check-in self-service kiosk was
         the primary method for check-in and who, due to their disability, could
22       not use all the functions of the kiosks.

23   *See Vargas v. Quest Diagnostics Clinical Labs, Inc.*, No. 2:19-cv-0818-DMG-MRW,

24   Dkt. 228 (C.D. Cal. June 17, 2022).[3] Like the refined class definition recently ordered

25   _____

26   [3] LabCorp - without any explanation - claims this definition, too, is infirm and should

27   not have been certified by Judge Gee. (Dkt. 110 at p. 10) ("LabCorp does not believe
     such an injunctive class should have been certified"). Accordingly, it remains unclear
28   that *any* class definition would be suitable to LabCorp.

6

by Judge Gee in *Quest*, here the proposed class definitions do not speak in terms of any violation of law or other unlawful conduct and thus are not fail-safe.

### C.   LabCorp's Reconsideration Arguments On Predominance and Superiority Are Procedurally Improper

LabCorp's Opposition improperly asks this Court to reconsider its factual and legal findings on class certification. However, as another court in this District recently noted upon a similar motion to refine the certified class definition in that action:

> [T]he Court cannot reconsider a previous ruling unless the party requesting reconsideration meets the following standard:  A motion for reconsideration of an Order on any motion or application may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered. No motion for reconsideration may in any manner repeat any oral or written argument made in support of, or in opposition to, the original motion . . . . C.D. Cal. Local Rule 7-18.

*See Vargas v. Quest Diagnostics Clinical Labs, Inc.*, No. 2:19-cv-0818-DMG-MRW, Dkt. 228, at pp. 4-5 (C.D. Cal. June 17, 2022).

Here, LabCorp has not formally moved this Court for reconsideration of its class certification order. Nor does it even attempt to meet the standard set forth in Local Rule 7-18. Accordingly, its arguments for the Court to reconsider predominance and superiority fail as a procedural matter.

### D.   LabCorp's Reconsideration Arguments on Predominance and Superiority Are Unpersuasive

Putting aside the indisputable procedural deficiency of LabCorp's reconsideration arguments, the arguments also substantively fail for both factual and legal reasons. As a threshold matter, in its transparent effort to improve its litigation position by attempting to align the facts of this case with the facts in *Quest*, LabCorp wholly ignores its prior statement to this Court that this case is "fundamentally different from the Quest Diagnostics case." (Dkt. 90, LabCorp's Opposition to

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

7

1    Plaintiff's Request for Judicial Notice, at p. 4.) In fact, it is precisely upon these

2    "fundamental" factual differences that this Court rested its findings on the Rule

3    23(b)(3) elements of superiority and predominance. (*See* Dkt. 97, Class Cert. Order,

4    at p. 21 (setting forth material facts which differentiate the instant case from *Quest*)).

5        Plaintiffs accordingly agree with LabCorp's pre-certification position that the

6    facts of this case are materially different from those in Quest - and that it is precisely

7    these differences that account for the disparate findings on predominance and

8    superiority. First, in contrast to Quest, LabCorp applied for, received and for many

9    years benefited from, a federal "service mark" for LabCorp Express with the United

10   States Patent and Trade Office ("USPTO") - which, as a requirement for its grant,

11   required that the Company prove that it was offering a unique and distinct good or

12   service. After all, if LabCorp Express was not a unique and distinct service - and

13   therefore eligible for federal service mark protection - why exactly did LabCorp seek

14   service mark protection from the USPTO?

15       Additional facts further differentiate the two actions, as this Court correctly

16   noted in its certification order, including that here, in contrast to what Judge Gee

17   found in *Quest*, the LabCorp Express kiosk was available at 280 LabCorp PSCs in

18   California during the applicable limitations period. (Dkt. 97, Class Cert. Order, at p.

19   21 ("In other words, LabCorp is aware of which PSCs in California have kiosks, when

20   they were installed and made operational, and how each PSC is staffed.")). By

21   contrast, in *Quest*, Judge Gee found that the facts demonstrated that it was impossible

22   to establish through common proof which California locations featured the kiosk

23   during the Class Period and which did not - and that this fact meant that individual

24   issues predominated. *See Vargas v. Quest Diagnostics Clinical Labs, Inc.*, No. 2:19-

25   cv-0818-DMG-MRW, Dkt. 190 (C.D. Cal. Dec. 2, 2021). While Plaintiffs

26   respectfully disagree with the *Quest* Court's factual findings in this regard, the *Quest*

27   Court nevertheless relied upon these findings to conclude that individual issues

28   predominated there. As LabCorp itself argued pre-certification regarding the key

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

8

REPLY TO OPPOSITION TO MOTION TO REFINE CLASS DEFINITIONS

1    differences between the two actions, "key factual distinctions … present different

2    legal issues." (Dkt. 90.) Accordingly, these otherwise procedurally improper

3    arguments are without merit because the cases are in, LabCorp's own words,

4    "fundamentally different." (*Id.*)

5           LabCorp's arguments on the law similarly fail. LabCorp erroneously suggests

6    that *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) precludes a finding of

7    predominance here because the proposed class definition for the California class may

8    include some members who did not experience an injury. (Dkt 110, at pp. 1, 13.) But,

9    the *Olean* court expressly rejected the notion that certification of a class that

10   potentially includes more than a de minimis number of uninjured class members is

11   inappropriate, finding that such a holding would be inconsistent with Rule 23(b)(3),

12   which requires only that the district court determine after rigorous analysis whether

13   the common question predominates over any individual questions, including

14   individualized questions about injury or entitlement to damages. *Olean*, at 669; *see*

15   *also* <u>Fed. R. Civ. P. 23(b)(3)</u>. The *Olean* court stated:

16          Because antitrust impact—i.e., that the Tuna Suppliers' collusion had a
            common, supra-competitive impact on a class-wide basis—is sufficient
17          to show an injury-in-fact traceable to the defendants and redressable by
            a favorable ruling, the Tuna Purchasers have adequately demonstrated
18          Article III standing at the class certification stage for all class members,
            whether or not that was required. *See TransUnion*, 141 S.Ct. at 2208 n.4.

19   *Olean*, 31 F.4th at 682. Similarly, here because LabCorp Express (1) is a unique and

20   distinct service; and (2) has no accessible features that would allow a legally blind

21   person to use it, all legally blind Californians who visited a LabCorp PSC during the

22   applicable limitations period clearly have Article III standing. *TransUnion* and *Olean*

23   require nothing more. Accordingly, this argument, and all procedurally improper

24   arguments against superiority and predominance should be rejected.

25   ///

26   ///

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

9

REPLY TO OPPOSITION TO MOTION TO REFINE CLASS DEFINITIONS

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Refine the Class Definitions should be granted in its entirety.[4]

Dated: July 7, 2022                    Respectfully submitted,

By:
                        */s/ Jonathan D. Miller*
                        Jonathan D. Miller (SBN 220848)
                        jonathan@nshmlaw.com
                        Alison M. Bernal (SBN 264629)
                        alison@nshmlaw.com
                        NYE, STIRLING, HALE & MILLER, LLP
                        33 West Mission Street, Suite 201
                        Santa Barbara, CA 93101
                        Telephone: (805) 963-2345
                        Facsimile: (805) 284-9590

                        Benjamin J. Sweet
                        (*admitted pro hac vice*)
                        ben@nshmlaw.com
                        NYE, STIRLING, HALE & MILLER, LLP
                        1145 Bower Hill Road, Suite 104
                        Pittsburgh, PA 15243
                        Telephone: (412) 857-5350

                        Matthew K. Handley
                        (*admitted pro hac vice*)
                        mhandley@hfajustice.com
                        HANDLEY FARAH &
                        ANDERSON PLLC
                        200 Massachusetts Ave, NW 7th Floor
                        Washington, DC 20001
                        Telephone: (202) 559-2411
                        Facsimile: (844) 300-1952

                        Attorneys for Plaintiffs, LUKE DAVIS,
                        JULIAN VARGAS, AMERICAN COUNCIL
                        OF THE BLIND, and the Proposed Class

---

[4] Should the Court believe the proposed certified Class definitions are infirm in any way, Plaintiffs respectfully request that the Court further refine the definitions to effectively encompass LabCorp's conduct in regard to the LabCorp Express service during the applicable limitations period. *See Vargas v. Quest Diagnostics Clinical Labs, Inc.*, No. 2:19-cv-0818-DMG-MRW, Dkt. 228 (C.D. Cal. June 17, 2022) (further refining the proposed refined class definition).

10

REPLY TO OPPOSITION TO MOTION TO REFINE CLASS DEFINITIONS

1    Robert I. Steiner (admitted *pro hac vice*)
2    rsteiner@kelleydrye.com
     **KELLEY DRYE & WARREN LLP**
3    3 World Trade Center
     175 Greenwich Street
4    New York, NY 10007
5    Telephone:  (212) 808-7800
     Facsimile:   (212) 808-7897
6
7    Becca Wahlquist (State Bar No. 215948)
     bwahlquist@kelleydrye.com
8    **KELLEY DRYE & WARREN LLP**
9    350 South Grand Avenue, Suite 3800
     Los Angeles, CA 90071
10   Telephone:  (213) 547-4900
11   Facsimile:   (213) 547-4901
12
     *Attorneys for Defendant*
13   *Laboratory Corporation of America Holdings*
14
15                 **UNITED STATES DISTRICT COURT**
                **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17   LUKE DAVIS, et al. | CASE NO. 2:20-CV-00893-FMO-KS |
| 18                    Plaintiffs, | **DEFENDANT LABORATORY** |
| 19        v. | **CORPORATION OF AMERICA** |
| 20   LABORATORY CORPORATION OF | **HOLDINGS' MEMORANDUM IN** |
|      AMERICA HOLDINGS, et al. | **OPPOSITION TO PLAINTIFFS'** |
| 21 | **MOTION TO REFINE CLASS** |
|                    Defendants. | **DEFINITIONS** |
| 22 | |
| 23 | Hr'g Date:    July 21, 2022 |
| 24 | Time:         10:00 a.m. |
|    | Location:     Courtroom 6D |
| 25 | FAC Filed:    September 3, 2020 |
|    | Trial Date:   Not Yet Set |
| 26 | |

27
28                                        CASE NO. 2:20-CV-00893-FMO-KS
                                    OPPOSITION TO PLAINTIFFS' MOTION
                                         TO REFINE CLASS DEFINITIONS

## **<u>TABLE OF CONTENTS</u>**

Page

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 2

    **I.**    THE CURRENTLY CERTIFIED CLASSES ARE FAIL-SAFE. ....... 2

    **II.**   THE FAIL-SAFE CLASSES CANNOT BE "REFINED" INTO
       CLASSES WITH FAIL-SAFE MEMBERSHIPS ............................. 5

    **III.**  NO "REFINEMENT" TO THE RULE 23(B)(3) CALIFORNIA
       SUB-CLASS CAN RENDER IT CERTIFIABLE. ............................ 8

CONCLUSION ................................................................................... 13

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Botosan v. Paul McNally Realty*,
   216 F.3d 827 (9th Cir. 2000) ........................................................ 13

*Dixon v. Monterey Fin. Servs., Inc.*,
   No. 15-cv-3298, 2016 WL 4426908 (N.D. Cal. Aug. 22, 2016) ......................... 4

*Donald v. Café Royale, Inc.*,
   218 Cal.App.3d 168 (1990) .......................................................... 13

*Doran v. 7-Eleven, Inc.*,
   509 Fed. App'x 647 (9th Cir. 2013) ............................................ 12, 13

*Gannon v. Network Telephone Services, Inc.*,
   No. 12-cv-9777, 2013 WL 2450199 (C.D. Cal. June 5, 2013) ...................... 3, 4

*Kamar v. RadioShack Corp.*,
   375 Fed. App'x 734 (9th Cir. 2010) ........................................... 3, 7

*Melgar v. CSK Auto, Inc.*,
   681 Fed. App'x 605 (9th Cir. 2017) ............................................... 3

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ..................................................... 3

*Moeller v. Taco Bell Corp.*,
   No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) ................... 13

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ..................................................... 7

*Nevarez v. Forty Niners Football Co., LLC*,
   326 F.R.D. 562 (N.D. Cal. 2018) ................................................. 11

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ..................................................... 5

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
    31 F.4th 651 (9th Cir. 2022).................................................................*passim*

*Pepka v. Kohl's Dept. Stores, Inc.,*
    No. 16-cv-4293, 2016 WL 8919460 (C.D. Cal. Dec. 21, 2016)..........................4

*Russell v. Tyson Farms, Inc.,*
    No. 19-cv-1179, 2020 WL 3051241 (N.D. Ala. Jun. 8, 2020)...........................8

*TransUnion LLC v. Ramirez,*
    141 S.Ct. 2190 (2021) ..............................................................................1, 13

*Vargas v. Quest Diagnostics Clinical Labs., Inc.,*
    No. 19-cv-8108, 2021 WL 5989958 (C.D. Cal. Dec. 2, 2021)..................*passim*

*Young v. Nationwide Mut. Ins. Co.,*
    693 F.3d 532 (6th Cir. 2012).........................................................................3

*Zarichny v. Complete Payment Recovery Servs., Inc.,*
    80 F.Supp.3d 610 (E.D. Pa. 2015)................................................................3

**Statutes**

Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ......................3, 6, 10

Rehabilitation Act, 29 U.S.C. § 794, et seq....................................................3

The Patient Protection and Affordable Care Act, 5 U.S.C. § 8116.........................3

California Unruh Civil Rights Act, Cal. Civ. Code § 51................................*passim*

**Other Authorities**

Fed. R. Civ. P. 23.........................................................................................*passim*

iii

**INTRODUCTION**

The Ninth Circuit in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) made clear that "fail-safe" classes are impermissible and cannot be certified. *Id.* at 669 n.14. Plaintiffs acknowledge, as they must, the impact that *Olean* has on the currently certified classes in this case and as a result have moved the Court to "refine" the previously certified class definitions, which are fail-safe. But as Labcorp explained to Plaintiffs during the meet-and-confer on this Motion, the new class definitions they propose continue to be fail-safe. This is because membership in the class is entirely contingent on whether that person has a claim under Plaintiffs' legal theories.

As detailed below in <u>Part I</u>, the Rule 23(b)(2) and 23(b)(3) certified classes are fail-safe and should be decertified. The Court should not "refine" the class definitions to those now proposed by Plaintiffs, because Plaintiffs admit their new definitions would still include as class members the **exact same individuals** who currently populate the fail-safe classes. *See* Dkt. No. 107-1 at 3 ("Plaintiffs' refined classes are intended to be **identical in every way to the certified classes...**") (emphasis added)). Thus, this is not "refinement" at all. Indeed, the newly proposed definition is even more broad than the existing one because it clearly includes those who were "unable" or did not seek to access the kiosk for a plethora of reasons, including those having nothing to do with Plaintiffs' theory of liability and thus have no injury, and who would not ultimately have claims under that theory. *See TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (each class member must possess Article III standing).[1] As explained in <u>Part II</u>, Plaintiffs

_____

[1] Plaintiffs are clear that they "seek refinement to remove any claim by [Labcorp] that the current class definitions contain 'fail-safe' language.'" (Dkt. No. 107-1 at 2.) Plaintiffs then argue in a footnote that "[r]efining the class definitions . . . would resolve the gravamen of Defendant's pending Rule 23(f) appeal, as it would render

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

1  cannot simply eliminate some language from their definitions while retaining the
2  fail-safe infirmity that exists in their prior class definition.

3      Finally, as addressed in <u>Part III</u>, should the Court consider altering the class
4  definitions, it should recognize that *Olean*'s restriction on fail-safe classes at the
5  very least prevents the certification of the Rule 23(b)(3) damages sub-class here.
6  Plaintiffs propose an overbroad class from which uninjured persons will later be
7  jettisoned after individual inquiries—a class that cannot meet the predominance and
8  superiority requirements.  Injury from an alleged Unruh Act violation is part of any
9  merits determination and certain class members who are "unable to use" a kiosk will
10  have no injury at all because, for example, they preferred to check in at the front
11  desk with a Labcorp employee and never attempted to (or wanted to) check in at a
12  kiosk.   After *Olean* and *TransUnion,* Plaintiffs cannot simply plan to drop all
13  uninjured legally blind persons from class membership after individual inquiries into
14  whether those members have claims under Plaintiffs' legal theory.

15      Plaintiffs' Motion to Refine has put the fail-safe issue squarely before this
16  Court, and neither the current definitions nor the new ones they propose now can
17  stand.   Accordingly, Plaintiffs' motion should be denied and their proposed
18  "refined" classes should not be certified.

19                    <u>**ARGUMENT**</u>

20  **I.     THE CURRENTLY CERTIFIED CLASSES ARE FAIL-SAFE.**

21      While it was until recently a matter of dispute whether the Ninth Circuit

---

23  the issue moot." (Dkt. No. 107-1 at 2 n.1.)  However, this is not the case.
24  Labcorp's Rule 23(f) petition primarily seeks review to address the intra-circuit
25  inconsistency on when Rule 23(b)(3) Unruh Act damages classes are certifiable, as
   well as asking the Ninth Circuit to address other legal issues tied to certification.
26  *See Davis v, Laboratory Corp. of America Holdings*, No. 22-80053, Dkt. No. 1-2
27  (9th Cir. June 6, 2022) (Labcorp's Rule 23(f) petition).

28                                  2                    CASE NO. 2:20-CV-00893-FMO-KS
                                                    OPPOSITION TO PLAINTIFFS' MOTION
                                                      TO REFINE CLASS DEFINITIONS

1   precluded fail-safe classes, it is now clear that "[a] court *may not* . . . create a 'fail

2   safe' class that is defined to include only those individuals who were injured by the

3   allegedly unlawful conduct." *Olean*, 31 F.4th 651 at 669 n.14 (emphasis added)

4   (citations omitted). A class definition is impermissibly "fail-safe" if it is defined in

5   a manner wherein "a class member either wins, or by virtue of losing, is defined out

6   of the class and is therefore not bound by the judgment." *Id.* (quoting *Messner v.*

7   *Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)). Stated

8   differently, a fail-safe class is "one that includes *only* those who are *entitled* to

9   relief." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). A

10  fail-safe class is "prohibited because it would allow putative class members to seek

11  a remedy but not be bound by an adverse judgment." *Id.* (citation omitted).

12  Accordingly, such classes are "palpably unfair to the defendant." *Kamar v.*

13  *RadioShack Corp.*, 375 Fed. App'x 734, 736 (9th Cir. 2010).

14       Here, both of the certified class definitions are textbook fail-safe classes. In

15  order to be a member of Plaintiffs' proposed classes, each class member must

16  prevail on their claims under Plaintiffs' theory of the case, *i.e.*, by establishing they

17  are legally blind and unable to use the kiosk because of that disability. Therefore,

18  membership within the proposed definitions is intertwined with Plaintiffs' ADA,

19  RA, ACA and Unruh Act claims because "whether a person qualifies as a member

20  depends on whether that person has a valid claim." *Zarichny v. Complete Payment*

21  *Recovery Servs., Inc.*, 80 F.Supp.3d 610, 623 (E.D. Pa. 2015) (quoting *Messner*, 669

22  F.3d at 825); *see also Melgar v. CSK Auto, Inc.*, 681 Fed. App'x 605, 607 (9th Cir.

23  2017) ("A fail-safe class is commonly defined as limiting membership to plaintiffs

24  described by their theory of liability in the class definition such that the definition

25  presupposes success on the merits.")

26       *Gannon v. Network Telephone Services, Inc.*, No. 12-cv-9777, 2013 WL

27  2450199 (C.D. Cal. June 5, 2013) is instructive. In *Gannon*, the putative Telephone

28
                                    3                    CASE NO. 2:20-CV-00893-FMO-KS
                                                         OPPOSITION TO PLAINTIFFS' MOTION
                                                         TO REFINE CLASS DEFINITIONS

1  Consumer Protection Act ("TCPA") class consisted of all person in the United
2  States who received at least one or more "*unauthorized* text messages sent by or on
3  behalf of defendants." *Id.* at *2.  In other words, membership of the proposed class
4  turned on whether the class members had a valid TCPA claim.  In denying
5  plaintiff's motion for class certification, the Court reasoned:

> The Court cannot determine whether an individual is part
> of the class without extensive individual inquiry into the
> merits of Plaintiff's claim, which ultimately makes
> identification of the class administratively unfeasible. . . .
> Plaintiffs' class definition would require individual inquiry
> into whether the potential class members consented to
> receiving text messages. . . . Based on these facts, the
> Court would have to hold mini-trials to determine who
> received unauthorized text messages and thus, who is a
> class member. . . . [S]ignificant inquiry as to each
> individual class member would be required, as well as
> inquiry into the merits of the claim.

*Id.* at *2-3 (internal citations and quotation marks omitted).

Similarly, here, because membership in Plaintiffs' classes turns on whether
members have a valid claim under Plaintiffs' legal theory, the classes are fail-safe.
*See Pepka v. Kohl's Dept. Stores, Inc.*, No. 16-cv-4293, 2016 WL 8919460, at *4
(C.D. Cal. Dec. 21, 2016) (striking class allegations that were fail-safe because
"[d]eciding who fell into Plaintiff's proposed class would require the Court to
engage in an improper merits evaluation to determine who is in the class") (citation
omitted); *Dixon v. Monterey Fin. Servs., Inc.*, No. 15-cv-3298, 2016 WL 4426908,
at *2 (N.D. Cal. Aug. 22, 2016) (striking class allegations as fail-safe where "a
determination of whether a person is a member of the class is dependent on whether
he/she prevails on the merits of the TCPA claim alleged in the operative pleading.")

Because fail-safe classes are impermissible under *Olean*, this Court should
decertify the classes.  *See* Fed. R. Civ. P. 23(c)(1) (a class certification order "may

4

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

be altered or amended before final judgment"); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 633 (9th Cir. 1982) (affirming that a "district court's order respecting class status . . . is inherently tentative" prior to final judgment on the merits.)  And while it is true that a faulty class definition can at times be refined prior to certification, as further addressed below, Plaintiffs' proposed "refinements" to the class definitions do not change the fail-safe nature of the class memberships and thus cannot be adopted by the Court.

## II.   THE FAIL-SAFE CLASSES CANNOT BE "REFINED" INTO CLASSES WITH FAIL-SAFE MEMBERSHIPS.

Significantly, while Plaintiffs style their motion as a Motion to Refine Class Definitions, ostensibly to cure the fail-safe problem of the currently defined classes in that they include only those who are entitled to relief, Plaintiffs concede that their purported modification has done nothing to alter class membership at all, stating, "**Plaintiffs' refined classes are intended to be identical in every way to the certified classes**[.]"  (Dkt. No. 107-1 at 3) (emphasis added).  Plaintiffs thus intend exactly the same membership contained in the certified classes—legally blind persons unable to use kiosks because the kiosks were not independently accessible to those persons.  Here are the proposed memberships that Plaintiffs assert are actually "identical in every way" to those currently certified:

| **CURRENT** | **PROPOSED** |
|---|---|
| **Nationwide Class** ||
| All legally blind individuals in the United States who visited a LabCorp patient service center in the United States and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its echeck-in kiosks accessible to legally blind individuals. | All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk. |

5

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

| **California Class** | |
| --- | --- |
| All legally blind individuals in California who visited a LabCorp patient service center in California and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to make its e-check-in kiosks accessible to legally blind individuals. | All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California, but were unable to use the LabCorp Express Self-Service kiosk. |

(Dkt. No. 107-1 at 8.)

Plaintiffs have dropped some of the language more closely tied to their theory of ADA violations in an attempt to disguise the continued fail-safe nature of the classes, and now define class membership as all legally blind persons "unable to use" the kiosk. However, a class (particularly a Rule 23(b) class) cannot be certified so broadly as to include persons "unable to use" a Labcorp kiosk, including, for example: (i) persons visiting a patient service center ("PSC") without an operational kiosk; or (ii) persons who preferred to (and did) check in at the front desk, as 25% of all Labcorp PSC patients do; or (iii) persons who (like Plaintiff Vargas) were directed to check in at the front desk and never attempted to use a kiosk or may not have even known a kiosk existed at a particular PSC. Plaintiffs' "refined" class definitions include individuals in all of these situations, making the revised definitions overbroad. Instead of addressing this infirmity, Plaintiffs double down and assert that the proposed classes would be "**identical in every way**" to the certified fail-safe classes. Those classes are impermissible because they contain persons who were allegedly denied access to Labcorp's services due to an inaccessible kiosk, even when there was an appropriate auxiliary aid available (*i.e.*, desk check-in).

Essentially, Plaintiffs are trying to avoid more obvious fail-safe language

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

while still seeking certification of the same fail-safe class of persons who Plaintiffs believe have ADA claims (and California-based claims tied to the ADA claims) **because** an independently accessible kiosk was not available to them. This is based on Plaintiffs' legal theory that an independently accessible kiosk would be required by the ADA, and that the desk check-in available at every PSC is not a reasonable accommodation. The proposed classes are designed to include only those persons who "either win[] or, by virtue of losing, [are] defined out of the class and [are] therefore not bound by the judgment." *Olean*, 31 F.4th at n.14. For example, if members of the California class are shown to have no Unruh Act claim, they will fall out of the proposed definition. That is precisely what is forbidden by *Olean's* fail-safe class proscription due to the "palpably unfair" result to Labcorp. *Kamar*, 375 Fed. App'x at 736.

Plaintiffs rely on *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015), for their argument that the proposed refined class definitions are not fail-safe because they are subject to "objective criteria," but this reliance is misplaced. As Judge Gee recognized in rejecting this same argument in the other case brought by Plaintiffs Vargas and American Council for the Blind against Labcorp competitor Quest Diagnostics, on the same theories of liability for PSC kiosk check-ins:

> . . . while there may be objective, non-legal criteria that map onto the Class definition (e.g., visually impaired individuals who attempted to but could not use Quest's kiosks), Plaintiffs' Class is explicitly defined in terms of the legal injury to Class Members. It therefore appears that any Class Member who did not suffer a legal injury would be defined out.

*Vargas v. Quest Diagnostics Clinical Labs, Inc.,* No. 2:19-cv-0818-DMG-MRW, Dkt. No. 228 at 4-5 (C.D. Cal. June 17, 2022).

The same is true for Plaintiffs' proposed refined classes here. There is non-legal criteria "mapped onto" the class definition, but the core of membership is a

7

"denial" due to an inaccessible kiosk so that any class member—particularly one asserting Unruh Act claims—would fall out of the class if he or she was unable to prove damage and proximate causation, and therefore ultimate liability. This is the very definition of an impermissible fail-safe class. *See, e.g. Russell v. Tyson Farms, Inc.*, No. 19-cv-1179, 2020 WL 3051241 (N.D. Ala. Jun. 8, 2020), at *2 (striking fail-safe class definitions on that basis, "because the plaintiffs will be required to prove damages and proximate causation at trial, there runs the possibility of a set of plaintiffs who, unable to provide damages and proximate causation – and therefore ultimate liability – would, by virtue of that failure, not be included in the class. Consequently, those plaintiffs would not be bound by the judgment.").

Plaintiffs' new proposed definitions that they intend to contain the "identical" membership of patently fail-safe classes should not be adopted by this Court.[2]

## III.   NO "REFINEMENT" TO THE RULE 23(B)(3) CALIFORNIA SUB-CLASS CAN RENDER IT CERTIFIABLE.

Finally, the recent developments and pleadings filed by the same Plaintiffs here in the *Quest* litigation, and facts provided by Labcorp during the certification briefing, make clear that at the least, a Rule 23(b)(3) class cannot be certified now that fail-safe classes are prohibited in the Ninth Circuit.

As this Court is aware, in *Vargas v. Quest Diagnostics Clinical Labs., Inc.*, No. 19-cv-8108, 2021 WL 5989958 (C.D. Cal. Dec. 2, 2021), Judge Gee certified a fail-safe injunctive Rule 23(b)(2) almost identical to that certified here, after she noted that (as of the date of her original order) fail-safe classes were permitted in the

---

[2] If the proposed "refined" membership is **not** identical to that of the current fail-safe classes, as Plaintiffs have claimed in the Motion, then Plaintiffs should be required to explain their new proposed classes in a motion to certify, and Labcorp is entitled to oppose certification of these different classes.

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

1   Ninth Circuit. But then on May 11, 2022, Judge Gee issued an order asking the

2   parties to address whether the Court should decertify or redefine the certified

3   injunctive relief class in light of *Olean*'s prohibition on fail-safe classes. *See Vargas*

4   *v. Quest Diagnostics Clinical Labs, Inc*., No. 2:19-cv-0818-DMG-MRW, Dkt. No.

5   211. In response to that Order, Plaintiffs filed a brief acknowledging "the Ninth

6   Circuit's newly announced prohibition against fail-safe classes" at least for Rule

7   23(b)(3) classes, and asked Judge Gee to "refine" the injunctive relief class

8   definition, arguing that Rule 23(b)(2) injunctive relief classes can be defined broadly

9   and can include uninjured persons. *See Vargas v. Quest Diagnostics Clinical Labs,*

10  *Inc*., No. 2:19-cv-0818-DMG-MR, Dkt. No. 220, at 5, 13.

11         Plaintiffs claimed that the core concern of a fail-safe rule does not apply in

12  Rule 23(b)(2) classes, where (unlike in damages classes) the district court need not

13  conduct mini-trials regarding class membership. *See id.* at 17-18 & 17 n.11.

14  Plaintiffs then proposed the following redefinition of the Rule 23(b)(2) class:

15                 All legally blind individuals in the United States who
16                 visited a Quest patient service center during the Class
                   Period and were not assisted with check in by a Quest
17                 employee.

18  *Id.* at 18. *See also Vargas v. Quest Diagnostics Clinical Labs, Inc*., No. 2:19-cv-
19  0818-DMG-MRW, Dkt. No. 228 at 2. Plaintiffs argued that this new definition
20  would be subject to objective determination and would "encompass all legally blind
21  individuals in the United States who were denied effective communication by Quest
22  during the Class Period." *See Vargas,* No. 2:19-cv-0818-DMG-MR, Dkt. No. 220 at
23  18.

24         Tellingly, Plaintiffs in the Quest case **thus conceded that being assisted**
25  **with check-in by a PSC employee would not be a denial of effective**
26  **communication by Quest**. But here, the evidence is that Vargas experienced no
27  such denial of check-in assistance. Instead, Vargas was provided with effective

28
                                              9                 CASE NO. 2:20-CV-00893-FMO-KS
                                                              OPPOSITION TO PLAINTIFFS' MOTION
                                                                TO REFINE CLASS DEFINITIONS

communication when he was assisted with check-in by Labcorp PSC staff on both his visits and checked-in at the front desk.[3]   Vargas himself thus could not be a member of a class of persons who "were not assisted with check-in," which is likely why Plaintiffs proposed a different definitional "refinement" to this Court.

Judge Gee did redefine the injunctive relief class in a manner that she believed avoided fail-safe issues for a 23(b)(2) class, and crafted her own definition so that the injunctive class would include legally blind persons visiting a Quest PSC "at which the e-check-in self-service kiosk was the primary method for check-in and who, due to their disability, could not use all the functions of the kiosks." *Vargas,* No. 2:19-cv-0818-DMG-MRW, Dkt. No. 228 at 6.  (Labcorp does not believe such an injunctive class should have been certified, when there was no evidence that a common remedy for any alleged ADA violations would apply to the certified class.)

Plaintiffs also asked Judge Gee to reconsider her denial of the Rule 23(b)(3) class in light of this Court's findings on superiority and predominance in regards to the California sub-class certified against Labcorp, but Judge Gee did not grant that request.   Judge Gee had denied Plaintiff Vargas's request to certify a California Unruh Act class because:

> Under Vargas's theory of the case each putative class member must show only (1) that he or she is legally blind and (2) that he or she visited a patient service center *with* a kiosk and *without* a staffed desk (3) during the class

---

[3] *See* JA0158, JA0170-72, *id.* at 22:1-13, 34:4-35:6, 35:21-36:5 (deposition testimony establishing that during Vargas's pre-appointment visit to a PSC, he was told, "[a]ll I needed to do was come to the window or the desk at the date of the appointment, you know, the day that I needed the service, and that they would make someone available to help me with the check-in process.").  When he did return the next day for testing services, he went to the front desk to be checked in for service. JA0158 at 22:14-19.  After waiting at a short line at the counter, he was checked in. *See* JA0161, 1065 at 25:3-17, 29:6-9.

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

period.

> Under the circumstances, however, demonstrating these basic factual elements will essentially require each putative class member to litigate her own individual Unruh Act case.

*Vargas,* 2021 WL 5989958, at *9 (C.D. Cal. Dec. 2, 2021).  Thus, Judge Gee came "to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class."  *Id.*  She also held that class procedures were not superior.

When the Court here certified the fail-safe Rule 23(b)(3) Unruh Act claims class, finding predominance of common issues and superiority instead of agreeing with Judge Gee's analysis, it followed the lead of the court in *Nevarez v. Forty Niners Football Co., LLC,* 326 F.R.D. 562 (N.D. Cal. 2018), which had also certified a fail-safe Rule 23(b)(3) class.  *See  id.* at 572 (certifying three classes of "persons with mobility disabilities who use wheelchairs, scooters, or other mobility aids who will attempt to purchase accessible seating for a public event. . . **and who will be denied equal access to** [a stadium's] facilities, services, accessible seating, parking, amenities, and privileges, including ticketing") (emphasis added)).  Fail-safe classes can often give the appearance of predominance and superiority, because only injured persons are included in the class, and so claims can appear to be common across the class members.

But, even putting aside any alternate basis that this Court may have had to distinguish the facts in *Quest* from this case or to reject Judge Gee's legal conclusion, with fail-safe Rule 23(b)(3) classes now barred in this Circuit, Plaintiffs' new proposed definition of persons who were "unable to use" a kiosk would obviously include non-injured legally blind persons—such as those who preferred to and did check in at the PSC front desk, or those who visited a PSC without an

operational kiosk.  It is thus even more evident now that individualized inquiries would be required to assess the viability of each member's Unruh Act claim.

Here, even if Vargas argued that checking in at the front desk caused him difficulty, discomfort, or embarrassment, his own experience cannot be imputed to other California residents who are legally blind and "unable to use" a kiosk.  Not all California PSC's even have kiosks (*see* JA1064, Sinning Dep. at 40:3-12), and for those that do, staffing varies widely depending on location and a PSC's size:  some locations have a dedicated patient intake representative ("PIR") who sits full time at the front desk to check in patients; others have phlebotomists to conduct both check in and testing; and some PSCs are located inside Walgreens stores where there is always a dedicated Walgreens staff member to assist patients.  (JA1067-68, JA1069-70 *id.* at 47:22-48:4, 78:3-8; 79:12-21.)   Labcorp provided evidence that approximately 25% of all PSC patients check in at the front desk, even after the kiosk rollout.   (JA1191, Deal Rpt., Ex. 4, PSC Check-in Metrics.) Moreover, upwards of 10% of PSC patients check-in online before arriving at the PSC.  (*Id.*) And it is likely that a higher percentage of legally blind persons check in at the front desk (as Plaintiff Vargas and ACB member Harden did, and prefers to do) or online (as Plaintiff Davis has done).

Indeed, because of the Unruh Act's injury requirements, only a fail-safe class that eliminates uninjured persons from class membership (like the fail-safe class certified in *Nevarez*) could seem to avoid predominance and superiority issues because uninjured persons would be excluded. As Labcorp explained in its opposition to certification, to recover statutory damages under the Unruh Act, a class member must show they "personally encountered" an Unruh Act violation that caused them difficulty, discomfort, or embarrassment. *See, e.g., Doran v. 7-Eleven, Inc.,* 509 Fed. App'x 647, 648 (9th Cir. 2013) (affirming denial of statutory damages under the Unruh Act because the plaintiff did not prove he personally encountered a

120

violation and experienced difficulty, discomfort, or embarrassment). *See also Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000) ("[I]n order to maintain an action for damages under the Unruh Civil Rights Act, an individual must take the additional step of establishing that he or she was denied access on a particular occasion.") (internal quotations omitted). Similarly, "California courts have held that to maintain an action under the CDPA, a plaintiff must establish that he or she was denied equal access to a public facility on a particular occasion." *Moeller v. Taco Bell Corp.*, No. C 02-5849 PJH, 2012 WL 3070863, at *4 (N.D. Cal. July 26, 2012), citing *Donald v. Café Royale, Inc.*, 218 Cal.App.3d 168, 183 (1990).

Moreover, the *Olean* Court recently recognized the Supreme Court's directive that "[e]very class member must have Article III standing in order to recover individual damages," and cautioned: "Rule 23 also requires a district court to determine whether individualized inquiries into this standing issue would predominate over common questions." *Olean*, 31 F.4th at 669 n.12 (quoting *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021)).

## CONCLUSION

Plaintiffs' motion to refine the class definitions should be denied and the Court should decertify the classes. Plaintiffs' proposed "refinements" to the class should not be accepted, given their claim that the class memberships are "identical" the certified fail-safe classes, and the failure to provide a certifiable definition for the California sub-class in particular.

Finally, should Plaintiffs be permitted the opportunity to attempt once more to certify a class with another proposed definition, Labcorp should be given a full opportunity to oppose that motion, so that the Rule 23(a) and (b) factors can be addressed in light of any newly-defined proposed class.

CASE NO. 2:20-CV-00893-FMO-KS
OPPOSITION TO PLAINTIFFS' MOTION
TO REFINE CLASS DEFINITIONS

1   DATED: June 30, 2022                     KELLEY DRYE & WARREN LLP

2

3                                            By: */s/ Becca Wahlquist*
                                             Robert I. Steiner (admitted *pro hac vice*)
4                                            Becca Wahlquist (State Bar No. 215948)
                                             Glenn T. Graham (State Bar No. 338995)
5                                            Nathan T. Jamieson (State Bar No. 333304)

6                                            *Attorneys for Defendant*
                                             *Laboratory Corporation of America*
7                                            *Holdings*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    14       CASE NO. 2:20-CV-00893-FMO-KS
                                             OPPOSITION TO PLAINTIFFS' MOTION
                                             TO REFINE CLASS DEFINITIONS

Jonathan D. Miller (Bar No. 220848)
jonathan@nshmlaw.com
Alison M. Bernal (Bar No. 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

*Attorneys for Plaintiffs, Luke Davis, Julian Vargas, American Council of the Blind, and the Certified Class*

*Additional counsel for Plaintiffs listed on signature page.*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | CASE NO.: 2:20-cv-00893-FMO-KS<br><br>**PLAINTIFFS' NOTICE OF MOTION TO REFINE CLASS DEFINITIONS**<br><br>*{Concurrently filed with Memorandum of Points and Authorities, Declaration of Alison Bernal, and [Proposed] Order}*<br><br>Hon.  Fernando Olguin<br>Date:  July 21, 2022<br>Ctrm:  6D<br>Time:  10:00 a.m.<br><br>FAC Filed: September 3, 2020<br>Trial Date: Not yet set |

TO THE COURT, DEFENDANT, AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 21, 2022, at 10:00 a.m. or as soon thereafter as the matter may be heard in the courtroom of the Honorable Fernando M. Olguin, located in Courtroom 6D at 350 W. 1st Street, 6th Floor, Los Angeles, California 90012, Plaintiffs Luke Davis and Julian Vargas will and hereby do move for the following order modifying the Court's May 23, 2022, and June 13, 2022

1

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

123

(amended) class certification orders (Dkt. 97 and 103) pursuant to Federal Rule of Civil Procedure 23(c)(1)(C):

1.  To refine the existing Class definitions to read as follows:

**Nationwide Injunctive Class:** All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

**California Minimum Statutory Damages Class**: All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

While Plaintiffs do not concede the existing Class definitions are "fail-safe," to (1) remove any doubt on an issue that amounts to classic "form over substance," and (2) avoid burdening the Class and the appellate court with a lengthy and unnecessary appeal, Plaintiffs hereby move to slightly refine the existing Class definitions as described above to remove any potentially fail-safe language.

This Motion is made pursuant to Federal Rule of Civil Procedure 23(c)(1)(C) and is based upon this Notice of Motion, the supporting Memorandum of Points and Authorities, the supporting Declaration of Alison Bernal, and the pleadings, papers, and other documents on file in this action, along with any evidence and argument presented at the hearing on this matter.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on June 9, 2022.

Dated: June 16, 2022                    *{Signatures below}*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

2

1

2 Respectfully submitted,

3 By:

4 _/s/ Jonathan D. Miller_
Jonathan D. Miller (SBN 220848)

5 jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)

6 alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP

7 33 West Mission Street, Suite 201
Santa Barbara, CA 93101

8 Telephone: (805) 963-2345
Facsimile: (805) 284-9590

9 Benjamin J. Sweet

10 (*admitted pro hac vice*)
ben@nshmlaw.com

11 NYE, STIRLING, HALE & MILLER, LLP
1145 Bower Hill Road, Suite 104

12 Pittsburgh, PA 15243
Telephone: (412) 857-5350

13 Matthew K. Handley

14 (*admitted pro hac vice*)
mhandley@hfajustice.com

15 HANDLEY FARAH &
ANDERSON PLLC

16 200 Massachusetts Ave, NW 7th Floor
Washington, DC 20001

17 Telephone: (202) 559-2411
Facsimile: (844) 300-1952

18 *Attorneys for Plaintiffs, Luke Davis, Julian*

19 *Vargas, American Council of the Blind, and*
*the Certified Class*

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

3

PLAINTIFFS' NOTICE OF MOTION TO REFINE CLASS DEFINITIONS

Jonathan D. Miller (Bar No. 220848)
jonathan@nshmlaw.com
Alison M. Bernal (Bar No. 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California  93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

*Attorneys for Plaintiffs, Luke Davis, Julian Vargas, American Council of the Blind, and the Certified Class*

*Additional counsel for Plaintiffs listed on signature page.*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | CASE NO.: 2:20-cv-00893-FMO-KS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO REFINE CLASS DEFINITIONS**<br><br>*{Concurrently filed with Notice of Motion, Declaration of Alison Bernal, and [Proposed] Order}*<br><br>Hon.   Fernando Olguin<br>Date:  July 21, 2022<br>Ctrm:  6D<br>Time:  10:00 a.m.<br><br>FAC Filed: September 3, 2020<br>Trial Date: Not yet set |

1

126

## I.    INTRODUCTION

Pursuant to F.R.CP. 23(c)(1)(C), Plaintiffs Luke Davis and Julian Vargas, individually and on behalf of the nationwide and California certified classes (collectively "Plaintiffs"), bring the following motion to modify the Court's May 23, 2022, and June 13, 2022, (amended) class certification orders (Dkt. 97 and 103) to refine the class definitions pursuant to *Olean v. Bumble Bee Foods,* 31 F.4th 651 (9th Cir. 2022). Plaintiffs seek refinement to remove any claim by Laboratory Corporation of America Holdings ("LabCorp" or "Defendant") that the current class definitions contain "fail-safe" language in contravention with the Ninth Circuit's decision in *Olean.* While Plaintiffs do not concede the existing definitions are "fail-safe," and further agree with this Court's conclusion that Defendant waived its "fail-safe" argument by not previously asserting it (*see* Amended Order, Dkt. 103), Plaintiffs nevertheless move this Court for refinement to "secure the just, speedy, and inexpensive determination" of this action by avoiding unnecessary argument and appeals.[1] Fed. R. Civ. P. 1.

## II.   THE COURT HAS AUTHORITY TO MODIFY ITS CLASS CERTIFICATION RULING

There is no dispute "courts retain discretion to revisit class certification throughout the legal proceedings, and may rescind, modify, or amend the class definition in light of subsequent developments in the litigation." *Krueger v. Wyeth,*

---

[1] Refining the class definitions as outlined in *Olean* would resolve the gravamen of Defendant's pending Rule 23(f) appeal, as it would render the issue moot. *Allard v. DeLorean*, 884 F.2d 464, 466 (9th Cir. 1989) ("If events subsequent to the filing of an appeal moot the issues presented in a case, no justiciable controversy is presented.") (citing *Aguirre v. S.S. Sohio Intrepid*, 801 F.3d 1185, 1189 (9th Cir. 1986)); NASD *Dispute Resolution, Inc. v. Judicial Council of State of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007) ("A case is moot on appeal if no live controversy remains at the time the court of appeals hears the case.") (citing *GTE Cal., Inc. v. FCC*, 39 F.3d 940, 945 (9th Cir. 1994)).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

2

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

Inc., 310 F.R.D. 468, 473-74 (S.D. Cal. 2015). This authority is found in Federal Rule of Civil Procedure 23(c)(1)(C), which states, "[a]n order that grants or denies class certification may be altered or amended before final judgment[,]" and in Supreme Court case law. *See generally Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.") "In considering the appropriateness of [modification or] decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met.'" *Roy v. County of Los Angeles*, No. CV 13-04416-AB (FFMx), 2018 WL 3435417, at *2 (C.D. Cal. July 11, 2018) (quoting *Marlo v. United Parcel Serv., Inc*., 251 F.R.D. 476, 479 (C.D. Cal. 2008)). *See also Lyon v. U.S. Immigration & Customs Enforcement*, 308 F.R.D. 203, 210-11 (N.D. Cal. 2015); *Astiana v. Kashi Co*., 295 F.R.D. 490, 492 (S.D. Cal. 2013) (same).

Plaintiffs' refined classes are intended to be identical in every way to the certified classes, except that they are defined in a way that comports with the Ninth Circuit's holding in *Olean v. Bumble Bee Foods,* 31 F.4th 651 (9th Cir. 2022) regarding "fail-safe" classes.

## III. BACKGROUND

On April 26, 2021, Plaintiffs moved to certify both a nationwide injunctive relief Class and the California Unruh Act damages Class based on Defendant discriminating against legally blind individuals at its patient service centers.

On April 8, 2022, the Ninth Circuit *en banc* issued its opinion in *Olean v. Bumble Bee Foods,* 31 F.4th 651 (9th Cir. 2022). Though the decision in *Olean* disapproved of "fail-safe" class definitions for Rule 23(b)(3) classes, the decision affirmed certification of three Rule 23(b)(3) classes and included key favorable holdings. Notably, *Olean* instructs that refinement of a class definition—not decertification or dismissal—is the appropriate remedy where a class definition is

3

128

1    found to be potentially infirm but the elements necessary for class certification are

2    otherwise established. *Olean*, 31 F. 4th at 669, n.14.

3        On May 19, 2022, four days before this Court issued its Order certifying both

4    the California Unruh Act damages Class and the nationwide ADA injunctive relief

5    Class, counsel for Plaintiffs sent a meet-and-confer communication pursuant to Local

6    Rule 7–3 to counsel for LabCorp. (Ex. 1, attached to Declaration of Alison Bernal

7    ("Bernal Decl.") at ¶ 6.)   The communication stated:

8        Dear Counsel,

9        We are writing pursuant to Local Rule 7-3 to meet and confer on Plaintiffs'
10       anticipated motion to refine the proposed class definition pursuant to *Olean v.
         Bumble Bee Foods,* 31 F.4th 651 (9th Cir. 2022). The proposed new class
11       definitions are as follows:

12       **Nationwide Injunctive Class:** All legally blind individuals in the United
         States who visited a LabCorp patient service center but were not able to utilize
13       the LabCorp Express service because it lacked accessible features.

14       **California Minimum Statutory Damages Class**: All legally blind individuals
         in California who visited a LabCorp patient service center in California but
15       were not able to utilize the LabCorp Express service because it lacked
         accessible features.

16       Plaintiffs' anticipated motion would not argue or introduce any new evidence;
17       it would simply request the Court substitute the prior definitions as stated in
         Dkt. 66 with the refined definitions stated above in light of the change in Ninth
18       Circuit law.

19       Before filing the motion, I would like to ask whether LabCorp will stipulate to
         substitute the above definitions for the prior-stated definitions? Because class
20       certification orders are interlocutory in nature, with the Court retaining
         jurisdiction to modify the class definition, and further because this Court has
21       not yet ruled on class certification, we do not believe there will be any prejudice
         to defendant. The stipulation would simply state there has been a recent change
22       in 9th circuit law (*Olean*), and in light of this change, the parties stipulate that
         the class definitions as previously stated in Plaintiff's motion for class
23       certification (Dkt. 66) be substituted with the proposed class definitions above,
         and that both sides retain all arguments raised in the respective briefing on class
24       certification (Dkt. 66, 83 86, and all supporting docs).

25       Please let me know if you will agree to this stipulation. Additionally, we are
         available to further meet and confer telephonically either tomorrow or early
26       next week, if you would like to further discuss this. Thank you,

    (*Id.*)

27       Four days later, on May 23, 2022, this Court issued its Order certifying both

28                                               4

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

the nationwide injunctive relief Class and the California Unruh Act damages Class. (Dkt. 97.)

On June 6, 2022, Defendant filed a Rule 23(f) Petition with the Ninth Circuit. LabCorp's Petition is based, in large part, on what it claims are "fail-safe" class definitions which violate the Ninth Circuit's newly established prohibition on "fail-safe" class definitions in *Olean*.[2] See *Olean*, at n.14.

After having an opportunity to fully review this Court's class certification Order, the Ninth Circuit's decision in *Olean,* and LabCorp's Rule 23(f) Petition, Plaintiffs further sought LabCorp's agreement to stipulate to refined class definitions which remove all arguably "fail-safe" language. Specifically, on June 9, 2022, Plaintiffs sent the following Local Rule 7-3 communication to counsel for LabCorp:

> We have further considered your comments regarding the contours of the refined class definition and will be proposing the following refine definitions to the Court.
>
> **California Damages Class:**
>
> All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.
>
> **Nationwide Injunctive Relief Class:**
>
> All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

(Ex. 3, attached to Bernal Decl. at ¶ 6.) The letter was followed by a conference

---

[2] Plaintiffs have also reviewed this Court's June 14, 2022 Amended Order Regarding Class Certification (discussed *infra*), which correctly noted that Defendant failed to raise any issues related to a purported "fail-safe" class until the Rule 23(f) appeal.

5

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

of counsel that took place on June 9, 2022. During the conference, Defendant indicated it would not stipulate to the refined class definitions and the issue would need to be resolved by this motion.

On June 13, 2022, this Court issued an Amended Order on Class Certification *sua sponte.* (Dkt. 103.) The Amended Order adds footnote 4 as follows:

> To the extent LabCorp may be challenging the nationwide class on the ground that it is a fail-safe class, the court rejects the challenge, as defendant merely referenced a "fail-safe class" in its "Introductory Statement," (see Dkt. 66-1, Joint Br. At 6); it provided no argument or authority to support its challenge. (See, generally, id. at 30-32, 34-45, 47-53); (Dkt. 86, Supplemental Memorandum in Support of LabCorp's Opposition to Motion to Certify Class); see Beasley v. Astrue, 2011 WL 1327130, *2 (W.D. Wash. 2011) ("It is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work – framing the argument, and putting flesh on its bone through a discussion of the applicable law and facts.").

## IV.   ARGUMENT

In *Olean*, the Ninth Circuit—for the first time—held that "fail-safe" classes are no longer permissible in Rule 23(b)(3) actions like this one.  The Court stated:

> A court may not, however, create a "fail safe" class that is defined to include only those individuals who were injured by the allegedly unlawful conduct. *See Ruiz Torres*, 835 F.3d at 1138 n.7 (internal quotation marks omitted). "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. **But, ultimately, the problem of a potentially "over-inclusive" class "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis."** *Id.*

*Olean*, 31 F.4th at 669 (emphasis added).  The takeaway from *Olean* in this regard is that (1) fail-safe classes are not permissible in Rule 23(b)(3) class actions; and (2) refinement of the class definition—and not decertification or dismissal—is the appropriate remedy where a court confronts a potentially fail-safe class definition. *Id.*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

6

131

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1    As noted in its class certification Order, this Court has "broad discretion to
2 determine whether a class should be certified and to revisit that certification
3 throughout the legal proceedings before the court. *United Steel, Paper & Forestry,*
4 *Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v.*
5 *ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010)."  To wit, this Court—*sua*
6 *sponte*—has already refined the Class definitions to limit Class membership to those
7 within the respective applicable limitations periods. (*See* Dkt. 97 at 24 n.16; Dkt. 103
8 at 24 n.17.)

9    Determining what is (and is not) a fail-safe class definition requires careful
10 consideration. In enunciating its prohibition on fail-safe class definitions, the *Olean*
11 Court rested its holding on the Seventh Circuit's decision in *Messner v. Northshore*
12 *Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012). A later Seventh Circuit
13 opinion, *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660-61 (7th Cir. 2015) further
14 illuminated the contours of a "fail-safe" definition.  It held that a class definition is
15 not fail-safe when "[i]t identifies a particular group of individuals [ ] harmed in a
16 particular way [ ] during a specific period in particular areas."). *Id.*  Put another way,
17 *Mullins* defines a non-fail-safe class definition as one that is subject to objective
18 criteria. *Id.* at 657.

19    While Plaintiffs do not concede the existing Class definitions are "fail-safe," to
20 (1) remove any doubt on an issue that amounts to classic "form over substance," and
21 (2) avoid burdening the Class and the appellate court with a lengthy and unnecessary
22 appeal, Plaintiffs hereby move to slightly refine the existing Class definitions to
23 remove any potentially fail-safe language.

24    The current nationwide injunctive relief Class definition is as follows:

25 All legally blind individuals in the United States who visited a LabCorp
26 patient service center in the United States during the applicable
27 limitations period and were denied full and equal enjoyment of the
goods, services, facilities, privileges, advantages or accommodations
28

7

132

due to LabCorp's failure to make its e-check in kiosks accessible to legally blind individuals.

The existing California class definition is as follows:

All legally blind individuals in California who visited a LabCorp patient service center in California during the applicable limitations period and were denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations due to LabCorp's failure to make its e-check in kiosks accessible to legally blind individuals.

Accordingly, the certified Classes hereby move to slightly refine the existing Class definitions to read as follows:

**Nationwide Injunctive Class:** All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

**California Class:** All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

These proposed refined class definitions are not fail-safe in any way because each requirement for class membership is subject to objective criteria. Specifically, a person only qualifies as a class member if he or she (1) is legally blind; (2) visited a LabCorp PSC; (3) in the United States; (4) during the applicable limitations period and (5) was unable to use the LabCorp Express Self-Service kiosk.

## V.    CONCLUSION

For the reasons described above, and to avoid the needless waste of the parties' and the appellate court's resources through an appeal on the basis of a fail-safe class definition, the certified Classes respectfully request that the Court refine the class definitions as described herein.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1    Dated: June 16, 2022              Respectfully submitted,

2                                      By:
                                            /s/ Jonathan D. Miller
3                                          Jonathan D. Miller (SBN 220848)
                                           jonathan@nshmlaw.com
4                                          Alison M. Bernal (SBN 264629)
                                           alison@nshmlaw.com
5                                          NYE, STIRLING, HALE & MILLER, LLP
                                           33 West Mission Street, Suite 201
6                                          Santa Barbara, CA 93101
                                           Telephone: (805) 963-2345
7                                          Facsimile: (805) 284-9590

8

9                                          Benjamin J. Sweet
                                           (*admitted pro hac vice*)
10                                         ben@nshmlaw.com
                                           NYE, STIRLING, HALE & MILLER, LLP
11                                         1145 Bower Hill Road, Suite 104
                                           Pittsburgh, PA 15243
12                                         Telephone: (412) 857-5350

13                                         Matthew K. Handley
                                           (*admitted pro hac vice*)
14                                         mhandley@hfajustice.com
                                           HANDLEY FARAH &
15                                         ANDERSON PLLC
                                           200 Massachusetts Ave, NW 7th Floor
16                                         Washington, DC 20001
                                           Telephone: (202) 559-2411
                                           Facsimile: (844) 300-1952
17

18                                         *Attorneys for Plaintiffs, Luke Davis, Julian*
                                           *Vargas, American Council of the Blind, and*
19                                         *the Certified Class*

20

21

22

23

24

25

26

27

28
                                           9
     ────────────────────────────────────────────────────────
        MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
         PLAINTIFFS' MOTION TO REFINE CLASS DEFINITIONS

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1   Jonathan D. Miller (Bar No. 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (Bar No. 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE & MILLER, LLP
    33 West Mission Street, Suite 201
4   Santa Barbara, California  93101
    Telephone: (805) 963-2345
5   Facsimile: (805) 563-5385

6   *Attorneys for Plaintiffs, Luke Davis, Julian Vargas, American Council of the Blind, and the Certified Class*

7

8                UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  LUKE DAVIS, JULIAN VARGAS, and        CASE NO.: 2:20-cv-00893-FMO-KS
    AMERICAN COUNCIL OF THE
12  BLIND, individually and on behalf of all   **DECLARATION OF ALISON M.**
    others similarly situated,             **BERNAL IN SUPPORT OF**
13                                          **PLAINTIFFS' MOTION TO**
              Plaintiffs,                   **REFINE CLASS DEFINITION**
14
         v.                                 *[Concurrently filed with Notice of*
15                                          *Motion, Memorandum of Points and*
    LABORATORY CORPORATION OF               *Authorities, and Proposed Order]*
16  AMERICA HOLDINGS,
                                            Hon.   Fernando Olguin
17            Defendant.                     Date:  July 21, 2022
                                            Ctrm:  6D
18                                          Time:  10:00 a.m.

19                                          FAC Filed: September 3, 2020
                                            Trial Date: Not yet set
20

21

22

23

24

25

26

27

28

Vertical left margin text: NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

                              1

**<u>DECLARATION OF ALISON M. BERNAL</u>**

I, ALISON M. BERNAL, declare as follows:

1.      I am an attorney at law duly qualified to practice before the Courts of the State of California and before this Court and am a member of the firm Nye, Stirling, Hale & Miller, LLP, attorneys for Plaintiffs Luke Davis, Julian Vargas, American Council of the Blind, and the Certified Classes in the above captioned matter. The facts stated herein are stated of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently thereto. This declaration is made in support of Plaintiffs' motion to refine the class definition.

2.      Pursuant to the Local Rules, I met and conferred with Plaintiff's counsel Robert Steiner, Becca Wahlquist, and Glenn Graham on June 9, 2022, regarding Plaintiffs' intent to move to refine the class definition. My partner Benjamin Sweet and co-counsel Matthew Handley were also present for the meet and confer. During our call, we discussed the proposed refined class, proposing the following refined definitions:

<u>California Damages Class:</u>

All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

<u>Nationwide Injunctive Relief Class:</u>

All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

3.      Plaintiffs discussed the basis for their motion, in light of the Ninth Circuit's recent decision in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC,* 31 F.4th 651 (2022), and the Ninth Circuit's directive to refine class

2

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

definitions (especially where the controlling circuit law changed in the interim).

4.     Defendant disagreed that Plaintiffs' new definitions met the *Olean* requirements, and thus did not stipulate to allow the refinements.

5.     The parties did agree on a briefing and hearing schedule, with the hearing on July 21, 2022, and the briefing set per that schedule.

6.     Prior to the meet and confer conference, Plaintiffs also sent communications to defense counsel on May 19, 2022 (pre-certification) June 7, and June 9, 2022 (post-certification) to set forth their position as to class refinement. True and correct copies of those communications are attached hereto as **Exhibits 1, 2,** and **3,** respectively.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 16th day of June, 2022, in Montepulciano, Italy.

*/s/ Alison M. Bernal*
*ALISON M. BERNAL, Declarant*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

3
DECLARATION OF ALISON M. BERNAL

# EXHIBIT 1

**Lindsey LeBlanc**

| | |
|---|---|
| **From:** | Alison Bernal |
| **Sent:** | Thursday, May 19, 2022 10:53 AM |
| **To:** | Steiner, Robert; Wahlquist, Becca; Jamieson, Nathan T.; Graham, Glenn T. |
| **Cc:** | Benjamin Sweet; Jonathan Miller; Jordan Porter; mhandley@hfajustice.com; Lindsey LeBlanc; Meg Parker; Callum Appleby |
| **Subject:** | Davis v. LabCorp: LR 7-3 Meet and confer |

Dear Counsel,

We are writing pursuant to Local Rule 7-3 to meet and confer on Plaintiffs' anticipated motion to refine the proposed class definition pursuant to *Olean v. Bumble Bee Foods,* 31 F.4th 651 (9th Cir. 2022). The proposed new class definitions are as follows:

> **Nationwide Injunctive Class:** All legally blind individuals in the United States who visited a LabCorp patient service center but were not able to utilize the LabCorp Express service because it lacked accessible features.
> **California Minimum Statutory Damages Class**: All legally blind individuals in California who visited a LabCorp patient service center in California but were not able to utilize the LabCorp Express service because it lacked accessible features.

Plaintiffs' anticipated motion would not argue or introduce any new evidence; it would simply request the Court substitute the prior definitions as stated in Dkt. 66 with the refined definitions stated above in light of the change in Ninth Circuit law.

Before filing the motion, I would like to ask whether LabCorp will stipulate to substitute the above definitions for the prior-stated definitions? Because class certification orders are interlocutory in nature, with the Court retaining jurisdiction to modify the class definition, and further because this Court has not yet ruled on class certification, we do not believe there will be any prejudice to defendant. The stipulation would simply state there has been a recent change in 9th circuit law (*Olean*), and in light of this change, the parties stipulate that the class definitions as previously stated in Plaintiff's motion for class certification (Dkt. 66) be substituted with the proposed class definitions above, and that both sides retain all arguments raised in the respective briefing on class certification (Dkt. 66, 83 86, and all supporting docs).

Please let me know if you will agree to this stipulation. Additionally, we are available to further meet and confer telephonically either tomorrow or early next week, if you would like to further discuss this. Thank you,

Alison

**Alison M. Bernal** | Partner | Nye, Stirling, Hale & Miller, LLP
33 West Mission Street, Suite 201 | Santa Barbara, CA 93101
T: 805.963.2345 | F: 805.284.9590
E: Alison@nshmlaw.com |W: www.nshmlaw.com

1

139

# EXHIBIT 2

**Lindsey LeBlanc**

| | |
|---|---|
| **From:** | Alison Bernal |
| **Sent:** | Tuesday, June 7, 2022 12:08 PM |
| **To:** | BWahlquist@KelleyDrye.com; Steiner, Robert; Jamieson, Nathan T.; Graham, Glenn T. |
| **Cc:** | Benjamin Sweet; Jonathan Miller; Jordan Porter; mhandley@hfajustice.com; Meg Parker; Callum Appleby; Lindsey LeBlanc |
| **Subject:** | RE: Davis v. LabCorp: LR 7-3 Meet and confer |

Counsel,

We are following up on the below email. We previously proposed a stipulation to modify/refine the class definition. We did not hear back from you in response to my prior effort to meet and confer pursuant to LR 7-3 within the 7 days required. While plaintiffs would be within their right to move the Court now, nevertheless, if defendant does want to meet and confer on this, please let us know your availability Wednesday or Thursday. Please note, I am out of the office June 10-24.

If we do not further meet and confer by Thursday, Plaintiffs will proceed with filing the motion at that time. Thank you,

Alison

**From:** Wahlquist, Becca <BWahlquist@KelleyDrye.com>
**Sent:** Thursday, May 19, 2022 12:19 PM
**To:** Alison Bernal <alison@nshmlaw.com>
**Cc:** Steiner, Robert <RSteiner@KelleyDrye.com>; Jamieson, Nathan T. <NJamieson@KelleyDrye.com>; Graham, Glenn T. <GGraham@KelleyDrye.com>; Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; mhandley@hfajustice.com; Lindsey LeBlanc <lindsey@nshmlaw.com>; Meg Parker <meg@nshmlaw.com>; Callum Appleby <Callum@nshmlaw.com>
**Subject:** Re: Davis v. LabCorp: LR 7-3 Meet and confer

Hi Alison.

Rob is out of pocket today, but I will coordinate with him tomorrow and we will send you some times that we are available next week to do the requested Rule 7–3 meet and confer call on this proposed motion.

Thanks,

—Becca

Sent from my iPhone

On May 19, 2022, at 10:53 AM, Alison Bernal <alison@nshmlaw.com> wrote:

CAUTION: This message originated outside of Kelley Drye and was sent by: alison@nshmlaw.com

1

141

Dear Counsel,

We are writing pursuant to Local Rule 7-3 to meet and confer on Plaintiffs' anticipated motion to refine the proposed class definition pursuant to *Olean v. Bumble Bee Foods,* 31 F.4th 651 (9th Cir. 2022). The proposed new class definitions are as follows:

> **Nationwide Injunctive Class:** All legally blind individuals in the United States who visited a LabCorp patient service center but were not able to utilize the LabCorp Express service because it lacked accessible features.
> **California Minimum Statutory Damages Class**: All legally blind individuals in California who visited a LabCorp patient service center in California but were not able to utilize the LabCorp Express service because it lacked accessible features.

Plaintiffs' anticipated motion would not argue or introduce any new evidence; it would simply request the Court substitute the prior definitions as stated in Dkt. 66 with the refined definitions stated above in light of the change in Ninth Circuit law.

Before filing the motion, I would like to ask whether LabCorp will stipulate to substitute the above definitions for the prior-stated definitions? Because class certification orders are interlocutory in nature, with the Court retaining jurisdiction to modify the class definition, and further because this Court has not yet ruled on class certification, we do not believe there will be any prejudice to defendant. The stipulation would simply state there has been a recent change in 9th circuit law (*Olean*), and in light of this change, the parties stipulate that the class definitions as previously stated in Plaintiff's motion for class certification (Dkt. 66) be substituted with the proposed class definitions above, and that both sides retain all arguments raised in the respective briefing on class certification (Dkt. 66, 83 86, and all supporting docs).

Please let me know if you will agree to this stipulation. Additionally, we are available to further meet and confer telephonically either tomorrow or early next week, if you would like to further discuss this. Thank you,

Alison

**Alison M. Bernal**  | Partner | Nye, Stirling, Hale & Miller, LLP
33 West Mission Street, Suite 201 | Santa Barbara, CA 93101
T: 805.963.2345 | F: 805.284.9590
E: Alison@nshmlaw.com |W:  www.nshmlaw.com

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

2

142

# EXHIBIT 3

**From:** Benjamin Sweet <ben@nshmlaw.com>
**Sent:** Thursday, June 9, 2022 12:35 PM
**To:** Steiner, Robert <RSteiner@kelleydrye.com>; Wahlquist, Becca <BWahlquist@kelleydrye.com>
**Cc:** Jonathan Miller <jonathan@nshmlaw.com>; Alison Bernal <alison@nshmlaw.com>; mhandley@hfajustice.com
**Subject:** LabCorp LR 7-3 Conference Re: Motion to Refine Class Definition

Rob & Becca:

We have further considered your comments regarding the contours of the refined class definition and will be proposing the following refine definitions to the Court.

**California Damages Class:**

All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in California during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

**Nationwide Injunctive Relief Class:**

All legally blind individuals who visited a LabCorp patient service center with a LabCorp Express Self-Service kiosk in the United States during the applicable limitations period, but were unable to use the LabCorp Express Self-Service kiosk.

We look forward to speaking to you at 1:30 PM PST.

Best regards,
-Benjamin Sweet

**Benjamin J. Sweet**  | Partner| Nye, Stirling, Hale & Miller, LLP
1145 Bower Hill Road, Suite 104, Pittsburgh, Pennsylvania 15243
T: 412.857.5352|

1

144

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br> v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>   Defendant. | CASE NO.: 2:20-cv-00893-FMO-KS<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO REFINE CLASS DEFINITIONS**<br><br>*[Concurrently filed with Notice of Motion, Memorandum of Points and Authorities, and Declaration of Alison Bernal]*<br><br>Hon. Fernando Olguin<br>Date: July 21, 2022<br>Ctrm: 6D<br>Time: 10:00 a.m.<br><br>FAC Filed: September 3, 2020<br>Trial Date: Not yet set |

  The Motion to Refine Class Definitions brought by Plaintiffs Luke Davis and Julian Vargas, individually and on behalf of the nationwide and California certified classes (collectively "Plaintiffs") came on regularly for consideration before the Court on July 21, 2022, at 10:00 a.m. in Courtroom 6D. Appearances by counsel are noted in the record.

  After considering the parties' respectively submitted briefs, as well as the oral arguments presented by the parties' respective counsel, this Court finds modification

1

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO REFINE CLASS DEFINITIONS

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

145

1   of the class definitions appropriate in light of subsequent developments in the

2   litigation.

3       IT IS HEREBY ORDERED:

4       Pursuant to F.R.CP. 23(c)(1)(C), the Court's May 23, 2022 and June 13, 2022

5   (amended) class certification orders (Dkt. 97 and 103) are modified to reflect the

6   follow Class definitions:

7   PREVIOUS DEFINITION:

8       **Nationwide Injunctive Class:** All legally blind individuals in the
        United States who visited a LabCorp patient service center in the United
9       States during the applicable limitations period and were denied full and
        equal enjoyment of the goods, services, facilities, privileges,
10      advantages or accommodations due to LabCorp's failure to make its e-
        check in kiosks accessible to legally blind individuals. (Dkt. 97 at
11      24:13-17; Dkt. 103 at 24:13-17.)
12

13  REFINED DEFINITION:

14      **Nationwide Injunctive Class:** All legally blind individuals who
        visited a LabCorp patient service center with a LabCorp Express Self-
15      Service kiosk in the United States during the applicable limitations
        period, but were unable to use the LabCorp Express Self-Service kiosk.
16

17

18  PREVIOUS DEFINITION:

19      **California Class**: All legally blind individuals in California who
        visited a LabCorp patient service center in California during the
20      applicable limitations period and were denied the full and equal
        enjoyment of the goods, services, facilities, privileges, advantages or
21      accommodations due to LabCorp's failure to make its e-check in kiosks
        accessible to legally blind individuals. (Dkt. 97 at 24:19-23; Dkt. 103
22      at 24:19-23.)
23

24  REFINED DEFINITION:

25      **California Class**: All legally blind individuals who visited a LabCorp
        patient service center with a LabCorp Express Self-Service kiosk in
26      California during the applicable limitations period, but were unable to
        use the LabCorp Express Self-Service kiosk.
27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

2

146

1    IT IS SO ORDERED.

2

3   _____           _____

4   Date                                 Hon. Fernando M. Olguin

5

6

7

8

9

10

11

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

147

1  Robert I. Steiner (admitted *pro hac vice*)
2  rsteiner@kelleydrye.com
   **KELLEY DRYE & WARREN LLP**
3  3 World Trade Center
   175 Greenwich Street
4  New York, NY 10007
5  Telephone:   (212) 808-7800
6  Facsimile:    (212) 808-7897

7  Becca Wahlquist (State Bar No. 215948)
8  bwahlquist@kelleydrye.com
   **KELLEY DRYE & WARREN LLP**
9  350 South Grand Avenue, Suite 3800
   Los Angeles, CA 90071
10 Telephone:   (213) 547-4900
11 Facsimile:    (213) 547-4901

12 *Attorneys for Defendant*
13 *Laboratory Corporation of America Holdings*

14
15              **UNITED STATES DISTRICT COURT**
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
16

17 LUKE DAVIS, et al.                    CASE NO. 2:20-CV-00893-FMO-KS

18              Plaintiffs,              **DEFENDANT LABORATORY**
                                         **CORPORATION OF AMERICA**
19      v.                               **HOLDINGS' SUPPLEMENTAL**
                                         **BRIEF IN SUPPORT OF ITS**
20 LABORATORY CORPORATION OF             **RENEWED MOTION FOR**
   AMERICA HOLDINGS, et al.              **SUMMARY JUDGMENT**
21
              Defendants.
22
23                                       Hr'g Date:    June 30, 2022
                                         Time:         10:00 am
24                                       Location:     Courtroom 6D
                                         FAC Filed:    September 3, 2020
25                                       Trial Date:   Not Yet Set
26
27
28                                              CASE NO. 2:20-CV-00893-FMO-KS
                                           DEFENDANT'S SUPPLEMENTAL BRIEF IN
                                  SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

Labcorp is entitled to summary judgment. The undisputed factual record demonstrates that supplying kiosks to those who choose to use them to check-in at a Labcorp patient service center ("PSC") to receive phlebotomy services does not discriminate against blind individuals.  This is because (1) Labcorp has employees who act as "qualified readers" at the front desk ready, willing and able to check-in all customers and (2) a "qualified reader" is an appropriate auxiliary aid for the blind that is specifically contemplated by the ADA.  Because Labcorp makes available an auxiliary aid, Plaintiffs' claims fail as a matter of law.  Further, Plaintiff Vargas lacks standing because he was not directed to, nor did he ever even attempt to interact with, Labcorp's kiosk.

Plaintiffs admit key facts which demonstrate that Labcorp's qualified readers were sufficient auxiliary aids, including:

- Each time they visited a Labcorp PSC, Plaintiffs Vargas and Davis were able to receive the laboratory testing services their doctors ordered.  (D199, Ex.39 at JA694, JA699-700; D205, Ex.40 at JA712.)

- Desk check-in is readily available to all patients.  Approximately four years after the kiosks were introduced, *25% of all Labcorp patients still checked-in at the desk,* (D180, Ex.52 at JA870), which belies any claim that kiosk check-in is required or part of any Labcorp policy.

- After checking in at either the kiosk or the front desk, *all patients* must interact with a PSC employee *at the desk* to get their prescription information confirmed.  (D168-170, Ex.38 at JA662-663.)

- Consistent with Labcorp's policy, Plaintiff Vargas, who is legally blind, was checked in by a Labcorp employee at the front desk, treated respectfully during his visit, and received his blood test shortly after being checked in.  (D195-200, Ex.39 at JA691-695, JA699-700, JA702-703.)

In addition, Plaintiff Vargas admits that there are numerous material differences between his experience at Labcorp and at Quest Diagnostics (which he has sued under the same theory). These differences illustrate why he lacks standing to maintain his causes of action against Labcorp, including:

- Unlike at Labcorp, there was no one at the Quest Diagnostics facility to check-in Vargas when he arrived. In contrast, Labcorp had people working at the front desk of its facility when Vargas visited. (D219, Ex.53 at JA875-876; D222, Ex.53 at JA884.)

- Unlike at Labcorp, Vargas was *required* to use the kiosk at Quest Diagnostics to check-in and he was required to provide his personal information about the reason for his visit to Quest Diagnostics. (D220, Ex.53 at JA878-879; D221, Ex.53 at JA881-883.) He was not required to do either of these things when he visited Labcorp's PSC.

Furthermore, certain of Plaintiff's allegations are not supported and/or contradicted by the established facts, including that:

- Labcorp's policies and practices ensure that front desk check-in remained available at all PSCs to assist people who could not (or did not want to) use the kiosks. (D175, Ex.43 at JA754-755.) That these policies are followed is demonstrated by the fact that 25% of all patients still use front desk check-in.

- Labcorp began installing kiosks in October 2017 (D159, Ex.38 at JA647-648, JA657); *thus, Plaintiff Davis could not have been directed to check-in at a kiosk in 2016*—one of the three times he complained about a direction to check-in at the kiosk. Davis's allegations are also not consistent with the experiences of Vargas, the multiple experiences of ACB member Harden and his wife, or with Labcorp's documented corporate policy.

- The kiosk *does not ask for any private medical information*; nor is any protected health information ever spoken out loud at the desk during check-in

2

CASE NO. 2:20-CV-00893-FMO-KS
DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR SUMMARY
JUDGMENT

(D167, Ex.46 at JA792; D188, Ex.45 at JA776-777, JA780-781, JA782), demonstrating that key-allegations in the Complaint and Plaintiffs' contentions of "separate but equal" treatment are not supported by record evidence.

• Plaintiff Vargas admitted under oath that he never interacted with the Labcorp kiosk because there was a qualified reader there to check him in.  (D223, Ex.53 at 885-886; D224, Ex.53 at 886-887.)

For the reasons set forth in its moving brief, Labcorp is entitled summary judgment and all of Plaintiffs' claims must be dismissed in their entirety.[1]

## ARGUMENT

## I.  PLAINTIFFS FAIL TO ESTABLISH ANY ADA VIOLATION

### A.  Plaintiffs' experiences show Labcorp provides effective auxiliary aids for the check-in process and that Vargas lacks standing.

Under the ADA, Labcorp is not required to provide the specific auxiliary aid desired by a particular individual—in this case, technologically-advanced, accessible check-in kiosks.  28 C.F.R. § 36.303(c)(1)(ii).  Instead, Labcorp is free to choose which auxiliary aid it provides, so long as the chosen method "results in effective communication."  *Id*.  Plaintiffs concede as much, stating that this is "an effective communication case."  *See* Dkt. No. 98-1 at 23.  Here, Labcorp offers an auxiliary aid in the form of trained employees acting as "qualified readers" who, consistent with Labcorp's policies, routinely assist blind and sighted individuals with checking in at the front desk.  This fact alone warrants summary judgment in Labcorp's favor on all counts because "[s]taff assistance is sufficient to provide

---

[1] Because Labcorp is entitled to summary judgment on all claims, Plaintiffs are not members of and cannot represent the classes the Court certified on May 23, 2022 (Dkt. No. 97) and the Court should decertify both classes.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the [Court] remains free to modify it in light of subsequent developments in litigation").

CASE NO. 2:20-CV-00893-FMO-KS
DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR SUMMARY
JUDGMENT

1  effective communication." *Nat. Fed. of the Blind, Inc., v. Wal-Mart Assocs., Inc.*,
2  2021 WL 4750521, at *11 (D. Md. Oct. 12, 2021).

3       The circumstances surrounding each Plaintiffs' specific visits to the Labcorp
4  PSC further support finding of summary judgment in Labcorp's favor.

5       ***Plaintiff Vargas Never Attempted to Use The Kiosk.  He was Checked-in***
6  ***Using an Appropriate Auxiliary Aid.***  When Vargas visited a Labcorp PSC to
7  familiarize himself with the check-in process, Labcorp's staff advised him that he
8  did not need to use the kiosk to check-in but instead would be checked in at the front
9  desk.  (D192, Ex.39 at JA688, JA690; D193, Ex.39 at JA689, JA696-698.)  When
10 Vargas returned to the same PSC for a blood test the next day, ***he was checked in by***
11 ***an employee at the front desk*** without issue.  (D194-200, Ex.39 at JA689, JA691-
12 695, JA699-700, JA702-703.)  Thus, Vargas was provided an effective auxiliary
13 aid—an employee at the front desk acting as a qualified reader to assist with the
14 check-in process.  This is all the ADA requires.  And because he has no ADA claim
15 he cannot satisfy Article III's injury-in-fact requirement.  *See* (Dkt. No. 98-1 at 40-
16 47); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016); *Chapman v. Pier 1*
17 *Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011); *Gomez v. Tribecca, Inc.*,
18 2022 WL 1469504, at *2-4 (C.D. Cal. May 10, 2022); *see also TransUnion LLC v.*
19 *Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Only those . . . concretely harmed by a
20 defendant's statutory violation may sue that private defendant over the violation in
21 federal court.")

22      ***Plaintiff ACB Prefers the Auxiliary Aid Used By Labcorp.***  Plaintiff ACB
23 sent a survey to 4,542 of its members asking about their kiosk check-in experiences.
24 (D208, Ex.50 at JA816; D209, Ex.41 at JA721-722.)  Only twelve of ACB's
25 members responded to the survey and one of the twelve that did respond, John
26 Harden, stated that ***whenever he visits a Labcorp PSC, an employee checks him in***
27 ***at the front desk***.  (D209, Ex.41 at JA722-724.; D210, Ex.51 at JA819, Ex.45 at

28
                    CASE NO. 2:20-CV-00893-FMO-KS
                    DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
                    ITS RENEWED MOTION FOR SUMMARY
                    JUDGMENT

1   JA777.)  Regarding Labcorp, Harden also wrote: The "ADA states that a business
2   needs to make reasonable accommodations for the disabled.  They certainly do
3   that."  (*Id*.)  Harden further testified that in the past four years and over about 32
4   visits, neither he nor his wife, who is also legally blind and an ACB member, have
5   *ever* been required to or told to check-in at the kiosk.  (D214, Ex.45 at JA778-779.)
6   Labcorp ***always*** had someone available to take care of his needs and provide the
7   testing services his doctor ordered without him having to rely on the kiosk.  (D215,
8   Ex.45 at JA783.)  Moreover, Harden testified he prefers to check-in at the desk
9   because it is more efficient.  (D216, Ex.45 at JA782.)

10       Like Harden, ACB's preferred check-in method is having a staff member
11   check-in the visually disabled.  (D217, Ex.41 at JA726.)  ACB's corporate
12   representative confirmed that an employee assisting blind individuals with check-
13   in—exactly as Labcorp has always assisted Harden, his wife and Plaintiff Vargas
14   (who is not an ACB member)—is not a discriminatory practice.  ACB further agreed
15   that no remedy would be needed for those visually disabled who had been able to
16   check-in at the front desk with the assistance of an employee.  (D218, Ex.41 at
17   JA725-726.)  ACB's desired check-in process is that same process that Labcorp
18   makes available to legally blind individuals.  Therefore because Labcorp already
19   does what ACB wants, its ADA claim must be dismissed[2].

20       ***Plaintiff Davis's Purported Isolated Experiences Do Not Make Out an ADA***
21   ***Claim.***  Davis alleges he visited Labcorp's PSCs on October 11, 2016, December
22   23, 2017 and March 28, 2018, and was told by an employee to use the kiosk for
23   check-in.  (D201-202, Ex.40 at JA710-711.)  But on October 11, 2016, no Labcorp

24

25   _____

26   [2] Plaintiffs' claim that ACB's representative sees having a person at the desk "as an
     option[,]" (Dkt. No. 98-2 at D217 (Plaintiffs' response)), dooms their claims; the
     ADA only requires Labcorp to provide an auxiliary aid, not a specific one.
27

28                                          5          CASE NO. 2:20-CV-00893-FMO-KS
                                                   DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
                                                   ITS RENEWED MOTION FOR SUMMARY
                                                   JUDGMENT

1   PSC in the country had introduced a kiosk for check-in.  (D159, Ex.38 at JA647,
2   JA657; D203-204, Ex.38 at JA657.)  Plaintiffs do not dispute this fact, because they
3   cannot. Plaintiffs also do not dispute that Davis was able to receive the testing
4   services his doctor ordered each time he claimed to have visited a Labcorp PSC.
5   (D205, Ex.40 at JA712.)  To the extent the two other occasions cited by Davis in his
6   summary judgment motion occurred, they would have been: (1) in violation of
7   Labcorp's corporate policies that ensure that PSC employees are available to assist
8   blind individuals with check-in at the desk, as evidenced by the experiences of
9   Vargas, Harden, Harden's wife and the fact that 25% of all patients who check-in at
10  Labcorp PSCs do so at the desk (D189-190, Ex. 38 at JA649, JA658, JA665-666
11  JA669-670, Ex.42 at JA738; D176, Ex.47 at JA800); and (2) contrary to the
12  trainings Labcorp provides to its PSC employees to ensure that they can assist the
13  blind with checking in.  (D191, Ex.42 at JA739-740.)  Such isolated experiences do
14  not make out an ADA claim.  *West v. Moe's Franchisor, LLC*, 2015 WL 8484567,
15  at *4 (S.D.N.Y. Dec. 9, 2015); (Dkt. No. 98-1 at 43-44.)

16      **B.      Different kiosks for the blind are not required under the ADA.**

17      Plaintiffs' argument that Labcorp violates the ADA (despite Plaintiffs' actual
18  experiences) because qualified readers are insufficient as an auxiliary aid since they
19  do not allow for independent use of the kiosks to check-in is misplaced.  No court
20  faced with a similar argument has taken the bold step of doing what Plaintiffs would
21  have this Court do here: re-write the ADA by removing the use of "qualified
22  readers" as an option to accommodate visually-impaired individuals.  *See, e.g.,*
23  *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 558 (D. Md.
24  2019) (such argument "run[s] afoul of the ADA itself, which specifically permits the
25  services of a 'qualified reader' as an accommodation"); *Moe's Franchisor*, 2015
26  WL 8484567, at *3; *Dicarlo v. Walgreens Boot Alliance, Inc.*, 2016 WL 482982, at
27  *2 (S.D.N.Y. Feb. 5, 2016) (defendant need not install plaintiff's requested auxiliary

28

154

aid that would allow plaintiff to independently use a soda machine, as defendant's employees acting as qualified readers providing assistance sufficed under the ADA). Indeed in *Vargas v. Quest Diagnostics Clinical Labs, Inc.*, 2021 WL 5989961, at *6 (C.D. Cal. Oct. 15, 2021), Vargas' ADA claim against Quest survived summary judgment only because "phlebotomist unavailability appears to have been part of Quest's plan" and the "real issue" in that case was not whether such assistance was adequate under the ADA because that assistance was not provided.  Here, to the contrary, Labcorp provides effective qualified readers.

The ADA regulations specifically provide examples of policies that comply with the ADA even though they do not allow the blind to act independently.  For example, brailed price tags on all of the merchandise is not required if sales personnel acting as qualified readers can provide price information orally upon request.  28 C.F.R. pt. 36, App'x C.  Likewise, restaurants are not required to provide menus in braille for patrons who are blind if the waiters acting as qualified readers are made available to read the menu and retailers may provide qualified readers at store checkout counters. *Id*; *Wal-Mart Assoc.*, 2021 WL 4750521, at *12.

Plaintiffs' insistence that Labcorp must implement independently-accessible technology mandated for ATMs on the kiosks and not rely on ADA-sanctioned qualified readers is similarly misplaced.  (*See* P11, Ex.31 at JA259-260; P135-137, Ex.31 at JA359-362 (Plaintiffs' expert opining that the kiosks are not ADA-compliant because they do not meet the ADA standards for ATMs).)  The kiosks are not ATMs, nor are they in any way *like* ATMs.  ATMs are specifically regulated under the ADA because they "require users to input inherently private personal information, like a PIN number, the theft of which could deplete a user of all of their savings." *Dominguez v. Banana Republic, LLC*, 2020 WL 1950496, at *11 fn. 8 (S.D.N.Y. April 23, 2020).  The Labcorp kiosks, on the other hand, do not raise such privacy concerns nor are they specifically regulated under the ADA.  Indeed, the

CASE NO. 2:20-CV-00893-FMO-KS
DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR SUMMARY
JUDGMENT

record shows that the Labcorp kiosks do not ask for any private medical information. (D161-167, Ex.38 at JA661-662, JA664, JA672-676, Ex.46 at JA792.) Nor is a patient who checks in at the front desk through the assistance of a qualified reader required to speak any private personal information. (D188, Ex.45 at JA776-777, JA780-782.) Moreover, a patient's prescription information is confirmed by a PSC employee *at the front desk* only after one completes the check-in process at the kiosk or the desk. (D168-170, Ex.38 at 662-663; D184, Ex.39 at JA695, Ex.45 at JA781.) Thus, while the heightened privacy concerns implicated by use of ATMs necessitate a certain level of independence (hence, the ADA's specific requirements regarding ATMs), the same cannot be said about the check-in kiosks.

Nor does the ADA require covered entities offering an auxiliary aid to use "the most advanced technology" available. *Dobard v. San Francisco Bay Area Rapid Transit Dist.*, 1993 WL 372256, at *3 (N.D. Cal. Sept. 7, 1993); *see also Arizona ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 673 (9th Cir. 2010) (rejecting plaintiffs' argument that the DOJ guidance foreclosing open captioning at theaters had been superseded by technological developments). To the contrary, the use of a "qualified reader" is specifically contemplated by the ADA and its implementing regulations as an appropriate auxiliary aid. *See, e.g., Moe's Franchisor*, 2015 WL 8484567, at *3 (holding that recent ADA caselaw noting the development of new technologies in fashioning auxiliary aids and services "do not foreclose the use of 'qualified readers' as an option for [defendant] to facilitate effective communication of patrons' beverage options.") To find that a qualified reader is insufficient would be directly contrary to the ADA regulations themselves.

Furthermore, Plaintiffs' attempt to characterize the kiosks as "goods" or "services" under the ADA in order to argue that Labcorp must offer special, independently-accessible kiosks to the blind is misguided. The kiosks are clearly not goods or services as used in the ADA as they are not manufactured items that

8

CASE NO. 2:20-CV-00893-FMO-KS
DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR SUMMARY
JUDGMENT

Labcorp sells to the general public.  Regardless, if the kiosks do constitute "goods" or "services" under the ADA, then the law is clear that Labcorp does **not** need to offer special, independently-accessible kiosks for the blind.  Indeed, the ADA "does not require a public accommodation to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a).  Nor does it require the "provision of different … services, just nondiscriminatory enjoyment of those that are provided." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000).  As the Seventh Circuit explained in *Doe v. Mut. of Omaha Ins.*, 179 F.3d 557, 560 (7th Cir. 1999), "[t]he common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated."  Plaintiffs' reliance on *Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), for the proposition that the kiosks, like Domino's website, are an accommodation that connects customers to Labcorp's testing services is misplaced because they ignore the fact that Labcorp provides qualified readers at the same nexus point—an auxiliary aid specifically authorized by the ADA.

Finally, the ADA's general mandate for "full and equal enjoyment" does not mean that a blind individual must be able to enjoy every accommodation offered to "the same and identical extent as those who are not disabled."  *McNeil v. Time Ins.*, 205 F.3d 179, 187 (5th Cir. 2000); 28 C.F.R. pt. 36, App'x C ("Full and equal enjoyment … does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.").  Nor does it mean that the auxiliary aid offered must provide perfectly identical communication.  As the Ninth Circuit held, "[b]y its very definition, an auxiliary aid or service is an **additional and different** service that establishments must offer the disabled." *Harkins Amusement*, 603 F.3d at 672 (emphasis added).  The focus is thus not on whether the method of communication is different for the visually

CASE NO. 2:20-CV-00893-FMO-KS
DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR SUMMARY
JUDGMENT

impaired, as it must necessarily be, but on whether those different aids provide "effective communication." And here, it is undisputed that the auxiliary aid Labcorp offers does just that: Vargas, Harden and Harden's wife were successfully checked in by a trained employee at the front desk. Accordingly, Labcorp's employees acting as qualified readers clearly constitute a sufficient auxiliary aid.

## II.   PLAINTIFFS FAIL TO ESTABLISH ANY RA OR ACA VIOLATION

Because Plaintiffs' ADA claims fail, so must their RA and ACA claims. (Dkt. No. 98-1 at 53-55.) In addition, Plaintiffs' ACA claims must be dismissed because there is no evidence that Plaintiffs Vargas or Davis ever requested a specific auxiliary aid. The ACA's requirement that covered entities give primary consideration to the requested aid does not (and cannot) apply unless triggered by an actual request. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147-48 (11th Cir. 2014) (affirming summary judgment in favor of defendants after noting, among other things, that there was no evidence that plaintiffs had "ever requested" or "demanded" a specific auxiliary aid).

## III.   PLAINTIFF VARGAS HAS NO UNRUH CLAIM

Plaintiff Vargas's Unruh claim also fails as he relies on an underlying violation of the ADA that must be dismissed. (Dkt. No. 98-1 at 56.) Moreover, Plaintiffs' throwaway line that Plaintiff Vargas has demonstrated "intentional discrimination" under the Unruh Act is unsupported by the factual record. (*Id.*) There is no evidence that Labcorp intentionally discriminated against the blind on account of their disability. *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 426 (9th Cir. 2014). Further, his Unruh Act claim fails because Vargas did not even attempt to use the kiosk and therefore was not personally aggrieved. *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (Cal. 2019).

## CONCLUSION

Labcorp's motion for summary judgment should be granted in its entirety.

10

CASE NO. 2:20-CV-00893-FMO-KS
DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
ITS RENEWED MOTION FOR SUMMARY
JUDGMENT

1

2    DATED: June 16, 2022                     KELLEY DRYE & WARREN LLP

3

4                                             By:  */s/ Becca Wahlquist*
5                                             Robert I. Steiner (admitted *pro hac vice*)
                                              Becca Wahlquist (State Bar No. 215948)
6                                             Glenn T. Graham (State Bar No. 338995)
                                              Nathan T. Jamieson (State Bar No. 333304)
7
                                              *Attorneys for Defendant*
8                                             *Laboratory Corporation of America*
                                              *Holdings*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    11
                                                      CASE NO. 2:20-CV-00893-FMO-KS
                                         DEFENDANT'S SUPP. BRIEF IN SUPPORT OF
                                          ITS RENEWED MOTION FOR SUMMARY
                                                                      JUDGMENT

Robert I. Steiner (admitted *pro hac vice*)
rsteiner@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone:   (212) 808-7800
Facsimile:    (212) 808-7897

Becca Wahlquist (State Bar No. 215948)
bwahlquist@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
350 South Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone:   (213) 547-4900
Facsimile:    (213) 547-4901
[*additional counsel listed on signature page*]

*Attorneys for Defendant*
*Laboratory Corporation of America Holdings*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE DAVIS, et al., | CASE NO. 2:20-CV-00893-FMO-KS |
| Plaintiffs, | **NOTICE OF DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS'S MOTION FOR SUMMARY JUDGMENT AND MOTION** |
| v. | |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, et al., | |
| Defendants. | Judge:      Hon. Fernando Olguin<br>Date:       June 30, 2022<br>Ctrm:       6D<br>Time:       10:00 a.m.<br><br>FAC Filed:   September 3, 2020<br>Trial Date:   Not Yet Set |

1

CASE NO. 2:20-CV-00893-FMO-KS
NOTICE OF MOTION
AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on June 30, 2022, at 10:00 a.m. or as soon as thereafter as the matter may be heard in Courtroom 6D of the Honorable Fernando M. Olguin, located at 350 W. 1st Street, 6th Floor, Los Angeles, California 90012, Defendant Laboratory Corporation of America Holdings ("Labcorp") will and hereby does move the court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment in its favor as to all of the claims brought by Plaintiffs Luke Davis, Julian Vargas, and the American Council of the Blind (collectively "Plaintiffs"), in their individual capacities, in their First Amended Complaint (Dkt. No. 40).

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there are no genuine disputes as to any material fact, and Labcorp is entitled to judgment as a matter of law in its favor, as to: Plaintiffs' claims regarding violation of Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq; Plaintiffs' claims regarding violation of Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a); Plaintiffs' claims regarding violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 8116; Plaintiff Vargas's claim regarding violation of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civil Code § 51 et seq. and Plaintiff Vargas's claim regarding Violation of California's Disabled Persons Act, ("CDPA")[1], Cal. Civil Code § 54, et seq.

Labcorp is entitled to summary judgment on each of Plaintiffs' individual claims because Labcorp has met its obligation pursuant to the ADA, Section 504, and Section 1557 by providing an employee at the front desk who can check-in all

_____

[1] Plaintiffs are no longer pursuing their CDPA claim; it should be dismissed. (Dkt. No. 94 at 2.)

161

1    patients for the diagnostic testing services that Labcorp provides at its patient
2    service centers ("PSCs").   This approach is Plaintiff American Council of the
3    Blind's (a national advocacy group for the blind) preferred check-in method, and is
4    fully consistent with the requirements of the ADA and analogous statutes to provide
5    a "qualified reader" as an "auxiliary aid or service" which ensures that legally blind
6    individuals are provided with effective communication during the PSC check-in
7    process.   Consequently, Plaintiffs' ADA, RA, and ACA claims all fail.
8    Additionally, since Plaintiff Vargas's Unruh Act claim is based on an alleged
9    violation of the ADA that has not occurred, that claim fails as well.

10       Moreover, Labcorp is entitled to summary judgment with respect to the
11   claims plaintiff Vargas has asserted because Vargas has not sustained any injury-in-
12   fact required by Article III of the United States Constitution to maintain a federal
13   cause of action.   *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016); *Chapman v.*
14   *Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011).   Each time Vargas
15   visited a Labcorp facility, he received Labcorp's services without issue or delay.
16   Thus, he lacks Article III standing and also lacks statutory standing to assert his
17   Unruh Act claim. *See, e.g. White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (Cal. 2019).

18       Labcorp's motion is based on this Notice of Motion and Motion for Summary
19   Judgment;  the Parties' Joint Brief Concerning Cross Motions for Summary
20   Judgment and Partial Summary Judgment; the Joint Statement of Disputed and
21   Undisputed Facts; the Joint Evidentiary Appendix; the pleadings, papers, and other
22   documents on file in this action, along with any evidence and argument presented at
23   the hearing on this matter.

24       This Motion is made following the conference of counsel pursuant to Local
25   Rule 7-3 and Dkt. No. 31, which took place on March 10, March 26, and March 31,
26   2021, and April 14, 2022.

27

28

CASE NO. 2:20-CV-00893-FMO-KS
NOTICE OF MOTION
AND MOTION



1 | DATED: May 26, 2022

KELLEY DRYE & WARREN LLP

By: */s/ Becca Wahlquist*

Becca Wahlquist (State Bar No. 215948)
Nathan T. Jamieson (State Bar No. 333304)
Robert I. Steiner (admitted *pro hac vice*)
Glenn T. Graham (State Bar No. 338995)

*Attorneys for Defendant*
*Laboratory Corporation of America*
*Holdings*

4

CASE NO. 2:20-CV-00893-FMO-KS
NOTICE OF MOTION
AND MOTION

1   Jonathan D. Miller (Bar No. 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (Bar No. 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE & MILLER, LLP
    33 West Mission Street, Suite 201
4   Santa Barbara, California 93101
    Telephone: (805) 963-2345
5   Facsimile: (805) 284-9590

6   Attorneys for Plaintiffs, LUKE DAVIS,
    JULIAN VARGAS, AMERICAN
7   COUNCIL OF THE BLIND, and the
    Proposed Class
8
    *Additional counsel for Plaintiffs and*
9   *Defendant's counsel listed on signature*
    *page.*
10

11              **UNITED STATES DISTRICT COURT**
        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
12

13  LUKE DAVIS, JULIAN VARGAS, and          CASE NO.: 2:20-cv-00893-FMO-KS
    AMERICAN COUNCIL OF THE
14  BLIND, individually and on behalf of all
    others similarly situated,              **JOINT BRIEF CONCERNING**
15                                          **CROSS MOTIONS FOR**
                 Plaintiffs,                **SUMMARY JUDGMENT AND**
16                                          **PARTIAL SUMMARY**
           v.                               **JUDGMENT**
17
    LABORATORY CORPORATION OF               *[Concurrently filed with Plaintiffs'*
18  AMERICA HOLDINGS,                       *Notice of Motion; Joint Appendix of*
                                            *Exhibits; Joint Statement of Disputed*
19               Defendant.                 *and Undisputed Facts; Declaration*
                                            *of Alison Bernal; Declaration of*
20                                          *Jonathan Miller; Request for Judicial*
                                            *Notice; and Plaintiff's [Proposed]*
21                                          *Order; Defendant's Notice of Motion;*
                                            *Declaration of Becca Wahlquist; and*
22                                          *Defendant's [Proposed] Order]*

23                                          Hon.  Fernando Olguin
                                            Date: June 30, 2022
24                                          Ctrm: 6D
                                            Time: 10:00 a.m.
25
                                            FAC Filed: September 3, 2020
26                                          Trial Date: Not yet set

27

28
                                    1
    JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

**TABLE OF CONTENTS**

I.    PLAINTIFFS' INTRODUCTION ..................................................7
II.   LABCORP'S INTRODUCTION .................................................7
III.  PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL
      FACTS...................................................................................8
     A.   LabCorp's Business .......................................................8
     B.   Project Horizon ...........................................................8
     C.   The "LabCorp Express" Service Mark ..............................11
     D.   LabCorp's Purported "Separate But Equal" Check-In Process
         For Those Who Cannot Independently Use the Kiosk ...............11
     E.   Complaints from the Blind Community ...............................13
     F.   Plaintiffs Davis and Vargas Cannot Use the Kiosks Independently ..........14
     G.   LabCorp's Lack of Auxiliary Aids and Services For the Kiosks...............15
     H.   LabCorp Staff's Lack of Training ....................................15
IV.  LABCORP'S STATEMENT OF UNDISPUTED MATERIAL
      FACTS..................................................................................16
     A.   Labcorp ..................................................................16
     B.   The Check-In Process ..................................................17
         1. Touchscreen Kiosk Check-In ......................................17
         2. Desk Check-In ....................................................18
     C.   Plaintiffs' Visits to Labcorp PSCs for
        Testing Services .........................................................19
         1. Plaintiff Vargas's Visit ...........................................19
         2. Plaintiff Davis's Visit ............................................20
         3. Plaintiff ACB's Member Visits ...................................21
V.   LEGAL ANALYSIS: PLAINTIFFS' INTRODUCTORY
      ARGUMENT .........................................................................22
VI.  LEGAL ANALYSIS: LABCORP'S INTRODUCTORY
      ARGUMENT .........................................................................22
VII.  PLAINTIFFS HAVE STANDING .................................................23
VIII. VARGAS LACKS STANDING BECAUSE HE DID NOT
      SUFFER AN
      ARTICLE III INJURY ............................................................24
IX.  PLAINTIFFS' ARGUMENTS IN SUPPORT OF SUMMARY
      JUDGMENT ON THEIR ADA CLAIM ........................................26
         1. Plaintiffs Are Legally Blind .......................................26
         2. PSCs are Places of Public Accommodation ......................26
         3.LabCorp Denied Plaintiffs Full and Equal Enjoyment of
         LabCorp's Goods, Services, Facilities, Privileges, Advantages,
         or Accommodations...................................................26
           a. The "LabCorp Express" Registered Service Mark Indisputably

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

2

165

Establishes that LabCorp's Kiosks Are Services ..................................27
   b. It Is Undisputed the Kiosk Service Is Not Independently
Accessible To The Legally Blind ..............................................................29
   c. LabCorp Failed to Provide Adequate Auxiliary Aids or Services
To Independently Use the Kiosks .............................................................29
   d. If Not "Services" Themselves, the Kiosks are Nevertheless
Privileges or Advantages Under the ADA ...............................................34
   e. Even if Not Services, Privileges, or Advantages Themselves, the
Kiosks Connect Patients with LabCorp's Phlebotomy Services.................35
   f. Any "Separate But Equal" Argument Fails ......................................37

X.    LABCORP'S ARGUMENTS IN SUPPORT OF SUMMARY
     JUDGMENT ON PLAINTIFFS' ADA CLAIM AND COUNTER-
     ARGUMENTS ........................................................................................39
  A.   Plaintiffs' ADA Claims Must Fail Because Labcorp's Employees Are
     An Effective Auxiliary Aid To Effectively Communicate With The
     Blind ......................................................................................................39
     1. There is no evidence that Plaintiffs were ever unable to obtain
     Labcorp's testing services ......................................................................40
     2. Labcorp provides "qualified readers" to ensure effective
     communication with the blind during the check-in process ......................40
      a. Labcorp's qualified readers are a sufficient auxiliary aid and the
     ADA does not require Labcorp to provide the specific auxiliary aid
     demanded by Plaintiffs ..........................................................................41
      b. The auxiliary aids and services requirement requires only
     effective communication, not a guarantee of independence........................45
     3. Labcorp is not required to offer different kiosks for the blind ...............48
      a. The ADA does not require covered entities to offer different
     "goods or services" for the disabled .......................................................48
      b. "Full and equal enjoyment" does not mean that the disabled must
     be able to enjoy every offering to the "same and identical extent" as
     the non-disabled......................................................................................49
     4. Plaintiffs' "separate but equal" argument has no
     application here........................................................................................51

XI.   PLAINTIFFS PREVAIL ON THEIR REHABILITATION ACT CLAIM ....52
XII.  PLAINTIFFS PREVAIL ON SECTION 1557 OF THE ACA CLAIM ........52
XIII. DEFENDANT'S RESPONSE TO PLAINTIFFS' RA AND ACA
     CLAIMS AND COUNTER-ARGUMENTS ...........................................53
  A.   Plaintiffs' RA and ACA Claims Must Fail................................................53
XIV. PLAINTIFF VARGAS IS ENTITLED TO FULL SUMMARY
     JUDGMENT ON HIS UNRUH CIVIL RIGHTS CLAIM..........................55
XV.  LABCORP IS ENTITLED TO SUMMARY JUDGMENT ON
     VARGAS' UNRUH ACT CLAIM .........................................................56
XVI. PLAINTIFFS' CONCLUSION ...............................................................56
XVII. LABCORP'S CONCLUSION.................................................................56

3

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

# **TABLE OF AUTHORITIES**

*Anderson v. City of Blue Ash*
   798 F.3d 338 (6th Cir. 2015)...................................................................55
*Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*
   603 F.3d 666, 670 (9th Cir. 2010)....................................................26,40
*Bax v. Doctors Med. Ctr. Of Modesto, Inc.*
   393 F. Supp. 3d 1000, 1012 (E.D. Cal. 2019)..................................52,53
*Bragdon v. Abbott*
   524 U.S. 624, 646 (1998)......................................................................29
*Breyer v. Pac. Univ.*
   2020 WL 1161434, at *32 (D. Or. Mar. 10, 2020). ...........................55
*Brooke v. IA Lodging Santa Clara LLC*
   2020 WL 3833287, *2 (N.D. Cal. July 8, 2020)..................................24
*Brown v. Bd. of Educ. of Topeka, Shawnee Cty., Kan.*
   347 U.S. 483, 495 (1954).........................................................................7
*Chapman v. Pier 1 Imports (U.S.), Inc.*
   631 F.3d 939, 944 (9th Cir. 2011)......................................................23,24
*Cullen v. Netflix, Inc.*
   880 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012). ...................................55
*Dicarlo v. Walgreens Boot All., Inc.*
   2016 WL 482982, *2 (S.D.N.Y. Feb. 5, 2016) ...................................41
*D'Lil v. Best Western Encina Lodge & Suites*
   538 F.3d 1031, 1036 (9th Cir. 2008)....................................................23
*Dobard v. San Francisco Bay Area Rapid Transit Dist.*
   1993 WL 372256, *3 (N.D. Cal. Sept. 7, 1993)..................................50
*Doe v. CVS Pharmacy, Inc.*
   982 F.3d 1204, 1210 (9th Cir. 2020).....................................................52
*Dominguez v. Banana Republic, LLC*
   2020 WL 1950496, at *6 (S.D.N.Y. April 23, 2020)..................*passim*
*Doran v. 7-Eleven, Inc.*
   524 F.3d 1034, 1039 (9th Cir. 2008).....................................................23
*Durand v. Fairview Health Servs.*
   902 F.3d 836, 842 (8th Cir. 2018).........................................................41
*Duvall v. Cnty. of Kitsap*
   260 F.3d 1124, 1139 (9th Cir. 2001).....................................................54
*Enyart v. Nat'l Conference of Bar Examiners, Inc.*
   630 F.3d 1153, 1163 (9th Cir. 2011).....................................................37
*Gomez v. Como*
   2022 WL 1082016, *1 (C.D. Cal. Apr. 11, 2022)...............................24
*Gomez v. Tribecca, Inc.*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

4

167

2022 WL 1469504, *4 (C.D. Cal. May 10, 2022).........................................24
*Greater Los Angeles Agency on Deafness v. Cable News Network*
742 F.3d 414, 426 (9th Cir. 2014)..............................................................56
*Helfand v. Gerson*
105 F.3d 530, 535 (9th Cir.1997)................................................................29
*Juech v. Children's Hosp. & Health Sys., Inc.*
353 F. Supp. 3d 772, 777 (E.D. Wis. 2018)................................................41
*Kohler v. Bed Bath & Beyond of Ca., LLC*
778 F.3d 827, 833 (9th Cir. 2015)..............................................................41
*Kong v. Mission Plaza Center, LLC*
2020 WL 5237297, *4 (C.D. Cal. June 30, 2020).......................................25
*Liese v. Indian River Cty. Hosp. Dist.*
701 F.3d 334, 343 (11th Cir. 2012)............................................................48
*Lopez v. Arby's Franchisor*
2021 WL 878735, *6 (S.D.N.Y. Mar. 8, 2021) ..........................................48
*Lujan v. Defenders of Wildlife*
504 U.S. 555, 560 (1992)...........................................................................23
*Marie v. Ariz. Dep't of Econ. Serv.*
2020 U.S. Dist. LEXIS 34270, *19 (D. Ariz. Feb. 28, 2020).....................54
*McCullum v. Orlando Reg'l Healthcare Sys. Inc.*
768 F.3d 1135, 1147 (11th Cir. 2014)........................................................41
*McNeil v. Time Ins. Co.*
205 F.3d 179, 187 (5th Cir. 2000)..............................................................50
*Molski v. Foley Estates Vineyard and Winery, LLC*
531 F.3d 1043, 1050 (9th Cir. 2008) ...........................................................7
*Nat. Fed. of the Blind, Inc. v. Wal-Mart Assocs., Inc.*
2021 WL 4750521, *11 (D. Md.  Oct. 12, 2021)........................................42
*New Hampshire v. Maine*
532 U.S. 742, 749 (2001) ..........................................................................28
*O'Campo v. Chico Crossroads, LP*
2012 WL 787594, *2 (E.D. Cal. Mar. 9, 2012)...........................................25
*Pinnock v. Int'l House of Pancakes Franchisee*
844 F. Supp. 574, 583 (S.D. Cal. 1993) .....................................................50
*Plessy v. Ferguson*
163 U.S. 537 (1896) ...................................................................................37
*Prusak v. Health*
2018 U.S. Dist. LEXIS 166538, *16 (D. Ariz. Sept. 26, 2018)..................43
*Rivera v. Crema Coffee Co. LLC*
438 F. Supp. 3d 1068, 1076 (N.D. Cal. 2020) ..............................................7
*Robles v. Domino's Pizza, LLC*
913 F.3d 898, 904–905 (9th Cir. 2019)...........................................31,35,36
*Romero v. Curry County Detention Ctr.*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

5

168

2002 WL 35649779, at *8 (D.N.M. Sept. 5, 2002)..................................54

*Spokeo, Inc. v. Robins*
578 U.S. 330, 337-38 (2016)..................................24

*Stephens v. Shuttle Assocs.*
547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008)..................................44

*Strojnik v. Bakersfield Convention Hotel I, LLC*
436 F. Supp. 3d 1332, 1340 (E.D. Cal. 2020)..................................25,56

*Trafficante v. Metro. Life Ins. Co.*
409 U.S. 205, 209 (1972). ..................................23

*Tucker v. Tennessee*
539 F.3d 526, 538 (6th Cir. 2008)..................................55

*Vargas v. Quest Diagnostics*
2021 WL 5989961, *5 (C.D. Cal. Oct. 15, 2021)..................................*passim*

*Wagner v. Prof'l Eng'rs in Cal. Gov't*
354 F.3d 1036, 1044 (9th Cir.2004)..................................28

*Wal-Mart Assocs., Inc*
2021 WL 4750521, *12 ..................................43

*West v. Moe's Franchisor*
2015 WL 8484567, *3 (S.D.N.Y. Dec. 9, 2015)..................................41

*Weyer v. Twentieth Century Fox Film Corp.*
198 F.3d 1104, 1115 (9th Cir. 2000)..................................49

*White v. Square, Inc.*
7 Cal. 5th 1019, 1023 (Cal. 2019)..................................56

*Williams v. McDonald's Corp.*
2022 WL 329557, *3 (E.D. Cal. Feb. 3, 2022)..................................42

*Wyatt v. Ralphs Grocery Co.*
No. SACV001260DOCEEX, 2002 WL 32985831 at *3
(C.D. Cal. Feb. 21, 2002)..................................39

*Zukle v. Regents of Univ. of Calif.*
166 F.3d 1041, 1045 n.11 (9th Cir. 1999)..................................52,53

*15 U.S.C.A. § 1127* ..................................27
*28 C.F.R. § 35-36* ..................................*passim*
*29 U.S.C. § 794(a)* ..................................52
*42 U.S.C. § 12101* ..................................37
*42 U.S.C. § 12103* ..................................41
*42 U.S.C. § 12182* ..................................*passim*
*45 C.F.R. § 84* ..................................52

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

6

## I.   PLAINTIFFS' INTRODUCTION

Plaintiffs instituted this nationwide civil rights class action lawsuit to vindicate a long-settled, bedrock principle of American law: that "separate but equal" treatment is inherently unequal. *Rivera v. Crema Coffee Co. LLC*, 438 F. Supp. 3d 1068, 1076 (N.D. Cal. 2020) ("[t]he Court declines to endorse the "separate but equal" theory implied in defendants' proposed alternative method of access"), citing *Brown v. Bd. of Educ. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 495 (1954); *Molski v. Foley Estates Vineyard and Winery, LLC*, 531 F.3d 1043, 1050 (9th Cir. 2008).

Here, the evidence demonstrates Defendant Laboratory Corporation of America Holdings ("LabCorp") systemically discriminates against legally blind patients such as lead Plaintiffs Luke Davis and Julian Vargas—as well as thousands of other legally blind Americans—by offering a patient check-in service that has one set of features for the sighted, and a separate, lesser, and fundamentally unequal set of features for the blind, thereby negatively impacting the quality of care blind patients receive. The evidence further establishes that the significant cost savings LabCorp enjoyed from its move to its discriminatory automated check-in service contributed to a doubling of its stock price over a five-year period and the personal enrichment of its senior executives. Plaintiffs are therefore entitled to summary judgment in their individual capacities on their federal and state claims.

## II.   LABCORP'S INTRODUCTION

Labcorp provides access to diagnostic testing services at its patient service centers ("PSC"), as well as through other outlets, including but not limited to, doctors' offices and hospitals. At its PSCs, **all patients** may opt to check in for their lab testing appointment with an employee at the front desk. This approach is: (1) Plaintiff American Council of the Blind's ("ACB") (a national advocacy group for the blind) preferred check-in method; (2) Plaintiff Vargas's experience on the only two occasions he visited a Labcorp PSC; and (3) fully consistent with Title III of the Americans with Disabilities Act ("ADA") and the requirements of analogous statutes

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

to provide a "qualified reader" as an "auxiliary aid or service" to legally-blind individuals. Nonetheless, Plaintiffs Davis, Vargas, and ACB allege that Labcorp's check-in process at PSCs violates the ADA, Section 504 of the Rehabilitation Act ("RA"), Section 1557 of the Affordable Care Act ("ACA"), California's Unruh Act and California's Disabled Persons Act ("CDPA")[1] because the optional check-in kiosks are inaccessible to the blind. But there is no legal requirement that the kiosks be accessible to blind patients when the same check-in process is available at the front desk with a qualified reader. Indeed, front desk check-in offers the same access as kiosks to all of the services provided at Labcorp's PSCs, which Plaintiffs concede in each instance they were able to receive. Thus, judgment dismissing Plaintiff's individual claims should be entered in Labcorp's favor.

## III. PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. LabCorp's Business

LabCorp "provides diagnostic, drug development and technology-enabled solutions for more than 160 million patient encounters per year." (P1, Ex. 18 at pp. 248-49.) LabCorp has approximately 1,853 patient service centers ("PSCs") throughout the country where customers can, among other services, make appointments, pay their bills, and obtain laboratory services such as blood work or urine tests. (P4, Ex. 8, 12 at pp. 23, 25, 27-28, 130, 134.) Patients are often required to fast before many of the tests, making delays in accessing testing services a patient care issue. (*See* P5, Ex. 9-10 at pp. 82, 88, 92, 101-02.)

### B. Project Horizon

Beginning in 2016, LabCorp implemented "Project Horizon," whereby the Company replaced its employee-driven patient check-in system with "LabCorp Express"—an automated check-in service where patients are directed to check

---

[1] Plaintiffs are no longer pursuing their CDPA claim; it should be dismissed. (Dkt. No. 94 at 2.)

8

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1   themselves in at a modified iPad mounted to a free-standing kiosk. (P6, Ex. 8, 21-22

2   at pp. 31-32, 47, 58, 265-66, 270.) Prior to implementing Project Horizon, the process

3   to check-in patients required interaction with a LabCorp staff member at a service

4   window inside the PSC, where the employee would call a patient, ask for their

5   identification and insurance information, input that data, and collect payment. (P18,

6   Ex. 12 at p. 127; P19, Ex. 12 at pp. 127-28.)

7       LabCorp implemented Project Horizon to increase its capacity to serve more

8   patients per day, while at the same time reducing labor costs within each of the PSCs

9   through automation of the check-in process. (P7, Ex. 8, 11-14 at pp. 40-41, 117-119,

10   150, 192, 214-15.) LabCorp installed the inaccessible LabCorp Express kiosks in

11   nearly all its PSCs: 1,853 locations nationally and 280 locations within California.

12   (P8, Ex. 8 at pp. 28-29, 56.) Internal documents demonstrate that for an upfront capital

13   expenditure of $22.4M, Horizon would pay for itself in less than four years. (P9, Ex.

14   8, 30 at pp. 38-39, 313.) Transitioning to the self-check-in kiosks resulted in a $14

15   million dollars in savings in 2019 realized from both the transition of employees from

16   full-time to part-time, and the increased capacity to process more patients without

17   hiring additional employees. (P25, Ex. 8, 12, 14 at pp. 38-39, 140-41, 222.)

18       Apple's iPad is equipped with built-in iOS accessibility features for the blind,

19   including a built-in screen reader program called "VoiceOver" that many legally blind

20   individuals use on a regular basis. (P10, Ex. 9 at pp. 80-81.) A blind person can use

21   headphones to connect to the iPad and turn on VoiceOver to allow screen reading of

22   on-screen content with volume control. (*See* P11, Ex. 31 at p.259-60). At the time of

23   implementation, LabCorp was aware its legally blind patients would not be able to

24   check-in at its kiosks, but disregarded those concerns, as well as its obligations under

25   the ADA, because it found no compelling "business case" to provide ADA compliant,

26   accessible kiosks to blind patients.[2] (P39, Ex. 13 at p. 172; P44, Ex. 13 at p. 184.) This

27

28   ––––––––––––––––––

[2] Mr. Wright testified—without any documentary support—he believed an accessible

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

9

172

1   was despite conducting an internal risk scenario at the inception of Project Horizon

2   where LabCorp determined one of the barriers to implementation was blind patients

3   could not independently access the kiosks. (P12, Ex. 8, 29 at pp. 33-34, 296-304; P13,

4   Ex. 12, 29 at pp. 72, 142, 296; P14, Ex. 12, 29 at pp. 142, 296.) Yet LabCorp's Senior

5   Vice President for IT, Mark Wright, conceded LabCorp selected an inaccessible kiosk

6   for its entire 1,850-plus PSC network, even though LabCorp was aware of other ADA

7   compliant, accessible kiosk options.[3] (P41, Ex. 13 at p. 173; P106, Ex. 13 at pp. 171,

8   191.) While the kiosk LabCorp selected had the capability of being made accessible,

9   LabCorp explicitly chose a design that did not utilize the iOS accessibility features

10  and sealed the iPad inside an enclosure, covering the built-in headphone jack. (P45,

11  Ex. 13 at pp. 178-180, P106, Ex. 13 at pp. 171, 191.) LabCorp implemented this

12  design across its 1,853-location network. (*See* P107, Ex. 8 at pp. 43-44.)

13      LabCorp actively trained its employees to "redirect" all patients, including

14  blind patients who failed to check-in at the kiosks, back to the device to do so. (P56,

15  Ex. 12, 24 at pp. 145-46, 281.) LabCorp's messaging led both high-level employees

16  working on the implementation of Project Horizon and on-site personnel to believe

17  its patients' use of the kiosks was mandatory. (P83, Ex. 8, 15 at pp. 52-55, 229-34.)

18  In 2018, LabCorp's Patient Services Director received complaints that LabCorp staff

19  were telling patients that use of the kiosks was mandatory. (P84, Ex. 14 at p. 218;

20  P85, Ex. 12 at pp. 147-49.) Senior LabCorp executives knew its employees considered

21  patient check-in through the kiosks to be mandatory but failed to inform those

22  employees that its kiosks were also inaccessible to its blind patients. (P83, Ex. 8, 15

23  _____

24  kiosk was "ten times" more expensive than the Aila kiosk he selected. (P47, Ex. 13 at

25  pp. 195-96.) Wright conceded that as the tablets used in the PSCs' kiosks began to be

26  replaced, his team did not perform any analysis of whether a cost-comparable
    accessible kiosk could be provided for blind customers. (P46, Ex. 13 at p. 193.)

27  [3] For example, before contracting with Aila, LabCorp considered the accessibility
    features included in a proposal by Olea Kiosks, Inc., a company that manufactures
28  ADA-compliant kiosks. (P43, Ex. 13, 28 at pp. 182-84, 292-95.)

10

JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

at pp. 52-55, 229-34; P85, Ex. 12 at pp. 147-49.) LabCorp's actions, or lack thereof, again, resulted in numerous blind patients being directed to check-in through a kiosk it knew was inaccessible and not independently usable.[4]

**C.    The "LabCorp Express" Service Mark**

Project Horizon became "LabCorp Express," defined by the company's user's guide as "LabCorp's tablet-based PSC patient self-service check-in system designed to give the patient greater control of their personal demographics and insurance information and its accuracy." (P51, Ex. 23 at p. 271.) LabCorp applied for a service mark for LabCorp Express with the USPTO. (P52, Ex. 16 at pp. 239-34; RFJN). LabCorp "request[ed] registration of the trademark/service mark . . . for . . . laboratory diagnostic testing check-in services," and stated, under oath, that "[t]he applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the identified goods/services." (P53, Ex. 17 at p. 242; RFJN.) LabCorp obtained a registered service mark for "LABCORP EXPRESS," Registration Number 5,704,211. (P54, Ex. 17 at pp. 245-46; RFJN.)[5]

**D.    LabCorp's Purported "Separate But Equal" Check-In Process For Those Who Cannot Independently Use the Kiosk**

All patients must check-in to access LabCorp's services. (P57, Ex. 12, 14 at pp.

---

[4] Mr. Wright testified LabCorp stock, which he owns, increased substantially over the last five years, demonstrating he personally profited financially from Project Horizon's successfully rollout, at the expense of the legally blind shut out from the kiosk's use. (P146, Ex. 13 at pp. 164-65; P147, Ex. 13 at p. 190.)

[5] The undisputed fact LabCorp stated under oath in its service mark application that LabCorp Express is a distinct service it seeks to offer patients is a key fact distinguishing the instant case from a similar action pending before Judge Gee, *Vargas v. Quest Diagnostics* (Case 2:19-cv-08108-DMG-MRW). There, even without a sworn statement from the company attesting that its kiosk was a distinct service (as is present here), Judge Gee denied Defendants' motion for summary judgment and certified a nationwide class of legally blind individuals who could not access Quest's kiosk. *Vargas v. Quest Diagnostics,* 2021 WL 5989961 (C.D. Cal. Oct. 15, 2021) (P150, Ex. 37).

11

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

174

126, 242.) When patients check-in, they are placed in a queue for service based on the time they completed the check in process. (P58, Ex. 8 at p. 69.) At PSCs equipped with a kiosk—1,853 nationwide—sighted patients check-in independently at the kiosk and are placed immediately in the queue. (P59, Ex. 8 at p. 49.)

Following the installation of the kiosks, LabCorp reduced staffing and transitioned to a one employee model—staffing only a phlebotomist—at more than 400 of its PSCs. (P60, Exhibit 14 at pp. 151-152.) In PSCs with only one employee, there is no one available to assist blind patients at the check-in window when the phlebotomist is in the back servicing a patient. (P61, Ex. 8, 14 at pp. 48, 152; P62, Ex. 8 at p. 49.) At PSC locations with two employees, both employees are now phlebotomists, rather than a phlebotomist and a patient intake representative that staffed such locations prior to installing the kiosks. (P63, Ex. 8 at pp. 50-51.) This, again, allows LabCorp to service more patients and increase revenue. However, when two patients enter a PSC at the same time, one sighted and the other blind, the sighted patient can complete check-in at the kiosk and be placed in the queue for care, while the blind patient is left to wait for a phlebotomist to complete their work, recognize a patient needed help in the waiting room, then assist the blind person with their check in. This results in the blind patient losing priority in the queue and waiting significantly longer than a sighted person to complete their appointment. (P64, Ex. 8 at pp. 70-71.)

The kiosks provide an effective method of allowing sighted patients to alert LabCorp employees the patient has checked in for their appointment. (P65, Ex. 8 at p. 64.) LabCorp, however, has failed to implement any system for blind patients, who are unable to access the kiosk, to alert the phlebotomists working in the back of the PSCs that the blind patients are waiting at the window. (P66, Ex. 12 at p. 153.) While the kiosks have a sign mounted on the back stating, "Having trouble checking in? Please see us for help," the signs are neither in braille nor have any other features to allow a blind patient to understand the content. (P67, Ex. 8, 25 at pp. 67, 387-88; P68,

12

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Ex. 8, 14 at pp. 68, 217.) There are no other specific directions within the PSCs informing blind patients to go to the window to check-in or directing them how to locate an employee when they enter a PSC. (P69, Ex. 8 at p. 68.)

Patients able to independently access the kiosks can input their email address to receive a subsequent email inviting them to provide feedback to LabCorp about their experience. (P70, Ex. 14 at p. 208.) However, a patient checking in at the window would have to orally tell the LabCorp staff member their email address for it to be entered into the system to receive a feedback survey, if invited by the LabCorp employee to participate in the survey. (P71, Ex. 14 at p. 209.) Other benefits of the kiosk service include that it allows patients to independently update their contact information and gives patients full access and visibility to their patient data functions that LabCorp considers to be important for patients to manage their own healthcare. (P72, Ex. 12 at pp. 131-32; P73, Ex. 12 at p. 132.) Kiosk users can further pay and manage their past invoices via self-service and use the kiosk to manage appointments without the assistance of LabCorp staff. (P74, Ex. 12 at p. 130; P75, Ex. 12 at p. 130.) These services are all unavailable to the legally blind.

### E.    Complaints from the Blind Community

LabCorp has received complaints from the blind community about their difficulties with the inaccessible kiosks since their implementation. (P77, Ex. 26 at p. 289.) In fact, between May 9, 2018, and February 17, 2021, LabCorp received over *130 separate complaints from blind or legally blind individuals* and *over 80 separate complaints from visually impaired individuals* about their respective experiences at PSCs. (P78, Ex. 26 at p. 289; P79, Ex. 26 at p. 289.) One patient complained on June 4, 2018, as follows:

> The new check in kiosk is NOT accessible for blind/low vision individuals. The woman behind the counter in a monotone voice said to use the kiosk to sign in when standing there. I did have someone with me, however, I did not feel that some staff would have been willing to assist me to check in had I been alone. The kiosk may be comviner [*sic*] for staff, but not clients. Please be sure to ensure your staff be provided with etiquette training on individuals with disabilities. (P80, Ex. 26 at p. 289.)

Other patient complaints to LabCorp included similar statements including, "[a]s a legally blind individual, the check in process [is] somewhat frustrating and the staff is not always available to assist me;" and "[t]he check-in process needs to be better able to handle visual disability patients. When entering the lab[,] I was told to use the machine but wasn't able to because of being blind. Had to ask for help and was told to follow the onscreen prompts. How am I supposed to when I can't see[?] Had another patient help me check-in." (P81, Ex. 26 at p. 289; P82, Ex. 26 at p. 289.)

**F.    Plaintiffs Davis and Vargas Cannot Use the Kiosks Independently**

Plaintiff Davis lives in Philadelphia and is legally blind. (P86, Ex. 10 at p. 98; P87, Ex. 10 at pp. 99-100.) Plaintiff Vargas lives in Van Nuys, California, and is also legally blind. (P88, Ex. 9 at p. 81; P89, Ex. 9 at p. 79.) On three occasions, October 11, 2016, December 23, 2017, and March 28, 2018, Mr. Davis attempted to check-in with an employee at a LabCorp PSC, and on each occasion the employee told him he needed to use the kiosk. (P91, Ex. 10 at pp. 103, 105-06.) LabCorp never offered him the option to check-in at a desk after kiosks were installed in its PSCs. (P92, Ex. 10 at p. 104.) Instead, Mr. Davis had to rely on a third party to enter his personal information into the kiosk. (P93, Ex. 10 at pp. 108-09; P94, Ex. 10 at p. 110.) On one occasion, Mr. Davis had to ask another patient's aide for assistance in filling out information as the staff at the window would not assist him. (P94, Ex. 10 at p. 110.)

On January 10, 2020, Mr. Vargas visited a LabCorp PSC in Van Nuys. (P95, Ex. 9 at pp. 82-83.) A day or two prior to the date of service, Mr. Vargas visited the PSC because he wanted to familiarize himself with how to find the center and what the procedure would be like when he arrived. (P96, Ex. 9 at p.82.) At that time, a LabCorp employee told Mr. Vargas the kiosk was not accessible for a blind person to use independently, and he would require an attendant to assist him with checking in. (P97, Ex. 9 at p. 83; P98, Ex. 9 at p.83; P99, Ex. 9 at pp. 83, 88-89.) On the date of his service, Mr. Vargas waited in line, approached the window, and, after waiting several minutes, a LabCorp employee checked him in. (P100, Ex. 9 at pp.83-85; P101,

14

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

177

1   Ex. 9 at pp. 83, 86; P102, Ex. 9 at pp. 83, 86.)

2   **G.    LabCorp's Lack of Auxiliary Aids and Services For the Kiosks**

3   LabCorp's kiosks consist of an iPad mounted on a stand, enclosed in a case that

4   prevents access to the headphone jack. (P105, Ex. 8 at p. 58.) LabCorp "explicitly

5   chose during the design of the tablet and the enclosure to not have anything exposed

6   which, therefore, led to not having access to speakers, headphone jacks, or anything

7   else that could enable access to the blind." (P106, Ex. 13 at pp. 171, 191.) It made no

8   effort to access or utilize the accessibility features provided by Apple and built into

9   the iPad operating system. (P108, Ex. 8 at p. 57.) Braille is not offered at any of the

10  kiosks in LabCorp's PSCs throughout the United States. (P109, Ex. 8, 12 at pp. 37,

11  59, 142-43.) The kiosks do not utilize any screen reader software, optical readers,

12  magnification software, or speech output for the information displayed on its screens,

13  nor are tactile keypads installed on the kiosks that could be used by the legally blind

14  to access the kiosks independently. (P110, Ex. 8 at p. 59; P111, Ex. 8 at p.59; P112,

15  Ex. 8 at pp. 59-60; P113, Ex. 8, 13 at pp. 66, 194; P114, Ex. 8, 13 at pp. 67, 195.) The

16  kiosks thus do not have any qualifying aids or auxiliary services that would allow the

17  blind to access the kiosk service independently. (P37, Ex. 13-14 at pp. 175, 201.)

18  **H.    LabCorp Staff's Lack of Training**

19  LabCorp employees do not assist blind patients in accessing the kiosk service

20  offered to sighted patients; instead, the employees manually input private patient data

21  at the PSC window, rather than at the kiosk. (P115, Ex. 14 at p. 213.) Employees who

22  check-in patients at the window bypass the self-service kiosk experience entirely. (*See*

23  *id*.) They do not stand next to a blind patient, read the information from the kiosk to

24  them, or otherwise guide them through the self-check-in process. (*See id*.) LabCorp

25  did not hire greeters or ambassadors to guide patients through the self-check-in

26  process at its kiosks during or after the Project Horizon rollout. (P116, Ex. 8 at p.55.)

27  LabCorp does not train, much less test its PSC employees to determine whether they

28  can effectively serve as "qualified readers" under the ADA. (P117, Ex. 12, 14 at pp.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

15

178

154, 220-21; P118, Ex. 14 at p.221.) LabCorp's PSC employees are not tested to examine their proficiency in reading and pronouncing medical terms, nor are they tested to determine if they are able to correctly pronounce all terminology LabCorp uses at its PSCs. (P119, Ex. 14 at p.221; P120, Ex. 12 at p.154.) It is not part of either LabCorp's patient intake representative or phlebotomist job descriptions that they are able to serve as qualified readers as defined by the ADA. (P121, Ex. 12 at p.155; P122, Ex. 12 at p.155.)

LabCorp provides no specific training to its employees on how to communicate effectively with those with visual impairments during the check-in process at its PSCs. (P123, Ex. 8 at pp.72-73.) It has no policies for its phlebotomists or intake representatives to assess what aids or auxiliary services might assist an individual with visual disabilities with the kiosk. (P124, Ex. 8, 12 at pp.73-44, 136-137.) LabCorp's only accessibility policy is its two-page, top level "Public Access Accommodation Policy," that fails to address how to engage in the interactive process with blind individuals. (P125, Ex. 8, 27 at pp.61-62, 290-91; P126, Ex. 12 at p.135; P127, Ex. 12 at p.156.) LabCorp provides no training on what an individual's disability is, much less how to assess a disability. (P128, Ex. 8 at p.73.) No guidance is provided to PSC employees to address the scenario of a blind patient arriving at a PSC and attempting to access the kiosk. (P129, Ex. 14 at p.216.)

## IV.   LABCORP'S STATEMENT OF UNDISPUTED MATERIAL FACTS

The majority of the "facts" set forth by Plaintiffs are not supported by, and/or mischaracterizations of, the record, irrelevant to Plaintiffs' claims, hypotheticals or are disputed. The facts relevant to the parties' respective motions are set forth below.

### A.   Labcorp

Labcorp is a diagnostic testing company that, among other things, operates approximately 2,000 PSCs in the U.S. (D151, Ex.38 at 643-644.) Patients who visit PSCs provide samples, collected by Labcorp phlebotomists, for a wide range of diagnostic tests, *i.e.*, blood draws and urine collections. (D152, Ex.38 at 645, 650.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

16

Only 20% of Labcorp's diagnostic testing services are provided through PSCs, with the other 80% coming through other sources. (D153, Ex.38 at 645-646.)

### B. The Check-In Process

#### 1. Touchscreen Kiosk Check-In

Historically, Labcorp employees checked in all patients at the front desk of its PSCs. (D158, Ex.38 at 659-660.) In October 2017, Labcorp began rolling out touchscreen check-in kiosks to allow, but not require, patients to self-check in for their services. (D159, Ex.38 at 647-648, 657.) The roll out occurred gradually over a one-year time period. (D160, Ex.52 at 830, 869; Ex.38 at 657.) A patient who chooses to use the kiosk for check-in scans his or her driver's license and health insurance card at the kiosk. (D161, Ex.38 at 672-673, 674.) From these scans, the patient's contact and insurance information is displayed onto the screen for the patient to correct if needed. (D162, Ex.38 at 675.) The patient is further prompted to select the purpose of his or her visit: lab work, drug screen, other, or specimen drop-off. (D163, Ex.38 at 676.) The patient can also indicate if he or she is fasting. (D164, Ex.38 at 676.) Finally, the patient may pay past outstanding bills with a credit card. (D165, Ex.38 at 661, 664.) The patient is then placed in a queue for service. (D166, Ex.38 at 662.) At no time does the kiosk ask for any private medical information. (D167, Ex.46 at 792.) The same check in process is also available at the PSC's front desk, discussed below.

After checking in, when it is the patient's turn to receive service, he or she is called to the front desk by a PSC employee who confirms the patient's services. (D168, Ex.38 at 662-663.) If the prescription was already electronically transmitted to Labcorp, the employee will confirm the order by making sure that the contact and ordering physician information is correct. (D169, Ex.38 at 662.) If the order has not already been transmitted, the patient must provide a paper prescription to the employee who will then enter the order. (D170, Ex.38 at 662-663.) The patient can also discuss at this time how payment will be made for the testing services that day, such as co-pay, co-insurance, or deductible. (D171, Ex.38 at 663.) The patient is then

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

17

1   taken to a private room where the sample collection is conducted. (D172, Ex.52 at
2   833; Ex.38 at 645.)

3         2.   Desk Check-In

4       Patients are **not required** to use the kiosks to check in at PSCs. (D173, Ex.38
5   at 647-648, 668; Ex.47 at 800.) In fact, when it was first introducing the kiosks,
6   Labcorp was aware that its kiosks were not a check-in option for the blind. (D174,
7   Ex.43, at 754-755.) For this and other reasons, Labcorp ensured that front desk check-
8   in remained available at all PSCs to assist people who could not use, or did not want
9   to use, the kiosks. (D175, *id.*) To that end, Labcorp issued multiple bulletins to advise
10  employees of its desk check-in policy, such as the following:

> [S]elf check-in is not for every patient. We should remember our top
> priority is to provide excellent customer service and patient care, which
> includes our "patient first" approach to the check-in process. Check-in
> using the **Labcorp Express** station tablet is **NOT** mandatory for
> patients. If a patient does not want to use or is struggling to use the
> Express tablet, invite them to the front desk and check them in using
> **Express Admin.**
>
> ***Key points to remember:***
>
> •   **NEVER** tell a patient they <u>must</u> check in using the Express
> tablet....
>
> •   WATCH FOR and HELP struggling patients by checking them in
> via Express Admin.

22  (D176, Ex.47 at 800.) At the same time, demonstrating that desk check-in would
23  continue, Labcorp updated its desk check-in capabilities to make desk check-in more
24  efficient. (D177, Ex.43 at 754-755; Ex.44 at 770.) At certain PSCs, Labcorp has a
25  dedicated patient intake representative ("PIR") at the desk at all times to check in
26  patients. (D178, Ex.38 at 649-650.) Where there is no dedicated PIR, Labcorp often
27  has two or more phlebotomists, with one sitting at the desk full-time and the others
28  collecting samples. (D179, Ex.52 at 833.) Four years after the kiosks were introduced,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

18

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1   approximately 25% of all Labcorp's PSC patients still checked in at the desk and not

2   at the kiosks. (D180, Ex.52 at 870.)

3       The check-in process at the front desk and kiosk is essentially the same. (D181,

4   Ex.38 at 647-648, 667, 680.) The employee scans the patient's driver's license and

5   insurance card. (D182, Ex.48 at 807; Ex.38 at 680.) Once the patient's contact and

6   insurance information appear on the screen, the employee can correct the information

7   by verifying it against the cards. (D183, Ex.38 at 680.) The employee then confirms

8   the service the patient is receiving by collecting the patient's prescription, if it has not

9   already been electronically transmitted. (D184, Ex.39 at 695; Ex.45 at 781.) The

10  employee is also able to take payment for any outstanding bills, as well as for services

11  the patient is receiving that day. (D185, Ex.38 at 647-648, 661.) When it is the

12  patient's turn to receive service, a phlebotomist will take the patient to a private room

13  for service. (D187, Ex.39 at 694; Ex.45 at 780-781.)

14      No protected health information is ever spoken at the desk. (D188, Ex.45 at

15  776-777, 780-781, 782.) Labcorp's policies ensure that PSC employees (whether a

16  PIR or a phlebotomist) will be available to assist blind individuals with check-in at

17  the desk. (D189, Ex.38 at 649, 658, 665-666, 669.) These policies also require

18  employees to clearly communicate with blind individuals so that they can receive

19  accommodations as necessary during check-in. (D190, Ex.38 at 670; Ex.42 at 738.)

20  Labcorp provides annual trainings for its PSC employees to ensure that they are able

21  to assist all persons with checking in. (D191, Ex.42 at 739-740.)

22      **C.**    **Plaintiffs' Visits to Labcorp PSCs for Testing Services**

23          1.    <u>Plaintiff Vargas's Visit</u>

24      On around January 9, 2020, Vargas visited a Labcorp PSC in Van Nuys,

25  California to familiarize himself with the check-in process. (D192, Ex.39 at 688, 690.)

26  Consistent with Labcorp's policies and its employee training, Labcorp's staff advised

27  Vargas that he would not need to use the kiosk to check in, but instead would be

28  checked in at the front desk. (D193, Ex.39 at 689, 696-698.)

19

182

The next day, on January 10, 2020, Vargas returned to the same PSC for a blood test. (D194, Ex.39 at 689.) When he arrived, he waited in line at the front desk to check in. (D195, Ex.39 at 691, 694.) When it was his turn, he provided the employee his identification and insurance cards. (D196, Ex.39 at 692-693.) He also provided the employee with his prescription. (D197, Ex.39 at 695.) Vargas confirmed that he was not required to, and did not, disclose any personal information out loud during the check-in process. (D198, Ex.39 at 693.) Shortly after checking-in, a Labcorp employee collected Vargas's blood sample. (D199, Ex.39 at 694, 699-700.) Vargas testified he was treated respectfully during his visit. (D200, Ex.39 at 702-703.)

Vargas's experiences at Labcorp were far different than those he claims he experienced at Quest Diagnostics, another laboratory services provider who uses a kiosk for checking in and against which Vargas has brought similar claims to the ones here. At Quest, unlike at Labcorp, Vargas claims "there was nobody there" at the desk to check Vargas in when he arrived, and while a Quest employee "eventually came out" and checked him in, that was only because there was another patient in the waiting room who had already checked in. (D219, Ex.53 at 875-876.) The Quest employee, moreover, did not check Vargas in at the desk but rather took him to the kiosk to check in there. (D220, Ex.53 at 878-879.) Further, unlike at Labcorp, Vargas was required to speak personal information out-loud at Quest. (D221, Ex.53 at 881-883.)

Vargas testified that Labcorp, in accordance with its policies, had "more people working" at the Labcorp PSC he visited than at Quest. (D222, Ex.53 at 884) He also testified that he "never actually interacted with the kiosk" at Labcorp because "there were other staff there" to check him in. (D223, Ex.53 at 885-886.) Unlike at Quest, "it wasn't just one person manning the office" and "he was told to come to the window prior to his visit" and that he would not have to give out his personal information. (D224, Ex.53 at 886-887.)

    2.    Plaintiff Davis's Visits

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

20

1    Davis visited Labcorp's PSCs in Pennsylvania on at least three occasions—

2    October 11, 2016, December 23, 2017, and March 28, 2018. (D201, Ex.40 at 710.)

3    On each of those occasions, Davis claims he attempted to check-in at the desk but was

4    told by the PSC employee—contrary to Labcorp's written policy, the experiences of

5    Vargas, and the two ACB members who testified in this case—that he needed to use

6    the kiosk for check-in. (D202, Ex.40 at 710-711.) But, on October 11, 2016, no

7    Labcorp PSC in the country had introduced a kiosk for check-in. (D203, Ex.38 at

8    657.) Indeed, kiosks were not introduced until over one year later. (D204, *id.*) Each

9    time Davis visited a Labcorp PSC, he was able to check-in and receive the testing

10   services his doctor ordered. (D205, Ex.40 at 712.)

11          3.    Plaintiff ACB's Member Visits

12         ACB joined this lawsuit on September 15, 2020. Just prior to doing so, ACB

13   sent a survey to its members and asked about their kiosk check-in experiences at

14   Labcorp's PSCs. (D206, Ex.49 at 813.) It did not ask its members about the desk

15   check-in process. (D207, *id.*) ACB sent this survey to 4,542 of its members. (D208,

16   Ex.50 at 813.) Only twelve responded. (D209, Ex.41 at 722, 723-724.)

17         One member, John Harden, responded that whenever he visits a Labcorp PSC,

18   an employee checks him in at the front desk, writing: The "ADA states that a business

19   needs to make reasonable accommodations for the disabled. They certainly do that."

20   (D210, Ex.51 at 819; Ex.45 at 777.) Harden further testified that Labcorp employees

21   complete his check-in by collecting his identification card, insurance card, and

22   prescription. (D211, Ex.45 at 780-781.) He never has to speak any of this information

23   out-loud. (D212, Ex.45 at 780.) Once checked in, he waits to be called by a

24   phlebotomist who privately verifies his date of birth and then provides the testing

25   services. (D213, Ex.45 at 780-781.) In the past four years, and over about thirty-two

26   visits, neither Harden nor his wife, who is also legally blind, has ever been required

27   to or told to check-in at the kiosk. (D214, Ex.45 at 778-779.) Labcorp always has

28   someone there to take care of his needs without him having to rely on the kiosk.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

21

184

(D215, Ex.45 at 783.) Moreover, Harden prefers to check in at the desk because it is more efficient. (D216, Ex.45 at 782.)

ACB's preferred check-in method is having a staff member check-in the visually disabled. (D217, Ex.41 at 726.) ACB's representative confirmed that an employee assisting blind individuals with checking in is not a discriminatory practice and further agreed that no remedy would be needed for those visually-disabled persons who opt to check-in at the front desk. (D218, Ex.41 at 725, 726.)

## V.      LEGAL ANALYSIS: PLAINTIFFS' INTRODUCTORY ARGUMENT

Plaintiffs allege violations of: (1) Title III of the ADA; (2) California's Unruh Civil Rights Act; (3) Section 504 of the Rehabilitation Act; and (4) Section 1557 of the Affordable Care Act ("ACA"). Plaintiffs bring the first, third, and fourth claims individually and as to the Nationwide Injunctive Class. Plaintiff Vargas brings the second claim individually and as to the California sub-class. Each of Plaintiffs' claims turns on whether LabCorp's check-in service discriminates against the legally blind. The undisputed facts establish LabCorp's kiosk service is inaccessible to the legally blind, and LabCorp offers a stigmatizing, inferior check-in process instead of the kiosks, affecting blind patients' quality of care. Plaintiffs seek partial summary judgment on liability in their individual capacities as to the ADA, Rehabilitation Act, and ACA. Plaintiff Vargas seeks full summary judgment and minimum statutory damages in his individual capacity for the Unruh Act claim.

## VI.     LEGAL ANALYSIS: LABCORP'S INTRODUCTORY ARGUMENT

Labcorp provided a front desk check-in option at the PSCs that Plaintiffs visited. Labcorp is not required to also provide an accessible check-in kiosk just because Vargas and Davis (but not ACB) claim to prefer one. Thus, Plaintiffs have no viable claim under the ADA, RA or ACA (and Vargas has no viable Unruh claim). Indeed, Judge Gee's decision in *Vargas v. Quest Diagnostics Clinical Labs., Inc.* ("*Quest*"), 2021 WL 5989961 (C.D. Cal. Oct. 15, 2021)—another case brought by Vargas and the ACB—illustrates why Labcorp provides a sufficient check-in process

22

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1    for the blind. Moreover, because Vargas did not suffer any injury-in-fact, he lacks

2    Article III standing. Summary judgment should be granted in Labcorp's favor, in full.

3    **VII.   PLAINTIFFS HAVE STANDING**

4           Article III standing requires (1) plaintiff suffer an injury in fact; (2) there is a

5    causal connection between the injury and defendant's conduct; and (3) the Court

6    could likely redress the injury through a favorable decision. *D'Lil v. Best Western*

7    *Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008) (quoting *Lujan v.*

8    *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). LabCorp challenges Plaintiff

9    Vargas' standing, arguing Vargas did not suffer an injury in fact. *Chapman v. Pier 1*

10   *Imports (U.S.), Inc.,* 631 F.3d 939, 944 (9th Cir. 2011). The Supreme Court has

11   instructed courts to take "a broad view of constitutional standing in civil rights cases,

12   especially where, as under the ADA, private enforcement suits 'are the primary

13   method of obtaining compliance with the Act.'" *Doran v. 7-Eleven, Inc*., 524 F.3d

14   1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co*., 409 U.S. 205,

15   209 (1972)). Plaintiff Vargas meets this threshold.

16          LabCorp relies on the Ninth Circuit's decision in *Chapman* to support its

17   challenge to Vargas' standing, arguing Vargas did not suffer any cognizable injury.

18   This reliance is misplaced. *Chapman* involved architectural barriers and the plaintiff

19   could not identify which alleged ADA violation "deprived him of the full and equal

20   access that a person who is not wheelchair bound would enjoy while shopping at Pier

21   One." *Chapman,* 631 F.3d at 955. In other words, the Chapman plaintiff did not

22   identify how the specific barriers injured him. The present case is not a barrier case;

23   it is an effective communication case. LabCorp offers a distinct service allowing

24   patients to communicate with LabCorp, to check in, to pay bills, to update insurance,

25   and other services. LabCorp does not offer this service to legally blind patients. This

26   service is distinct from LabCorp's phlebotomy service, as evidenced by LabCorp's

27   distinct service mark for "laboratory diagnostic testing check-in services" designed

28   "to give the patient greater control of their personal demographics and insurance

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

23

186

information and its accuracy." (P51, P53.) LabCorp denied Plaintiff Vargas the ability to access this distinct service. It is a service LabCorp offers its sighted patients and denies to legally blind patients, including Plaintiff Vargas directly who LabCorp told he could not use the service because of his disability. (P97.)

## VIII.  VARGAS LACKS STANDING BECAUSE HE DID NOT SUFFER AN ARTICLE III INJURY

Each Plaintiffs' claims fail in their entirety for the reasons discussed below. However, the undisputed record confirms that Vargas's claims fail for the additional reason that he cannot satisfy Article III's injury-in-fact requirement for federal court jurisdiction. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016). "[A] plaintiff in an ADA case may establish standing 'either by demonstrating deterrence or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility.'" *Gomez v. Como*, 2022 WL 1082016, *1 (C.D. Cal. Apr. 11, 2022) (quoting *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011)). Vargas lacks standing, however, because he was neither deterred[6] from using Labcorp's testing services nor did he suffer any injury-in-fact that is "concrete and particularized." *Spokeo*, 578 U.S. at 339 (internal quotations omitted). Contrary to Plaintiffs assertion, Vargas was not "directed to a kiosk" nor did he lose his place in line. On the only two occasions that Vargas visited a Labcorp PSC, he was informed that he did not need to be checked in at a kiosk, but rather would be checked in at the front desk. (D193, Ex.39 at 689, 696-698.) On his second visit, when Vargas returned

---

[6] Deterrence requires that Vargas establish Labcorp's purported failure to comply with the ADA deterred him from making use of Labcorp's facility. *Brooke v. IA Lodging Santa Clara LLC*, 2020 WL 3833287, *2 (N.D. Cal. July 8, 2020); *see also Chapman*, 631 F.3d at 949; *Gomez v. Tribecca, Inc.*, 2022 WL 1469504, *4 (C.D. Cal. May 10, 2022) (no standing where plaintiff did not credibly demonstrate he intended to return to defendant's website). Vargas was not deterred from using Labcorp's services and does not argue to the contrary.

24

1    to the LabCorp PSC for diagnostic testing services, he was checked in at the desk.

2    (D195, Ex.39 at 691, 694.) As a result, Vargas has not suffered any cognizable injury.

3      The Ninth Circuit's decision is *Chapman* is instructive.  In *Chapman*, the Ninth

4    Circuit explained that to establish an injury-in-fact, a plaintiff must encounter a barrier

5    that "affects the plaintiff's full and equal enjoyment of the facility on account of his

6    particular disability." 631 F.3d at 947. The plaintiff, who was unable to walk

7    unassisted, alleged that certain architectural features of a Pier One Imports store

8    "deprived him of full and equal enjoyment because of his wheelchair confinement"

9    in violation of the ADA. *Id.* at 943. Chapman, however, did not pinpoint which

10    alleged ADA violation "deprived him of the same full and equal access that a person

11    who is not wheelchair bound would enjoy when shopping at Pier One." *Id.* at 955.  In

12    such an instance, the Ninth Circuit held, the plaintiff lacked standing to assert an ADA

13    claim because he failed to indicate "how his disability was affected by [the alleged

14    barriers] so as to deny him 'full and equal' access that would satisfy the injury-in-fact

15    requirement (*i.e.*, that he personally suffered discrimination on account of his

16    disability)." *Id.* at 954. Here, the record is clear that Vargas did not encounter any

17    barrier that denied him the full and equal enjoyment of Labcorp's testing services;

18    instead he was checked in almost immediately at the PSC desk in accordance with

19    Labcorp's policy and subsequently had his blood drawn. (D193, Ex.39 at 689, 696-

20    698; D199, Ex.39 at 694, 699-700.) Because he did not encounter any barrier, Vargas

21    lacks Article III standing to assert an ADA claim. *See Strojnik v. Bakersfield*

22    *Convention Hotel I, LLC*, 436 F. Supp. 3d 1332, 1340 (E.D. Cal. 2020) (plaintiff

23    lacked standing to assert ADA claim because he did not explain how a barrier

24    "'affects the plaintiff in a personal and individual way'" (internal quotations

25    omitted)); *Kong v. Mission Plaza Center, LLC*, 2020 WL 5237297, *4 (C.D. Cal. June

26    30, 2020) (finding "[p]laintiff lacks standing to bring claims against O'Reilly Auto

27    because he **has not personally encountered a barrier** arising from O'Reilly Auto's

28    conduct" (emphasis added)); *O'Campo v. Chico Crossroads, LP*, 2012 WL 787594,

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

25

188

*2 (E.D. Cal. Mar. 9, 2012) (no injury-in-fact where plaintiff "provided no evidence connecting the barriers he allegedly encountered with his alleged use of a wheelchair at the time"); *Quest*, 2021 WL 5989961, *11 ("[t]he short wait required by visually-impaired individuals . . . would generally not amount to a cognizable injury.")

## IX.   PLAINTIFFS' ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT ON THEIR ADA CLAIM

To establish that LabCorp violated their rights under the ADA, Plaintiffs must show: (1) they are disabled within the meaning of the ADA; (2) Defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) Defendant denied Plaintiffs public accommodations because of their disabilities. *See* 42 U.S.C. § 12182(a); *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2010).

### 1.   Plaintiffs Are Legally Blind

It is undisputed Plaintiffs are qualified individuals with disabilities. The Code of Federal Regulations defines disability as a "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 28 C.F.R. § 35.108(a)(1). Plaintiffs are legally blind, a qualifying disability under the ADA. (P87, Ex. 10 at pp. 99-100; P88, Ex. 9 at p. 81; P104, Ex. 3-7, pp. 7-11.)

### 2.   PSCs are Places of Public Accommodation

Title III prohibits discrimination against persons with disabilities by any person who "owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §12182; *see also* 28 C.F.R. §36.104. LabCorp's PSCs are open to members of the public; LabCorp phlebotomists collect samples used to perform diagnostic tests. (P16, Ex. 8 at p. 26; P4, Ex. 8, 12 at pp. 23, 25, 27-28, 130, 134; P31, Ex. 14 at pp. 203, 211.) Thus, the PSCs are places of public accommodation. (P15, Ex. 1 at 1.)

### 3.   LabCorp Denied Plaintiffs Full and Equal Enjoyment of LabCorp's Goods, Services, Facilities, Privileges, Advantages, or Accommodations

Under Title III of the ADA, "[n]o individual shall be discriminated against on

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

the basis of a disability in the full and equal enjoyment of the *goods, services, facilities, privileges, advantages, or accommodations* of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). The kiosks are themselves a good or service within the meaning of the ADA, a fact LabCorp swore to under penalty of perjury in its USPTO filings. And even without the USPTO filings, Plaintiffs still prevail because the kiosks deny Plaintiffs full and equal access to LabCorp's phlebotomy services.

a)   **The "LabCorp Express" Registered Service Mark Indisputably Establishes that LabCorp's Kiosks Are Services**

Title 15 defines a trademark as "any word, name, symbol, or device, or any combination thereof . . . to identify and distinguish his or her *goods*, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C.A. § 1127 (emphasis added). Similarly, the term "service mark," means "any word, name, symbol, or device, or any combination thereof . . . to identify and distinguish the *services* of one person, including a unique service, from the *services* of others . . .." *Id.* (emphasis added).

In 2016, LabCorp began "Project Horizon," to implement kiosks in its PSCs. (P6, Ex. 8, 21-22 at pp. 31-32, 47, 58, 265-66, 270.) According to an "IT Internal Capitalization Justification" document, the project name was "Horizon—Patient Self Service at the PSC." (P17, Ex. 20 at p. 255.) Prior to Project Horizon, LabCorp's check-in process did not include a self-service check-in option for its patients. (*See* P18, Ex. 12 at p. 127; P19, Ex. 12 at pp. 127-28.) Patient self-service was the core purpose of Project Horizon. LabCorp renamed Project Horizon "LabCorp Express," and defined it as "LabCorp's tablet-based PSC patient self-service check-in system designed to give the patient greater control of their personal demographics and insurance information and its accuracy." (P51, Ex. 23 at p. 271.)

On August 21, 2017, LabCorp filed an application for a federal service mark of

27

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1    "LABCORP EXPRESS" with the USPTO. (P52, Ex. 16 at pp. 239-34; RFJN).

2    LabCorp "request[ed] registration of the trademark/service mark . . . for . . . laboratory

3    diagnostic testing check-in services," and stated under oath that "[LabCorp] has a

4    bona fide intention, and is entitled, to use the mark in commerce on or in connection

5    with the identified goods/services." (P53, Ex. 17 at p. 242; RFJN.) The USPTO

6    granted a registered service mark for "LABCORP EXPRESS," Registration Number

7    5,704,211. (P54, Ex. 17 at pp. 245-46; RFJN.) The service mark is defined as

8    "providing non-downloadable software for patients to check in to laboratory

9    diagnostic testing clinics; providing a website featuring technology allowing users to

10   check in to laboratory diagnostic testing clinics." (*Id*.) Thus, its kiosks, as integral

11   parts of "laboratory diagnostic testing check-in services" are indisputably qualifying

12   services under the ADA, as both the ADA and Lanham Act revert to the dictionary

13   definition of "good and services." *Dominguez v. Banana Republic, LLC*, 2020 WL

14   1950496, at *6 (S.D.N.Y. April 23, 2020).

15          In seeking the service mark, LabCorp was required to demonstrate the LabCorp

16   Express service was sufficiently distinct from other services LabCorp offers (such as

17   blood draws or front desk check-ins) and was for the benefit of someone other than

18   LabCorp (i.e., LabCorp's patients). *See* U.S. Dept. of Commerce, Patent and

19   Trademark Office, Trademark Manual of Examining Procedure §§ 1301.01,

20   1301.01(a), and 130.01(a)(ii) (issued October 31, 2018) (hereinafter "PTO Manual").

21   LabCorp is thus judicially estopped from taking the position that the LabCorp Express

22   kiosks are not themselves services because that position is diametrically opposed to

23   the sworn verification LabCorp's Chief Legal Officer executed in the company's

24   application for, and success in obtaining from the USPTO, the registered service mark

25   for the "LabCorp Express." "[W]here a party assumes a certain position in a legal

26   proceeding, and succeeds in maintaining that position, he may not thereafter, simply

27   because his interests have changed, assume a contrary position . . ." *New Hampshire*

28   *v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted); *Wagner v.*

JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1   *Prof'l Eng'rs in Cal. Gov't,* 354 F.3d 1036, 1044 (9th Cir.2004). Judicial estoppel

2   applies to a party's stated position whether it is an expression of intention, a statement

3   of fact, or a legal assertion. *Helfand v. Gerson,* 105 F.3d 530, 535 (9th Cir.1997).

4   Here, LabCorp took the position before the USPTO that its kiosks are

5   "diagnostic testing check-in services," that are distinct from other services LabCorp

6   offers. LabCorp had succeeded in maintaining that position and continues to benefit

7   from service mark protection. LabCorp may not now take the contrary position that

8   the kiosks are not "diagnostic testing check-in services" merely for convenience in

9   avoiding its clear obligations under the ADA. For these reasons, LabCorp Express

10  kiosks are qualifying services within the meaning of 42 U.S.C. § 12182(a).

11          **b)     It Is Undisputed the Kiosk Service Is Not**
                     **Independently Accessible To The Legally**
12                   **Blind**

13  LabCorp never intended for the legally blind to be able to check-in at its kiosks

14  and LabCorp's corporate management concedes the kiosks are not independently

15  accessible to the legally blind. (P36, Ex. 8, 13 at pp. 49, 181, 189; P37, Ex. 13-14 at

16  pp. 175, 201). Indeed, LabCorp "explicitly recognized that the device could not

17  service a blind person, and they would have to be serviced by the Express solution

18  behind the desk." (P39, Ex. 13 at p. 172.) LabCorp was aware of accessible-to-blind

19  options for kiosks but chose not to incorporate them. (P41, Ex. 13 at p. 173.) LabCorp,

20  however, argues they were not required to have special kiosks for the blind "as a

21  matter of law." (*See, infra,* at § X(A)(3)(a).) This is incorrect. As Judge Gee notes in

22  *Vargas v. Quest Diagnostics,* 2021 WL 5989961, *5 (C.D. Cal. Oct. 15, 2021), "the

23  kiosks are a part of the service that [Defendant] provides, and it must provide auxiliary

24  aids and services to render them accessible to blind patients."

25          **c)     LabCorp Failed to Provide Adequate Auxiliary**
                     **Aids or Services To Independently Use the**
26                   **Kiosks**

27  Department of Justice ("DOJ") regulations require a public accommodation to

28  "furnish appropriate auxiliary aids and services where necessary to ensure effective

JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA compliance is entitled to deference). The DOJ regulations define "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b)(2). These include screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology designed to make visually delivered materials available to individuals who are blind or have low vision. 28 C.F.R. §§ 36.303(b)(2), (4).

The type of auxiliary aid or service public accommodations provide "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii). This is especially critical in this action, where patients notified LabCorp the electronic check-in process forced blind users to divulge confidential medical information to other patients or aides willing to help them at the kiosk. (*See* P82, Ex. 26 at p. 289.) Moreover, by leaving its blind patients to wait until a phlebotomist finishes their work with other patients already in the queue, before checking in blind patients, LabCorp deliberately segregates and treats its blind patients differently from its sighted patients. Its blind patients do not enjoy the privileges and advantages that LabCorp provides it sighted patients, nor do they receive timely access to LabCorp's goods and services.

The DOJ itself has stated this system—one allowing sighted individuals to access a check-in kiosk and requiring legally blind individuals to wait for eventual in-person help—violates the ADA. (P149, Ex. 36, p. 10.) The DOJ unambiguously stated that "[r]elegating patients with disabilities who have scheduled appointments to the bottom of the walk-in waitlist because of a lack of auxiliary aids and services is treating those patients differently." (*Id.*) This is precisely the sort of discrimination—

30

JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

1    that which prevents the disability community from timely, effective, independent, and

2    private access to public accommodations—that the ADA was enacted to address.  The

3    ADA mandates that places of public accommodation, like LabCorp, provide auxiliary

4    aids and services to make visually delivered materials available to the legally blind.

5    *See* 28 C.F.R. § 36.303; *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904–905 (9th

6    Cir. 2019), cert. denied (2019).

7        LabCorp continues to deny blind patients the auxiliary aids and services

8    mandated by law. As set forth above, LabCorp deliberately chose a tablet without

9    accessibility features and covered up the headphone jack. (P106, Ex. 13 at pp. 171,

10   191.) LabCorp does not offer Braille or any screen reader software, optical readers,

11   magnification software, or speech output for all information displayed on the screens.

12   LabCorp does not utilize tactile keypads the legally blind could use to participate in

13   LabCorp's self-service check-in system, assert greater control over their personal

14   demographics and insurance information, or to pay their bills, advantages accessible

15   to LabCorp's patients only through its kiosks. (P110, Ex. 8 at p. 59; P111, Ex. 8 at

16   p.59; P112, Ex. 8 at pp. 59-60; P113, Ex. 8, 13 at pp. 66, 194; P114, Ex. 8, 13 at pp.

17   67, 195; P51, Ex. 23 at p. 271; P4, Ex. 8, 12 at pp. 23, 25, 27-28, 130, 134.)

18       Multiple management-level LabCorp employees, including its Rule 30(b)(6)

19   designee, admit the kiosks do not provide any aids or auxiliary services that allow the

20   blind to access its kiosks independently. (P36, Ex. 8, 13 at pp. 49, 181, 189; P37, Ex.

21   13-14 at pp. 175, 201; P39, Ex. 13 at p. 172.) Yet, to avoid liability, LabCorp argues

22   in this litigation that its staff members serve as qualified readers under 28 C.F.R. §

23   36.303. However, as explained below, LabCorp's senior management concedes its

24   employees are not qualified readers under the ADA. These same witnesses

25   acknowledge the company made no effort to determine whether its employees have

26   the requisite skills or training to be deemed qualified readers. (P117, Ex. 12, 14 at pp.

27   154, 220-21; P118, Ex. 14 at p.221 P119, Ex. 14 at p.221; P120, Ex. 12 at p.154.)

28   Moreover, and critically, at over 400 PSCs nationwide, there is only one employee

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

31

194

working – a phlebotomist who remains in the back. (P60, P61.) That does not qualify as an appropriate aid or auxiliary service necessary to access LabCorp's kiosk service.

As an initial and important distinction, LabCorp employees do not assist blind patients with the kiosks themselves; instead, its employees gather and input blind patients' private information at the PSC window. (P115, Ex. 14 at p. 213.) In this way, LabCorp employees who check patients in at the window bypass the self-service kiosk experience entirely. (*See id*.) LabCorp employees do not stand next to a blind patient at the kiosk, read information presented on the kiosk screen, or otherwise guide them through self-check-in. (*See id*.) LabCorp has also failed to hire any greeters or ambassadors to fulfill this purpose despite recommendations from its employees that they do so. (*See* P116, Ex. 8 at p.55; P145, Ex. 15 at pp. 236-38.) This distinction is important because, as LabCorp admitted in its USPTO service mark application, the kiosks *themselves* are a service that denies the legally blind access to in any meaningful way. As discussed further in Section V.A.3.d, *infra*, LabCorp's practice of having blind patients wait for an employee to check them in at the window, as opposed to using the self-service kiosks, segregates, stigmatizes, and leaves them with a fundamentally different and inferior check-in experience than that of sighted patients. *See Baughman*, 685 F.3d at 1137 (requiring Disney to allow a disabled individual to use a "Segway" rather than a wheelchair to permit her an experience more akin to that of non-disabled guests).

Even without this distinction, LabCorp does not provide blind patients with qualified readers. A "[q]ualified reader means a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary." 28 C.F.R. § 35.104. It is not part of a phlebotomist's or patient intake representative's job description that they are qualified readers as defined in the ADA. (P121, Ex. 12 at p.155; P122, Ex. 12 at p.155.) LabCorp never administered any test to its PSC employees, or undertook any analysis, to determine if they could serve as qualified readers under the ADA. (P117, Ex. 12, 14 at pp. 154, 220-21; P118, Ex. 14 at p.221.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

32

1   That LabCorp PSC employees do not serve as "qualified readers" is further

2   established by the fact LabCorp provides no specific training on how to communicate

3   effectively with those with visual impairments during the check-in process at its PSCs.

4   (P123, Ex. 8 at pp.72-73.) It has no policies by which its phlebotomists or patient

5   intake representatives could assess what aids or auxiliary services might assist an

6   individual with visual disabilities with the kiosk. (P124, Ex. 8, 12 at pp.73-44, 136-

7   137.) Its two-page, top level "Public Access Accommodation Policy," is its only

8   accessibility policy, that itself fails to address fundamental requirements of the ADA,

9   including such as how to engage in the interactive process with blind individuals.

10  (P125, Ex. 8, 27 at pp.61-62, 290-91; P126, Ex. 12 at p.135; P127, Ex. 12 at p.156.)

11  LabCorp provides no guidance to its PSC employees to address the scenario of a blind

12  user entering the PSC and attempting to use a kiosk. (P129, Ex. 14 at p.216.)

13  The experiences of Luke Davis demonstrate LabCorp PSC employees do not,

14  in practice, act as "qualified readers," much less offer to assist blind patients. Instead,

15  in his experience they direct blind patients back to the kiosks. (P91, Ex. 10 at pp. 103,

16  105-06.) Mr. Davis was never offered the option to check in with a PSC employee

17  after kiosks were installed in LabCorp's PSCs. (P92, Ex. 10 at p. 104.) Instead, he had

18  to rely on a third party to assist him with entering his personal information into the

19  kiosk. (P93, Ex. 10 at pp. 108-09; P94, Ex. 10 at p. 110.) Mr. Davis was not alone in

20  his experience; many other legally blind patients reported similar experiences.[7] (P78,

21  Ex. 26 at p. 289.) To the extent LabCorp claims its PSC employees act as "qualified

22  readers," the Plaintiffs' experiences, the experiences of ACB members, and the

23  _____

24  [7] Patient complaints to LabCorp included statements such as "[a]s a legally blind

25  individual, the check in process [is] somewhat frustrating and the staff is not always
    available to assist me;" and "[t]he check-in process needs to be better able to handle

26  visual disability patients . . . I was told to use the machine but wasn't able to because
    of being blind. Had to ask for help and was told to follow the on screen prompts.

27  How am I supposed to when I can't see[?] Had another patient help me check-in."

28  (P80, Ex. 26 at p. 289; P81, Ex. 26 at p. 289; P82, Ex. 26 at p. 289.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

experiences of other blind patients complaining to LabCorp's Patient Services Director beginning in 2018, establish the "qualified reader" auxiliary aid and service is ineffective, inaccessible, not provided in a timely manner, and absolutely fails to protect the privacy and independence of blind patients in contravention of the ADA.

In summary, LabCorp denied Plaintiffs full and equal enjoyment of the kiosks. LabCorp cannot take the position the kiosks are not a service because LabCorp applied for and obtained a service mark for "laboratory diagnostic check-in services." There is no dispute the kiosks themselves are not independently accessible to the legally blind. LabCorp admits the kiosks have no auxiliary aids—no Braille, no tactile keyboard, no speech output, no screen reader software, etc. Finally, LabCorp PSC employees are not qualified readers and do not even attempt to assist patients with accessing the *kiosks*, the service at issue. At best, they help a legally blind patient enter the queue, long after his sighted peers have done so via the kiosk. Based on these facts, Plaintiffs are entitled to partial summary judgment on the issue of liability under the ADA.

### d) If Not "Services" Themselves, the Kiosks are Nevertheless Privileges or Advantages Under the ADA

Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, *privileges, advantages,* or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). LabCorp now contends its kiosks are not qualifying services despite its prior under oath statements to the USPTO. Even if LabCorp could prevail on that argument, and it cannot, its kiosks remain subject to the ADA as "privileges" or "advantages" within the meaning of 42 U.S.C. § 12182(a), and LabCorp has admittedly denied its blind patients the opportunity to benefit from those privileges and advantages.

34

197

An intended benefit of Project Horizon and implementing the kiosks was to "improve the patient check-in experience" (P21, Ex. 14, 19 at pp. 210, 223, 250.) LabCorp considered the self-check-in option for patients provided through Project Horizon as a privilege and advantage not previously available when its employees were responsible for checking in patients. (P22, Ex. 12 at p. 129.) The benefits of the kiosk include allowing patients to update their contact information and providing patients full access and visibility to their patient data. (P72, Ex. 12 at pp. 131-32; P73, Ex. 12 at p. 132.) Kiosk users can further pay and manage their past invoices through the self-service process, manage appointments, and enter their email address to receive a patient experience survey. (P70, Ex. 14 at p. 208; P74, Ex. 12 at p. 130; P75, Ex. 12 at p. 130.) The kiosks also include the privilege or advantage of an expedited check-in process whereby kiosk users may check in as they arrive to the PSC, and be placed in line to see a phlebotomist ahead of those already waiting for a LabCorp employee to return to the window to check them in. (P59, Ex. 8 at p. 49; P61, Ex. 8, 14 at pp. 48, 152; P62, Ex. 8 at p. 49.) Among the realized goals of Project Horizon were to reduce the potential for extended patient wait time and improve the overall patient experience. (P20, Ex. 8 at p. 42) But the privileges and advantages created by access to the self-service kiosks benefit and inure only to sighted patients. Blind patients are segregated, treated differently, and denied the opportunity to benefit from the privileges and advantages the kiosks offer. 42 U.S.C. § 12182(a)(i) & (ii).

     e)     **Even if Not Services, Privileges, or Advantages Themselves, the Kiosks Connect Patients with LabCorp's Phlebotomy Services**

Assuming *arguendo,* that LabCorp's kiosks are not themselves services, privileges, or advantages under 42 U.S.C. § 12182(a), the ADA still applies to the kiosks as they facilitate access to LabCorp's phlebotomy services. *Robles*, 913 F.3d at 905. In *Robles*, a blind plaintiff alleged Domino's Pizza failed to design, construct, maintain, and operate its website and app to be fully accessible to him. *Id.* at 902. Domino's "operates a website and app that allows customers to order pizzas and other

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1  products for at-home delivery or in-store pickup, and receive exclusive discounts."

2  *Id.* Customers could still also use less technologically advanced methods of ordering

3  pizza such as physically entering Domino's stores or ordering pizza by telephone.

4  Nevertheless, the Ninth Circuit noted:

> Domino's website and app facilitate access to the goods and services of a place of public accommodation—Domino's physical restaurants. *They are two of the primary (and heavily advertised) means of ordering Domino's products to be picked up at or delivered from Domino's restaurants*. We agree with the district court . . . that the ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants.

9  *Id.* at 905–906 (emphasis added). The Ninth Circuit continued that the "alleged

10  inaccessibility of Domino's website and app impedes access to the goods and services

11  of its physical pizza franchise—which are places of public accommodation." *Id.* at

12  905. Here, the inaccessibility of LabCorp's kiosks to the legally blind also impedes

13  access to LabCorp's phlebotomy services, as all patients must check in to access

14  LabCorp's services. (P57, Ex. 12, 14 at pp. 126, 242.)

15      Notably, the Ninth Circuit also stated that Domino's website and app are "two

16  of the primary (and heavily advertised) means of ordering Domino's products," but

17  not the *only* means, as blind individuals such as Robles can still order pizza by

18  telephone or by physically patronizing a brick-and-mortar store. That Robles had

19  other, less technologically advanced options did not preclude the ADA's application

20  to Domino's website and app, which connect customers to goods and services. In the

21  same exact way, after their implementation, the kiosks became the primary and highly

22  encouraged means of checking in to access LabCorp's phlebotomy services. LabCorp

23  expected the self-check-in option would be heavily used. (P55, Ex. 14 at p. 213.) And,

24  as of May 2018, LabCorp was instructing its phlebotomists that if a patient walks past

25  the kiosks, the employee should softly redirect the patient back, thus encouraging

26  kiosk use. (P56, Ex. 12, 24 at pp. 145-46, 281.) That LabCorp provides the option for

27  patients to check in at the window with an employee does not relieve LabCorp of its

28  ADA obligations; as in *Robles*, the ADA applies to LabCorp's kiosks because they

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

36

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

connect patients to LabCorp's phlebotomy services. *Baughman*, 685 F.3d at 1135 ("As new devices become available, public accommodations must consider using or adapting them to help disabled guests have an experience more akin to that of non-disabled guests."); *see Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011) (noting that "assistive technology is not frozen in time: as technology advances, [] accommodations should advance as well.").

### f)    Any "Separate But Equal" Argument Fails

In enacting the ADA, the legislature recognized that "historically, society has tended to isolate and segregate individuals with disabilities" and sought to rectify the problem. 42 U.S.C. § 12101(a)(2). For example, "[g]oods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the *most integrated setting appropriate to the needs of the individual."* 42 U.S.C. § 12182(b)(1)(B) (emphasis added); *see also* 42 U.S.C. § 12182(b)(1)(A)(iii) (making it illegal to provide a person with a disability "a good, service, facility, privilege, advantage, or accommodation that is *different or separate from* that provided to other individuals." (emphasis added)). The ADA provides that a public accommodation, like LabCorp, engages in unlawful discrimination if it fails to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services . . .." 42 U.S.C.A. § 12182(b)(2)(A)(iii). LabCorp contends that its check-in process complies with the ADA because a PSC employee is present to check-in the blind patient who cannot use the kiosk in a separate way. This "separate but equal" defense must fail.

No anti-discrimination statute in the country, and certainly not in California, allows for a separate but equal defense. This has been the law since the Supreme Court overruled *Plessy v. Ferguson*, 163 U.S. 537 (1896) in 1954. While *Plessy* and *Brown v. Board of Education* dealt with racial segregation, the application is no different for disability discrimination. LabCorp advances a theory that sighted customers may have

one check-in process that is quicker, easier, and does not depend on an elusive window employee to check in. That check-in process results in sighted individuals experiencing shorter wait times and being empowered to take control of their healthcare, manage appointments, take care of past due balances, and update demographic or contact information. Meanwhile, disabled individuals are denied the opportunity to participate in and benefit from those goods, services, privileges, or advantages, and must instead wait for help, either from rarely present staff or a good Samaritan to whom the disabled individual must divulge personal information.

Specifically, the facts at hand present at least four ways in which the separate check-in process for the legally blind is inherently unequal. First, while sighted individuals may check in using the kiosk without waiting, the legally blind must wait for a LabCorp employee to assist them at the window, resulting in a later placement in the service queue. (P57, Ex. 12, 14 at pp. 126, 242; P58, Ex. 8 at p. 69; P59, Ex. 8 at p. 49.) LabCorp has over 400 PSCs that employ only one employee, a phlebotomist, who is often in the back servicing a patient and not at the window. (P60, Exhibit 14 at pp. 151-152; P61, Ex. 8, 14 at pp. 48, 152; P62, Ex. 8 at p. 49.) Where two patients enter a PSC at the same time, one sighted and the other blind, the sighted patient can complete check-in at the kiosk, be placed in the queue, while the blind patient is left to wait for a phlebotomist to complete their work, to assist the blind person with checking in, resulting in the blind patient losing priority in the queue and waiting longer than a sighted person to complete their appointment. (P64, Ex. 8 at pp. 70-71.) Second, the kiosks provide an effective method of allowing patients to alert LabCorp employees that the patient has checked in for their appointment, whereas for the legally blind, there is no uniform system for a patient to alert a phlebotomist in the back that the patient is at the window waiting. (P65, Ex. 8 at p. 64; P66, Ex. 12 at p. 153.) Third, the "Having trouble checking in? Please see us for help" signage is neither in braille nor has any other features that would allow a blind individual to understand the content, thus leaving the legally blind in an awkward, stigmatizing

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

38

201

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1    position of standing there without any direction to go to the window for service. (P67,

2    Ex. 8, 25 at pp. 67, 387-88; P68, Ex. 8, 14 at pp. 68, 217; P68, Ex. 8, 14 at pp. 68,

3    217.) Fourth, a patient using the kiosk can input their email address to receive a

4    feedback survey, whereas a patient checking in at the window would have to orally

5    tell the LabCorp staff member their email address, risking their privacy, in order to

6    receive a feedback survey. (P70, Ex. 14 at p. 208; P71, Ex. 14 at p. 209.)

7         Courts have routinely rejected similar defenses in disability access cases. As

8    the Northern District of California explained in *Rivera,* 438 F. Supp. 3d at 1076:

9         The Court declines to endorse the "separate but equal" theory implied in
         defendants' proposed alternative method of access. The suggestion that
10        disabled customers should be required to go to another location to be
         served invites comparison to long-discredited views and outcomes that
11        are inherently unfair. . . . [S]ee also *Rodriguez,* 10 F. Supp. 3d at 1085
         ("[T]he mere existence of a separate La Victoria location does not suffice
12        to make the subject property's goods and services 'available through
         alternative methods.' "); cf. *Molski v. Foley Estates Vineyard and*
13        *Winery,* LLC, 531 F.3d 1043, 1050 (2008) (noting the "disadvantage"
         separate facilities may create for patrons who could be accommodated
14        by readily achievable barrier removal).

15   *See also Wyatt v. Ralphs Grocery Co.,* No. SACV001260DOCEEX, 2002 WL

16   32985831 at *3 (C.D. Cal. Feb. 21, 2002) (holding that access that did not coincide

17   with the route for the general public violated ADA). LabCorp's check-in system thus

18   illegally segregates the legally blind from the sighted.[8] *See also,* Ex. 36, p.10.

19   **X.    LABCORP'S ARGUMENTS IN SUPPORT OF SUMMARY
            JUDGMENT ON PLAINTIFFS' ADA CLAIM AND COUNTER-**
20          **ARGUMENTS**

21          **A.    Plaintiffs' ADA Claims Must Fail Because Labcorp's Employees
                   Are An Effective Auxiliary Aid To Effectively Communicate With**

22

23

24

25   ─────────────────────

26   [8] Should the Court grant Plaintiffs' motion for partial summary judgment on the
     question of liability as to the federal claims, Plaintiffs intend to move for permanent
27   injunctive relief after the class certification motion is decided and, if appropriate,
     Class notice is provided to the Class. The specific contours of the injunctive relief
28   sought will be set forth in detail at that time.

**The Blind**

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). A plaintiff must establish that: (1) he or she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against the plaintiff because of his or her disability. *Arizona ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 670 (9th Cir. 2010). Plaintiffs' ADA claims fail because they were not discriminated against because of their disability.

Because Plaintiffs' ADA claims are based on a communication-related disability, the "auxiliary aids and services" requirement applies. 42 U.S.C. § 12182(b)(2)(A)(iii). This means Labcorp is required only to ensure "effective communication" by "furnish[ing] appropriate auxiliary aids and services where necessary." 28 C.F.R. § 36.303(c)(1); *Quest*, 2021 WL 5989961, *5.

Here, Plaintiffs' ADA claims can be reduced to one straightforward question: does the ADA obligate Labcorp to provide the specific auxiliary aid preferred by Plaintiffs Davis and Vargas (*i.e.*, a different kind of kiosk), or may Labcorp continue to provide the auxiliary aid it currently offers, which is the same one preferred by Plaintiff ACB (*i.e.*, a qualified reader that effectively checks in patients at the desk)? Because Labcorp provides an appropriate auxiliary aid, summary judgment is warranted in its favor and Plaintiffs' arguments to the contrary fail.

### 1. There is no evidence that Plaintiffs were ever unable to obtain Labcorp's testing services

Plaintiffs concede that they were not denied access to Labcorp's testing services. (D199, Ex.39 at 694, 699-700; D205, Ex.40 at 712.) In each instance that they claim they visited a Labcorp PSC, both Vargas and Davis, as well as all of ACB's declarants, were able to receive Labcorp's testing services in the same manner as a

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

40

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

sighted individual. (*Id*.) Moreover, there is no evidence to support Plaintiffs' "wait time" hypothetical. Plaintiffs provided no testimony that Davis, Vargas or any member of the ACB encountered Plaintiffs' hypothetical scenario. There is none; the record is clear that Plaintiffs' received Labcorp's services without issue.

### 2.   Labcorp provides "qualified readers" to ensure effective communication with the blind during the check-in process

#### a)   Labcorp's qualified readers are a sufficient auxiliary aid and the ADA does not require Labcorp to provide the specific auxiliary aid demanded by Plaintiffs

Plaintiffs argue that Labcorp is liable under the ADA because its staff members assist blind individuals with the check-in process at the front desk instead of providing special, accessible check-in kiosks. The law, however, is clear: the ADA does not require covered entities to provide the specific auxiliary aid demanded by a particular individual. Rather, covered entities are required to provide auxiliary aids and services *as necessary* to avoid discrimination. The ADA defines auxiliary aids and services to include "qualified readers[.]" 42 U.S.C. § 12103(1)(B). "[T]he ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii); *Quest*, 2021 WL 5989961, *5. As the DOJ's regulations emphasize:

> The auxiliary aid requirement is a flexible one. A public accommodation can choose among various alternatives as long as the result is effective communication. For example, a restaurant would not be required to provide menus in Braille for patrons who are blind, if the waiters in the restaurant are made available to read the menu. Similarly, a clothing boutique would not be required to have Brailled price tags if sales personnel provide price information orally upon request....

28 C.F.R. pt. 36, App'x C. To construe the ADA as requiring that covered entities provide any auxiliary aid preferred by an individual would "substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid." *McCullum v. Orlando Reg'l Healthcare Sys. Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014). It is, therefore, well-settled that the ADA imposes no liability where a covered entity does not offer the specific

41

1   auxiliary aid demanded.[9] *See Kohler v. Bed Bath & Beyond of Ca., LLC*, 778 F.3d

2   827, 833 (9th Cir. 2015) ("the legal requirements of the ADA should not be

3   modified merely to reflect an individual's preference").

4      *Moe's Franchisor* is illustrative. In that case, like here, the plaintiff claimed

5   that the defendant violated the ADA by failing to install adaptive accessibility

6   technology (*e.g.*, tactile buttons or screen-reading software) on self-service soda

7   machines. *See* 2015 WL 8484567, *1. In rejecting that claim, the court explained:

8         Nothing in the ADA or its implementing regulations
         supports Plaintiffs' argument that Moe's must alter its
9         Freestyle machines in a way that allows blind individuals to
         retrieve beverages without assistance. . . . Plaintiffs may be
10        correct that technological additions to the Freestyle
         machines are both feasible and preferable. However, under
11        the ADA, effective assistance from Moe's employees
         acting as "qualified readers" is sufficient.
12

13   *Id.* at *3; *See Nat. Fed. of the Blind, Inc. v. Wal-Mart Assocs., Inc.*, 2021 WL

14   4750521, *11 (D. Md.  Oct. 12, 2021) ("Staff assistance is sufficient to provide

15   effective communication"); *Williams v. McDonald's Corp.*, 2022 WL 329557, *3

16   (E.D. Cal. Feb. 3, 2022) (same).

17      Here, special, technologically-accessible kiosks for the blind are not, and were

18   not, necessary for Labcorp to effectively communicate with Plaintiffs so as to check-

19   them in. There is no evidence to suggest that assistance from Labcorp's employees

20   did not effectively communicate the information necessary for Plaintiffs to check in.

21   In fact, the undisputed record shows that Labcorp has employees at the front desk

22   acting as "qualified readers," who provide effective check-in assistance to the legally

23   blind (and anyone else who prefers to check-in with an employee). Indeed, when it

24   first introduced the kiosks, Labcorp was aware that the kiosks were not a check-in

25   option for the blind. For this and other reasons, it ensured that front desk check-in

26

27   ─────────────────────
    [9]*See, e.g., Durand v. Fairview Health Servs.*, 902 F.3d 836, 842 (8th Cir. 2018);
28   *West v. Moe's Franchisor*, 2015 WL 8484567, *3 (S.D.N.Y. Dec. 9, 2015); *Dicarlo v. Walgreens Boot All., Inc.*, 2016 WL 482982, *2 (S.D.N.Y. Feb. 5, 2016); *Juech v. Children's Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 777 (E.D. Wis. 2018).

42

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

would remain available at all PSCs to assist with checking-in. (D174-75, Ex.43 at 754-755.) Labcorp also implemented policies and provided annual trainings directing its employees to assist the blind and others with desk check-in (D176, Ex.47 at 800; D190, Ex. 38 at 670; D191, Ex. 42 at 739-740), and updated its desk check-in capabilities to make desk check-in more efficient. (D177, Ex.43 at 754-755.)

Vargas concedes as much. He testified that he was checked in by a Labcorp employee at the front desk, treated respectfully during his visit, and able to receive his blood test shortly after being checked-in. (D195-200, Ex.39, at 691-695, 699-700, 702-703.) Harden, a blind member of ACB, also testified that an employee always checked him in at the front desk, he was treated respectfully at all times, and Labcorp always had someone there to take care of his needs. (D210-15, Ex.45 at 777-783.)

Moreover, despite claiming in this action that Labcorp is liable under the ADA for not providing accessible kiosks, ACB's corporate representative testified that ACB's preferred check-in experience is having a staff member available to assist in checking in blind individuals, which is exactly the check-in process experienced by Plaintiff Vargas and ACB member Harden. (D217, Ex.41 at 726.) Harden prefers to check-in at the desk because it is more efficient. (D216, Ex.45 at 782.) Such undisputed facts demonstrate that Labcorp's employees acting as qualified readers were able to effectively communicate with Plaintiffs during the check-in process. This is all that is required under the ADA. *See Prusak v. Health*, 2018 U.S. Dist. LEXIS 166538, *16 (D. Ariz. Sept. 26, 2018) (granting defendant summary judgment where the deaf plaintiff testified that she was able to communicate effectively with defendant's physicians via the auxiliary aid provided by defendant); *Wal-Mart Assocs., Inc.* 2021 WL 4750521, *12 (granting summary judgment where defendant fulfilled its obligation to provide auxiliary aids "by appointing associates to serve as 'qualified readers.'")

Davis's claimed contrary experience during his PSC visits is insufficient to save his ADA claim from dismissal. First, although Davis claims he was always told

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

43

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

to use the kiosk, the record shows that the PSC location he visited in 2016 did not even have a kiosk installed at the time of his visit, making his claimed experience not possible. (D203-04, Ex.38 at 657.) Second, to the extent such experiences occurred when kiosks were actually installed, courts have held that no reasonable inference can be drawn from "isolated mistakes" that the covered entity "fails to train its employees to provide effective auxiliary aids and services." *Moe's Franchisor*, 2015 WL 8484567, *4; *Stephens v. Shuttle Assocs.*, 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008) ("[T]he ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities."); *see Wal-Mart Assocs., Inc.*, 2021 WL 4750521, *12 (ADA claim fails where policies ensure effective communication.)

In fact, the record shows that Labcorp has policies to ensure that PSC employees are available to check in blind individuals. Employees are specifically instructed to check-in patients at the desk and are reminded that use of the kiosk is not mandatory. (D173, Ex.38 at 647-648, 668; Ex.47 at 800.) It is, therefore, no coincidence that Labcorp's employees, without even a specific request being made, offered to check-in Vargas and Harden at the desk and that all Plaintiffs, including the six ACB declarants, were able to receive the testing services ordered after being checked-in. Indeed, four years after the kiosks were introduced, approximately 25% of all Labcorp's PSC patients still checked in at the desk and not at the kiosks. (D180, Ex.52 at 870.)

Contrasting the undisputed record in this case with the facts present in Judge Gee's *Quest* decision further underscores Labcorp's compliance with the ADA. Although both Quest and Labcorp are diagnostic testing companies that rolled out self-service kiosks, the factual circumstances concerning Labcorp's appropriate use of qualified readers and Quest's apparent lack thereof could not be more dissimilar.

In *Quest*, defendant installed touchscreen tablets "to replace paper sign-in sheets." 2021 WL 5989961, *1. Once patients were checked in, they were then placed in a queue and received their estimated wait times. *Id.* Unlike at Labcorp PSCs, Quest

44

did not have employees or phlebotomists available at the front desk who were trained and able to check-in blind patients at the desk. Indeed, the Quest phlebotomists were "located behind a closed door," not at a desk check-in. *Id.* at *5. As Judge Gee recognized, the "real issue" in *Quest* was not whether "phlebotomist assistance was adequate under the ADA" because, there, such "assistance does not appear to have been readily or reliably available." *Id.* at *6. Judge Gee's findings concerning Quest's practices are starkly different than Labcorp's practices:

> [P]hlebotomist unavailability appears to have been part of Quest's plan. Quest's waiting rooms are generally unattended; the kiosk communicated to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room . . . Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was *designed* to make phlebotomists available only sometimes.

*Id.* Here, to the contrary, the undisputed record (and Plaintiffs' own visits) show that Labcorp had effective qualified readers ready, willing, and able to assist Plaintiffs and other blind individuals entering a PSC. In fact, Labcorp's commitment to desk check-in is illustrated by its introduction of technology behind the desk to make desk check-in more efficient – resulting in over one-quarter of all Labcorp patients continuing to opt to check-in at the PSC desks and not at the kiosks.

> **b)    The auxiliary aids and services requirement requires only effective communication, not a guarantee of independence**

Plaintiffs argue that this Court should hold that an auxiliary aid is sufficient only if it is independently accessible and is the specific aid that Plaintiffs want. They claim that a "qualified reader" is insufficient (despite the explicit statutory text including qualified readers as an auxiliary aid) because qualified readers purportedly deny Plaintiffs the privacy and independence afforded to sighted individuals who use the kiosks for check-in. Plaintiffs' position has been consistently rejected because it

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

45

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1  "run[s] afoul of the ADA itself, which specifically permits the services of a 'qualified

2  reader' as an accommodation." *Brown v. Dep't of Pub. Safety & Corr. Servs*., 383 F.

3  Supp. 3d 519, 558 (D. Md. 2019); *Moe's Franchisor*, 2015 WL 8484567, *3;

4  *Dominguez v. Banana Republic, LLC*, 2020 WL 1950496, *11 (S.D.N.Y. Apr. 23,

5  2020). Such auxiliary aids are expressly endorsed by the DOJ as sufficient. 28 C.F.R.

6  Part 36, App'x C.

7          And, while there may be scenarios in which providing effective communication

8  also requires that public accommodations ensure that disabled customers can perform

9  certain functions independently, so as to not expose a third-party to sensitive

10  confidential information, like a banking PIN number, that is not the case here.[10]  For

11  example, because of the obvious privacy concerns inherent in the use of ATMs by

12  blind individuals, ATMs are specifically regulated under Title III. Similar privacy

13  concerns are nowhere to be found in the context of a simple check-in process where

14  one hands over his or her driver's license and insurance card to an employee to be

15  scanned in order to be placed in a queue for service.  None of this information is said

16  out loud. And as Plaintiffs' own kiosk expert conceded, no private medical

17  information is handled during the kiosk check-in process. (D167, Ex.46 at 792.)

18  Moreover, the staff member at the front desk reviews and confirms the prescription

19  information for those who checked in at the kiosk or at the desk.  (D168-69, Ex.38 at

20  662-663.)  Thus, any privacy concern over such health information would still exist

21  even if the kiosk were made independently accessible as Plaintiffs demand.

22          As the *Dominguez* court aptly noted:

23          To be sure, the Department of Justice's regulations require places of
            public accommodation to consider "the privacy and independence of the
24          individual with a disability" when providing auxiliary aids and services.
            29 C.F.R. § 36.303(c)(ii). ATMs for example, must "provide the
25          opportunity for the same degree of privacy of input and output available

26  _____

27  [10] *See* 75 FR 43452, 43458 (2010) ("Individuals with disabilities who engage in
    financial or other transactions should be able to do so independently and not have to
28  provide third parties with private financial information, such as a personal
    identification number (PIN).").

JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> to all individuals," presumably because ATMs require users to input inherently private personal information, like a PIN number, the theft of which could deplete a user of all of their savings. See 36 C.F.R. Pt. 1191, App. D. § 707. No such specific provision of the ADA or its implementing regulations exempts gift cards from the general rule that a business may offer any auxiliary aid or service that ensures effective communication.

2020 WL 1950496, at *11 n. 8. Thus, while there are times when a certain level of independence is necessary to ensure effective communication, checking in to be placed in a queue for service is not such a scenario. It is no wonder then, that Judge Gee found Plaintiffs' ATM analogy to be "not persuasive" in the context of a check-in kiosk. *Quest*, 2021 WL 5989961, *6.

Plaintiffs also dispute that Labcorp's desk check-in staff are "qualified" to be a qualified reader, alleging that Labcorp administers no test to determine whether its employees could serve as "qualified readers" under the ADA. Again, Plaintiffs misconstrue the ADA and its regulations. The regulations define a "qualified reader" as "a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary." 28 C.F.R. § 35.104. Labcorp's PSC employees meet this definition. Indeed, Plaintiffs cite no evidence in the record showing that Labcorp's PSC employees are unable "to read effectively, accurately and impartially" and the fact that Vargas and Harden were able to check-in at the desk with the assistance of Labcorp's employees plainly demonstrates the qualifications of those employees to perform the check-in process. As Judge Gee discussed in *Quest*, the "real issue" in *Quest* was "not whether phlebotomist assistance was adequate under the ADA" (it indisputably is), but that "phlebotomist assistance d[id] not appear to have been readily or reliably available" because the *Quest* plaintiffs "have presented evidence that phlebotomists were not always available." *Quest*, 2021 WL 5989961, *6. That is not the scenario presented here, where Labcorp's PSCs were staffed with employees and/or phlebotomists to serve as qualified readers and the record is undisputed that such assistance was readily available.

As for the need for a reader to use "any necessary specialized vocabulary," the

47

210

DOJ provides guidance as to when such a need would arise and when it would not:

> For example, an individual with a disability who is deaf or hard of hearing may need a qualified interpreter to discuss with hospital personnel a diagnosis, procedures, tests, treatment options, surgery, or prescribed medication (*e.g.,* dosage, side effects, drug interactions, etc.). In comparison, an individual who is deaf or hard of hearing who purchases an item in the hospital gift shop may need only an exchange of written notes to achieve effective communication.

28 C.F.R. § Pt. 36, App. A. Thus, for example, under circumstances in which a deaf patient must decide whether to undergo emergency surgery involving the removal of an organ, understanding the necessity, risks, and procedures surrounding the surgery—"a complicated concept to convey to a person who can hear well"— a "qualified" interpreter would be required who can both understand and explain complicated medical terms. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012). In comparison, in the context of a simple check-in process, no understanding of any specialized medical vocabulary is needed, nor do Plaintiffs provide any evidence otherwise.

### 3.    Labcorp is not required to offer different kiosks for the blind

#### a)    The ADA does not require covered entities to offer different "goods or services" for the disabled

Plaintiffs' argument that, even if Labcorp's PSC employees are qualified readers, Labcorp still violates the ADA by failing to offer special, different kiosks for the legally blind fails on its face. As a preliminary matter, Plaintiffs cite no authority to support their position that a trademark application renders the kiosks "goods or services" within the meaning of the ADA and Labcorp is not aware of any.

In any event, courts recognize that the ADA does not define "goods" or "services." *See Lopez v. Arby's Franchisor*, 2021 WL 878735, *6 (S.D.N.Y. Mar. 8, 2021); *Dominguez*, 2020 WL 1950496, *6. Thus, Courts have turned to the dictionary definitions and applied them in the ADA context: "The most appropriate dictionary definition defines 'goods' as 'something manufactured or produced for sale.'" *Lopez*, 2021 WL 878735, *6. According to this plain meaning of the term

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

211

"goods," the kiosks are clearly *not* goods. They are not manufactured items that
Labcorp "has sold" or "presently sells" to customers in the same manner as it sells
its other products (*i.e.*, its laboratory testing services). Likewise, "services" are
defined in the dictionary as "useful labor that does not produce a tangible
commodity—usually used in plural." Service, Merriam-Webster.com Dictionary,
Merriam-Webster, https://www.merriam-webster.com/ dictionary/service. Again,
the kiosks are clearly *not* services under the ADA as they are not intangible
commodities that Labcorp sells to the general public[11].

Second, and more importantly, the law is clear that, if the check-in kiosks here
constitute "goods" or "services" under the ADA, then Labcorp is ***not*** required to
provide special, accessible kiosks for the blind, as Plaintiffs contend. Indeed, the ADA
regulations are unequivocal: Title III "does not require a public accommodation to
alter its inventory to include accessible or special goods that are designed for, or
facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a). As the DOJ has
succinctly put it: "[t]he purpose of the ADA's public accommodations requirements
is to ensure accessibility to the goods offered by a public accommodation, not to alter
the nature or mix of goods that the public accommodation has typically provided." 28
C.F.R. pt. 36, App'x C.

Case law from around the country is in accord. In *Weyer*, the Ninth Circuit
joined the Third and Sixth Circuits and held that Title III "does not require provision
of different goods or services, just nondiscriminatory enjoyment of those that are
provided." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th
Cir. 2000). As a matter of law then, the ADA does not require Labcorp to offer special,
accessible kiosks for the blind. Labcorp is only required to provide appropriate

---

[11] Tellingly, while the government submitted an amicus brief in *Quest* arguing that
Quest's check-in system was not ADA compliant, even if that were so, the
government chose *not* to take that position here, where the facts are vastly different.

49

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

212

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

auxiliary aids where necessary to ensure effective communication with its legally blind customers. The undisputed record shows that it does just that.

### b) "Full and equal enjoyment" does not mean that the disabled must be able to enjoy every offering to the "same and identical extent" as the non-disabled

Nor is the requirement for "effective communication" through auxiliary aids a requirement that public accommodations ensure that the disabled be able to enjoy every offering to "the same and identical extent as those who are not disabled." *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000). The court observed:

> We acknowledge that it is literally possible, though strained, to construe "full and equal enjoyment" to suggest that the disabled must be able to enjoy every good and service offered to the same and identical extent as those who are not disabled.... But such a reading is plainly unrealistic, and surely unintended, because it makes an unattainable demand.

> The unvarnished and sober truth is that in many, if not most, cases, the disabled simply will not have the capacity or ability to enjoy the goods and services of an establishment "fully" and "equally" compared to the non-disabled. The blind may surely enjoy attending a movie or even a tennis match. But it seems indisputable that the blind will not fully and equally enjoy the "good" or "service" of those places of public accommodation when visual elements of that experience are, by circumstance, denied them.... It is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible.

*Id.* Indeed, it is well established that full and equal enjoyment "does not mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability." 28 C.F.R. app. B § 36.201(a); *Dobard v. San Francisco Bay Area Rapid Transit Dist.*, 1993 WL 372256, *3 (N.D. Cal. Sept. 7, 1993) (quoting same); *Pinnock v. Int'l House of Pancakes Franchisee*, 844 F. Supp. 574, 583 (S.D. Cal. 1993) (discussing legislative history of Title III).

The recent *Wal-Mart* decision is instructive. There, plaintiffs "insist[ed] that an auxiliary aid that does not allow blind customers to check out without assistance 'transforms the nature of Walmart's self-checkout service,'" because "Walmart's use of associate assistance does not allow blind customers 'to take advantage of the convenience, shorter lines, and speed of the self-checkout kiosks as sighted Walmart's

50

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

customers can.'"  2021 WL 4750521, *13. The court rejected that argument, holding that "'[e]qual opportunity' is . . . precisely what Walmart provides by instructing associates to communicate all necessary information for blind customers to complete their transactions." *Id.* at *14. "Plaintiffs goal of absolute independence is not achievable." *Id.* The same rings true here. Labcorp provides equal opportunity by having its PSC employees communicate all necessary information for blind customers to complete their check-in, and having a desk check-in available.

### 4.  Plaintiffs' "separate but equal" argument has no application here

Plaintiffs' "separate but equal" argument is misplaced and demonstrates a fundamental misconception of the Title III requirement governing auxiliary aids. Communication barriers, like the one alleged here, cannot be "removed," exist at every physical location, and must, in every instance, be overcome through auxiliary aids. Hence, covered entities governed by the auxiliary aid requirement may not allow disabled individuals to be segregated "because of the absence of auxiliary aids and services." 42 U.S.C. § 12182.

The ADA does not, and cannot, require auxiliary aids and at the same time require that those services be perfectly identical to those provided to sighted persons. As the Ninth Circuit has held, "[b]y its very definition, an auxiliary aid or service is an additional and *different* service that establishments must offer the disabled." *Harkins Amusement Enters. Inc.*, 603 F.3d at 672 (emphasis added). The focus is thus not on whether the method of communication is different for the visually impaired, as it must necessarily be, but on whether those different aids provide "effective communication." The DOJ Title III TA Manual illustrates the practical application of auxiliary aids as follows:

> S . . . has tickets to a play. When S arrives at the theater, the usher notices that S is an individual who is blind and guides S to her seat. An usher is also available to guide S to her seat following intermission. With the provision of these services, a Brailled ticket is not necessary for effective communication in seating S.

214

1    *Id*. § III-4.3000. Sighted individuals do not need an usher to reach their seats because

2    they can read their ticket and locate their seat unassisted. Nonetheless, as the DOJ

3    recognizes, it is not discrimination or segregation to provide an auxiliary service

4    (ushers) to blind individuals for the very purpose of providing them the access to the

5    communication that they would lack if left unassisted. *Id.* Accordingly, where desk

6    check in is available at all PSCs, Plaintiffs' ADA claims fail as a matter of law.

7    **XI.   PLAINTIFFS PREVAIL ON THEIR REHABILITATION ACT CLAIM**

8        The Rehabilitation Act and the ADA contain similar requirements. *Zukle v.*

9    *Regents of Univ. of Calif.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). Section 504 of

10   the Rehabilitation Act provides that no qualified individual with a disability shall be

11   subjected to disability-based discrimination under any program or activity receiving

12   federal financial assistance. 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(h). Discrimination

13   under Section 504 includes failing to "[a]fford a qualified handicapped person an

14   opportunity to participate in or benefit from the aid, benefit, or service that is not equal

15   to that afforded others," or providing qualified handicapped persons with "an aid,

16   benefit, or service that is not as effective as that provided to others." 45 C.F.R. §

17   84.4(b)(1)(ii)-(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

18       For the reasons explained in Section V.A., *supra*, LabCorp denied Plaintiffs its

19   services solely because of Plaintiffs' disabilities. Finally, LabCorp receives federal

20   financial assistance as LabCorp services patients covered by Medicare and is a

21   recipient of Medicare funding. (P130, Ex. 8 at p. 65; P131, Ex. 8 at p. 65.) Thus,

22   Plaintiffs are entitled to partial summary judgment on their Rehabilitation Act claim.

23   **XII.   PLAINTIFFS PREVAIL ON SECTION 1557 OF THE ACA CLAIM**

24       "A claim under the ACA is enforced through Section 504 of the Rehabilitation

25   Act and is subject to the same standards. 42 U.S.C. § 18116(a)." *Bax v. Doctors Med.*

26   *Ctr. Of Modesto, Inc.*, 393 F. Supp. 3d 1000, 1012 (E.D. Cal. 2019); *Doe v. CVS*

27   *Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) ("Because Does claim

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

52

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

discrimination on the basis of their disability, to state a claim for a Section 1557 violation, they must allege facts adequate to state a claim under Section 504 of the Rehabilitation Act."). As explained in Section V. D., *supra*, Plaintiffs are entitled to partial summary judgment on their ACA claim. Additionally, LabCorp did not give "primary consideration" to the requests of individuals with disabilities as required by 28 C.F.R. §35.160, the implementing regulations of the ACA. When LabCorp chose its kiosk, it did not discuss the determination to choose a kiosk not independently accessible to the blind with any blind people or disability rights group. (P48, Ex. 13 at pp. 185, 188.) LabCorp did not conduct any direct market research with the blind regarding aids and auxiliary services in Project Horizon, nor did LabCorp consult with any actual blind people in offering a separate check-in system as the solution to the accessibility problem. (P49, Ex. 13 at pp. 185-186; P50, Ex. 13 at pp. 185-187.)

## XIII. DEFENDANT'S RESPONSE TO PLAINTIFFS' RA AND ACA CLAIMS AND COUNTER-ARGUMENTS

### A.   Plaintiffs' RA and ACA Claims Must Fail

Plaintiffs concede that their claims under Section 504 of the RA and Section 1557 of the ACA are based on the same factual allegations supporting their ADA claims. (Dkt. No. 40, ¶¶ 74-95.) Thus, because Plaintiffs' ADA claims fail, so must their RA and ACA claims.[12]   Additionally, under the ACA, covered entities must give "primary consideration" to the specific kind of auxiliary aid *requested* by the disabled individual. Based on this requirement, Plaintiffs argue that Labcorp was obligated to foresee, and be prepared for, Plaintiffs' putative need for the whole host of specific auxiliary aids that Plaintiffs identify now, but never requested at the time of the alleged discrimination. That assertion is both legally and factually wanting.

---

[12]The Ninth Circuit applies the same standard to the RA and Title III of the ADA. *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). Likewise, as the ACA incorporates the RA, ACA claims are analyzed together with RA claims. *Bax v. Doctors Med. Ctr. of Modesto*, 393 F. Supp. 3d 1000, 1012 (E.D. Cal. 2019).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

1    The ACA requires that covered entities give primary consideration to the

2    "requests of individuals." 28 C.F.R. § 35.160.[13]   This requirement does not (and

3    cannot) apply unless triggered by an actual request. This common-sense reading is

4    borne out by the DOJ's guidance and relevant case law. The DOJ's guidance clearly

5    contemplates that the choice be "expressed by the individual" who needs an

6    accommodation "because the individual with a disability is most familiar with his or

7    her disability." DOJ Title II TA Manual, § II-7.1100. Similarly, the Ninth Circuit

8    articulated the primary consideration requirement as follows: once a plaintiff

9    "alert[s]" the covered entity as to his need for accommodation, the entity's "duty on

10    receiving a request for accommodation" requires it to "consider the particular

11    individual's need" as part of a fact-specific inquiry into what accommodations are

12    reasonable. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (finding

13    that hearing-impaired plaintiff, who did not use sign language, had repeatedly

14    requested videotext display which required a fact-specific investigation as to whether

15    such display was available).

16    The context and individual-specific analysis that the DOJ guidance and the

17    Ninth Circuit require demonstrates what is obvious: the obligation to give primary

18    consideration applies to a specific individual, only arises after he or she makes a

19    request, and requires consideration of that specific individual's needs and familiarity

20    with various aids. *See Quest*, 2021 WL 5989961, *9 ("[t]he FAC contains no factual

21    allegations that any individual plaintiff or any ACB member ever made a request for

22    a specific accommodation, or that such a request was inappropriately addressed");

23    *Marie v. Ariz. Dep't of Econ. Serv.*, 2020 U.S. Dist. LEXIS 34270, *19 (D. Ariz. Feb.

24    28, 2020) (plaintiff never "requested any accommodation other than a qualified

25    reader"); *Romero v. Curry County Detention Ctr.*, 2002 WL 35649779, at *8 (D.N.M.

26    _____

27    [13]ACA regulations incorporate standards found in ADA Title II regulations governing
state and local governments. 45 C.F.R. § 92.102. The ADA imposes a primary
consideration requirement on Title II entities, but not Title III. *Compare* 28 C.F.R. §

28    35.160 *with* § 36.303; 28 C.F.R. pt. 36, App'x C.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

Sept. 5, 2002) (holding that another "crucial fact [wa]s whether the [plaintiff] made a request for auxiliary aids" since covered "entities are not required to guess at what accommodations they should provide").

In an analogous situation involving educational auxiliary aids, a court in this Circuit rejected the assertion that a covered entity was obligated to investigate auxiliary aids before it knew that a specific individual both had a disability and desired a specific accommodation. *See Breyer v. Pac. Univ.*, 2020 WL 1161434, at *32 (D. Or. Mar. 10, 2020). There, the court rejected the plaintiff's suggestion that defendant had "to unilaterally 'take preemptive steps to investigate' months in advance" of any request. *Id.* As the court noted, the obligation was only "to consult the individual in need of accommodation" once that individual made such a request. *Id.*

Covered entities simply are not obligated to manufacture the requests themselves through some limitless obligation to try to anticipate issues and then give those "hypothetical requests" primary consideration. *Tucker v. Tennessee*, 539 F.3d 526, 538 (6th Cir. 2008) (primary consideration "does not require that every potential auxiliary device be on standby so that whatever request a particular individual makes can be accommodated"), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015). To be clear, LabCorp does not argue that it may discriminate in the absence of a request and it does not do so. Rather, it simply takes the common sense position that it cannot give primary consideration to a request that was never made. Summary judgment is warranted as to the RA and ACA claims.

## XIV.  PLAINTIFF VARGAS IS ENTITLED TO FULL SUMMARY JUDGMENT ON HIS UNRUH CIVIL RIGHTS CLAIM

Plaintiff Vargas' claim under the Unruh Civil Rights Act is predicated upon a violation of the ADA. "A violation of the ADA is, by statutory definition, a violation of both the Unruh Act and the DPA [Disabled Persons Act]. Cal. Civ. Code §§ 51(f), 54.1(d)." *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012). For the reasons explained in Section V. A., *supra*, Plaintiff Vargas is entitled to full summary

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

judgment on his Unruh Act claims. Moreover, because LabCorp knew the kiosk service was not accessible to legally blind users, that there was a cost-efficient accessible alternative, and nevertheless chose to implement the inaccessible kiosk across all PSCs, Plaintiff Vargas has demonstrated intentional discrimination under the Unruh Act.

## XV. LABCORP IS ENTITLED TO SUMMARY JUDGMENT ON VARGAS' UNRUH ACT CLAIM

Plaintiff Vargas's Unruh Act claim is premised on an underlying ADA violation. Because Vargas cannot succeed on his ADA claim he cannot succeed on an Unruh claim based on the ADA.[14] Vargas's Unruh Act claim fails for the additional reason that lacks standing under the Unruh Act because he was not personally aggrieved and alleges no actual injury. "A person suffers discrimination under the Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using its services[.]" *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (Cal. 2019). "California courts require plaintiffs to show actual denial of access to claim damages" under the Unruh Act. *Strojnik v. Xenia Hotels & Resorts, Inc.*, 2020 WL 3060761, *4 (N.D. Cal. June 9, 2020). Vargas was not denied access to Labcorp's facility; thus his Unruh claim fails.

## XVI. PLAINTIFFS' CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment, or in the alternative, partial summary judgment and should deny LabCorp's motion for summary judgment.

## XVII. LABCORP'S CONCLUSION

Plaintiffs' motion should be denied and Labcorp's motion should be granted.

---

[14]In the Complaint, Vargas also asserted an Unruh claim that is not predicated on an ADA violation, Compl. ¶ 64, but he now appears to be dropping such claim. To the extent Vargas is still asserting an independent Unruh claim, he must, but cannot, prove intentional discrimination. *Greater Los Angeles Agency on Deafness v. Cable News Network*, 742 F.3d 414, 426 (9th Cir. 2014).

56

1

2   Dated: May 26, 2022                  Respectfully submitted,

3                                        By:

4                                            */s/ Jonathan D. Miller*
                                         Jonathan D. Miller (SBN 220848)
5                                        jonathan@nshmlaw.com
                                         Alison M. Bernal (SBN 264629)
6                                        alison@nshmlaw.com
                                         NYE, STIRLING, HALE & MILLER, LLP
7                                        33 West Mission Street, Suite 201
                                         Santa Barbara, CA 93101
8                                        Telephone: (805) 963-2345
                                         Facsimile: (805) 284-9590

9                                        Benjamin J. Sweet
                                         (*admitted pro hac vice*)
10                                       ben@nshmlaw.com
                                         NYE, STIRLING, HALE & MILLER, LLP
11                                       1145 Bower Hill Road, Suite 104
                                         Pittsburgh, PA 15243
12                                       Telephone: (412) 857-5350

13                                       Matthew K. Handley
                                         (*admitted pro hac vice*)
14                                       mhandley@hfajustice.com
                                         HANDLEY FARAH &
15                                       ANDERSON PLLC
                                         200 Massachusetts Ave, NW 7th Floor
16                                       Washington, DC 20001
                                         Telephone: (202) 559-2411
17                                       Facsimile: (844) 300-1952

18                                       Attorneys for Plaintiffs, LUKE DAVIS,
                                         JULIAN VARGAS, AMERICAN COUNCIL
19                                       OF THE BLIND, and the Proposed Class

20

21   DATED:  May 26, 2022                KELLEY DRYE & WARREN LLP

22

23                                       By:  */s/  Becca Wahlquist*
                                         Robert I. Steiner (admitted *pro hac vice*)
24                                       Becca Wahlquist (State Bar No. 215948)
                                         Glenn T. Graham (State Bar No. 338995)
25                                       Nathan T. Jamieson (State Bar No. 333304)

26                                       Attorneys for Defendant Laboratory
                                         Corporation of America Holdings

27

28

                                         57

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

## SIGNATURE ATTESTATION

1

2         I hereby attest that all signatories listed above, on whose behalf this

3     stipulation is submitted, concur in the filing's content, and have authorized the

4     filing.

5

6     Dated: May 26, 2022          By: */s/ Jonathan D. Miller*
                                       Jonathan D. Miller (SBN 220848)
7
                                       Attorneys for Plaintiffs, LUKE DAVIS,
8                                      JULIAN VARGAS, AMERICAN COUNCIL
                                       OF THE BLIND, and the Proposed Class
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

JOINT BRIEF RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

221

1 | Robert I. Steiner (admitted *pro hac vice*)
2 | rsteiner@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
3 | 3 World Trade Center
175 Greenwich Street
4 | New York, NY 10007
5 | Telephone:   (212) 808-7800
6 | Facsimile:     (212) 808-7897

7 | Becca J. Wahlquist (State Bar No. 215948)
8 | bwahlquist@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
9 | 1800 Century Park East, Suite 600
10 | Los Angeles, CA 90067
Telephone:   (310) 712-6100
11 | Facsimile:     (310) 712-6199

12 | *Attorneys for Defendant*
13 | *Laboratory Corporation of America Holdings*

14

15 | **UNITED STATES DISTRICT COURT**
16 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17 | LUKE DAVIS, et al. | CASE NO. 2:20-CV-00893-FMO-KS

18 |                         Plaintiffs, | **DEFENDANT LABORATORY**
19 |        v. | **CORPORATION OF AMERICA**
**HOLDINGS' NOTICE OF**
20 | LABORATORY CORPORATION OF | **RELATED AUTHORITY**
AMERICA HOLDINGS, et al.
21 |
22 |                         Defendants. | Hon.  Fernando Olguin
23 |

24

25

26

27

28

CASE NO. 2:20-CV-00893-FMO-KS
NOTICE OF RELATED AUTHORITY

222

Defendant Laboratory Corporation of America Holdings ("Labcorp") hereby alerts this Court to a recent decision from *Vargas v. Quest Diagnostics*, 2:19-cv-08108-DMG-MRW (C.D. Cal. 2021) ("the *Quest Diagnostics* case"), another case brought by Plaintiff Julian Vargas in the Central District of California that has been pending before Judge Dolly M. Gee.

Attached as Exhibit A hereto is Judge Gee's December 2, 2021 ruling on Vargas's class certification motion. First, Judge Gee found that because each member of a California subclass asserting Unruh Act claims would need to litigate her individual Unruh Act claims, individual issues would predominate and the class could not be certified under the federal rules. Second, considering the very different facts before her in regards to Quest's check-in processes (*see e.g.* Dkt. 90 (9/30/21 Opposition to Plaintiff's Request for Judicial Notice, detailing differences)), Judge Gee certified a nationwide class of persons to pursue injunctive claims.

Moreover, Labcorp notes that it has become aware that Judge Gee (considering the different facts relevant to Quest's check in processes) denied summary judgment in mid October in the *Quest Diagnostics* case. That order is attached hereto as Exhibit B.

Labcorp would welcome the opportunity to provide supplemental briefing to discuss Judge Gee's recent class certification and summary judgment rulings.

DATED: December 10, 2021          KELLEY DRYE & WARREN LLP

By: _/s/ Becca J. Wahlquist_____
Becca J. Wahlquist (State Bar No. 215948)
Robert I. Steiner (admitted *pro hac vice*)

*Attorneys for Defendant*
*Laboratory Corporation of America*
*Holdings*

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 1 of 15 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

|  KANE TIEN  |  NOT REPORTED  |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:  IN CHAMBERS—ORDER RE PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION [107]**

This matter is before the Court on Plaintiff Julian Vargas's Motion for Class Certification (the "Motion"). [Doc. # 107.] The Motion is fully briefed. [*See* Doc. ## 133, 147.] The Court held a hearing on the Motion on October 29, 2021. For the reasons set forth below, Vargas's Motion is **GRANTED in part** and **DENIED in part**.

## I.
## BACKGROUND

The Court described the factual and procedural background of this case at length in its Order denying Defendant Quest Diagnostics' Motion for Summary Judgment. [*See* Doc. # 144.] For purposes of the instant Motion for Class Certification, the relevant facts are as follows.

Quest provides diagnostic services at patient service centers around the country. Beginning in the spring of 2016, Quest began to install touchscreen electronic kiosks at its patient service centers to enable patients to check in for their appointments. Quest concedes that these kiosks, as originally rolled out, were inaccessible to legally blind patients. Instead, Quest asserts that—consistent with Quest's preexisting practice of using paper sign-in sheets—patients who could not or did not wish to check in using a kiosk could check in with a Quest phlebotomist. Quest phlebotomists, however, are primarily responsible for collecting patient specimens, not staffing the waiting room, so phlebotomists may only be available when they emerge from the back of a patient service center, which may or may not happen frequently enough to allow phlebotomists to attend to newly-arrived patients. Beginning in 2020, Quest began to roll out a change to its kiosks that allows visually-impaired patients to swipe the touchscreen using three fingers, which checks the patient in and alerts a phlebotomist that the patient has arrived.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 2 of 15 |

      Plaintiffs Julian Vargas, Anne West,[1] and the American Council for the Blind filed the operative First Amended Complaint ("FAC") in this Court on May 15, 2020. [Doc. # 41.] The FAC asserts claims for violations of (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. section 12101 *et seq.*, (2) California's Unruh Civil Rights Act, Cal. Civ. Code section 51 *et seq.*, (3) California's Disabled Persons Act, Cal. Civ. Code sections 54-54.3, and (4) section 504 of the Rehabilitation Act, 29 U.S.C. section 794. On October 15, 2021, the Court granted summary judgment in favor of Quest as to Plaintiffs' claim under the Rehabilitation Act and as to Plaintiffs' claims under the Unruh Act and the Disabled Persons Act to the extent Plaintiffs asserted claims under those statutes separate from their ADA claims. [*See* Doc. # 144.]

      Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Vargas seeks to certify the following class:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018, through December 31, 2019 (the "Class Period"), and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

Not. of Mot. for Class Certification ("Not.") at 2. [Doc. # 107.] Vargas also seeks to certify the following California sub-class:

> All legally blind individuals who visited a Quest patient service center in California during the Class Period and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

*Id*. Vargas asserts his ADA claim on behalf of the proposed nationwide class, and the Unruh Act and Disabled Persons Act claims only on behalf of the proposed California sub-class. Vargas also seeks appointment as class representative for both the nationwide class and the California sub-class, and for appointment of the law firms Nye, Stirling, Hale and Miller, LLP and Handley, Farah & Anderson, PLLC as class counsel. Not. at 2.

---

[1] On May 27, 2021, West voluntarily dismissed all her claims with prejudice. [Doc. # 78.]

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>KT</u> |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 3 of 15 |
|---|---|---|---|

## II.
## REQUEST FOR JUDICIAL NOTICE

Quest requests that the Court take judicial notice of two documents published online. [Doc. # 135.] First, Quest seeks judicial notice of a report by the law firm Seyfarth Shaw counting claims brought under Title III of the ADA in various courts across different years. Second, Quest seeks judicial notice of a list of definitions published by the American Federation of the Blind. Because the Court does not rely on the documents for which Quest requests judicial notice, the Court **DENIES** Quest's request as moot.

## III.
## LEGAL STANDARD

Federal Rule of Civil Procedure 23 provides the standard for certification of a class action. Vargas must meet all of the requirements under Rule 23(a) and must also satisfy at least one of Rule 23(b)'s requirements.

Courts refer to the Rule 23(a) requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation." *See Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). The Ninth Circuit does not recognize an "ascertainability" requirement under Rule 23. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) ("[Defendant] cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not.").

If the four prerequisites of Rule 23(a) are satisfied, the Court also must find that Vargas can "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Vargas seeks class certification pursuant to Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard, and it requires the party seeking class certification to "affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc.*

---

Exhibit A Page 4

227

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 4 of 15 |

*v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted). Thus, a court must conduct a "rigorous" class certification analysis. *Id*. at 350-51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). Frequently, the analysis "will entail some overlap with the merits of the plaintiff's underlying claim," and "sometimes it may be necessary for the court to probe behind the pleadings . . . ." *Id*. at 351 (internal quotation omitted). The Supreme Court cautions, however, that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

**IV.**
**DISCUSSION**

**A.     Class Definition**

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" in places of public accommodation. 42 U.S.C. § 12182(a). Discrimination includes a public accommodation's failure to take steps necessary to "ensure" that disabled individuals are not "excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id*. at § 12182(b)(2)(A)(iii). Regulations promulgated by the Department of Justice further provide that a public accommodation must provide appropriate auxiliary aids and services necessary "to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

Title III "prohibits anything less than the full and equal enjoyment of places of public accommodation by individuals with disabilities." *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101 (9th Cir. 2021). "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

Vargas draws his proposed class narrowly: all legally blind individuals who visited a Quest patient service center and were denied full and equal access *because of Quest's failure to make its e-check-in self-service kiosks independently accessible*. Vargas's framing assumes the ADA requires that Quest's kiosks be "independently accessible." Quest, on the other hand, argues that during the class period it ensured effective communication with its blind patients

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

Exhibit A Page 5

228

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | Date | December 2, 2021 |
|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 5 of 15 |

because phlebotomists were available to assist blind patients, who Quest admits could not use the kiosks independently.

In its MSJ Order, the Court did not reach the question of whether the kiosks must be independently accessible, because Plaintiffs offered evidence that established a triable issue of fact as to whether phlebotomists were in fact available to assist blind patients. *See* MSJ Ord. at 13. ADA regulations are clear that a public accommodation may choose which auxiliary aids to provide in order to ensure effective communication, so long as the method chosen "results in effective communication." *See* 28 C.F.R. § 36.303(c)(1)(ii).

Vargas has defined the proposed class based on his theory of Quest's liability. This appears to be a so-called "fail-safe" class. *See Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017) ("*Melgar II*") ("A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits.") (citing William B. Rubenstein, 1 Newberg on Class Actions § 3:6 (5th ed.)).

In *Melgar II*, the Ninth Circuit "note[d], though [. . .did] not hold, that our circuit's caselaw appears to disapprove of the premise that a class can be fail-safe." 681 F. App'x at 607; *see also Vizcaino v. U.S. District Court for Western Dist. Cf Washington*, 173 F.3d 713, 722 (9th Cir. 1999). District courts in this circuit have certified similar classes in the disability litigation context. *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018) (certifying three classes of "[. . .] persons with mobility disabilities who use wheelchairs, scooters, or other mobility aids who will attempt to purchase accessible seating for a public event [. . .] and who will be denied equal access to [a stadium's] facilities, services, accessible seating, parking, amenities, and privileges, including ticketing" and collecting cases). And Vargas's narrow class definition may ultimately benefit Quest: Vargas's class is so narrow that Plaintiffs must prevail on a specific theory of Quest's liability in order for the class to prevail against Quest. If Plaintiffs' legal theory fails or they prevail on a different theory, Quest will be potentially liable only to the individual plaintiff.

**B.    Rule 23(a) Requirements**

**1.    Numerosity**

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs*

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 6 of 15 |
|---|---|---|---|

*Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting *Adver. Specialty Nat'l Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir. 1956)). The numerosity requirement imposes no absolute limitations; rather, it "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980). Thus, while the Supreme Court has noted that putative classes of 15 are too small to meet the numerosity requirement, *id*. at 330 & n.14, district courts in this Circuit have found that classes with as few as 39 members met the numerosity requirement, *see Patrick v. Marshall*, 460 F. Supp. 23, 26 (N.D. Cal. 1978); *see also Jordan v. L.A. County*, 669 F.2d 1311, 1320 (9th Cir. 1982) (noting, in *dicta*, that the court "would be inclined to find the numerosity requirement . . . satisfied solely on the basis of [39] ascertained class members"), *vacated on other grounds*, 459 U.S. 810 (1982).

Vargas offers a declaration estimating the number of legally blind patients who may have checked into a Quest Patient Service Center in a given year, based on the average number of annual check-ins, the average number of visits per year by any given patient, and the percentage of legally blind individuals in the population as a whole. *See* Green Decl. at ¶¶ 21-23 [Doc. # 107-5, Ex. 33]. Vargas's expert, Jed Greene, estimates that between 6,152 and 8,472 legally blind individuals must have visited a Quest Patient Service Center in California, and between 31,863 and 45,500 nationwide. *Id*. at Table 3. Quest calls Green's estimate a "guesstimate," but even if Green's estimate is off by a large margin, there are clearly enough legally blind visitors to Quest patient service centers in any given year to render it impracticable to join them all in this case.

Vargas does not seek to certify a class of all legally blind patients who visited Quest patient service centers, however. Vargas seeks to certify a class of all legally blind patients who visited Quest patient service centers and were denied equal access to Quest's services because of the absence of effective communication through independently accessible self-service kiosks. Nevertheless, based on complaints received by Quest and by the American Council for the Blind, there appear to be a sufficiently sizeable number of visually-impaired individuals across Quest's network who identified access issues.[2]

Vargas counts up the feedback received by the American Council for the Blind (29) and Quest itself (45) regarding visually impaired individuals' use of the kiosks. Adding himself, he concludes that the proposed class consists of at least 75 class members. Mot. at 19-20. Quest argues that the feedback items it received were not all complaints regarding this particular issue, that some of the feedback indicates patients were promptly helped by phlebotomists, and that the

---

[2] The parties do not address how many of the visually-impaired individuals who identified access issues visited patient service centers in California. Because the Court declines to certify a California sub-class, however, the Court need not address whether there are enough patients who identified access issues in California.

Exhibit A Page 7

230

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | Date | December 2, 2021 |

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 7 of 15 |

feedback Vargas offers as evidence does not take into account the Three-Finger Swipe, which Quest argues moots Vargas's claims.[3]  Opp. at 10.

Quest is correct that not all feedback regarding the kiosks clearly reflects the unavailability of phlebotomist assistance for patients who could not use the kiosks.  At least eight of the complaints received by Quest describe exactly this problem, however.  [*See* Doc. # 94-3.]  Likewise, at least eight ACB members described the same problem.  [*See* Doc. # 107-5, Ex. 24.]  Moreover, a number of other Quest feedback items indicate that visually-impaired patients asked other patients for help or otherwise were unable to use the kiosks in a way that clearly satisfies the ADA.  Because not every patient will lodge a complaint (and, as Vargas points out, Quest's system for lodging complaints may also be inaccessible), it is highly unlikely that these complaints reflect every individual who encountered these problems.  *Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529, 545 (C.D. Cal. 2011).  Vargas has therefore demonstrated that there are a sufficient number of potential class members during the class period to satisfy the numerosity requirement.

**2.    Commonality**

The commonality requirement is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Dukes*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  In determining that a common question of law exists, it is insufficient to find that all putative class members have suffered a violation of the same provision of law.  *Id.*  Rather, the putative class members' claims "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Vargas has defined his proposed class in terms of the injury they have suffered.  It is therefore virtually a foregone conclusion that the class members will share common questions or law or fact.  Vargas identifies the following common questions of law or fact:  (1) whether

---

[3] Quest also objects that the customer feedback items are hearsay.  Opp. at 11.  The Ninth Circuit does not require that evidence submitted in connection with a class certification motion be admissible.  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019) ("Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification.").  Since the Court's "consideration should not be limited to only admissible evidence" at the class certification stage, the Court need not decide whether any hearsay objections apply to the customer feedback.  Quest's objections are **OVERRULED** to the extent they seek to exclude evidence solely under evidentiary rules governing admissibility.

Exhibit A Page 8

231

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 8 of 15 |
|---|---|---|---|

Quest's ECSS kiosks are independently accessible to legally blind individuals; (2) whether Quest has implemented the inaccessible ECSS kiosks across its national network of 2,152 PSCs; (3) whether use of the kiosk is a service Quest offers its customers; (4) whether Quest offers a qualified aid or auxiliary service to allow legally blind individuals to access the ECSS kiosk; and (5) whether Quest has remedied the inaccessible ECSS kiosk across its system. Mot. at 21.

There is no real question that the kiosks, as implemented during the class period, were not independently accessible to blind customers. Likewise, there is no real dispute that Quest had not implemented its kiosks across its network at the beginning of the class period. And the Court has already determined that the use of the kiosks is part of the service Quest offers its customers. MSJ Ord. at 10. Posed slightly differently, however, Vargas's final two questions are common questions central to the validity of each proposed class-member's claim.[4] Whether Quest during the class period offered an auxiliary aid or service that allows blind patients to access the services provided through the kiosks, and whether the three-finger swipe has remedied any access violations created by the kiosks, are questions common to the class members that remain outstanding.

Vargas has satisfied the commonality requirement.

3.      **Typicality**

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* Typicality is a "permissive standard" and requires only that the representative's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

---

[4] Quest notes that the *answer* to these questions may, in some cases, require individualized treatment. The Court will address this concern *infra*. Quest also points out that the "primary consideration" requirement imposed on Quest by the Rehabilitation Act and the Affordable Care Act is ill-suited to class consideration. The Court shares Quest's concern, *see* MSJ Ord. at 18 n.11, but previously granted Quest's MSJ as to this claim, so need not address the issue here.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 9 of 15 |
|---|---|---|---|

There is no real dispute that, to the extent there are common questions shared by the class members, Vargas's experience with Quest's kiosks raises the same questions. Vargas, like other putative class members who filed complaints with Quest and with the American Council for the Blind, encountered an inaccessible kiosk and was not offered an auxiliary aid or service—even assistance from a Quest phlebotomist—to allow him equal access to Quest's services. Vargas has satisfied the typicality requirement.

### 4. Adequacy of Representation

The Rule 23(a)(4) adequacy determination turns on the answers to two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Similarly, Rule 23(g) requires courts to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P 23(g)(1)(A).

The Court is not aware of, and Quest does not raise, any conflicts between Vargas's counsel and the proposed class. Likewise, Quest does not dispute that Vargas's counsel will prosecute the action vigorously on behalf of the class.

Quest argues that Vargas's decision to seek damages under California law on behalf of a California sub-class in addition to injunctive relief on behalf of a nationwide class creates a conflict between Vargas and the class. According to Quest, a decision to seek *only* damages or *only* injunctive relief may render a class representative's representation inadequate under certain circumstances. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985-86 (9th Cir. 2011) (noting that plaintiffs who lack standing to seek injunctive relief cannot adequately protect the interests of class members whose primary goal is to seek injunctive relief). Although the Court declines to certify a damages sub-class, Vargas may continue to seek both injunctive relief on behalf of the class and damages on his own behalf. Vargas and his counsel satisfy the adequacy requirement.

### C. Rule 23(b)(2) Requirements

Classes may be certified pursuant to Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 10 of 15 |
|---|---|---|---|

or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Class certification under Rule 23(b)(2) is possible only when declaratory or injunctive relief is sought. Rule 23(b)(2) certification is available for monetary relief, if at all, only when such relief is incidental to the injunctive or declaratory relief. *Dukes*, 564 at 360. Civil rights actions against parties charged with unlawful, class-based discrimination are "prime examples" of Rule 23(b)(2) cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *see also Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (explaining that Rule 23(b)(2) "was adopted in order to permit the prosecution of civil rights actions").

In determining whether certification is appropriate under Rule 23(b)(2), a court must "look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id.* (citing *Walters*, 145 F.3d at 1047). Claims for individualized relief, in contrast, do not satisfy Rule 23(b)(2). This subsection "applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360-61.

This is a civil rights action against a party charged with unlawful, class-based discrimination based on the use of a specific auxiliary aid or service, and is a prime candidate for 23(b)(2) certification. The only real questions are whether the three-finger swipe has resolved Plaintiffs' claims such that the ADA claim for injunctive relief will become moot and whether the kiosks must be independently accessible. The Court found in its MSJ Order that Plaintiffs' ADA claim is not moot because disputed issues of fact exist. MSJ Ord. at 20-21. Vargas's proposed nationwide class is therefore suitable for 23(b)(2) certification.

**D.      Rule 23(b)(3) Requirements**

To satisfy Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because the Court has found the nationwide class is suitable for 23(b)(2) certification, this section addresses only Vargas's proposed California sub-class.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 11 of 15 |
|---|---|---|---|

### 1.    Predominance

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal citations and quotations omitted). This requires "careful scrutiny" of "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (internal citations and quotations omitted). If "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

Vargas argues that the questions common to class members predominate over individual issues because each class member encountered the inaccessible kiosk in exactly the same way: it was not independently accessible, and therefore class members were all harmed by it in the same way. Quest correctly points out that this argument hangs on Plaintiffs' argument that the ADA requires independently accessible kiosks. Quest, on the other hand, argues that because phlebotomist assistance is an acceptable auxiliary aid, and because some class members would not want to use independently accessible kiosks even if they were available, individualized issues predominate over common ones.

The Court observed at summary judgment that the kiosks were designed in part to allow phlebotomists to be unavailable. *See* MSJ Ord. at 13. The Court also found at summary judgment that there remained a question whether Plaintiffs' evidence established inaccessibility across Quest's entire network. *See id.* at 13 n.9. Finally, the Court found that disputed factual issues remain as to whether the three-finger swipe had remedied any ADA violations created by the kiosks. *Id.* at 20-21. Vargas has defined the proposed class narrowly, and the class claim will turn on whether Vargas can establish that the ADA requires independently accessible kiosks. With this framing in mind, the questions of whether Quest provided an auxiliary aid or service that ensured effective communication with blind individuals during the class period, and whether the three-finger swipe has resolved that issue, predominate over individualized issues as to effective communication.

Quest also argues that, because the Unruh Act requires that a plaintiff prove he personally encountered a violation and experienced "difficulty, discomfort, or embarrassment because of the violation," *see* Cal. Civ. Code § 55.56(b)-(c), individualized issues predominate over common ones with respect to that class such that Vargas cannot maintain a class action under the Unruh Act.

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | ***Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.*** | Page | 12 of 15 |
|---|---|---|---|

This section of the Unruh Act applies specifically to construction-related accessibility claims. *See* § 55.56(a); *Mundy v. Pro-Thro Enterprises*, 192 Cal. App. 4th Supp. 1, 5 (2011) ("The provisions in sections 55.51 through 55.57 apply only to a 'construction-related accessibility claim' [. . . .]"); *see also Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 677-78 (2009) (noting section 55.56 was enacted to protect businesses from abusive access litigation specifically with respect to construction-related access barriers). At the hearing on this matter, Quest argued that both federal and California courts have nevertheless articulated the same standard without reference to section 55.56.

Under California law, "[i]n general, a person suffers discrimination under the [Unruh] Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." *White v. Square, Inc.*, 7 Cal. 5th 1019, 1023 (2019). A plaintiff will lack standing under the Act if he lacked intent to use a business's services. *See Thurston v. Omni Hotels Mgmt. Corp.*, 284 Cal. Rptr. 3d 341, 348 (Cal. App. 2021) (affirming requirement that an Unruh Act plaintiff have a "bona fide" intent to use defendant's services); *Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1224 (2009) (finding standing to seek damages under the Disabled Persons Act requires a showing that a disabled plaintiff "actually presented himself or herself to a business or public place with the intent of purchasing its products or utilizing its services in the manner in which those products and/or services are typically offered to the public and was actually denied equal access on a particular occasion"); *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1177 (9th Cir. 2010) (affirming denial of statutory damages under the Disabled Persons Act for visits to Chipotle during which plaintiff was not actually seeking to purchase food or to have the "Chipotle experience").

Because Vargas proposes to identify members of the California sub-class using Quest's own records of patients who actually used Quest's services, there is no real question that the putative class members had a bona fide intent to use Quest's services. The issue of whether a putative class member actually presented himself or herself at a particular Quest location and encountered a barrier to access, however, poses a more difficult problem.

Quest cites three cases in which district courts in California have declined to certify Unruh Act classes because individualized issues predominated over common ones. The three cases cited by Quest have certain notable similarities: all three involved disabled plaintiffs who alleged that counter heights and other physical barriers to access in fast food establishments violated the ADA and the Unruh Act. For example, in *Vondersaar v. Starbucks Corp.*, the court denied certification of nationwide and California classes of disabled wheelchair and scooter users who had been adversely affected by high handoff counters in Starbucks stores constructed during

---

**CIVIL MINUTES—GENERAL**

Exhibit A Page 13

236

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|

| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | Page | 13 of 15 |
|---|---|---|---|

a particular period. No. CV 12-05027-DDP (AJWx), 2015 WL 629437, at *1, 4 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018). In *Moeller v. Taco Bell Corp.*, the court decertified an Unruh Act class because individualized issues, such as which Taco Bell store a class member visited and what barriers he or she encountered, would predominate over common ones. No. CV 02-5849-PJH, 2012 WL 3070863, at *6 (N.D. Cal. July 26, 2012). In *Antoninetti*, the court denied certification of an Unruh Act class because the question of whether each putative class member actually encountered a barrier to access and was denied equal access on a particular occasion would require a fact-intensive inquiry regarding counter heights and whether a class member sat high enough in his or her wheelchair to actually see over the counter on a given visit to a particular Chipotle store. No. CV 06-2671-BTM (WMc), 2012 WL 3762440, at *6 (S.D. Cal. Aug. 28, 20212).

District courts in California have, however, certified Unruh Act classes even applying the pleading standard imposed by section 55.56. In *Nevarez v. Forty Niners Football Company, LLC*, 326 F.R.D. 562 (N.D. Cal. 2018), the court certified a damages class of individuals with mobility disabilities who "ha[d] purchased, attempted to purchase, or for whom third parties [had] purchased accessible seating" at a football stadium and "who ha[d] been denied equal access" to the stadium's facilities and services. *Id.* at 586. In its predominance analysis, the court distinguished the cases cited by Quest above. The court emphasized that although the football stadium was large, it was still only one building. *Id.* The court also found "perhaps most important" the fact that the defendants kept records of class members' purchase of accessible seating, including the purchasers' names and contact information. *Id.*

This case sits somewhere between *Nevarez* and the fast food cases cited by Quest. Unlike in the fast food cases, the record here is uncontroverted that Quest's kiosks were identical—and similarly inaccessible—across Quest's network of patient service centers. There are therefore fewer individualized issues regarding what barriers to access a putative class member encountered. Moreover, as the Court has noted elsewhere, individualized issues regarding whether a phlebotomist offered the class member assistance do not predominate because of the narrowness of the proposed class definition, and more importantly because the Court has already found that the kiosks were designed in part to allow phlebotomists to be unavailable.

The critical facts that allowed for class certification in *Nevarez*, however, are not present here. Unlike in *Nevarez*, this case does not involve one big building; it involves hundreds of small ones. *See* Green Decl., Ex. L (showing 77 patient service centers in Los Angeles County alone) [Doc. # 107-5]. Issues such as whether a patient service center had a fully operative kiosk on the date of a putative class member's visit will therefore require individualized inquiries.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk KT

Exhibit A Page 14

237

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 19-8108-DMG (MRWx)** | Date | December 2, 2021 |
|---|---|---|---|

| Title | **Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.** | Page | 14 of 15 |

Most importantly, although Quest maintains records of the patients who visit its patient service centers, Quest does not keep records regarding its patients' visual impairments. A patient's use of the three-finger swipe to check in for an appointment might serve as a useful proxy for determining whether a patient was visually impaired, but the three-finger swipe was not implemented until after the end of the class period and some patients may have had access to an auxiliary aid or service that ensured effective communication. Moreover, the kiosks were not rolled out uniformly across Quest's network throughout the class period.

Under Vargas's theory of the case each putative class member must show only (1) that he or she is legally blind and (2) that he or she visited a patient service center *with* a kiosk and *without* a staffed desk (3) during the class period. Under these circumstances, however, demonstrating these basic factual elements will still essentially require each putative class member to litigate her own individual Unruh Act case. Vargas's expert estimates that, at a minimum, nearly three million patients attempted to use a Quest kiosk each year of the class period. Green Decl. at ¶ 22; *id.* at Ex. E. Vargas's expert likewise estimates that fewer than .5% of these patients are putative class members. Without at least a proxy for determining class membership to narrow the scope of the individualized inquiry, the Court comes to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class.

**2. Superiority**

The factors the Court considers in determining superiority of the class action device are:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see Zinser v. Accu.fix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). When "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser v. Accu.fix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).

The prime issue under the superiority analysis is whether each class member should be required to litigate his or her own case. There is no indication that individual class members (other than Vargas) have filed individual claims seeking to adjudicate their own cases.

---

**CIVIL MINUTES—GENERAL**                Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 19-8108-DMG (MRWx) | | Date | December 2, 2021 |
|---|---|---|---|---|
| Title | *Julian Vargas, et al. v. Quest Diagnostics Clinical Labs., Inc., et al.* | | Page | 15 of 15 |

Concentrating litigation in this forum is not particularly desirable, nor is it particularly undesirable—so this factor is neutral. As discussed *supra*, however, it is clear that given the circumstances, each class member would essentially need to litigate her own case even if the Unruh Act sub-class were certified. These individualized issues render a California sub-class unmanageable.

Moreover, the Unruh Act provides for $4,000 in minimum statutory damages for each violation. Although $4,000 is not such a large bounty that it is likely to drive all 6,000 potential California sub-class members to court, the statutory damages plus attorneys' fees available for prevailing plaintiffs renders individual actions a viable alternative to a class action. *See Antoninetti*, 2012 WL 3762440, at *7 (noting the Unruh Act's minimum statutory damages plus attorneys' fees provides individuals with a "significant monetary incentive to file individual lawsuits").

Under these circumstances, a class action is not superior to other available methods for adjudicating the Unruh Act claim. Vargas's motion to certify a damages sub-class is therefore **DENIED**.

**V.**
**CONCLUSION**

In light of the foregoing, Vargas's Motion for Class Certification is **GRANTED in part** and **DENIED in part**. The Court certifies the following class:

All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through December 31, 2019 (the "Class Period"), and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

The Court certifies Vargas as class representative, and appoints the law firms Nye, Stirling, Hale and Miller, LLP and Handley, Farah & Anderson, PLLC as co-class counsel.

**IT IS SO ORDERED**.

---

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN VARGAS and AMERICAN COUNCIL FOR THE BLIND, individual and on behalf of themselves and all others similar situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED; and DOES 1-10, inclusive,<br><br>               Defendants. | Case No. CV 19-8108-DMG (MRWx)<br><br>**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [95]** |

This matter is before the Court on the Motion for Summary Judgement ("MSJ") of Defendants Quest Diagnostics Clinal Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated (collectively, "Quest"). [Doc. # 95.] The motion is fully briefed. [Doc. ## 111, 122.] The Court held a hearing on this matter on October 8, 2021. For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Quest's MSJ.

-1-

# I.

## FACTUAL BACKGROUND

Quest provides diagnostic services whereby it collects and tests blood and urine samples in accordance with doctors' orders. SUF A1.[1] Quest receives these samples from doctors' offices and hospitals, but also operates a network of more than 2,000 patient service centers ("PSCs") throughout the United States. SUF A2. This case is about how patients—specifically, legally blind patients—check in to receive services at PSCs.

Beginning in spring of 2016, Quest began to install touchscreen tablets at its PSCs to replace paper sign-in sheets. SUF A9, A3. The tablets were enclosed in plastic casings and mounted on posts, which Quest calls "kiosks." Quest intended to allow patients to check in by entering their name, birth date, and phone number at a kiosk. When a patient checked in, the kiosk communicated to the phlebotomist's screen in the back of the PSC. SUF B34. Once patients were checked in, they would be placed in a queue to be seen by a Quest phlebotomist according to whether they had an appointment or when they checked in. SUF B33. The queue, along with estimated wait times, would appear on a screen (a "Quest TV" monitor) in the waiting room. SUF A9. Quest says patients who did not wish to check in using the kiosk could also check in with a phlebotomist. Plaintiffs strongly contest this. *See* SUF A9. Beginning in approximately 2017, the kiosks also included a "help button." SUF B28; Walsh Decl. at PA0638:1-PA0640:3 [Doc. # 110-4]. This was not a physical button; rather, it was a touchscreen button that was only useable for patients who could read the text on the screen. SUF B28.

Quest says it always expected to make changes to the kiosks in response to user feedback. SUF A15; Yarrison Decl., ¶¶ 12-13 [Doc. # 98-1]. Quest did receive feedback from 45 patients who identified as blind, some of which identified issues with using the

---

[1] The Court cites to Defendants' Response to Plaintiffs' Statement of Genuine Disputes of Material Facts and Additional Material Facts ("SUF"), filed in support of Defendants' Reply. [Doc. # 120-3.]

To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objections are OVERRULED as moot.

-2-

242

1    kiosks to check in. SUF A17. Quest also engaged in discussions about the kiosks with the
2    American Council for the Blind ("ACB") after ACB sent Quest a letter in December 2018.
3    SUF A18-20.

4        Quest has made changes to the kiosks since they were first implemented. Most
5    important here, after Quest's discussions with ACB and the filing of this lawsuit, Quest
6    developed an "enhancement" to the kiosks that was specifically designed to make them
7    independently accessible for blind patients.[2] SUF A28. The "enhancement" is known as
8    the Three-Finger Swipe. As designed, an audio message played on Quest TV monitors
9    instructs visually impaired patients to use three fingers to swipe in any direction on the
10    kiosk's screen. SUF A29. The message is designed to be played every seven to ten
11    minutes. SUF B46. Quest points out that once patients have used the Three-Finger Swipe,
12    they will not need the Quest TV instruction on their next visit. SUF A37. The three-finger
13    swipe checks the patient in and generates a generic patient ID number that will be called
14    when it is the patient's turn to be seen. SUF A29. The kiosk plays an audio message to
15    inform the patient of the generic ID number. The swipe also notifies Quest phlebotomists
16    at the PSC that a visually impaired individual has checked in. Quest also says updated
17    training for phlebotomists was part of the Three-Finger Swipe enhancement, although
18    Plaintiffs dispute this. *See* SUF A29. The Three-Finger Swipe was rolled out across PSCs
19    in August 2020, the Quest TV message in January 2021, and the new phlebotomist training
20    (the adequacy of which Plaintiffs dispute) in March 2021. SUF A30. Quest says
21    phlebotomist assistance remains available, although Plaintiffs dispute this. SUF A32.

22        Quest has made other changes to the kiosks since their initial rollout. At some
23    kiosks, Quest has begun to provide the ability to scan identity and insurance cards. SUF
24    B36-37. During the COVID-19 pandemic, Quest has also implemented a feature that
25    allows patients checking in using the kiosks to input a phone number and receive a text

---

26
27
28

[2] Quest presents evidence that Quest developed the Three-Finger Swipe after soliciting feedback from three different groups, including a focus group, of blind individuals or individuals who work with accommodating the blind. SUF A28; Carr Decl. at ¶ 4 [Doc. # 98-1]. Plaintiffs dispute that Quest developed the Three-Finger Swipe in response to feedback. *See* SUF A28.

1    message when it is their turn to be seen.  This "wait where you want" feature allows patients
2    to wait somewhere other than the waiting area.  SUF B38.

3        The Three-Finger Swipe allows blind patients to check in, but does not allow patients
4    to interact with the kiosks in order to access all the kiosks' features.  The "wait where you
5    want" feature is not available using the Three-Finger Swipe.  SUF B38, B51.  The Three-
6    Finger Swipe also does not allow patients with appointments to check in as such—rather,
7    patients using the Three-Finger Swipe process check in as walk-ins, and wait their turn as
8    walk-ins.  SUF B47.  Blind patients using the Three-Finger Swipe also cannot check where
9    they are in the queue to be seen, because this information is available only on Quest TV
10   monitors.  SUF B51.

11       Quest does not dispute that these features are not available using the Three-Finger
12   Swipe, but says "wait where you want" is available to blind patients through other
13   technology, and all the services available through the kiosks are accessible for blind
14   patients with assistance from a phlebotomist.  SUF B38, B51.

15                                      **II.**
16                        **PROCEDURAL BACKGROUND**

17       Plaintiffs Julian Vargas, Anne West,[3] and the American Council for the Blind
18   ("ACB") filed the operative First Amended Complaint in this Court on May 15, 2020
19   ("FAC").  [Doc. # 41.]  Plaintiffs' FAC asserts claims for violations of (1) the Americans
20   with Disabilities Act ("ADA"), 42 U.S.C. section 12101 *et seq.*, (2) California's Unruh
21   Civil Rights Act, Cal. Civ. Code section 51 *et seq.*, (3) California's Disabled Persons Act,
22   Cal. Civ. Code sections 54-54.3, and (4) section 504 of the Rehabilitation Act, 29 U.S.C.
23   section 794.  Plaintiffs bring their claims individually and on behalf of a proposed
24   nationwide class (as to claims (1) and (4)) and a proposed California sub-class (as to claims

25
26
27

---

28       [3] On May 27, 2021, West voluntarily dismissed all her claims with prejudice.  [Doc. # 78.]

-4-

244

1  (2) and (3)).[4]  Plaintiffs seek declaratory and injunctive relief in addition to statutory

2  damages (on behalf of Vargas and the proposed California sub-class) for the Unruh Act

3  and Disabled Persons Act claims.  Quest filed its Answer on June 5, 2020.  [Doc. # 47.]

4       Quest filed the instant MSJ on September 3, 2021.  [Doc. # 95.] Plaintiffs filed their

5  opposition on September 17, 2021.  [Doc. # 111.]  Quest filed its reply on September 24,

6  2021.  [Doc. # 122.][5]  The Department of Justice also filed a Statement of Interest of the

7  United States of America, articulating the United States' position regarding the application

8  of the ADA to "the use of kiosks in healthcare settings."  [Doc. # 118.]

9       Quest moves for summary judgment or, in the alternative, for summary adjudication

10  of one or more of 15 issues.  Quest seeks summary judgment against Vargas and ACB on

11  all four of Plaintiffs' claims, as well as the following issues:

12       (1) whether the obligation to provide "effective communication" under Title III of

13  the ADA permits a place of public accommodation to provide the auxiliary aid or service

14  of its choosing provided that the aid or service provides "effective communication" within

15  the meaning of the ADA and its regulations;

16       (2) whether the provision of phlebotomist assistance to check in at Quest patient

17  service centers, combined with the provision of the Three-Finger Swipe enhancement,

18  provides "effective communication" within the meaning of 28 C.F.R. § 36.303;

19       (3) whether section 504 of the Rehabilitation Act extends the "primary

20  consideration" obligation found in 28 C.F.R. § 35.160(b)(2) to recipients of federal

21  financial assistance;

22       (4) if the Rehabilitation Act does impose the "primary consideration" requirement

23  on recipients of federal financial assistance, whether such requirements apply to Quest's

24

25     [4] By the parties' stipulation, the Court will hold a hearing on Plaintiffs' Motion for Class

26  Certification on October 29, 2021, after the hearing on the instant MSJ.  [Doc. ## 76, 77.]  Briefing on
that motion is ongoing.  [*See* Doc. ## 107, 133.]

27     [5] Quest filed its Reply after midnight the night of September 24, so it appears from the docket that

28  Quest filed its Reply on September 25.

Exhibit B Page 21

245

development of a single enterprise-wide check-in technology for its millions of patients at all its patient service centers;

(5) if the Rehabilitation Act does impose the "primary consideration" requirement on recipients of federal financial assistance, whether it applies to the initial version of Quest's kiosk, given that there is no dispute that Quest did not receive (and could not have received) a request for an auxiliary aid or service related to the kiosks before the kiosks were even deployed;

(6) if the Rehabilitation Act does impose the "primary consideration" requirement on recipients of federal financial assistance, whether Quest satisfied the requirement in its development of the Three-Finger Swipe enhancement based on feedback provided by ACB and by groups of blind individuals and their advocates;

(7) whether Plaintiffs can satisfy the intentional discrimination requirement to prove a violation of section 51(b) of the California Civil Code;

(8) whether Plaintiffs' claims under the Unruh Act and Disabled Persons Act fail to the extent they rely on Plaintiffs' ADA claim;

(9) whether Vargas lacks standing to seek injunctive relief;

(10) whether ACB lacks standing to seek injunctive relief; and

(11) whether Plaintiffs' claims for injunctive relief under each of their four claims for relief should be dismissed with prejudice as moot.

## III.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the

Exhibit B Page 22

246

1    evidence is such that a reasonable jury could return a verdict for the nonmoving party."
2    *Liberty Lobby*, 477 U.S. at 248.

3        The moving party bears the initial burden of establishing the absence of a genuine
4    dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the
5    moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go
6    beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to
7    interrogatories, and admissions on file,' designate 'specific facts showing that there is a
8    genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)). "In judging
9    evidence at the summary judgment stage, the court does not make credibility
10    determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509
11    F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable
12    to the nonmoving party." *Id.*

13 <div align="center">**IV.**</div>
14 <div align="center">**DISCUSSION**</div>
15 **A.**      **ADA Claim**

16        Title III of the ADA prohibits discrimination on the basis of disability "in the full
17    and equal enjoyment of the goods, services, facilities, privileges, advantages, or
18    accommodations" in places of public accommodation. 42 U.S.C. § 12182(a).
19    Discrimination includes a public accommodation's failure to take steps necessary to
20    "ensure" that disabled individuals are not "excluded, denied services, segregated or
21    otherwise treated differently than other individuals because of the absence of auxiliary aids
22    and services." *Id.* at § 12182(b)(2)(A)(iii).[6] Regulations promulgated by the Department
23    of Justice further provide that a public accommodation must provide appropriate auxiliary
24    aids and services necessary "to ensure effective communication with individuals with
25    disabilities."

26
27      [6] A public accommodation need not provide auxiliary aids and services if it can show that doing
   so "would fundamentally alter the nature of the good, service, facility, privilege, advantage, or
28    accommodation being offered or would result in an undue burden." *Id.* Quest does not argue that this
   exemption applies here.

<div align="center">-7-</div>

<div align="center">247</div>

Title III "prohibits anything less than the full and equal enjoyment of places of public accommodation by individuals with disabilities." *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101 (9th Cir. 2021). "Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

Plaintiffs allege that Quest, by denying Plaintiffs access to the kiosks' check-in functions, failed and continues to fail to provide Plaintiffs with benefits or services equal to those Quest provides to others and fails to ensure effective communication with Plaintiffs. In their MSJ, Quest argues that under the ADA it need not provide Plaintiffs independent access to the kiosks; rather, it need only provide equal access to Quest's *diagnostic* services. For this reason, Quest argues, it need only provide an alternative means of effective communication, and that the availability of phlebotomist assistance satisfies that requirement.

**1.    Whether The Kiosks Are "Special Goods"**

Title III does not require a public accommodation to "alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities." 28 C.F.R. § 36.307(a). In *Weyer v. Twentieth Century Fox Film Corporation*, the Ninth Circuit reasoned this principle did not require an employer to offer an insurance policy providing the same duration of long-term disability coverage for individuals with mental disabilities as for individuals with physical disabilities:

> The ordinary meaning of [Title III] is that whatever goods or services [a] place provides, it cannot discriminate on the basis of disability in providing enjoyment of those goods and services. This language does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided. Thus, a bookstore cannot discriminate against disabled people in granting access, but need not assure that the books are available in Braille as well as print.

-8-

248

1   198 F.3d 1104, 1115 (9th Cir. 2000); *accord McNeil v. Time Insurance Company*, 205 F.3d
2   179 (5th Cir. 2000). Quest argues this principle excuses Quest from making its kiosks
3   independently accessible to blind individuals. *Weyer* and the regulation, however, do not
4   control here.

5     In *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*—to which Quest
6   cites repeatedly—the Ninth Circuit reversed a district court opinion finding a movie theater
7   was not required to offer closed captioning to a disabled moviegoer. 603 F.3d 666, 674
8   (9th Cir. 2010). The court in *Goddard* reasoned that to find, based on *Weyer*, that a movie
9   theater that simply offered disabled and non-disabled patrons "equal access" to movies
10  with sound would effectively eliminate the duty to provide auxiliary aids and services,
11  because "[b]y its very definition, an auxiliary aid or service is an additional and different
12  service that establishments must offer the disabled." *Id.* at 672.

13    In its Statement of Interest, DOJ calls the "special goods" regulation an "inventory
14  exception." This understanding allows *Weyer* to be harmonized with *Goddard*. *Weyer*
15  concerned the provision of insurance policies, and reasoned that the plaintiff's employer
16  "simply gave her the same opportunity that it gave all the rest of its employees—buy into
17  the group policy with the limitation at the cheaper, group price or buy her own individual
18  insurance coverage without the limitation at whatever the market price may be." *Id.* at
19  1116. The *Weyer* court, despite referring to "goods and services," treated the insurance
20  policy in question as a *product* for which special alternatives need not be offered. This
21  way of thinking about the similarities between books and insurance policies helps explain
22  why the kiosks do not fit into this exception.

23    Though not articulated quite this way, Quest's argument seems to be that the kiosks
24  are "goods," and that Quest need not provide special goods (i.e., accessible kiosks) to
25  accommodate disabled patients, but only "auxiliary aids and services" (i.e., phlebotomist
26  assistance) to allow patients to access the goods (kiosks) it already provides. As Quest
27  points out, though, Quest does not manufacture or sell kiosks. The principle that public
28  accommodations need not provide "special goods" designed to accommodate individuals

<div align="center">-9-</div>

with disabilities does not apply to Quest's use of kiosks to allow patients to check in to receive diagnostic services. Rather, the kiosks are a part of the service that Quest provides, and it must provide auxiliary aids and services to render them accessible to blind patients.

### 2. The "Effective Communication" Requirement

Quest provides healthcare services, which include testing blood and urine samples in a lab, but also includes collecting those samples in PSCs around the country.

The primary issue here is whether Quest has provided auxiliary aids and services that ensure "effective communication" with disabled patients as required by the ADA. ADA regulations provide that a public accommodation may choose which auxiliary aids to provide in order to ensure effective communication, so long as the method chosen "results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). In weighing what aids or services to provide, "[a] public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed." *Id.* "Effectiveness" will depend on the circumstances:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. . . . In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.* The effective communication requirement is fact intensive. For this reason, "an effective-communication claim often presents questions of fact precluding summary judgment." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 836 (11th Cir. 2017) (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012)).

Quest appears to concede that its kiosks, as originally developed, did not provide "effective communication" with blind individuals. Quest argues, however, that phlebotomist assistance was available to provide effective communication, and that this

-10-

1    satisfied the requirements of the ADA.[7]

2          At the outset, it is important to establish exactly what "communication" the kiosks

3    enabled for sighted patients, since (as the regulations make clear), the effectiveness of the

4    auxiliary aids provided will turn on the nature of the communication. The

5    "communication" effected by the kiosk was not, as Quest would have it, the provision of a

6    patient's name, birth date, and phone number. Rather, it was a patient's communication

7    to a phlebotomist located behind a closed door that the patient had arrived and was ready

8    to be seen. For a patient with an appointment, this included checking in for the

9    appointment; for a patient without an appointment, this included adding her name to the

10   waitlist to be seen at the appropriate time.[8]

11         Quest analogizes to restaurant menus to argue that phlebotomist assistance, if

12   available, was and is an adequate auxiliary aid under the ADA. Quest cites to several out

13   of circuit cases, as well as a DOJ guidance document on "Effective Communication,"

14   which support the idea that restaurants may provide "qualified readers" instead of

15   independently accessible menus for visually-impaired customers. *See Sullivan v. Doctor's*

16   *Assocs. LLC*, No. 1:19-CV-719-GHW, 2020 WL 2319295, at *4 (S.D.N.Y. May 8, 2020)

17   (finding on a motion to dismiss that under Title III "the ADA does not require, as Plaintiff

18   argues, that Subway restaurants use self-ordering kiosks"); *West v. Moe's Franchisor, LLC*,

19   No. 15CV2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) (finding on a motion to

20   dismiss that "effective assistance from [fast-food restaurant] employees acting as 'qualified

21   readers'" when operating touchscreen soda fountains satisfies the ADA); *see also* U.S.

22   Department of Justice, Civil Rights Division, "ADA Requirements: Effective

23   Communication," available at https://www.ada.gov/effective-comm.htm ("In a lunchroom

---

[7] Quest also argues that the Three-Finger Swipe enhancement moots Plaintiffs' claims. The Court addresses the Three-Finger Swipe in the context of Quest's mootness claims below.

[8] Later iterations of the kiosks include more complex, interactive communications, such as enabling a patient to wait outside during the COVID-19 pandemic and scan insurance or ID cards. The Court will address these more complex communications along with the Three-Finger Swipe when it discusses mootness in a later section.

-11-

1   or restaurant, reading the menu to a person who is blind allows that person to decide what

2   dish to order."); *cf. Boyer v. Five Guys Enterprises, LLC*, No. 15-CV-1417-L-JLB, 2018

3   WL 4680007, at *7 (S.D. Cal. Sept. 28, 2018) (finding failure to offer employee assistance

4   to operate a touchscreen soda fountain violated the ADA because it did not ensure effective

5   communication).  Plaintiffs, on the other hand, compare Quest's kiosks to ATMs, which

6   must be independently accessible. *See* 2010 Americans with Disabilities Act Standards for

7   Accessible Design, § 707, available at http://www.ada.gov/regs2010/

8   2010ADAStandards/2010ADAstandards.htm#pgfId–1006537.

9       Plaintiffs' analogy is not persuasive because the ADA Standards for Accessible

10  Design specify that the requirements that apply to ATMs do not apply to other "interactive

11  transaction machines." *Id*. To the extent Quest's restaurant analogy is persuasive, it still

12  requires that employees be available to read the visually-impaired customer the menu. *See*

13  *Boyer*, 2018 WL 4680007, at *7.

14      Controlling Ninth Circuit authority also supports rejection of Quest's restaurant

15  menu analogy.  In *Robles v. Domino's Pizza, LLC*, the Ninth Circuit held that the ADA's

16  mandate to provide auxiliary aids and services to make visual materials available to

17  individuals who are blind applied to the website and app for Domino's Pizza.  913 F.3d

18  898, 904-06 (9th Cir. 2019).  Despite the fact that phone and in-person ordering were still

19  available, the court reasoned that the website and app were "two of the primary (and heavily

20  advertised) means of ordering Domino's products," and that their alleged inaccessibility

21  impeded access to the goods and services of a place of public accommodation.  *Id*. at 905.

22      Regardless, the real issue here is not whether phlebotomist assistance was adequate

23  under the ADA.  The major problem with Quest's argument is that using the original

24  iteration of the kiosks, phlebotomist assistance does not appear to have been readily or

25  reliably available.  Plaintiffs have presented evidence that phlebotomists were not always

26  available.  Quest argues that isolated instances of phlebotomist unavailability do not

27  indicate programmatic unavailability, and that the Court should therefore find that

28

-12-

Plaintiffs' evidence does not create a material factual dispute.[9]  The Court need not rely on Plaintiffs' evidence to determine whether phlebotomists were always available, however, because phlebotomist unavailability appears to have been part of Quest's plan.  Quest's waiting rooms are generally unattended; the kiosk communicates to phlebotomists "in the back" that a patient has arrived, and the phlebotomist comes out of "the back" to invite patients into a draw room.  *See* Walsh Dep. at PA0663:9-20 [Doc. # 106-5]; *see also* SUF B34.  Phlebotomists come out periodically to invite patients into a draw room, and a patient who could not use the kiosk could speak to a phlebotomist then, but Quest's system was *designed* to make phlebotomists available only sometimes.

Patients may have sometimes had longer or shorter waits—and Quest challenges whether the limited duration of Plaintiffs' waits give Plaintiffs standing at all—but at least using the initial version of the kiosks, Plaintiffs have established a triable issue as to whether phlebotomist assistance was available as a means of effective communication.

Quest fails to show that there is no material issue of fact as to Plaintiffs' *prima facie* case that the original iteration of the kiosks violated the ADA.  Quest may be able to show that providing independently accessible kiosks would be unduly burdensome, but it does not make that showing here.  The Court thus **DENIES** Quest's MSJ as to Plaintiffs' ADA claim with regard to the original iteration of the kiosks.

**B.  State Law Claims**

Vargas is the only plaintiff who complains under the Unruh Act and California's Disabled Persons Act.

---

[9] Quest cites throughout its papers to *Kirola v. City and County of San Francisco* for the proposition that "anecdotal testimony about barriers to access" does not "establish inaccessibility at a programmatic level."  860 F.3d 1164, 1183 (9th Cir. 2017).  *Kirola*, however, is a Title II case, and as discussed below, the ADA imposes different standards on public entities under Title II and places of public accommodation under Title III.  "Program access" is a Title II concept, not a Title III concept.  Nonetheless, because this is Quest's MSJ, not Plaintiffs', the Court need not decide whether Plaintiffs' evidence establishes inaccessibility across Quest's network, only that Plaintiffs' evidence, when viewed in their favor, establishes a triable issue of fact.

-13-

Exhibit B Page 29

253

**1.   Unruh Act Claim**

A plaintiff may assert a violation of the Unruh Act in two ways:  either by establishing a direct violation of the Unruh Act, or by establishing a violation of the ADA. *See* Cal. Civ. Code §§ 51(b), (f).  To establish a direct violation of the Unruh Act (independent of a claim under the ADA), a plaintiff must "plead and prove intentional discrimination in public accommodations in violation of the terms of the Act." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (quoting *Munson v. Del Taco*, 46 Cal. 4th 661, 671 (2009)).  There is no need to prove intentional discrimination, however, if plaintiffs have successfully established a violation of the ADA.  *Munson*, 46 Cal. 4th at 678.

As discussed above, Plaintiffs' ADA claim survives, and therefore Vargas's Unruh Act claim survives.  For this reason, the Court **DENIES** Quest's motion for summary judgment as to Vargas's Unruh Act claim.

Vargas alleges in the FAC, however, that Quest's kiosks constitute intentional discrimination in direct violation of the Unruh Act.  Vargas appears to have abandoned this argument in his opposition to Quest's MSJ.  Thus, the Court **GRANTS** Quest's motion for summary adjudication as to whether Vargas can show intentional discrimination.

**2.   Disabled Persons Act Claim**

Like the Unruh Act, California's Disabled Persons Act ("DPA") incorporates the standards of the ADA.  Cal. Civ. Code § 54.1(a)(3); *see also Cohen v. City of Culver City*, 754 F.3d 690, 701 (9th Cir. 2014) ("A violation of the ADA constitutes a violation of the California DPA.").  As discussed above, Plaintiffs' ADA claim survives, so Vargas's DPA claim survives.

Quest argues that, because Vargas made no arguments in support of his DPA claim in his opposition, the Court should grant summary judgment as to Vargas's DPA claim. This Court will not grant summary judgment as to Vargas's valid DPA claim simply for failure to mention it in his opposition if its survival relies on the viability of the ADA claim.

The FAC asserts Quest violated the DPA by denying Vargas access to the kiosks

-14-

254

and "also" violated the DPA by violating the ADA. *See* FAC at ¶¶ 82-83. To the extent Vargas alleges a claim under the DPA *separate* from his ADA claim, he appears to have abandoned it. Because Vargas's DPA claim under section 54.1(a)(3) survives, however, the Court **DENIES** Quest's MSJ as to Vargas's DPA claim. The MSJ as to the DPA claim is **GRANTED** to the extent the FAC asserted a violation separate from the ADA claim.

**D.    Rehabilitation Act Claim**

Section 504 of the Rehabilitation Act provides that an "otherwise qualified" person with a disability may not, "solely by reason of his or her disability," "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A "program or activity" includes a private organization "which is principally engaged in the business of providing . . . health care," any part of which is extended federal financial assistance. *Id.* at § 794(b)(3)(A)(ii).

To establish a violation of the Rehabilitation Act, a plaintiff must show that (1) he is a "qualified individual with a disability," (2) he was "either excluded from participation in or denied the benefits of" the "services, programs, or activities" of an entity, "or was otherwise discriminated against by the [. . .] entity," (3) the entity that denied him the services received federal financial assistance, and (4) "such exclusion, denial of benefits, or discrimination was by reason of his disability." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737-38 (9th Cir. 2021).

Claims under section 504 of the Rehabilitation Act are generally coextensive with ADA Title II claims. *See Payan*, 11 F.4th at 737 ("[T]here is no significant difference in the analysis of rights and obligations created by" Title II and the Rehabilitation Act.) (citing *K.M. ex rel. Bright v. Tustin Unified School Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013)). Congress used section 504 "as a model when drafting Title II." *K.M.*, 725 F.3d at 1098. Title II governs the obligations of public entities not to discriminate on the basis of disability, whereas the Rehabilitation Act governs the obligations of entities receiving federal funds, whether public or not.

-15-

Title II and Title III impose different requirements. In some ways, Title II is stricter than Title III; in some ways, more lenient. Relevant here, Title II imposes a different obligation to take into account the wishes of disabled individuals in selecting what auxiliary aid or service to provide in order to ensure effective communication. When it comes to providing a particular type of auxiliary aid in order to effectuate "effective communication," the ADA imposes less stringent obligations on places of public accommodation than it does on public entities. The regulations promulgated pursuant to Title III (the regulations relevant to places of public accommodation) provide that "[a] public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but *the ultimate decision as to what measures to take rests with the public accommodation*, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii) (emphasis added). In contrast, the Title II regulations provide (with respect to public entities) that "[i]n determining what types of auxiliary aids and services are necessary, *a public entity shall give primary consideration to the requests of individuals with disabilities*." 28 C.F.R. § 35.160(b)(2) (emphasis added). In promulgating these regulations in 1991, DOJ reasoned that "Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability." 28 C.F.R. § Pt. 36, App. C.

To the extent the Court can discern Plaintiffs' theory of how Quest violates the Rehabilitation Act, it is that Quest has failed to give primary consideration to Plaintiffs' requests for specific accommodations. Quest does not contest that the Rehabilitation Act applies to it. But as Quest says, the Rehabilitation Act does not contain a primary consideration requirement.

To understand why Plaintiffs believe Quest is under an obligation to provide primary consideration to the requests of individuals with disabilities, the Court must explain the relationship between the Rehabilitation Act, the ADA, and the Affordable Care Act ("ACA"). Section 1557 of the ACA incorporates several civil rights statutes, including the

-16-

256

1  Rehabilitation Act, and provides:

2      [A]n individual shall not, on the ground prohibited under . . . section 794 of

3      Title 29 [the Rehabilitation Act], be excluded from participation in, be denied

4      the benefits of, or be subjected to discrimination under, any health program or

5      activity, any part of which is receiving Federal financial assistance, including

6      credits, subsidies, or contracts of insurance . . . The enforcement mechanisms

7      provided for and available under [the Rehabilitation Act] shall apply for

8      purposes of violations of this subsection.

9  42 U.S.C. § 18116(a). In other words, section 1557 of the ACA "incorporates the anti-

10 discrimination provisions of" the Rehabilitation Act. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d

11 1204, 1208-09 (9th Cir. 2020), *cert. granted in part*, 141 S. Ct. 2882 (2021). The ACA

12 also creates a private right of action that is co-extensive with a claim under the

13 Rehabilitation Act. *Id.* at 1210 ("[T]o state a claim for a Section 1557 violation, [plaintiffs]

14 must allege facts adequate to state a claim under Section 504 of the Rehabilitation Act.").

15     The regulations promulgated pursuant to the ACA borrow Title II's "primary

16 consideration" requirement and apply it to public accommodations that are subject to the

17 ACA. The regulations, which apply to "[a]ny health program or activity, any part of which

18 is receiving Federal financial assistance (including credits, subsidies, or contracts of

19 insurance) provided by the Department [of Health and Human Services]," 45 C.F.R. §

20 92.3(a)(1), provide that:

21      Any entity operating or administering a program or activity under this part

22      shall take appropriate steps to ensure that communications with individuals

23      with disabilities are as effective as communications with others in such

24      programs or activities, *in accordance with the standards found at 28 CFR*

25      *35.160 through 35.164.* Where the regulatory provisions referenced in this

26      section use the term 'public entity,' the term 'entity' shall apply in its place."

27 45 C.F.R. § 92.102(a) (emphasis added). The standards extended to health programs and

28 activities include the primary consideration requirement, which is found at 28 C.F.R. §

-17-

257

1   35.160(b)(2).  *See also Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 (2d Cir. 2021)

2   ("[T]he ACA extends "primary consideration" to individuals seeking services at Title III

3   public accommodations.").

4   Quest does not contest that it is subject to the Rehabilitation Act, so it would appear

5   that these regulations—which extend new obligations under that act—apply to Quest.  As

6   Quest points out, however, Plaintiffs do not bring a claim under the ACA, which would be

7   the appropriate procedural vehicle for Plaintiffs' claims.  *See, e.g., Doe*, 982 F.3d at 1208.

8   If Plaintiffs' FAC alleged facts that added up to a claim under the ACA, Plaintiffs

9   could still assert that claim, even if they called it a claim under the Rehabilitation Act.  *See*

10  *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff

11  to set forth in his complaint claims for relief, not causes of action, statutes or legal

12  theories.").[10]  Plaintiffs' FAC did not put Quest on notice, however, that Plaintiffs alleged

13  a failure to provide primary consideration for Plaintiffs' claims.  The FAC contains no

14  factual allegations that any individual plaintiff or any ACB member ever made a request

15  for a specific accommodation, or that such a request was inappropriately addressed by

16  Quest employees.  *See* FAC at ¶¶ 27-33.[11]  Thus, Quest did not have notice of Plaintiffs'

17  claim, under the Rehabilitation Act or the ACA.  "[W]here a plaintiff sets forth [one basis

18  for his claim] in his pleadings and does not move to amend his complaint until summary

19

20  [10] Plaintiffs point out that in *Gray v. Golden Gate Nat. Recreational Area*, the court ordered

21  plaintiffs to amend their complaint after class certification to allege with greater specificity the particular
    policies and procedures at issue in their claims, which were not identified in the complaint and were only

22  identified in a report prepared after the litigation was commenced. 866 F. Supp. 2d 1129, 1141 (N.D. Cal.
    2011).  In *Gray*, however, the court found that the plaintiffs' complaint made clear that the defendants'

23  policies and procedures in general were at issue, even though the particular policies and procedures were
    not identified until later.  *Id.* at 1139.  That is not the case here:  Plaintiffs' FAC does not contain

24  allegations regarding any individual's request for a specific accommodation.  The FAC did not put Quest
    on notice of Plaintiffs' theory.

25

26  [11] Plaintiffs' opposition papers seem to suggest that ACB believes Quest should have given
    primary consideration to *ACB*'s request for a PSC-wide specific accommodation.  Plaintiffs do not point

27  to any case law in which primary consideration has been given (or denied) to the requests of anyone other
    than an individual.  Indeed, the idea of primary consideration appears to be focused on the needs and

28  desires of *individuals* with disabilities.  Regardless, this theory is likewise not apparent from the FAC.

-18-

258

1   judgment following the close of discovery, the plaintiff is barred from proceeding on

2   [another] theory." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).

3        Any request for amendment of the FAC at this time to assert the ACA claim is

4   untimely as the deadline for amendment of the pleadings expired on April 10, 2020. [Doc.

5   # 27-1.] Since the deadline to amend pleadings has expired, the Court must consider

6   Plaintiffs' request to amend under Federal Rule of Civil Procedure 16(b)'s good cause

7   standard. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992). The

8   Rule 16(b) analysis focuses on the diligence of the party requesting leave to amend.

9   *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) ("The pretrial

10   schedule may be modified if it cannot reasonably be met despite the diligence of the party

11   seeking the extension.") (internal quotations omitted); *Coleman*, 232 F.3d at 1294. Here,

12   Plaintiffs cannot make a showing of due diligence because, presumably before the FAC

13   was filed, Plaintiffs possessed the facts relating to their "primary consideration" theory and

14   yet failed to assert it in their complaint or to timely seek amendment to assert it. If the

15   moving party was not diligent, the inquiry ends. *Johnson*, 975 F.2d at 609.

16        For this reason, the Court **GRANTS** Quest's MSJ as to Plaintiffs' Rehabilitation Act

17   claim and **DENIES** Plaintiffs' request to amend the pleadings to assert an ACA claim.

18   **E.**   **Jurisdictional Issues**

19      **1.**   **Standing**

20        Establishing constitutional standing is a threshold requirement to bringing suit in

21   federal court. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 (1983). To demonstrate

22   standing, plaintiffs must show that: (1) they have suffered an injury in fact; (2) there is a

23   causal connection between the injury and the defendant's conduct; and (3) the court could

24   likely redress the injury through a favorable decision. *D'Lil v. Best Western Encina Lodge*

25   *& Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504

26   U.S. 555, 560 (1992)). The Supreme Court has instructed courts to take "a broad view of

27   constitutional standing in civil rights cases, especially where, as under the ADA, private

28   enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran*

-19-

1  *v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life*
2  *Ins. Co.*, 409 U.S. 205, 209 (1972)).

3       Quest argues in its motion that Plaintiffs' (relatively) short periods spent waiting for
4  a phlebotomist to assist them with their use of the kiosks do not constitute a cognizable
5  injury in fact.[12]  Quest cites to several cases in which waits of several minutes did not
6  support standing under the ADA.  In *Skaff v. Meridien N. Am. Beverly Hills, LLC*, the Ninth
7  Circuit found a plaintiff did not allege an injury in fact to support standing when a hotel
8  mistakenly assigned a disabled guest to a room with a bathtub rather than a roll-in shower,
9  but moved the plaintiff to another room in approximately an hour.  506 F.3d 832, 838 (9th
10 Cir. 2007).  In *O'Connor v. Scottsdale Healthcare Corp.*, the court found a plaintiff lacked
11 standing where a hospital security guard delayed plaintiff's access to a hospital by about
12 40 minutes because she had her service dog with her.  871 F. Supp. 2d 900 (D. Ariz. 2012),
13 *adhered to on reconsideration*, No. CV11-2264-PHX-JAT, 2012 WL 2106365 (D. Ariz.
14 June 11, 2012), *and aff'd*, 582 F. App'x 695 (9th Cir. 2014).  *Accord Frankeberger v.*
15 *Starwood Hotels & Resorts Worldwide, Inc.*, No. C09-1827RSL, 2010 WL 2217871, at *4
16 (W.D. Wash. June 1, 2010) (finding "a wait of less than sixteen minutes for assistance was
17 neither unreasonable nor reflective of discrimination" where no discriminatory policy or
18 practice caused the delay).

19      The short wait required by visually-impaired individuals using the Three-Finger
20 Swipe would generally not amount to a cognizable injury.  As discussed below, however,
21 because the Court finds a triable issue as to whether the Three-Finger Swipe has in fact
22 been fully implemented across Quest's network, Plaintiffs have standing to pursue their
23 remaining claims.

24     **2.**    **Mootness**

25      Quest argues that the implementation of the Three-Finger Swipe moots Plaintiffs'

26

27     [12] Quest also argues that, because Plaintiffs did not respond to Quest's arguments regarding
28 standing in its opposition papers, Plaintiffs have waived their standing to sue.  Because the Court finds it
does have jurisdiction to hear this case, it does not find that Plaintiffs' standing to sue has been waived.

<center>-20-</center>

1  claims, because the kiosks are now independently accessible by blind patients. The Three-
2  Finger Swipe, if effective, may very well address Plaintiffs' claims, but Plaintiffs have
3  presented evidence showing that a triable issue of fact remains as to whether the Three-
4  Finger Swipe has been implemented across Quest's network such that it would moot
5  Plaintiffs' claims. *See* Plaintiffs' Appendix of Evidence, Ex. 31 (Derry Decl., Ex. B) [Doc.
6  # 113-3].[13]  The Court therefore finds that Plaintiffs' claims are not moot.

## V.
## CONCLUSION

9  For the reasons stated herein, the Court:

10  1.  **DENIES** Quest's MSJ as to Plaintiffs' ADA claim;

11  2.  **DENIES** Quest's MSJ as to Vargas's Unruh Act claim to the extent it
12      relies on the ADA claim, but **GRANTS** it to the extent Vargas purports to
13      assert a claim of intentional discrimination;

14  3.  **DENIES** Quest's MSJ as to Vargas's Disabled Persons Act claim to the
15      extent it relies on the ADA claim, but **GRANTS** it to the extent Vargas
16      purports to assert a separate claim;

17  4.  **GRANTS** Quest's MSJ as to Plaintiffs' Rehabilitation Act claim; and

18  5.  **DENIES** Plaintiffs' request for leave to amend the FAC to add a claim
19      under the ACA.

**IT IS SO ORDERED.**

DATE: October 15, 2021

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

_____

[13] The Court relies on Derry's evidence based on his personal experience at several Quest locations, and does not extrapolate his conclusions across all Quest PSCs or draw statistical conclusions based on Derry's evidence.  For this reason, the Court OVERRULES Quest's objections that Derry's evidence is statistically irrelevant.  Viewed in the light most favorable to Plaintiffs, that evidence creates a triable issue of fact as to the effective implementation of the Three-Finger Swipe system.

-21-

1  Robert I. Steiner (admitted *pro hac vice*)
2  rsteiner@kelleydrye.com
   **KELLEY DRYE & WARREN LLP**
3  3 World Trade Center
4  175 Greenwich Street
   New York, NY 10007
5  Telephone:   (212) 808-7800
6  Facsimile:    (212) 808-7897

7  Becca Wahlquist (State Bar No. 215948)
8  bwahlquist@kelleydrye.com
   **KELLEY DRYE & WARREN LLP**
9  1800 Century Park East, Suite 600
10 Los Angeles, CA 90067
   Telephone:  (310) 712-6100
11 Facsimile:    (310) 712-6199

12
   *Attorneys for Defendant*
13 *Laboratory Corporation of America Holdings*

14

15              **UNITED STATES DISTRICT COURT**
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
16

17 LUKE DAVIS, et al.                    CASE NO. 2:20-CV-00893-FMO-KS

18             Plaintiffs,              **DEFENDANT LABORATORY**
                                        **CORPORATION OF AMERICA**
19      v.                              **HOLDINGS'S NOTICE OF NEW**
                                        **AUTHORITY IN SUPPORT OF ITS**
20 LABORATORY CORPORATION OF            **OPPOSITION TO PLAINTIFFS'**
   AMERICA HOLDINGS, et al.             **MOTION FOR CLASS**
21                                      **CERTIFICATION**
22             Defendants.
                                        Hon.  Fernando Olguin
23

24

25

26

27

28

262

1    Defendant Laboratory Corporation of America Holdings provides herein

2  notice to the Court of new authority, *TransUnion LLC v. Ramirez*, No. 20-297, 2021

3  WL 2599472 (U.S. June 25, 2021), which is relevant to its Opposition to Plaintiffs'

4  Motion for Class Certification and is attached hereto as Exhibit A.

5

6  DATED:  July 2, 2021                    KELLEY DRYE & WARREN LLP

7
                                           By:  */s/ Becca Wahlquist*
8                                          Becca Wahlquist (State Bar No. 215948)
                                           Robert I. Steiner (admitted *pro hac vice*)
9
                                           *Attorneys for Defendant*
10                                         *Laboratory Corporation of America*
                                           *Holdings*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

263

# Exhibit A

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

2021 WL 2599472
Supreme Court of the United States.

TRANSUNION LLC, Petitioner

v.

Sergio L. RAMIREZ

No. 20-297
|
Argued March 30, 2021
|
Decided June 25, 2021

**Synopsis**
**Background:** Class of 8,185 consumers with alerts in their credit files maintained by credit reporting agency, indicating that the consumer's name was a "potential match" to a name on a list maintained by the United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, brought action against agency under the Fair Credit Reporting Act (FCRA), alleging that agency failed to use reasonable procedures to ensure the accuracy of their credit files, that for 1,853 of the class members, agency provided misleading credit reports to third-party businesses, and that certain mailings sent to them by agency contained formatting defects. Following certification of class, 301 F.R.D. 408, and denial of agency's motions to decertify class, 2016 WL 6070490, for summary judgment, 2017 WL 1133161, and for leave to file motion for reconsideration, 2017 WL 2403812, trial was held, after which jury returned a verdict in consumers' favor, awarding statutory and punitive damages of more than $60 million for three willful violations of the statute. Agency moved for judgment as matter of law, or in the alternative, for a new trial, remittitur, or an amended judgment. The United States District Court for the Northern District of California, Jacqueline Scott Corley, United States Magistrate Judge, 2017 WL 5153280, denied agency's motions. Agency appealed. The United States Court of Appeals for the Ninth Circuit, Murguia, Circuit Judge, 951 F.3d 1008, affirmed in relevant part. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kavanaugh, held that:

[1] under Article III, only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court;

[2] consumers whose credit reports containing alerts were disseminated to third-party businesses suffered a concrete injury in fact, as required for Article III standing;

[3] mere existence of misleading alerts in consumers' credit files that were not disseminated to third-party businesses did not constitute a concrete injury, for purposes of Article III standing;

[4] risk of future harm to consumers as a result of misleading alerts in their credit files, which had not been disseminated to third-party businesses, did not supply basis for Article III standing to seek retrospective damages; and

[5] consumers other than named plaintiff lacked Article III standing to pursue claims against agency for breach of obligation under the FCRA to provide them with complete credit files upon request.

Reversed and remanded.

Justice Thomas filed a dissenting opinion, in which Justices Breyer, Sotomayor, and Kagan joined.

Justice Kagan filed a dissenting opinion, in which Justices Breyer and Sotomayor joined.

West Headnotes (50)

[1]   **Constitutional Law**   ⬌   **Separation of Powers**
The law of Article III standing is built on a single basic idea: the idea of separation of powers. U.S. Const. art. 3, § 2, cl. 1.

[2]   **Federal Civil Procedure**   ⬌   **In general; injury or interest**
      **Federal Courts**   ⬌   **Case or Controversy Requirement**
Article III confines the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const. art. 3, § 2, cl. 1.

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

**[3]**  **Federal Civil Procedure** 👈 In general; injury or interest

**Federal Courts** 👈 Case or Controversy Requirement

For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case, in other words, standing. U.S. Const. art. 3, § 2, cl. 1.

**[4]**  **Federal Civil Procedure** 👈 In general; injury or interest

**Federal Civil Procedure** 👈 Causation; redressability

To establish Article III standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. U.S. Const. art. 3, § 2, cl. 1.

**[5]**  **Federal Courts** 👈 Injury, harm, causation, and redress

If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve, under Article III. U.S. Const. art. 3, § 2, cl. 1.

**[6]**  **Constitutional Law** 👈 Separation of Powers

**Federal Civil Procedure** 👈 In general; injury or interest

**Federal Civil Procedure** 👈 Causation; redressability

Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court to have Article III standing ensures that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separated government. U.S. Const. art. 3, § 2, cl. 1.

**[7]**  **Federal Courts** 👈 Nature of dispute; concreteness

Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. U.S. Const. art. 3, § 2, cl. 1.

**[8]**  **Federal Courts** 👈 Case or Controversy Requirement

Federal courts do not possess a roving commission to publicly opine on every legal question.

**[9]**  **Constitutional Law** 👈 Encroachment on Legislature

**Constitutional Law** 👈 Encroachment on Executive

**Federal Courts** 👈 Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities.

**[10]**  **Constitutional Law** 👈 Advisory Opinions

Federal courts do not issue advisory opinions; they instead decide only matters of a judiciary nature.

1 Cases that cite this headnote

**[11]**  **Federal Courts** 👈 Case or Controversy Requirement

Under Article III, a federal court may resolve only a real controversy with real impact on real persons. U.S. Const. art. 3, § 2, cl. 1.

**[12]**  **Federal Civil Procedure** 👈 In general; injury or interest

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

Article III requires that, to have standing, the plaintiff's injury in fact must be concrete, that is, real, and not abstract. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[13]    Federal Civil Procedure** 👉 **In general; injury or interest**

Inquiry into whether the alleged injury to a plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts, to determine whether it is a concrete injury, as required for Article III standing, does not require an exact duplicate in American history and tradition, but it is not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts. U.S. Const. art. 3, § 2, cl. 1.

**[14]    Federal Civil Procedure** 👉 **In general; injury or interest**

Certain harms readily qualify as "concrete injuries" under Article III; the most obvious are traditional tangible harms, such as physical harms and monetary harms. U.S. Const. art. 3, § 2, cl. 1.

**[15]    Federal Civil Procedure** 👉 **In general; injury or interest**

If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III. U.S. Const. art. 3, § 2, cl. 1.

**[16]    Federal Civil Procedure** 👉 **In general; injury or interest**

Various intangible harms can be concrete, as required for Article III standing; chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts, including, for example, reputational harms, disclosure of private information, and intrusion upon

seclusion, and those traditional harms may also include harms specified by the Constitution itself. U.S. Const. art. 3, § 2, cl. 1.

**[17]    Federal Civil Procedure** 👉 **In general; injury or interest**

Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation; in that way, Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.

**[18]    Federal Civil Procedure** 👉 **In general; injury or interest**

For purposes of Article III standing, even though Congress may elevate harms that existed in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is. U.S. Const. art. 3, § 2, cl. 1.

**[19]    Federal Civil Procedure** 👉 **In general; injury or interest**

Article III standing requires a concrete injury even in the context of a statutory violation. U.S. Const. art. 3, § 2, cl. 1.

**[20]    Federal Civil Procedure** 👉 **In general; injury or interest**

Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

the law violates the First Amendment. U.S. Const. art. 3, § 2, cl. 1; U.S. Const. Amend. 1.

**[21]    Federal Civil Procedure** 🔑 In general; injury or interest

Courts cannot treat an injury as "concrete" for Article III purposes based only on Congress's say-so. U.S. Const. art. 3, § 2, cl. 1.

**[22]    Federal Civil Procedure** 🔑 In general; injury or interest

For Article III standing purposes, an important difference exists between (i) a plaintiff 's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff 's suffering concrete harm because of the defendant's violation of federal law; Congress may enact legal prohibitions and obligations, and Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations, but under Article III, an injury in law is not an injury in fact. U.S. Const. art. 3, § 2, cl. 1.

**[23]    Federal Civil Procedure** 🔑 In general; injury or interest

Under Article III, only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court. U.S. Const. art. 3, § 2, cl. 1.

**[24]    Federal Courts** 🔑 Injury, harm, causation, and redress

Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions. U.S. Const. art. 3, § 2, cl. 1.

**[25]    Federal Civil Procedure** 🔑 In general; injury or interest

The public interest that private entities comply with the law cannot be converted into an individual right by a statute that denominates it as such, and that permits all citizens, or, for that matter, a subclass of citizens who suffer no distinctive concrete harm, to sue.

**[26]    Constitutional Law** 🔑 Encroachment on Executive

**Federal Civil Procedure** 🔑 In general; injury or interest

A regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority. U.S. Const. art. 3, § 2, cl. 1.

**[27]    Constitutional Law** 🔑 Nature and scope in general

**Constitutional Law** 🔑 Nature and scope in general

The court accepts the displacement of the democratically elected branches when necessary to decide an actual case, but otherwise, the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs and their attorneys; private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law.

**[28]    Constitutional Law** 🔑 Separation of Powers

**Federal Civil Procedure** 🔑 In general; injury or interest

The concrete-harm requirement to Article III standing is essential to the Constitution's separation of powers. U.S. Const. art. 3, § 2, cl. 1.

268

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

**[29]    Constitutional Law** 🔑 **Constitutionality of Statutory Provisions**

The fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.

**[30]    Federal Civil Procedure** 🔑 **In general; injury or interest**

The party invoking federal jurisdiction bears the burden of demonstrating that they have standing.

**[31]    Federal Civil Procedure** 🔑 **Representation of class; typicality; standing in general**

Every class member must have Article III standing in order to recover individual damages in a class action. U.S. Const. art. 3, § 2, cl. 1.

2 Cases that cite this headnote

**[32]    Federal Civil Procedure** 🔑 **In general; injury or interest**

**Federal Civil Procedure** 🔑 **Representation of class; typicality; standing in general**

Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. U.S. Const. art. 3, § 2, cl. 1.

**[33]    Federal Civil Procedure** 🔑 **In general; injury or interest**

Plaintiffs must maintain their personal interest in the dispute at all stages of litigation to maintain standing.

**[34]    Federal Civil Procedure** 🔑 **In general; injury or interest**

A plaintiff must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation; therefore, in a case that proceeds to trial, the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial.

1 Cases that cite this headnote

**[35]    Federal Civil Procedure** 🔑 **In general; injury or interest**

Standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek, for example, injunctive relief and damages.

**[36]    Federal Civil Procedure** 🔑 **Consumers, purchasers, borrowers, and debtors**

**Finance, Banking, and Credit** 🔑 **Credit reporting**

Consumers whose credit reports, which indicated that their name was a "potential match" to a name on a list maintained by United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, were disseminated to third-party businesses, suffered a concrete injury in fact, as required to have Article III standing to bring class action seeking statutory and punitive damages from credit reporting agency, under Fair Credit Reporting Act (FCRA), for failure to use reasonable procedures to ensure accuracy of credit files; consumers suffered harm with a close relationship to that associated with defamation, even though reports merely identified a consumer as a "potential match," which was not technically false, as harm from being labeled a "potential terrorist" bore a close relationship to harm from being labeled a "terrorist." U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act §§ 607, 616(a), 15 U.S.C.A. §§ 1681e(b), 1681n(a).

**[37]    Libel and Slander** 🔑 **Injury from Defamation**

Under longstanding American law, a person is injured when a defamatory statement that would subject him to hatred, contempt, or ridicule is published to a third party.

A-7

269

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

**[38]    Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Finance, Banking, and Credit** 🔑 Credit reporting

Mere existence of misleading alerts in consumers' credit files maintained by credit reporting agency, indicating that the consumer's name was a "potential match" to a name on a list maintained by the United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, did not constitute a "concrete injury," for purposes of Article III standing to bring class action seeking statutory and punitive damages from credit reporting agency, under Fair Credit Reporting Act (FCRA), for failure to use reasonable procedures to ensure accuracy of credit files, where allegedly inaccurate or misleading information sat in a company database, and was not disclosed to a third party; consumers' harm was roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer, that is, such information did not harm anyone. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act §§ 607, 616(a), 15 U.S.C.A. §§ 1681e(b), 1681n(a).

**[39]    Federal Courts** 🔑 Presentation of Questions Below or on Review;  Record;  Waiver

Consumers whose credit reports, which indicated that their name was a "potential match" to a name on a list maintained by United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, were not disseminated to third-party businesses, forfeited for certiorari review on issue of Article III standing their argument that credit reporting agency "published" their information internally, for example, to employees within agency and to vendors that printed and sent mailings that consumers received, where consumers raised argument for first time to the Supreme Court. U.S. Const. art. 3, § 2, cl. 1.

**[40]    Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Finance, Banking, and Credit** 🔑 Credit reporting

Credit reporting agency's internal publication of credit files for consumers, containing alerts indicating that the consumer's name was a "potential match" to a name on a list maintained by the United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, did not bear a sufficiently close relationship to the traditional defamation tort to satisfy the concrete injury requirement for Article III standing to bring class action seeking statutory and punitive damages from credit reporting agency, under Fair Credit Reporting Act (FCRA), for failure to use reasonable procedures to ensure accuracy of credit files, absent evidence that the files were actually read and not merely processed. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act §§ 607, 616(a), 15 U.S.C.A. §§ 1681e(b), 1681n(a).

**[41]    Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Finance, Banking, and Credit** 🔑 Credit reporting

Risk of future harm to consumers as a result of misleading alerts in their credit files maintained by credit reporting agency, which had not been disseminated to third-party businesses, indicating that the consumer's name was a "potential match" to a name on a list maintained by the United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, did not satisfy the concrete injury requirement for Article III standing to bring class action seeking retrospective damages from credit reporting agency, under Fair Credit Reporting Act (FCRA), for failure to use reasonable procedures to ensure accuracy of credit files; consumers did not demonstrate that risk of future harm materialized, that there was sufficient likelihood that agency would disseminate the

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

information, or that they suffered some other injury, such as emotional injury, from mere risk that credit reports would be provided to third parties. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act §§ 607, 616(a), 15 U.S.C.A. §§ 1681e(b), 1681n(a).

**[42]    Injunction** 🔑 Injury, Hardship, Harm, or Effect

A person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.

**[43]    Federal Civil Procedure** 🔑 In general; injury or interest

**Injunction** 🔑 Persons entitled to apply; standing

A plaintiff must demonstrate standing separately for each form of relief sought; therefore, a plaintiff 's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages.

**[44]    Federal Civil Procedure** 🔑 In general; injury or interest

In a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm, for purposes of Article III standing, at least unless the exposure to the risk of future harm itself causes a separate concrete harm. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[45]    Libel and Slander** 🔑 Presumption as to damage; special damages

**Libel and Slander** 🔑 Weight and Sufficiency

Libel and slander per se require evidence of publication, and for those torts, publication is generally presumed to cause a harm, albeit not a readily quantifiable harm.

**[46]    Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Finance, Banking, and Credit** 🔑 Credit reporting

Other than named plaintiff, there was no evidence of harm to class of consumers with alerts in their credit files maintained by credit reporting agency, indicating that their name was a "potential match" to a name on a list maintained by United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, as result of incorrect format of mailings to consumers, and thus, consumers other than named plaintiff lacked Article III standing to pursue claims against agency for breach of obligation under Fair Credit Reporting Act (FCRA) to provide them with complete credit files upon request; there was no evidence that any other class member opened mailings, or that they were confused, distressed, or relied on mailings in any way. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act § 609, 15 U.S.C.A. § 1681g(a)(1), (c)(2).

**[47]    Finance, Banking, and Credit** 🔑 Disclosures to consumer

The Fair Credit Reporting Act's (FCRA) disclosure and summary-of-rights requirements are designed to protect consumers' interests in learning of any inaccuracies in their credit files so that they can promptly correct the files before they are disseminated to third parties. Consumer Credit Protection Act § 609, 15 U.S.C.A. § 1681g(a)(1), (c)(2).

**[48]    Federal Civil Procedure** 🔑 Consumers, purchasers, borrowers, and debtors

**Finance, Banking, and Credit** 🔑 Credit reporting

Risk of future harm to consumers with alerts in their credit files maintained by credit reporting agency, indicating that their name was a "potential match" to a name on a list maintained by United States Treasury Department's Office

Transunion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

of Foreign Assets Control (OFAC) of terrorists, drug criminals, and other serious criminals, as result of incorrect format of mailings to consumers, did not support Article III standing to pursue class action retrospective damages claims against agency for breach of obligation under Fair Credit Reporting Act (FCRA) to provide them with complete credit files upon request; consumers did not explain how the formatting error prevented them from contacting agency to correct any errors before misleading credit reports were disseminated to third-party businesses. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act § 609, 15 U.S.C.A. § 1681g(a)(1), (c)(2).

[49]  **Federal Civil Procedure** ⟜ Consumers, purchasers, borrowers, and debtors

**Finance, Banking, and Credit** ⟜ Credit reporting

Consumers with alerts in their credit files maintained by credit reporting agency, indicating that their name was a "potential match" to a name on list maintained by United States Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals, did not suffer a concrete informational injury as a result of incorrect format of mailings to consumers, as would support Article III standing to pursue class action claims against agency for breach of obligation under Fair Credit Reporting Act (FCRA) to provide complete credit files upon request; consumers did not allege that they failed to receive required information, only that they received it in the wrong format, and they identified no downstream consequences from failing to receive the information. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act § 609, 15 U.S.C.A. § 1681g(a)(1), (c)(2).

[50]  **Federal Civil Procedure** ⟜ In general; injury or interest

An asserted informational injury that causes no adverse effects cannot satisfy Article III's

concrete injury requirement to standing. U.S. Const. art. 3, § 2, cl. 1.

*Syllabus* [*]

 **\*1**  The Fair Credit Reporting Act regulates the consumer reporting agencies that compile and disseminate personal information about consumers. 15 U.S.C. § 1681 et seq. The Act also creates a cause of action for consumers to sue and recover damages for certain violations. § 1681n(a). TransUnion is a credit reporting agency that compiles personal and financial information about individual consumers to create consumer reports and then sells those reports for use by entities that request information about the creditworthiness of individual consumers. Beginning in 2002, TransUnion introduced an add-on product called OFAC Name Screen Alert. When a business opted into the Name Screen service, TransUnion would conduct its ordinary credit check of the consumer, and it would also use third-party software to compare the consumer's name against a list maintained by the U. S. Treasury Department's Office of Foreign Assets Control (OFAC) of terrorists, drug traffickers, and other serious criminals. If the consumer's first and last name matched the first and last name of an individual on OFAC's list, then TransUnion would place an alert on the credit report indicating that the consumer's name was a "potential match" to a name on the OFAC list. At that time, TransUnion did not compare any data other than first and last names.

A class of 8,185 individuals with OFAC alerts in their credit files sued TransUnion under the Fair Credit Reporting Act for failing to use reasonable procedures to ensure the accuracy of their credit files. The plaintiffs also complained about formatting defects in certain mailings sent to them by TransUnion. The parties stipulated prior to trial that only 1,853 class members (including the named plaintiff Sergio Ramirez) had their misleading credit reports containing OFAC alerts provided to third parties during the 7-month period specified in the class definition. The internal credit files of the other 6,332 class members were not provided to third parties during the relevant time period. The District Court ruled that all class members had Article III standing on each of the three statutory claims. The jury returned a verdict for the plaintiffs and awarded each class member statutory

A-10

272

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

damages and punitive damages. A divided panel of the Ninth Circuit affirmed in relevant part.

*Held*: Only plaintiffs concretely harmed by a defendant's statutory violation have Article III standing to seek damages against that private defendant in federal court. Pp. —— – ——.

(a) Article III confines the federal judicial power to the resolution of "Cases" and "Controversies" in which a plaintiff has a "personal stake." *Raines v. Byrd*, 521 U.S. 811, 819–820, 117 S.Ct. 2312, 138 L.Ed.2d 849. To have Article III standing to sue in federal court, a plaintiff must show, among other things, that the plaintiff suffered concrete injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351. Central to assessing concreteness is whether the asserted harm has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340, 136 S.Ct. 1540, 194 L.Ed.2d 635. That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury. Physical or monetary harms readily qualify as concrete injuries under Article III, and various intangible harms—like reputational harms—can also be concrete. *Ibid.*

**\*2** "Article III standing requires a concrete injury even in the context of a statutory violation." *Ibid.* The Court has rejected the proposition that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.*, at 341, 136 S.Ct. 1540. An injury in law is not an injury in fact. Pp. —— – ——.

(b) The Court applies the fundamental standing requirement of concrete harm to this case. Pp. —— – ——.

(1) In their reasonable-procedures claim, all 8,185 class members maintain that TransUnion did not do enough to ensure that misleading OFAC alerts labeling them as potential terrorists were not included in their credit files. See § 1681e(b). TransUnion provided third parties with credit reports containing OFAC alerts for 1,853 class members (including the named plaintiff Ramirez). Those 1,853 class members therefore suffered a harm with a "close relationship" to the harm associated with the tort of defamation. *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540. Under longstanding American law, a person is injured when a defamatory statement "that would subject him to hatred, contempt, or

ridicule" is published to a third party. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, 110 S.Ct. 2695, 111 L.Ed.2d 1. The Court has no trouble concluding that the 1,853 class members suffered a concrete harm that qualifies as an injury in fact

The credit files of the remaining 6,332 class members also contained misleading OFAC alerts, but the parties stipulated that TransUnion did not provide those plaintiffs' credit information to any potential creditors during the designated class period. The mere existence of inaccurate information, absent dissemination, traditionally has not provided the basis for a lawsuit in American courts. The plaintiffs cannot demonstrate that the misleading information in the internal credit files itself constitutes a concrete harm.

The plaintiffs advance a separate argument based on their exposure to the risk that the misleading information would be disseminated in the future to third parties. The Court has recognized that material risk of future harm can satisfy the concrete-harm requirement in the context of a claim for injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial. See *Spokeo*, 578 U. S., at 341–342, 136 S.Ct. 1540 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264). But TransUnion advances a persuasive argument that the mere risk of future harm, without more, cannot qualify as a concrete harm in a suit for damages. The 6,332 plaintiffs did not demonstrate that the risk of future harm materialized. Nor did those plaintiffs present evidence that the class members were independently harmed by their exposure to the risk itself. The risk of future harm cannot supply the basis for their standing. Pp. —— – ——.

(2) In two other claims, all 8,185 class members complained about formatting defects in certain mailings sent to them by TransUnion. But the plaintiffs have not demonstrated that the format of TransUnion's mailings caused them a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. See *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540.

The plaintiffs argue that TransUnion's formatting violations created a risk of future harm, because consumers who received the information in the dual-mailing format were at risk of not learning about the OFAC alert in their credit files and thus not asking for corrections. The risk of future harm on its own is not enough to support Article III standing for their damages claim. In any event, the plaintiffs here made

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

no effort to explain how the formatting error prevented them asking for corrections to prevent future harm.

*3 The United States as *amicus curiae* asserts that the plaintiffs suffered a concrete "informational injury" from TransUnion's formatting violations. See *Federal Election Comm'n v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10; *Public Citizen v. Department of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377. But the plaintiffs here did not allege that they failed to receive any required information. They argued only that they received the information in the wrong format. Moreover, an asserted informational injury that causes no adverse effects does not satisfy Article III. Pp. ——– ——.

951 F.3d 1008, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, and BARRETT, JJ., joined. THOMAS, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KAGAN, J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**Attorneys and Law Firms**

Paul D. Clement, Washington, DC, for the petitioner.

Nicole F. Reaves, for the United States as amicus curiae, by special leave of the Court, supporting neither party.

Samuel Issacharoff, New York, NY, for the respondent.

Julia B. Strickland, Stephen J. Newman, Christine E. Ellice, Stroock & Stroock & Lavan LLP, Los Angeles, CA, Paul D. Clement, Counsel of Record, Erin E. Murphy, Matthew D. Rowen, Andrew C. Lawrence, Kirkland & Ellis LLP, Washington, DC, for petitioner.

Robert H. Klonoff, Portland, OR, Elizabeth J. Cabraser, Michael W. Sobol, Ian R. Ensberg, John D. Maher, Andrew R. Kaufman, Jason L. Lichtman, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA, Andrew J. Ogilvie, Carol M. Brewer, Ogilvie & Brewer, LLP, San Francisco, CA, Samuel Issacharoff, Counsel of Record, New York, NY, James A. Francis, John Soumilas, Lauren KW Brennan,

Francis, Mailman & Soumilas, P.C. Philadelphia, PA, Counsel for Respondent.

**Opinion**

Justice KAVANAUGH delivered the opinion of the Court.

To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing. Central to assessing concreteness is whether the asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including (as relevant here) reputational harm. *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340–341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016).

In this case, a class of 8,185 individuals sued TransUnion, a credit reporting agency, in federal court under the Fair Credit Reporting Act. The plaintiffs claimed that TransUnion failed to use reasonable procedures to ensure the accuracy of their credit files, as maintained internally by TransUnion. For 1,853 of the class members, TransUnion provided misleading credit reports to third-party businesses. We conclude that those 1,853 class members have demonstrated concrete reputational harm and thus have Article III standing to sue on the reasonable-procedures claim. The internal credit files of the other 6,332 class members were *not* provided to third-party businesses during the relevant time period. We conclude that those 6,332 class members have not demonstrated concrete harm and thus lack Article III standing to sue on the reasonable-procedures claim.

In two other claims, all 8,185 class members complained about formatting defects in certain mailings sent to them by TransUnion. But the class members other than the named plaintiff Sergio Ramirez have not demonstrated that the alleged formatting errors caused them any concrete harm. Therefore, except for Ramirez, the class members do not have standing as to those two claims.

Over Judge McKeown's dissent, the U. S. Court of Appeals for the Ninth Circuit ruled that all 8,185 class members have standing as to all three claims. The Court of Appeals approved a class damages award of about $40 million. In light of our conclusion that (i) only 1,853 class members have standing for the reasonable-procedures claim and (ii) only Ramirez himself has standing for the two formatting claims relating to the mailings, we reverse the judgment of the Ninth Circuit

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

and remand the case for further proceedings consistent with this opinion.

I

In 1970, Congress passed and President Nixon signed the Fair Credit Reporting Act. 84 Stat. 1127, as amended, 15 U.S.C. § 1681 *et seq*. The Act seeks to promote "fair and accurate credit reporting" and to protect consumer privacy. § 1681(a). To achieve those goals, the Act regulates the consumer reporting agencies that compile and disseminate personal information about consumers.

**\*4** The Act "imposes a host of requirements concerning the creation and use of consumer reports." *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 335, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). Three of the Act's requirements are relevant to this case. *First*, the Act requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" in consumer reports. § 1681e(b). *Second*, the Act provides that consumer reporting agencies must, upon request, disclose to the consumer "[a]ll information in the consumer's file at the time of the request." § 1681g(a)(1). *Third*, the Act compels consumer reporting agencies to "provide to a consumer, with each written disclosure by the agency to the consumer," a "summary of rights" prepared by the Consumer Financial Protection Bureau. § 1681g(c)(2).

The Act creates a cause of action for consumers to sue and recover damages for certain violations. The Act provides: "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer" for actual damages or for statutory damages not less than $100 and not more than $1,000, as well as for punitive damages and attorney's fees. § 1681n(a).

TransUnion is one of the "Big Three" credit reporting agencies, along with Equifax and Experian. As a credit reporting agency, TransUnion compiles personal and financial information about individual consumers to create consumer reports. TransUnion then sells those consumer reports for use by entities such as banks, landlords, and car dealerships that request information about the creditworthiness of individual consumers.

Beginning in 2002, TransUnion introduced an add-on product called OFAC Name Screen Alert. OFAC is the U. S. Treasury Department's Office of Foreign Assets Control. OFAC maintains a list of "specially designated nationals" who threaten America's national security. Individuals on the OFAC list are terrorists, drug traffickers, or other serious criminals. It is generally unlawful to transact business with any person on the list. 31 C.F.R. pt. 501, App. A (2020). TransUnion created the OFAC Name Screen Alert to help businesses avoid transacting with individuals on OFAC's list.

When this litigation arose, Name Screen worked in the following way: When a business opted into the Name Screen service, TransUnion would conduct its ordinary credit check of the consumer, and it would also use third-party software to compare the consumer's name against the OFAC list. If the consumer's first and last name matched the first and last name of an individual on OFAC's list, then TransUnion would place an alert on the credit report indicating that the consumer's name was a "potential match" to a name on the OFAC list. TransUnion did not compare any data other than first and last names. Unsurprisingly, TransUnion's Name Screen product generated many false positives. Thousands of law-abiding Americans happen to share a first and last name with one of the terrorists, drug traffickers, or serious criminals on OFAC's list of specially designated nationals.

Sergio Ramirez learned the hard way that he is one such individual. On February 27, 2011, Ramirez visited a Nissan dealership in Dublin, California, seeking to buy a Nissan Maxima. Ramirez was accompanied by his wife and his father-in-law. After Ramirez and his wife selected a color and negotiated a price, the dealership ran a credit check on both Ramirez and his wife. Ramirez's credit report, produced by TransUnion, contained the following alert: "\*\*\*OFAC ADVISOR ALERT - INPUT NAME MATCHES NAME ON THE OFAC DATABASE." App. 84. A Nissan salesman told Ramirez that Nissan would not sell the car to him because his name was on a " 'terrorist list.' " *Id.,* at 333. Ramirez's wife had to purchase the car in her own name.

**\*5** The next day, Ramirez called TransUnion and requested a copy of his credit file. TransUnion sent Ramirez a mailing that same day that included his credit file and the statutorily required summary of rights prepared by the CFPB. The mailing did not mention the OFAC alert in Ramirez's file. The following day, TransUnion sent Ramirez a second mailing— a letter alerting him that his name was considered a potential match to names on the OFAC list. The second mailing did not include an additional copy of the summary of rights. Concerned about the mailings, Ramirez consulted a lawyer

275

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

and ultimately canceled a planned trip to Mexico. TransUnion eventually removed the OFAC alert from Ramirez's file.

In February 2012, Ramirez sued TransUnion and alleged three violations of the Fair Credit Reporting Act. *First*, he alleged that TransUnion, by using the Name Screen product, failed to follow reasonable procedures to ensure the accuracy of information in his credit file. See § 1681e(b). *Second*, he claimed that TransUnion failed to provide him with *all* the information in his credit file upon his request. In particular, TransUnion's first mailing did not include the fact that Ramirez's name was a potential match for a name on the OFAC list. See § 1681g(a)(1). *Third*, Ramirez asserted that TransUnion violated its obligation to provide him with a summary of his rights "with each written disclosure," because TransUnion's second mailing did not contain a summary of Ramirez's rights. § 1681g(c)(2). Ramirez requested statutory and punitive damages.

Ramirez also sought to certify a class of all people in the United States to whom TransUnion sent a mailing during the period from January 1, 2011, to July 26, 2011, that was similar in form to the second mailing that Ramirez received. TransUnion opposed certification. The U. S. District Court for the Northern District of California rejected TransUnion's argument and certified the class. 301 F.R.D. 408 (2014).

Before trial, the parties stipulated that the class contained 8,185 members, including Ramirez. The parties also stipulated that only 1,853 members of the class (including Ramirez) had their credit reports disseminated by TransUnion to potential creditors during the period from January 1, 2011, to July 26, 2011. The District Court ruled that all 8,185 class members had Article III standing. 2016 WL 6070490, *5 (Oct. 17, 2016).

At trial, Ramirez testified about his experience at the Nissan dealership. But Ramirez did not present evidence about the experiences of other members of the class.

After six days of trial, the jury returned a verdict for the plaintiffs. The jury awarded each class member $984.22 in statutory damages and $6,353.08 in punitive damages for a total award of more than $60 million. The District Court rejected all of TransUnion's post-trial motions.

The U. S. Court of Appeals for the Ninth Circuit affirmed in relevant part. 951 F.3d 1008 (2020). The court held that all members of the class had Article III standing to recover

damages for all three claims. The court also concluded that Ramirez's claims were typical of the class's claims for purposes of Rule 23 of the Federal Rules of Civil Procedure. Finally, the court reduced the punitive damages award to $3,936.88 per class member, thus reducing the total award to about $40 million.

Judge McKeown dissented in relevant part. As to the reasonable-procedures claim, she concluded that only the 1,853 class members whose reports were actually disseminated by TransUnion to third parties had Article III standing to recover damages. In her view, the remaining 6,332 class members did not suffer a concrete injury sufficient for standing. As to the two claims related to the mailings, Judge McKeown would have held that none of the 8,185 class members other than the named plaintiff Ramirez had standing as to those claims.

**\*6** We granted certiorari. 592 U. S. ——, 141 S.Ct. 972, 208 L.Ed.2d 504 (2020).

II

The question in this case is whether the 8,185 class members have Article III standing as to their three claims. In Part II, we summarize the requirements of Article III standing —in particular, the requirement that plaintiffs demonstrate a "concrete harm." In Part III, we then apply the concrete-harm requirement to the plaintiffs' lawsuit against TransUnion.

A

**[1]** The "law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Raines v. Byrd*, 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks omitted). Separation of powers "was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *INS v. Chadha*, 462 U.S. 919, 946, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (internal quotation marks omitted).

**[2]** **[3]** Therefore, we start with the text of the Constitution. Article III confines the federal judicial power to the resolution of "Cases" and "Controversies." For there to be a case or controversy under Article III, the plaintiff must have a " 'personal stake' " in the case—in other words, standing.

276

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

*Raines*, 521 U.S., at 819, 117 S.Ct. 2312. To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: " 'What's it to you?' " Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983).

**[4]   [5]**   To answer that question in a way sufficient to establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 333 (CA7 2019) (Barrett, J.).

**[6]   [7]   [8]   [9]   [10]**   Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only "the rights of individuals," *Marbury v. Madison*, 1 Cranch 137, 170, 5 U.S. 137, 2 L.Ed. 60 (1803), and that federal courts exercise "their proper function in a limited and separated government," Roberts, Article III Limits on Statutory Standing, 42 Duke L. J. 1219, 1224 (1993). Under Article III, federal courts do not adjudicate hypothetical or abstract disputes. Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities. And federal courts do not issue advisory opinions. As Madison explained in Philadelphia, federal courts instead decide only matters "of a Judiciary Nature." 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed. 1966).

**\*7   [11]**   In sum, under Article III, a federal court may resolve only "a real controversy with real impact on real persons." *American Legion* v. *American Humanist Assn.*, 588 U. S. ——, ——, 139 S.Ct. 2067, 2103, 204 L.Ed.2d 452 (2019).

**B**

**[12]**   The question in this case focuses on the Article III requirement that the plaintiff 's injury in fact be "concrete"—that is, "real, and not abstract." *Spokeo, Inc.* v. *Robins*, 578

U. S. 330, 340, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (internal quotation marks omitted); see *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014); *Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009); *Lujan*, 504 U.S., at 560, 112 S.Ct. 2130; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220–221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

**[13]**   What makes a harm concrete for purposes of Article III? As a general matter, the Court has explained that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008); see also *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). And with respect to the concrete-harm requirement in particular, this Court's opinion in *Spokeo* v. *Robins* indicated that courts should assess whether the alleged injury to the plaintiff has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts. 578 U. S., at 341, 136 S.Ct. 1540. That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury. *Spokeo* does not require an exact duplicate in American history and tradition. But *Spokeo* is not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts.

**[14]   [15]**   As *Spokeo* explained, certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.

**[16]**   Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. *Id.*, at 340–341, 136 S.Ct. 1540. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion. See, *e.g., Meese v. Keene*, 481 U.S. 465, 473, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (reputational harms); *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (disclosure of private information); see also *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (CA7 2020) (Barrett, J.) (intrusion upon seclusion). And those traditional

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

harms may also include harms specified by the Constitution itself. See, *e.g., Spokeo*, 578 U. S., at 340, 136 S.Ct. 1540 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (abridgment of free speech), and *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (infringement of free exercise)).

**[17]** **[18]** In determining whether a harm is sufficiently concrete to qualify as an injury in fact, the Court in *Spokeo* said that Congress's views may be "instructive." 578 U. S., at 341, 136 S.Ct. 1540. Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation. See *id.*, at 340–341, 136 S.Ct. 1540. In that way, Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.*, at 341, 136 S.Ct. 1540 (alterations and internal quotation marks omitted); see *Lujan*, 504 U.S. at 562–563, 578, 112 S.Ct. 2130; cf., *e.g., Allen v. Wright*, 468 U.S. 737, 757, n. 22, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (discriminatory treatment). But even though "Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (CA6 2018) (Sutton, J.) (citing *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540)).

***8** **[19]** Importantly, this Court has rejected the proposition that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540. As the Court emphasized in *Spokeo*, "Article III standing requires a concrete injury even in the context of a statutory violation." *Ibid.*

**[20]** **[21]** Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment. Cf. *United States v. Eichman*, 496 U.S. 310, 317–318, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). As Judge Katsas has rightly

stated, "we cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 999, n. 2 (CA11 2020) (sitting by designation); see *Marbury*, 1 Cranch, at 178; see also *Raines*, 521 U.S., at 820, n. 3, 117 S.Ct. 2312; *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41, n. 22, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Muskrat v. United States*, 219 U.S. 346, 361–362, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

**[22]** **[23]** **[24]** For standing purposes, therefore, an important difference exists between (i) a plaintiff 's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff 's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court. As then-Judge Barrett succinctly summarized, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Casillas*, 926 F.3d at 332.

To appreciate how the Article III "concrete harm" principle operates in practice, consider two different hypothetical plaintiffs. Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.

Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those two scenarios. The first lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property. But the second lawsuit may not proceed because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts. An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy

A-16

278

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages). *Spokeo, 578 U. S., at 345, 136 S.Ct. 1540* (THOMAS, J., concurring) (internal quotation marks omitted); see *Steel Co., 523 U. S., at 106–107, 118 S.Ct. 1003*. Those are not grounds for Article III standing.[1]

**\*9 [25]** As those examples illustrate, if the law of Article III did not require plaintiffs to demonstrate a "concrete harm," Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law. Such an expansive understanding of Article III would flout constitutional text, history, and precedent. In our view, the public interest that private entities comply with the law cannot "be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue." *Lujan, 504 U.S., at 576–577, 112 S.Ct. 2130.*[2]

**[26] [27]** A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority. We accept the "displacement of the democratically elected branches when necessary to decide an actual case." Roberts, *42 Duke L. J., at 1230*. But otherwise, the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys). Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law. See *Lujan, 504 U.S., at 577, 112 S.Ct. 2130.*

**[28] [29]** In sum, the concrete-harm requirement is essential to the Constitution's separation of powers. To be sure, the concrete-harm requirement can be difficult to apply in some cases. Some advocate that the concrete-harm requirement be ditched altogether, on the theory that it would be more efficient or convenient to simply say that a statutory violation and a cause of action suffice to afford a plaintiff standing. But as the Court has often stated, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Chadha, 462 U.S., at 944, 103 S.Ct. 2764.* So it is here.[3]

**III**

**\*10** We now apply those fundamental standing principles to this lawsuit. We must determine whether the 8,185 class members have standing to sue TransUnion for its alleged violations of the Fair Credit Reporting Act. The plaintiffs argue that TransUnion failed to comply with statutory obligations (i) to follow reasonable procedures to ensure the accuracy of credit files so that the files would not include OFAC alerts labeling the plaintiffs as potential terrorists; and (ii) to provide a consumer, upon request, with his or her complete credit file, including a summary of rights.

**[30] [31] [32] [33] [34] [35]** Some preliminaries: As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing. See *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).* Every class member must have Article III standing in order to recover individual damages. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 466, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016)* (ROBERTS, C. J., concurring).[4] Plaintiffs must maintain their personal interest in the dispute at all stages of litigation. *Davis v. Federal Election Comm'n, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008).* A plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan, 504 U.S., at 561, 112 S.Ct. 2130.* Therefore, in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial." *Ibid.* (internal quotation marks omitted). And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages). *Davis, 554 U.S., at 734, 128 S.Ct. 2759; Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).*

**A**

We first address the plaintiffs' claim that TransUnion failed to "follow reasonable procedures to assure maximum possible accuracy" of the plaintiffs' credit files maintained by TransUnion. *15 U.S.C. § 1681e(b).* In particular, the plaintiffs argue that TransUnion did not do enough to ensure that OFAC

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

alerts labeling them as potential terrorists were not included in their credit files.

Assuming that the plaintiffs are correct that TransUnion violated its obligations under the Fair Credit Reporting Act to use reasonable procedures in internally maintaining the credit files, we must determine whether the 8,185 class members suffered concrete harm from TransUnion's failure to employ reasonable procedures.[5]

1

**[36]** Start with the 1,853 class members (including the named plaintiff Ramirez) whose reports were disseminated to third-party businesses. The plaintiffs argue that the publication to a third party of a credit report bearing a misleading OFAC alert injures the subject of the report. The plaintiffs contend that this injury bears a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts—namely, the reputational harm associated with the tort of defamation. *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016).

**\*11 [37]** We agree with the plaintiffs. Under longstanding American law, a person is injured when a defamatory statement "that would subject him to hatred, contempt, or ridicule" is published to a third party. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (internal quotation marks omitted); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); see also Restatement of Torts § 559 (1938). TransUnion provided third parties with credit reports containing OFAC alerts that labeled the class members as potential terrorists, drug traffickers, or serious criminals. The 1,853 class members therefore suffered a harm with a "close relationship" to the harm associated with the tort of defamation. We have no trouble concluding that the 1,853 class members suffered a concrete harm that qualifies as an injury in fact.

TransUnion counters that those 1,853 class members did not suffer a harm with a "close relationship" to defamation because the OFAC alerts on the disseminated credit reports were only misleading and not literally false. See *id.*, § 558. TransUnion points out that the reports merely identified a consumer as a "*potential* match" to an individual on the OFAC list—a fact that TransUnion says is not technically false.

In looking to whether a plaintiff 's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate. The harm from being labeled a "potential terrorist" bears a close relationship to the harm from being labeled a "terrorist." In other words, the harm from a misleading statement of this kind bears a sufficiently close relationship to the harm from a false and defamatory statement.

In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.

2

The remaining 6,332 class members are a different story. To be sure, their credit files, which were maintained by TransUnion, contained misleading OFAC alerts. But the parties stipulated that TransUnion did not provide those plaintiffs' credit information to any potential creditors during the class period from January 2011 to July 2011. Given the absence of dissemination, we must determine whether the 6,332 class members suffered some other concrete harm for purposes of Article III.

**[38]** The initial question is whether the mere existence of a misleading OFAC alert in a consumer's internal credit file at TransUnion constitutes a concrete injury. As Judge Tatel phrased it in a similar context, "if inaccurate information falls into" a consumer's credit file, "does it make a sound?" *Owner-Operator Independent Drivers Assn., Inc. v. United States Dept. of Transp.*, 879 F.3d 339, 344 (CADC 2018).

Writing the opinion for the D. C. Circuit in *Owner-Operator*, Judge Tatel answered no. Publication is "essential to liability" in a suit for defamation. Restatement of Torts § 577, Comment a, at 192. And there is "no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *Owner-Operator*, 879 F.3d at 344–345. "Since the basis of the action for words was the loss of credit or fame, and not the insult, it was always necessary to show a publication of the words." J. Baker, An Introduction to English Legal History 474 (5th ed. 2019). Other Courts of Appeals have similarly recognized that, as Judge Colloton summarized, the "retention of information lawfully obtained, without further disclosure, traditionally has not provided the basis for a lawsuit in American courts,"

A-18

280

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

meaning that the mere existence of inaccurate information in a database is insufficient to confer *Article III* standing. *Braitberg v. Charter Communications, Inc.*, 836 F.3d 925, 930 (CA8 2016); see *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 912 (CA7 2017).

**\*12** **[39]** **[40]** The standing inquiry in this case thus distinguishes between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies disseminate to third-party creditors. The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm. In cases such as these where allegedly inaccurate or misleading information sits in a company database, the plaintiffs' harm is roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer. A letter that is not sent does not harm anyone, no matter how insulting the letter is. So too here.[6]

**[41]** Because the plaintiffs cannot demonstrate that the misleading information in the internal credit files itself constitutes a concrete harm, the plaintiffs advance a separate argument based on an asserted *risk of future harm*. They say that the 6,332 class members suffered a concrete injury for *Article III* purposes because the existence of misleading OFAC alerts in their internal credit files exposed them to a material risk that the information would be disseminated in the future to third parties and thereby cause them harm. The plaintiffs rely on language from *Spokeo* where the Court said that "the risk of real harm" (or as the Court otherwise stated, a "material risk of harm") can sometimes "satisfy the requirement of concreteness." 578 U. S., at 341–342, 136 S.Ct. 1540 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)).

**[42]** To support its statement that a material risk of future harm can satisfy the concrete-harm requirement, *Spokeo* cited this Court's decision in *Clapper*. But importantly, *Clapper* involved a suit for *injunctive relief*. As this Court has recognized, a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial. See *Clapper*, 568 U.S., at 414, n. 5, 133 S.Ct. 1138; *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); see also *Gubala*, 846 F.3d, at 912.

**[43]** But a plaintiff must "demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S., at 185, 120 S.Ct. 693. Therefore, a plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages.

**\*13** **[44]** TransUnion advances a persuasive argument that in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm. Brief for Petitioner 39, n. 4; Tr. of Oral Arg. 36.[7] TransUnion contends that if an individual is exposed to a risk of future harm, time will eventually reveal whether the risk materializes in the form of actual harm. If the risk of future harm materializes and the individual suffers a concrete harm, then the harm itself, and not the pre-existing risk, will constitute a basis for the person's injury and for damages. If the risk of future harm does *not* materialize, then the individual cannot establish a concrete harm sufficient for standing, according to TransUnion.

Consider an example. Suppose that a woman drives home from work a quarter mile ahead of a reckless driver who is dangerously swerving across lanes. The reckless driver has exposed the woman to a risk of future harm, but the risk does not materialize and the woman makes it home safely. As counsel for TransUnion stated, that would ordinarily be cause for celebration, not a lawsuit. *Id.*, at 8. But if the reckless driver crashes into the woman's car, the situation would be different, and (assuming a cause of action) the woman could sue the driver for damages.

**[45]** The plaintiffs note that *Spokeo* cited libel and slander *per se* as examples of cases where, as the plaintiffs see it, a mere risk of harm suffices for a damages claim. But as Judge Tatel explained for the D. C. Circuit, libel and slander *per se* "require evidence of *publication*." *Owner-Operator*, 879 F.3d, at 345. And for those torts, publication is generally presumed to cause a harm, albeit not a readily quantifiable harm. As *Spokeo* noted, "the law has long permitted recovery by certain tort victims *even if their harms may be difficult to prove or measure*." 578 U. S., at 341, 136 S.Ct. 1540 (emphasis added). But there is a significant difference between (i) an actual harm that has occurred but is not readily quantifiable, as in cases of libel and slander *per se*, and (ii) a mere risk of future harm. By citing libel and slander *per se*, *Spokeo* did not hold that the mere risk of future harm, without more, suffices to demonstrate *Article III* standing in a suit for damages.

Here, the 6,332 plaintiffs did not demonstrate that the risk of future harm materialized—that is, that the inaccurate OFAC alerts in their internal TransUnion credit files were ever provided to third parties or caused a denial of credit. Nor did those plaintiffs present evidence that the class members were independently harmed by their exposure to the risk itself —that is, that they suffered some other injury (such as an emotional injury) from the mere risk that their credit reports would be provided to third-party businesses. Therefore, the 6,332 plaintiffs' argument for standing for their damages claims based on an asserted risk of future harm is unavailing.

*14 Even apart from that fundamental problem with their argument based on the risk of future harm, the plaintiffs did not factually establish a sufficient risk of future harm to support Article III standing. As Judge McKeown explained in her dissent, the risk of future harm that the 6,332 plaintiffs identified—the risk of dissemination to third parties—was too speculative to support Article III standing. 951 F.3d 1008, 1040 (CA9 2020); see Whitmore v. Arkansas, 495 U.S. 149, 157, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The plaintiffs claimed that TransUnion could have divulged their misleading credit information to a third party at any moment. But the plaintiffs did not demonstrate a sufficient likelihood that their individual credit information would be requested by third-party businesses and provided by TransUnion during the relevant time period. Nor did the plaintiffs demonstrate that there was a sufficient likelihood that TransUnion would otherwise intentionally or accidentally release their information to third parties. "Because no evidence in the record establishes a serious likelihood of disclosure, we cannot simply presume a material risk of concrete harm." 951 F.3d, at 1040 (opinion of McKeown, J.).

Moreover, the plaintiffs did not present any evidence that the 6,332 class members even *knew* that there were OFAC alerts in their internal TransUnion credit files. If those plaintiffs prevailed in this case, many of them would first learn that they were "injured" when they received a check compensating them for their supposed "injury." It is difficult to see how a risk of future harm could supply the basis for a plaintiff 's standing when the plaintiff did not even know that there was a risk of future harm.

Finally, the plaintiffs advance one last argument for why the 6,332 class members are similarly situated to the other 1,853 class members and thus should have standing. The 6,332 plaintiffs note that they sought damages for the entire

46-month period permitted by the statute of limitations, whereas the stipulation regarding dissemination covered only 7 of those months. They argue that the credit reports of many of those 6,332 class members were likely also sent to third parties outside of the period covered by the stipulation because all of the class members requested copies of their reports, and consumers usually do not request copies unless they are contemplating a transaction that would trigger a credit check.

That is a serious argument, but in the end, we conclude that it fails to support standing for the 6,332 class members. The plaintiffs had the burden to prove at trial that their reports were actually sent to third-party businesses. The inferences on which the argument rests are too weak to demonstrate that the reports of any particular number of the 6,332 class members were sent to third-party businesses. The plaintiffs' attorneys could have attempted to show that some or all of the 6,332 class members were injured in that way. They presumably could have sought the names and addresses of those individuals, and they could have contacted them. In the face of the stipulation, which pointedly failed to demonstrate dissemination for those class members, the inferences on which the plaintiffs rely are insufficient to support standing. Cf. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse").

In sum, the 6,332 class members whose internal TransUnion credit files were not disseminated to third-party businesses did not suffer a concrete harm. By contrast, the 1,853 class members (including Ramirez) whose credit reports were disseminated to third-party businesses during the class period suffered a concrete harm.

B

We next address the plaintiffs' standing to recover damages for two other claims in the complaint: the disclosure claim and the summary-of-rights claim. Those two claims are intertwined.

[46]    [47]    In the disclosure claim, the plaintiffs alleged that TransUnion breached its obligation to provide them with their complete credit files upon request. According to the plaintiffs, TransUnion sent the plaintiffs copies of their credit files that omitted the OFAC information, and then in a second

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

mailing sent the OFAC information. See § 1681g(a)(1). In the summary-of-rights claim, the plaintiffs further asserted that TransUnion should have included another summary of rights in that second mailing—the mailing that included the OFAC information. See § 1681g(c)(2). As the plaintiffs note, the disclosure and summary-of-rights requirements are designed to protect consumers' interests in learning of any inaccuracies in their credit files so that they can promptly correct the files before they are disseminated to third parties.

*15  In support of standing, the plaintiffs thus contend that the TransUnion mailings were formatted incorrectly and deprived them of their right to receive information in the format required by statute. But the plaintiffs have not demonstrated that the format of TransUnion's mailings caused them a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. See *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540. In fact, they do not demonstrate that they suffered any harm *at all* from the formatting violations. The plaintiffs presented no evidence that, other than Ramirez, "a single other class member so much as *opened* the dual mailings," "nor that they were confused, distressed, or relied on the information in any way." 951 F.3d, at 1039, 1041 (opinion of McKeown, J.) (emphasis added). The plaintiffs put forth no evidence, moreover, that the plaintiffs would have tried to correct their credit files—and thereby prevented dissemination of a misleading report—had they been sent the information in the proper format. *Ibid.* Without any evidence of harm caused by the format of the mailings, these are "bare procedural violation[s], divorced from any concrete harm." *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540. That does not suffice for Article III standing.[8]

[48]  The plaintiffs separately argue that TransUnion's formatting violations created a risk of future harm. Specifically, the plaintiffs contend that consumers who received the information in this dual-mailing format were at risk of not learning about the OFAC alert in their credit files. They say that they were thus at risk of not being able to correct their credit files before TransUnion disseminated credit reports containing the misleading information to third-party businesses. As noted above, the risk of future harm on its own does not support Article III standing for the plaintiffs' damages claim. In any event, the plaintiffs made no effort here to explain how the formatting error prevented them from contacting TransUnion to correct any errors before misleading credit reports were disseminated to third-party businesses. To reiterate, there is no evidence that "a single

other class member so much as opened the dual mailings," "nor that they were confused, distressed, or relied on the information in any way." 951 F.3d, at 1039, 1041 (opinion of McKeown, J.).

[49]  [50]  For its part, the United States as *amicus curiae*, but not the plaintiffs, separately asserts that the plaintiffs suffered a concrete "informational injury" under several of this Court's precedents. See *Federal Election Comm'n v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); *Public Citizen v. Department of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). We disagree. The plaintiffs did not allege that they failed to receive any required information. They argued only that they received it *in the wrong format*. Therefore, *Akins* and *Public Citizen* do not control here. In addition, those cases involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information. This case does not involve such a public-disclosure law. See *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 338 (CA7 2019); *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (CA11 2020). Moreover, the plaintiffs have identified no "downstream consequences" from failing to receive the required information. *Trichell*, 964 F.3d at 1004. They did not demonstrate, for example, that the alleged information deficit hindered their ability to correct erroneous information before it was later sent to third parties. An "asserted informational injury that causes no adverse effects cannot satisfy Article III." *Ibid.*

* * *

No concrete harm, no standing. The 1,853 class members whose credit reports were provided to third-party businesses suffered a concrete harm and thus have standing as to the reasonable-procedures claim. The 6,332 class members whose credit reports were not provided to third-party businesses did not suffer a concrete harm and thus do not have standing as to the reasonable-procedures claim. As for the claims pertaining to the format of TransUnion's mailings, none of the 8,185 class members other than the named plaintiff Ramirez suffered a concrete harm.

*16  We reverse the judgment of the U. S. Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion. In light of our conclusion about Article III standing, we need not decide whether Ramirez's claims were typical of the claims of the

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

class under Rule 23. On remand, the Ninth Circuit may consider in the first instance whether class certification is appropriate in light of our conclusion about standing.

*It is so ordered.*

Justice THOMAS, with whom Justice BREYER, Justice SOTOMAYOR, and Justice KAGAN join, dissenting.

TransUnion generated credit reports that erroneously flagged many law-abiding people as potential terrorists and drug traffickers. In doing so, TransUnion violated several provisions of the Fair Credit Reporting Act (FCRA) that entitle consumers to accuracy in credit-reporting procedures; to receive information in their credit files; and to receive a summary of their rights. Yet despite Congress's judgment that such misdeeds deserve redress, the majority decides that TransUnion's actions are so insignificant that the Constitution prohibits consumers from vindicating their rights in federal court. The Constitution does no such thing.

I

For decades, the Treasury Department's Office of Foreign Assets Control (OFAC) has compiled a list of "Specially Designated Nationals." The list largely includes terrorists and drug traffickers, among other unseemly types. And, as a general matter, Americans are barred from doing business with those listed. In the wake of the September 11 attacks, TransUnion began to sell a new (and more expensive) type of credit report that flagged whether an individual's name matched a name found on that list.

The system TransUnion used to decide which individuals to flag was rather rudimentary. It compared only the consumer's first and last name with the names on the OFAC list. If the names were identical or similar, TransUnion included in the consumer's report an "OFAC ADVISOR ALERT," explaining that the consumer's name matches a name on the OFAC database. See, *e.g.,* 951 F.3d 1008, 1017, 1019 (CA9 2020) (" 'Cortez' would match with 'Cortes' "). TransUnion did not compare birth dates, middle initials, Social Security numbers, or any other available identifier routinely used to collect and verify credit-report data. *Id.,* at 1019, n. 2.

In 2005, a consumer sued. TransUnion had sold an OFAC credit report about this consumer to a car dealership. The report flagged her—Sandra Jean Cortez, born in May 1944

—as a match for a person on the OFAC list: Sandra Cortes Quintero, born in June 1971. TransUnion withheld this OFAC alert from the credit report that Cortez had requested. And despite Cortez's efforts to have the alert removed, TransUnion kept the alert in place for years.

After a trial, the jury returned a verdict in the consumer's favor on four FCRA claims, two of which are similar to claims at issue here: (1) TransUnion failed to follow reasonable procedures that would ensure maximum possible accuracy, 15 U.S.C. § 1681e(b); and (2) TransUnion failed to provide Cortez all information in her file despite her requests, § 1681g(a). See *Cortez v. Trans Union, LLC,* 617 F.3d 688, 696–706 (CA3 2010). The jury awarded $50,000 in actual damages and $750,000 in punitive damages, and it also took the unusual step of including on the verdict form a handwritten note urging TransUnion to "completely revam[p]" its business practices. App. to Brief for Respondent 2a. The District Court reduced the punitive damages award to $100,000, which the Third Circuit affirmed on appeal, stressing that TransUnion's failure to, "at the very least, compar[e] birth dates when they are available," was "reprehensible." 617 F.3d, at 723.

**\*17** But TransUnion "made surprisingly few changes" after this verdict. 951 F.3d, at 1021. It did not begin comparing birth dates. Or middle initials. Or citizenship. In fact, TransUnion did not compare *any* new piece of information. Instead, it hedged its language saying a consumer was a " 'potential match' " rather than saying the person was a " 'match.' " *Ibid.* And instead of listing matches for similar names, TransUnion required that the first and last names match exactly. Unsurprisingly, these reports kept flagging law-abiding Americans as potential terrorists and drug traffickers. And equally unsurprising, someone else sued.

That brings us to this case. Sergio Ramirez visited a car dealership, offered to buy a car, and negotiated the terms. The dealership then ran a joint credit check on Ramirez and his wife. The salesperson said that the check revealed that Ramirez was on " 'a terrorist list,' " so the salesperson refused to close the deal with him. *Id.,* at 1017.

Ramirez requested and received a copy of his credit report from TransUnion. The report purported to be "complete and reliable," but it made no mention of the OFAC alert. See App. 88–91. TransUnion later sent a separate " 'courtesy' " letter, which informed Ramirez that his "TransUnion credit report" had "been mailed to [him] separately." *Id.*, at 92. That letter

284

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

informed Ramirez that he was a potential match to someone in the OFAC database, but it never revealed that any OFAC information was present on his credit report. See *id.*, at 92–94. TransUnion opted not to include with this letter a description of Ramirez's rights under the FCRA or any information on how to dispute the OFAC match. 951 F.3d, at 1018. The letter merely directed Ramirez to visit the Department of Treasury's website or to call or write TransUnion if Ramirez had any additional questions or concerns.

Ramirez sued, asserting three claims under the FCRA: TransUnion willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning him, § 1681e(b); TransUnion willfully failed to disclose to him all the information in his credit file by withholding the true version of his credit report, § 1681g(a)(1); and TransUnion willfully failed to provide a summary of rights when it sent him the courtesy letter, § 1681g(c)(2).

Ramirez also sought to represent a class of individuals who had received a similar OFAC letter from TransUnion. "[E]veryone in the class: (1) was falsely labeled ... a potential OFAC match; (2) requested a copy of his or her credit report from TransUnion; and (3) in response, received a credit-report mailing with the OFAC alert redacted and a separate OFAC Letter mailing with no summary of rights." *Id.*, at 1022.

The jury found in favor of the class on all three claims. And because it also determined that TransUnion's misconduct was "willful[l]," § 1681n(a), the jury awarded each class member $984.22 in statutory damages (about $8 million total) and $6,353.08 in punitive damages (about $52 million total).

TransUnion appealed, arguing that the class members lacked standing. The Ninth Circuit disagreed, explaining that "TransUnion's reckless handling of OFAC information exposed every class member to a real risk of harm to their concrete privacy, reputational, and informational interests protected by the FCRA." *Id.*, at 1037.[1]

## II

### A

**\*18** Article III vests "[t]he judicial Power of the United States" in this Court "and in such inferior Courts as the Congress may from time to time ordain and establish." § 1.

This power "shall extend to *all* Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." § 2 (emphasis added). When a federal court has jurisdiction over a case or controversy, it has a "virtually unflagging obligation" to exercise it. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

The mere filing of a complaint in federal court, however, does not a case (or controversy) make. Article III "does not extend the judicial power to every violation of the constitution" or federal law "which may possibly take place." *Cohens v. Virginia*, 6 Wheat. 264, 405, 5 L.Ed. 257 (1821). Rather, the power extends only "to 'a case in law or equity,' in which a *right*, under such law, is asserted." *Ibid.* (emphasis added).

Key to the scope of the judicial power, then, is whether an individual asserts his or her own rights. At the time of the founding, whether a court possessed judicial power over an action with no showing of actual damages depended on whether the plaintiff sought to enforce a right held privately by an individual or a duty owed broadly to the community. See *Spokeo, Inc. v. Robins*, 578 U.S. 330, 344–346, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (THOMAS, J., concurring); see also *Thole* v. *U. S. Bank N. A.*, 590 U. S. ——, —— – ——, 140 S.Ct. 1615, 1618–19, 207 L.Ed.2d 85 (2020) (same); 3 W. Blackstone, Commentaries on the Laws of England 2 (J. Chitty ed. 1826); 4 *id.*, at 5. Where an individual sought to sue someone for a violation of his private rights, such as trespass on his land, the plaintiff needed only to allege the violation. See *Entick* v. *Carrington*, 2 Wils. K. B. 275, 291, 95 Eng. Rep. 807, 817 (K. B. 1765). Courts typically did not require any showing of actual damage. See *Uzuegbunam* v. *Preczewski*, 592 U. S. ——, —— – ——, 141 S.Ct. 792, 798-99, 209 L.Ed.2d 94 (2021). But where an individual sued based on the violation of a duty owed broadly to the whole community, such as the overgrazing of public lands, courts required "not only *injuria* [legal injury] but also *damnum* [damage]." *Spokeo*, 578 U. S., at 346, 136 S.Ct. 1540 (THOMAS, J., concurring) (citing *Robert Marys's Case*, 9 Co. Rep. 111b, 112b, 77 Eng. Rep. 895, 898–899 (K. B. 1613); brackets in original).

This distinction mattered not only for traditional common-law rights, but also for newly created statutory ones. The First Congress enacted a law defining copyrights and gave copyright holders the right to sue infringing persons in order to recover statutory damages, even if the holder "could not

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

show monetary loss." *Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917, 972 (CA11 2020) (Jordan, J., dissenting) (in the patent context, a defendant challenged an infringement suit brought under a similar law. Along the lines of what TransUnion argues here, the infringer contended that "the making of a machine cannot be an offence, because no action lies, except for actual damage, and there can be no actual damages, or even a rule for damages, for an infringement by making a machine." *Whittemore v. Cutter,* 29 F.Cas. 1120, 1121 (No. 17,600) (CC Mass. 1813). Riding circuit, Justice Story rejected that theory, noting that the plaintiff could sue in federal court merely by alleging a violation of a private right: "[W]here the law gives an action for a particular act, the doing of that act imports of itself a damage to the party" because "[e]very violation of a right imports some damage." *Ibid.*; cf. *Gayler v. Wilder,* 10 How. 477, 494, 13 L.Ed. 504 (1851) (patent rights "did not exist at common law").[2]

 **\*19** The principle that the violation of an individual right gives rise to an actionable harm was widespread at the founding, in early American history, and in many modern cases. See *Uzuegbunam,* 592 U. S., at —— – ——, 141 S.Ct. at 798-99 (collecting cases); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ("[T]he actual or threatened injury required by *Art. III* may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing" (citing cases; brackets and internal quotation marks omitted)). And this understanding accords proper respect for the power of Congress and other legislatures to define legal rights. No one could seriously dispute, for example, that a violation of property rights is actionable, but as a general matter, "[p]roperty rights are created by the State." *Palazzolo v. Rhode Island,* 533 U.S. 606, 626, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). In light of this history, tradition, and common practice, our test should be clear: So long as a "statute fixes a minimum of recovery ..., there would seem to be no doubt of the right of one who establishes a technical ground of action to recover this minimum sum without any specific showing of loss." T. Cooley, Law of Torts *271.[3] While the Court today discusses the supposed failure to show "injury in fact," courts for centuries held that injury in law to a private right was enough to create a case or controversy.

B

Here, each class member established a violation of his or her private rights. The jury found that TransUnion violated three separate duties created by statute. See App. 690. All three of those duties are owed to individuals, not to the community writ large. Take § 1681e(b), which requires a consumer reporting agency to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." This statute creates a duty: to use reasonable procedures to assure maximum possible accuracy. And that duty is particularized to an individual: the subject of the report. Section 1681g does the same. It requires an agency to "clearly and accurately disclose" to a consumer, upon his request, "[a]ll information in the consumer's file at the time of the request" and to include a written "summary of rights" with that "written disclosure." §§ 1681g(a), (c)(2). Those directives likewise create duties: provide all information in the consumer's file and accompany the disclosure with a summary of rights. And these too are owed to a single person: the consumer who requests the information.

Were there any doubt that consumer reporting agencies owe these duties to specific individuals—and not to the larger community—Congress created a cause of action providing that "[a]ny person who willfully fails to comply" with an FCRA requirement "with respect to any *consumer* is liable to *that consumer.*" § 1681n(a) (emphasis added). If a consumer reporting agency breaches any FCRA duty owed to a specific consumer, then that individual (not all consumers) may sue the agency. No one disputes that each class member possesses this cause of action. And no one disputes that the jury found that TransUnion violated each class member's individual rights. The plaintiffs thus have a sufficient injury to sue in federal court.

C

The Court chooses a different approach. Rejecting this history, the majority holds that the mere violation of a personal legal right is *not*—and never can be—an injury sufficient to establish standing. What matters for the Court is only that the "injury in fact be 'concrete.' " *Ante,* at ——. "No concrete harm, no standing." *Ante,* at ——, ——.

That may be a pithy catchphrase, but it is worth pausing to ask why "concrete" injury in fact should be the sole inquiry. After all, it was not until 1970—180 years after the ratification of Article III—that this Court even introduced the "injury

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

in fact" (as opposed to injury in law) concept of standing. *Sierra v. Hallandale Beach*, 996 F.3d 1110, 1117 (CA11 2021) (Newsom, J., concurring). And the concept then was not even about constitutional standing; it concerned a *statutory* cause of action under the Administrative Procedure Act. See *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (explaining that the injury-in-fact requirement "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question").

**\*20** The Court later took this statutory requirement and began to graft it onto its constitutional standing analysis. See, *e.g., Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). But even then, injury in fact served as an *additional* way to get into federal court. Article III injury still could "exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " *Id.,* at 500, 95 S.Ct. 2197 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). So the introduction of an injury-in-fact requirement, in effect, "represented a substantial broadening of access to the federal courts." *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 39, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). A plaintiff could now invoke a federal court's judicial power by establishing injury by virtue of a violated legal right *or* by alleging some *other* type of "personal interest." *Ibid.*

In the context of public rights, the Court continued to require more than just a legal violation. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), for example, the Court concluded that several environmental organizations lacked standing to challenge a regulation about interagency communications, even though the organizations invoked a citizen-suit provision allowing " 'any person [to] commence a civil suit ... to enjoin any person ... who is alleged to be in violation of ' " the law. See *id.,* at 558, 571–572, 112 S.Ct. 2130; 16 U.S.C. § 1540(g). Echoing the historical distinction between duties owed to individuals and those owed to the community, the Court explained that a plaintiff must do more than raise "a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws." 504 U.S. at 573, 112 S.Ct. 2130. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is

the function of Congress and the Chief Executive." *Id.,* at 576, 112 S.Ct. 2130. " 'The province of the court,' " in contrast, " 'is, solely, to decide on the rights of individuals.' " *Ibid.* (quoting *Marbury v. Madison*, 1 Cranch 137, 170, 2 L.Ed. 60 (1803)).

The same public-rights analysis prevailed in *Summers v. Earth Island Institute*, 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). There, a group of organizations sought to prevent the United States Forest Service from enforcing regulations that exempt certain projects from notice and comment. *Id.,* at 490, 129 S.Ct. 1142. The Court, again, found that the mere violation of the law "without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.,* at 496, 129 S.Ct. 1142. But again, this was rooted in the context of public rights: " 'It would exceed Article III's limitations if, at the behest of Congress and in the absence of any showing of concrete injury, we were to entertain citizen suits to vindicate the *public's* nonconcrete interest in the proper administration of the laws.' " *Id.,* at 497, 129 S.Ct. 1142 (emphasis added; brackets omitted].

In *Spokeo*, the Court built on this approach. Based on a few sentences from *Lujan* and *Summers*, the Court concluded that a plaintiff does not automatically "satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540. But the Court made clear that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements" and explained that "the violation of a procedural right granted by statute *can be* sufficient in some circumstances to constitute injury in fact." *Id.,* at 341, 342, 136 S.Ct. 1540 (emphasis added).

Reconciling these statements has proved to be a challenge. See *Sierra*, 996 F.3d at 1116–1117 (Newsom, J., concurring) (collecting examples of inconsistent decisions). But "[t]he historical restrictions on standing" offer considerable guidance. *Thole*, 590 U. S., at ——, 140 S.Ct., at 1622 (THOMAS, J., concurring). A statute that creates a public right plus a citizen-suit cause of action is insufficient by itself to establish standing. See *Lujan*, 504 U.S., at 576, 112 S.Ct. 2130.[4] A statute that creates a private right and a cause of action, however, *does* give plaintiffs an adequate interest in vindicating their private rights in federal court. See *Thole*, 590 U. S., at ——, 140 S.Ct. at 1622 (THOMAS, J., concurring); *Spokeo*, 578 U. S., at —— – ——, 136 S.Ct. 1540 (same); see

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

also *Muransky*, 979 F.3d, at 970–972 (Jordan, J., dissenting); *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 469 (CA6 2019) ("*Article III* standing may draw a line between private and public rights"); *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617, 624 (CA7 2020) (the *Spokeo* concurrence "drew a useful distinction between two types of injuries").

**\*21** The majority today, however, takes the road less traveled: "[U]nder *Article III*, an injury in law is not an injury in fact." *Ante*, at ——; but see *Webb v. Portland Mfg. Co.*, 29 F.Cas. 506, 508 (No. 17,322) (CC Me. 1838) ("The law tolerates no farther inquiry than whether there has been the violation of a right"). No matter if the right is personal or if the legislature deems the right worthy of legal protection, legislatures are constitutionally unable to offer the protection of the federal courts for anything other than money, bodily integrity, and anything else that this Court thinks looks close enough to rights existing at common law. See *ante*, at ——. The 1970s injury-in-fact theory has now displaced the traditional gateway into federal courts.

This approach is remarkable in both its novelty and effects. Never before has this Court declared that legal injury is *inherently* insufficient to support standing.[5] And never before has this Court declared that legislatures are constitutionally precluded from creating legal rights enforceable in federal court if those rights deviate too far from their common-law roots. According to the majority, courts alone have the power to sift and weigh harms to decide whether they merit the Federal Judiciary's attention. In the name of protecting the separation of powers, *ante*, at ——, ——, this Court has relieved the legislature of its power to create and define rights.

### III

Even assuming that this Court should be in the business of second-guessing private rights, this is a rather odd case to say that Congress went too far. TransUnion's misconduct here is exactly the sort of thing that has long merited legal redress.

As an initial matter, this Court has recognized that the unlawful withholding of requested information causes "a sufficiently distinct injury to provide standing to sue." *Public Citizen v. Department of Justice*, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); see also *Havens Realty Corp.*, 455 U.S., at 374, 102 S.Ct. 1114. Here, TransUnion unlawfully withheld from each class member the OFAC version of his or her credit report that the class member

requested. And TransUnion unlawfully failed to send a summary of rights. The majority's response is to contend that the plaintiffs actually did not allege that they failed to receive any required information; they alleged only that they received it in the "*wrong format*." *Ante*, at ——.

That reframing finds little support in the complaint, which alleged that TransUnion "fail[ed] to include the OFAC alerts ... in the consumer's own files which consumers, as of right, may request and obtain," and that TransUnion did "not advise consumers that they may dispute inaccurate OFAC alerts." Class Action Complaint in No. 3:12–cv–00632, ECF Doc. 1 (ND Cal.), p. 5. It also finds no footing in the record. Neither the mailed credit report nor separate letter provide any indication that a person's report is marked with an OFAC alert. See, *e.g.*, App. 88–94.

**\*22** Were there any doubt about the facts below, we have the helpful benefit of a jury verdict. The jury found that "Defendant TransUnion, LLC willfully fail[ed] to clearly and accurately disclose OFAC information in the written disclosures it sent to members of the class." *Id.*, at 690. And the jury found that "Defendant TransUnion, LLC willfully fail[ed] to provide class members a summary of their FCRA rights with each written disclosure made to them." *Ibid.* I would not be so quick as to recharacterize these jury findings as mere "formatting" errors. *Ante*, at ——, —— – ——; see also U. S. Const., Amdt. 7 ("no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law").

Moreover, to the extent this Court privileges concrete, *financial* injury for standing purposes, recall that TransUnion charged its clients extra to receive credit reports with the OFAC designation. According to TransUnion, these special OFAC credit reports are valuable. Even the majority must admit that withholding something of value from another person—that is, "monetary harm"—falls in the heartland of tangible injury in fact. *Ante*, at ——, ——. Recognizing as much, TransUnion admits that its clients would have standing to sue if they, like the class members, did not receive the OFAC credit reports they had requested. Tr. of Oral Arg. 9.

And then there is the standalone harm caused by the rather extreme errors in the credit reports. The majority (rightly) decides that having one's identity falsely and publicly associated with terrorism and drug trafficking is itself a concrete harm. *Ante*, at —— – ——. For good reason. This case is a particularly grave example of the harm this

288

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

Court identified as central to the FCRA: "curb[ing] the dissemination of false information." *Spokeo, 578 U. S., at 342, 136 S.Ct. 1540*. And it aligns closely with a "harm that has traditionally been regarded as providing a basis for a lawsuit." *Id., at 341, 136 S.Ct. 1540*. Historically, "[o]ne who falsely, and without a privilege to do so, publishes matter defamatory to another in such a manner as to make the publication a libel is liable to the other," even though "no special harm or loss of reputation results therefrom." Restatement of Torts § 569, p. 165 (1938).

The question this Court has identified as key, then, is whether a plaintiff established "a degree of risk" that is "sufficient to meet the concreteness requirement." *Spokeo, 578 U. S., at 343, 136 S.Ct. 1540*. Here, in a 7-month period, it is undisputed that nearly 25 percent of the class had false OFAC-flags sent to potential creditors. Twenty-five percent over just a 7-month period seems, to me, "a degree of risk sufficient to meet the concreteness requirement." *Ibid*. If 25 percent is insufficient, then, pray tell, what percentage is?

The majority deflects this line of analysis by all but eliminating the risk-of-harm analysis. According to the majority, an elevated risk of harm simply shows that a concrete harm is *imminent* and thus may support only a claim for injunctive relief. *Ante*, at ——, ——. But this reworking of *Spokeo* fails for two reasons. First, it ignores what *Spokeo* said: "[Our opinion] does not mean ... that the risk of real harm cannot satisfy the requirement of concreteness." *Spokeo, 578 U. S., at 341, 136 S.Ct. 1540*. Second, it ignores what *Spokeo* did. The Court in *Spokeo* remanded the respondent's claims for statutory damages to the Ninth Circuit to consider "whether the ... violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement." *Id., at 342–343, 136 S.Ct. 1540*. The theory that risk of harm matters only for injunctive relief is thus squarely foreclosed by *Spokeo* itself.

But even if risk of harm is out, the Ninth Circuit indicated that every class member may have had an OFAC alert disclosed. According to the court below, TransUnion not only published this information to creditors for a quarter of the class but also "communicated about the database information and OFAC matches" with a third party. 951 F.3d, at 1026; cf. *Cortez*, 617 F.3d, at 711 (TransUnion cannot avoid FCRA liability "by simply contracting with a third party to store and maintain information"). Respondent adds to this by pointing out that TransUnion published this information to vendors that printed and sent the mailings. See Brief for Respondent 16; see also

App. 161 (deposition testimony explaining that "a printed credit report ... would have been sent through our print vendor through the mail and delivered to the consumer requesting the file disclosure); *id.,* at 545 (trial testimony identifying three different print-vendor companies that worked with TransUnion during the relevant time period). In the historical context of libel, publication to even a single other party could be enough to give rise to suit. This was true, even where the third party was a telegraph company,[6] an attorney,[7] or a stenographer who merely writes the information down.[8] Surely with a harm so closely paralleling a common-law harm, this is an instance where a plaintiff "need not allege any additional harm beyond the one Congress has identified." *Spokeo, 578 U. S., at 342, 136 S.Ct. 1540* (emphasis deleted).

**\*23** But even setting aside everything already mentioned—the Constitution's text, history, precedent, financial harm, libel, the risk of publication, and actual disclosure to a third party—one need only tap into common sense to know that receiving a letter identifying you as a potential drug trafficker or terrorist is harmful. All the more so when the information comes in the context of a credit report, the entire purpose of which is to demonstrate that a person can be trusted.

And if this sort of confusing and frustrating communication is insufficient to establish a real injury, one wonders what could rise to that level. If, instead of falsely identifying Ramirez as a potential drug trafficker or terrorist, TransUnion had flagged him as a "potential" child molester, would that alone still be insufficient to open the courthouse doors? What about falsely labeling a person a racist? Including a slur on the report? Or what about openly reducing a person's credit score by several points because of his race? If none of these constitutes an injury in fact, how can that possibly square with our past cases indicating that the inability to "observe an animal species, even for purely esthetic purposes, ... undeniably" is? *Lujan*, 504 U.S., at 562, 112 S.Ct. 2130; see also *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened" (internal quotation marks omitted)); *Summers*, 555 U.S., at 494, 129 S.Ct. 1142 ("[I]f ... harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice"). Had the class members claimed an aesthetic interest in viewing an accurate report, would this case have come out differently?

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

And if some of these examples do cause sufficiently "concrete" and "real"—though "intangible"—harms, how do *we* go about picking and choosing which ones do and which do not? I see no way to engage in this "inescapably value-laden" inquiry without it "devolv[ing] into [pure] policy judgment." *Sierra*, 996 F.3d, at 1129 (Newsom, J., concurring). Weighing the harms caused by specific facts and choosing remedies seems to me like a much better fit for legislatures and juries than for this Court.

Finally, it is not just the harm that is reminiscent of a constitutional case or controversy. So too is the remedy. Although statutory damages are not necessarily a proxy for unjust enrichment, they have a similar flavor in this case. TransUnion violated consumers' rights in order to create and sell a product to its clients. Reckless handling of consumer information and bungled responses to requests for information served a means to an end. And the end was financial gain. "TransUnion could not confirm that a single OFAC alert sold to its customers was accurate." 951 F.3d, at 1021, n. 4. Yet thanks to this Court, it may well be in a position to keep much of its ill-gotten gains.[9]

* * *

**\*24** Ultimately, the majority seems to pose to the reader a single rhetorical question: Who could possibly think that a person is harmed when he requests and is sent an incomplete credit report, or is sent a suspicious notice informing him that he may be a designated drug trafficker or terrorist, or is *not* sent anything informing him of how to remove this inaccurate red flag? The answer is, of course, legion: Congress, the President, the jury, the District Court, the Ninth Circuit, and four Members of this Court.

I respectfully dissent.

Justice KAGAN, with whom Justice BREYER and Justice SOTOMAYOR join, dissenting.
The familiar story of Article III standing depicts the doctrine as an integral aspect of judicial restraint. The case-or-controversy requirement of Article III, the account runs, is "built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Rigorous standing rules help safeguard that separation by keeping the courts away from

issues "more appropriately addressed in the representative branches." *Id.*, at 751, 104 S.Ct. 3315. In so doing, those rules prevent courts from overstepping their "proper—and properly limited—role" in "a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); see *ante*, at —— — —— (THOMAS, J., dissenting).

After today's decision, that story needs a rewrite. The Court here transforms standing law from a doctrine of judicial modesty into a tool of judicial aggrandizement. It holds, for the first time, that a specific class of plaintiffs whom Congress allowed to bring a lawsuit cannot do so under Article III. I join Justice THOMAS's dissent, which explains why the majority's decision is so mistaken. As he recounts, our Article III precedents teach that Congress has broad "power to create and define rights." *Ante*, at ——; see *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Warth*, 422 U.S., at 500, 95 S.Ct. 2197. And Congress may protect those rights by authorizing suits not only for past harms but also for the material risk of future ones. See *Spokeo*, 578 U. S., at 341–343, 136 S.Ct. 1540; *ante*, at —— (THOMAS, J., dissenting). Under those precedents, this case should be easy. In the Fair Credit Reporting Act, Congress determined to protect consumers' reputations from inaccurate credit reporting. TransUnion willfully violated that statute's provisions by preparing credit files that falsely called the plaintiffs potential terrorists, and by obscuring that fact when the plaintiffs requested copies of their files. To say, as the majority does, that the resulting injuries did not " 'exist' in the real world" is to inhabit a world I don't know. *Ante*, at ——. And to make that claim in the face of Congress's contrary judgment is to exceed the judiciary's "proper—and properly limited—role." *Warth*, 422 U.S., at 498, 95 S.Ct. 2197; see *ante*, at —— — —— (THOMAS, J., dissenting).

I add a few words about the majority's view of the risks of harm to the plaintiffs. In addressing the claim that TransUnion failed to maintain accurate credit files, the majority argues that the "risk of dissemination" of the plaintiffs' credit information to third parties is "too speculative." *Ante*, at ——. But why is it so speculative that a company in the business of selling credit reports to third parties will in fact sell a credit report to a third party? See also *ante*, at —— (THOMAS, J., dissenting) (noting that "nearly 25% of the class" already had false reports "sent to potential creditors"). And in addressing the claims of faulty disclosure to the plaintiffs, the majority makes a set of curious assumptions.

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

According to the majority, people who specifically request a copy of their credit report may not even "*open[ ]* " the envelope. *Ante*, at —— (emphasis in original). And people who receive multiple opaque mailings are not likely to be "confused." *Ibid.*; but see *Niz-Chavez v. Garland*, 593 U. S. ——, ——, 141 S.Ct. 1474, 1485, —— L.Ed.2d —— (2021) (explaining that a "series of letters," "each containing a new morsel of vital information," is likely to perplex recipients). And finally, people who learn that their credit files label them potential terrorists would not "have tried to correct" the error. *Ante*, at ——. Rather than accept those suppositions, I sign up with Justice THOMAS: "[O]ne need only tap into common sense to know that receiving a letter identifying you as a potential drug trafficker or terrorist is harmful." *Ante*, at ——.

**\*25** I differ with Justice THOMAS on just one matter, unlikely to make much difference in practice. In his view, any "violation of an individual right" created by Congress gives rise to Article III standing. *Ante*, at ——. But in *Spokeo*, this Court held that Article III requires a concrete injury even in the context of a statutory violation." 578 U. S., at 341,

136 S.Ct. 1540. I continue to adhere to that view, but think it should lead to the same result as Justice THOMAS's approach in all but highly unusual cases. As *Spokeo* recognized, "Congress is well positioned to identify [both tangible and] intangible harms" meeting Article III standards. *Ibid.* Article III requires for concreteness only a "real harm" (that is, a harm that "actually exist[s]") or a "risk of real harm." *Ibid.* And as today's decision definitively proves, Congress is better suited than courts to determine when something causes a harm or risk of harm in the real world. For that reason, courts should give deference to those congressional judgments. Overriding an authorization to sue is appropriate when but only when Congress could not reasonably have thought that a suit will contribute to compensating or preventing the harm at issue. Subject to that qualification, I join Justice THOMAS's dissent in full.

**All Citations**

--- S.Ct. ----, 2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

**Footnotes**

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      The lead dissent notes that the terminology of injury in fact became prevalent only in the latter half of the 20th century. That is unsurprising because until the 20th century, Congress did not often afford federal "citizen suit"-style causes of action to private plaintiffs who did not suffer concrete harms. For example, until the 20th century, Congress generally did not create "citizen suit" causes of action for private plaintiffs to sue the Government. See Magill, Standing for the Public, 95 Va. L. Rev. 1131, 1186–1187 (2009). Moreover, until *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), a plaintiff often could not bring a pre-enforcement suit against a Government agency or official under the Administrative Procedure Act arguing that an agency rule was unlawful; instead, a party could raise such an argument only in an enforcement action. Likewise, until the 20th century, Congress rarely created "citizen suit"-style causes of action for suits against private parties by private plaintiffs who had not suffered a concrete harm. All told, until the 20th century, this Court had little reason to emphasize the injury-in-fact requirement because, until the 20th century, there were relatively few instances where litigants without concrete injuries had a cause of action to sue in federal court. The situation has changed markedly, especially over the last 50 years or so. During that time, Congress has created many novel and expansive causes of action that in turn have required greater judicial focus on the requirements of Article III. See, *e.g.*, *Spokeo, Inc. v. Robins*, 578 U. S. 330, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016); *Summers v. Earth Island Institute*, 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

2      A plaintiff must show that the injury is not only concrete but also particularized. But if there were no concrete-harm requirement, the requirement of a particularized injury would do little or nothing to constrain Congress from freely creating causes of action for vast classes of *unharmed* plaintiffs to sue any defendants who violate any federal law. (Congress might, for example, provide that everyone has an individual right to clean air and can sue any defendant who violates any air-pollution law.) That is one reason why the Court has been careful to emphasize that concreteness and particularization are separate requirements. See *Spokeo*, 578 U. S., at 339-40, 136 S.Ct. 1540; see generally Bayefsky, Constitutional Injury and Tangibility, 59 Wm. & Mary L. Rev. 2285, 2298–2300, 2368 (2018).

TransUnion LLC v. Ramirez, --- S.Ct. ---- (2021)
2021 WL 2599472, 21 Cal. Daily Op. Serv. 6194

3    The lead dissent would reject the core standing principle that a plaintiff must always have suffered a concrete harm, and would cast aside decades of precedent articulating that requirement, such as *Spokeo*, *Summers*, and *Lujan*. *Post*, at —— – —— (opinion of THOMAS, J.). As we see it, the dissent's theory would largely outsource Article III to Congress. As we understand the dissent's theory, a suit seeking to enforce "general compliance with regulatory law" would not suffice for Article III standing because such a suit seeks to vindicate a duty owed to the whole community. *Spokeo*, 578 U. S., at 345, 136 S.Ct. 1540 (THOMAS, J., concurring) (internal quotation marks omitted). But under the dissent's theory, so long as Congress frames a defendant's obligation to comply with regulatory law as an obligation owed to *individuals*, any suit to vindicate that obligation suddenly suffices for Article III. Suppose, for example, that Congress passes a law purporting to give all American citizens an individual right to clean air and clean water, as well as a cause of action to sue and recover $100 in damages from any business that violates any pollution law anywhere in the United States. The dissent apparently would find standing in such a case. We respectfully disagree. In our view, unharmed plaintiffs who seek to sue under such a law are still doing no more than enforcing general compliance with regulatory law. And under Article III and this Court's precedents, Congress may not authorize plaintiffs who have not suffered concrete harms to sue in federal court simply to enforce general compliance with regulatory law.

4    We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class. See, *e.g.*, *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (CA11 2019).

5    For purposes of this case, the parties have assumed that TransUnion violated the statute even with respect to those plaintiffs whose OFAC alerts were never disseminated to third-party businesses. But see *Washington v. CSC Credit Servs. Inc.*, 199 F.3d 263, 267 (CA5 2000). We take no position on that issue.

6    For the first time in this Court, the plaintiffs also argue that TransUnion "published" the class members' information internally—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received. That new argument is forfeited. In any event, it is unavailing. Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation. See, *e.g.*, *Chalkley v. Atlantic Coast Line R. Co.*, 150 Va. 301, 326–328, 143 S.E. 631, 638–639 (1928). Nor have they necessarily recognized disclosures to printing vendors as actionable publications. See, *e.g.*, *Mack v. Delta Air Lines, Inc.*, 639 Fed.Appx. 582, 586 (CA11 2016). Moreover, even the plaintiffs' cited cases require evidence that the defendant actually "brought an idea to the perception of another," Restatement of Torts § 559, Comment *a*, p. 140 (1938), and thus generally require evidence that the document was actually read and not merely processed, cf. *Ostrowe v. Lee*, 256 N.Y. 36, 38–39, 175 N.E. 505, 505–506 (1931) (Cardozo, C. J.). That evidence is lacking here. In short, the plaintiffs' internal publication theory circumvents a fundamental requirement of an ordinary defamation claim—publication—and does not bear a sufficiently "close relationship" to the traditional defamation tort to qualify for Article III standing.

7    For example, a plaintiff 's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm. We take no position on whether or how such an emotional or psychological harm could suffice for Article III purposes—for example, by analogy to the tort of intentional infliction of emotional distress. See Reply Brief 14; Tr. of Oral Arg. 30. The plaintiffs here have not relied on such a theory of Article III harm. They have not claimed an emotional distress injury from the risk that a misleading credit report might be sent to a third-party business. Nor could they do so, given that the 6,332 plaintiffs have not established that they were even aware of the misleading information in the internal credit files maintained at TransUnion.

8    The District Court and the Court of Appeals concluded that Ramirez (in addition to the other 8,184 class members) had standing as to those two claims. In this Court, TransUnion has not meaningfully contested Ramirez's individual standing as to those two claims. We have no reason or basis to disturb the lower courts' conclusion on Ramirez's individual standing as to those two claims.

1    TransUnion also contends that Ramirez's claims and defenses are not typical of those of the class. The Court declines to reach that question because its jurisdictional holding is dispositive. *Ante*, at ——. In my view, the District Court did not abuse its discretion in certifying the class given the similarities among the claims and defenses at issue.

2    The "public rights" terminology has been used to refer to two different concepts. In one context, these rights are " 'take[n] from the public' "—like the right to make, use, or sell an invention—and " 'bestow[ed] ... upon the' " individual, like a "decision to grant a public franchise." *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. ——, —— – ——, 138 S.Ct. 1365 1372-74, 200 L.Ed.2d 671 (2018). Disputes with the Government over these rights generally can be resolved "outside of an Article III court." *Id.*, at —— – ——, 138 S.Ct. at 1374. Here, in contrast, the term "public rights" refers to duties owed collectively to the community. For example, Congress owes a duty to all Americans to legislate within its constitutional confines. But not every single American can sue over Congress' failure to do so. Only individuals who, at a minimum, establish harm beyond the mere violation of that constitutional duty can sue. Cf. *Fairchild*

*v. Hughes*, 258 U.S. 126, 129–130, 42 S.Ct. 274, 66 L.Ed. 499 (1922) ("Plaintiff has only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted. Obviously this general right does not entitle a private citizen to institute in the federal courts a suit to secure by indirection a determination whether a statute, if passed, or a constitutional amendment, about to be adopted, will be valid").

3    Etymology is also a helpful guide. The word "injury" stems from the Latin "*ir.juria*," which combines "in" (expressing negation) and "jus" (right, law, justice). See Barnhart Dictionary of Etymology 529 (1988).

4    But see Caminker, Comment, The Constitutionality of *Qui Tam* Actions, 99 Yale L. J. 341, 342, n. 3 (1989) ("Six statutes [enacted by the First Congress] imposed penalties and/or forfeitures for conduct injurious to the general public and expressly authorized suits by private informers, with the recovery being shared between the informer and the United States"); *McCulloch v. Maryland*, 4 Wheat. 316, 317, 321–322, 4 L.Ed. 579 (1819) (reviewing "an action of debt brought by the defendant in error ... who sued as well for himself as for the State of Maryland ... to recover certain penalties").

5    See, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("Nothing in this contradicts the principle that the injury required by Art. III may result solely by virtue of 'statutes creating legal rights, the invasion of which creates standing' (internal quotation marks, brackets, and ellipsis omitted)); *Warth v. Seldin*, 422 U.S. 490, 514, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute"); *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute").

6    *Munson v. Lathrop*, 96 Wis. 386, 389, 71 N.W. 596, 597 (1897) ("The writing of the message, and the delivery of it by him to the [telegraph] company for transmission, was a publication of the same").

7    *Hedgepeth v. Coleman*, 183 N.C. 309, 312–313, 111 S.E. 517, 519 (1922) ("[I]t has been held that the publication was sufficient where the defendant had communicated the defamatory matter to the plaintiff 's agent, or attorney; or had read it to a friend before posting it to the plaintiff; or had procured it to be copied, or sealed in the form of a letter addressed to the plaintiff and left in the house of a neighbor by whom it was read; or had caused it to be delivered to and read by a member of the plaintiff 's family").

8    *Rickbeil v. Grafton Deaconess Hospital*, 74 N.D. 525, 542, 23 N.W.2d 247 (1946) ("We hold that the dictating of this letter by the manager to the stenographer and her transcription of her notes into the written instrument constitutes publication within the purview of the law of libel: whether the relationship be that of master and servant or of coemployees of a corporation"); see also *Larimore v. Blaylock*, 259 Va. 568, 573, 528 S.E.2d 119, 122 (2000) (rejecting an argument of "absolute protection of the 'intracorporate immunity doctrine' " for defamatory statements); but see *Swindle v. State*, 10 Tenn. 581, 582 (1831) (" 'A personal libel is published when it arrives to the person *against whom it is written*, pursuant to the design of the author, or is made known to any other person, by any means to which the dissent of the author is not necessarily implied' " (emphasis added)).

9    Today's decision might actually be a pyrrhic victory for TransUnion. The Court does not prohibit Congress from creating statutory rights for consumers; it simply holds that federal courts lack jurisdiction to hear some of these cases. That combination may leave state courts—which "are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law," *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989)—as the sole forum for such cases, with defendants unable to seek removal to federal court. See also Bennett, The Paradox of Exclusive State-Court Jurisdiction Over Federal Claims, 105 Minn. L. Rev. 1211 (2021). By declaring that federal courts lack jurisdiction, the Court has thus ensured that state courts will exercise exclusive jurisdiction over these sorts of class actions.

---

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Robert I. Steiner (admitted *pro hac vice*)
rsteiner@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone:   (212) 808-7800
Facsimile:    (212) 808-7897

Becca Wahlquist (State Bar No. 215948)
bwahlquist@kelleydrye.com
Tahir L. Boykins (State Bar No. 323441)
tboykins@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone:   (310) 712-6100
Facsimile:    (310) 712-6199

*Attorneys for Defendant*
*Laboratory Corporation of America Holdings*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, et al. | CASE NO. 2:20-CV-00893-FMO-KS |
| Plaintiffs, | **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF LABCORP'S OPPOSITION TO MOTION TO CERTIFY CLASS** |
| v. | |
| LABORATORY CORPORATION OF AMERICA HOLDINGS, et al. | |
| Defendants. | Hr'g Date:   May 27, 2021<br>Time:         10:00 am<br>Location:    Courtroom 6D<br>FAC Filed:  September 3, 2020<br>Trial Date:  Not Yet Set |

## I.    **INTRODUCTION**

Plaintiffs Vargas's and Davis's alleged preference to self check-in at a PSC kiosk with certain proposed technologies they claim would make the kiosks usable for them does not mean that Labcorp violates the ADA (or any other law) in offering a front desk check-in process via a qualified reader, as specifically authorized by the ADA. Nor can their personal preference form the basis for class-wide relief. Indeed, when it comes to ADA class actions, putative class plaintiffs generally claim that they and other persons were prevented from accessing services by physical barriers, which a proposed injunction, if granted, would remedy for all class members (i.e. access ramps of a specific grade, or lower counters at a certain height). But here, there are no claims that any legally blind persons were barred in any way from entering PSCs or from receiving the medical testing offered at PSCs. Further, Plaintiffs have no proposed "fix" to the check-in kiosks that would make touch-screen kiosks accessible to all legally blind persons, as Labcorp's desk check-in process does through the use of a qualified reader. Plaintiff ACB's own corporate representative and ACB member Mr. Harden illustrate this point: both confirmed that they would prefer front-desk check-in with a PSC employee as a reasonable accommodation for blindness (if an accommodation is required for checking in).

The absurdity of the class-wide relief Plaintiffs demand is illustrated by the fact that if Labcorp were required to make the kiosks "independently" accessible through the technology solutions proposed by Plaintiffs and their expert, it could then presumably require all blind people to check in through the kiosks and not offer desk check-in as it currently does. But that "solution," would make checking in to PSCs less accessible to people such as Mr. Harden and others who, for a variety of reasons, cannot or prefer not to use the kiosks. Certainly, nothing about Plaintiffs' own personal preference to use kiosks can be presumed to apply to all members of the putative class.

Thus, Plaintiffs have not shown that they are typical representatives, as

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

required by Rule 23(a).  Further, Plaintiffs lack a common remedy to anchor their Rule 23(b)(2) class, and have failed to show that common questions predominate in regards to their proposed Rule 23(b)(3) California subclass (which also lacks numerosity and superiority).  Plaintiffs' proposed classes should not be certified, as detailed in Labcorp's sections of the Joint Brief (Dkt. 66-1) and below.

## II.    LEGAL ARGUMENT

### A.    Plaintiffs Are Not Typical As Required By Rule 23(a)(3).

Plaintiffs seek an injunction requiring that certain technologies be provided at the check-in kiosks.  However, it is undisputed that a qualified reader option at the front desk is available via a PSC employee (*see, e.g.,* Dkt. 66-1 at 23 (Vargas testimony)); that certain legally blind persons and ACB prefer that front desk check in option (*id.* at 24 (Harden testimony)); and that Plaintiffs' preferred technologies would not make kiosks fully and independently accessible for all legally blind persons, as Plaintiffs' own expert conceded.  *Id.* at 26, 44 (Montgomery testimony, also conceding that the purported expert had no information as to the actual preferences of legally blind persons).  Using a kiosk to check in at a PSC is not mandatory, and it would violate Labcorp's policy to tell customers otherwise.  *Id.* at 21.  Indeed, even after the kiosk rollout, a substantial segment of PSC patients continue to use the front desk to check-in for appointments, with over 25% checking in at the front desk.  *Id.*

When class members have no injury that would be remedied by a common injunction, a putative class plaintiff has not shown typicality needed for a 23(b)(2) class.  *See, e.g., Mielo v. Bob Evans Farms, Inc.*, 2015 WL 1299815, at \*9-10 (W.D. Pa. Mar. 23, 2015) (finding that variations in class member experiences at Bob Evans' parking lots meant that plaintiff was not typical because some plaintiffs would not have the same claimed injury, and denying Rule 23(b)(2) certification where a common injunction would not resolve claims "in one stroke").  Here, there is no indication that Davis's and Vargas's claim of injury caused by the kiosk

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

1    inaccessibility is typical:   Plaintiff ACB sent out surveys to over 4,500 members

2    regarding check-in experiences at Labcorp PSCs, and of the handful of members

3    that replied, one legally blind respondent made clear that both he and his legally

4    blind wife preferred front desk check-in and believed that to be a reasonable

5    accommodation under the ADA, *see* Dkt. 66-1 at 24-25, the same accommodation

6    preference shared by Plaintiff ACB.  *See id.* at 25.  No ACB member who responded

7    to the survey claimed that they were told that they **must** use the kiosk (*id.*) and even

8    Vargas, who purports to represent a class based on his own claimed "common"

9    experiences, was clearly told he need not use the kiosk for check-in and was

10   checked in at the desk (*id.* at 22-23).

11          Thus the record evidence illustrates that were a class certified, it would

12   include persons: (1) who visited a PSC without a kiosk at all or without a working

13   kiosk; or (2) who prefer front-desk check in with a qualified reader to self-check-in

14   procedures.  No such persons have been "injured" by the lack of an independently

15   accessible kiosk check-in option, as Plaintiffs claim to have been, when arriving for

16   their appointments.  As the *Moeller* court explained when considering the proposed

17   injunctive relief class that it did certify (before refusing to certify the California

18   damages subclass in an amended decision eight years later), injury must be at the

19   core of a Rule 23(b)(2) class membership, even if injuries need not be identical.  *See*

20   *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), amended in part,

21   2012 WL 3070863 (N.D. Cal. July 26, 2012) ("The Ninth Circuit does 'not insist

22   that the named plaintiffs' injuries be identical with those of the other class members,

23   only that the unnamed class members have injuries similar to those of the named

24   plaintiffs and that the injuries result from the same injurious course of conduct.'"

25   (citing *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001))).

26          Plaintiffs cite to this 2004 *Moeller* decision on the 23(b)(2) class as

27   supporting their own claims of typicality, but *Moeller* was a different type of ADA

28   case involving allegations of physical barriers that impacted all persons in

3

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

297

wheelchairs from accessing services at Taco Bell restaurants. It did not involve a situation, as here, where legally blind persons (such as Mr. Vargas and Ms. VanLant) checked in via the front desk and received their medical testing, where other legally blind persons (such as Mr. Davis) had already checked in online before arriving at the PSC, or where legally blind persons (such as Mr. Harden) prefer to check in via the front desk and do so on a regular basis. *See* Dkt. 66-1 at 39-40.

There simply is not a uniform experience at check-in: while Plaintiff ACB's representative ***mistakenly*** believed there was a mandatory kiosk check in for all PSC visitors, kiosk check in is not mandatory, as Labcorp testified (Dkt. 66-1 at 21-22), as Plaintiff Vargas and ACB members Mr. Harden and Ms. VanLant confirmed in their depositions (*id.* at 41 n.10), and as Labcorp's own statistics demonstrate (*id.* at 21 (25% of Labcorp PSC customers check in at the desk)). Various configurations of PSCs have different front-desk set ups and staffing, but there is always an on-site employee (whether a phlebotomist, a dedicated receptionist, or a dedicated Walgreens staff member) who can perform the check-in from the front desk. *Id.* at 21-22, 48. Notably, ***ACB's own representative agreed that if patients were allowed to check in at the front desk, the check-in would <u>not</u> be discriminatory***. *Id.* Moreover, various PSCs during the class period had no operational kiosk, so that all persons needing on-site check in were checked in via the front desk. *Id.* at 28.

It is not the case that all the putative class members each share the same "injury" claimed by Plaintiffs when varied staffing, the type of PSC involved, the number of patients at the location during a visit, and other shifting factors would impact whether there was a shorter wait for kiosk check-in than for a front desk check-in; when an operational kiosk may not have been available at all for use; and when some legally blind persons could not use a kiosk even with Plaintiffs' proposed modifications. *See Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 156 (1982) ("a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."). Thus, as detailed in the

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

1  Joint Brief (Dkt. 66-1 at 39-41), Plaintiffs have not met their burden of showing they
2  are typical of the classes they hope to represent, and no class should be certified
3  pursuant to Rule 23. And because they are not typical, Plaintiffs are inadequate
4  representatives as well.

### B. No Common Remedy Would Provide Relief To All Class Members, So As To Support Certifying A Rule 23(b)(2) Class.

7  In addition to lacking typicality (and numerosity and adequacy as noted in the
8  Joint Brief), Plaintiffs have not shown the kind of commonality required for an
9  injunctive relief Rule 23(b)(2) class: a **common remedy** that would provide relief
10 to each member of the putative class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.
11 338, 360 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory
12 judgment would provide relief to each member of the class. It does not authorize
13 class certification when each individual class member would be entitled to a
14 *different* injunction or declaratory judgment against the defendant."). When
15 designing the kiosk check-in process, Labcorp improved its front desk check-in
16 process, as no kiosk could be useable by all blind persons to check-in for PSC
17 appointments. *See* Dkt. 66-1 at 20, 44. Plaintiffs' proposed technology changes to
18 the kiosk would not make touchscreen kiosks available to persons with different
19 technological abilities and preferences, as Plaintiff ACB and Plaintiffs' own expert
20 concede. *Id.* at 44-45. Here, where even the named Plaintiffs and their expert do
21 not agree on the appropriate accommodation that could make the kiosk check-in
22 process fully accessible to all legally blind class members, no injunction would
23 provide relief to each member of the class. *See, e.g., Mielo,* 2015 WL 1299815, at
24 *12 (denying 23(b)(2) certification where "[Defendant's] conduct is not such that it
25 can be enjoined or declared unlawful only as to all of the class members or as to
26 none of them, nor can it answer the common question in one stroke.").

27 Plaintiffs' ADA injunctive claims would not provide a common remedy of
28 access to previously inaccessible places of public accommodation. Thus, the

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

299

1    23(b)(2) class should not be certified.

2    **C.    The Rule 23(b)(3) California Damages Subclass Is Not Certifiable.**

3    In addition to the Rule 23(a) factors Plaintiff failed to show (numerosity and

4    typicality—*see* Dkt. 66-1 at 34-36, 39-41), the proposed California resident subclass

5    fails entirely to meet any of Rule 23(b) requirements for a damages class.

6    **1.    Common Issues Do Not Predominate for the Subclass.**

7    Plaintiffs apparently hope to find some way to identify (somehow) which

8    California residents who visited a Labcorp PSC were legally blind, and then assert

9    that each is entitled to statutory damages for each visit under California disability

10   statutes.  However, as detailed at Dkt. 66-1 at 47-50, in order to establish a claim for

11   damages under the Unruh Act, a plaintiff must show, among other things, that he

12   "actually presented himself to a business or public accommodation with the intent of

13   purchasing its products or utilizing its services in the manner in which those

14   products and/or services are typically offered to the public **and was actually denied**

15   **equal access on a particular occasion**."  *Reycraft v. Lee,* 177 Cal. App. 4th 1211,

16   1224 (2009) (emphasis added); *see also Antoninetti v. Chipotle Mexican Grill, Inc.*,

17   643 F.3d 1165, 1177 (9th Cir. 2010) (plaintiff "must show that he actually presented

18   himself to the restaurant on a particular occasion, as any other customer would do,

19   with the intent of being … served and to purchase food…in the manner offered

20   **[and] actually encountered access to…the restaurant that was not full and**

21   **equal**") (emphasis added) (internal quotation marks omitted); *Urhausen v. Longs*

22   *Drug Stores California*, 155 Cal. App. 4th 254, 263 (2007) ("The phrase "denied

23   equal access" necessarily implies that either the structure of the public facility, or

24   some policy of its operator, precluded equal access.").

25   To show a "denial of equal access," it is insufficient to merely prove a

26   violation of the accessibility standards under the ADA or Unruh Act or a

27   noncompliant policy.  *Mundy v. Pro-Thro Enterprises*, 192 Cal. App. 4th Supp. 1, 5

28   (Cal. App. Dep't Super. Ct. 2011) (a plaintiff alleging a violation of either the Unruh

6

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

300

1    Act or the Disabled Persons Act may recover statutory damages <u>only</u> if he or she

2    proves difficulty, discomfort, or embarrassment as a result of the violation); *Doran*

3    *v. 7-Eleven, Inc.*, 509 F. App'x 647, 648 (9th Cir. 2013) (district court properly

4    dismissed the plaintiff's claims under the Unruh Act and the Disabled Persons Act

5    because he did not prove that he "experienced difficulty, discomfort, or

6    embarrassment because of the violation"); *Vondersaar v. Starbucks Corp.*, 2015 WL

7    629437, at *4 (C.D. Cal. Feb. 12, 2015), *aff'd*, 719 F. App'x 657 (9th Cir. 2018)

8    (individual liability and damages showing required).

9          Instead, as explained by the court in *Urhausen*, 155 Cal. App. 4th at 265-66, a

10   damages claim must be tied to an actual impairment from the alleged ADA

11   violation:  "Plaintiff's attempt to equate a denial of access with the presence of a

12   violation of federal or state regulations would nullify the standing requirement of

13   section 54.3, since any disabled person could sue for statutory damages whenever he

14   or she encountered noncompliant facilities, **regardless of whether the lack of**

15   **compliance actually impaired the plaintiff's access to those facilities**."

16   (emphasis added.)  *See also Reycraft*, 177 Cal. App. 4th at 1223 (same).  Thus, not

17   every denial of "full and equal access" can give rise to a cause of action for

18   damages, which has a separate standing requirement relying on the individual facts

19   of the encounter.  *See, e.g., Strojnik v. Xenia Hotels & Resorts, Inc.,* 2020 WL

20   3060761, at *5 (N.D. Cal. June 9, 2020) (where plaintiff claimed hotel doors were

21   not compliant with ADA, but did not allege he could not access the facilities another

22   way, "At most, Strojnik merely alleged that Xenia's hotels were not fully compliant

23   with the ADA.  This, however, is insufficient to establish statutory standing for

24   damages.").

25         In *Antoninetti v. Chipotle Mexican Grill, Inc.*, 2012 WL 3762440 (S.D. Cal.

26   2012), the plaintiffs sought to certify Unruh Act statutory damages claims, alleging

27   that wheelchair users were unable to participate equally in the "Chipotle experience"

28   because defendant's service counters were too high and blocked their view of the

food preparation. *Id.* at *1. The court denied class certification with respect to the plaintiffs' claim for damages under the Unruh Act because the plaintiffs could not meet the predominance requirements of Rule 23(b)(3) when damages were inextricably intertwined with individualized liability questions: "It requires each class member to establish which Chipotle restaurant he visited, when he visited it, and whether he traveled the food service line -- all as to each particular occasion for which that class member seeks damages. . . . . Even if some of the factual issues could be resolved on a class-wide basis (e.g., if Plaintiffs could establish that all high counter walls were the exact same height), the issues regarding individualized proof would still predominate." *Id.* at *6.

Similarly, in *Moeller v. Taco Bell Corp.*, 2012 WL 3070863 (N.D. Cal. 2012), the court decertified a class action for damages under the Unruh Act which had previously been certified under F.R.C.P. 23(b)(2) in light of the Supreme Court's decision in *Wal-Mart v. Dukes*, 131 S.Ct. 2541 (2011). The *Moeller* court found that the alleged California statutory damages were inextricably intertwined with individualized liability questions:

> An individual class member's claim for damages cannot be adjudicated simply by demonstrating the mere presence of an alleged non-compliant feature. **Each class member must show how she or he was personally affected and was denied full and equal access by the defendant**. . . . It is not only damages that are individualized, but also liability and causation, because the issue is whether an individual class member has any claim at all. Such fact-specific individual liability and damages questions cannot be determined on a classwide basis.

*Moeller*, 2012 WL 3070863 at *5 (emphasis added).

Here, California PSCs logged over 10.29 million visits between just January 2018 and December 2020. *See* JA1188. Plaintiffs are not sure how many *legally blind* persons in California may have visited a PSC (their expert's guesstimates have a wide range of between 1,575 and 112,400 Californians), but it is clear that for the damages subclass, there would need to be at least the following findings for each member: whether he or she is legally blind, which PSC(s) he or she visited, when

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

302

he or she visited, how many times he or she visited the PSC(s), whether a check-in kiosk was operational during each visit, whether he or she attempted to use the kiosk to check-in or intended all along to check in at the front desk, whether he or she was embarrassed or discomfited in trying to use the kiosk, and whether he or she was actually denied full and equal access to the PSC's goods and services during the visit due to the kiosk's limitations. A legally blind California resident who, like Mr. Harden and his wife, prefers to check-in at the front desk with an employee would not be entitled to California statutory damages because that customer would not have been negatively affected by any alleged issues with the kiosk technology. Ms. VanLant's testimony, too, highlights the need for individual inquiries: for many visits she was unaware of the kiosk as a check-in option and checked in at the front desk with no discomfort or embarrassment (Dkt. 66-1 at 24-25)—similar California residents also would not be entitled to statutory damages under California law.

Because only individual inquiries would reveal the entitlement to damages claims, the *Moeller*, *Antoninetti*, and *Vondersaar* courts found a lack of predominance for California statutory damages classes.[1]

### 2. Class Procedures Are Not Superior for the Subclass.

Finally, in their short assessment of Rule 23(b)(3)'s superiority requirement, Plaintiffs assert that the California subclass "will, in fact, involve a garden variety application of the Rule 23 mechanism" and that "Plaintiffs will establish both liability and minimum statutory damages by common proof." Dkt. 66-1 at 50-51. However, the individualized inquiries required to assess the availability of statutory

---

[1] Such predominance considerations based on individualized inquiries remain crucial to consider in the certification phase, even though this Circuit does not have freestanding administrative feasibility requirement. *See Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 633 (9th Cir. 2020) ("*Briseno* [*v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)] was narrow in focus. The case does not expressly excuse a district court from considering exposure under the predominance rubric. *Briseno*, in fact, did not directly bear on predominance at all.").

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

damages under California law discussed above defeat certification on superiority grounds as well as predominance ones, as the *Moeller* Court found when considering a damages class of mobility-challenged visitors to 92 Taco Bells.

The *Moeller* plaintiffs had argued that calculating damages would simply be a matter of adding up the class members' visits to the defendant's California stores and could be handled administratively at the claims stage, making class procedures superior. But the *Moeller* court quickly rejected this argument, holding that "because of the intersection between liability for separate violations and the damages calculation, there would need to be a finding -- for each class member in this potentially huge class -- regarding which Taco Bell store or stores he/she visited, how many times he/she visited each store, when the visits occurred, what 'Key Barriers' he/she encountered, and what his/her disability was and whether the 'Key Barrier' precluded access for him/her at that particular Taco Bell." *Id.* at *5 (finding that certifying a (b)(3) class for the issue of damages "would not constitute a superior method for adjudicating the controversy.")

Here, too, there is no indication of manageability of the statutory damages class, given the individual inquiries required to assess damages. Moreover, Plaintiffs' expert posited that the California statutory damages subclass would involve at least 8,861, or perhaps 12.6 times that number of class members, annually. See Dkt. 66-1 at 52. But over 10.29 million visits to California PSCs occurred between January 2018 and December 2020 alone (JA1188), and neither Labcorp, nor Plaintiffs, know which visitors were legally blind, to even start the damages inquiries needed. Thus, this is not like *Nevarez v. Forty Niners Football Co.*, 326 F.R.D. 562, 586 (N.D. Cal. 2018), where the 3,400 purchasers of ADA accessible seating could be readily located in the defendant's own records.

## III.   **CONCLUSION**

Plaintiffs' proposed classes should not be certified for the reasons detailed above and in Labcorp's sections of Dkt. 66-1.

CASE NO. 2:20-CV-00893-FMO-KS
SUPP MEMO IN OPPOSITION TO
CLASS CERTIFICATION

1  DATED:  May 13, 2021                KELLEY DRYE & WARREN LLP

2

3                                      By:  /s/ Becca Wahlquist
                                       Becca Wahlquist (State Bar No. 215948)
4                                      Tahir L. Boykins (State Bar No. 323441)
                                       Robert I. Steiner (admitted *pro hac vice*)
5
                                       *Attorneys for Defendant*
6                                      *Laboratory Corporation of America*
                                       *Holdings*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                            11        CASE NO. 2:20-CV-00893-FMO-KS
                                      SUPP MEMO IN OPPOSITION TO
                                      CLASS CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan D. Miller (Bar No. 220848)
jonathan@nshmlaw.com
Alison M. Bernal (Bar No. 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE & MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, California  93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Attorneys for Plaintiffs, LUKE DAVIS, JULIAN
VARGAS, AMERICAN COUNCIL OF THE
BLIND, and the Proposed Class

*Additional counsel listed on signature page.*

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS, JULIAN VARGAS, and
AMERICAN COUNCIL OF THE
BLIND, individually and on behalf of all
others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF
AMERICA HOLDINGS; and DOES 1-
10, inclusive,

Defendants.

CASE NO.: 2:20-cv-00893-FMO-KS

**PLAINTIFFS' SUPPLEMENTAL
MEMORANDUM IN SUPPORT
OF PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

Hon.   Fernando Olguin
Date:  May 27, 2021
Ctrm:  6D
Time:  10:00 a.m.

TRIAL DATE:     None set

*Left margin (vertical):* NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1

306

# SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In its oppositions to Plaintiffs' Motions for Summary Judgment and Class Certification, Defendant LabCorp makes several important concessions, including:

- LabCorp created a new service – LabCorp Express self-service check-in – and sought service mark protection from the United States Patent and Trade Office. Def. Br. in Opp. to MSJ at 40.

- Patients who are legally blind cannot independently access LabCorp Express. Def. Br. in Opp. To Class Cert. at 20:18-19; see also, Ex. 12, at JA0047:24-48:23, JA0066:12-22 [Sinning Dep.].

- LabCorp's uniformly inaccessible kiosk is currently deployed to 1,853 patient service centers ("PSC") nationwide, including 280 in California. *Id.*

- Plaintiffs Vargas and Davis both have a qualified disability (*i.e.,* legal blindness) within the definition of the ADA. Def. Br. in Supp. of MSJ at 14.

- The national Class is sufficiently numerous to satisfy Rule 23(a)(1)'s requirements. Def. Br. in Opp. To Class Cert. at 30.

- Common issues of law are present in this action under Rule 23(a)(2). Def. Br. in Opp. To Class Cert. at 33.

- Plaintiffs' counsel is adequate to represent the Class under Rule 23(a)(4). Def. Br. in Opp. To Class Cert. at 38.

LabCorp's remaining arguments against class certification rely upon either (1) an unsupportable definition of LabCorp Express, the service at the heart of this dispute, or (2) distortions of the factual record. Because none of LabCorp's arguments are compelling, Plaintiffs' motion for class certification must be granted.[1]

---

[1] Plaintiffs respectfully request that the Court address their earlier-filed class certification motion prior to addressing their summary judgment motion. (Plaintiffs' Notice of Motion and Motion for Class Certification at Dkt. 66; Plaintiffs' Notice of Motion and Motion for Summary Judgment at Dkt. 73.)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

2

## II.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(a)

### A.    Numerosity

LabCorp concedes the nationwide class meets the numerosity requirement based on LabCorp's own records demonstrating at least 191 complaints from blind users. Def. Br. at 30.  LabCorp claims that Plaintiffs cannot satisfy the numerosity requirement for the California subclass, however, because they do not identify 40 California subclass members by name. This is simply wrong. Courts in the Ninth Circuit routinely allow disability access plaintiffs to establish numerosity through census data alone. *See, e.g., National Federation of the Blind v. Target Corp.*, 582 F.Supp.2d 1185, 1199 (N.D. Cal. 2007); *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 n. 8 (N.D. Cal. 2004) ("[C]ensus data is frequently relied on by courts in determining the size of proposed classes."). Here, there is ample evidence to meet numerosity for the California subclass. First, LabCorp's own records demonstrate 24 complaints from California blind users. *See, e.g., Nevarez v. Forty Niners Football Company, LLC,* 326 F.R.D. 562, 576 (N.D. Cal. 2018) ("[t]he numerosity requirement is usually satisfied where the class comprises 40 or more members, and generally not satisfied when the class comprises 21 or fewer members."). In addition, census data demonstrates the class is sufficiently numerous, as confirmed by Plaintiffs' expert statistician Sean Chasworth. Ex. 27, at JA0722. Mr. Chasworth utilized census data to draw common sense conclusions about the size of the California subclass, finding that the subclass contains *at least* 8,861 California individuals.[2] Accordingly, Plaintiffs easily meet the numerosity requirement for both

---

[2] To establish numerosity, Mr. Chasworth employed a range of conservative methodologies to arrive at an estimate of legally blind Californians denied independent access to LabCorp PSCs, which LabCorp criticizes as unreliable. But the purpose of utilizing multiple methodologies is to establish that, no matter what conservative methodology is employed, there are thousands of legally blind Californians denied independent access to LabCorp each year.  LabCorp fails to provide any calculation or estimate at all – much less any calculation or estimate

3

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

308

1   the nationwide and California subclass.[3] [4]

2   **B.   Commonality**

3   LabCorp concedes there are issues of law and fact common to the Class. Def.

4   Br. at 37:21-22. Indeed, the myriad common questions identified in Plaintiffs'

5   opening brief stand unrebutted. The Ninth Circuit has held, post-*Dukes,* that "as

6   long as there is 'even a single common question,' a would-be class can satisfy the

7   commonality requirement." *Parson,* 754 F.3d at 675. Nevertheless, LabCorp half-

8   heartedly claims Plaintiffs fail to identify a common *remedy*. Def. Br. at 33-34. Its

9   argument relies upon a blatant distortion of the deposition testimony of ACB's

10  corporate designee, Claire Stanley, as well as a tortured reading of the report of

11  accessibility expert Dr. Rachael Montgomery.

12  LabCorp's out-of-context citation to Ms. Stanley's deposition testimony is

13  particularly egregious. LabCorp asked Ms. Stanley whether speech output –

14  standing alone – would resolve the accessibility concerns of everyone who is blind

15  or visually impaired. (Ex. 35, at JA 1099-1100 [Stanley Dep.].) Ms. Stanley

16  correctly testified that "[n]o one accommodation is going to accommodate every

17  person everywhere." *Id.* Never did Ms. Stanley say that there is no common remedy

18  that would render LabCorp Express accessible. Rather, her testimony merely stands

19  _____

20  showing the Californian sub-class is not numerous.

21  [3] LabCorp claims Mr. Chasworth's analysis is flawed because he fails to offer a methodology to "actually identify legally blind patients who attempted to use LabCorp's check-in kiosks." This misstates the law. Here, where LabCorp has admitted the kiosks are not accessible, there is no requirement that the class members tried to use the kiosks because doing so would be futile. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 951 (9th Cir. 2011) ("[T]he ADA specifically does not require that the disabled individual personally encounter each [] barrier as a predicate to seeking its removal.").

[4] When a final transcript is available, Plaintiffs intend to lodge the deposition of LabCorp's proposed damages expert Bruce Deal on the element of numerosity. Mr. Deal testified that it is reasonable to assume there are more than 100 legally blind California patients who visited LabCorp during the Class Period.

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

4

1   for the unremarkable proposition that the common remedy – a fully accessible kiosk

2   -– must include more accessible features than speech output alone.

3       Dr. Montgomery's expert report explains that a common remedy – a fully

4   accessible kiosk – is available and can be achieved without imposing any undue

5   financial burden on LabCorp. (Ex. 28, at JA0850-853 [Montgomery report].) Such

6   accessible kiosks include an array of accessible features beyond speech output alone

7   including, *inter alia*, tactile keypads and voice-over technology. (*Id.*) Because (1)

8   common questions abound, and (2) the court is capable of fashioning a common

9   remedy, Plaintiffs satisfy commonality.

10      **C.    Typicality**

11      Plaintiffs also meet the typicality requirement. In advancing its typicality

12  attack, LabCorp relies upon a definition of the "service" that is in conflict with (1)

13  its sworn and verified service mark application describing LabCorp Express as a

14  new service, (2) its internal documents describing LabCorp Express as a service, and

15  (3) the dictionary definition of "service." Pl. Br. in Supp. of MSJ at 21-23. The

16  inaccessible service at issue is the LabCorp Express self-service kiosk. Where, as

17  here, the named plaintiffs are both legally blind individuals who rely on identical

18  legal theories to challenge a public accommodation's identically inaccessible

19  system-wide kiosk service, "the interests, injuries, and claims of the class members

20  are, in truth, identical such that any class member could satisfy the typicality

21  requirement for class representation." *Arnold v. United Artists Theatre Circuit, Inc.,*

22  158 F.R.D. 439, 450 (N.D. Cal. 1994).

23      LabCorp concedes that Plaintiffs Vargas and Davis, the proposed class

24  representatives, are both legally blind. Def. Br. at 10, 13. It further concedes they

25  were both unable to independently access LabCorp Express because it lacks any

26  accessible features. Likewise, *11 of 12* ACB survey respondents describe

27  experiences with LabCorp Express that are strikingly similar to those of Plaintiffs.

28  That Plaintiffs ultimately used different methods to check-in at LabCorp *after*

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

5

310

encountering the inaccessible LabCorp Express service, or that non-class representative ACB member Harden never encountered LabCorp Express at all, is irrelevant to the typicality of plaintiffs' claims regarding LabCorp Express. There is no dispute that LabCorp Express is inaccessible to legally blind users, and Plaintiffs' experiences are therefore typical of all legally blind persons who attempt to use it.

Finally, this case is not concerned with class member preferences regarding *other* LabCorp services (such as the front desk check-in that was available for many years prior to the introduction of LabCorp Express); it is only concerned with legally blind individuals' independent access to LabCorp Express. All legally blind Americans – including Mr. Vargas and Mr. Davis – share a vested interest in access to the LabCorp Express service. Typicality is satisfied.

**D.    Adequacy**

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). LabCorp concedes the adequacy of class counsel and devotes one paragraph in its Opposition to challenging the adequacy of Plaintiffs Vargas and Davis. Def. Br. at 38-39. Put simply, Plaintiffs are exceptional class representatives. Both have backgrounds in technology. Both prepared and sat for lengthy depositions, where each provided expansive testimony regarding the steps each has taken to represent the interests of the Class including, *inter alia*, supervising litigation, responding to document requests, consulting with counsel 20-30 times, and approving all case filings. (Ex. 13, at JA0203:21-207:8 [Vargas deposition]; Ex. 14, at JA0336:7-340:23 [Davis deposition]). Both demonstrated expansive knowledge of the key facts, including the judge, jurisdiction, and specific legal theories. *Id.* Neither has any financial stake in the litigation beyond that of any class member. *Id.* Given that "[t]he threshold knowledge required of the class representatives is low" (*In re: Facebook Privacy Litig.,* 2016 WL 4585817, at *6 (N.D. Cal. Sept. 2, 2016) (citation omitted), the knowledge Plaintiffs demonstrated, coupled with their active involvement in the

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

6

311

1   litigation, satisfies the adequacy requirement.

2   **IV.    PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(b)(2)**

3       "In contrast to Rule 23(b)(3) classes, the focus [in a Rule 23(b)(2) class] is

4   not on the claims of the individual class members, but rather whether [Defendant]

5   has engaged in a 'common policy.'" *In re Yahoo Mail Lit.*, 308 F.R.D. 577, 599

6   (N.D. Cal. 2015). The national Rule 23(b)(2) class meets these requirements.

7   LabCorp concedes both that it deployed LabCorp Express to 1,853 locations across

8   the country and that LabCorp Express is not independently accessible to legally

9   blind patients. Def. Br. at 20:18-19; see also, Ex. 12, at JA0047:24-48:23,

10  JA0066:12-22 [Sinning Dep.]. LabCorp unquestionably engaged in a common

11  course of conduct in regard to LabCorp Express. Yet LabCorp again trots out the

12  same flawed arguments it asserts against commonality, above. Because common

13  questions abound – and because these questions are apt to a common remedy (*i.e.,* a

14  fully accessible kiosk) – these arguments fail and Rule 23(b)(2) is satisfied.

15  **V.    PLAINTIFFS HAVE MET THE REQUIREMENTS OF RULE 23(b)(3)**

16      **A.    Predominance**

17      The following examples of common issues are not subject to individualized

18  determination or inquiry: (1) LabCorp Express is not independently accessible to

19  legally blind individuals. Def. Br. at 20:18-19. (2) LabCorp implemented LabCorp

20  Express across a national network of more than 1,800 LabCorp PSCs, including 280

21  in California. (Ex. 12, at JA0047:24-48:13, JA0066:12-22 [Sinning dep.].) (3)

22  LabCorp trained its employees that use of LabCorp Express was mandatory and "not

23  optional." (Ex. 20, at JA0518:65-523:17, JA0524:8-15 [Coan dep.].) (4) LabCorp

24  Express is a distinct service it offers its customers. (Exs. 22 and 23 [service mark

25  applications].) (5) LabCorp does not offer a qualified aid or auxiliary service which

26  allows legally blind patients to access LabCorp Express privately and

27  independently. (Ex. 12, at JA0051:25-52:2, JA0072, JA00133-135 [Sinning dep.],

28  Ex. 17, at JA0423:5-12 [DeAngelo Dep.]; Ex. 18, at JA0458:7-23 [Wright dep.].)

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

7

312

1  (6) LabCorp has not remedied the accessibility failures of LabCorp Express across

2  its 1,853 PSC network. (Ex. 18, at JA0478:21-480:14, JA0487:16-488:25 [Wright

3  dep.].) (7) Plaintiffs can fashion a common remedy despite minor differences

4  amongst class members. (Ex. 28, at JA0850-853 [Montgomery report].)

5        The configuration of LabCorp Express is uniform, its implementation is

6  ubiquitous across LabCorp's network, and its total inaccessibility for legally blind

7  users is severe. Accordingly, the issues Plaintiffs present here are uniquely suited for

8  adjudication through common proof. Faced with these common questions,

9  LabCorp's remaining argument against predominance is one of feasibility– that

10  individualized issues in the later administration of a class-wide resolution might

11  render this action unmanageable. LabCorp's critical error is in improperly conflating

12  class-wide proof of liability with administrative feasibility in the settlement process,

13  and its argument fails for at least three reasons.

14        First, an individualized showing of intentional discrimination is not required

15  for an Unruh Act claim predicated on an ADA claim where, as here, Plaintiffs seek

16  minimum statutory damages. *Nevarez*, 326 F.R.D. at 586. Second, the Ninth Circuit

17  in *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017), expressly

18  rejected the feasibility requirement LabCorp seeks to inject into the class

19  certification stage. The *Briseno* court explained that "requiring class proponents to

20  satisfy an administrative feasibility prerequisite 'conflicts with the well-settled

21  presumption that courts should not refuse to certify a class merely on the basis of

22  manageability concerns.'" *Id.* at 1128 (internal citation omitted). [5] As the Seventh

23

24  _____

25  [5] The Ninth Circuit has since held that *Briseno* "foreclose[es] … [a defendant's]

26  argument that a self-identifying class is not 'administratively feasible' at the class
   certification stage." *Melgar v. CSK Auto, Inc.,* 681 F. App'x 605, 607 (9th Cir.

27  2017); *see also In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *21 (N.D.
   Cal. Jan. 19, 2017); *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *7 (N.D.

28  Cal. July 15, 2016).

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

313

Circuit noted in *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015), parties regularly rely on "claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court" to validate claims. *Id.* at 667; *see* Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment (certification appropriate "despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class"). Thus, "[t]he due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward." *Mullins*, 795 F.3d at 670. LabCorp will have such a fair opportunity.

Third, to the extent the Court is concerned with whether there is a feasible method to determine whether legally blind individuals in California were similarly harmed by the identically inaccessible kiosks deployed to 280 separate California locations, the record demonstrates there is. The evidence shows that (1) LabCorp maintains records of every single patient visit to its PSCs, and (2) there are verifiable methods to identify legally blind patients amongst the PSC visits. As to the first point, *LabCorp maintains records of every single patient visit to its PSCs.* (*See, e.g.,* Ex. 14, at JA0249:14-23 [Davis dep., testifying LabCorp has his identification information from check-in]; *see also,* DeAngelo Dep, at p. 36:25-37:5.

Every blind person in California who visited any of the 280 locations during the Class Period was denied access to LabCorp Express's benefits. Thus, the only remaining determination in a claims process is whether there exists a reliable way to prove each individual's legal blindness. There is. California class members can reliably demonstrate blindness through any of the following means: SSDI registration based on legally blind status, California-issued ID cards identifying blindness, or a note from a physician diagnosing blindness. *See, e.g.,* https://www.cdss.ca.gov/ inforesources/cdss-programs/ssi-ssp/ssi-ssp-eligibility-

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

9

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

1    summary (allowing physician's notes to verify legal blindness). Accordingly, there

2    are no *bona fide* manageability concerns presented here.

3       Indeed, since *Briseno,* California courts have both certified classes and

4    approved settlements of Unruh classes under Rule 23(b)(3). *Nevarez*, 326 F.R.D. at

5    589 (certifying Unruh Act class); *Kim v. Tinder*, Inc., 2019 WL 2576367 (C.D. Cal.

6    2019) (approving Unruh class settlement utilizing claim forms). *Nevarez* is

7    particularly instructive. In finding that predominance was satisfied there, the court's

8    holding turned in large part on the fact that class members could be identified

9    through use of the defendant's own records:

10      Perhaps most important, nothing in *Moeller* and *Antoninetti* suggests the
11      defendants could easily identify class members, whereas here the Stadium
12      Defendants keep records of class members' purchases of accessible seating
       that include names and contact information.
13

14    *Id.* at *586.  Here, as in *Nevarez*, identifying class members through LabCorp's

15    records is easily achieved and none of the manageability concerns raised by the pre-

16    *Briseno* cases are presented.

17       Importantly, *all* of the cases relied upon by LabCorp were decided years

18    before *Briseno* and are also factually and procedurally distinguishable. *Antoninetti v.*

19    *Chipotle Mexican Grill, Inc.*, 2012 WL 3762440 (S.D. Cal. Aug. 28, 2012), an ADA

20    and Unruh case concerning impermissibly high food counters, is factually and

21    procedurally distinguishable. There the class certification decision was issued *after*

22    the defendant's liability was adjudicated – thereby dispensing with all common

23    questions. *Id.* at *2. The same is true of *Moeller v. Taco Bell Corp.,* 816 F.Supp.2d

24    831, 841 (N.D. Cal. 2011), which is also factually distinguishable because there

25    (unlike here) no facts suggested that the defendant kept records of class member

26    visits which might render a claims process manageable. *Id.* Here, unlike *Antoninetti*

27    or *Moeller,* no factually intensive, individualized inquiry is required to establish

28    when a class member visited a LabCorp PSC, which PSC the class member visited,

1    or which PSCs implemented LabCorp Express – because the company maintains

2    those records. Finally, in *Vondersaar v. Starbucks Corp.,* No. CV 12-05027 DDP

3    AJWX, 2015 WL 629437 (C.D. Cal. Feb. 12, 2015), the court declined to certify the

4    Unruh Act class based in part on a finding that the barrier at issue – impermissibly

5    high service counters – was not uniform across more than 200 California Starbucks

6    locations and had, in any event, been fully remediated. *Id.* at 3. Because the

7    predicate ADA claim in *Vondersaar* was mooted by the remediation, and because

8    there was no evidence of *uniform* counter height across the network prior to

9    remediation, the court required proof of individual reliance for the remaining stand-

10   alone Unruh Act claims.  *Id.* at *3.[6] Such is not the case here: LabCorp Express has

11   not been remediated, it remains uniformly and identically inaccessible to the legally

12   blind across the 280 California locations, and LabCorp maintains records of its

13   patient encounters, locations, and dates when LabCorp Express was implemented at

14   each location. No individualized inquiry is necessary. Common issues predominate.

15       **B.   Superiority**

16       LabCorp's arguments against certification rely upon the same flawed premise

17   it uses to oppose predominance, and therefore fail. As explained in the moving

18   papers, Plaintiffs have met all four requirements for superiority.

19   **VI.   CONCLUSION**

20       For the foregoing reasons, as well as those set forth in the moving papers,

21   Plaintiffs Luke Davis and Julian Vargas request the Court grant their motion for

22   class certification.

23

24

25   [6] Finally, even *Vondersaar* makes clear that Rule 23(b)(3) predominance can be
     satisfied in an Unruh case: "[t]his is not to suggest … that Unruh Act claims are
26   inherently incapable of class treatment. *An alleged barrier's ubiquity, severity, and*
     *uniformity of impact will, of course, vary from case to case*." *Id.* at *4, fn. 4
27   (emphasis added). The uniformity, ubiquity, and severity of LabCorp's inaccessible
28   kiosk across all 280 California PSCs here present such a case.

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

11

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

316

1    Dated: May 13, 2021

2                                    Respectfully submitted,

3                                    By:  _____*/s/ Jonathan D. Miller*_____
                                         Jonathan D. Miller (Bar No. 220848)
4                                        jonathan@nshmlaw.com
                                         Alison M. Bernal (Bar No. 264629)
5                                        alison@nshmlaw.com
                                         Jordan T. Porter (Bar No. 250112)
6                                        jordan@nshmlaw.com
                                         NYE, STIRLING, HALE
7                                        & MILLER, LLP
                                         33 West Mission Street, Suite 201
8                                        Santa Barbara, CA 93101
                                         Telephone: (805) 963-2345
9                                        Facsimile: (805) 284-9590

10                                       Benjamin J. Sweet (PA Bar No. 87338)
                                         (*admitted pro hac vice*)
11                                       ben@nshmlaw.com
                                         NYE, STIRLING, HALE
12                                       & MILLER, LLP
                                         1145 Bower Hill Road, Suite 104
13                                       Pittsburgh, PA 15243
                                         Telephone: (412) 857-5350
14
                                         Matthew K. Handley
15                                       (*admitted pro hac vice*)
                                         mhandley@hfajustice.com
16                                       HANDLEY FARAH &
                                         ANDERSON PLLC
17                                       200 Massachusetts Ave. NW, 7th Floor
                                         Washington, DC 20001
18                                       Telephone: (202) 559-2411
                                         Facsimile: (844) 300-1952
19
20                                       Attorneys for Plaintiffs, LUKE DAVIS,
                                         JULIAN VARGAS, AMERICAN COUNCIL
21                                       OF THE BLIND, and the Proposed Class

22

23

24

25

26

27

28

                                         12

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

1   Jonathan D. Miller (Bar No. 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (Bar No. 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE & MILLER, LLP
    33 West Mission Street, Suite 201
4   Santa Barbara, California 93101
    Telephone: (805) 963-2345
5   Facsimile: (805) 563-5385

6   *Attorneys for Plaintiffs, Luke Davis, Julian*
    *Vargas, American Council of the Blind,*
7   *and the Proposed Class*

8                    **UNITED STATES DISTRICT COURT**

9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11  LUKE DAVIS, JULIAN VARGAS, and       CASE NO.: 2:20-cv-00893-FMO-KS
    AMERICAN COUNCIL OF THE
12  BLIND, individually and on behalf of all   **EXHIBITS 30-51 TO**
    others similarly situated,            **PLAINTIFFS' MOTION FOR**
13                                        **CLASS CERTIFICATION**
            Plaintiffs,
14                                        Hon.   Fernando Olguin
        v.                                Date:  May 27, 2021
15                                        Ctrm:  6D
    LABORATORY CORPORATION OF             Time:  10:00 a.m.
16  AMERICA HOLDINGS,
                                          FAC Filed: September 3, 2020
17          Defendant.                    Trial Date: Not yet set

18

19

20

21

22

23

24

25

26

27

28

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA, 93101

                                1
    EXHIBITS 30-51 TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# EXHIBIT 30

```
 1                  UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
 3                            - - -
 4
 5    LUKE DAVIS AND JULIAN VARGAS,      )
      INDIVIDUALLY AND ON BEHALF OF ALL  )
 6    OTHER SIMILARLY SITUATED,          )
                                         )
 7                   PLAINTIFFS,         )
                                         )
 8    vs.                               ) CV20-00893
                                         )
 9    LABORATORY CORPORATION OF AMERICA  )
      HOLDINGS; AND DOES 1-10, INCLUSIVE,)
10                                       )
                     DEFENDANTS.         )
11    _____ )
12
13
14
15
16      REPORTER'S TRANSCRIPT OF TELEPHONIC MEET AND CONFER
17           WEDNESDAY, MARCH 31, 2021; 11:00 A.M.
18
19
20
21
22
23
                 _____
24
                   ALEXANDER T. JOKO, CSR NO. 12272
25
```

Page 1

```
 1    APPEARANCES OF COUNSEL:
 2

      For Plaintiffs:    NYE, STIRLING, HALE & MILLER LLP
 3                       BY:  ALISON M. BERNAL
                              BENJAMIN SWEET
 4                       33 WEST MISSION STREET
                         SUITE 201
 5                       SANTA BARBARA, CA 93101
 6

 7    For Defendants:    KELLEY DRYE
                         BY:  ROBERT I. STEINER
 8                             BECCA J. WAHLQUIST
                               SOJIN YOON
 9                       1800 CENTURY PARK EAST
                         SUITE 600
10                       LOS ANGELES, CA 90067
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

<div align="right">Page 2</div>

321

```
 1      TELEPHONIC PROCEEDINGS; WEDNESDAY, MARCH 31, 2021

 2

                        11:00 AM

 3

                        - - - - -

 4

 5          MS. BERNAL:  This is Alison Bernal on behalf

 6      of the Plaintiff.

 7              And my partner is with me as well.

 8      Benjamin Sweet is here as well.

 9          MR. STEINER:  Rob Steiner for the Defendant

10      and Becca Wahlquist.  And Sojin Yoon is also listening

11      in from my office.

12          MS. BERNAL:  Okay.  This is Alison Bernal

13      speaking.

14              So this is the continuation of our

15      meet-and-confer conversation from last week on last

16      Friday, March 26th.

17              And at the conclusion of that call, there

18      were two remaining issues that we wanted to discuss.

19      The first being Defendant's position on the expert

20      reports that Plaintiff intends to rely upon on both

21      summary judgment and class certification.

22              And a second being just the format of the

23      joint summary judgment motion and how we wanted to

24      approach that.

25              So why don't we start on the first one,
```

<div align="right">Page 3</div>

 1   Defendant's position on the expert reports and any
 2   response that they wanted to offer to that particular
 3   piece of evidence that would be used for both class
 4   certification and summary judgment.
 5           MR. STEINER:  Sure.  Let me have Becca address
 6   the class issue, and I'll go into the summary judgment
 7   issue.
 8           MS. WAHLQUIST:  Hi, Alison.  This is Becca
 9   Wahlquist.
10               I have been able to review in much more
11   detail the expert report that we got last week.
12               On the class briefing, I believe you had
13   said you were only using the expert report for
14   numerosity; is that correct?
15           MS. BERNAL:  The expert report will be used to
16   help establish numerosity, not as the sole reason to
17   establish numerosity.
18               And then the expert report from
19   Ms. Montgomery is just on the basic factual background,
20   but not specifically relied upon in the arguments.
21           MS. WAHLQUIST:  Do you already know how it is
22   that you plan -- or what portions of her report that
23   you would be relying on in the factual section?
24           MS. BERNAL:  Certainly.  So give me one
25   second.

                                              Page 4

323

```
 1            So this is to -- just in the background

 2   facts as to what a typical I-Pad would be equipped

 3   with, the headphone port to allow for independent

 4   access, and just the general accessibility issues of

 5   the I-Pad itself.  So that is part of what's in her

 6   report.  That there are cost effective accessible kiosk

 7   options.

 8            And there's -- a lot of these things are

 9   duplicative of testimony that has already been offered,

10   but it's just a supplementary piece of evidence to

11   establish that.  And that they're not independently

12   accessible for blind users, which, again, several

13   LabCorp witnesses testified to; but it's just another

14   piece of evidence that we would use for that.

15        MS. WAHLQUIST:  Okay.  But in terms of any

16   legal argument, it would only be your numerosity --

17   your expert talking about the numbers for numerosity?

18        MS. BERNAL:  Correct.

19            The merits are going to be argued in

20   summary judgment where Ms. Montgomery's declaration

21   will be more cited, but that's just for background

22   facts for class certification as class certification

23   isn't really arguing the merits of the accessibility

24   issues.

25        MS. WAHLQUIST:  Okay.  Hold on.  I'm --
```

                                                    Page 5

```
 1              MR. STEINER:  Rob Steiner.
 2                   When you ask about Ms. Montgomery's
 3      report and the accessibility functions, does that
 4      relate to the certification on the injunctive relief
 5      class or is it -- I'm just trying to understand how
 6      that becomes relevant for your class certification
 7      issue.
 8              MS. BERNAL:  Yes, sorry about that.  I was on
 9      mute and speaking.
10                   So if -- in our factual background when
11      we're stating the accessability issues -- or the
12      accessability features of an I-Pad, we cite to other
13      testimony that has already been provided in
14      supplementary to Ms. Montgomery's report.
15                   So it would be used on the injunctive
16      relief because it shows that there's readily achievable
17      options.  And anything that applies to the injunctive
18      relief would then kind of flow into the California
19      class as the injunction requested.
20              MR. STEINER:  So it does relate to the request
21      for injunctive relief?
22              MS. BERNAL:  Yes.
23              MS. WAHLQUIST:  Okay.  So I think I understand
24      how you are planning to use it.
25                   Our issue of course is that we haven't
```

<div align="right">Page 6</div>

1    had a chance to depose the experts yet.  I believe that

2    Jules sent out the subpoena notices for when Rob is

3    back the following week.

4             If you're using it just for the legal

5    arguments on numerosity and then the other things are

6    factual statements that we can disagree with, but I

7    just -- Alison, I hope you don't think I'm coming in

8    and trying to be really difficult.  I'm just concerned

9    that Judge Olguin's order is to the meet and confer and

10    discuss all of these issues before we put any kind of

11    joint brief before him, and if there's going to be any

12    kind of extensive use of the experts in your briefing

13    before we've been able to depose them, it concerns me a

14    little bit.

15             At the same time, it sounds like the

16    class certification briefing will not be making --

17    using the experts to make any legal arguments.  And I

18    guess, if it appears after we get the briefing that we

19    need to complete the depositions to be able to respond,

20    I can raise it at that point.

21       MS. BERNAL:  I would just add, numerosity I

22    think technically could be a legal -- so

23    Mr. Chatsworth is being used in the numerosity section

24    in addition to additional evidence that we cited to you

25    on our March 31st -- I'm sorry, March 26th

Page 7

326

1    meet-and-confer call.

2         MS. WAHLQUIST:  You're not using his opinions

3    about the number of potential class members to make any

4    statements about manageability or superiority or

5    ascertainability; is that correct?

6             Like his -- his opinion that there's a

7    certain number of people in a certain range is just for

8    the numerosity and not for manageability,

9    ascertainability?

10        MS. BERNAL:  I would just add that for

11   portions of the 23(b)(3) analysis, as we mentioned on

12   March 26th, the legal arguments are what they are.  But

13   we are citing to Mr. Chatsworth's report on the

14   California minimum statutory damages class.

15        MR. STEINER:  Alison, it's Rob.

16            I'm not -- I'm not sure whether maybe

17   we're being overly cautious here or you're being --

18   maybe you're being more deliberate than I'm expecting

19   you to be.

20            I just want to get a really kind of clear

21   answer that the Chatsworth report will solely be used

22   in the numerosity section on class certification?

23            When you go back and say -- refer to

24   things we discussed on March 26th, I'm concerned that

25   you are suggesting that something was left open on

                                              Page 8

```
 1    March 26th to use him for other purposes.

 2              MS. BERNAL:  No, I'm not trying to be

 3    deliberate.

 4              On March 26th, I essentially read our

 5    class certification brief into the record.  So you guys

 6    have our facts and evidence.

 7              I didn't cite every single case in there

 8    just as a matter of time, but I think we set forth the

 9    facts and evidence.  Mr. Chatsworth will be used for

10    numerosity.  And as I just mentioned, he's cited in the

11    predominance argument as well for 23(b)(3).

12              MS. WAHLQUIST:  I guess I'm trying to decide

13    if we -- I have never -- I have never done class

14    certification briefing when the expert discovery isn't

15    complete, so it's just a different situation for me.

16              I understand that you're ready to go.  I

17    believe that, under his orders, we should be discussing

18    everything fully.  And I don't know that we have

19    everything that we would get if we finish deposing him

20    first.

21              But if he's being used predominantly for

22    numerosity, I don't think numerosity requires the

23    depth.  But if he's being used for the predominance or

24    on the 23(b) damages class, I feel like we need to have

25    his deposition and be able to tell you anything from
```

Page 9

328

1      his deposition that we are going to be using in

2      response in order to finish up discussing things.

3                I also think that after reading his

4      expert report much more thoroughly over the weekend and

5      really thinking about it, I think that a lot of what

6      he's doing in making kind of assumptions about everyone

7      who falls into certain categories, like there's 8

8      percent of people who have visual disabilities and that

9      use -- and then this percent would use LabCorp -- I

10     mean, he's missing a lot of things such as the fact

11     that, of the LabCorp market share, I think 80 percent

12     of those visits are -- 80 percent of the testing is

13     coming through hospitals and doctors and not through

14     visits to the physical testing places.

15               There's also the issue of, if 25 percent

16     of people going to the testing locations are checking

17     in at the front desk, is there an actual barrier of any

18     sort if someone wasn't even going to the kiosk in the

19     first place?  That raises all kinds of Article III

20     standing issues.  Is there an actual injury you need

21     for Article III?  And the Supreme Court just heard

22     really relevant arguments on that yesterday in the

23     class context.  If you have a class and not all the

24     members would have an injury, do you still get to

25     certify that class?

                                                    Page 10

1        I don't know how the Supreme Court is
2   going to come out.  I don't know if you listened to
3   that argument, but it feels as if they're going to be
4   limiting the ability to certify classes with uninjured
5   people in the mix.
6        And from your expert's report, he's got a
7   class that would include everyone who is legally blind
8   injured or not.  So I'm just feeling a little like
9   we're not ready to give you all of those arguments yet
10  before we have deposed him.
11       And we've got a deposition scheduled, I
12  think, in two weeks, because we're going to need to
13  prepare for that deposition.  And I think if you -- so
14  my proposal -- and I know that you want to be ready to
15  go, but I would very much like to be able to depose the
16  expert before we finish our meet and confer so that we
17  can tell you and see what comes out in those expert
18  depositions and give you the information and how we are
19  going to respond to the use of the expert.
20       MS. BERNAL:  Becca, I appreciate that.
21       Just in looking at your expert report
22  exchanged on March 8th, it identified many of those
23  issues you just listed.
24       So I would ask, are you going to rely on
25  your expert report to oppose numerosity?

                                    Page 11

```
1            MR. STEINER:  I think -- it's Rob Steiner.
2                 We are going to submit -- it's our -- I
3      think.  We're still working through it.  But we may
4      submit a rebuttal report as well to Chatsworth.  So
5      that will come consistent with the Judge's schedule,
6      which I think is April 29th.
7            MS. BERNAL:  Okay.  And --
8            MS. WAHLQUIST:  Alison, it's not numerosity
9      that -- if you were only using it for numerosity, I
10     don't know that I would need anything further, as
11     beyond the numerosity isn't really where our focus is
12     going to be.  We're going to be focusing on
13     predominance and the damages class and, you know, other
14     issues on the injunctive class.
15                 But since you're saying that he and the
16     other expert are going to be used in sections other
17     than numerosity -- if it was just numerosity, I don't
18     know that we would need to depose him.  But I think
19     we're going to need to depose the experts because
20     they're being used in other sections of the briefing.
21     And I think we're entitled to do that rather than just
22     rely on our own expert report.
23           MS. BERNAL:  At this point, Plaintiffs have
24     read their class certification brief into the record.
25     Not verbatim, but nearly verbatim during the three-hour
```

Page 12

331

1    phone call on March 26.  We're holding a further

2    meet-and-confer discussion today.  And we had a first

3    meet-and-confer discussion on March 10th.

4              It's our position that we have fully met

5    Judge Olguin's meet-and-confer requirements on class

6    certification.

7              And we will internally discuss what you

8    are saying.  But if you are saying that you will take

9    the position that we have not met and conferred, we

10   might need to seek court intervention on this because

11   we have been trying to move for class certification now

12   for several weeks.  And we believe that Defendants are

13   continuing to delay this process to prevent us from

14   moving the court for certification.

15        MR. STEINER:  Alison, it's Rob Steiner.

16             We have an opportunity -- I understand

17   that you guys want to move prior to the deadline, and

18   we're not opposed to that.  But what we are opposed to

19   is having a motion be made on an incomplete record,

20   which is inconsistent with the Judge's order.

21             And so your desire to move quickly still

22   needs to coincide with what the Judge requires and what

23   our rights are, which are to -- which includes the

24   ability to use the expert testimony that you have only

25   produced last week through -- the expert report that

                                                    Page 13

```
 1    you only produced last week and to depose that expert
 2    in order to allow the motion to go forward.
 3              So, obviously, if you need to -- if you
 4    want to -- you can file what you want to file, but
 5    we're explaining to you the reasons why we think it's
 6    improper.  And, obviously, we would seek relief on that
 7    basis notwithstanding your desire to move quickly.
 8              MS. WAHLQUIST:  I think the reason that this
 9    is coming up is, that the expert reports -- the
10    Plaintiffs were able to get an extension of time to put
11    out their expert reports, which kind of pushed back
12    where we are in talking about this because I believe,
13    when you had the first meet and confer with Rob, there
14    wasn't expert reports on the Plaintiff side to
15    consider.  And as you mentioned, we just got them last
16    week.  We are trying, in good faith, to make sure that
17    we comply with the requirement to really have discussed
18    the issues because it's not just us understanding your
19    issues.  It's you understanding our responses.  And we
20    weren't prepared last week to give our responses to the
21    expert report.  And now as I'm explaining it, I don't
22    think I need to depose the expert to address what you
23    say about numerosity.  But if he's going to be used to
24    talk about the damages class and identifying and
25    finding people in a way that would go outside of the
```

Page 14

333

```
 1    numerosity and go into more manageability or
 2    ascertainability, I need to explore his positions on
 3    this so that I can then use that deposition testimony
 4    in our response to your class certification motion.
 5           MR. SWEET:  This is Benjamin Sweet.  If I may
 6    address one point you just made?
 7                  With regard to Mr. Chatsworth's opinion,
 8    I just want to be clear.  On the California minimum
 9    statutory damages class, I think he's offering an
10    ultimate opinion that more than class certification
11    really goes to the summary judgment brief in terms of
12    what we believe that the damages class is.  I'm not
13    sure that that is an element of the analysis under Rule
14    23.  So I just wanted to make that clarification.
15                  I think what Alison was saying is, in
16    addition to numerosity, he's providing some of the sort
17    of factual background.  And so to the extent that
18    factual background is being relied upon in any class
19    certification analysis, he would be relevant to, I
20    guess, all of the elements in that way, but
21    specifically he's offering his opinion on numerosity.
22           MR. STEINER:  It's Rob.
23                  So, you know, that having been said with,
24    you know, you using him for factual background which we
25    have not been able to test through deposition and
```

Page 15

```
 1    provide, you know, potentially contrary rebuttal
 2    information, you know, through our own rebuttal expert,
 3    our position is that we are not -- that any motion that
 4    you make for class certification at this point in time
 5    would be premature and not in compliance with the
 6    Judge's order.  And so we would obviously point that
 7    out to the extent that you chose to go forward
 8    notwithstanding our position.  And we would seek
 9    appropriate relief from the Court.
10        MR. SWEET:  Rob, our position is that, as
11    Alison has stated very succinctly, we now have had
12    three meet and confers.  We have possibly been on the
13    record longer than four hours on this motion.  We
14    believe we've met and satisfied the requirements set
15    forth in Judge Olguin's order.  We are prepared to move
16    forward with our motion.  And we certainly understand
17    you have an opposing view, and you want to seek court
18    intervention, but our intention is to press forward and
19    to let the record speak for itself.
20        MR. STEINER:  It's Rob.
21            Obviously, I can't prevent you from
22    sending us what you think is appropriate, and we'll
23    respond to it.  I just -- I think we've advised you
24    that we think it's inappropriate.  We have told you why
25    we believe it's plainly inappropriate under the Judge's
```

Page 16

1    order.  And that's why we have a judge to decide whose

2    position is correct here.

3              I think that what you're doing is clearly

4    inconsistent with his order and -- you know, which

5    provides -- which includes a provision that if a party

6    fails to comply with the order and there needs to be

7    rebriefing, that appropriate sanctions will be leveled

8    against the non-complying party.  And so I think we're

9    better off trying to work through these issues than

10   going down that road.

11             And why you want us to -- why you want to

12   move forward without giving us an opportunity to take

13   your expert's deposition or to submit rebuttal

14   testimony, I think it's inappropriate.  But, look, the

15   record is what it is.  And I'm not sure --

16        MR. SWEET:  This is Benjamin Sweet.

17             To correct your misstatement on the

18   record.  At no point did we take a position that you

19   cannot depose our expert.

20             What we're discussing here is whether or

21   not the meet-and-confer obligation has been met for us

22   to start the clock and send you our portions of the

23   briefing.

24             We will absolutely make the experts

25   available to you for deposition, as I assume you will

Page 17

1    do for whatever rebuttal experts you decide to put up.

2    And nothing should be construed as our impeding that

3    process.

4              We're simply trying to get our motion on

5    file in a timely fashion.

6         MR. STEINER:  Yes, I was not suggesting that

7    you're precluding us from taking the expert deposition.

8              My point was that you were trying to move

9    forward before we had an opportunity to do that.  And I

10   understand you will produce your experts for a

11   deposition.

12        MS. BERNAL:  I will add -- this is Alison.

13             Looking at Judge Olguin's order, the

14   requirement is that we discuss the issues that we will

15   raise in the motion.  As we previously stated, we read

16   our motion into the record.  So we have discussed fully

17   each issue that we will raise in the motion.  And I

18   believe that meets the requirement and the spirit of

19   Document 30 and 31.

20        MR. STEINER:  And we disagree, but obviously

21   we're not going to.  And I'm not sure we need to --

22   neither of us sounds like we're going to convince the

23   other.  So I think our positions are clear on the

24   record.

25        MS. BERNAL:  So that was class certification.

                                          Page 18

```
 1                    Did you want to discuss summary judgment?
 2              MR. STEINER:  Our position, you know, again,
 3       hearing that your expert -- really, the position is the
 4       same.  You are going to be relying on your expert, as
 5       we understand it, for various aspects of your summary
 6       judgment motion.  In order for us to properly address
 7       those issues, including incorporating any evidence that
 8       we might develop for our own cross-motion, we want an
 9       opportunity to depose your experts.
10              MR. SWEET:  We will, of course, afford you the
11       opportunity to depose the experts in connection with
12       the summary judgment motion as well in due course.
13                    But our position is, that we met our
14       requirement with regard to the meet-and-confer
15       obligation on the motion for summary judgment.
16              MR. STEINER:  I understand that's your
17       position.
18                    And I think we're clear that our position
19       is that, in order for the proper meet and confer to
20       have taken place and to discuss all facts and issues
21       relevant to the motion, we need to have been in a
22       position to have actually taken that deposition, as
23       well as potentially putting rebuttal reports.  So we
24       don't agree with your position.
25              MS. BERNAL:  With that in mind, is LabCorp
```

                                                      Page 19

338

1    intending to move for summary judgment such that the

2    exchange would be seven days from today?

3           MR. STEINER:  We're not in position because,

4    as I said, we have not deposed your experts to do that.

5    So I don't think -- I don't think we're at that

6    procedural posture.

7           MR. SWEET:  Rob, can I also ask whether

8    LabCorp intends to move for summary judgment on an

9    individual or a class-wide basis?

10          MS. WAHLQUIST:  Yes.  There's no certified

11   class, so we're moving on an individual basis on

12   summary judgment for our cross-claims at this point.

13          MS. BERNAL:  When we exchange the briefs, our

14   portion of the joint brief, should we format that so

15   Defendant is cross-moving in the same joint brief?

16          MS. WAHLQUIST:  This is something we were

17   discussing a lot yesterday trying to figure this out.

18   I've done so many of the Rule 37 joint things which I

19   think Judge Olguin is using as the basis.

20              We looked for examples of somebody who

21   would have had a cross-motion.  Just the way his order

22   goes, it seems, because each issue needs a response

23   immediately under it, and because it sounds as if, from

24   our discussion last week and your earlier discussions

25   with Rob, that it's really the same general facts and

                                              Page 20

```
 1    issues and each party is going to be asking for summary
 2    judgment on that same thing, that if we get your
 3    section with all of the issues, then by putting in our
 4    issues responding to yours, those would be the
 5    arguments for the cross-motion.  And that at the very
 6    end, we would say -- we wouldn't have a separate
 7    cross-motion.  We would say for the reasons, you know,
 8    articulated in the above, we'd ask that summary
 9    judgment be granted on our side instead.  So that it --
10    we were talking about, it just wouldn't make any sense.
11    We're not prepared to do it right now because we were
12    thinking of July as the summary judgment deadline.  But
13    in needing to respond to your sections, we would
14    essentially be doing our cross-motion.
15              So if you sent, first, with your appendix
16    the five-column chart he requires, we could -- we would
17    have to exchange the chart back and forth cause we need
18    to put in any additional facts.  And you would have to
19    say whether they were disputed or undisputed.  But we
20    can work on the evidentiary chart and then respond to
21    your issues in a way that would be the cross-motion as
22    well, is what we were thinking makes the most sense.
23         MS. BERNAL:  If that's how you want to
24    proceed, we will format the brief that way then.
25         MR. SWEET:  Can I offer a potential solution
```

Page 21

1      to this -- what appears to be a log jam and maybe this
2      will help us get past this issue?

3              I would propose that we press forward
4      with exchanging our briefs seven days from today.  And
5      then we will make the experts available for deposition
6      prior to the time that your opposition sections are
7      due.  And that way you have the benefit of -- as you
8      claim, you need to depose the experts.  We'll make them
9      available to you prior to the time that your opposition
10     section is due.

11             Does that idea have any appeal to
12     LabCorp?

13         MR. STEINER:  Well, I think that there are at
14     least two issues.

15             The first is the logistical issue.  As I
16     mentioned, I'm away starting Friday and really out of
17     contact through the following Friday, which is part of
18     the reason why we set the depositions for the following
19     week.  So we don't see those depositions taking place
20     any sooner than the dates that we had proposed.  And
21     we're, obviously, happy to work with you on alternative
22     dates depending on witness availability and your
23     availability.  So that's one issue.

24             And we obviously would need to take those
25     depositions and have a transcript back in sufficient

Page 22

```
 1    time to review it and incorporate whatever needs to be
 2    incorporated in our sections.  And so there's that
 3    logistical issue, which I think we need to think
 4    through and go through the calendar on that timing.
 5              I think that the second issue relates to
 6    one that I had mentioned I think a couple of times
 7    before on this call, which is our opportunity to submit
 8    a rebuttal expert report to the extent that we
 9    determine that that's necessary.  And those rebuttal
10    reports are not due until April 29th based on the
11    revised schedule set by the Judge.
12              So I think those two issues present some
13    challenges to what you're proposing.
14         MS. BERNAL:  I understand the rebuttal
15    deadline in Judge Olguin's order.  I don't think that
16    means that you can't submit a declaration with your
17    evidence in opposition to either motion.
18              And, secondarily, I think could we
19    stipulate to use rough transcripts to lessen any delay
20    on those for the expert depositions?
21         MR. STEINER:  So what is your -- I'm sorry.
22    It's Rob.
23              Based -- I'm looking at the current
24    calendar to understand what it is that we're talking
25    about here.
```

Page 23

1          So you're going to send us what you are
2     going to send us on the 7th, right, of April?
3          MS. BERNAL:  Correct.
4          MR. STEINER:  Okay.  And we have noticed the
5     depositions for the 15th and 16th.
6          Do you have any idea whether those dates
7     work?
8          MS. BERNAL:  We are contacting the experts, I
9     think, this morning.  I don't have the update on
10    whether the actual --
11         MR. STEINER:  No, that's --
12         MS. BERNAL:  They are being contacted sometime
13    today to confirm those dates.
14         MS. WAHLQUIST:  We can also switch the order
15    depending if one is available on the Friday and not the
16    Thursday.
17         MS. BERNAL:  Are those the earliest dates you
18    are available?
19         MR. STEINER:  Yes.
20         MS. WAHLQUIST:  As Rob mentioned last week,
21    he's on a potentially satellite phone, but we don't
22    even know if that's going to be working all of next
23    week.
24         MR. SWEET:  And you would not be able to take
25    the depositions on the 12th, 13th or 14th?

                                            Page 24

```
 1          MR. STEINER:  No.  I'm going to be
 2   returning -- I'm really not going to be in a position
 3   to be working while I'm away.  I would not be in a
 4   position to prepare for these depositions until I
 5   return on the 12th.
 6          MS. BERNAL:  And as you'll -- you guys have
 7   had our briefs and read them last Friday and the
 8   experts are just being used for small portions, I think
 9   it wouldn't hold up drafting the responsive portions of
10   the brief.  It would just be a matter of putting in any
11   excerpts you want from those depositions.  Again,
12   they're not -- our briefs are not expert heavy at all.
13   They're being used for very discreet portions of the
14   brief.  So as far as drafting an opposing section, the
15   deposition should not hold that up.
16               As it stands, your opposing portion of
17   the brief would be due on April 21st.  And then there's
18   the exchange to integrate if there's a few days back
19   and forth there.  So that would be almost a week after
20   the depositions were complete, which I think, if we can
21   stipulate to use a rough transcript, we can generally
22   get those the same day.
23          MR. SWEET:  Is that something you would be
24   agreeable to, Rob?
25          MR. STEINER:  I think -- I appreciate the
```

<div align="right">Page 25</div>

1    offer.  I think that's in line.  It's very, very tight.

2              Alison's characterization of that as a

3    week is really two or three business days.  I'm fine

4    using a rough transcript, but I think that I don't want

5    to be jammed on our schedule based on, you know, what

6    you guys are trying to do when we're not up against a

7    deadline, other than the deadline that you guys are

8    creating.

9              So I -- we will go forward and take the

10   depositions on the 15th and 16th, assuming that the

11   witnesses are available and they get produced.  But I

12   don't think it's reasonable to say that you have two to

13   three business days to take those transcripts and

14   incorporate them.

15             I'll look at your moving papers and see

16   how you rely on your expert.  And if I come to a

17   different conclusion, I would let you know that.

18        MS. BERNAL:  I would add respectfully, I work

19   nights and weekends doing these briefs.  So I don't

20   think that -- I mean, I'm not saying you have to do

21   that, but it can certainly be done.

22             Deadlines set by Judge Olguin are

23   incredibly tight under the best of circumstances.  So I

24   don't think they're really designed for a lot of down

25   time in the middle of briefing, but I understand your

Page 26

1    position.

2          MR. SWEET:  Are there any other issues that we

3    need to discuss today?

4          MR. STEINER:  I don't believe so.

5          Becca, unless you have anything else?

6          MS. WAHLQUIST:  No.  I think we've gone

7    through everything.

8          And we will -- I do want to just go back

9    to the point I raised about the Supreme Court argument

10   from yesterday.  That given how it went and that it

11   looks like it's going to be expanding some of the

12   interpretations of standing on a class-wide basis, I

13   just did want to make sure that I alerted you that we

14   are exploring that.  I don't have all of our arguments

15   together right now on it, but it'll essentially be part

16   of our response to what the expert was raising.

17         And I'll have a better handle on it, you

18   know, over this week.  And if you would like, I can

19   detail our position a little bit better for you before

20   you send us your brief next week in case you want to

21   change any portion of your brief.

22         And I apologize again.  I just got to the

23   firm.  I'm just getting into the case.  So I wasn't

24   available to talk about this earlier.  I just got my

25   matters opened a couple of days ago.  So I'm here and

                                          Page 27

```
 1    I'm focused on this.

 2              So, Alison, if you want to hear more

 3    detail of the Article III arguments that I think we

 4    might be raising, I could maybe give you a call on

 5    Monday in case you want to alter anything that's in

 6    your brief before you send it?

 7         MS. BERNAL:  Sure, that would be great.

 8              I thought LabCorp already argued Article

 9    III in the motion to dismiss in this case.

10         MS. WAHLQUIST:  I just want to make sure that

11    you're aware of the arguments.  And I'm in the process

12    of developing them after listening to the oral argument

13    from yesterday.

14         MS. BERNAL:  Okay.  Certainly.  I'm happy to

15    hear more.

16              It's not going to delay our providing our

17    moving papers, but if anything -- if there's an option

18    for the supplemental brief afterwards, so --

19         MS. WAHLQUIST:  Yes.  And then I'll plan to

20    just be in touch with you Monday and -- cause it sounds

21    like you and I are both doing the laboring oar on the

22    class certification briefing.  So I'll touch base with

23    you and just make sure you're aware of what those

24    arguments are going to be.

25         MS. BERNAL:  Perfect.  Okay.  Thank you.
```

Page 28

347

```
 1              MR. STEINER:  Thank you, guys.

 2              MS. BERNAL:  Thank you.

 3                 (END OF PROCEEDINGS At 11:41 A.M.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 29

348

```
 1                 CERTIFICATE OF REPORTER
 2
 3   COUNTY OF LOS ANGELES        )
                                  )
 4   STATE OF CALIFORNIA          )
 5
 6             I, ALEXANDER T. JOKO, COURT REPORTER, IN
 7   AND FOR THE UNITED STATES DISTRICT COURT FOR THE
 8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY
 9   CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
10   STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT
11   TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS
12   HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE
13   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE
14   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED
15   STATES.
16   DATE:  APRIL 2, 2021
17
18
19
20
21
22
23
24
25
                                            Page 30
```

[& - benefit]

| & | | |
| --- | --- | --- |
| **&** 2:2 | | |

| 1 |
| --- |
| **1-10** 1:9 |
| **10th** 13:3 |
| **11:00** 1:17 3:2 |
| **11:41** 29:3 |
| **12272** 1:24 |
| **12th** 24:25 25:5 |
| **13th** 24:25 |
| **14th** 24:25 |
| **15th** 24:5 26:10 |
| **16th** 24:5 26:10 |
| **1800** 2:9 |

| 2 |
| --- |
| **2** 30:16 |
| **201** 2:4 |
| **2021** 1:17 3:1 |
| 30:16 |
| **21628** 30:22 |
| **21st** 25:17 |
| **23** 8:11 9:11,24 |
| 15:14 |
| **25** 10:15 |
| **26** 13:1 |
| **26th** 3:16 7:25 |
| 8:12,24 9:1,4 |
| **28** 30:9 |
| **29th** 12:6 23:10 |

| 3 |
| --- |
| **3** 8:11 9:11 |
| **30** 18:19 |
| **31** 1:17 3:1 18:19 |
| **31st** 7:25 |
| **33** 2:4 |
| **37** 20:18 |

| 6 |
| --- |
| **600** 2:9 |

| 7 |
| --- |
| **753** 30:9 |
| **7th** 24:2 |

| 8 |
| --- |
| **8** 10:7 |
| **80** 10:11,12 |
| **8th** 11:22 |

| 9 |
| --- |
| **90067** 2:10 |
| **93101** 2:5 |

| a |
| --- |
| **a.m.** 1:17 29:3 |
| **ability** 11:4 13:24 |
| **able** 4:10 7:13,19 |
| 9:25 11:15 14:10 |
| 15:25 24:24 |
| **absolutely** 17:24 |
| **access** 5:4 |
| **accessability** 6:11 |
| 6:12 |
| **accessibility** 5:4 |
| 5:23 6:3 |
| **accessible** 5:6,12 |
| **achievable** 6:16 |
| **actual** 10:17,20 |
| 24:10 |
| **add** 7:21 8:10 |
| 18:12 26:18 |
| **addition** 7:24 |
| 15:16 |
| **additional** 7:24 |
| 21:18 |
| **address** 4:5 14:22 |
| 15:6 19:6 |
| **advised** 16:23 |
| **afford** 19:10 |

| ago 27:25 |
| --- |
| **agree** 19:24 |
| **agreeable** 25:24 |
| **alerted** 27:13 |
| **alexander** 1:24 |
| 30:6 |
| **alison** 2:3 3:5,12 |
| 4:8 7:7 8:15 12:8 |
| 13:15 15:15 16:11 |
| 18:12 28:2 |
| **alison's** 26:2 |
| **allow** 5:3 14:2 |
| **alter** 28:5 |
| **alternative** 22:21 |
| **america** 1:9 |
| **analysis** 8:11 |
| 15:13,19 |
| **angeles** 2:10 30:3 |
| **answer** 8:21 |
| **apologize** 27:22 |
| **appeal** 22:11 |
| **appearances** 2:1 |
| **appears** 7:18 22:1 |
| **appendix** 21:15 |
| **applies** 6:17 |
| **appreciate** 11:20 |
| 25:25 |
| **approach** 3:24 |
| **appropriate** 16:9 |
| 16:22 17:7 |
| **april** 12:6 23:10 |
| 24:2 25:17 30:16 |
| **argued** 5:19 28:8 |
| **arguing** 5:23 |
| **argument** 5:16 |
| 9:11 11:3 27:9 |
| 28:12 |
| **arguments** 4:20 |
| 7:5,17 8:12 10:22 |
| 11:9 21:5 27:14 |
| 28:3,11,24 |

| article 10:19,21 |
| --- |
| 28:3,8 |
| **articulated** 21:8 |
| **ascertainability** |
| 8:5,9 15:2 |
| **asking** 21:1 |
| **aspects** 19:5 |
| **assume** 17:25 |
| **assuming** 26:10 |
| **assumptions** 10:6 |
| **availability** 22:22 |
| 22:23 |
| **available** 17:25 |
| 22:5,9 24:15,18 |
| 26:11 27:24 |
| **aware** 28:11,23 |

| b |
| --- |
| **b** 8:11 9:11,24 |
| **back** 7:3 8:23 |
| 14:11 21:17 22:25 |
| 25:18 27:8 |
| **background** 4:19 |
| 5:1,21 6:10 15:17 |
| 15:18,24 |
| **barbara** 2:5 |
| **barrier** 10:17 |
| **base** 28:22 |
| **based** 23:10,23 |
| 26:5 |
| **basic** 4:19 |
| **basis** 14:7 20:9,11 |
| 20:19 27:12 |
| **becca** 2:8 3:10 4:5 |
| 4:8 11:20 27:5 |
| **behalf** 1:5 3:5 |
| **believe** 4:12 7:1 |
| 9:17 13:12 14:12 |
| 15:12 16:14,25 |
| 18:18 27:4 |
| **benefit** 22:7 |

[benjamin - dates]

**benjamin** 2:3 3:8 15:5 17:16
**bernal** 2:3 3:5,5 3:12,12 4:15,24 5:18 6:8,22 7:21 8:10 9:2 11:20 12:7,23 18:12,25 19:25 20:13 21:23 23:14 24:3,8,12 24:17 25:6 26:18 28:7,14,25 29:2
**best** 26:23
**better** 17:9 27:17 27:19
**beyond** 12:11
**bit** 7:14 27:19
**blind** 5:12 11:7
**brief** 7:11 9:5 12:24 15:11 20:14 20:15 21:24 25:10 25:14,17 27:20,21 28:6,18
**briefing** 4:12 7:12 7:16,18 9:14 12:20 17:23 26:25 28:22
**briefs** 20:13 22:4 25:7,12 26:19
**business** 26:3,13

**c**

**ca** 2:5,10
**calendar** 23:4,24
**california** 1:2 6:18 8:14 15:8 30:4,8
**call** 3:17 8:1 13:1 23:7 28:4
**case** 9:7 27:20,23 28:5,9
**categories** 10:7
**cause** 21:17 28:20

**cautious** 8:17
**central** 1:2 30:8
**century** 2:9
**certain** 8:7,7 10:7
**certainly** 4:24 16:16 26:21 28:14
**certificate** 30:1
**certification** 3:21 4:4 5:22,22 6:4,6 7:16 8:22 9:5,14 12:24 13:6,11,14 15:4,10,19 16:4 18:25 28:22
**certified** 20:10
**certify** 10:25 11:4 30:9
**challenges** 23:13
**chance** 7:1
**change** 27:21
**characterization** 26:2
**chart** 21:16,17,20
**chatsworth** 7:23 8:21 9:9 12:4
**chatsworth's** 8:13 15:7
**checking** 10:16
**chose** 16:7
**circumstances** 26:23
**cite** 6:12 9:7
**cited** 5:21 7:24 9:10
**citing** 8:13
**claim** 22:8
**claims** 20:12
**clarification** 15:14
**class** 3:21 4:3,6,12 5:22,22 6:5,6,19 7:16 8:3,14,22 9:5 9:13,24 10:23,23

10:25 11:7 12:13 12:14,24 13:5,11 14:24 15:4,9,10 15:12,18 16:4 18:25 20:9,11 27:12 28:22
**classes** 11:4
**clear** 8:20 15:8 18:23 19:18
**clearly** 17:3
**clock** 17:22
**code** 30:10
**coincide** 13:22
**column** 21:16
**come** 11:2 12:5 26:16
**comes** 11:17
**coming** 7:7 10:13 14:9
**complete** 7:19 9:15 25:20
**compliance** 16:5
**comply** 14:17 17:6
**complying** 17:8
**concerned** 7:8 8:24
**concerns** 7:13
**conclusion** 3:17 26:17
**confer** 1:16 3:15 7:9 8:1 11:16 13:2 13:3,5 14:13 17:21 19:14,19
**conference** 30:14
**conferred** 13:9
**confers** 16:12
**confirm** 24:13
**conformance** 30:13
**connection** 19:11

**consider** 14:15
**consistent** 12:5
**construed** 18:2
**contact** 22:17
**contacted** 24:12
**contacting** 24:8
**context** 10:23
**continuation** 3:14
**continuing** 13:13
**contrary** 16:1
**conversation** 3:15
**convince** 18:22
**corporation** 1:9
**correct** 4:14 5:18 8:5 17:2,17 24:3 30:10
**cost** 5:6
**counsel** 2:1
**county** 30:3
**couple** 23:6 27:25
**course** 6:25 19:10 19:12
**court** 1:1 10:21 11:1 13:10,14 16:9,17 27:9 30:6 30:7
**creating** 26:8
**cross** 19:8 20:12 20:15,21 21:5,7 21:14,21
**csr** 1:24
**current** 23:23
**cv20-00893** 1:8

**d**

**damages** 8:14 9:24 12:13 14:24 15:9,12
**date** 30:16
**dates** 22:20,22 24:6,13,17

JA1052

**[davis - flow]**

**davis**  1:5

**day**  25:22

**days**  20:2 22:4 25:18 26:3,13 27:25

**deadline**  13:17 21:12 23:15 26:7 26:7

**deadlines**  26:22

**decide**  9:12 17:1 18:1

**declaration**  5:20 23:16

**defendant**  3:9 20:15

**defendant's**  3:19 4:1

**defendants**  1:10 2:7 13:12

**delay**  13:13 23:19 28:16

**deliberate**  8:18 9:3

**depending**  22:22 24:15

**depose**  7:1,13 11:15 12:18,19 14:1,22 17:19 19:9,11 22:8

**deposed**  11:10 20:4

**deposing**  9:19

**deposition**  9:25 10:1 11:11,13 15:3,25 17:13,25 18:7,11 19:22 22:5 25:15

**depositions**  7:19 11:18 22:18,19,25 23:20 24:5,25 25:4,11,20 26:10

**depth**  9:23

**designed**  26:24

**desire**  13:21 14:7

**desk**  10:17

**detail**  4:11 27:19 28:3

**determine**  23:9

**develop**  19:8

**developing**  28:12

**different**  9:15 26:17

**difficult**  7:8

**disabilities**  10:8

**disagree**  7:6 18:20

**discovery**  9:14

**discreet**  25:13

**discuss**  3:18 7:10 13:7 18:14 19:1 19:20 27:3

**discussed**  8:24 14:17 18:16

**discussing**  9:17 10:2 17:20 20:17

**discussion**  13:2,3 20:24

**discussions**  20:24

**dismiss**  28:9

**disputed**  21:19

**district**  1:1,2 30:7 30:8

**division**  1:2

**doctors**  10:13

**document**  18:19

**doing**  10:6 17:3 21:14 26:19 28:21

**drafting**  25:9,14

**drye**  2:7

**due**  19:12 22:7,10 23:10 25:17

**duplicative**  5:9

**e**

**earlier**  20:24 27:24

**earliest**  24:17

**east**  2:9

**effective**  5:6

**either**  23:17

**element**  15:13

**elements**  15:20

**entitled**  12:21 30:12

**equipped**  5:2

**essentially**  9:4 21:14 27:15

**establish**  4:16,17 5:11

**evidence**  4:3 5:10 5:14 7:24 9:6,9 19:7 23:17

**evidentiary**  21:20

**examples**  20:20

**excerpts**  25:11

**exchange**  20:2,13 21:17 25:18

**exchanged**  11:22

**exchanging**  22:4

**expanding**  27:11

**expecting**  8:18

**expert**  3:19 4:1,11 4:13,15,18 5:17 9:14 10:4 11:16 11:17,19,21,25 12:16,22 13:24,25 14:1,9,11,14,21 14:22 16:2 17:19 18:7 19:3,4 23:8 23:20 25:12 26:16 27:16

**expert's**  11:6 17:13

**experts**  7:1,12,17 12:19 17:24 18:1 18:10 19:9,11 20:4 22:5,8 24:8 25:8

**explaining**  14:5,21

**explore**  15:2

**exploring**  27:14

**extension**  14:10

**extensive**  7:12

**extent**  15:17 16:7 23:8

**f**

**fact**  10:10

**facts**  5:2,22 9:6,9 19:20 20:25 21:18

**factual**  4:19,23 6:10 7:6 15:17,18 15:24

**fails**  17:6

**faith**  14:16

**falls**  10:7

**far**  25:14

**fashion**  18:5

**features**  6:12

**feel**  9:24

**feeling**  11:8

**feels**  11:3

**figure**  20:17

**file**  14:4,4 18:5

**finding**  14:25

**fine**  26:3

**finish**  9:19 10:2 11:16

**firm**  27:23

**first**  3:19,25 9:20 10:19 13:2 14:13 21:15 22:15

**five**  21:16

**flow**  6:18

Veritext Legal Solutions
866 299-5127

352

**[focus - know]**

**focus**  12:11
**focused**  28:1
**focusing**  12:12
**following**  7:3
  22:17,18
**foregoing**  30:10
**format**  3:22 20:14
  21:24 30:13
**forth**  9:8 16:15
  21:17 25:19
**forward**  14:2 16:7
  16:16,18 17:12
  18:9 22:3 26:9
**four**  16:13
**friday**  3:16 22:16
  22:17 24:15 25:7
**front**  10:17
**fully**  9:18 13:4
  18:16
**functions**  6:3
**further**  12:10 13:1

**g**

**general**  5:4 20:25
**generally**  25:21
**getting**  27:23
**give**  4:24 11:9,18
  14:20 28:4
**given**  27:10
**giving**  17:12
**go**  4:6 8:23 9:16
  11:15 14:2,25
  15:1 16:7 23:4
  26:9 27:8
**goes**  15:11 20:22
**going**  5:19 7:11
  10:1,16,18 11:2,3
  11:12,19,24 12:2
  12:12,12,16,19
  14:23 17:10 18:21
  18:22 19:4 21:1
  24:1,2,22 25:1,2

27:11 28:16,24
**good**  14:16
**granted**  21:9
**great**  28:7
**guess**  7:18 9:12
  15:20
**guys**  9:5 13:17
  25:6 26:6,7 29:1

**h**

**hale**  2:2
**handle**  27:17
**happy**  22:21 28:14
**headphone**  5:3
**hear**  28:2,15
**heard**  10:21
**hearing**  19:3
**heavy**  25:12
**held**  30:12
**help**  4:16 22:2
**hi**  4:8
**hold**  5:25 25:9,15
**holding**  13:1
**holdings**  1:9
**hope**  7:7
**hospitals**  10:13
**hour**  12:25
**hours**  16:13

**i**

**idea**  22:11 24:6
**identified**  11:22
**identifying**  14:24
**iii**  10:19,21 28:3,9
**immediately**
  20:23
**impeding**  18:2
**improper**  14:6
**inappropriate**
  16:24,25 17:14
**include**  11:7

**includes**  13:23
  17:5
**including**  19:7
**inclusive**  1:9
**incomplete**  13:19
**inconsistent**  13:20
  17:4
**incorporate**  23:1
  26:14
**incorporated**  23:2
**incorporating**
  19:7
**incredibly**  26:23
**independent**  5:3
**independently**
  5:11
**individual**  20:9,11
**individually**  1:5
**information**  11:18
  16:2
**injunction**  6:19
**injunctive**  6:4,15
  6:17,21 12:14
**injured**  11:8
**injury**  10:20,24
**integrate**  25:18
**intending**  20:1
**intends**  3:20 20:8
**intention**  16:18
**internally**  13:7
**interpretations**
  27:12
**intervention**  13:10
  16:18
**issue**  4:6,7 6:7,25
  10:15 18:17 20:22
  22:2,15,23 23:3,5
**issues**  3:18 5:4,24
  6:11 7:10 10:20
  11:23 12:14 14:18
  14:19 17:9 18:14

19:7,20 21:1,3,4
  21:21 22:14 23:12
  27:2
**it'll**  27:15

**j**

**j**  2:8
**jam**  22:1
**jammed**  26:5
**joint**  3:23 7:11
  20:14,15,18
**joko**  1:24 30:6
**judge**  7:9 13:5,22
  16:15 17:1 18:13
  20:19 23:11,15
  26:22
**judge's**  12:5 13:20
  16:6,25
**judgment**  3:21,23
  4:4,6 5:20 15:11
  19:1,6,12,15 20:1
  20:8,12 21:2,9,12
**judicial**  30:14
**jules**  7:2
**julian**  1:5
**july**  21:12

**k**

**kelley**  2:7
**kind**  6:18 7:10,12
  8:20 10:6 14:11
**kinds**  10:19
**kiosk**  5:6 10:18
**know**  4:21 9:18
  11:1,2,14 12:10
  12:13,18 15:23,24
  16:1,2 17:4 19:2
  21:7 24:22 26:5
  26:17 27:18

[labcorp - order]

**l**

labcorp  5:13 10:9
  10:11 19:25 20:8
  22:12 28:8
laboratory  1:9
laboring  28:21
left  8:25
legal  5:16 7:4,17
  7:22 8:12
legally  11:7
lessen  23:19
leveled  17:7
limiting  11:4
line  26:1
listed  11:23
listened  11:2
listening  3:10
  28:12
little  7:14 11:8
  27:19
llp  2:2
locations  10:16
log  22:1
logistical  22:15
  23:3
longer  16:13
look  17:14 26:15
looked  20:20
looking  11:21
  18:13 23:23
looks  27:11
los  2:10 30:3
lot  5:8 10:5,10
  20:17 26:24
luke  1:5

**m**

m  2:3
making  7:16 10:6
manageability  8:4
  8:8 15:1

march  1:17 3:1,16
  7:25,25 8:12,24
  9:1,4 11:22 13:1,3
market  10:11
matter  9:8 25:10
  30:12
matters  27:25
mean  10:10 26:20
means  23:16
meet  1:16 3:15 7:9
  8:1 11:16 13:2,3,5
  14:13 16:12 17:21
  19:14,19
meets  18:18
members  8:3
  10:24
mentioned  8:11
  9:10 14:15 22:16
  23:6 24:20
merits  5:19,23
met  13:4,9 16:14
  17:21 19:13
middle  26:25
miller  2:2
mind  19:25
minimum  8:14
  15:8
missing  10:10
mission  2:4
misstatement
  17:17
mix  11:5
monday  28:5,20
montgomery  4:19
montgomery's
  5:20 6:2,14
morning  24:9
motion  3:23 13:19
  14:2 15:4 16:3,13
  16:16 18:4,15,16
  18:17 19:6,8,12

  19:15,21 20:21
  21:5,7,14,21
  23:17 28:9
move  13:11,17,21
  14:7 16:15 17:12
  18:8 20:1,8
moving  13:14
  20:11,15 26:15
  28:17
mute  6:9

**n**

nearly  12:25
necessary  23:9
need  7:19 9:24
  10:20 11:12 12:10
  12:18,19 13:10
  14:3,22 15:2
  18:21 19:21 21:17
  22:8,24 23:3 27:3
needing  21:13
needs  13:22 17:6
  20:22 23:1
neither  18:22
never  9:13,13
nights  26:19
non  17:8
noticed  24:4
notices  7:2
notwithstanding
  14:7 16:8
number  8:3,7
numbers  5:17
numerosity  4:14
  4:16,17 5:16,17
  7:5,21,23 8:8,22
  9:10,22,22 11:25
  12:8,9,11,17,17
  14:23 15:1,16,21
nye  2:2

**o**

oar  28:21
obligation  17:21
  19:15
obviously  14:3,6
  16:6,21 18:20
  22:21,24
offer  4:2 21:25
  26:1
offered  5:9
offering  15:9,21
office  3:11
okay  3:12 5:15,25
  6:23 12:7 24:4
  28:14,25
olguin  20:19 26:22
olguin's  7:9 13:5
  16:15 18:13 23:15
open  8:25
opened  27:25
opinion  8:6 15:7
  15:10,21
opinions  8:2
opportunity  13:16
  17:12 18:9 19:9
  19:11 23:7
oppose  11:25
opposed  13:18,18
opposing  16:17
  25:14,16
opposition  22:6,9
  23:17
option  28:17
options  5:7 6:17
oral  28:12
order  7:9 10:2
  13:20 14:2 16:6
  16:15 17:1,4,6
  18:13 19:6,19
  20:21 23:15 24:14

Veritext Legal Solutions
866 299-5127

354

[orders - requirements]

orders  9:17
outside  14:25
overly  8:17

**p**

pad  5:2,5 6:12
page  30:13
papers  26:15
  28:17
park  2:9
part  5:5 22:17
  27:15
particular  4:2
partner  3:7
party  17:5,8 21:1
people  8:7 10:8,16
  11:5 14:25
percent  10:8,9,11
  10:12,15
perfect  28:25
phone  13:1 24:21
physical  10:14
piece  4:3 5:10,14
place  10:19 19:20
  22:19
places  10:14
plainly  16:25
plaintiff  3:6,20
  14:14
plaintiffs  1:7 2:2
  12:23 14:10
plan  4:22 28:19
planning  6:24
point  7:20 12:23
  15:6 16:4,6 17:18
  18:8 20:12 27:9
port  5:3
portion  20:14
  25:16 27:21
portions  4:22 8:11
  17:22 25:8,9,13

position  3:19 4:1
  13:4,9 16:3,8,10
  17:2,18 19:2,3,13
  19:17,18,22,24
  20:3 25:2,4 27:1
  27:19
positions  15:2
  18:23
possibly  16:12
posture  20:6
potential  8:3
  21:25
potentially  16:1
  19:23 24:21
precluding  18:7
predominance
  9:11,23 12:13
predominantly
  9:21
premature  16:5
prepare  11:13
  25:4
prepared  14:20
  16:15 21:11
present  23:12
press  16:18 22:3
prevent  13:13
  16:21
previously  18:15
prior  13:17 22:6,9
procedural  20:6
proceed  21:24
proceedings  3:1
  29:3 30:11
process  13:13 18:3
  28:11
produce  18:10
produced  13:25
  14:1 26:11
proper  19:19

properly  19:6
proposal  11:14
propose  22:3
proposed  22:20
proposing  23:13
provide  16:1
provided  6:13
provides  17:5
providing  15:16
  28:16
provision  17:5
purposes  9:1
pursuant  30:9
pushed  14:11
put  7:10 14:10
  18:1 21:18
putting  19:23 21:3
  25:10

**q**

quickly  13:21 14:7

**r**

raise  7:20 18:15
  18:17
raised  27:9
raises  10:19
raising  27:16 28:4
range  8:7
read  9:4 12:24
  18:15 25:7
readily  6:16
reading  10:3
ready  9:16 11:9,14
really  5:23 7:8
  8:20 10:5,22
  12:11 14:17 15:11
  19:3 20:25 22:16
  25:2 26:3,24
reason  4:16 14:8
  22:18

reasonable  26:12
reasons  14:5 21:7
rebriefing  17:7
rebuttal  12:4 16:1
  16:2 17:13 18:1
  19:23 23:8,9,14
record  9:5 12:24
  13:19 16:13,19
  17:15,18 18:16,24
refer  8:23
regard  15:7 19:14
regulations  30:14
relate  6:4,20
relates  23:5
relevant  6:6 10:22
  15:19 19:21
relied  4:20 15:18
relief  6:4,16,18,21
  14:6 16:9
rely  3:20 11:24
  12:22 26:16
relying  4:23 19:4
remaining  3:18
report  4:11,13,15
  4:18,22 5:6 6:3,14
  8:13,21 10:4 11:6
  11:21,25 12:4,22
  13:25 14:21 23:8
reported  30:11
reporter  30:1,6
reporter's  1:16
reports  3:20 4:1
  14:9,11,14 19:23
  23:10
request  6:20
requested  6:19
requirement
  14:17 18:14,18
  19:14
requirements  13:5
  16:14

[requires - testing]

**requires** 9:22
    13:22 21:16
**respectfully** 26:18
**respond** 7:19
    11:19 16:23 21:13
    21:20
**responding** 21:4
**response** 4:2 10:2
    15:4 20:22 27:16
**responses** 14:19
    14:20
**responsive** 25:9
**return** 25:5
**returning** 25:2
**review** 4:10 23:1
**revised** 23:11
**right** 21:11 24:2
    27:15
**rights** 13:23
**road** 17:10
**rob** 3:9 6:1 7:2
    8:15 12:1 13:15
    14:13 15:22 16:10
    16:20 20:7,25
    23:22 24:20 25:24
**robert** 2:7
**rough** 23:19 25:21
    26:4
**rule** 15:13 20:18

**s**

**sanctions** 17:7
**santa** 2:5
**satellite** 24:21
**satisfied** 16:14
**saying** 12:15 13:8
    13:8 15:15 26:20
**schedule** 12:5
    23:11 26:5
**scheduled** 11:11
**second** 3:22 4:25
    23:5

**secondarily** 23:18
**section** 4:23 7:23
    8:22 21:3 22:10
    25:14 30:9
**sections** 12:16,20
    21:13 22:6 23:2
**see** 11:17 22:19
    26:15
**seek** 13:10 14:6
    16:8,17
**send** 17:22 24:1,2
    27:20 28:6
**sending** 16:22
**sense** 21:10,22
**sent** 7:2 21:15
**separate** 21:6
**set** 9:8 16:14 22:18
    23:11 26:22
**seven** 20:2 22:4
**share** 10:11
**shows** 6:16
**side** 14:14 21:9
**signature** 30:22
**similarly** 1:6
**simply** 18:4
**single** 9:7
**situated** 1:6
**situation** 9:15
**small** 25:8
**sojin** 2:8 3:10
**sole** 4:16
**solely** 8:21
**solution** 21:25
**somebody** 20:20
**sooner** 22:20
**sorry** 6:8 7:25
    23:21
**sort** 10:18 15:16
**sounds** 7:15 18:22
    20:23 28:20

**speak** 16:19
**speaking** 3:13 6:9
**specifically** 4:20
    15:21
**spirit** 18:18
**standing** 10:20
    27:12
**stands** 25:16
**start** 3:25 17:22
**starting** 22:16
**state** 30:4
**stated** 16:11 18:15
**statements** 7:6 8:4
**states** 1:1 30:7,10
    30:15
**stating** 6:11
**statutory** 8:14
    15:9
**steiner** 2:7 3:9,9
    4:5 6:1,1,20 8:15
    12:1,1 13:15,15
    15:22 16:20 18:6
    18:20 19:2,16
    20:3 22:13 23:21
    24:4,11,19 25:1
    25:25 27:4 29:1
**stenographically**
    30:11
**stipulate** 23:19
    25:21
**stirling** 2:2
**street** 2:4
**submit** 12:2,4
    17:13 23:7,16
**subpoena** 7:2
**succinctly** 16:11
**sufficient** 22:25
**suggesting** 8:25
    18:6
**suite** 2:4,9

**summary** 3:21,23
    4:4,6 5:20 15:11
    19:1,5,12,15 20:1
    20:8,12 21:1,8,12
**superiority** 8:4
**supplemental**
    28:18
**supplementary**
    5:10 6:14
**supreme** 10:21
    11:1 27:9
**sure** 4:5 8:16
    14:16 15:13 17:15
    18:21 27:13 28:7
    28:10,23
**sweet** 2:3 3:8 15:5
    15:5 16:10 17:16
    17:16 19:10 20:7
    21:25 24:24 25:23
    27:2
**switch** 24:14

**t**

**t** 1:24 30:6
**take** 13:8 17:12,18
    22:24 24:24 26:9
    26:13
**taken** 19:20,22
**talk** 14:24 27:24
**talking** 5:17 14:12
    21:10 23:24
**technically** 7:22
**telephonic** 1:16
    3:1
**tell** 9:25 11:17
**terms** 5:15 15:11
**test** 15:25
**testified** 5:13
**testimony** 5:9 6:13
    13:24 15:3 17:14
**testing** 10:12,14
    10:16

**[thank - yoon]**

thank   28:25 29:1
    29:2
thing   21:2
things   5:8 7:5 8:24
    10:2,10 20:18
think   6:23 7:7,22
    9:8,22 10:3,5,11
    11:12,13 12:1,3,6
    12:18,21 14:5,8
    14:22 15:9,15
    16:22,23,24 17:3
    17:8,14 18:23
    19:18 20:5,5,19
    22:13 23:3,3,5,6
    23:12,15,18 24:9
    25:8,20,25 26:1,4
    26:12,20,24 27:6
    28:3
thinking   10:5
    21:12,22
thoroughly   10:4
thought   28:8
three   12:25 16:12
    26:3,13
thursday   24:16
tight   26:1,23
time   7:15 9:8
    14:10 16:4 22:6,9
    23:1 26:25
timely   18:5
times   23:6
timing   23:4
title   30:9
today   13:2 20:2
    22:4 24:13 27:3
told   16:24
touch   28:20,22
transcript   1:16
    22:25 25:21 26:4
    30:11,13

transcripts   23:19
    26:13
true   30:10
trying   6:5 7:8 9:2
    9:12 13:11 14:16
    17:9 18:4,8 20:17
    26:6
two   3:18 11:12
    22:14 23:12 26:3
    26:12
typical   5:2

**u**

ultimate   15:10
understand   6:5,23
    9:16 13:16 16:16
    18:10 19:5,16
    23:14,24 26:25
understanding
    14:18,19
undisputed   21:19
uninjured   11:4
united   1:1 30:7,9
    30:14
update   24:9
use   5:14 6:24 7:12
    9:1 10:9,9 11:19
    13:24 15:3 23:19
    25:21
users   5:12

**v**

vargas   1:5
various   19:5
verbatim   12:25,25
view   16:17
visits   10:12,14
visual   10:8
vs   1:8

**w**

wahlquist   2:8 3:10
    4:8,9,21 5:15,25
    6:23 8:2 9:12 12:8
    14:8 20:10,16
    24:14,20 27:6
    28:10,19
want   8:20 11:14
    13:17 14:4,4 15:8
    16:17 17:11,11
    19:1,8 21:23
    25:11 26:4 27:8
    27:13,20 28:2,5
    28:10
wanted   3:18,23
    4:2 15:14
way   14:25 15:20
    20:21 21:21,24
    22:7
we've   7:13 11:11
    16:14,23 27:6
wednesday   1:17
    3:1
week   3:15 4:11 7:3
    13:25 14:1,16,20
    20:24 22:19 24:20
    24:23 25:19 26:3
    27:18,20
weekend   10:4
weekends   26:19
weeks   11:12 13:12
went   27:10
west   2:4
western   1:2
wide   20:9 27:12
witness   22:22
witnesses   5:13
    26:11
work   17:9 21:20
    22:21 24:7 26:18

working   12:3
    24:22 25:3

**y**

yesterday   10:22
    20:17 27:10 28:13
yoon   2:8 3:10

Veritext Legal Solutions
866 299-5127

JA1058

357