No. 22-55873

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, DBA
(doing business as) Labcorp,

*Defendant-Appellant.*

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:20-cv-00893-FMO-KS · The Honorable Fernando M. Olguin

## EXCERPTS OF RECORD
## VOLUME 3 OF 8 – Pages 358 to 644

Robert I. Steiner
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
212-808-7800

Glenn T. Graham
ggraham@kelleydrye.com
KELLEY DRYE & WARREN LLP
One Jefferson Road, 2nd Floor
Parsippany New Jersey 07054
973-503-5917

Becca J. Wahlquist
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, California 90071
213-547-4900

Attorneys for Appellant
LABORATORY CORPORATION OF AMERICA HOLDINGS

# EXHIBIT 31

**From:** Steiner, Robert <RSteiner@KelleyDrye.com>
**Sent:** Wednesday, March 10, 2021 10:45 AM
**To:** Alison Bernal <alison@nshmlaw.com>
**Cc:** Benjamin Sweet <ben@nshmlaw.com>; Jonathan Miller <jonathan@nshmlaw.com>; Jordan Porter <jordan@nshmlaw.com>; Matthew Handley <mhandley@hfajustice.com>; Lindsey LeBlanc <lindsey@nshmlaw.com>; Boykins, Tahir L. <TBoykins@KelleyDrye.com>; Tewiah, Jewel K. <JTewiah@KelleyDrye.com>; Yoon, Sojin <SYoon@KelleyDrye.com>
**Subject:** Davis et al. v. LabCorp

Alison,

This will confirm that during our meet and confer just now related to your motion for summary judgment and class certification, which I understand you intend to make before the Court's deadline for doing so, and our cross motion for summary judgment, we agreed that both sides met their obligations under the Court's Rules.  I understand you will serve your section of the joint brief and joint appendix in seven days, on March 17.

Rob


**ROBERT STEINER**

**Kelley Drye & Warren LLP**
Tel: (212) 808-7965
Cell: (917) 981-1365


This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

JA1059

360

# EXHIBIT 32

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   LUKE DAVIS and JULIAN VARGAS,    CASE NO.: 2:20-cv-00893
     individually on behalf of
 5   themselves and all others
     similarly situated,
 6
             Plaintiffs,
 7
         v.
 8
     LABORATORY CORPORATION OF
 9   AMERICA HOLDINGS; and DOES 1-10,
     inclusive,
10
             Defendants.
11   _____
12
13
14      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
15   LABORATORY CORPORATION OF AMERICA HOLDINGS 30(B)(6),
16              JOSEPH SINNING
17            Cape Girardeau, Missouri
18           Tuesday, February 2, 2021
19                 Volume 1
20
21
22   Reported by:
     LESLIE JOHNSON
23   RPR, CCRR, CSR No. 11451
24   Job No.: 4445335
25   PAGES 1 - 232
```

Page 1

JA1060

362

```
 1                 UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4    LUKE DAVIS and JULIAN VARGAS,   CASE NO.: 2:20-cv-00893
      individually on behalf of
 5    themselves and all others
      similarly situated,
 6
              Plaintiffs,
 7
          v.
 8
      LABORATORY CORPORATION OF
 9    AMERICA HOLDINGS; and DOES 1-10,
      inclusive,
10
              Defendants.
11    _____
12
13
14
15
16
17      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JOSEPH
18    SINNING, Laboratory Corporation of America Holdings
19    30(b)(6), Volume 1, taken on behalf of Plaintiffs, at
20    Cape Girardeau, Missouri, beginning at 10:05 a.m. and
21    ending at 3:55 p.m., on Tuesday, February 2, 2021, before
22    LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.
23
24
25
                                                  Page 2
```

```
 1   BY MR. MILLER:                                      10:36:52
 2        Q    Do you have knowledge of any number of how
 3   many patients are served by LabCorp at their service
 4   centers throughout the United States?
 5        A    I know that we're seeing about 125,000     10:37:03
 6   people a day across the country.
 7        Q    At how many patient service centers?
 8        A    Just under 1900.
 9        Q    And those are located throughout the
10   United States?                                       10:37:20
11        A    That is correct.
12        Q    How many patient service centers are
13   located within California?
14        A    One second.  I've got that number in my --
15   299 locations.                                       10:37:34
16        Q    Do you know how many patients on average
17   LabCorp sees at their patient service centers in
18   California?
19             MR. STEINER:  Objection.  Beyond the
20   scope.                                               10:38:03
21             THE WITNESS:  Yeah.  I do not have that
22   number with me.
23   BY MR. MILLER:
24        Q    But it would certainly be a portion of the
25   125,000 that LabCorp sees per day; is that right?    10:38:11
```

Page 35

```
 1        A    That is correct.                        10:38:15

 2        Q    Now, these patient service centers, what

 3   is their function within LabCorp?  What are they

 4   for?

 5             MR. STEINER:  Objection.  Vague.          10:38:37

 6             THE WITNESS:  They're there to provide a

 7   location to collect samples from patients based on

 8   what a physician has ordered, or an employer in some

 9   cases.

10   BY MR. MILLER:                                      10:38:53

11        Q    And that could be for a wide range of

12   diagnostic tests, correct?

13        A    That is correct.

14        Q    It could be, for example, blood tests.

15   That would be one example, right?                   10:39:01

16        A    Correct.

17        Q    Then there could be a series of diagnostic

18   tests run from those blood samples, correct?

19        A    Correct.

20        Q    And the patient service centers are the    10:39:18

21   access points by which the patients can go and

22   deliver their samples for LabCorp's diagnostic

23   testing, right?

24             MR. STEINER:  Object to the form.  Vague.

25             THE WITNESS:  They're one of many types of  10:39:29
```

Page 36

365

1    processes for patients?                                    10:43:19

2        A    The last count I have is 1,853 of them.

3        Q    And do you have an understanding of the

4    number of patient service centers in California that

5    have kiosks that allow a patient to check in?            10:43:34

6        A    My understanding from the last count we

7    did is there were 19 that did not out of that 299.

8        Q    So, if I just subtract 19 from 299, I can

9    get to the number of patient service centers in

10   California that have kiosk check-in?                       10:44:01

11       A    Yes, sir.  I didn't want to try to do that

12   mental math, sorry.

13       Q    That's all right.

14            Now, LabCorp doesn't discriminate in

15   providing access to its services at patient service     10:44:13

16   centers, does it, sir?

17       A    Absolutely not.

18       Q    LabCorp seeks to serve all members of the

19   public who wish for services, including individuals

20   with disabilities, right?                                 10:44:24

21       A    That is correct.

22       Q    And that includes individuals who are

23   blind or low vision, true?

24       A    Correct.

25       Q    And you would agree that LabCorp provides    10:44:32

                                                            Page 40

366

```
 1    Project Horizon; isn't that true?                    10:46:37

 2        A    That is our kiosk project, sir.

 3        Q    And that project began in the 2016 time

 4    frame; is that correct?

 5        A    Yes, sir.                                    10:46:48

 6        Q    And the purpose of the project was to

 7    implement patient self-service at the LabCorp

 8    patient service centers, right?

 9             MR. STEINER:  Object to the form.

10             THE WITNESS:  No.  The purpose was to        10:46:59

11    create a tablet self-check-in service as an option

12    for patients in our PSCs.

13    BY MR. MILLER:

14        Q    So, effectively, you were attempting to

15    create a self-check-in service for patients at each  10:47:09

16    one of your patient service centers; is that -- am I

17    correct?

18        A    It's a self-check-in option for patients.

19    They can either use the tablet or they can go to our

20    window and be serviced for the check-in purposes.    10:47:21

21        Q    But now patients can do other things at

22    the self-service center other than just check-ins;

23    isn't that true?

24             MR. STEINER:  Object to the form.

25             THE WITNESS:  They can make a payment on     10:47:32
```

Page 43

JA1065

367

```
 1    account or on an NOBD, which is notice of balance        10:47:34

 2    due.  They can also do that at the front window.

 3    BY MR. MILLER:

 4        Q    But as it relates specifically to the

 5    kiosks that have been placed in the patient service      10:47:45

 6    center, they can make a payment.  That's another

 7    thing they can do other than to check in, right?

 8        A    Yes.  There is a credit card machine on

 9    the side of it.

10        Q    Can they change their appointments for the      10:47:55

11    future?

12        A    No, sir, they cannot.

13        Q    Is that part of the functionality that's

14    going to be rolled out eventually?

15        A    It's in a backlog, but it has not been          10:48:02

16    developed.

17        Q    But does the company have plans to roll

18    out the ability to schedule appointments through the

19    kiosk check-in -- or excuse me.

20             Does LabCorp have plans to allow patients       10:48:17

21    to make appointments through the kiosk?

22        A    It's an idea that's been discussed, but

23    there is no definitive plan as to when that may come

24    to fruition.

25        Q    As part of the Project Horizon, there was       10:48:32
```

                                                    Page 44

368

```
 1    assuming the role.  The project was complete by the        10:51:17

 2    time that I assumed my role as this position.

 3    So . . .

 4    BY MR. MILLER:

 5         Q    We see here on the third risk scenario,          10:51:27

 6    "Patient arrives with seeing eye dog and is unable

 7    to check in with device."

 8              Has anyone ever told you that one of the

 9    risk scenarios at the kiosk at the patient service

10    center is the patient arriving with a seeing eye dog       10:51:41

11    and unable to check in with a device?

12         A    It's never been discussed as a risk

13    assessment.  We have a policy in place that has been

14    communicated many times that we have employees in

15    our PSCs that are there to help patients that either       10:51:58

16    will not, cannot, or won't use the tablet.  We've

17    never taken that position away, and we have no

18    intentions of doing so.

19         Q    Are any of those employees who are

20    directed to assist phlebotomists?                          10:52:17

21         A    They are.

22         Q    How many of them are phlebotomists as

23    opposed to staff that just handle check-ins?

24              MR. STEINER:  Object to the form.

25              THE WITNESS:  We have very few PIRs -- I         10:52:30
```

Page 47

JA1067

369

```
 1   don't have the exact number in my head -- which is a        10:52:32
 2   patient intake representative.  The vast majority of
 3   the people working in our patient service centers
 4   doing patient care and intake are phlebotomists.
 5   BY MR. MILLER:                                              10:52:47
 6        Q    Has there been any reduction in patient
 7   intake representatives following the implementation
 8   of Project Horizon?
 9        A    I don't have direct knowledge if it was a
10   PIR that was reduced or not.  What we did, because         10:52:58
11   of the efficiencies gained, was move some people to
12   part-time versus full-time.  We have not eliminated
13   any positions in general because of the tablet.
14        Q    But there has been a reduction in hours as
15   a result of the tablet; isn't that true?                   10:53:17
16        A    Yes, based on the efficiencies that we
17   have gained in doing this process.
18        Q    But you can't tell me how many hours has
19   been reduced?
20        A    No, sir, I cannot.                                10:53:29
21        Q    Or how many -- or what positions they
22   relate to?
23        A    Not directly, no, sir.
24        Q    Who would be the individual, to your
25   knowledge, within LabCorp that would possess that          10:53:42
```

Page 48

370

```
 1    at the front desk to be able to tell -- to tell that      11:38:21

 2    information?

 3         A    At our Walgreens locations, it's the

 4    Walgreens team members that would help that person

 5    check in, not us, because there's not a front desk         11:38:30

 6    at Walgreens.  That's part of our agreement with

 7    Walgreens, that they're there to assist the patients

 8    if they need it.

 9         Q    Then why would you have the bell ring the

10    phlebotomist in the back?                                  11:38:45

11         A    So that we know somebody was -- had

12    checked in.

13         Q    Well, if there was somebody at the front

14    desk to service the individual, why would the

15    phlebotomist need to know that?                            11:38:56

16         A    At the Walgreens we do not have a front

17    desk.  That's why we have an agreement with

18    Walgreens to assist anybody that needs assistance.

19         Q    Has the bell functionality been

20    implemented only at the Walgreens?                         11:39:11

21         A    Yes.

22         Q    Has it been implemented at any other

23    patient service centers?

24         A    Not to my knowledge.

25         Q    Are there any patient service centers         11:39:28
```

Page 78

371

```
 1    within the United States where the phlebotomists are      11:39:30

 2    the individuals responsible for handling the

 3    check-in, if people can't check in vis-à-vis the

 4    kiosk or on their smartphone?

 5         A    State that again.                                11:39:42

 6         Q    Are there any patient service centers

 7    within the United States where the phlebotomists

 8    have the primary responsibility of checking in

 9    individuals who can't check in on the kiosk or their

10    smartphone?                                                11:39:55

11              MR. STEINER:  Object to the form.

12              THE WITNESS:  All of our employees that

13    work in patient service centers are there to assist

14    patients if they need it.

15    BY MR. MILLER:                                             11:40:05

16         Q    Including the phlebotomists?

17         A    Yes.

18         Q    Is it true that there are patient service

19    centers that only employ one employee at their

20    center?                                                    11:40:15

21         A    Yes.

22         Q    And isn't it true that there -- bear with

23    me here.

24              Isn't it true there is over 440 locations

25    throughout the United States where there is only one      11:40:28
```

Page 79

372

```
 1    And I'm not sure what you're referring to as far as      11:44:58
 2    scope changes.
 3         Q    All right.  Project Horizon was rolled out
 4    by LabCorp to the patient service centers in 2018;
 5    is that accurate?                                         11:45:10
 6         A    Yes.
 7         Q    And do you know specifically when that
 8    project began being rolled out to the patient
 9    service centers in 2018?
10         A    It would have been October of 2017 when it      11:45:19
11    started.
12         Q    And how do you have that information?
13         A    There was a discussion with Mark Wright,
14    Lori Crozier and Richard Porter.
15         Q    Am I correct in understanding, though,          11:45:40
16    that the bulk of the rollout to patient service
17    centers occurred in 2018, after January of 2018?
18              MR. STEINER:  Objection to the form.
19              THE WITNESS:  That is my understanding,
20    that Richard Porter was running that project.            11:45:51
21    BY MR. MILLER:
22         Q    Does Mr. Porter have more knowledge -- or
23    strike that.
24              Would Mr. Porter have more knowledge than
25    you as to the dates that various patient service         11:46:12
```

                                                    Page 83

373

```
 1    at the tablet?                                          12:00:12

 2         A    Well, our credit card capture program

 3    isn't paying for the service.  It is authorizing us

 4    to have payment taken from their credit card after

 5    the insurance is adjudicated, based on what the        12:00:23

 6    insurance says.  So they can authorize up to said

 7    amount that they choose.  That's all done at the

 8    front desk.

 9              The credit card machine on the tablet

10    allows a patient to either pay on an open balance or   12:00:37

11    pay on a past-due balance as they're registering.

12         Q   Can the patient also pay for the service

13    they're receiving on the date when they check in?

14         A    Not at the tablet.  That takes place at

15    the front desk.                                        12:00:56

16         Q   Does that take place upon check-in or

17    check-out?

18         A    Upon check-in.

19         Q   So the process currently works with the

20    LabCorp Express kiosk, a patient who wants to use      12:01:10

21    the kiosk can come in and use the kiosk to check in;

22    is that right?

23         A    That is correct.

24              MR. STEINER:  Objection to form.

25    / / / /
```

<div style="text-align:right">Page 94</div>

374

```
 1    sale patient when they come to LabCorp.  Some have    12:03:41

 2    insurance that covers services, correct?

 3        A    That is correct.

 4        Q    So those individuals can check in

 5    vis-à-vis the kiosk and then just wait to be called   12:03:50

 6    for their appointment; is that right?

 7        A    Yes.

 8        Q    And so, just so I'm clear, is it your

 9    testimony that the kiosk can only be used to resolve

10    past payments owed?                                    12:04:06

11        A    A current bill, which is a bill that's

12    been sent to them within dunning 1 and 2 or a

13    past-due bill, which is dunning 3 and on.

14        Q    But can a patient at the kiosk pay for the

15    services that they're receiving on that given day?    12:04:31

16        A    No, sir, they cannot.

17        Q    Can they pay for the services that they

18    receive upon their next visit --

19             MR. STEINER:  Object to the form.

20    BY MR. MILLER:                                         12:04:43

21        Q    -- at the kiosk?

22        A    State that question again.  I'm sorry.

23        Q    Sure.

24             So a patient -- so, in the scenario I'm

25    proposing, patient comes into a patient service       12:04:53
```

Page 97

375

```
 1    patient themselves, the check-in system that's been        01:02:26

 2    implemented through the Horizon project has to be

 3    used by one of those two sources.  It's not

 4    optional?

 5              MR. STEINER:  Objection to form.              01:02:38

 6              THE WITNESS:  That is what we've asked

 7    people to do.

 8    BY MR. MILLER:

 9         Q    Am I correct that the same software that

10    is available at the kiosk for patients'              01:02:43

11    self-check-in is the same software utilized at the

12    window?

13         A    Yeah.  It's called Express Admin at the

14    window, but yes, it's the same technology, just not

15    using a tablet.                                       01:02:59

16         Q    In other words, is the technology

17    integrated between what's available at the

18    self-check-in kiosk and what's available at the

19    window?

20         A    Yes.                                         01:03:09

21         Q    And is the technology also integrated with

22    the check-in process vis-à-vis LabCorp's website?

23              MR. STEINER:  Object to the form.

24              THE WITNESS:  Well, there's not a check-in

25    process via the website.  It's a check-in for an      01:03:20
```

                                                        Page 111

376

```
 1   clear.  Once the patient makes an appointment        01:04:27
 2   through the website portal, can they also check in
 3   through their mobile app on the smartphone?
 4        A    No.  It is only done through either the
 5   email or the text.                                    01:04:43
 6        Q    Not through the mobile app?
 7        A    That's correct.
 8        Q    To your knowledge, does LabCorp ever
 9   indicate to its employees that all patients must use
10   the self-check-in kiosk and that it was not           01:05:05
11   optional?
12        A    Every patient must go through the check-in
13   process that's part of either the tablet or behind
14   the counter.  That's our communication.  I'm not
15   aware of anything that says every patient has to use  01:05:20
16   the tablet itself.
17        Q    The express kiosk?
18        A    Correct.  We've always provided ourselves
19   to be part of that process.
20        Q    As the patient services director, have you  01:05:36
21   been made aware from any source that any LabCorp
22   employees have recommended hiring additional
23   individuals to assist in the waiting room to help
24   patients coming in following the implementation of
25   Project Horizon?                                      01:05:52
```

<div align="right">Page 113</div>

377

```
 1    memory at all as to whether LabCorp ever indicated        01:09:46

 2    to any of its employees that the Express check-in

 3    station was not optional?

 4        A    No.  I don't recall that ever being

 5    communicated to us.                                        01:09:56

 6        Q    Have you ever investigated any type of

 7    similar statements?

 8        A    We've had a couple of complaints where a

 9    PST said "You need to use the tablet," even though

10    our training and protocols say that we're there to        01:10:09

11    service the patient.  I have seen that, and we've

12    addressed those in the divisions as they've come up.

13        Q    So, just so I'm clear, there have been

14    occasions where PSTs have directed patients that

15    they have to use the Express check-in tablet?             01:10:25

16        A    Yes.  In violation of our policy, yes.

17        Q    So that -- you would agree that would be a

18    violation of your LabCorp's internal policies if

19    such a directive was made?

20        A    Correct.                                          01:10:39

21        Q    In the next paragraph -- if you could go

22    to the last paragraph of this page.  It goes on to

23    say, "I'm certain there are a number of reasons why

24    the staff are immediately redirecting the patients

25    to the Express stations.  Employees really like the       01:11:01
```

Page 117

JA1076

378

```
 1    kiosk presently?                                    02:20:06

 2        A    Checking in for myself, my child, or

 3    somebody else.

 4        Q    Is there -- you can see on the top of

 5    Exhibit 23 there's a "Hello, please check in here"  02:20:14

 6    sentence.

 7             Is there any kind of similar verbiage in

 8    the current iteration of the LabCorp Express kiosks?

 9        A    I believe it's asking "Who are you

10    checking in for?"                                    02:20:29

11        Q    Okay.

12        A    And then you --

13        Q    And so you can then -- I'm sorry.  You can

14    pick one of those three options?

15        A    Correct.                                    02:20:39

16        Q    So, as you review Exhibit 23, this was a

17    prior iteration of what was displayed, to your

18    knowledge, on the Express kiosks?

19        A    According to the date, it was from 2016.

20    I do not believe this is how it initially rolled     02:20:50

21    out.

22        Q    And so, once you make that election

23    between one of the three options presently, if you

24    choose yourself, what's the next screen that it

25    takes you to?                                        02:21:07
```

Page 167

379

```
 1        A    It takes you to scanning the driver's      02:21:09

 2   license.

 3        Q    And does it tell you where to scan the

 4   driver's license?  Is there a direction of where to

 5   hold it?                                             02:21:17

 6        A    Yeah.  It tells you to put it in the tray.

 7        Q    And then, once you scan the driver's

 8   license, what's the next screen that it takes you

 9   to?

10        A    It depends on whether you're a known       02:21:25

11   patient or not.  If you're a known patient, it takes

12   you to you demographics page for you to review it.

13   And, if you're not a known patient, then you scan

14   your insurance card.

15        Q    And, when you say it takes you to a        02:21:37

16   demographics page, what's generally depicted on the

17   demographics page?

18        A    Address, phone number, e-mail, texting

19   capabilities, insurance, who is paying for the bill

20   today.                                               02:21:50

21        Q    And can a patient update any of their

22   demographic information on that page if it's not

23   correct?

24        A    They can.

25        Q    Through the Express center kiosk?          02:21:57
```

                                                    Page 168

380

```
 1        A    Yes, sir.                              02:22:01

 2        Q    And then once the -- does the patient have

 3   to confirm that the demographic information is

 4   correct when it goes to that screen?

 5        A    They're asked -- the question is, "Is   02:22:09

 6   everything correct, yes or no?"  And, if it's "no,"

 7   then you're able to edit it.  If it's "yes," then

 8   you just move on to the next screen.

 9        Q    And, if you're an unknown patient, where

10   does it take you to on the Express center kiosk      02:22:22

11   instead of the demographic screen?

12        A    To scan your insurance card.

13        Q    And then, once you do that for -- and,

14   again, does it direct you where to scan the

15   insurance card?                                   02:22:35

16        A    It does.

17        Q    And then, once you scan the insurance

18   card, what screen does it take you to next for an

19   unknown patient?

20        A    To the demographics page.              02:22:42

21        Q    And then, once at the demographics page,

22   can you input your personal information at the

23   Express center kiosk?

24        A    You can correct anything if it needs to

25   be.                                              02:22:54
```

Veritext Legal Solutions
866 299-5127

JA1079

381

```
 1         Q    Does LabCorp integrate with the insurance    02:22:55
 2   cards to get demographic information?  Is that how
 3   it would then populate that field?
 4              MR. STEINER:  Object to the form.
 5   BY MR. MILLER:                                           02:23:03
 6         Q    So, in other words -- well, let me ask it
 7   this way.  You're an unknown patient.  You come to
 8   the Express center kiosk.  You identify somebody who
 9   hasn't previously logged in or is unknown to the
10   system.  You've scanned your driver's license.         02:23:13
11   You've now scanned your insurance card.
12              How does the demographic information get
13   then inputted into the next screen?
14         A    It comes from the two cards that we've
15   scanned.                                                02:23:24
16         Q    Okay.  So it pulls from those sources?
17         A    Correct.
18         Q    And then, at that point, can the unknown
19   patient start to input or make any corrections to
20   the information, the demographic information?          02:23:35
21         A    They can.
22         Q    Okay.  And then does it again ask the
23   patient to confirm that the information is correct?
24         A    You have an "OK" button at the top if
25   everything is correct.                                 02:23:48
```

Page 170

382

```
 1        Q    And once that "OK" button is hit, what          02:23:49

 2   happens next in the process?

 3        A    It takes you to a screen to ask you what

 4   service you're there for and gives you options on

 5   the screen.                                               02:24:00

 6        Q    And what kind of options does it generally

 7   provide?

 8        A    Lab work, drug screen, other, specimen

 9   dropoff.

10        Q    And can the patient then select one of         02:24:09

11   those options?

12        A    They can.

13        Q    And, once that option is selected, then

14   what happens next?

15        A    It asks them whether or not they're            02:24:18

16   fasting.

17        Q    And the patient can answer that through

18   the kiosk?

19        A    Yes.  "Yes" or "no."

20        Q    And then, once those options are selected,     02:24:28

21   what's the next functionality in the kiosk?

22        A    It tells them that they're checked in, to

23   have a seat, and we'll be with them as soon as we

24   can.

25        Q    Okay.  And that's for both known and           02:24:39
```

Page 171

# EXHIBIT 33

```
 1                   UNITED STATES DISTRICT COURT

 2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4        LUKE DAVIS and JULIAN VARGAS,    )

 5        individually on behalf of        ) Case No. 2:20-cv-00893

 6        themselves and all others        )

 7        similarly situated,              )

 8                  Plaintiff,             )

 9        vs.                              )

10        LABORATORY CORPORATION OF        )

11        AMERICA HOLDINGS; and DOES       )

12        1-10, inclusive,                 )

13                  Defendant.             )

14        _____ )

15

16

17                   DEPOSITION OF MARK WRIGHT

18                   TAKEN MARCH 4, 2021

19

20

21        REPORTED REMOTELY BY:

22        BEVERLY A. BENJAMIN, CSR No. 710

23        Notary Public

24

25

                                              Page 1
```

1    principals.

2          We also during discussions of physical and

3    cyber security also consulted with our internal security

4    team, but they weren't primary participants in the

5    discussion about finalizing the physical design of the

6    enclosure.

7          Q.  So during any of those discussions among Aila

8    and PointSource and your internal team, was there any

9    discussion at all or any analysis performed as to the

10   issue of whether the kiosks should be made accessible

11   for blind people?

12         MR. STEINER:  Object to the form.

13         THE WITNESS:  I would put it a different way.

14   One of our design targets was to make the device as

15   accessible as physically possible within the design

16   constraints that we had.

17         I'm going to answer your question this way:

18   We found it not at all physically practical within our

19   design constraints to service blind people, and we

20   designed the solutions so that blind people could be

21   serviced at the desk, because we also built the solution

22   to operate behind the desk in the same efficient way

23   that it operated on the tablet.

24         So we had to make design decisions to make it

25   accessible to wheelchair-bound people and low vision

                                              Page 39

 1    people, but we explicitly recognized that the device

 2    could not service a blind person, and they would have to

 3    be serviced by the Express solution behind the desk.

 4         Q.  (BY MR. SWEET)  So there were discussions

 5    around the issue of accessibility for blind people among

 6    this group?

 7         A.  Yes, but it was a short discussion.

 8         Q.  And who was involved in those discussions,

 9    sir?

10         A.  The same integrated design team that I was

11    leading at the time that involved Aila and PointSource

12    and my internal team.

13         Q.  And are there any memos or emails or other

14    documentation of these discussions?

15         A.  Not that I'm aware of.  The documentation for

16    how the design was implemented is certainly contained on

17    our documentation platforms that we use to build

18    software.

19              However, I think I'm answering your question

20    fairly directly that we had design intent that anyone

21    that was disabled and unable or preferred not to use the

22    tablet could be serviced equally as well or better from

23    the desk because of the technology solution we built as

24    part of the Express solution to enable fast check-in at

25    the desk.

                                             Page 40

# EXHIBIT 34

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    LUKE DAVIS and JULIAN VARGAS,    )

 5    individually on behalf of       ) Case No. 2:20-cv-00893

 6    themselves and all others       )

 7    similarly situated,             )

 8           Plaintiff,               )

 9    vs.                             )

10    LABORATORY CORPORATION OF        )

11    AMERICA HOLDINGS; and DOES       )

12    1-10, inclusive,                )

13           Defendant.               )

14    _____)

15

16

17           DEPOSITION OF KEVIN DeANGELO

18              TAKEN MARCH 3, 2021

19

20

21    REPORTED REMOTELY BY:

22    ANDREA L. CHECK, CSR No. 748, RPR

23    Notary Public

24

25

                                            Page 1
```

```
 1              MR. STEINER:  Objection to the form, no
 2    foundation.
 3              THE WITNESS:  I have no basis to answer that
 4    question.
 5         Q.  (BY MR. MILLER)  Well, first of all, the focus
 6    groups that you referenced, that happened back in the
 7    2016 timeframe; right?
 8         A.  Late 2016, early 2017, that would be correct.
 9              (Exhibit 54 marked.)
10         Q.  (BY MR. MILLER)  And if we take a look at
11    Exhibit 54.
12         A.  Okay.  It's in the file now.
13         Q.  This is a November 2020 newsletter; correct?
14         A.  It is.
15         Q.  And, again, there's a discussion in the
16    newsletter about the Express kiosk check-in process;
17    right?  If we take a look here on page 4.
18         A.  I'm scrolling to page 4 now.  I see an article
19    on the customer experience.
20         Q.  And there's a discussion about the LabCorp
21    Express kiosks; right?
22         A.  Yes.
23         Q.  And it acknowledges that the Express kiosk is
24    a great tool for the patients; true?
25         A.  It does say that, correct.
```

Page 101

```
1          Q.  It gives the patients a benefit to control and
2     expedite the order-entry process; right?
3          A.  That's correct.
4          Q.  But it goes on to say that self-check-in is
5     not for every patient; right?
6          A.  It does state that.
7          Q.  And further on in the paragraph, it says,
8     "Check-in using the LabCorp Express station tablet is
9     NOT" -- and the word "not" is capitalized and underlined
10    -- "mandatory for patients"?
11         A.  That's a correct statement.
12         Q.  And isn't it true that November of 2020 is the
13    first time that it was communicated in writing to the
14    LabCorp employees that the use of the Express kiosk was
15    not mandatory?
16              MR. STEINER:  Just objection, no foundation.
17              Jonathan, you know -- well, you're
18    misrepresenting the record.  No foundation.
19              THE WITNESS:  My response is, no, that
20    multiple times, and in documents that I reviewed prior
21    to this deposition, we have focused on the patient-first
22    approach, and that this was not, not required for all
23    patients, including the document we referenced in 2018.
24         Q.  (BY MR. MILLER)  But you would agree the
25    language here is very specifically telling your
```

# EXHIBIT 35

```
                                                    Page 1

 1           IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    LUKE DAVIS, JULIAN VARGAS, AND

 5    AMERICAN COUNCIL OF THE BLIND,

 6    INDIVIDUALLY AND ON BEHALF OF

 7    ALL OTHERS SIMILARLY SITUATED,

 8              Plaintiffs,        Case No.

 9       vs.                      2:20-cv-00893-FMO-KS

10    LABORATORY CORPORATION OF

11    AMERICA HOLDINGS,

12              Defendant.

13    _____/

14

15           Pursuant to Notice, the remote video

16       deposition of CLAIRE STANLEY was taken on

17       Monday, December 7, 2020, commencing at 10:00

18       a.m., before David C. Corbin, a Registered

19       Professional Reporter and Notary Public.

20

21

22

23

24

25           REPORTED BY:  David Corbin, RPR
```

Page 8

```
 1        A.    No.
 2        Q.    Okay.  I had sent your counsel a copy of
 3   the deposition notice in this case.  Did you get an
 4   opportunity to review it before the deposition?
 5             MR. HANDLEY:  Rob -- sorry.  Rob, just so
 6        I can be clear.  We cut and paste the topics
 7        into a word document for her so that it would
 8        be particularly accessible.  So the notice
 9        itself she may not have seen but the topics she
10        is designated for she has.
11        A.    Thank you.
12        Q.    That's fine.  So -- and that was the point
13   I was getting to.  I'm not trying to trick you,
14   ma'am.  You understand that you have been designated
15   by counsel for the American Council of the Blind as
16   a corporate representative to testify on its behalf
17   in this matter; is that correct?
18        A.    Yes.
19        Q.    Okay.  And I understand you haven't
20   reviewed the notice in the form in which it was
21   issued, but did you review the topics that were in
22   that notice which numbered one through 19?
23        A.    Yes.
24        Q.    Okay.  And when did you do that?
25        A.    I'm pausing because I'm trying to think of
```

Page 20

1    as being visually impaired?

2        A.    No, we do not.

3        Q.    So if someone wears glasses and their

4    vision can be corrected to 20/20 or something close,

5    would that person be defined as visually impaired?

6        A.    Again, we don't get nit picky on where

7    your visual acuity lies.  It's a personal

8    identification.

9        Q.    Okay.  So are there any specific

10   requirements to join ACB as a member?

11       A.    Nope.  Even sighted people are allowed to

12   join.

13       Q.    So of the 20,000 members that you have,

14   fair to say some are -- some are totally blind, some

15   are sighted, and then there are others that are

16   somewhere in between?

17       A.    Yes.

18       Q.    And those somewhere in between would --

19   some would lean more towards totally blind and some

20   would lean more towards being able to see with

21   corrective lenses, correct?

22       A.    Yes.  But I can't give you a percentage.

23   I don't know that.

24       Q.    Does ACB survey its members to determine

25   where they fall in terms of the spectrum for visual

Page 21

1  acuity?

2      A.   We are beginning, and I mean very early

3  infancy stage, to collect that data.  But at this

4  time, no, we don't have that information.

5      Q.   Okay.  So you can't tell me if a majority

6  of ACB members are totally blind or if a majority of

7  them are visually impaired and to what level?

8      A.   No, I can not.

9      Q.   Has -- you said ACB is beginning to --

10  that process.  What are they doing to begin that

11  process?

12      A.   Developing a survey.

13      Q.   Has that survey been sent out?

14      A.   No.

15      Q.   And does the survey ask members to

16  quantify in any way their level of visual

17  impairment?

18      A.   No.

19      Q.   How does the survey propose to identify

20  the level of visual impairment for its membership?

21      A.   It asks basic questions based on a few

22  very short identifications that again are based on

23  people's identification.  It's not a, you know,

24  number system or anything like that.

25      Q.   So it's descriptive.  It's not like your

Page 22

1    20/200 or something like that in terms of your level

2    of vision?

3        A.   Correct.  Your acuity is not asked.

4        Q.   So I take it on the survey there are a

5    number of categories from blind to able to -- to

6    sighted; is that right?

7        A.   Yes.  Very, very basic.  Very broad

8    strokes identification.

9        Q.   And how many categories are there?

10       A.   I don't recall.

11       Q.   Is it more or less than five?

12       A.   Probably less.  But I don't recall.

13       Q.   And is it fair to say that based on the

14   level of visual impairment individuals in ACB have

15   that they might need different accommodations in

16   order to participate in certain activities?

17       A.   Yes.

18       Q.   And so if one is totally blind, they might

19   need accommodations that someone who is simply

20   visually impaired may not need; is that correct?

21       A.   That's correct.  No two people with a

22   visual impairment need the same accommodation.

23       Q.   And are there some members of ACB who to

24   your knowledge need no accommodation in order to

25   participate in daily life activities?

```
                                         Page 26

 1   administrative staff who is in charge of sending

 2   that out?

 3        A.   One person in particular does, but I'm not

 4   sure if she is the one who sent it out on this

 5   occasion.

 6        Q.   What's her name?

 7        A.   Kelly Gasque.

 8        Q.   Can you spell the last name?

 9        A.   G-A-S-Q-U-E.

10        Q.   And to your knowledge did this go out in

11   June of 2020?

12        A.   Yes.

13        Q.   Does ACB -- you told me ACB does not have

14   a method of identifying which of its members used or

15   tried to use Lab Corp for its medical diagnostic

16   testing services other than the survey results; is

17   that right?

18        A.   Correct.

19        Q.   Does ACB have a method of identifying

20   which of its members who used Lab Corp were able to

21   receive Lab Corp's products and services?

22        A.   The only way is through the response of

23   the survey.

24        Q.   So as far as ACB knows, only 12 of its

25   members tried to or were able to use Lab Corp's
```

Page 27

1    products and services?

2        A.    That's based on the response to the

3    survey.

4        Q.    And you can't identify any other members

5    of ACB who have used or tried to use ACB -- sorry,

6    let me strike that.  You can't identify any other

7    members who have used or tried to use Lab Corp's

8    services other than those 12 people?

9        A.    Not at this time.

10       Q.    Has ACB sent a follow-up request to its

11   members to answer the survey questions?

12       A.    No.

13       Q.    Did you review the complaint in this

14   matter?

15       A.    I did, but it's been a while.  But yes.

16       Q.    When was the first time you reviewed it?

17       A.    Oh, goodness, I can't give you a precise

18   date.

19       Q.    Was it several months ago?

20       A.    Likely.

21       Q.    Do you know if you reviewed it before it

22   was filed?

23       A.    I can't say with certainty.

24       Q.    Okay.  Did you provide any comments on the

25   complaint to anyone?

Page 50

1      Q.    Can you spell the last name, please?

2      A.    L-O-V-E-R-I-N-G.

3      Q.    And what's Ms. Lovering's title?

4      A.    Editor.

5      Q.    When you -- did you have a conversation

6    with Mr. Harden after you received his survey

7    responses?

8      A.    Not that I can recollect.

9      Q.    Did you have e-mail communications with

10   him?

11     A.    Not that I can recollect.

12     Q.    Now, Mr. Harden in his survey response

13   states that, he says "ADA states that a business

14   needs to make reasonable accommodations for the

15   disabled.  They certainly do that."  Do you recall

16   reading that?

17     A.    Yes.

18     Q.    Okay.  And did you think it was -- would

19   have been a good idea to follow up with Mr. Harden

20   to ask him to elaborate on that statement?

21     A.    No, not that I can recollect.

22     Q.    Mr. Harden was basically telling you that

23   the allegation in the complaint that Lab Corp

24   required all patients to use the kiosk to check in

25   was not true, right?

Page 51

1          A.    Yes.

2          Q.    And you -- you discounted Mr. Harden's

3     statement concluding that it must have been an

4     isolated incident, correct?

5          A.    Yes.

6          Q.    And your basis for discounting

7     Mr. Harden's statement that Lab Corp makes

8     reasonable accommodation for people that are blind

9     and visually impaired was what?

10          A.    Can you rephrase your question?

11          Q.    What was the basis for your discounting

12     Mr. Harden's statement?

13          A.    There were greater -- there was a greater

14     number of persons who had problems than those who

15     did not.

16          Q.    Okay.  And Mr. Harden volunteered that

17     he's able to hand his I.D. card to the receptionist

18     and private information is never spoken to anyone,

19     correct?

20          A.    That's what he said.

21          Q.    Right.  And you had never asked that

22     question in your survey, right?

23          A.    No.

24          Q.    You had never asked whether patients are

25     required to check in using the kiosk, right?

Page 57

1    blind or visually impaired?

2         A.   No.

3         Q.   Did you do any investigation to determine

4    whether or not the way Lab Corp used to check

5    patients in was still available to those that simply

6    preferred to not use the kiosks for whatever reason?

7         A.   No.

8         Q.   Do you know when Lab Corp introduced its

9    kiosk check-in system?

10        A.   No, I do not.

11        Q.   Is it ACB's view that being able to check

12   in with a receptionist it discriminates against

13   those that are blind or visually impaired?

14        A.   I'm sorry, can I --

15             MR. HANDLEY:  I'm going to object as

16        calling for a legal conclusion.  You can

17        answer, Claire.

18        A.   Can you kind of restate what you mean.

19        Q.   Sure.  So my question is is ACB contending

20   that if Lab Corp allows patients to check in with a

21   patient service technician or a receptionist that

22   that is discriminatory?

23        A.   No.

24        Q.   Have you reviewed in connection with your

25   litigation, with this litigation, any of Lab Corp's

Page 60

1    can't see the kiosk, that they have to check in

2    through the kiosk?

3         A.   No, I am not aware.

4         Q.   Are you aware of anything that Lab Corp

5    has done as it relates to people who are visually

6    impaired to advise them that they have no other

7    choice but to check in through the kiosks?

8         A.   I'm not aware of anything Lab Corp has

9    done, no.

10         Q.   Are you aware of -- so your contention

11    is -- ACB's contention in this litigation is that

12    Lab Corp requires all patients to use the kiosks to

13    announce their arrival, sign in and/or register for

14    their appointments, correct?

15         A.   Correct.

16         Q.   Are you aware of anything that Lab Corp

17    has done to communicate to its patients that alleged

18    policy?

19         A.   No.

20         Q.   Do you know how many of ACB's members have

21    experiences similar to Mr. Harden in as much as they

22    have been able to check in with a receptionist?

23         A.   I do not.

24         Q.   Do you know of any Lab Corp facility where

25    patients were informed that they had to check in

Page 72

```
1        A.    The list of suggestions is in the letter
2   that we provided.
3        Q.    The letter doesn't include a request that
4   Lab Corp allow its employees to check patients in,
5   correct?
6        A.    Yes.
7        Q.    Is there a reason why that's not a request
8   made in the letter?
9        A.    I'm not sure.
10       Q.    Now, one of the requests that is made in
11  the letter is providing speech output that provides
12  information a blind user needs as the user navigates
13  through the kiosk workflow, correct?
14       A.    Correct.
15       Q.    And are there certain people that
16  notwithstanding such speech output, is it your
17  belief they would still have difficulty navigating
18  the kiosk?
19       A.    Can you rephrase that.
20       Q.    Sure.  Is providing speech output, will
21  that resolve the accessibility concerns of everyone
22  that is blind or visually impaired?
23       A.    No one accommodation is going to
24  accommodate every person everywhere.
25       Q.    Okay.  Because everyone has different
```

Page 73

```
 1   levels of impairment and different comfort levels
 2   with the technology that might be offered to
 3   accommodate their disability, correct?
 4        A.   Correct.
 5             MR. HANDLEY:  Can I stop one second.  Does
 6        someone have an animal that they need tending
 7        to.
 8        A.   I was going to say that.  My dog is --
 9   yeah, she is chomping at the bit.  I should probably
10   take her out.
11             MR. STEINER:  I don't have very much more
12        but why don't we do this.  Why don't we go off
13        the record for -- tell me how long you need,
14        I'm happy to take 15, 20 minutes.
15        A.   I don't even need that.  Probably just
16   five, ten minutes.  She is getting stir crazy.
17             MR. STEINER:  Let's take ten minutes.  And
18        then I don't make any promises, but hopefully
19        we can be done within the hour after that.
20             (Short break was taken.)
21   BY MR. STEINER:
22        Q.   Ma'am, we're back on the record.  Among
23   the requests that ACB makes is for a tactile keypad
24   for navigation of the check-in kiosks.  Are you
25   aware of that?
```

Page 78

1          a legal conclusion.  But go ahead and answer,
2          Claire.
3              A.   It would be preferable than having to rely
4      on another human being that is not an employee of
5      Lab Corp.
6              Q.   So it is ACB's preference that a staff
7      member be available to check in people that are
8      blind or visually impaired, correct?
9              A.   Correct.
10             Q.   And is that more preferable to having a
11     kiosk that provides speech output?
12             A.   I would not -- I wouldn't choose either
13     or.  I see them as options.
14             Q.   Options for accommodations for people who
15     are blind or visually impaired, correct?
16             A.   Correct.
17             Q.   Is there a specific remedy that you're
18     looking for for people such as Mr. Harden who have
19     been able to check in with a receptionist where
20     private information is never spoken?
21             A.   No.
22             Q.   Is there any remedy that you're looking
23     for in people of Mr. Harden's situation?
24             A.   No.
25             Q.   Other than the lawsuit against Quest, has

# EXHIBIT 36

```
                                                    Page 1
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3             CASE NO.:  2:20-CV-00893-FMO-KS
 4
     LUKE DAVIS, JULIAN VARGAS, and
 5   AMERICAN COUNCIL OF THE BLIND,
     individually, and on behalf of
 6   all others similarly situated,
 7                  Plaintiffs,
 8   vs.
 9   LABORATORY CORPORATION OF
     AMERICAN HOLDINGS; and DOES 1
10   through 10,
11                  Defendants.
     _____/
12
                    February 17, 2021
13                  Videoconference Deposition
                    9:07 a.m. - 10:11 a.m.
14
15
16
17              VIDEOCONFERENCE ZOOM
18           DEPOSITION OF JOHN HARDEN
19
20        Taken before Angela Saxon, Professional Court
21   Reporter and Notary Public in and for the State of
22   Florida at Large, pursuant to Notice of Taking
23   Deposition filed in the above cause.
24
25
```

Page 16

1      A    Yeah, personal computer, home computers.

2      Q    And what was your next job, sir?

3      A    2000 I retired.

4      Q    And do you currently have any employment?

5      A    I currently do a little bit of

6   braillewriter repair just as a hobby more than

7   anything else.

8      Q    Do you read Braille, sir?

9      A    Yes.

10     Q    Sir, are you visually impaired?

11     A    Yes.

12     Q    And are you -- can you describe your level

13  of visual impairment?

14     A    Totally blind now.  I was able to see a

15  little bit as a younger person, never been able to

16  read print very well.

17     Q    When would you say approximately that you

18  became totally blind?

19     A    Oh, it kind of went slowly, but I would

20  say sometime between 2000 and 2010.

21     Q    Have you ever been a party to a

22  litigation, sir?

23     A    Repeat.

24     Q    Sure.  Have you ever been a plaintiff in a

25  litigation or a defendant in a litigation?

Page 19

1        Q    And the first question, sir, was have you

2   attempted to access LabCorp's facilities through the

3   use of the E-kiosk check-in system in the past three

4   years.  Do you recall that question, sir?

5        A    If it was on the survey, yes.

6        Q    And then do you recall responding:  No, I

7   walk in and go to the window just as I always did,

8   and the receptionist checks me in just like she

9   always did.  In fact, I was unaware there was an

10  E-kiosk.  Is that your answer, sir?

11       A    That sounds familiar, yes.

12       Q    And was that a true and accurate answer of

13  your experience going to that --

14       A    Yes.

15       Q    Let me just finish my question.

16            MR. HANDLEY:  Let him finish the question,

17       Mr. Harden.  Thanks.

18            THE WITNESS:  Sorry.

19  BY MR. STEINER:

20       Q    Was that a true and accurate statement of

21  your experiences going to LabCorp's Patient Service

22  Centers within the last three years prior to

23  responding to the survey?

24       A    Yes.

25       Q    Do you recall, sir, being asked the

Page 21

1    is that correct?

2         A    That is correct.  And it's Beville Road,

3    not Bellview.

4         Q    I apologize, sir, Beville Road.

5         A    Hey, it's a strange spelling.  It's an

6    easy mistake.

7         Q    Thank you.  And since you responded to

8    this survey on June 26, 2020, have you continued to

9    go to the LabCorp Patient Service Center at Beville

10   Road in South Daytona Florida?

11        A    Yes.

12        Q    And have your experiences going to that

13   location been the same as they were at the time you

14   responded to this survey on June 26, 2020?

15        A    Yes.

16        Q    And how many times would you estimate

17   you've been to that LabCorp Patient Service Center

18   on Beville Road since June 26, 2020?

19        A    Well, every three months, so three times.

20        Q    You go to that LabCorp Patient Service

21   Center approximately every three months; is that

22   correct?

23        A    That is correct.

24        Q    And when you go to that patient service

25   center, what goods or services are you seeking from

Page 22

1    LabCorp?

2         A    Leaving a blood sample for them to do

3    their tests on for as ordered by my physician.

4         Q    And on every instance, sir, that you've

5    been to that location in the last three years, have

6    you been able to get the goods and services from

7    LabCorp that you were there for?

8         A    Yes.

9         Q    Have you ever been denied any goods and

10   services from LabCorp at a patient service center?

11        A    No.

12        Q    Sir, I'm going to skip question three and

13   go to question four on the survey.  The question

14   was, Have you ever -- sorry, excuse me, Have you

15   attempted to access LabCorp's E-kiosk check-in

16   system and were forced to disclose private

17   information to another person to get help signing

18   in.  Do you recall that question, sir?

19        A    Yes.

20        Q    And your response was:  I hand my ID card

21   to the receptionist and private information is never

22   spoken to anyone.  Do you recall that response, sir?

23        A    Yes.

24        Q    Was that an accurate response relating to

25   your experience at the Beville Road LabCorp Patient

Page 23

1  Service Center over the last three-and-a-half years?

2      A    Yes.

3      Q    Sir, you wrote on the survey response

4  dated June 26, 2020, ADA states that a business

5  needs to make reasonable accommodations for the

6  disabled; they certainly do that.  Do you recall

7  that response, sir?

8      A    Yes.

9      Q    Was that an accurate response relating to

10 your experiences at LabCorp's Beville Road Patient

11 Service Center over the last three years?

12     A    Yes.

13     Q    And since you filled out that survey, has

14 anything happened at any of the LabCorp Patient

15 Service Center on Beville Road that would cause you

16 to change any of your responses to this survey?

17     A    No.

18     Q    Sir, the last time you were at a LabCorp

19 Patient Service Center was when?

20     A    It was the middle of January.  The exact

21 date, I couldn't say.

22     Q    That's fine.  The middle of January 2021?

23     A    Yes.

24     Q    And you would have been at a patient

25 service center approximately in the middle of

```
                                              Page 25
 1   yourself?
 2        A     I don't believe so.  I don't remember.
 3        Q     What is your wife's name, sir?
 4        A     Teresa Faye Harden.
 5        Q     Does Ms. Harden have visual impairment?
 6        A     Yes.
 7        Q     Is Ms. Harden legally blind?
 8        A     Yes.
 9        Q     And so I take it from your testimony that
10   the two of you obtain goods and services from that
11   LabCorp Patient Service Center on Beville Road,
12   correct?
13        A     Yes.
14        Q     Are you aware of any instance where Ms.
15   Harden, your wife, has been denied any goods and
16   services from the patient service center on Beville
17   road?
18        A     She has not been denied any services.
19        Q     Has your wife to your knowledge been able
20   to check in at the window in the last four years?
21        A     Yes.
22        Q     Has she ever been required to use the
23   kiosk to check in?
24        A     No.
25        Q     Have you ever been required to use the
```

414

Page 26

1    kiosk to check in?

2         A    No.

3         Q    As to Ms. Harden, does she require

4    laboratory testing services at the same frequency

5    that you do, sir?

6         A    Yes.

7         Q    So approximately every three months?

8         A    Approximately.

9         Q    So the two of you collectively over the

10   last four years would have been at a LabCorp Service

11   Center approximately, what is that, 32 times?

12        A    Probably.

13        Q    And on each and every occasion that you've

14   gone, the two of you have gone, of those 32 times

15   you've been able to check in at the desk, correct?

16        A    Correct.

17        Q    You have never been required on any of

18   those 32 times to check in at the kiosk, correct?

19        A    That is correct.

20        Q    Sir, when you were at the location on

21   Beville Road in January of this year, you were able

22   I take it to physically access that location?

23        A    Yes.

24        Q    You entered the location and then tell me

25   what you would do.

Page 29

1   the phlebotomist who drew your blood in the back?

2       A    I don't believe so.

3       Q    When you have gone to the desk, have you

4   ever had to wait in line?

5       A    No.

6       Q    So you walk up to the desk and your

7   information is taken from you almost immediately; is

8   that correct?

9       A    That's correct.

10      Q    And then you're asked to take a seat and

11  depending on how busy this location is depends on

12  how long it takes for them to call you into the

13  back; is that right?

14      A    Right.

15      Q    Do you know whether people who are

16  checking in the kiosks are able to check in sooner

17  than you or if that takes more or less time?

18      A    Repeat.

19      Q    Sure.  Do you know whether, sir, on the

20  occasions that you've been to the LabCorp Patient

21  Service Center since they introduced the kiosk, if

22  it is quicker to check in at the kiosk or check in

23  at the desk?

24      A    I don't really -- it depends on the person

25  at the kiosk.  Some people take a minute and some

Page 30

1    people take three or four minutes.

2          At the desk I'm probably there a minute at

3    the most.

4       Q    And so your understanding is that some

5    people are less familiar with the kiosk and so it

6    may take them longer to check in at the kiosk than

7    at the desk; is that correct?

8       A    Yes.

9       Q    So you find checking in at the desk to be

10   an efficient way to get services from LabCorp?

11      A    Yes.

12      Q    And do you have any reason, sir, to check

13   in at the kiosk?

14      A    No.

15      Q    Have you ever tried to use the kiosk, sir?

16      A    No.

17      Q    When you check in at the desk, sir, have

18   you ever been required to provide any personal

19   medical information?

20      A    No.

21      Q    Are you aware of anyone, sir, who is

22   visually impaired who has been denied the

23   opportunity to check in at a LabCorp Patient Service

24   Center at the desk?

25      A    I'm not aware of anyone.

417

# EXHIBIT 37

Page 1

1                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

2

3    LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE

     BLIND, individually, and on behalf of all others similarly

4    situated,

5         Plaintiffs,            Case No. 2:20-CV-00893-FMO-KS

6    vs.

7

     LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1

8    through 10,

9         Defendants.

10

11    _____

12         VIDEORECORDED VIDEOCONFERENCED DEPOSITION OF

13                       ROBIN VAN LANT

14                      February 17, 2021

15    _____

16

17

18

19

20

21

22

23

24

25

419

Page 35

```
 1              A.    That is my recollection.  Yes.
 2              Q.    They confirmed who you were and asked you
 3   your birth date?
 4              A.    Uh-huh.
 5              Q.    Yes?
 6              A.    That's -- yes.  Thank you.  I think -- I
 7   think that is correct, yes.
 8              Q.    And that was -- that was also done in a
 9   private setting?
10              A.    Yes.
11              Q.    Did anyone at Lab Corp tell you that you
12   needed to use the kiosk to check in?
13              A.    Not verbally.  No.
14              Q.    And you said that the last time you were at
15   that facility was in late 2019; correct?
16              A.    Yes.  As I recall.
17              Q.    Have you been -- I may have asked you this.
18   I apologize.  Had you been to any other Lab Corp locations
19   in the last four years?
20              A.    No.  I have not.
21              Q.    Do you know what the check-in process is at
22   any other Lab Corp location, other than the 90 Health Park
23   Drive location that you went to on the -- the dates that
24   you were there?
25              A.    I do not.
```

420

Page 41

1    suggesting that in order to sign in at a Lab Corp patient

2    service center in 2017 or 2018, you needed to fill out any

3    forms; correct?

4              A.    I did not physically write a form.

5              Q.    And the only information, as you said

6    before, that you provided on those occasions was in the

7    form of your identification card and insurance card;

8    correct?

9              A.    That is my recollection.  And verbally, my

10   name.

11             Q.    You say in your response, "If my husband

12   had not been there, I would not have even known of the

13   kiosk and would have just waited for a receptionist to

14   talk with."

15             That was your response; correct?

16             A.    That is correct.

17             Q.    Okay.  And so you don't know if you had

18   waited another minute or 2 minutes, a receptionist would

19   have come out to check you in; correct?

20             A.    That is correct.

21             Q.    And I may have asked you this.  I

22   apologize.  Was there anyone else in the waiting area in

23   late 2019 when you were there?

24             A.    I don't remember at this point.  I don't

25   remember there being anyone, but I can't be sure.

# EXHIBIT 38

```
                                                    Page 1

 1         UNITED STATES DISTRICT COURT FOR THE CENTRAL
                    DISTRICT OF CALIFORNIA
 2
       LUKE DAVIS, JULIAN          :
 3     VARGAS, and AMERICAN        :  CASE NO.
       COUNCIL OF THE BLIND,       :  2:20-CV-00893-FMO-KS
 4     individually, and on        :
       behalf of all others        :
 5     similarly situated,         :
                    Plaintiffs,    :
 6                                 :
                    v.             :
 7                                 :
       LABORATORY CORPORATION      :
 8     OF AMERICA HOLDINGS; and    :
       DOES 1 through 10,          :
 9                    Defendant.   :
10
11              DEPOSITION VIA ZOOM OF:
12        RACHAEL BRADLEY MONTGOMERY, Ph.D.
13           THURSDAY, APRIL 15, 2021
14
15
16
17
18
19
20
21
22
23
24     REPORTED BY:
       SILVIA P. WAGE, CCR, CRR, RPR
25
```

Page 106

```
 1    blind users.

 2           A.      Okay.

 3           Q.      And, as I understand your testimony,

 4    it's that the technical changes to the kiosk that

 5    you propose would make check-in at the kiosk

 6    accessible to, I think, you used the word a vast

 7    majority of blind people; is that right?

 8           A.      So it is correct that the changes I

 9    am recommending would be required.  They may not be

10    sufficient.

11           Q.      "Required" to make the check-in kiosk

12    accessible to the vast majority of blind people,

13    right?

14           A.      Correct, yes.

15           Q.      But there would be blind people who

16    still would require desk check-in; is that correct?

17           A.      That is conceivably possible, yes.

18           Q.      And is it fair to say that check-in

19    at the desk will allow all legally blind users to

20    check in for LabCorp's services?

21                   MR. HANDLEY:  Objection, calls for

22    information outside the scope of the witness's

23    assigned task.

24           A.      Again, there are factors beyond just

25    whether or not it's accessible.  But, assumably, if
```

Page 109

1          A.      I was.  However, my disability does
2     not in any way interfere with communication in that
3     way.
4          Q.      In other words, the person at the
5     desk would speak to you and tell you what you
6     needed, right?
7          A.      Correct.
8          Q.      And you found that to be an adequate
9     method of communication with the individual at the
10    desk?
11         A.      I did, yes.
12         Q.      But it's fair to say, Ma'am, that
13    even with your proposal in Paragraph 1 on Page 2,
14    some legally blind people would not be able to check
15    in at the kiosk independently, correct?
16         A.      It is my opinion that if these
17    modifications were made and the speech output was
18    provided to allow navigation, that the majority
19    would.  But it is hard to say -- it is hard to say
20    that absolutely everyone would because there are
21    different situations.
22         Q.      And you didn't study the preference
23    of legally blind people when it comes to checking in
24    at a LabCorp Patient Service Center?
25         A.      I did not.

Page 144

1    throughout.  And so there are a number of ways to

2    make that relatively easy including linting,

3    including tests for accessibility as part of the

4    unit test, as part of the developer test and,

5    especially, part of validation changes before

6    changes to the website are upgraded.

7         Q.      You indicated that you tested the

8    2017 website.

9         A.      I went back and tested pieces of the

10   site that were available on the Wayback Machine.

11        Q.      And why did you do that?

12        A.      I did that because I -- if the 2017

13   site was accessible, I wanted to be able to speak to

14   that because it was the beginning of this -- the

15   kiosk deployment and I felt it was relevant to look

16   at the history as much as I could.

17        Q.      Did you -- so you looked at the

18   website in 2017 because it's your understanding that

19   the kiosks were being deployed in 2017?

20        A.      I looked at the website for a

21   reasonable amount of time, 2017 being where I

22   thought based on the documents seemed reasonable.

23              But to, specifically, answer your

24   question about why, as you noted, websites can have

25   small errors that happen over time.  I was trying to

# EXHIBIT 39

```
                                          Page 1

1                UNITED STATES DISTRICT COURT
2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
3
4    LUKE DAVIS, JULIAN VARGAS,        )
     AND AMERICAN COUNCIL OF THE       )
5    BLIND, individually, and on       )
     behalf of all others             )
6    similarly situated,              ) Case No.
                                       ) 2:20-CV-00893-FMO-KS
7            PLAINTIFFS,               )
                                       )
8            VS.                       )
                                       )
9    LABORATORY CORPORATION OF         )
     AMERICA HOLDINGS; and DOES 1      )
10   through 10,                       )
                                       )
11           DEFENDANTS.               )
     _____)
12
13
14
15       VIDEOTAPED DEPOSITION OF SEAN CHASWORTH
16          FRIDAY, APRIL 16, 2021, 9:33 A.M.
17                VIA VIDEOCONFERENCE
18
19
20
21
22
23   Reported by Desiree Cooks, CSR No. 14075
24
25
```

Page 40

1    a geographical area, that is possible, but I'm not

2    certain of that, no.

3        Q    Well, did you do anything to attempt to exclude

4    in your numerical estimates individuals who visited a

5    Lab Corp patient service center but where there was no

6    express kiosk in that patient service center?

7        A    In my geographical studies, I was provided a

8    list of locations, and I did assume that all of those

9    locations had a -- a check-in kiosk.

10       Q    Okay.  And the locations you were provided with

11   were Lab Corp patient service center locations; correct?

12       A    Yes.

13       Q    Okay.  And so your analysis of people who were

14   denied independent access to Lab Corp services as a

15   result of Lab Corp's use of the express kiosks includes

16   locations where there was no express kiosk

17   installed; correct?

18           MR. SWEET:  Objection.  Assumes facts not in

19   evidence.

20           THE WITNESS:  I don't recall if the list that I

21   was provided contained only centers with -- with kiosks

22   or not.  I don't have -- I don't recall that at this

23   time.

24   BY MR. STEINER:

25       Q    Okay.  So did you investigate that at all,

Page 41

1   whether all the locations that you were provided had, in

2   fact, express kiosks?

3       A       No, I did not.

4       Q       Did you assume that all of the locations that

5   you were provided did, in fact, have express kiosks?

6       A       Yes, I did.

7       Q       And you assume that all of those locations were

8   Lab Corp PSCs; correct?

9       A       That's correct.

10      Q       And so, again, to be in your estimate of class

11  members, one has to be, then, legally blind, have visited

12  -- have visited a Lab Corp patient service center with a

13  self-service kiosk; correct?

14      A       Please repeat that question, if you could.

15          MR. STEINER:  Sure.  Desiree, could you read it

16  back, please.

17          (The record was read back as follows:

18              "Question:  And so, again, to be

19          in your estimate of class members, one

20          has to be, then, legally blind, have

21          visited a Lab Corp patient service

22          center with a self-service

23          kiosk; correct?")

24          THE WITNESS:  That is incorrect in terms that I

25  did not verify whether or not somebody had to visit a

Page 53

1   BY MR. STEINER:

2       Q    Are you aware of any database of people who are

3   considered to be legally blind in California?

4       A    No, I don't.

5       Q    Did you ask ACB if it had any information on

6   the number of its members who are legally blind?

7            MR. SWEET:  Objection.  Calls for information

8   outside of his assigned task.

9            THE WITNESS:  No, I did not.

10  BY MR. STEINER:

11      Q    Do you know whether ACB keeps such a list?

12           MR. SWEET:  Same objection.

13           THE WITNESS:  No, I don't.

14  BY MR. STEINER:

15      Q    Are you aware of any statistics that Lab Corp

16  keeps of the number of legally blind people who it

17  services?

18      A    No, I don't.

19      Q    Are you offering an opinion on how to identify

20  every legally blind person who visited a Lab Corp

21  facility?

22           MR. SWEET:  Objection.  Calls for information

23  well outside of his report.

24           THE WITNESS:  No, I am not.

25  ///

Page 54

1   BY MR. STEINER:

2       Q    Are you offering an opinion on how to identify

3   every legally blind person who visited a Lab Corp

4   facility with a kiosk?

5               MR. SWEET:  Same objection.

6               THE WITNESS:  No, I am not.

7   BY MR. STEINER:

8       Q    Are you offering an opinion as to how to

9   identify every legally blind person who visited a

10  Lab Corp facility with a kiosk but was denied access to

11  Lab Corp services as a result?

12              MR. SWEET:  Objection --

13              THE WITNESS:  No, I am not.

14  BY MR. STEINER:

15      Q    Are you offering an opinion on how to identify

16  every legally blind person in California who visited a

17  Lab Corp PSC?

18              MR. SWEET:  Objection.

19              THE WITNESS:  No, I am not.

20  BY MR. STEINER:

21      Q    Are you offering an opinion on every legally

22  blind -- withdrawn.

23              Are you offering an opinion on how to identify

24  every legally blind person in California who attempted to

25  visit a Lab Corp PSC?

Page 55

1       A       No, I am not.

2       Q       Are you offering an opinion on how to identify

3   every legally blind person in California who visited a

4   Lab Corp facility who had a kiosk?

5       A       No, I am not.

6       Q       Are you offering an opinion on how to identify

7   every legally blind person who visited a Lab Corp

8   facility in California and was denied services as a

9   result of its kiosks?

10              MR. SWEET:  Objection.  Calls for information

11  well beyond his assigned task.

12              THE WITNESS:  No, I am not.

13  BY MR. STEINER:

14      Q       Are you offering an opinion on how to identify

15  whether a blind person who visited a Lab Corp facility

16  attempted to use or wanted to use a kiosk either

17  nationally or in California?

18              MR. SWEET:  Same objection.

19              THE WITNESS:  No, I am not.

20  BY MR. STEINER:

21      Q       If an individual is legally blind, sir, and

22  visited a Lab Corp facility -- as you described in your

23  report, reference this Davis-LabCorp515 -- and never

24  attempted to use the kiosk, are they counted as a class

25  member in your estimate?

Page 87

```
 1    adjustment based on Lab Corp's share of the population.
 2         Q     Did you consider whether or not -- whether
 3    other factors might influence whether or not an
 4    individual who is blind might go to a Lab Corp PSC with a
 5    kiosk?
 6         A     I don't believe so, no.
 7         Q     Now, according to your report, the NIH says the
 8    number of legally blind people in the U.S. is 1 million
 9    -- 1 million people -- excuse me -- correct?
10         A     Yes.
11         Q     And do you know where NIH got that number from?
12         A     No, I don't.
13         Q     Did you do anything to investigate NIH's
14    methodology?
15         A     No, I didn't.
16         Q     If you look at your report, sir -- do you have
17    that in front of you?  Exhibit 63, Page 13 is an article
18    which refers to the NIH estimate; correct?
19              MR. SWEET:  That is not the Page 13 I have.
20              MR. STEINER:  I apologize, Page 27.
21              MR. SWEET:  Let's get there.  One second.
22    Okay.
23    BY MR. STEINER:
24         Q     Let me know when you're there, sir.
25         A     I believe I'm there.
```

Page 131

```
 1    again?
 2    BY MR. STEINER:
 3        Q    Sure.  If you heard testimony from a potential
 4    class member that he never attempted to use a kiosk, had
 5    no desire to use a kiosk, and was able to receive
 6    Lab Corp's goods and services, would that individual be
 7    in your class?
 8             MR. SWEET:  Objection.  Calls for speculation.
 9    Hypothetical.
10             THE WITNESS:  I believe it would be counted as
11    part of my estimations according to the other
12    calculations that I made.
13    BY MR. STEINER:
14        Q    Even though that individual was not denied any
15    Lab Corp's goods and services; correct?
16        A    Again, the assumptions that I've used of
17    including people are in my report.  He might be included
18    in my report.
19        Q    Okay.  Even if he wasn't denied any access to
20    Lab Corp's services?
21             MR. SWEET:  Objection.  Assumes facts not in
22    evidence.
23             THE WITNESS:  That's a legal conclusion and not
24    part of my report.
25    ///
```

Page 132

1    BY MR. STEINER:

2        Q     But that individual would be in your number of

3    punitive class members; correct?

4        A     He would be considered as part of, for example,

5    the -- you know, 87,500 national number, yes.

6        Q     Okay.  And so you would conclude because he's

7    in that 87,500 number that he was denied independent

8    access to Lab Corp's services; correct?

9            MR. SWEET:  Again, objection.  Hypothetical.

10   Calls for speculation.

11           THE WITNESS:  Not necessarily.  I was asked to

12   provide an overall estimate of -- of class members, so I

13   I'm not sure he would be counted or not.

14   BY MR. STEINER:

15       Q     So you don't know whether, based on your

16   opinion of the number of legally blind individuals who

17   were denied independent access to Lab Corp's services as

18   a result of Lab Corp's use of express kiosks, if someone

19   who was not denied access to Lab Corp's services and

20   never attempted to use the express kiosks would be within

21   the numbers contained in your opinion?

22       A     I'm sorry, could you repeat that question

23   again?

24       Q     Sure.  You don't know whether an individual who

25   was not denied independent access to Lab Corp's services

Page 185

```
 1      Q      And when you say subject to the list of
 2   documents contained in your report, if it's not listed
 3   there, you didn't review it?
 4      A      That's correct.
 5      Q      So you don't recall reviewing Mr. Vargas's or
 6   Mr. Davis's transcript; is that right?
 7      A      I don't believe so, no.
 8      Q      Would the staffing levels of a PSC be relevant
 9   to your analysis as to the number of individuals who were
10   denied independent access to Lab Corp services as a
11   result of Lab Corp's use of express kiosks?
12      A      I don't believe so, no.
13      Q      Would whether or not Lab Corp had a dedicated
14   patient intake representative to check people in at the
15   desk be relevant to your analysis as to the number of
16   legally blind individuals who were denied independent
17   access to Lab Corp's services as a result of Lab Corp's
18   use of express kiosk?
19      A      Not for the estimates I've made, no.
20      Q      Okay.  Have you taken into account in your
21   analysis at all the differing check-in experiences that
22   individuals may have had at a Lab Corp PSC?
23      A      No, I have not.
24      Q      Have you taken into account at all whether or
25   not an individuals who visited a Lab Corp PSC went
```

Page 186

1    straight to the Lab Corp patient service representative

2    to check in?

3        A    No, I didn't.

4        Q    And you have not taken into account in your

5    analysis of the number of legally blind individuals who

6    were denied independent access to Lab Corp services as a

7    result of Lab Corp's use of express kiosks whether or not

8    any individual tried to use the express kiosk at

9    all; correct?

10       A    I don't believe so, no.

11       Q    And you have not taken into account whether or

12   not an individual that visited a Lab Corp patient service

13   center that didn't have a kiosk was denied independent

14   access to Lab Corp services as a result of Lab Corp's use

15   of express kiosks; correct?

16       A    I haven't incorporated that in my analysis, no.

17       Q    And you didn't believe that that would be

18   relevant to your analysis; is that correct?

19       A    No, not at this time, no.

20       Q    And you told me before that you have not

21   reviewed the report of Bruce Deal; is that correct?

22       A    That's correct.

23       Q    Do you know who Mr. Deal is?

24            MR. SWEET:  Objection.  Asked and answered.

25            THE WITNESS:  I don't believe so, no.

# EXHIBIT 40

# Ex. 40 (Davis-LabCorp00004748) is being lodged with the Court due to the size of the Excel file

JA1130

# EXHIBIT 41

NY01/VENAK/954981.1

441

# Ex. 41 (Davis-LabCorp00004749) is being lodged with the Court due to the size of the Excel file

JA1131

# EXHIBIT 42

# Ex. 42 (Davis-LabCorp00004750) is being lodged with the Court due to the size of the Excel file

JA1132

# EXHIBIT 43

# Ex. 43 (Davis-LabCorp00004751) is being lodged with the Court due to the size of the Excel file

JA1133

# EXHIBIT 44

447

# Ex. 44 (Davis-LabCorp00004752) is being lodged with the Court due to the size of the Excel file

JA1134

# EXHIBIT 45

# Ex. 45 (Davis-LabCorp00004755) is being lodged with the Court due to the size of the Excel file

JA1135

# EXHIBIT 46

**John Harden**

1. Have you attempted to access LabCorp's facilities through the use of the e-kiosk check-in system in past three years?  No.  I walk in and go to the window just as I always did and the receptionist checks me in just like she always did.  In fact, I was unaware that there was an E-Kiosk.
2. How many times have you attempted to access LabCorp's e-kiosk check-in system in the past three years?  As I said before, Never but I go to the lab about four times a year.
3. How many times have you attempted to access LabCorp's e-kiosk check-in system in the past three years and were unable to do so independently?
4. Have you attempted to access LabCorp's e-kiosk check-in system and were forced to disclose private information to another person to get help signing in? I hand my Id card to the receptionist and private information is never spoken to anyone.
5. Where are the LabCorp locations have you attempted to access an e-kiosk check-in system in past three years?

927 Beville Rd., S. Daytona, FL
ADA states that a business needs to make reasonable accomadations for the disabled.  They certainly do that.

CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 47

Jonathan D. Miller (SBN 220848)
jonathan@nshmlaw.com
Alison M. Bernal (SBN 264629)
alison@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590

Benjamin J. Sweet
(pro hac vice)
ben@nshmlaw.com
NYE, STIRLING, HALE
& MILLER, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350

Attorneys for Plaintiffs Julian Vargas, Anne West, American Council of the Blind, and the Proposed Class

*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1 through 10,

Defendants.

CASE NO. 2:20-CV-00893-FMO-KS

**PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S SUPPLEMENTAL RESPONSE TO REQUEST NO. 17 OF DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff American Council of the Blind ("ACB") submits the following supplemental response to Request No. 17 of Defendant Laboratory Corporation of America Holdings' First Set of Requests for Production of Documents.

## **PRELIMINARY STATEMENT**

The following supplemental response is rendered and based upon information in the possession of ACB at the time of the preparation of this response.

1

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S SUPPLEMENTAL RESPONSE TO REQUEST NO. 17 OF DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

JA1137

1

2  **REQUEST FOR PRODUCTION NO. 17**

3      The complete list to whom You sent Your June 2020 Survey (Bates Stamped

4  PL204) along with any and all responses received thereto in their original form.

5  **RESPONSE TO REQUEST FOR PRODUCTION NO. 17**

6      ACB objects to this request as overly broad, unduly burdensome,

7  unreasonable, and not proportional to the needs of the case.  ACB also objects to

8  this request to the extent it unnecessarily and unreasonably invades the privacy

9  interests of its members.

10     Without waiving any objections, ACB responds as follows: ACB agrees to

11  produce nonprivileged, responsive documents within its custody, control, or

12  possession sufficient to show ACB's recordation of instances where its members

13  have interacted with LabCorp that can be located after a reasonable search.

14  **SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 17**

15     Without waiving any objections, ACB further responds that the June 2020

16  Survey was sent to a total of 4,542 persons.

17

18  Dated: March 2, 2021              NYE, STIRLING, HALE & MILLER, LLP

19

20                                   /s/ Jonathan D. Miller
                                     Jonathan D. Miller
21                                   Alison M. Bernal
                                     Benjamin J. Sweet
22                                   Jordan T. Porter

23
                                     HANDLEY FARAH & ANDERSON
24
                                     /s/ Matthew Handley
25                                   Matthew K. Handley

26                                   *Attorneys for Plaintiffs*

27                                            2

28  ─────────────────────────────────────────────────────────
    PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S SUPPLEMENTAL RESPONSE TO
    REQUEST NO. 17 OF DEFENDANT LABORATORY CORPORATION OF AMERICA
    HOLDINGS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

JA1138

455

DocuSign Envelope ID: D335FC75-2416-49B2-B9AF-CA9094235A3C

## <u>VERIFICATION</u>

I have read the foregoing <u>PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S SUPPLEMENTAL RESPONSE TO REQUEST NO. 17 OF DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS</u> and know its contents.

☐  I am a party to this action.  The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒  I am the Director of Advocacy and Governmental Affairs of the American Council of the Blind, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in the supplemental response to Request No. 17 are true.

☐  I am one of the attorneys of record for _____ , a party to this action.  Such party is absent from the county in which I have my office, and I make this verification for and on behalf of that party for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

Executed on ___<u>3/2/2021</u>_____.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DocuSigned by:

*Clark Rachfal*

87AE1C7D7C2426...

Clark Rachfal

**PROOF OF SERVICE**
**DISTRICT OF COLUMBIA**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the District of Columbia.  My business address is 200 Massachusetts Avenue, NW, 7th Floor, Washington, DC, 20001.

On March 3, 2021, I served true copies of the following document(s) described as following document(s):

**PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S RESPONSE TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS FROM DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS**

on the interested parties in this action as follows:

Robert L. Steiner, Esq.
rsteiner@kelleydrye.com
KELLY DRYE & WAREEN LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800

Tahir L. Boykins, Esq.
KELLEY DRYE & WARREN LLP
tboykins@kelleydrye.com
1800 Century Park East, Suite 600
Los Angeles, CA 90067-4008
Telephone: (310) 712-6100

*Attorneys for Defendant*

[X]     **BY EMAIL**: I caused the above listed document(s) to be sent via electronic mail to the above listed email address from the email address mhandley@hfajustice.com and did not receive an error message after sending.

I declare under penalty of perjury under the laws of the State of California and the District of Columbia that the above is true and correct. Executed on March 3, 2021.

*/s/ Matthew Handley*
Matthew Handley

3

PLAINTIFF AMERICAN COUNCIL OF THE BLIND'S SUPPLEMENTAL RESPONSE TO REQUEST NO. 17 OF DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

NYE, STIRLING, HALE & MILLER
33 WEST MISSION STREET, SUITE 201
SANTA BARBARA, CALIFORNIA 93101

JA1140

# EXHIBIT 48

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>    Defendant. | Case No.: 2:20-cv-00893-FMO-KS |

**EXPERT REPORT OF
BRUCE DEAL**

**March 8, 2021**

**CONFIDENTIAL**

JA1141

459

CONFIDENTIAL

## TABLE OF CONTENTS

I.   **Qualifications** ........................................................................................... **1**

II.  **Case Background** ...................................................................................... **1**

III. **Assignment** ............................................................................................... **3**

IV. **Summary of Opinions** ............................................................................. **3**

V.  **Using Census Data Is Not an Accurate Methodology to Estimate the Number of Class Members** ...................................................................... **4**

    A.  Broad Nationwide Numbers Do Not Correspond to the Patients that Visit Labcorp's PSCs.................................................................. 5

    B.  Broad Nationwide Statistics Do Not Capture Individualized Patient Choices for Laboratory Testing Services ...................................... 7

    C.  Broad Nationwide Statistics Do Not Capture Location-Specific Kiosk Availability.. 8

VI. **An Analysis of Whether Visually Impaired Persons Received Inferior Services Compared to Sighted Patients, and/or Whether Such Persons Were Harmed, Requires Individualized Inquiry** ............................... **10**

    A.  Patients' Individualized Check-In Experiences Impact Whether or Not They Have Received Inferior Services and/or Experienced Any Harm ...................................... 10

    B.  Not All Visually-Impaired Patients Are Unable to Use the Kiosks ......................... 13

VII. **Conclusion** ............................................................................................. **14**

i

JA1142

460

CONFIDENTIAL

## I.   QUALIFICATIONS

1.   I am a Managing Principal of Analysis Group, Inc. ("Analysis Group"), an economic and financial consulting firm with offices located throughout the United States and internationally. I lead the economic consulting practice in Analysis Group's Menlo Park, California office. I have over 25 years of experience in economic, litigation, and financial consulting. I have developed and managed hundreds of assignments requiring complex economic analysis of publicly available and internal client information. I have a Master in Public Policy ("MPP") degree from Harvard University and have completed additional graduate coursework at Harvard. I have taught economics and analytic methods to graduate students at Harvard University and published articles on economics-related topics.

2.   I have provided expert testimony in dozens of matters over 25 years and have led the analysis on projects covering a wide range of topics. In much of my expert work, I deal with questions involving the use and analysis of large, complex datasets. I have specific expertise in the healthcare industry. During my career, I have worked on hundreds of projects involving insurance, quality of care, calculation of economic damages, and class action lawsuits. I have prepared expert reports in numerous litigations involving the health care industry, including matters determining reasonable value for hospital and physician services, assessing payments for laboratory and hospital services, and matters relating to class certification issues. I have testified many times in state and federal courts, on behalf of both plaintiffs and defendants. Further information about my professional activities and prior testimony appears in **Appendix A**.

## II.   CASE BACKGROUND

3.   Defendant Laboratory Corporation of America Holdings ("Labcorp" or "Defendant") is a global life sciences company that, among other things, operates approximately 2,000 diagnostic testing centers, known as patient service centers ("PSCs"), in the United States.[1] Patients visit PSCs to provide samples of blood, urine, tissue, or other specimen types for

---

[1]   Laboratory Corp of America Holdings, Form 10-K for the fiscal year ended December 31, 2019, at pp. 4, 7. *See also:* Deposition of Joe Sinning, February 2, 2021 ("Sinning Deposition"), at 35:8.

JA1143

461

CONFIDENTIAL

medical diagnostic testing.[2] PSCs accept both walk-in patients and visits by appointment.[3] I understand that in 2017, as part of "Project Horizon," Labcorp began introducing touchscreen tablets at kiosks for self-service check-in, alongside the option to check-in with a staff member at the patient service desk.[4]

4.   Plaintiffs Mr. Davis and Mr. Vargas allege that Labcorp "discriminated against [them] by refusing and failing to provide auxiliary aids and services to Plaintiffs, and by requiring Plaintiffs to rely upon other means of communication that are inadequate to provide equal opportunity to participate in and benefit from Defendant's health care services free from discrimination."[5] Specifically, Plaintiffs allege that "Defendant's touchscreen kiosks for self-service check-in do not contain the necessary technology that would enable a person with a visual impairment to a) enter any personal information necessary to process a transaction in a manner that ensures the same degree of personal privacy afforded to those without visual impairments; or b) use the device independently and without the assistance of others in the same manner afforded to those without visual impairments."[6]

5.   The proposed class in this matter is defined by Plaintiffs to be:[7]

> [A]ll legally blind individuals who visited a LabCorp patient service center in the United States and were denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations due to LabCorp's failure to comply with the ADA's and Rehabilitation Act's auxiliary aids and services requirements during the Class Period.

6.   Plaintiffs also propose a "California sub-class," defined as:[8]

> [A]ll legally blind individuals who visited a LabCorp patient service center in California and were denied full and equal enjoyment of the goods, services,

---

[2]   Sinning Deposition, at 36:2-19.

[3]   Deposition of Julian Vargas, February 10, 2021 ("Vargas Deposition"), at 39:5-8, Deposition of Luke Davis, February 16, 2021 ("Davis Deposition"), at 31:2-7.

[4]   Sinning Deposition, at 42:25, 43:1-20, Vargas Deposition, at 35:21-25, 36:1-15. I understand that in December 2018, the option to check-in via a mobile device was introduced for patients that had made a reservation in advance.

[5]   First Amended Class Action Complaint, *Luke Davis, et al. v. Laboratory Corporation of America Holdings*, Case No. 2:20-cv-00893-FMO-KS, United States District Court, Central District of California, September 3, 2020 ("Complaint") at ¶ 2.

[6]   Complaint at ¶ 5.

[7]   Complaint at ¶ 34. While the Complaint makes reference to a "Class Period," the dates of the period are not defined.

[8]   Complaint at ¶ 35.

CONFIDENTIAL

facilities, privileges, advantages, or accommodations due to LabCorp's use of touchscreen check-in kiosks.

### III.    ASSIGNMENT

7.    I have been retained by counsel for Labcorp to offer my expert opinion on whether common methods can be used to identify a class of injured persons. I was also asked to offer my expert opinion as to whether individualized inquiry would be necessary to determine whether visually impaired persons received inferior services compared to sighted patients, and/or whether such persons were harmed. I understand that Plaintiffs propose to identify the class, and/or deal with other purported class issues, by applying census data on the share of the population with visual impairments to the number of patients using Labcorp facilities. To the extent that Plaintiffs provide an affirmative expert report describing their proposed methodology in more detail, I may be asked to update my testimony. For the purposes of this report, I have been asked to provide a preliminary evaluation of Plaintiffs' proposed methodology.

8.    **Appendix B** includes a list of all documents and data that I considered for my assignment. I reserve the right to amend or supplement this report if additional relevant documents or information become available.

9.    Analysis Group is being compensated at a rate of $890 per hour for my time. Other professional staff at Analysis Group working under my direction have assisted me in this assignment. Neither my compensation nor that of the Analysis Group is contingent on the nature of my findings or the outcome of this case.

### IV.    SUMMARY OF OPINIONS

10.   In order to properly identify the proposed class, one must, among other things, identify how many visually impaired individuals: (1) visited or attempted to visit a Labcorp PSC with a self-serve check-in kiosk; and (2) were denied Labcorp's goods and service as a result, or were not offered those services on an equal basis. As I discuss throughout this report, applying broad nationwide statistics answers neither of these questions.

11.   First, applying broad nationwide statistics on visual impairment fails to account for: (1) the distribution of Labcorp PSCs and its correlation (or lack thereof) with the U.S. population

3

CONFIDENTIAL

and the population of visually impaired persons; (2) the individualized nature of patient choice when selecting a laboratory testing provider; and (3) the diversity in self-service check-in kiosk availability across Labcorp PSCs throughout the proposed class period.

12.    Second, even if one were able to identify the number of visually impaired persons visiting a Labcorp PSC with a check-in kiosk, such an estimate would not take into account the individualized check-in experiences of those Labcorp patients, many of whom may not have experienced any barriers at all to checking-in and therefore would not have suffered any of the harm Plaintiffs allege. For example, the individualized check-in experiences discussed herein all reflect vastly different check-in experiences at Labcorp PSCs with a check-in kiosk. Some of the witnesses claim to have been required to check-in at the kiosk; some claim they were told kiosk check-in was not required and were offered assistance at the desk; and some never tried to, or had any desire to, use the kiosks at all and expressed a preference for desk check-in. The only common thread among the experiences is that none of the individuals were denied the laboratory testing services that they desired. Thus, applying broad nationwide statistics, as Plaintiffs have indicated they plan to do, is insufficient for identifying the class members, for accurately estimating the size of the class, and for determining which, if any, class members suffered any harm without conducting an individualized inquiry into each member's claim.

## V.    USING CENSUS DATA IS NOT AN ACCURATE METHODOLOGY TO ESTIMATE THE NUMBER OF CLASS MEMBERS

13.    The Complaint alleges that "Defendant denies approximately 8.1 million Americans who have difficulty seeing access to its goods, products, and services."[9] The 8.1 million figure cited by Plaintiffs is based on a 2012 press release by the U.S. Census Bureau, discussing the report "Americans with Disabilities: 2010."[10] It is simply a citation to the nationwide number in the report, effectively implying that every single visually impaired person in the U.S. on the list was denied "access to [Labcorp's] goods, products, and services." However, such broad nationwide numbers do not correspond to specific class members at issue in this matter. The relevant question in this matter is not how many visually impaired

---

[9]    Complaint at ¶ 29 (internal citation omitted).
[10]   U.S. Census Bureau, "Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports," July 25, 2012, available at https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html.

JA1146

CONFIDENTIAL

individuals exist in the United States, but how many visually impaired individuals: (1) visited or attempted to visit a Labcorp PSC with a check-in kiosk; and (2) as a result, were denied a good or service or were not offered the good or service on an equal basis. Thus, to properly assess class membership or estimate the number of putative class members, one must contend with both of these issues, and all issues associated with answering these questions.

### A. Broad Nationwide Numbers Do Not Correspond to the Patients that Visit Labcorp's PSCs

14.    There are numerous factors that may influence the number of visually impaired individuals visiting a Labcorp PSC with a self-serve check-in kiosk that are not accounted for by simply citing overall counts from the U.S. population or even applying simple nationwide census averages to a patient count. In this section, I identify a number of such issues.

15.    **Population Distribution and PSC Visit Distribution**: First, patient visits at Labcorp PSCs are not evenly or equally distributed across the United States. As seen in **Exhibits 1a and 1b**,[11] Labcorp visits are not well correlated with state population, nor with the share of that population that is visually impaired. Examples include:

- New Jersey accounts for only 2.7 percent of the U.S. population, but has a disproportionate number of Labcorp visits, representing 11.5 percent of all U.S. Labcorp visits.

- Michigan, which accounts for 3.0 percent of the U.S. population, has only 0.3 percent of all U.S. Labcorp visits.

- Massachusetts, which accounts for 2.1 percent of U.S. population has only 0.2 percent of all U.S. Labcorp visits.

---

[11]    These exhibits rely on data from Labcorp covering January 1, 2018 through December 30, 2020 (*see* Davis-LabCorp00004749, Davis-LabCorp00004750, Davis-LabCorp00004752) and from the U.S. Census Bureau (*see* U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019," 2019, available at https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&tp=true&hidePreview=true).

Note that the Complaint (at ¶ 29) cites that there are 8.1 million visually impaired people in the U.S. This estimate is based on US Survey of Income and Program Participation data from 2010, whereas the Census data I rely on in **Exhibits 1a and 1b** are from 2019.

5

CONFIDENTIAL

- There are no Labcorp PSC visits <u>at all</u> in Hawaii, Maine, North Dakota, Vermont, or Puerto Rico, states and territories that cumulatively comprise 2.2 percent of the U.S. population.

16.    Similarly, certain states have disproportionately more Labcorp visits than the share of the population that is visually impaired. Examples include:

- California has 9.7 percent of the U.S. visually impaired population, but accounts for disproportionately more Labcorp visits, with 14.9 percent of the total.

- Florida has 7.0 percent of the U.S. visually impaired population, but accounts for 13.9 percent of all Labcorp visits.

- Tennessee has 2.7 percent of the U.S. visually impaired population, but accounts for only 0.9 percent of Labcorp visits.

17.    From a statistical perspective, applying national totals or national averages to a patient population that does not follow the same distribution as the U.S. population does not provide accurate results. National averages would tend to undercount in states with a disproportionately high share of Labcorp patients, and over-count in states with a disproportionately low (or zero) share of Labcorp patients.

18.    This geographic variation in Labcorp visits and potential utilization by visually impaired people presents serious hurdles in identifying relevant class members. For example, the state with the most Labcorp visits in the nation is California (14.9 percent of Labcorp visits in the country). However, California has among the *lowest* prevalence for visual impairment (1.9 percent), lower than the national average (2.4 percent). Thus, applying the 2.4 percent national average to California would likely substantially overstate the number of visually impaired California residents who went to Labcorp PSCs. Similarly, as discussed, Puerto Rico has no Labcorp PSC visits, but has the highest prevalence of visual impairment at 6.6 percent.

19.    **Demographic Factors**: The proposed class does not consider variability in demographic factors specific to the visual impairment population (such as age), and how they vary from the general Labcorp population. Labcorp provided demographic data on the 61,522,195 patients that visited a Labcorp PSC from January 1, 2018 through December 30, 2020.[12]

---

[12]    *See* Davis-LabCorp00004749, Davis-LabCorp00004750, Davis-LabCorp00004752.

6

CONFIDENTIAL

As seen in **Exhibit 2,** while 25.5 percent of all visually impaired people are 75 and older, only 17.5 percent of the Labcorp population are even 70 and older (and only 5.4 percent are 80 and older). Additionally, 2.7 percent of patients were younger than ten years old and would be less likely to use a Labcorp kiosk on their own, without caregiver/adult supervision, regardless of visual impairment.

### B.   Broad Nationwide Statistics Do Not Capture Individualized Patient Choices for Laboratory Testing Services

20.    Broad nationwide statistics would also not capture more nuanced aspects of population clustering and consumer choice. For example, they would not capture factors like whether visually impaired populations are more or less likely to reside near a Labcorp PSC, more or less likely to choose alternate methods to a PSC for their bloodwork or testing, or more or less likely to have Labcorp as an in-network provider for their insurance. I discuss these examples below.

21.    **Location of Testing**: Labcorp PSCs provide access to routine laboratory testing, but they are certainly not the only option to obtain laboratory testing, and are not even the only option offered by Labcorp. According to the deposition testimony of Labcorp witness Joseph Sinning, testing services through PSCs represent only about 20 percent of Labcorp's business.[13] Sample collection can also be performed at hospitals, at many doctor's offices, and even at select pharmacies.[14] Even if Labcorp performs the test, the tissue or fluid sample collection may or may not even be provided by Labcorp, and they may or may not have check-in procedures similar to those at a Labcorp PSC.[15] In addition, Labcorp is not the only provider of stand-alone collection facilities. For example, Quest Diagnostics operates approximately 2,000 locations in the U.S.,[16] comparable to the number of Labcorp locations in the U.S.[17] Thus, it is important to consider the patient's options in choosing a laboratory testing provider, and whether those choices may be correlated with visual

---

[13]   Sinning Deposition, at 37:10-19.

[14]   Sinning Deposition, at 36:20-37:9, 77:18-78:8.

[15]   Sinning Deposition, at 78:3-21.

[16]   Quest Diagnostics, "Laboratory and Office Locations Around the World," available at https://www.questdiagnostics.com/home/about/locations/.

[17]   Labcorp's 2019 Form 10-K indicated that it had "nearly 2,000 PSCs." (Laboratory Corp of America Holdings, Form 10-K for the fiscal year ended December 31, 2019, at p. 7).

JA1149

467

CONFIDENTIAL

impairment. Such an evaluation would require much more detailed analysis than simply using national statistics.

22.     For example, a key component of choosing a laboratory provider is likely the convenience of the location. As discussed above, some states have relatively few Labcorp locations. If that location is not convenient to the visually impaired population—for example, if it is not accessible by public transportation or is simply very far away from the home of individuals who are visually impaired—that may impact the choices of patients and whether or not they visit a Labcorp PSC for their medical diagnostic testing needs.

23.     **Insurance Coverage**: Another key component of patient choice in healthcare relates to insurance coverage. Most insurance plans partner with certain providers to provide discounted services that are "in-network" while services that are "out-of-network" are relatively expensive for the member.[18] Thus, a patient with an insurance plan that has Labcorp as an out-of-network provider is less likely to select Labcorp for their testing needs. Using national statistics does not capture how insurance coverage relates to the visually impaired population.

### C. Broad Nationwide Statistics Do Not Capture Location-Specific Kiosk Availability

24.     Even if a visually impaired person chose to go to a Labcorp PSC during the proposed class period, that is not sufficient to identify whether the individual qualifies as a purported class member. For example, the Labcorp location may not necessarily have had a kiosk check-in procedure in place at that time. The question raised by Plaintiffs' allegations in this matter is whether a visually impaired person: (1) visited or attempted to visit a Labcorp PSC *with a self-service check-in kiosk*; and (2) as a result was denied a good or service or was not offered the good or service on an equal basis. Thus, at a minimum, a PSC must have had a functioning self-service check-in kiosk at the time of the patient's visit to even potentially establish class membership. To the extent that the PSC did not have a kiosk installed or had a kiosk that was not working, this would not be a relevant visit for the purposes of this matter.

---

[18]     *See, e.g.*, American Health Insurance Plans Center for Policy and Research, "Charges Billed by Out-of-Network Providers: Implications for Affordability," September 2015, available at https://www.ahip.org/wp-content/uploads/2015/09/OON_Report_11.3.16.pdf.

JA1150

468

CONFIDENTIAL

25. **Installation of Kiosks**: Labcorp began introducing check-in kiosks at its PSCs in October 2017.[19] However, the process of installing kiosks was not instantaneous and universal; they were rolled out over the course of at least a year. As depicted in **Exhibit 3**, kiosks were slowly rolled out beginning in October 2017 until finally, by September 2018, they had been introduced in 1,699 PSC locations.[20] This is still not 100 percent of PSC locations. Indeed, I understand that there are currently 48 Labcorp PSCs without a check-in kiosk.[21]

26. **Was the Kiosk Even Working**?: Even after a given location had a kiosk installed, there were periods of time where a given kiosk at a given location was not operational.[22] In those cases, there would be no potential violation, as the site would be functionally equivalent to one that had no kiosk at all, and visually impaired individuals would necessarily receive identical service to sighted individuals.

27. Even if one could accurately identify the number of visually impaired people that visited Labcorp PSCs during the proposed class period, that would not accurately identify the number of visually impaired people who visited a Labcorp PSC *with a working check-in kiosk*. To the extent that a visually impaired person visited a Labcorp PSC that had no check-in kiosk at the time of their visit, that patient cannot be considered a class member.

28. Furthermore, even if one could identify the number of visually impaired individuals who visited a Labcorp PSC with a working check-in kiosk, that does not mean that the visually impaired person: (1) attempted to check-in at the kiosk; or (2) was denied service or received substandard service.

---

[19]   Sinning Deposition, at 83:7-11.

[20]   The source of these data was last updated September 26, 2018 so rollout information on the remaining PSC locations is not available.

[21]   *See* Davis-LabCorp00004354. I understand that the highlighted locations in the spreadsheet are PSCs without self-service check-in kiosks.

[22]   *See* Davis-LabCorp00004751, Davis-LabCorp00004748, Davis-LabCorp00004755.

JA1151

469

CONFIDENTIAL

### VI.  AN ANALYSIS OF WHETHER VISUALLY IMPAIRED PERSONS RECEIVED INFERIOR SERVICES COMPARED TO SIGHTED PATIENTS, AND/OR WHETHER SUCH PERSONS WERE HARMED, REQUIRES INDIVIDUALIZED INQUIRY

29.  The Complaint alleges that the proposed class members "received services that were objectively substandard, inaccessible, and inferior to those provided to sighted patients, and were subjected to discriminatory treatment because of their disability."[23] Furthermore, the Complaint indicates that, as a result of his inability to use the kiosks unassisted, Plaintiff Mr. Davis needed to verbally state private information aloud, in one instance to a stranger, in a public waiting room where it could have been overheard.[24]

30.  Even if Plaintiffs were able to identify the number of visually impaired persons who went to Labcorp PSCs with installed and functioning check-in kiosks, this would still not be sufficient to show that each of those persons was required to engage with a kiosk and/or received inferior services than sighted persons and/or were otherwise harmed. In fact, based on the deposition testimony that I have reviewed, the proposed class members likely had a *variety* of experiences that would require individualized inquiry in order to determine whether they fit within the proposed class definition, could have any claim against Labcorp, and/or experienced any harm. In this section, I discuss several of these issues.

### A.  Patients' Individualized Check-In Experiences Impact Whether or Not They Have Received Inferior Services and/or Experienced Any Harm

31.  As discussed above, kiosks were installed at Labcorp facilities on a rolling basis starting in late 2017 through at least 2018. Prior to the installation of kiosks, all patients—visually impaired and otherwise—checked in at the desk. Moreover, contrary to Plaintiffs' allegations, once kiosks were installed, I understand that desk check-ins remained a routine check-in option.[25]

32.  In fact, as shown in **Exhibit 4**, data from Labcorp shows that only 65 percent of patients chose to use a self-service check-in kiosk during the 180-day period ending February 19, 2021. Thus, the addition of a check-in kiosk added one additional check-in option, but it

---

[23]  Complaint at ¶ 23.
[24]  Complaint at ¶ 21.
[25]  Sinning Deposition, at 43:14-20, Davis-LabCorp00004298-00004302.

JA1152

CONFIDENTIAL

was clearly not a *requirement* and did not remove or alter the prior check-in options for visually impaired persons. If anything, providing a self-serve option may have *improved* upon the prior check-in experience at the desk, by providing shorter lines for desk check-ins as others were using the kiosks.

33.   Even more fundamentally, the administrative check-in process is not the good or service being provided by Labcorp. It is simply an administrative step to the desired laboratory testing service. I am not aware that Plaintiffs have shown—or even alleged—that the self-serve kiosks led to any substandard, inaccessible, or inferior laboratory testing service. Plaintiffs' theory of harm rests on the premise that visually impaired persons attempted to use the check-in kiosks and were unable to do so or were forced to check-in at the desk and as a result were denied a Labcorp good or service or not offered it on an equal basis. In fact, testimony in this matter indicates the opposite, and at a minimum illustrates the diversity of experience, including:

- **Plaintiff Mr. Vargas** – Mr. Vargas testified that he was told (accurately) he need **not** use the kiosk and that someone would check him in.[26]

- **Plaintiff Mr. Davis** – Mr. Davis testified that he has checked in at Labcorp PSCs in multiple ways. Prior to the introduction of kiosks, he checked in with a Labcorp staff member during appointments.[27] After kiosks were rolled out, Mr. Davis claimed he was referred to a kiosk at least six times,[28] and starting in 2019, chose to use the mobile check-in option.[29] I also note that Mr. Davis claimed he was required to use a kiosk to check-in at PSC locations that did not have a kiosk installed at the time of his visit,[30] making his claimed experience not possible.

- **Mr. Harden** – Both Mr. Harden and his wife have never used or attempted to use kiosks or mobile check-in service.[31] Mr. Harden testified that over the last four years, and on 32 visits to a Labcorp PSC, he and his wife checked in with Labcorp staff and

---

[26]   Vargas Deposition, at 22:9-19, 56:16-20.

[27]   Davis Deposition, at 26:19-22.

[28]   Davis Deposition, at 59:6-13.

[29]   Davis Deposition, at 59:17-21.

[30]   *Compare* Davis Deposition, at 23:5-8, 42:13-43:9 *with* Davis-LabCorp00000650, Hz Rollout Tab: Row 773. Mr. Davis testified that he visited the Labcorp PSC at 9331 Bustleton Avenue, Philadelphia in 2016 and was told he needed to check in at the kiosk. However, Labcorp's data show that a kiosk was not installed in that location until December 2017.

[31]   Deposition of John Harden, February 17, 2021 ("Harden Deposition"), at 26:13-19, 33:5-7.

JA1153

471

CONFIDENTIAL

were never directed to a kiosk to check in.[32] Mr. Harden received service as expected and felt that staff were trained to accommodate his visual impairment.[33]

34.   The fact that these three deponents each recalled different experiences in checking in to Labcorp PSCs—all of which indicate no hardship or difficulty associated with receiving the laboratory testing services themselves—is itself indicative of the individualized nature of the claims alleged and any alleged harm in this matter.

35.   I understand that different Labcorp facilities have varying numbers of full-time and part-time staff who are equipped to assist patients with check-in, which may affect the check-in experience of potential class members. For example, I understand that certain locations, but not all, have a dedicated Patient Intake Representative ("PIR") who sits at the front desk to check in patients, while others have only phlebotomists available.[34] Among Labcorp PSCs with only phlebotomists, some have only a single phlebotomist while others have multiple working at the same time.[35] This variation in staffing may impact whether staff are available to immediately greet and assist patients with check-in. For example, where a PSC has two phlebotomists, but no PIR, one phlebotomist will often sit at the front desk full time, while allowing the other to focus on collecting samples for testing. Depending on the circumstance, however, in locations with multiple phlebotomists, each may handle both collections and check-ins.[36] And in locations with more phlebotomists (three, four, five, or more), it is statistically more likely (due to variation in arrival times) that someone is at the desk when a patient arrives, even if that location does not keep a phlebotomist full-time at the desk as a matter of practice. As yet another example, certain Labcorp locations are located inside Walgreens stores, where there is always a dedicated Walgreens staff member available to assist patients, if needed.[37] In short, there are a wide range of ways in which check-in desks are staffed, which will also contribute to variation in the experience of a visually impaired customer.

---

[32]   Harden Deposition, at 25:19-26:19.
[33]   Harden Deposition, at 33:13-23.
[34]   Sinning Deposition, at 47:22-48:4.
[35]   Sinning Deposition, at 79:12-21.
[36]   Interview with Joseph Sinning, March 8, 2021.
[37]   Sinning Deposition, at 78:3-8.

12

CONFIDENTIAL

36.     In addition, I understand that even if a patient checks in at the kiosk before a patient who checks in at the desk, factors such as the type of testing being done, whether the patient had an appointment, and what type of assistance the patient may need as it relates to performing the testing will impact who is seen first by a phlebotomist.[38] That is, even if checking in at the desk is a slower process,[39] this does not necessarily indicate that patients checking in at the desk are delayed in receiving Labcorp's medical diagnostic testing services.

37.     One method of harm posited by Mr. Davis is that he needed to verbally disclose his private information. However, there is no evidence that this applies equally or even commonly across proposed class members. In fact, Plaintiff Mr. Vargas testified that he checked in by providing his written credentials to a Labcorp representative; he did not need to verbally disclose any private information.[40] Nor did he overhear any information disclosed by the patients ahead of him in line.[41] This experience was echoed by Ms. VanLant, who stated that she did not have to verbally disclose any private information or information regarding her visit.[42] In fact, the check-in process at the desk before and after kiosks were installed appear to have been substantially unchanged. Thus, to the extent that any visually impaired persons gave their information verbally at the check-in desk, this would not be representative of the experiences of even the putative class representative, Mr. Vargas. Moreover, if anything, the existence of the kiosks would minimize the number of people in line for the check-in desk, and thus minimize the chance that someone would overhear private information, even if a patient was asked for it or chose to give it.

**B.     Not All Visually-Impaired Patients Are Unable to Use the Kiosks**

38.     As indicated in the U.S. Census Bureau press release discussed above that announced the Americans with Disabilities: 2010 report, as of 2010, "[a]bout 8.1 million people had

---

[38]   Deposition of Kevin DeAngelo, March 3, 2021, Rough Transcript, at 131:17-132:12, 135:9-15.

[39]   This premise is itself not uniform and would depend on a variety of factors, including how efficiently people check in at the kiosk, especially when they are unfamiliar with it, compared to how efficiently they can check in at the desk with a PIR or phlebotomist who presumably is familiar with the check-in process and is able to efficiently check patients in. *See* Harden Deposition, at 29:15-30:11.

[40]   Vargas Deposition, at 22:14-19.

[41]   Vargas Deposition, at 25:3-26:8.

[42]   Deposition of Robin VanLant, February 17, 2021 ("VanLant Deposition"), at 29:2-7.

JA1155

473

CONFIDENTIAL

difficulty seeing, including 2.0 million who were blind or unable to see."[43] That is, 6.1 million of the 8.1 million visually impaired people (more than 75 percent) had some sight. Visual impairment may include issues regarding clarity/sharpness of vision, light sensitivity, contrast sensitivity, field of vision, and color blindness.[44] It is certainly likely that patients with certain categories of visual impairment may be able to use a kiosk, depending on the degree of severity and type of visual impairment. Any estimation or identification of a proposed class would need to provide more accurate information as to the interaction between visual impairment and the inability to use the kiosk. Ms. Stanley, the 30(b)(6) witness (person most knowledgeable) for Plaintiff American Council of the Blind, recognized these disparities among potential class members, testifying that "[n]o two people with a visual impairment need the same accommodation" and that "no one accommodation is going to accommodate every person everywhere."[45]

39.   For example, Mr. Vargas testified that the law recognizes blindness as vision worse than 20/200.[46] However, research shows that "people with acuities as low as 20/2000 (acuity letters 100 times larger than 20/20 letters) can read… provided that adequate magnification is available."[47] And, in fact, statistics show that 51 percent of visually impaired people are able to use their phone camera and screen as a magnifier.[48] Thus, it is entirely possible that many Labcorp patients who were visually impaired—but with some sight ability—may have been able to use the kiosks. Accurate identification of class members would require that these factors be considered.

## VII.   CONCLUSION

40.   As I have discussed throughout this report, broad nationwide statistics neither provide sufficient information to identify the number of visually impaired persons visiting a

---

[43]   United States Census Bureau, "Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports," July 25, 2012, available at https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html.

[44]   WebAIM, "Survey of Users with Low Vision #2 Results," October 31, 2018, available at https://webaim.org/projects/lowvisionsurvey2/.

[45]   Deposition of Claire Stanley, December 7, 2020, at 8:14-18, 22:21-22, 72:23-24.

[46]   Vargas Deposition, at 14:18-20.

[47]   Legge, Gordon E., "Reading Digital with Low Vision," *Visible language* vol. 50, 2 (2016): 102-125.

[48]   Michael Crossland, Rui Silva and Antonio Macedo, "Smartphone, Tablet Computer and E-reader Use by People with Vision Impairment," July 28, 2014, available at https://pubmed.ncbi.nlm.nih.gov/25070703/.

JA1156

474

CONFIDENTIAL

Labcorp PSC with a working check-in kiosk, nor do they provide insight into whether those persons were harmed by the existence of the check-in kiosk. Such statistics do not account for the population distribution of visually impaired persons, nor do they account for the myriad ways in which the individual patient's choices and experiences influence whether that particular patient was harmed by the existence of a check-in kiosk.

Bruce Deal

March 8, 2021

15

JA1157

475

CONFIDENTIAL

## Appendix A

### BRUCE F. DEAL

### Managing Principal

Phone: 650 853 7201
Fax: 650 323 2796
bruce.deal@analysisgroup.com

1010 El Camino Real
Suite 310
Menlo Park, CA 94025

Mr. Deal leads the economic consulting practice in the Menlo Park, CA office of Analysis Group. He has over 25 years of experience in economic, litigation, and management consulting. He has led hundreds of projects requiring complex economic analysis of publicly available and internal client information.

He has served as an expert witness in dozens of litigation and regulatory matters, and has been retained as a neutral expert in a complex mediation. His work as an expert has covered a variety of practice areas, including antitrust, finance and securities litigation, damages, and business valuation. Mr. Deal's industry experience has included health care, insurance, technology, telecommunications, and many others.

Prior to joining Analysis Group, Mr. Deal spent several years as a senior consultant and manager with Arthur Andersen. In this position, he provided financial and management consulting services to hospitals, physicians, and other clients, in such areas as operational organization and efficiency, merger and consolidation strategies, current and projected financial performance, and overall strategic planning.

Mr. Deal has taught economics and analytic methods to graduate students at Harvard University and published articles on economics-related topics. He has also consulted on national economic policy issues to the government of Indonesia through the Harvard Institute for International Development.

He coauthored a major report, *The Economic Effects of Federal Participation in Terrorism Risk* with R. Glenn Hubbard, an Analysis Group affiliate and former chair of the President's Council of Economic Advisers. In addition, he also coauthored a study, *Economic Impact Analysis: Proposition 71 California Stem Cell Research and Cures Initiative* with Laurence Baker, an Analysis Group affiliate and Stanford University School of Medicine faculty member, with whom he published an updated interim economic report on California's stem cell initiative. Mr. Deal is also the coauthor of a chapter on the use of econometrics in antitrust litigation for a recent American Bar Association publication.

### EDUCATION

| | |
|---|---|
| 1994–97 | Ph.D. coursework completed, Public Policy, Graduate School of Arts and Sciences, Harvard University, Cambridge, MA |
| 1990 | M.P.P., Public Policy, Kennedy School of Government, Harvard University, Cambridge, MA |
| 1987 | B.A., *Summa cum Laude*, Economics and Global Studies (double major), Pacific Lutheran University, Tacoma, WA |

A-1

CONFIDENTIAL

## SUMMARY OF PROJECTS BY TOPIC

### Insurance (Health Insurance Included in Health Care Section)

- *Confidential Universal Life Litigation*
  Consulting expert on economic issues in a large cost of insurance (COI) charges litigation.

- *Mayumac v. Met Life*
  Testifying expert on economic damages in a disability insurance matter.

- *Various Military Housing Projects v. Ambac*
  Testifying expert on economic, insurance, and financial issues surrounding the use of credit enhancements and financial performance for large military housing projects.

- *Credit Disability Insurance*
  Analysis of financial issues in a case alleging improper disclosure of changes in premium levels.

- *Life Insurance Consulting*
  Valuation and analysis of a portfolio of large life insurance policies.

- *Long Trust v. Morgan Stanley*
  Analysis of financial issues and damages resulting from alternative policy restructuring options for second-to-die estate planning life insurance policies.

- *Insurance Tax Litigation*
  Consulting expert in a confidential tax litigation involving the tax treatment of certain insurance premiums.

- *Confidential Auto Insurance Litigation*
  Analysis of issues relative to claims handling practices of a large auto insurance company.

- *Confidential Life Insurance Litigation*
  Analysis of damages resulting from alternative portfolios of investments and second-to-die life insurance policies.

- *Confidential Insurance Litigation*
  Analysis of damages resulting from lost commissions in an insurance broker insurance litigation.

- *Katz v. Mass Mutual*
  Analysis of potential damages in a disability insurance litigation.

- *Confidential Insurance Litigation*
  Expert on insurance valuation and general damages issues in a dispute involving non-traditional life insurance.

- *Markocki v. Olde Republic Title Insurance*
  Expert on class certification issues in a class action regarding charges for title insurance.

- *Campbell v. Metropolitan Life*
  Expert on damages calculation in a disability insurance dispute.

A-2

CONFIDENTIAL

- *Cox v. Allstate*
  Expert on statistical sampling in the class certification phase of a class action alleging improper homeowners' insurance claims handling by Allstate.

- *Confidential Title Insurance Matter*
  Consulting effort on class certification matters in a large multi-state class action.

- *Estate Planning Life Insurance Matter*
  Consulting expert analyzing issues associated with the economic performance of a portfolio of large estate planning life insurance policies.

- *Confidential Homeowners' Insurance Matter*
  Consulting expert analyzing issues associated with the use of various data sources to obtain replacement values.

- *Confidential Indemnity Insurance Investigation*
  Consulting expert analyzing issues associated with the deterioration of a set of financial products insured by an indemnity insurer.

- *Confidential Auto Insurance Investigation*
  Consulting expert analyzing various aspects of auto insurance claims issues.

- *Confidential Life Insurance Litigation*
  Consulting expert valuing life insurance policies and other damages issues.

- *Confidential Life Insurance Litigation*
  Consulting expert valuing life insurance policies and other damages issues.

- *Hausman v. Union Bank*
  Testifying damages expert valuing life insurance policies and other damages issues. Expert report provided.

- *Perez v. First American Title Insurance Company*
  Testifying expert evaluating class certification issues relating the use of electronic data in identifying class members.

- *Windham v. Cook Life Insurance Litigation*
  Testifying expert valuing policy performance of a variable universal life insurance contract used in a tax planning program. Expert report and trial testimony provided.

- *Confidential Class Action Litigation*
  Consulting expert analyzing statistical issues associated with the use of a software package used to assist in evaluating bodily injury claims.

- *Confidential Class Action Litigation*
  Consulting expert analyzing statistical issues associated with diminished value claims in auto insurance.

- *Pavlov, et al. v. CNA*
  Testifying expert analyzing class certification issues associated with long-term care insurance.

A-3

478

CONFIDENTIAL

- *Confidential Class Action Litigation*
  Consulting expert analyzing statistical issues associated with claims handling in auto insurance.

- *Class Action v. CNA*
  Testifying expert in case involving long-term care insurance premium rates.

- *Confidential Pension Litigation*
  Consulting expert in analysis of actuarial and accounting issues in a defined benefit pension plan.

- *Best Buy v. DDR, October*
  Testifying expert in analysis of insurance costs applicable to common areas of retail developments.

- *Barnes & Noble v. DDR*
  Testifying expert in analysis of insurance costs applicable to common areas of retail developments.

- *Fireman's Fund v. Cunningham Lindsey*
  Testifying expert in analysis of damages related to third-party administration of a commercial auto insurance program.

- *Confidential Regulatory Investigation*
  Consulting expert in analysis of policy forms used by a property casualty insurer and corresponding policy forms approved by state regulators.

- *Variable Annuity Remediation*
  Consulting expert in analysis of remediation for deficiencies in administering variable annuities. Assisting with analyzing remediation package and negotiating with regulators and other parties.

- *CSR v. Lloyd's Underwriters*
  Testifying expert in coverage litigation involving liability insurance. Report focused on the availability and worldwide capacity for liability insurance during the relevant periods.

- *Economic Impact of Federal Participation in Terrorism Risk*
  Coauthored a study with Professor R. Glenn Hubbard, former chair of the President's Council of Economic Advisers. Study, which was commissioned by numerous insurance trade organizations, focused on the economic impact of the Federal TRIA terrorism legislation and the economic impact of failing to renew the legislation.

- *Class Action v. Allstate*
  Consulting expert on damages and other issues relating to the estimation of inherent diminished value that may still be present after a vehicle has been repaired following an accident.

- *Class Action v. American Home*
  Damages expert for American Home in a litigation involving alleged misreporting of certain types of claims to the Workers' Compensation Insurance Rating Bureau (WCIRB) of California.

- *Class Action v. State Compensation Insurance Fund*
  Damages expert for plaintiffs in a litigation involving claims estimation and reserving practices of State Compensation Insurance Fund in California.

A-4

CONFIDENTIAL

- *Class Action v. Knights of Columbus*
  Economic expert for the Knights of Columbus in a major sales practices litigation involving over 500,000 policyholders. Estimated the damage to policyholders under alternative theories of liability, including development of computer-based policy performance models.

- *Various Confidential Class Action Litigations v. Mutual Life Insurance Companies*
  Consulting expert in the analysis of sales practices for four major class action litigations involving between 100,000 and 3.6 million policyholders. Work included estimating the incidence of various allegations, evaluating the financial exposure and recommending alternatives to management and directors.

- *Insurance Modal Premium Litigation*
  Consulting expert on issues relating to the estimation of potential damages exposure for modal premium litigation. Prepare preliminary analyses of economic costs and benefits of modal premium payments on policyholders.

- *Confidential Liability Insurance Coverage Litigation*
  Economic expert in insurance coverage litigation. Managed the abstracting and statistical analysis of information contained in paper records useful for determining the possible insurance coverage.

- *Confidential Disability Insurance Sales Practices Litigation*
  Consulting expert for issues related to the sale and product performance of individual disability insurance policies. Designed and implemented large data abstracting effort for the insurance company defendant and assisted in the development and implementation of a settlement for tens of thousands of policyholders.

- *Confidential Mortgage Insurance Litigation*
  Consulting expert in a large litigation involving primary mortgage insurance. Analysis of issues involving the provision of various types of services and insurance products.

- *Health Insurance Redesign Litigation*
  Consulting expert in the analysis of a major health insurance benefit redesign program. Analysis of various issues associated with estimating damages and developing overall damages models.

- *Confidential Insurance Coverage Litigation Involving Toxic Waste Cleanup Costs*
  Consulting expert in the analysis of the allocation of toxic waste cleanup costs across various insurance companies. Developed a sophisticated model to predict the allocation behavior of the claimant under alternative scenarios. Assisted client personnel and counsel in modeling the impact on the client insurance company under different scenarios to assist in litigation and settlement negotiations.

- *Class Action v. Ohio National*
  Economic expert for Ohio National in a major class action litigation involving over 100,000 whole life and universal life policies. Estimated the incidence of various allegations, evaluated financial exposure, presented recommendation to management and outside counsel, and developed models to project ultimate class member "take rates" for particular forms of relief.

- *Arroyo v. Alexander & Alexander*
  Damages expert in a sales practices case involving the sale and subsequent performance of a universal life insurance policy. Analyzed exposure and damages.

A-5

480

CONFIDENTIAL

- *Life Insurance/Pension Program Litigation*
  Consulting and testifying expert in a complex sales practices case involving the sale of universal life insurance policies used to help fund a pension program for a large trade association. Analysis assisted counsel in determining exposure and damages.

- *Morris v. Fremont Life*
  Consulting expert to assist in evaluating sales practices of an insurance agent selling an annuity product.

- *Archuletta v. Fremont Life*
  Consulting expert to assist in refuting damages claims put forward by the plaintiff's expert regarding the sale and performance of a Universal Life insurance policy.

### Finance and Securities

- *Securities Litigation*
  Consulting expert on numerous issues in a securities matter involving allegations of omissions related to a large IPO.

- *Securities Litigation*
  Consulting expert on numerous issues in a securities matter involving allegations of omissions and misleading financial guidance.

- *Confidential Investigation*
  Consulting expert on finance and accounting issues for US Department of Justice (DOJ) in matter involving food stamp utilization.

- *Fischer v. Fischer Investment Return Analysis*
  Testifying expert on the expected rates of investment return for a diversified portfolio of investments.

- *Confidential Mortgage Litigation*
  Consulting expert in a matter involving the financial performance of a program for reducing the term and interest amount paid on a mortgage.

- *Confidential Investment Return Litigation*
  Testifying expert in a confidential arbitration involving the expected rates of investment returns on different assets classes into the future.

- *Class Action Securities Litigation (Confidential)*
  Consulting expert on loss causation issues in a large bondholder securities case.

- *Class Action Securities Litigation (Confidential)*
  Consulting expert on loss causation issues in a large securities case.

- *Business Interruption (Confidential)*
  Consulting expert in a case involving business interruption for a finance and securities firm.

- *Mortgage Securities Litigation (Confidential)*
  Consulting expert in a class action litigation alleging that the financial performance of mortgage securities were adversely affected by poor underwriting and appraisals.

481

CONFIDENTIAL

- *Securities Derivative Litigation (Confidential)*
  Consulting expert in a derivative litigation alleging that an acquisition failed to adhere to appropriate corporate governance policies.

- *Confidential Cash-Balance Pension Litigation*
  Consulting expert in a litigation involving the damages calculation for a class of cash balance pension participants who terminated prior to retirement.

- *Confidential CDO Litigation*
  Consulting expert in a litigation involving the valuation, financial performance, and default history of various collateralized debt obligations.

- *Confidential Securities Litigation*
  Consulting expert in a 10b-5 securities litigation.

- *Confidential Tax Shelter Litigation*
  Consulting expert in a tax litigation matter for the State of California analyzing the economic basis for an identified series of transactions.

- *Confidential Securities Class Action*
  Consulting expert in large securities class action matter involving allegations of failure to provide accurate financial guidance.

- *Stock Option Backdating Litigation*
  Consulting expert on stock option backdating matter.

- *Portfolio Diversification*
  Consulting expert on issues relating to portfolio diversification in a large trust.

- *Stock Option Backdating Litigation*
  Consulting expert on stock option backdating matter in private securities litigation.

- *Confidential SEC Investigation*
  Consulting expert on a Securities and Exchange Commission (SEC) investigation relating to reinsurance disclosures.

- *Confidential Mutual Fund Litigation*
  Consulting expert on litigation related to late trading of international mutual funds.

- *Williams Communication Securities Litigation*
  Consulting expert on 10b-5 litigation alleging audit failures led to stock decline. Case dismissed.

- *Class Action v. Ernst & Young*
  Consulting expert on 10b-5 litigation alleging audit failures led to stock decline. Case went to verdict with a no liability verdict for client, Ernst & Young.

- *Confidential Securities Litigation*
  Consulting expert assisting academic affiliate in analysis focused on the reasonableness of company disclosures based on internal company budgets and forecasts.

A-7

CONFIDENTIAL

- *Confidential Securities Litigation*
  Consulting expert for counsel in securities litigation focused on company disclosures.

- *IRS v. Center Apartments*
  Consulting expert assisting Professor Steve Grenadier in the analysis of proper commercial apartment mortgage interest rates.

- *Class Action v. Major Investment Bank*
  Consulting expert analyzing the impact of releasing allegedly fraudulent investment information on the stock price of two small software companies for a 10b-5 securities litigation.

- *Class Action v. Conseco*
  Consulting expert analyzing the value of a proposed settlement involving universal life crediting rates. Assisted expert in the financial evaluation of the value of the proposed settlement using interest rate simulation models.

- *IRS v. Major Retail Chain*
  Consulting expert in defense of a major retail chain. Provided assistance in evaluating various expert reports involving the economic consequences of the purchase of a particular investment.

- *In re: NASDAQ Market Maker Antitrust Litigation*
  Consulting expert analysis of millions of stock transactions for seven different NASDAQ market makers facing allegations of conspiracy and price-fixing.

### Commercial Damages

- *State of Washington v. Comcast*
  Testifying expert in litigation involving allegations related to the provision of repair services to cable TV customers.

- *Confidential Regulatory Breach Litigation*
  Consulting expert on damages and accounting issues in litigation involving a breach of federal regulations in the retail food industry.

- *Confidential Employment Breach Arbitration*
  Consulting expert on damages in an arbitration involving a breach of employment obligations.

- *Confidential Breach of Contract Arbitration*
  Testifying expert on damages in litigation involving a breach of contract for a health care claims administration company.

- *Confidential Breach of Contract Arbitration*
  Testifying expert on damages in litigation involving a breach of contract for a laboratory billing company.

- *Metzner v. Permanente Medical Group*
  Testifying expert on damages in litigation involving allegations of wrongful termination.

- *Confidential Commercial Airline Litigation*
  Testifying expert on damages and statistical issues in litigation involving the payment of fees for interrupted travel.

A-8

CONFIDENTIAL

- *2880 Stevens Creek v. Blach Construction*
  Testifying expert on loss-of-use damages in litigation involving construction defects.

- *Polteco v. Tecsult*
  Testifying expert on damages in litigation involving the failure of specialized machinery in a manufacturing operation.

- *Confidential Auto Dealership Litigation*
  Analysis of liability and damages issues in litigation involving auto dealership sales practices.

- *F&A Restaurant Group v. Shepard and Reyes*
  Analysis of damages relating to the sale of a restaurant. Provided arbitration testimony.

- *US Unwired v. Sprint*
  Assisted Analysis Group affiliate Robert Hall in the damages analysis associated with the change in status of Sprint's affiliate, US Unwired. Case settled after trial testimony had been presented.

- *Confidential Enterprise Software Litigation*
  Assisted Analysis Group affiliate in the damages analysis associated with loss of business in the enterprise software market.

- *Her Associates v. Kaiser*
  Damages expert for defense in litigation related to consulting firm's damages claim.

- *General American v. KPMG*
  Damages expert for plaintiffs in litigation related to auditor's alleged obligation to disclose certain financial instruments.

- *Creative Artists v. County of Santa Clara*
  Damages expert for defense in litigation related to the cancellation of musical events at facilities owned by the County of Santa Clara.

- *Class Action v. Ford Credit*
  Damages expert for plaintiffs analyzing the costs and charges associated with late fees on consumer auto leases.

- *Bar None v. The Duncan Group, January*
  Damages expert for defense analyzing damages associated with the failed efforts to develop a software program to be used in automating the subprime auto lending business.

- *Coram v. Aetna*
  Consulting expert for defense analyzing the damages associated with a home health care contract that experienced higher costs than anticipated. Supported industry expert in the cost analysis.

- *Confidential Breach of Contract Litigation*
  Consulting expert for defense analyzing the damages associated with the failed joint venture development of a removable storage device for personal computers. Supported academic expert in the analysis of damages.

JA1166

484

CONFIDENTIAL

- *Bourns v. Raychem*
  Consulting expert for defense analyzing damages associated with the monopolization of the market for primary lithium battery safety devices. Supported academic experts in the analysis of damages.

- *Procter & Gamble v. Amway*
  Consulting expert for plaintiff analyzing the impact of disparaging comments and rumors on the sales of Procter & Gamble products. Supported academic experts in the analysis of primary and secondary data sources and the development of surveys and laboratory experiments to test the impact of rumors on consumer behavior.

### Valuation / Intellectual Property

- *Confidential Stock Appraisals*
  Consulting expert in the appraisal of the stock value for several publicly traded companies that have been challenged in Delaware Chancery Court.

- *Dell Stock Appraisal*
  Consulting expert in the Delaware appraisal of Dell's shares arising from the October 2013 leveraged buyout of Dell's public shareholders.

- *Confidential International Arbitration*
  Testifying damages expert in dispute involving alleged breach of licensing and joint development agreements.

- *Confidential Business Valuation*
  Designated expert in a business valuation for a medical practice.

- *Confidential Patent Litigation*
  Consulting expert in litigation involving PC networking technology.

- *Confidential Patent Litigation*
  Consulting expert on determination of royalty amounts in a confidential semiconductor patent litigation.

- *Confidential High-Technology Manufacturing Company Valuation*
  Valuation expert analyzing economic factors associated with the value of a closely held manufacturer of specialized high tech components for defense applications.

- *Confidential Beverage Distributor Valuation*
  Valuation expert analyzing the value of the large beverage distributor.

- *Confidential Patent Infringement Litigation*
  Consulting expert on reasonably royalties and damages in the semiconductor industry.

- *Appaloosa Interactive Corporation v. Stephen Friedman and Related Cross-Actions, 2007*
  Valuation and damages expert in the video game development industry.

- *Confidential Insurance Company Valuation*
  Valuation expert analyzing the value of a private auto insurer for a Delaware valuation matter.

JA1167

CONFIDENTIAL

- *Carrino v. Carrino*
  Valuation expert analyzing the value of an investment management firm. Provided trial testimony.

- *Confidential Valuation*
  Valuation expert analyzing the value of capital contributions to a series of jointly invested real estate transactions.

- *Confidential Company Valuation*
  Valuation expert analyzing a privately held health care provider.

- *Confidential Company Valuation*
  Valuation expert analyzing a privately held consulting firm.

- *Confidential Software Distribution Dispute*
  Damages expert in an arbitration involving software distribution.

- *Capo v. Dioptics, January*
  Intellectual property damages expert in a trade dress case involving protective sunglasses.

- *Arthur Stockton v. Fidelity & Deposit*
  Analysis of the value of an investment management firm and any damages related to the payment of claims by the insurer.

- *Confidential Company Valuation*
  Valuation expert analyzing a privately held construction firm.

- *Redlands Insurance Company v. Edward Wolkowitz*
  Valuation expert for plaintiff analyzing the valuation and rating analysis of Redlands Insurance Company, a property and casualty insurer.

- *Confidential Catastrophic Insurance Company Valuation*
  Consulting expert for defense analyzing the valuation methodology used by the plaintiffs in the valuation of a catastrophic risk insurance modeling company.

- *Trigon v. United States of America*
  Valuation expert for defense analyzing the valuation methodology used by plaintiffs' expert for intangible assets.

- *Synbiotics v. Heska, November*
  Damages expert for defense in a patent infringement case involving antibody tests for animal diseases.

- *Air Products v. ATMI*
  Damages expert in a patent infringement case involving gases used for semiconductor manufacturing.

- *Confidential Telecommunications Equipment Trade Secret Litigation*
  Consulting expert analyzing the potential damages from the sale of telecommunications equipment allegedly containing trade secrets. Supported Analysis Group expert in the analysis of relevant data and the development of reasonable royalty damages estimates and potential lost profits.

CONFIDENTIAL

- *Bingo Card Minder v. Gametek*
  Consulting expert analyzing reasonable royalties for a handheld computer-based consumer product. Supported Analysis Group expert in the analysis of relevant data and development of reasonable royalty percentages.

### Health Care

- *Confidential Provider Network Dispute*
  Consulting expert analyzing issues associated with the development and maintenance of a provider network.

- *Dual Diagnosis Treatment Center, et al. v. Health Net*
  Consulting expert in a matter involving the provision of addiction care services.

- *CEP America – California v. Heritage Provider Network*
  Testifying expert in a matter involving the determination of reasonable value for physician services.

- *CSNI v. Blue Shield*
  Testifying expert in a matter involving the determination of reasonable value for physician services.

- *Confidential Arbitrations*
  Consulting and testifying expert in matters involving reasonable value rates.

- *Confidential Addiction Care Analysis*
  Consulting expert in a matter involving the provision of addiction care services.

- *Confidential Investigation of Charity Care*
  Consulting expert in a matter involving the provision of hospital charity care.

- *NorthBay Healthcare Group v. Blue Shield*
  Testifying expert in a matter involving the determination of reasonable value for hospital services.

- *YDM Management Inc. v. Blue Shield*
  Testifying expert in a matter involving the determination of reasonable value for physician services.

- *San Jose Neurospine v. Blue Shield*
  Testifying expert in a matter involving the determination of reasonable value for physician services.

- *Bodner, et al. v. Blue Shield*
  Testifying expert in a matter involving the disclosures and financial payments for various types of physician services.

- *Confidential Payor-Provider Disputes*
  Economic expert in litigation over payment for emergency and post-stabilization care.

- *Confidential Payor-Provider Dispute*
  Economic expert in arbitration over payment for emergency and post-stabilization care.

- *Des Roches, et al. v. Blue Shield and Magellan*
  Class certification expert for Blue Shield in a matter involving the use of guidelines for certain behavioral health services.

A-12

CONFIDENTIAL

- *Confidential Hospital Payment Dispute*
  Economics testifying expert in a case involving payments for hospital services.

- *Confidential Hospital Payment Dispute*
  Economics testifying expert in a case involving payments for hospital services.

- *Confidential Laboratory Payment Dispute*
  Economics testifying expert in a case involving payments for laboratory services.

- *Goel v. Blue Shield*
  Economics testifying expert in a case involving the determination of reasonable value for emergency department cardiology services.

- *Confidential Hospital Payment Dispute*
  Economics and statistical expert in a litigation involving the determination of payment levels associated with disputed status of certain payor groups.

- *NCAA Concussion Litigation*
  Economics expert in litigation involving the adequacy of funding for a medical monitoring program for a class of NCAA athletes.

- *Confidential Health Care Litigation*
  Consulting expert in a matter involving a dispute over the classification of various health care expenses related to deductible and maximum out-of-pocket expenditures.

- *Confidential Health Care Arbitration*
  Testifying expert in a dispute between a payor and provider involving payment levels and business practices.

- *Martin, et al. v. Blue Shield*
  Testifying expert on class certification issues in a matter involving plan-level premium change calculations for individual health insurance policies.

- *Prime v. Kaiser*
  Damages expert in dispute involving business practices and claims payment issues.

- *Confidential Health Care Litigation*
  Damages expert in a dispute involving group health insurance.

- *Confidential Class Action Litigation*
  Consulting expert on damages issues in a dispute over coverage issues for certain types of individual health insurance policies.

- *Confidential Payor/Provider Dispute*
  Consulting expert on damages issues in a dispute between a payor and provider involving payment terms and allowed services.

A-13

JA1170

CONFIDENTIAL

- *Confidential Arbitration*
  Expert on damages issues in a dispute between a payor and provider affecting enrollment and profitability for a large Medicare managed-care program and other patient programs.

- *Class Action v. Wellpoint*
  Expert on class certification matters in a class action alleging improper termination of a health insurance company.

- *Confidential Arbitration*
  Expert on damages issues in a dispute between a payor and provider regarding a change in payment methodology.

- *Clark v. Blue Shield*
  Expert for defense assisting in the economic analysis of policy rescission.

- *Confidential Arbitration*
  Expert on damages calculation in a dispute between a health insurer and a provider of supplemental insurance benefits.

- *Confidential Hospital Association*
  Consultant assisting with developing economic models and developing legislative for Medicaid financing arrangements among hospitals.

- *Paul v. Blue Shield*
  Expert for defense assisting in the economic analysis of policy rescission.

- *Simoes v. Blue Shield*
  Expert for defense assisting in the economic analysis of policy rescission.

- *Hailey v. Blue Shield*
  Expert for defense assisting in the economic analysis of policy rescission.

- *Leyra v. Blue Shield*
  Expert for defense assisting in the economic analysis of liability for policy rescission.

- *Sutter v. Blue Shield*
  Consulting expert for defense assisting in the economic analysis of hospital charges.

- *Various Health Insurance Matters*
  Consulting expert for defense assisting in the economic analysis of policy rescissions.

- *Class Action v. Health Insurer*
  Consulting expert for defense assisting in the economic analysis of liability for alleged misclassification of patient populations.

- *Missouri Stem Cell Economic Valuation*
  Authored a study examining the likely economic impact of possible health research breakthroughs for health care costs in Missouri.

CONFIDENTIAL

- *California Stem Cell Economic Impact Valuation*
  Coauthored a study with Professor Laurence Baker of Stanford examining the likely economic impact of a proposed major health research initiative in California.

- *Health Guideline Analysis*
  Consulting expert leading a team of health economists and statisticians in the evaluation of clinical and payment guidelines developed for heart valve replacement surgery.

- *California Attorney General v. Alta Bates/Summit Medical*
  Consulting expert analyzing the ability of managed care plans to move patients in response to quality or price incentives. Supported industry expert in developing report and preparing for deposition.

- *Various Hospital Mergers*
  Financial expert for various clients analyzing proposed mergers between not-for-profit community hospitals. Estimated the potential efficiencies resulting from the mergers, conducted market research on community needs, and presented findings to management, directors, and outside counsel.

- *Class Action Health Insurance Litigation*
  Hired by the nation's largest mediation service to serve as a neutral expert in a litigation involving the calculation of health insurance payments. Worked with experts from both sides and assisted the mediator in bringing the parties to a settlement.

### Antitrust and Other Cases

- *Medical Supply Rental*
  Consulting expert in antitrust matter alleging antitrust harm and damage related to medical equipment rentals.

- *Slovin, et al. v. Sunrun, et al.*
  Testifying expert on class action and data issues in a matter involving allegations of improper telephone sales calls.

- *Lucero v. Solar City*
  Testifying expert on class action and data issues in a matter involving allegations of improper telephone sales calls.

- *Solyndra v. Trina, et al.*
  Testifying expert on antitrust and damages issues in a matter involving allegations of below-cost pricing for solar panels.

- *Confidential Antitrust Investigation*
  Consulting expert on antitrust issues in the automobile industry.

- *US Department of Justice v. Richard Bai*
  Testifying expert on antitrust issues in a price-fixing case in the LCD industry.

- *Confidential Antitrust Investigation*
  Consulting expert on antitrust issues in a high tech industry.

JA1172

490

CONFIDENTIAL

- *Indirect Purchaser Class Action v. AUO, et al.*
  Designated testifying expert on antitrust issues in an alleged price-fixing case in the LCD industry.

- *Korean Fair Trade Commission v. AUO, et al.*
  Designated testifying expert on antitrust issues in an alleged price-fixing case in the LCD industry.

- *US Department of Justice v. AUO*
  Testifying expert on antitrust issues in price-fixing case in the LCD industry.

- *Confidential Antitrust Investigation*
  Consulting expert on antitrust issues in a high technology industry.

- *Confidential Predatory Pricing Litigation*
  Consulting expert on litigation related to antitrust claims in the replacement auto parts industry.

- *Confidential Private Antitrust Litigation*
  Consulting expert on litigation related to antitrust claims in the building construction industry.

- *Regulatory Investigation*
  Consulting expert for government regulatory body investigating allegations of consumer overcharges.

- *Class Action v. Noranda and DuPont*
  Consulting expert for defense assisting in the economic analysis of liability for alleged antitrust violations affecting sulfuric acid in the United States.

- *Class Action v. Microsoft*
  Consulting expert for defense assisting in the economic analysis of antitrust liability and damages issues in a series of price overcharge litigations. Assist various academic affiliates, including Professor Robert Hall.

- *Neon v. BMC Antitrust Litigation*
  Consulting expert for plaintiffs analyzing antitrust violations in the sale of computer software for large computer databases. Supported academic affiliate expert in the analysis of relevant data and development of damages estimates.

- *CFM v. Dainippon Screen Mfg. Co.*
  Consulting expert for defense analyzing the potential monopolization by CFM of the semiconductor cleaning market. Support academic affiliate, Professor Robert Hall.

- *Proposed Merger of WorldCom and Sprint*
  Consulting expert assisting in the economic evaluation of the proposed merger between WorldCom and Sprint. Evaluate issues relating to market share and pricing of residential long distance services.

## TEACHING

| 1994–96 | Teaching Fellow, *Analytic Methods*, Kennedy School of Government, Harvard University |
| --- | --- |
| 1994–96 | Instructor, *Economics Summer Program for Mid-Career Graduate Students*, Kennedy School of Government, Harvard University |
| 1989–90 | Teaching Assistant, *Statistics*, Kennedy School of Government, Harvard University |

A-16

CONFIDENTIAL

## PUBLICATIONS AND REPORTS

"COVID-19's Strain on Hospitals May Necessitate More Relief," with Mark Gustafson and Phil Hall-Partyka, *Law360* (May 26, 2020)

"Presentation of Econometric Analyses," with Samuel Weglein, in *Econometrics: Legal, Practical, and Technical Issues*, published by the American Bar Association (2014)

"Risk Management and the Economic Impact of Terrorism," with Peter Hess, in *Business Continuity and Homeland Security, Volume 1*, edited by David H. McIntyre and William I. Hancock, Edward Elgar Publishing (2012)

"Taming a Whale Lurking in Pension Financing," *Pensions & Investments* (August 9, 2010)

*Interim Economic Impact Review*, with Laurence Baker, CIRM (California Stem Cell Agency) (October 10, 2008)

*Winning Initiative Campaigns with Economic Analysis,* Campaigns & Elections, 39 (February 2006)

"The Economic Effects of Federal Participation in Terrorism Risk," with R. Glenn Hubbard and Peter Hess, *Risk Management and Insurance Review*, Vol. 8, No. 2, 177–209 (2005)

*Some Economic Implications of State Stem Cell Funding Programs*, with Lawrence Baker, prepared for "States and Stem Cells: A Symposium on the Policy and Implications of State-Funded Stem Cell Research, Woodrow Wilson School, Princeton University (April 15, 2005)

*Health Analysis of the Potential Benefits of SCNT Stem Cell Research and Therapies in Missouri: Patient Population and Health Care Costs* (February 8, 2005)

*The Economic Effect of Federal Participation in Terrorism Risk*, with R. Glenn Hubbard (September 14, 2004)

*Economic Impact Analysis Proposition 71: California Stem Cell Research and Cures Initiative*, with Laurence Baker (September 14, 2004)

"Hospital Consolidation: Optimal Strategy for a Two-Hospital Town," with John F. Tiscornia, in *Ambulatory Health Care: Case Studies for the Health Services Executive*, edited by Austin Ross and Mary Richardson, Health Administration Press (1996)

## PRESENTATIONS

"Modern Strategies & Approaches in Consumer Class Action Suits", presented on expert witness issues at a continuing education forum for attorneys sponsored by the National Law Journal (November 2012)

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?", presented at a webinar continuing education forum for attorneys sponsored by Analysis Group/Economics (July 29, 2008)

 "The Subprime Mortgage Crisis and Disclosures: What Went Wrong?", presented at a continuing education forum for attorneys sponsored by Analysis Group/Economics, San Francisco, CA (June 24, 2008)

A-17

CONFIDENTIAL

"Stock Option Backdating", presented at a continuing education forum for attorneys sponsored by Analysis Group/Economics, New York, NY (March 21, 2007)

"Stock Option Backdating", presented at a continuing education forum for attorneys sponsored by Analysis Group/Economics, Menlo Park, CA and San Francisco, CA (November 7, 2006)

"Overview of Stem Cell Legislation", moderator and presenter at a presentation on implementing California's stem cell initiative, sponsored by the Food and Drug Law Institute (FDLI), San Mateo, CA (March 9, 2004)

"Challenges to Expert Testimony," presentation at Law Seminar International Conference, San Francisco, CA (November 5, 2004)

"Federal Terrorism Insurance Panel Discussion," presentation and panel participant, National Press Club, Washington, DC (October 24, 2004)

"Insurance 101," presentation on the design and performance of whole life and universal life policies, presented to customer services representatives administering a life insurance sales practices settlement, Ogden, UT (April 27, 1999)

"Antitrust Case Study: NASDAQ Market Maker Litigation," presented at a continuing education forum for attorneys sponsored by Analysis Group/Economics, Menlo Park and San Francisco, CA (September 15, 1998)

"An Economist's Perspective on Life Insurance Sales Practices Problems," presented at the spring meeting of the Society of Actuaries, Maui, HI (June 15, 1998)

"Valuing Intellectual Property in an Age of Employee Mobility," presented at a continuing education forum for attorneys sponsored by Analysis Group/Economics, Menlo Park and San Francisco, CA (June 9, 1998)

## EXPERT DESIGNATION, TESTIMONY, AND REPORTS

| February 2021 | Deposition testimony in *Confidential – OCC (securities valuation)* |
| January 2021 | Arbitration testimony in *Confidential Arbitration (health insurance payor-provider matter)* |
| January 2021 | Expert report in *California Physicians' Service v. HealthPlan Services (contract performance dispute)* |
| November 2020 | Arbitration testimony in *Confidential Arbitration (health insurance payor-provider matter)* |
| November 2020 | Expert report in *Confidential – OCC (securities valuation)* |
| October 2020 | Arbitration testimony in *Confidential Arbitration (health insurance payor-provider matter)* |
| October 2020 | Expert reply report in *California Physicians' Service v. HealthPlan Services (contract performance dispute)* |

A-18

CONFIDENTIAL

| September 2020 | Deposition testimony in *California Physicians' Service v. HealthPlan Services (contract performance dispute)* |
| September 2020 | Deposition testimony in *In re: The Allstate Corporation Securities Litigation (class action alleging claim frequency misstatements)* |
| August 2020 | Expert declaration in *California Physicians' Service v. HealthPlan Services (contract performance dispute)* |
| July 2020 | Deposition testimony in *Confidential Arbitration (health care pricing dispute)* |
| July 2020 | Expert report in *Confidential Arbitration (health care pricing dispute)* |
| July 2020 | Expert rebuttal report in *In re: The Allstate Corporation Securities Litigation (class action alleging claim frequency misstatements)* |
| July 2020 | Expert reply report in *In re: The Allstate Corporation Securities Litigation (class action alleging claim frequency misstatements)* |
| July 2020 | Expert report in *Scott Crosby, et al. v. California Physicians' Service, et al. (class action alleging care restrictions)* |
| May 2020 | Expert declaration in *Scott Crosby, et al. v. California Physicians' Service, et al. (class action alleging care restrictions)* |
| April 2020 | Deposition testimony in *In re: CenturyLink Sales Practices and Securities Litigation (class action alleging customer cramming and related allegation)* |
| February 2020 | Expert report in *In re: The Allstate Corporation Securities Litigation (class action alleging claim frequency misstatements)* |
| February 2020 | Deposition testimony in *CEP America – California v. Heritage Provider Network (health insurance payor-provider matter)* |
| January 2020 | Arbitration testimony in *Confidential Arbitration (DMHC pricing matter)* |
| January 2020 | Expert rebuttal report in *Confidential Arbitration* |
| January 2020 | Expert report in *Confidential Arbitration* |
| January 2020 | Arbitration testimony in *Confidential Arbitration (ownership dispute matter)* |
| January 2020 | Arbitration testimony in *Confidential Arbitration (physician IPA affiliation matter)* |
| January 2020 | Expert deposition in *Confidential Arbitration (DMHC pricing matter)* |
| December 2019 | Expert report in *Confidential Arbitration* |
| December 2019 | Expert report in *Confidential Arbitration* |
| December 2019 | Expert deposition in *Confidential Arbitration (ownership dispute matter)* |

A-19

494

CONFIDENTIAL

| | |
|---|---|
| November 2019 | Expert rebuttal report in *CEP America – California v. Heritage Provider Network* |
| October 2019 | Expert declaration in *Dual Diagnosis Treatment Center, et al. v. Health Net* |
| July 2019 | Expert declaration in *CEP America – California v. Heritage Provider Network* |
| July 2019 | Expert deposition in *Physicians Healthsource Inc., et al. v. Masimo Corp. (TCPA matter)* |
| July 2019 | Expert deposition in *Empire Land, LLC (bankruptcy matter)* |
| June 2019 | Expert report in *Prime Healthcare Services, Inc., et al. v. Humana Insurance Company, et al. (Evaluation of health care utilization data)* |
| June 2019 | Expert deposition in *Michael Johnson, et al. v. Comodo Group (TCPA matter)* |
| June 2019 | Trial testimony in *California Spine and Neurosurgery Institute v. Blue Shield (health insurance payor-provider matter)* |
| June 2019 | Arbitration testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| May 2019 | Expert deposition in *California Spine and Neurosurgery Institute v. Blue Shield (health insurance payor-provider matter)* |
| May 2019 | Expert deposition in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| March 2019 | Expert deposition in *California Spine and Neurosurgery Institute v. Blue Shield (health insurance payor-provider matter)* |
| March 2019 | Expert deposition in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| March 2019 | Expert deposition in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| February 2019 | Expert deposition in *San Joaquin General Hospital v. Blue Shield (health insurance payor-provider matter)* |
| February 2019 | Trial testimony in *Northbay Healthcare Group v. Blue Shield (health insurance payor-provider matter)* |
| February 2019 | Expert report in *Confidential Arbitration* |
| January 2019 | Trial testimony in *State of Washington v. Comcast (consumer fraud matter)* |
| December 2018 | Trial testimony in *State of Washington v. Comcast (consumer fraud matter)* |
| December 2018 | Expert deposition in *Northbay Healthcare Group v. Blue Shield (health insurance payor-provider matter)* |

495

CONFIDENTIAL

| | |
|---|---|
| November 2018 | Expert report in *NorthBay Healthcare Group v. Blue Shield* |
| September 2018 | Expert report in *YDM Management, Inc. v. Blue Shield* |
| September 2018 | Expert deposition in *YDM, Management, Inc. v. Blue Shield (Health Insurance Payor Provider Matter)* |
| August 2018 | Expert declaration in *San Jose Neurospine v. Blue Shield* |
| July 2018 | Expert rebuttal report and deposition in *State of Washington v. Comcast* |
| June 2018 | Expert report in *State of Washington v. Comcast* |
| June 2018 | Trial testimony in *San Jose Neurospine v. Blue Shield (health insurance payor-provider matter)* |
| May 2018 | Expert report in *John H. Larry Jr. v. Rexall, et al.* |
| May 2018 | Expert deposition in *San Jose Neurospine v. Blue Shield (health insurance payor-provider matter)* |
| February 2018 | Expert deposition in *Bodner, et al. v. Blue Shield (health insurance pricing matter)* |
| January 2018 | Expert declaration in *Fort Leavenworth Military Housing v. Ambac* |
| December 2017 | Expert deposition in *Fort Bliss Military Housing v. Ambac (bond insurance matter)* |
| November 2017 | Expert deposition in *Slovin, et al. v. Sunrun, et al. (TCPA matter)* |
| November 2017 | Expert report in *Slovin, et al. v. Sunrun, et al.* |
| October 2017 | Expert report on economic and class issues in *Surrett, et al. v. Western Culinary Institute* |
| October 2017 | Expert deposition on damages issues in *Mayumac v. Met Life (disability insurance matter)* |
| October 2017 | Expert deposition on class certification issues in *Des Roches v. Blue Shield / Magellan (health insurance benefits matter)* |
| October 2017 | Expert report on statistical issues in *Scott v. Cricket* |
| October 2017 | Expert report in *Fort Bliss Military Housing v. Ambac* |
| September 2017 | Expert report in *Fort Riley Military Housing v. Ambac* |
| September 2017 | Expert declaration in *San Jose Neurospine v. Blue Shield* |
| August 2017 | Expert deposition in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |

A-21

CONFIDENTIAL

| | |
|---|---|
| July 2017 | Expert deposition in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| July 2017 | Expert deposition in *Starks, et al. v. Geico Indemnity (auto insurance class action)* |
| June 2017 | Expert deposition in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| May 2017 | Expert declaration on class certification issues in *Monterey Military Housing v. Ambac* |
| April 2017 | Expert declaration on class certification issues in *Des Roches v. Blue Shield/Magellan* |
| April 2017 | Expert declaration on class certification and data issues in *Lucero v. Solar City* |
| April 2017 | Expert rebuttal report in *Fort Meade Military Housing v. Ambac* |
| March 2017 | Expert deposition in *Fort Meade Military Housing v. Ambac (bond insurance matter)* |
| March 2017 | Expert declaration in *Monterey Military Housing v. Ambac* |
| February 2017 | Expert testimony in *Fort Meade Military Housing v. Ambac (bond insurance matter)* |
| February 2017 | Expert declaration in *Fort Meade Military Housing v. Ambac* |
| February 2017 | Expert declaration in *Confidential Hospital Payment Dispute* |
| January 2017 | Arbitration testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| January 2017 | Expert testimony in *Fort Bliss Military Housing v. Ambac (bond insurance matter)* |
| January 2017 | Expert declaration in *Fort Riley Military Housing v. Ambac* |
| December 2016 | Expert declaration in *Fort Bliss Military Housing v. Ambac* |
| December 2016 | Expert declaration in *Fort Meade Military Housing v. Ambac* |
| December 2016 | Trial testimony in *Ben-E-Lect v. Anthem (health insurance design matter)* |
| December 2016 | Arbitration testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| October 2016 | Arbitration testimony in *Confidential Breach of Contract Arbitration (IPA valuation matter)* |
| October 2016 | Expert report in *Confidential Hospital Payment Dispute* |
| September 2016 | Trial testimony in *Goel v. Blue Shield (health insurance payor-provider matter)* |

A-22

CONFIDENTIAL

| September 2016 | Expert declaration in *Monterey Military Housing v. Ambac* |
| September 2016 | Expert declaration in *Bodner, et al. v. Blue Shield* |
| August 2016 | Arbitration testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| July 2016 | Arbitration testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| May 2016 | Expert Declaration in *Monterey Military Housing v. Ambac* |
| April 2016 | Deposition testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| February 2016 | Arbitration testimony in *Confidential Health Care Payment Matter (health insurance payor-provider matter)* |
| January 2016 | Expert declaration in *Bodner, et al. v. Blue Shield* |
| December 2015 | Arbitration testimony in *Confidential Hospital Payment Dispute* |
| December 2015 | Expert deposition in *Chinese Drywall Products Liability Litigation* |
| December 2015 | Expert declaration in *Bodner, et al. v. Blue Shield of California* |
| December 2015 | Trial testimony in *Metzner v. Permanente Medical Group* |
| October 2015 | Expert report in *Chinese Drywall Products Liabiliy Litigation* |
| September 2015 | Expert deposition in *Metzner v. Permanente Medical Group* |
| August 2015 | Expert testimony in *Confidential Health Care Arbitration* |
| July 2015 | Expert deposition in *Solyndra v. Trina, et al.* |
| April 2014 | Expert report (update) in *NCAA Concussion Litigation* |
| January 2015 | Expert deposition in *Prime v. Kaiser* |
| December 2014 | Expert report (update) in *NCAA Concussion Litigation* |
| December 2014 | Expert deposition in *Martin, et al. v. Blue Shield of California* |
| November 2014 | Expert testimony in *Confidential International Arbitration* |
| September 2014 | Expert deposition in *Confidential Insurance Matter* |
| July 2014 | Expert report in *NCAA Concussion Litigation* |
| July 2014 | Expert testimony in *Confidential Wrongful Termination Matter* |

A-23

**498**

CONFIDENTIAL

| | |
|---|---|
| July 2014 | Expert report in *Confidential Disability Insurance Matter* |
| May 2014 | Expert report in *Martin v. Blue Shield of California* |
| May 2014 | Expert declaration in *Martin v. Blue Shield of California* |
| December 2013 | Expert report in *Confidential Airline Litigation* |
| December 2013 | Expert testimony in *Confidential Investment Return Litigation* |
| December 2013 | Expert deposition in *Confidential Investment Return Litigation* |
| November 2013 | Expert declaration in *Long Trust v. Morgan Stanley* |
| November 2013 | Expert report in *Long Trust v. Morgan Stanley* |
| November 2013 | Expert testimony in *Confidential Employment Litigation* |
| November 2013 | Expert deposition in *Confidential Employment Litigation* |
| November 2013 | Expert deposition in *Katz v. Mass Mutual* |
| October 2013 | Expert report in *Katz v. Mass Mutual* |
| October 2013 | Expert report in *Circuit City, et al. v. AUO* |
| October 2013 | Summary witness expert testimony in *US Department of Justice v. Richard Bai* |
| January 2013 | Expert testimony in *Confidential Arbitration* |
| January 2013 | Expert deposition in *Confidential Arbitration* |
| December 2012 | Expert declaration in *Markocki v. Olde Republic Title* |
| December 2012 | Expert deposition in *Paul v. Blue Shield of California* |
| June 2012 | Expert deposition in *Indirect Purchaser Class Action v. AUO* |
| June 2012 | Expert deposition in *Asbestos Litigation v. Borg Warner* |
| May 2012 | Expert report in *Indirect Purchaser Class Action v. AUO* |
| April 2012 | Expert deposition in *2880 Stevens Creek v. Blach Construction Co.* |
| April 2012 | Expert deposition in *Indirect Purchaser Class Action v. AUO* |
| March 2012 | Expert report in *Indirect Purchaser Class Action v. AUO* |
| February 2012 | Expert testimony in *United States Department of Justice v. AUO* |

A-24

CONFIDENTIAL

| February 2012 | Expert deposition in *Campbell v. MetLife* |
| November 2011 | Expert deposition in *Cox v. Allstate* |
| October 2011 | Expert report in *Cox v. Allstate* |
| October 2011 | Expert deposition in *Class Action v. Wellpoint* |
| October 2011 | Expert designation in *US Department of Justice v. AUO* |
| October 2011 | Expert report in *KFTC v. AUO* |
| July 2011 | Expert report in *Class Action v. Wellpoint* |
| June 2011 | Expert report in confidential damages arbitration |
| November 2010 | Expert testimony in *Jasmine v. Marvell* |
| October 2010 | Expert testimony in *US Government v. Jerry Cash* |
| July 2010 | Expert deposition in *M.E. Fox & Co. Valuation matter* |
| June 2010 | Expert designation in *M.E. Fox & Co. Valuation matter* |
| May–June 2010 | Expert testimony in *Polteco v. Tecsult* |
| March 2010 | Expert deposition in *Simoes v. Blue Shield* |
| December 2009 | Expert designation in *Simoes v. Blue Shield* |
| October 2009 | Affidavit in *Best Buy v. DDR* |
| March 2009 | Expert deposition in *Hailey v. Blue Shield* |
| March 2009 | Expert report in *Hausman v. Union Bank* |
| March 2009 | Expert report in *Perez v. First American Title Insurance Company* |
| March 2009 | Trial testimony in *Windham v. Cook* |
| February 2009 | Expert report in *Windham v. Cook* |
| January 2009 | Expert designation in *Hailey v. Blue Shield* |
| October 2008 | Deposition testimony in *Pavlov, et al. v. CNA* |
| September 2008 | Expert declaration in *Pavlov, et al. v. CNA* |
| September 2008 | Trial testimony in *Freidman v. Sega, et al.* |
| September 2008 | Expert report in *Freidman v. Sega, et al.* |

JA1182

500

CONFIDENTIAL

| | |
|---|---|
| July 2008 | Deposition testimony in *Freidman v. Sega, et al.* |
| July 2008 | Deposition testimony in *Best Buy v. DDR* |
| June 2008 | Expert report in *Best Buy v. DDR* |
| October 2007 | Expert designation in *Rowlands v. Blue Shield* |
| September 2007 | Deposition testimony in *Class Action v. CNA* |
| September 2007 | Expert report in *Class Action v. CNA* |
| May 2007 | Deposition testimony in *Tronox v. Rio Algom* |
| April 2007 | Expert designation in *Callil v. Blue Shield* |
| April 2007 | Expert designation in *Abbott v. Blue Shield* |
| March 2007 | Deposition testimony in *Leyra v. Blue Shield Life and Health* |
| December 2006 | Expert designation in *Leyra v. Blue Shield Life and Health* |
| August 2006 | Arbitration testimony in *F&A Restaurant Group v. Shepard and Reyes* |
| July 2006 | Trial testimony in *Carrino v. Carrino* |
| July 2006 | Deposition testimony in *Carrino v. Carrino* |
| February 2006 | Arbitration testimony in *ART v. Riverdeep* |
| January 2006 | Deposition testimony in *ART v. Riverdeep* |
| December 2005 | Deposition testimony in *FFIC v. Cunningham Lindsey* |
| September 2005 | Deposition testimony in *Barnes & Noble v. DDR (Texas and Kansas)* |
| September 2005 | Expert report in *Fireman's Fund v. Cunningham Lindsey* |
| September 2005 | Expert report in *Barnes & Noble v. DDR (Kansas)* |
| August 2005 | Expert report in *Barnes & Noble v. DDR (Texas)* |
| March 2005 | Expert report in *Bioport Corporation v. Elan Pharmaceuticals* |
| February 2005 | Expert report in *Capo v. Dioptics* |
| February 2005 | Expert report in *Arthur Stockton v. Fidelity & Deposit* |
| September 2004 | Deposition testimony in *Her Associates v. Kaiser* |

A-26

CONFIDENTIAL

| August 2004 | Deposition testimony in *CSR v. Lloyds, et al.* |
| June 2004 | Expert report in *CSR v. Lloyds, et al.* |
| April 2004 | Deposition testimony in *General American v. KPMG* |
| March 2004 | Expert report in *General American v. KPMG* |
| March 2004 | Deposition testimony in confidential company valuation for marital dissolution. |
| February 2004 | Expert report in confidential company valuation for marital dissolution. |
| January 2004 | Deposition testimony in *Her Associates v. Kaiser* |
| January 2004 | Expert report in *Her Associates v. Kaiser* |
| March 2003 | Expert designation in *Creative Artist Network v. Santa Clara County* |
| December 2002 | Deposition testimony in *Redland Insurance Company v. Anthony Choy and Edward Wolkowitz* |
| November 2002 | Expert designation in *Academy Tent, et al. Class Action v. American Home Assurance* |
| Sept.–Dec. 2002 | Trial testimony in *A&J Liquor, et al. Class Action v. State Compensation Insurance Fund* |
| September 2002 | Deposition testimony in *A&J Liquor, et al. Class Action v. State Compensation Insurance Fund* |
| July 2002 | Expert witness report in *Creative Artist Network v. Santa Clara County* |
| July 2002 | Deposition testimony in *Redland Insurance Company v. Anthony Choy and Edward Wolkowitz* |
| June 2002 | Expert declaration on insurance company valuation in *Redland Insurance Company v. Anthony Choy and Edward Wolkowitz* |
| May 2002 | Expert declaration on settlement valuation in *Class Action v. Knights of Columbus* |
| Jan.–Feb. 2002 | Deposition testimony in *A&J Liquor, et al. Class Action v. State Compensation Insurance Fund* |
| December 2001 | Deposition testimony in *Class Action v. Ford Credit* |
| May 2001 | Deposition testimony in *A&J Liquor, et al. Class Action v. State Compensation Insurance Fund* |
| April 2001 | Deposition testimony in *Bar None v. The Duncan Group* |
| April 2001 | Deposition testimony in *Trigon v. United States* |

JA1184

502

CONFIDENTIAL

| | |
|---|---|
| January 2001 | Deposition testimony in *Heska v. Synbiotics* |
| December 2000 | Expert declaration in *Trigon v. United States* |
| June 2000 | Deposition testimony in *A&J Liquor, et al. Class Action v. State Compensation Insurance Fund* |
| May 2000 | Deposition testimony in *Heska v. Synbiotics* |
| July 1999 | Appeared in Federal Court on behalf of Ohio National in *James A. Wemer, et al. Class Action v. Ohio National* (did not provide testimony) |
| June 1999 | Submitted a report on the valuation and fairness of the proposed settlement in *James A. Wemer, et al. Class Action v. Ohio National* |
| January 1999 | Identified as an insurance liability and damages expert in *Arroyo v. Alexander & Alexander* |
| December 1998 | Expert declaration in *A&J Liquor, et al. Class Action v. State Compensation Insurance Fund* |
| November 1998 | Identified as an economic expert in *Class Action v. Ohio National* litigation |
| October 1998 | Identified as an insurance expert in *Morris v. Fremont Life Insurance Company* |
| September 1998 | Expert declaration in *Class Action v. State Compensation Insurance Fund* |
| April 1998 | Deposition testimony in *Handicomp, Inc. v. United States Golf Association* |
| February 1998 | Rebuttal expert report in *Handicomp, Inc. v. United States Golf Association*, coauthored with Ronald C. Curhan |
| February 1998 | Expert declaration in *Class Action v. State Compensation Insurance Fund* |
| January 1993 | Expert testimony on the likely economic impact of the merger on the hospital's operating expenses and capital expenditures in Federal Trade Commission (FTC) administrative hearings, *Proposed Merger of Parkview Hospital and St. Mary Corwin Hospital*, Pueblo, CO |

**PROFESSIONAL MEMBERSHIPS**

American Economics Association

American Bar Association (non-lawyer member)

Association for Health Services Research

CONFIDENTIAL

**Appendix B**
**Documents Relied On**

**Legal Documents:**
First Amended Class Action Complaint, *Luke Davis, et al. v. Laboratory Corporation of America Holdings*, Case No. 2:20-cv-00893-FMO-KS, United States District Court, Central District of California, September 3, 2020

**Labcorp Data and Information:**
Davis-LabCorp00000650
Davis-LabCorp00004298-00004302
Davis-LabCorp00004354
Davis-LabCorp00004748
Davis-LabCorp00004749
Davis-LabCorp00004750
Davis-LabCorp00004751
Davis-LabCorp00004752
Davis-LabCorp00004753-00004754
Davis-LabCorp00004755
Interview with Joseph Sinning, March 8, 2021

**Depositions:**
Deposition of Claire Stanley, December 7, 2020
Deposition of Joe Sinning, February 2, 2021
Deposition of John Harden, February 17, 2021
Deposition of Julian Vargas, February 10, 2021
Deposition of Kevin DeAngelo, March 3, 2021 (Rough Transcript)
Deposition of Luke Davis, February 16, 2021
Deposition of Robin VanLant, February 17, 2021

**SEC Filings:**
Laboratory Corp of America Holdings, Form 10-K for the fiscal year ended December 31, 2019

**Publicly Available Documents:**
American Health Insurance Plans Center for Policy and Research, "Charges Billed by Out-of-Network Providers: Implications for Affordability," September 2015, available at https://www.ahip.org/wp-content/uploads/2015/09/OON_Report_11.3.16.pdf
Legge, Gordon E., "Reading Digital with Low Vision," *Visible language* vol. 50, 2 (2016): 102-125
Michael Crossland, Rui Silva and Antonio Macedo, "Smartphone, Tablet Computer and E-reader Use by People with Vision Impairment," July 28, 2014, available at https://pubmed.ncbi.nlm.nih.gov/25070703/
Quest Diagnostics, "Laboratory and Office Locations Around the World," available at https://www.questdiagnostics.com/home/about/locations/
U.S. Census Bureau, "American Community Survey and Puerto Rico Community Survey 2019 Subject Definitions," 2019, available at https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2019_ACSSubjectDefinitions.pdf
U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019," 2019, available at https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&tp=true&hidePreview=true
U.S. Census Bureau, "Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports," July 25, 2012, available at https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html
WebAIM, "Survey of Users with Low Vision #2 Results," October 31, 2018, available at https://webaim.org/projects/lowvisionsurvey2/

1

JA1187

CONFIDENTIAL



**Exhibit 1a**

**Comparison of People with Vision Difficulty & Labcorp Visits by State**

Legend:
- People with Vision Difficulty by State (% of U.S. Pop. With Vision Difficulty)
- Prevalence of Vision Difficulty (% of Total State Pop.)
- Visits to Labcorp Locations (% of Total Visits)

**Notes:**

[1] The American Community Survey (taken in 2019) classifies a respondent as having "Vision Difficulty" if they respond positively that they are "blind or ... [have] serious difficulty seeing even when wearing glasses" (see source [C]).

[2] Visits to Labcorp locations are aggregated over the period of January 2018 through December 2020 on a statewide basis using the state provided in the Labcorp "Site Address" and the "Number of Visits" field from each of the sources listed in [B].

**Sources:**

[A] U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019," 2019, available at https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&cp=true&hidePreview=true.

[B] Davis-LabCorp00004749, Davis-LabCorp00004750, Davis-LabCorp00004752.

[C] U.S. Census Bureau, "American Community Survey and Puerto Rico Community Survey 2019 Subject Definitions," 2019, available at https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2019_ACSSubjectDefinitions.pdf.

505

CONFIDENTIAL

**Exhibit 1b**
**Population, Vision Difficulty, and Labcorp Visits by State**

| | [a] | [b] = [a]/[c] | [c] | [d] = [c]/sum[c] | [e] = [a]/sum[a] | [f] | [g] = [f]/sum[f] |
|---|---|---|---|---|---|---|---|
| | Visual Difficulty[A] | | | | | Labcorp Visits[B] (Jan. 2018 - Dec. 2020) | |
| State | Estimated People with Vision Difficulty (count) | Prevalence of Vision Difficulty (% of Total State Pop.) | Total State Population | State Population (% of Total U.S. Pop.) | People with Vision Difficulty by State (% of U.S. Pop. With Vision D_fficulty) | Visits to Labcorp Locations (count) | Visits to Labcorp Locations (% of Total) |
| California | 747,867 | 1.9% | 38,997,581 | 12.0% | 9.7% | 10,290,146 | 14.9% |
| Texas | 695,054 | 2.4% | 28,514,428 | 8.7% | 9.1% | 4,919,905 | 7.1% |
| Florida | 538,105 | 2.5% | 21,156,770 | 6.5% | 7.0% | 9,633,016 | 13.9% |
| New York | 388,524 | 2.0% | 19,212,803 | 5.9% | 5.1% | 3,736,208 | 5.4% |
| Pennsylvania | 291,394 | 2.3% | 12,593,136 | 3.9% | 3.8% | 4,029,887 | 5.8% |
| Ohio | 266,651 | 2.3% | 11,514,951 | 3.5% | 3.5% | 1,137,292 | 1.6% |
| Illinois | 258,935 | 2.1% | 12,488,377 | 3.8% | 3.4% | 796,454 | 1.2% |
| Georgia | 255,907 | 2.5% | 10,420,412 | 3.2% | 3.3% | 1,678,541 | 2.4% |
| North Carolina | 244,982 | 2.4% | 10,281,062 | 3.2% | 3.2% | 2,299,273 | 3.3% |
| Michigan | 224,302 | 2.3% | 9,879,486 | 3.0% | 2.9% | 201,258 | 0.3% |
| Puerto Rico | 210,178 | 6.6% | 3,169,528 | 1.0% | 2.7% | 0 | 0.0% |
| Tennessee | 206,380 | 3.1% | 6,719,315 | 2.1% | 2.7% | 589,358 | 0.9% |
| Virginia | 184,978 | 2.2% | 8,303,671 | 2.5% | 2.4% | 2,410,878 | 3.5% |
| Arizona | 178,769 | 2.5% | 7,165,904 | 2.2% | 2.3% | 2,259,817 | 3.3% |
| Louisiana | 173,757 | 3.8% | 4,539,690 | 1.4% | 2.3% | 642,030 | 0.9% |
| New Jersey | 167,689 | 1.9% | 8,775,976 | 2.7% | 2.2% | 7,946,116 | 11.5% |
| Kentucky | 161,551 | 3.7% | 4,384,896 | 1.3% | 2.1% | 651,298 | 0.9% |
| Missouri | 158,184 | 2.6% | 6,020,665 | 1.8% | 2.1% | 925,531 | 1.3% |
| Indiana | 157,096 | 2.4% | 6,631,529 | 2.0% | 2.0% | 732,822 | 1.1% |
| Alabama | 150,989 | 3.1% | 4,822,514 | 1.5% | 2.0% | 692,724 | 1.0% |
| South Carolina | 147,752 | 2.9% | 5,048,513 | 1.6% | 1.9% | 948,985 | 1.4% |
| Washington | 145,299 | 1.9% | 7,497,453 | 2.3% | 1.9% | 1,486,702 | 2.2% |
| Oklahoma | 133,942 | 3.5% | 3,871,658 | 1.2% | 1.7% | 134,319 | 0.2% |
| Massachusetts | 112,017 | 1.6% | 6,820,969 | 2.1% | 1.5% | 132,945 | 0.2% |
| Maryland | 111,669 | 1.9% | 5,945,846 | 1.8% | 1.5% | 4,488,604 | 6.5% |
| Colorado | 109,868 | 1.9% | 5,664,199 | 1.7% | 1.4% | 1,534,566 | 2.2% |
| Mississippi | 109,074 | 3.8% | 2,904,609 | 0.9% | 1.4% | 114,715 | 0.2% |
| Arkansas | 101,638 | 3.4% | 2,962,596 | 0.9% | 1.3% | 68,016 | 0.1% |
| Oregon | 101,405 | 2.4% | 4,175,002 | 1.3% | 1.3% | 98,173 | 0.1% |
| Wisconsin | 96,271 | 1.7% | 5,751,404 | 1.8% | 1.3% | 132,461 | 0.2% |
| Minnesota | 84,900 | 1.5% | 5,580,828 | 1.7% | 1.1% | 115,843 | 0.2% |
| New Mexico | 76,108 | 3.7% | 2,058,918 | 0.6% | 1.0% | 41,931 | 0.1% |
| Kansas | 70,275 | 2.5% | 2,851,831 | 0.9% | 0.9% | 129,793 | 0.2% |
| West Virginia | 68,981 | 3.9% | 1,762,052 | 0.5% | 0.9% | 337,207 | 0.5% |
| Nevada | 68,615 | 2.3% | 3,043,419 | 0.9% | 0.9% | 1,088,383 | 1.6% |
| Connecticut | 65,651 | 1.9% | 3,514,562 | 1.1% | 0.9% | 133,324 | 0.2% |
| Iowa | 54,449 | 1.7% | 3,111,914 | 1.0% | 0.7% | 114,249 | 0.2% |
| Utah | 45,489 | 1.4% | 3,178,394 | 1.0% | 0.6% | 255,978 | 0.4% |
| Idaho | 41,207 | 2.3% | 1,764,911 | 0.5% | 0.5% | 166,596 | 0.2% |
| Nebraska | 38,381 | 2.0% | 1,904,211 | 0.6% | 0.5% | 41,871 | 0.1% |
| New Hampshire | 25,969 | 1.9% | 1,343,337 | 0.4% | 0.3% | 170,098 | 0.2% |
| Hawaii | 25,381 | 1.9% | 1,358,715 | 0.4% | 0.3% | 0 | 0.0% |
| Maine | 24,995 | 1.9% | 1,327,623 | 0.4% | 0.3% | 0 | 0.0% |
| Montana | 24,146 | 2.3% | 1,053,646 | 0.3% | 0.3% | 28,141 | 0.0% |
| Rhode Island | 20,216 | 1.9% | 1,043,753 | 0.3% | 0.3% | 34,092 | 0.0% |
| Delaware | 19,896 | 2.1% | 956,378 | 0.3% | 0.3% | 1,333,001 | 1.9% |
| South Dakota | 19,266 | 2.2% | 867,305 | 0.3% | 0.3% | 11,994 | 0.0% |
| Vermont | 15,123 | 2.4% | 618,064 | 0.2% | 0.2% | 0 | 0.0% |
| Wyoming | 15,118 | 2.7% | 568,859 | 0.2% | 0.2% | 30,387 | 0.0% |
| North Dakota | 14,844 | 2.0% | 744,172 | 0.2% | 0.2% | 0 | 0.0% |
| Alaska | 14,339 | 2.0% | 705,772 | 0.2% | 0.2% | 34,151 | 0.0% |
| District of Columbia | 13,642 | 2.0% | 696,599 | 0.2% | 0.2% | 320,832 | 0.5% |
| **Total** | **7,677,218** | **2.4%** | **326,290,206** | **100.0%** | **100.0%** | **69,099,911** | **100.0%** |

Notes:
[1] The American Community Survey classifies a respondent as having "Vision Difficulty" if they respond positively that they are are "blind or … [have] serious difficulty seeing even when wearing glasses" (see source [C]).
[2] Visits to Labcorp locations are aggregated over the period of January 2018 through December 2020 on a statewide basis using the state provided in the Labcorp "Site Address" and the "Number of Visits" field from each of the sources listed in [B].

Sources:
[A] U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019," 2019, available at https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&tp=true&hidePreview=true.
[B] Davis-LabCorp00004749, Davis-LabCorp00004750, Davis-LabCorp00004752.
[C] U.S. Census Bureau, "American Community Survey and Puerto Rico Community Survey 2019 Subject Definitions," 2019, available at https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2019_ACSSubjectDefinitions.pdf.

JA1188

506

JA1189

CONFIDENTIAL

**Exhibit 2**

**Comparison of Age Demographics Between Americans with Vision Difficulty & Labcorp Visitors**

*Age Demographics of People with Vision Difficulty (Estimates as of 2015)*

| | Age Range | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Under 5 years | 5 to 17 years | 18 to 34 years | 35 to 64 years | 65 to 74 years | 75 years and over | |
| People with Vision Difficulty *(% of U.S. Pop. With Vision Difficulty)* | 1.0% | 6.3% | 12.0% | 38.1% | 17.1% | 25.5% | 100.0% |

*Age Demographics of Labcorp Patients (January 2018 - December 2020)*

| | Age Range | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Under 10 years | 10 to 19 years | 20 to 29 years | 30 to 39 years | 40 to 49 years | 50 to 59 years | 60 to 69 years | 70 to 79 years | 80 years and over | |
| Patients at Labcorp PSCs *(% of total Labcorp Patients)* | 2.7% | 5.8% | 12.5% | 13.6% | 13.3% | 16.8% | 17.7% | 12.1% | 5.4% | 100.0% |

**Notes:**
[1] The American Community Survey classifies a respondent as having "Vision Difficulty" if they respond positively that they are are "blind or … [have] serious difficulty seeing even when wearing glasses" (see source [B])
[2] Labcorp age demographics are taken from the 2,411 Labcorp sites provided in source [C], and account for visits that occurred between January 2018 and December 2020. Percentages are taken as a proportion of the total number of visitors to the Labcorp locations over the relevant time period (61,522,195 visitors).

**Sources:**
[A] U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019." 2019, available at https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&tp=true&hidePreview=true.
[B] U.S. Census Bureau, "American Community Survey and Puerto Rico Community Survey 2019 Subject Definitions," 2019, available at https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2019_ACSSubjectDefinitions.pdf.
[C] Davis-LabCorp00004749, Davis-LabCorp00004750, Davis-LabCorp00004752.

507

JA1190

CONFIDENTIAL



**Exhibit 3**

**Cumulative Number of Labcorp PSCs with Kiosk Tablets Installed as of September 2018**

Legend:
- Cumulative Count of Labcorp Locations with Tablets Installed as of September 2018
- Total Labcorp Locations as of September 2018

Y-axis: Number of PSCs with Kiosk Tablets Installed

Data points (cumulative percentages):
- Oct-17: 1%
- Nov-17: 2%
- Dec-17: 4%
- Jan-18: 6%
- Feb-18: 14%
- Mar-18: 21%
- Apr-18: 35%
- May-18: 47%
- Jun-18: 62%
- Jul-18: 80%
- Aug-18: 92%
- Sep-18: 92%

1,844

**Notes:**
[1] The date a tablet was installed at a PSC is taken as the "Horizon Prod Date" from the source below, and aggregated on a monthly basis.
[2] The dataset lists installation dates for 1,699 of 1,844 Labcorp locations. There are 141 locations in the data where "Horizon Prod Date" is blank and 4 where the date is marked TBD.

**Source:**
Davis-LabCorp00000650 at "Hz Rollout" tab.

JA1191

CONFIDENTIAL

**Exhibit 4**
**Patient Service Center Check-in Metrics**
**August 23, 2020 to Feburary 19, 2021**

| Date Range | [a]<br>Kiosk Check-ins<br>(count) | [b]=[a]/[g]<br>Kiosk Check-ins<br>(%) | [c]<br>Mobile Check-ins<br>(count) | [d]=[c]/[g]<br>Mobile Check-ins<br>(%) | [e]<br>Front Desk Check-ins<br>(count) | [f]=[e]/[g]<br>Front Desk Check-ins<br>(%) | [g]<br>Total Check-ins<br>(count) |
|---|---|---|---|---|---|---|---|
| 8/23/2020 - 8/31/2020 | 426,118 | 66.0% | 53,668 | 8.3% | 165,590 | 25.7% | 645,376 |
| 9/1/2020 - 9/30/2020 | 1,581,064 | 67.2% | 183,968 | 7.8% | 587,139 | 25.0% | 2,352,171 |
| 10/1/2020 - 10/31/2020 | 1,686,211 | 67.7% | 190,179 | 7.6% | 613,273 | 24.6% | 2,489,663 |
| 11/1/2020 - 11/30/2020 | 1,444,755 | 65.9% | 223,981 | 10.2% | 524,515 | 23.9% | 2,193,251 |
| 12/1/2020 - 12/31/2020 | 1,484,034 | 65.1% | 272,722 | 12.0% | 523,731 | 23.0% | 2,280,487 |
| 1/1/2021 - 1/31/2021 | 1,502,923 | 65.2% | 267,584 | 11.6% | 535,249 | 23.2% | 2,305,756 |
| 2/1/2021 - 2/19/2021 | 686,691 | 56.6% | 168,131 | 13.9% | 358,749 | 29.6% | 1,213,571 |
| **Total** | **8,811,796** | **65.4%** | **1,360,233** | **10.1%** | **3,308,246** | **24.5%** | **13,480,275** |

Note:
Data was reported on a rolling 180 day basis as of February 19, 2021, over the time period August 23, 2020 to February 19, 2021.

Source:
Davis-LabCorp00004753-t00004754.

509

# EXHIBIT 49

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>          Defendant. | Case No.: 2:20-cv-00893-FMO-KS |

**EXPERT REBUTTAL REPORT OF**
**BRUCE DEAL**

**April 21, 2021**

**CONFIDENTIAL**

JA1192

511

CONFIDENTIAL

## TABLE OF CONTENTS

I.   Background & Assignment ................................................................................. 1

II.  Summary of Opinions ..................................................................................... 1

III. Mr. Chasworth's Wide Range of Estimates of the Size of the California Subclass Reveals the Unreliability of His Methodology .................................................. 2

IV.  Mr. Chasworth Assumes that All Legally Blind Individuals Were Harmed ................. 4

     A.   Half of Mr. Chasworth's Estimates Assume Every Legally Blind Individual in a Given Area Visited a Labcorp PSC Every Year ......................................... 5

     B.   Even for the Half of Mr. Chasworth's Estimates for which He Partially Accounts for How Many Individuals May Have Actually Visited a Labcorp PSC, He Applies a Faulty Market Share that Does Not Account for Labcorp's Business Model ............ 6

     C.   Mr. Chasworth Does Not Account for Variation in Kiosk Availability ..................... 7

     D.   Mr. Chasworth Does Not Account for Variation in Patients' Individualized Check-In Experiences ................................................................................ 9

V.   Conclusion .................................................................................................. 11

i

JA1193

512

CONFIDENTIAL

## I.     BACKGROUND & ASSIGNMENT

1.     My name is Bruce Deal. I previously submitted an expert report in this matter on March 8, 2021 ("Deal Report")[1] in this matter. My qualifications are outlined in the Deal Report.

2.     Following the submission of my report, Sean Chasworth submitted a report on March 23, 2021 on behalf of Plaintiffs ("Chasworth Report").[2] The Chasworth Report provides five estimates of the potential size of the nationwide class and eight estimates of the potential size of the California subclass. I describe Mr. Chasworth's methodology in detail in **Appendix A** and summarize all 13 of the estimates presented by Mr. Chasworth for the California subclass and nationwide class in **Exhibits 1** and **2**.

3.     After reviewing the Chasworth Report, my opinions as expressed in the Deal Report remain unchanged. I have been asked by counsel for Labcorp to respond to the Chasworth Report. **Appendix B** contains a comprehensive list of all documents and data that I considered for my assignment.

## II.    SUMMARY OF OPINIONS

4.     The Chasworth Report provides a wide range of estimates for the proposed nationwide class and California subclass, varying based on the data source, level of aggregation of the data, and whether they incorporate a market share adjustment. For the California subclass, Mr. Chasworth's smallest estimate is 1,575 individuals and his largest estimate is 112,140, more than *70 times* as high.[3] The sheer variability in these estimates demonstrates that Mr. Chasworth's approach does not produce a reliable estimate and underscores the fact that the estimates themselves reflect broad generalizations and flawed assumptions rather than a careful accounting of who the individual class members are.

---

[1]   Expert Report of Bruce Deal, *Luke Davis et al. v. Laboratory Corporation of America Holdings*, Case No. 2:20-cv-00893-FMO-KS, March 8, 2021 ("Deal Report").
[2]   Expert Report of Sean Chasworth, *Luke Davis et al. v. Laboratory Corporation of America Holdings*, March 23, 2021 ("Chasworth Report").
[3]   Chasworth Report, p. 6.

1

CONFIDENTIAL

5.   All of Mr. Chasworth's estimates are also flawed in that they rely on several flawed assumptions that are contradicted by the evidence, including evidence I discussed in the Deal Report:

- For half of his estimates, Mr. Chasworth assumes that *every single* blind person living in the same geographic area (zip code, city, or county) where at least one Labcorp PSC is located, visited a Labcorp PSC every year. Mr. Chasworth provides no basis for this assumption, which is flawed on its face, as Labcorp is far from the only option for diagnostic testing.

- For the other half of his estimates, Mr. Chasworth attempts to adjust for Labcorp's market share, but in so doing he assumes that all of Labcorp's revenue is derived from testing at PSCs. This assumption is contradicted by the evidence, including deposition testimony from Labcorp employees that PSCs account for only 20% of Labcorp revenue.

- All of Mr. Chasworth's estimates assume that all legally blind individuals visiting a Labcorp PSC would necessarily visit a PSC with a functioning kiosk. This assumption is again contradicted by the evidence, which shows that kiosks were rolled out at PSCs over time, that some PSCs in California do not have kiosks, and that there were periods of time where certain kiosks were not operational.

- All of Mr. Chasworth's estimates assume that all legally blind individuals visiting a Labcorp PSC necessarily would have attempted to use the check-in kiosk, been unable to do so, and been harmed as a result. Again, this assumption is contradicted by the evidence that individuals had different check-in experiences and some never even attempted to interact with the kiosk.

6.   The methodology outlined in the Chasworth Report is insufficient, inaccurate, and unreliable for the purposes of identifying the size of the nationwide class or the California subclass.

## III. MR. CHASWORTH'S WIDE RANGE OF ESTIMATES OF THE SIZE OF THE CALIFORNIA SUBCLASS REVEALS THE UNRELIABILITY OF HIS METHODOLOGY

7.   In his report, Mr. Chasworth provides 13 total estimates: five estimates for the nationwide class and another eight estimates for the California subclass. For purposes of this section of the report, I focus on Mr. Chasworth's estimates of the size of the California subclass. **Exhibit 1** summarizes these estimates and their corresponding methodologies. Mr. Chasworth's estimates vary based on three factors: (1) the data source; (2) the geographic

2

CONFIDENTIAL

level of aggregation of the data; and (3) whether he applies a market share estimate for Labcorp.

8.    For reasons he does not explain, Mr. Chasworth selects two of his eight estimates to present in his "Conclusions" section, as representing the range of estimates he concludes represent the "California sub-class of legally blind people who may be denied independent access to LabCorp facilities."[4]

9.    This purported range does not, in fact, include the highest and lowest estimates for the subclass that he includes in his report. The estimates for the subclass in Mr. Chasworth's report range from 1,575 people to 112,140 people,[5] yet he presents his conclusion as a range from 8,861 people to 112,140 people.[6] That is, the lower bound Mr. Chasworth presents as his conclusion includes more than five times as many people as the actual lowest estimate he reports.[7] Mr. Chasworth does not explain the reasoning behind this decision.

10.   The difference between the highest and lowest estimates of the eight estimates presented in the Chasworth Report is 110,565 people—nearly the entire size of his upper bound. Notably, of the eight California subclass estimates Mr. Chasworth presents in his report, two stand out as substantially higher than the other estimates. The mean of all eight of the subclass estimates in the Chasworth Report is 35,326, while the median is only 13,905. This difference is driven by two estimates of over 100,000, which stand out from the other estimates, all of which are below 30,000.

11.   In fact, Mr. Chasworth presents estimates that are contradictory: at one point in his report, he estimates that there are 101,273 legally blind people in California (whether harmed or not),[8] yet later estimates that there are more than that number of legally blind individuals in California who were harmed (112,140).[9] Mr. Chasworth provides no discussion or

---

[4]    Chasworth Report, p. 7.
[5]    Chasworth Report, pp. 5-6.
[6]    Chasworth Report, p. 7.
[7]    As discussed in **Appendix A**, there appears to have been a calculation error in Mr. Chasworth's estimate of 1,575. However, even correcting for that, his lower bound should be 2,490, and thus his purported lower bound of 8,861 includes 3.5 times as many people as his actual lower bound (as corrected).
[8]    Chasworth Report, p. 5.
[9]    Chasworth Report, p. 7.

3

515

CONFIDENTIAL

explanation for the wide range in his estimates, nor for which estimates he considers to be more or less accurate.[10]

12.      This broad range of estimates, with the two high estimates being substantially higher than the six other estimates, demonstrates the fundamental lack of reliability in Mr. Chasworth's methodology. It is well accepted among social scientists that if multiple data sources or approaches find similar results, the similarity (or "convergence") of those results provides stronger evidence of the accuracy of the estimate.[11] In the case of the Chasworth Report, however, the different methodologies and data sources provide wildly divergent estimates. These different estimates, by definition, cannot all be accurate. Yet Mr. Chasworth makes no attempt to reconcile the lack of convergent validity in his methodology or assist the finder of fact in identifying how many people fall within the proposed class definition.

13.      The estimates in the Chasworth Report are untethered to actual individual persons who may or may not have been harmed and instead reflect broad generalizations based on a single nationwide estimate from the National Institutes of Health of one million blind individuals, various geographic scalar factors, and a flawed estimate of Labcorp's market share. This contributes to a lack of validity in Mr. Chasworth's wide range of very specific class size estimates. Mr. Chasworth's methodology is not reliable for identifying the number of individuals in the California subclass, let alone identifying or contacting the actual people he claims were harmed by Labcorp's introduction of kiosks at some (but not all) PSCs.

### IV.      MR. CHASWORTH ASSUMES THAT ALL LEGALLY BLIND INDIVIDUALS WERE HARMED

14.      The Chasworth Report provides estimates of the proposed California subclass on a per-year basis.[12] Mr. Chasworth's estimates of the proposed subclass assume that all legally blind individuals in California who may have visited a Labcorp PSC were harmed, for

---

[10]   *See, e.g.*, Deposition of Sean Chasworth, April 16, 2021 ("Chasworth Deposition"), at 124:5-125:3 ("A. They are all accurate estimates based on the calculations that I performed… They are all estimates based on different methodologies and they are all accurate… Q. Do you have a preferred methodology for determining the number of blind people in the state of California? ... A. No, I don't. That's why I provided several.").

[11]   According to the Reference Manual on Scientific Evidence, "convergent results support the validity of generalizations." (David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence,* The National Academies Press, 2011, pp. 211-302, at p. 223.)

[12]   Chasworth Report, p. 7.

4

CONFIDENTIAL

every year in the proposed class period. In half of his estimates, as seen in **Exhibit 1**, he does not even attempt to account for whether or not a legally blind individual even visited a Labcorp PSC in a given year, he simply estimates the number of legally blind individuals in California and assumes—without evidence—that *all* of those individuals: (1) visited a Labcorp PSC; (2) chose a Labcorp PSC that happened to have a kiosk installed and functional; and (3) tried and failed to use the kiosk. In the other half of his estimates, he applies an overstated market share for Labcorp to attempt to scale the estimate of legally blind individuals to those who may have visited a Labcorp PSC, but still fails to contend with: (1) whether the legally blind individuals visited a Labcorp PSC that had a functioning kiosk; and (2) whether the legally blind individuals attempted to or wanted to attempt to use a kiosk and were unable to do so.

### A. Half of Mr. Chasworth's Estimates Assume Every Legally Blind Individual in a Given Area Visited a Labcorp PSC Every Year

15.    Four of Mr. Chasworth's eight California estimates (*Estimates 1, 3, 5,* and *7*, as described in **Appendix A** and listed on **Exhibit 1**) make no attempt whatsoever to estimate what fraction of the legally blind population actually visited a Labcorp PSC. This includes the estimate he includes as his upper bound in his conclusions (*Estimate 3*). That is, these estimates assume that *every single* legally blind individual who happens to live in the same zip code, city, county, or even state as at least one Labcorp PSC must have visited a Labcorp PSC every single year. Mr. Chasworth's upper bound assumes that every single legally blind individual in the 35 California counties that have Labcorp PSCs visited a PSC each year and was harmed.[13] This assumption is flawed on its face.

16.    As discussed in the Deal Report, Labcorp PSCs are far from the only places to receive diagnostic testing.[14] These four California subclass estimates attempt to account for the proximity of the Labcorp PSC (with varying precision) but do not take into account any of the other factors that may influence patient choice, including other testing options, convenience of that location, insurance coverage, and idiosyncratic individualized patient preferences. In fact, as Mr. Chasworth indicates in his report, "LabCorp receives

---

[13]    Chasworth Report, pp. 6, 7.
[14]    Deal Report, ¶ 20-23.

JA1198

517

CONFIDENTIAL

approximately $7 billion in annual revenue in an $80 billion industry,"[15] indicating that the vast majority of laboratory testing is *not* performed by Labcorp. Thus, to assume that *all* legally blind individuals received testing at a Labcorp PSC every single year, as Mr. Chasworth does for four of his estimates, including the upper bound to his range, one must assume that blind individuals visited Labcorp PSCs for diagnostic testing at a wildly disproportionate rate to sighted individuals (in fact, essentially assuming that such individuals sought out Labcorp and focused their testing at PSCs and nowhere else). Mr. Chasworth has provided no evidence of such extreme patient sorting.

**B.  Even for the Half of Mr. Chasworth's Estimates for which He Partially Accounts for How Many Individuals May Have Actually Visited a Labcorp PSC, He Applies a Faulty Market Share that Does Not Account for Labcorp's Business Model**

17.  The other four of Mr. Chasworth's eight California estimates (*Estimates 2, 4, 6,* and *8*, as described in **Appendix A** and listed on **Exhibit 1**) partially account for the existence of other options for diagnostic testing by including an estimate of Labcorp's market share. Mr. Chasworth's market share calculation, however, is still flawed. The 8.75% market share includes substantial revenue earned by Labcorp outside of the PSC setting, where the kiosk check-in option at the crux of this matter is inapplicable.

18.  Mr. Chasworth estimates Labcorp's market share based on a Labcorp presentation to investors from February 2018.[16] In this presentation, Labcorp reports that its diagnostics segment (Labcorp Diagnostics or "LCD") reported approximately $7 billion in revenue in 2017, part of an estimated total $80 billion U.S. clinical laboratory testing industry.[17] Thus, Mr. Chasworth calculates that Labcorp's market share is $7 billion/$80 billion, or 8.75%.[18]

19.  However, Mr. Chasworth fails to account for Labcorp's broad range of diagnostic services making up its $7 billion LCD revenue. As discussed in the Deal Report, sample collection can also be performed at hospitals, at many doctors' offices, and even at select

---

[15]  Chasworth Report, p. 3.
[16]  Chasworth Report, p. 3; Plaintiffs' Further Supplemental Disclosures Pursuant to Federal Rule of Civil Procedure 26(e); and Initial Expert Witness Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), March 25, 2021, Exhibit E ("Investor Presentation").
[17]  Investor Presentation, slide 29.
[18]  Chasworth Report, p. 3.

JA1199

CONFIDENTIAL

pharmacies.[19] The same investor presentation upon which Mr. Chasworth relies notes that Labcorp has more than 5,000 in-office phlebotomists, as compared to approximately 1,900 PSC locations.[20] In addition, Labcorp provides diagnostic testing even for samples that were not collected by Labcorp.[21] Mr. Chasworth's estimate of Labcorp's market share does not account for these other sources of revenue for Labcorp Diagnostics.

20.     In fact, as discussed in the Deal Report, Mr. Sinning testified that testing services performed at PSCs represent only about 20% of Labcorp's business.[22] That is, of Labcorp's $7 billion in diagnostic services revenue (the basis for Mr. Chasworth's 8.75% market share), only 20% comes from PSCs, and accordingly only 20% would be relevant to the kiosk check-in experience at the crux of this litigation. Thus, Mr. Chasworth has overstated Labcorp's market share by 80%. A more appropriate market share estimate would be 20% of 8.75%, or 1.75%.

21.     In addition, as with his estimates that do not include a market share adjustment, the market-share-adjusted estimates assume that *every single* blind individual receives some form of diagnostic testing each year (whether through Labcorp or not). Mr. Chasworth has not adjusted for the proportion of the blind population that might receive testing each year (whether at a Labcorp PSC or not).

### C. Mr. Chasworth Does Not Account for Variation in Kiosk Availability

22.     All of Mr. Chasworth's estimates stop at the point of estimating the number of legally blind people that he assumes may have visited a Labcorp PSC. He makes no further attempt to identify whether any individual visited a Labcorp PSC with a working kiosk. Mr. Chasworth's analysis simply *assumes* that all blind individuals who visited a Labcorp PSC were harmed.[23] In fact, as discussed in the Deal Report, not all Labcorp PSCs even have kiosks, nor did they all receive them at the same time. Labcorp began introducing check-

---

[19]   Deposition of Joseph Sinning, February 2, 2021 ("Sinning Deposition") at 36:20-37:9, 77:18-78:8. *See also* Deal Report, ¶ 21.

[20]   Investor Presentation, slide 7.

[21]   Sinning Deposition, at 37:4-9.

[22]   Sinning Deposition, at 37:10-19. *See also* Deal Report, ¶ 21. I note that Mr. Chasworth had access to Mr. Sinning's deposition and cited it for other aspects of his calculation.

[23]   *See, e.g.*, Chasworth Deposition, Rough Transcript at 201:14-18 ("Q. Do you know whether it is a true statement, sir, that all legally blind individuals in Lab Corp's market were denied independent access to Lab Corp's services as a result of Lab Corp's use of express kiosks? A. That's an assumption that I'm using.").

7

CONFIDENTIAL

in kiosks at its PSCs in October 2017.[24] However, kiosks were rolled out over the course of at least a year. As seen in **Exhibit 3**, PSC kiosks in California were first installed in November 2017 and installed through September 2018. Mr. Chasworth's estimates assume—without evidence—that the proposed California subclass would be the same size in all relevant years, yet **Exhibit 3** clearly demonstrates that kiosk availability in California—a key component in any class determination—varied over time.

23.   Moreover, as of August 2020, 48 Labcorp PSCs still did not have kiosks installed, 19 of which are in California.[25] Of the 19 PSCs without kiosks, 15 of them are included in Mr. Chasworth's analysis.[26] In addition, as discussed in the Deal Report,[27] even among facilities with installed kiosks, there were several instances of kiosk outages, which Mr. Chasworth does not consider in his analysis.[28]

24.   Mr. Chasworth does not propose excluding and does not explain how he plans to identify potential class members who visited a PSC at a time when a kiosk was not installed or not functioning. Despite his assignment being "to estimate the number of legally blind individuals who were denied independent access to LabCorp's services as a result of LabCorp's use of 'Express Kiosks,'"[29] Mr. Chasworth was unclear in his deposition about whether he needs to take account of whether the people in his estimates actually visited the working kiosks. For example, when asked whether it would be reasonable to assume that a percentage of the Labcorp market may never have interacted with a Labcorp check-in kiosk, he at first agreed, but then specified while it was possible it did not impact his estimates because he did not know if that was "a proper definition of a class member or not."[30]

25.   Furthermore, of the 15 California PSCs without kiosks that Mr. Chasworth includes in his analysis, seven are the only PSCs within their zip code,[31] five are the only PSCs within

---

[24]   Sinning Deposition, at 83:7-11. *See also* Deal Report, ¶ 25.
[25]   Davis-LabCorp00004354.
[26]   Davis-LabCorp00000515. The other four California PSCs without kiosks do not appear on the outdated list of PSCs upon which Mr. Chasworth relies.
[27]   Deal Report, ¶ 26.
[28]   Chasworth Deposition, Rough Transcript at 111:7-15.
[29]   Chasworth Report, p. 2.
[30]   Chasworth Deposition, Rough Transcript at 98:7-102:15.
[31]   The zip codes that should have been excluded are: 96073, 92126, 92223, 93240, 94132, 94574, and 95531.

JA1201

520

CONFIDENTIAL

their cities,[32] and one is the only PSC in Del Norte county. Per Mr. Chasworth's methodology, individuals within these zip codes, cities, and counties are only likely to go to Labcorp PSCs within their own geographic region. If they had done so (as Mr. Chasworth assumes), they would have visited a Labcorp PSC without a kiosk, and thus there is no potential for these legally blind individuals to have experienced harm as a result of an inaccessible kiosk.

### D. Mr. Chasworth Does Not Account for Variation in Patients' Individualized Check-In Experiences

26.   Mr. Chasworth's estimates assume that all legally blind individuals who visited a Labcorp PSC were necessarily harmed as a result of that visit. However, he provides the finder of fact with no basis upon which he makes that assumption, stating that whether someone is or is not a class member is a legal conclusion.[33] In other words, he opines on a maximum number of people who might be in the class (depending on his methodology), based on the number of people he believes are legally blind and in Labcorp's market and thus *might* have gone to a Labcorp PSC, but provides no opinion on the number of people who actually are class members because they were, in Mr. Chasworth's words, "denied independent access to Labcorp facilities."[34]

27.   In addition to failing to account for kiosk availability, Mr. Chasworth's estimates do not account for the variety of potential check-in experiences that these individuals may have faced, some of which may not have led to any harm. As discussed in the Deal Report, proposed class members likely had a variety of experiences that would require individualized inquiry to determine whether they were actually denied such access and consequently harmed during their Labcorp experience.[35] Visually impaired individuals may choose to use the front desk or mobile check-in option or receive assistance from front desk staff or their family members, even if the check-in kiosks are available. For example, Mr. Vargas, who visited a Labcorp PSC in California, testified that he was told he need not

---

[32]   The cities that should have been excluded are: Palo Cedro, Cherry Valley, Lake Isabella, Saint Helena, and Crescent City.
[33]   Chasworth Deposition, Rough Transcript at 99:17-20.
[34]   Chasworth Report, p. 7.
[35]   Deal Report, ¶¶ 31-37.

9

CONFIDENTIAL

use the kiosk and that someone would check him in.[36] Similarly, Mr. Harden testified that he was never directed to a kiosk to check in and always went directly to the desk.[37]

28. Different Labcorp locations have different methods of staffing, with dedicated check-in staff, full-time, and part-time staff available to assist with patient check-in, likely contributing to different patient check-in experiences. As discussed in the Deal Report,[38] certain locations, but not all, have a dedicated Patient Intake Representative ("PIR") who sits at the front desk to check in patients, while others have only phlebotomists available.[39] Among Labcorp PSCs with only phlebotomists, some have only a single phlebotomist while others have multiple working at the same time.[40] This variation in staffing may impact whether staff are available to immediately greet and assist patients with check-in. For example, where a PSC has two phlebotomists, but no PIR, one phlebotomist will often sit at the front desk full-time, while allowing the other to focus on collecting samples for testing. Depending on the circumstance, however, in locations with multiple phlebotomists, each may handle both collections and check-ins.[41] Mr. Chasworth has made no adjustment to reflect that not all blind individuals that visited a Labcorp location with a working kiosk may have attempted to use that kiosk and that, instead, some may simply have visited the check-in desk and bypassed the kiosk entirely.[42]

29. Finally, Mr. Chasworth does not account for the fact that not all legally blind individuals are unable to use kiosks. As Mr. Chasworth notes, the U.S. National Institutes of Health statistic he repeatedly relies upon defines legally blind individuals as those with vision of 20/200 or worse.[43] However, as mentioned in the Deal Report, research shows that "people with acuities as low as 20/2000 (acuity letters 100 times larger than 20/20 letters) can read… provided that adequate magnification is available."[44] That is, at least some people with vision 10 times worse than 20/200 may be able to read, with appropriate

36  Deposition of Julian Vargas, February 10, 2021, at 22:9-19, 23:2-4, 56:16-20.
37  Deposition of John Harden, February 17, 2021 at 25:19-26:19.
38  Deal Report, ¶ 35.
39  Sinning Deposition, at 47:22-48:4.
40  Sinning Deposition, at 79:12-21.
41  Interview with Joseph Sinning, March 8, 2021.
42  Chasworth Deposition, Rough Transcript, at 130:4-25.
43  Chasworth Report, p. 3.
44  Legge, Gordon E., "Reading Digital with Low Vision," *Visible Language*, vol. 50, 2 (2016), pp. 102-125. *See also* Deal Report, ¶ 39.

JA1203

CONFIDENTIAL

magnification, and thus use the kiosks. In fact, statistics show that 51% of visually impaired people with smartphones use their phone camera and screen as a magnifier.[45]

## V.  CONCLUSION

30.  Mr. Chasworth's analyses are not sufficient to establish that he has a reliable opinion on the proposed class size or an accurate method to identify these potential class members. The Chasworth Report provides a wide range of estimates that are untethered to actual individual class members, and Mr. Chasworth has provided no opinion on the correct number of individuals in the nationwide class or the California subclass.

31.  Mr. Chasworth's analyses include numerous unreasonable assumptions, including:

- That *all* legally blind individuals in California visit a Labcorp PSC every year, despite evidence that Labcorp does not provide 100% of diagnostic testing;

- That *all* of Labcorp's revenue (and thus market share) is attributable to testing at PSCs, despite evidence that Labcorp PSCs account for only 20% of Labcorp diagnostic revenue;

- That *all* individuals visiting a Labcorp PSC would have visited a PSC with a functioning kiosk, despite evidence that some PSC locations had or have no kiosks and that kiosks are not always operational;

- That *all* legally blind individuals visiting a Labcorp PSC would have attempted to check in at the kiosk and been harmed as a result, despite evidence that individuals had different check-in experiences.

32.  Mr. Chasworth's wide range of estimates that all rely on unreasonable assumptions do not provide a reliable basis for identifying the size of the nationwide class or the California subclass.

Bruce Deal

April 21, 2021

---

[45]  Michael Crossland, Rui Silva and Antonio Macedo, "Smartphone, Tablet Computer and E-reader Use by People with Vision Impairment," July 28, 2014, available at https://pubmed.ncbi.nlm.nih.gov/25070703/. *See also* Deal Report, ¶ 39.

JA1204

CONFIDENTIAL

## Appendix A
## Summary of Chasworth Report

1.    Mr. Chasworth presents five different estimates for the size of the proposed nationwide class and eight estimates for the size of the proposed California subclass. He calculates his different estimates by using various combinations of: (1) data source for visual impairment statistics (3 alternative sources); (2) level of aggregation of the data (nation, state, county, city, or zip code); and (3) Labcorp's national market share (applying or not applying his 8.75% estimate for Labcorp market share). Mr. Chasworth's combined 13 estimates are summarized in **Exhibits 1** and **2** of this report.

2.    Focusing on his California subclass, Mr. Chasworth calculates eight estimates. Each estimate relies on a 2016 press release from the U.S. National Institutes of Health ("NIH") indicating that there are approximately 1 million legally blind individuals nationwide.[1] Mr. Chasworth then uses various methods to attempt to identify the number of those approximately 1 million legally blind individuals who: (1) are residing in California; and (2) have potentially visited a Labcorp PSC. I discuss each estimate below.

   i.    ***Estimate 1 (CA)***: *U.S. Census American Community Survey ("ACS") data, for the entire state, without adjusting for Labcorp market share.*

      o    The ACS provides data on the number of individuals with vision difficulty by state. Mr. Chasworth first estimates the percentage of people with vision difficulty that are legally blind by dividing the 1 million legally blind nationwide statistic from the NIH by the estimated 6,919,957 people 18 and over with vision difficulty nationwide from the ACS. This calculation results in a ratio of 14.5% – that is, he estimates that 14.5% of people with vision difficulty (as defined in the ACS) are legally blind.[2] I refer to this as the Vision Difficulty Ratio.

      o    Mr. Chasworth then applies the 14.5% nationwide Vision Difficulty Ratio to the 698,434 people 18 and over with vision difficulty in California

---

[1]    Chasworth Report, p. 3.
[2]    Chasworth Report, p. 3.

A-1

JA1205

524

CONFIDENTIAL

according to the ACS to estimate the portion who are legally blind.[3] This gives him an estimate of 101,273 legally blind Californians 18 and over.[4]

- o   For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

ii.   **Estimate 2 (CA)**: *ACS data, for the entire state, adjusting for Labcorp market share.*

- o   Mr. Chasworth estimates Labcorp's national market share to be 8.75%.[5] For this estimate, he applies that market share estimate to the *Estimate 1* estimate of 101,273 legally blind Californians 18 and over to arrive at 8,861 legally blind people who he estimates may have visited a Labcorp PSC in California.[6]

- o   Mr. Chasworth presents this 8,861 statistic in his conclusion as his lower bound estimate for the California subclass.[7]

iii.   **Estimate 3 (CA)**: *Easy Analytics Software, Inc. ("EASI") data, for counties in California with at least one Labcorp PSC, without adjusting for Labcorp market share.*

- o   EASI provides data on the number of individuals with "vision trouble" by county, city, and zip code. Mr. Chasworth first estimates the percentage of people with vision trouble that are legally blind by dividing the 1 million legally blind nationwide estimate from NIH by the estimated 27,543,751 people with vision trouble nationwide from EASI. This calculation results in a ratio of 3.6% – that is, he estimates that 3.6% of people with vision trouble (as defined by EASI) are legally blind.[8] I refer to this as the Vision Trouble Ratio.

---

[3]   ACS provides data by county and metropolitan statistical area as well, but Mr. Chasworth does not use it.
[4]   Chasworth Report, p. 5.
[5]   Chasworth Report, p. 3. *See also* Plaintiffs' Further Supplemental Disclosures Pursuant to Federal Rule of Civil Procedure 26(e); and Initial Expert Witness Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), March 25, 2021, Exhibit E.
[6]   Chasworth Report, p. 5.
[7]   Chasworth Report, p. 7.
[8]   Chasworth Report, p. 3.

A-2

CONFIDENTIAL

- o   Mr. Chasworth then identifies which counties in California have Labcorp PSCs (35 of 58 potential California counties).[9] To do this, he relies upon a list of Labcorp PSCs produced in this litigation.[10]

- o   Mr. Chasworth uses EASI to identify the number of people with "vision trouble" in the 35 counties with a Labcorp PSC (3,114,995). He then applies his nationwide Vision Trouble Ratio (3.6%) to estimate that there are 112,140 legally blind individuals in the 35 California counties with at least one Labcorp PSC.[11]

- o   For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

- o   Mr. Chasworth presents this statistic in his conclusion as his upper bound estimate for the California subclass.[12]

iv.   ***Estimate 4 (CA)***: *EASI data, for counties in California with at least one Labcorp PSC, adjusting for Labcorp market share.*

- o   As he performed with *Estimate 1* to determine *Estimate 2*, Mr. Chasworth applies an assumed 8.75% market share for Labcorp to *Estimate 3* to arrive at an estimated 9,812 individuals who are legally blind and may have visited a Labcorp PSC in California, limiting to counties with at least one Labcorp PSC.[13]

v.   ***Estimate 5 (CA)***: *EASI data, for cities in California with at least one Labcorp PSC, without adjusting for Labcorp market share.*

- o   Relying on the same data used in *Estimate 3*, Mr. Chasworth identifies the 181 cities in California that have at least one Labcorp PSC.[14]

---

[9]   Chasworth Report, p. 5.

[10]   Davis-LabCorp00000515. This is a different list of Labcorp PSCs than I relied upon in the Deal Report Davis-LabCorp00004354. I understand that Davis-LabCorp00004354 is the most updated list of PSCs.

[11]   Chasworth Report, pp. 5-6. Note that this estimate of 112,140 legally blind people in the 35 California counties with Labcorp PSCs is *higher* than Mr. Chasworth's *Estimate 1* of 101,273 people, which purports to be the number of legally blind people for the entire state of California (albeit only those 18 and over).

[12]   Chasworth Report, p. 7

[13]   Chasworth Report, p. 6.

[14]   Chasworth Report, p. 5.

A-3

CONFIDENTIAL

o    He then applies his nationwide Vision Trouble Ratio (3.6%) to the number of people with vision trouble in the California cities that he includes, which he reports as 499,927 individuals.[15] This gives him an estimate of 17,997 legally blind individuals in California cities with at least one Labcorp PSC.[16]

o    For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

vi.    *Estimate 6 (CA): EASI data, for cities in California with at least one Labcorp PSC, adjusting for Labcorp market share.*

o    As done to obtain *Estimate 2* and *Estimate 4*, Mr. Chasworth applies an assumed 8.75% market share for Labcorp to *Estimate 5* to arrive at an estimated 1,575 individuals who are legally blind and may have visited a Labcorp PSC in California, limiting to cities with at least one Labcorp PSC.[17]

vii.    *Estimate 7 (CA): EASI data, for zip codes in California with at least one Labcorp PSC, without adjusting for Labcorp market share.*

o    Relying on the same data used in *Estimate 3* and *Estimate 5*, Mr. Chasworth identifies the 238 zip codes in California that have at least one Labcorp PSC.[18]

o    He then applies his nationwide Vision Trouble Ratio (3.6%) to the number of people with vision trouble in zip codes that he includes (790,613 individuals).[19] This gives him an estimate of 28,462 legally blind individuals in California zip codes with at least one Labcorp PSC.[20]

---

[15] Chasworth Report, p. 5. Based on the data he provided, it appears that Mr. Chasworth incorrectly summed the number of individuals with vision trouble in cities in California with Labcorp locations. Mr. Chasworth reports this number as 499,927 but his data indicate 1,931,198.
[16] Chasworth Report, p. 6. Corrected for the error noted above, this estimate would be 69,523 rather than 17,997.
[17] Chasworth Report, p. 6. Corrected for the error noted above, this estimate would be 6,083 rather than 1,575.
[18] Chasworth Report, p. 5.
[19] Chasworth Report, p. 5.
[20] Chasworth Report, p. 5.

A-4

JA1208

CONFIDENTIAL

    o    For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

   viii.   *Estimate 8 (CA)*: *EASI data, for zip codes in California with at least one Labcorp PSC, adjusting for Labcorp market share.*

    o    As with *Estimates 2, 4*, and *6*, Mr. Chasworth applies an assumed 8.75% market share for Labcorp to *Estimate 7* to arrive at an estimated 2,490 individuals who are legally blind and may have visited a Labcorp PSC in California.[21]

3.    Turning to Mr. Chasworth's estimates for the national class, he provides five estimates. Again, each estimate is based on the NIH statistic for 1 million legally blind individuals nationwide.[22] Mr. Chasworth uses different data sources and methods to identify the legally blind people nationwide who could have potentially visited a Labcorp PSC.

   ix.   *Estimate 9 (Nationwide)*: *ACS data and Sinning Deposition, for the U.S., adjusting for Labcorp visits.*

    o    Using ACS data, Mr. Chasworth calculates the nationwide percentage of the total population 18 and over with vision difficulty (2.8%).[23]

    o    Mr. Chasworth then applies this 2.8% figure to Mr. Sinning's estimate of 125,000 patients who visit Labcorp on a daily basis, to estimate that 3,500 patients with vision difficulty visit Labcorp PSCs daily.[24]

    o    He then applies his nationwide Vision Difficulty Ratio (14.5%, as explained in *Estimate 1*), which is also based on the ACS, to his estimated 3,500 patients with vision difficulty, to estimate that 507.5 people who are legally blind visit Labcorp PSCs daily.[25]

    o    Assuming 260 weekdays per year, Mr. Chasworth estimates 131,950 legally blind individuals visit Labcorp PSCs on an annual basis.[26]

---

[21]  Chasworth Report, p. 6.
[22]  Chasworth Report, p. 3.
[23]  Chasworth Report, p. 2.
[24]  Chasworth Report, p. 3.
[25]  Chasworth Report, p. 3.
[26]  Chasworth Report, p. 3.

A-5

CONFIDENTIAL

x.   **Estimate 10 (Nationwide):** *NIH, for the U.S., adjusting for Labcorp market share.*

 o  Mr. Chasworth uses the same NIH statistic of 1 million legally blind individuals used in all of his other calculations and applies his Labcorp market share estimate of 8.75% (see *Estimate* 2) to conclude that 87,500 legally blind individuals may have visited a Labcorp PSC per year.[27]

 o  Mr. Chasworth presents this statistic as his lower bound estimate for the nationwide class of legally blind people who may be denied independent access to Labcorp facilities.[28]

xi.   **Estimate 11 (Nationwide):** *EASI data, for counties nationwide with at least one Labcorp PSC, without adjusting for Labcorp market share.*

 o  Similar to his *Estimate 3* for California counties with at least one Labcorp PSC, Mr. Chasworth identifies the 542 *counties* nationwide that have Labcorp PSCs.[29]

 o  Mr. Chasworth uses EASI data to identify the number of people with "vision trouble" in counties with a Labcorp PSC (18,793,502).[30] He then applies his nationwide Vision Trouble Ratio (3.6%) to estimate that there are 676,566 legally blind individuals in counties with at least one Labcorp PSC.[31]

 o  For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

 o  Mr. Chasworth presents this statistic as his upper bound estimate for the nationwide class of people who may be denied independent access to Labcorp facilities in a particular year.[32]

---

[27]   Chasworth Report, p. 3.
[28]   Chasworth Report, p. 7.
[29]   Chasworth Report, pp. 3-4. He again relies on Davis-LabCorp00000515 for his list of Labcorp PSCs.
[30]   Chasworth Report, p. 4.
[31]   Chasworth Report, p. 4.
[32]   Chasworth Report, p. 7.

A-6

CONFIDENTIAL

xii.   ***Estimate 12 (Nationwide):*** *EASI data, for cities nationwide with at least one Labcorp PSC, without adjusting for Labcorp market share.*

- o   Similar to *Estimate 11* for counties, Mr. Chasworth identifies individuals with vision trouble in 1,187 *cities* nationwide that have at least one Labcorp PSC (9,703,681 individuals) and he applies his nationwide Vision Trouble Ratio (3.6%) to estimate 349,333 legally blind individuals live in cities with at least one Labcorp PSC.[33]

- o   For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

xiii.   ***Estimate 13 (Nationwide):*** *EASI data, for zip codes nationwide with at least one Labcorp PSC, without adjusting for Labcorp market share.*

- o   Similar to *Estimates 11 and 12* for counties and cities, Mr. Chasworth identifies individuals with vision trouble in all *zip codes* nationwide that have at least one Labcorp PSC (4,450,986 individuals), and he applies his nationwide Vision Trouble Ratio (3.6%) to estimate 160,235 legally blind people live in zip codes with at least one Labcorp PSC.[34]

- o   For this estimate, Mr. Chasworth does not attempt to identify or estimate whether those blind individuals visited a Labcorp PSC.

---

[33]   Chasworth Report, pp. 3-4.
[34]   Chasworth Report, pp. 3-4.

A-7

530

CONFIDENTIAL

**Appendix B**
**Documents Considered**

**Legal Documents:**
First Amended Class Action Complaint, *Luke Davis, et al. v. Laboratory Corporation of America Holdings,* Case No. 2:20-cv-00893-FMO-KS, United States District Court, Central District of California, September 3, 2020
Plaintiffs' Further Supplemental Disclosures Pursuant to Federal Rule of Civil Procedure 26(e); and Initial Expert Witness Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2), March 25, 2021

**Expert Reports:**
Expert Report of Bruce Deal, *Luke Davis et al v. Laboratory Corporation of America Holdings,* Case No. 2-20-cv-00893-FMO-KS, March 8, 2021
Expert Report of Sean Chasworth, *Luke Davis et al v. Laboratory Corporation of America Holdings,* March 23, 2021 (Exhibit B to plaintiffs' disclosures)

**Labcorp Data and Information:**
Davis-LabCorp00000515
Davis-LabCorp00000650
Davis-LabCorp00004298-00004302
Davis-LabCorp00004354
Davis-LabCorp00004748
Davis-LabCorp00004749
Davis-LabCorp00004750
Davis-LabCorp00004751
Davis-LabCorp00004752
Davis-LabCorp00004753-00004754
Davis-LabCorp00004755
Interview with Joseph Sinning, March 8, 2021

**Depositions:**
Deposition of Claire Stanley, December 7, 2020
Deposition of Joe Sinning, February 2, 2021
Deposition of John Harden, February 17, 2021
Deposition of Julian Vargas, February 10, 2021
Deposition of Kevin DeAngelo, March 3, 2021 (Rough Transcript)
Deposition of Luke Davis, February 16, 2021
Deposition of Robin VanLant, February 17, 2021
Deposition of Sean Chasworth, April 16, 2021 (Rough Transcript)

**SEC Filings:**
Laboratory Corp of America Holdings, Form 10-K for the fiscal year ended December 31, 2019

**Publicly Available Documents:**
American Health Insurance Plans Center for Policy and Research, "Charges Billed by Out-of-Network Providers: Implications for Affordability," September 2015, available at https://www.ahip.org/wp-content/uploads/2015/09/OON_Report_11.3.16.pdf
David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, The National Academies Press, 2011, pp. 211-302
Legge, Gordon E., "Reading Digital with Low Vision," *Visible Language,* vol. 50, 2 (2016), pp. 102-125
Michael Crossland, Rui Silva and Antonio Macedo, "Smartphone, Tablet Computer and E-reader Use by People with Vision Impairment," July 28, 2014, available at https://pubmed.ncbi.nlm.nih.gov/25070703/

JA1212

CONFIDENTIAL

Quest Diagnostics, "Laboratory and Office Locations Around the World," available at
https://www.questdiagnostics.com/home/about/locations/

U.S. Census Bureau, "American Community Survey and Puerto Rico Community Survey 2019 Subject Definitions," 2019, available at
https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2019_ACSSubjectDefinitions.pdf

U.S. Census Bureau, "American Community Survey Dataset ACSDT1Y2019," 2019, available at
https://data.census.gov/cedsci/table?q=vision&g=0100000US.04000.001&tid=ACSDT1Y2019.B18103&tp=true&hidePreview=true

U.S. Census Bureau, "Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports," July 25, 2012, available at
https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html

WebAIM, "Survey of Users with Low Vision #2 Results," October 31, 2018, available at https://webaim.org/projects/lowvisionsurvey2/

JA1213

532

CONFIDENTIAL

JA1214

**Exhibit 1**
**Chasworth Estimates of California Subclass Size**

| Scenario Number | Chasworth Primary Data Source[1] | Geographic Level | 8.75% Market Share Applied? | Upper & Lower Bounds from Chasworth Conclusions | Estimate |
|---|---|---|---|---|---|
| Estimate 1 (CA) | NIH, Census ACS[2] | State | | | 101,273 |
| Estimate 2 (CA) | NIH, Census ACS | State | [X] | Lower Bound | 8,861 |
| Estimate 3 (CA) | NIH, EASI | County | | Upper Bound | 112,140 |
| Estimate 4 (CA) | NIH, EASI | County | [X] | | 9,812 |
| Estimate 5 (CA) | NIH, EASI[3] | City | | | 17,997 |
| Estimate 6 (CA) | NIH, EASI[3] | City | [X] | | 1,575 |
| Estimate 7 (CA) | NIH, EASI | Zip Code | | | 28,462 |
| Estimate 8 (CA) | NIH, EASI | Zip Code | [X] | | 2,490 |

**Notes:**
[1] The Census ACS estimates represent populations aged 18 and older. The EASI dataset estimates are for all ages.
[2] The Census ACS also provides information that would allow analyses at a more granular level than the entire state, such as county or metropolitan statistical area.
However, the Chasworth Report does not rely on those data.
[3] The totals reported in the Chasworth Report for these two estimates mistakenly exclude 114 of the 181 cities with Labcorp locations. The corrected estimates are 69,523
without adjusting for market share and 6,083 with the market share adjustment.

**Source:**
[A] Expert Report of Sean Chasworth, *Luke Davis et al v. Laboratory Corporation of America Holdings*, March 23, 2021.

533

CONFIDENTIAL

JA1215

**Exhibit 2**
**Chasworth Estimates of Nationwide Class Size**

| Scenario Number | Chasworth Primary Data Source[1] | Geographic Level | 8.75% Market Share Applied?[5] | Upper & Lower Bounds from Chasworth Conclusions | Estimate |
|---|---|---|---|---|---|
| Estimate 9 (Nationwide) | NIH, Sinning Deposition,[2][3] Census ACS[4] | Nationwide | N/A[5] | | 131,950 |
| Estimate 10 (Nationwide) | NIH | Nationwide | [X] | | 87,500 |
| Estimate 11 (Nationwide) | NIH, EASI | County | | Lower Bound | 676,566 |
| Estimate 12 (Nationwide) | NIH, EASI | City | | Upper Bound | 349,333 |
| Estimate 13 (Nationwide) | NIH, EASI | Zip Code | | | 160,235 |

**Notes:**
[1] The Census ACS and Sinning Deposition estimates represent populations aged 18 and older. The EASI and NIH data estimates are for all ages.
[2] In his deposition, Mr. Sinning testified that about 125,000 patients visit Labcorp PSCs each day. Mr. Chasworth then applies the nationwide percentage of the total population that is blind from the Census ACS to arrive at an estimate of blind patients that visit Labcorp PSCs each day.
[3] Because the 125,000 figure that Mr. Chasworth draws from the Sinning Deposition is an estimate of the number of patients that visit Labcorp facilities in an average day, his estimate of 131,950 represents the number of visits that blind Americans made to Labcorp locations rather than the number of blind individuals who visited Labcorp locations. To compare it with his other estimates, one must assume that the blind individuals in those classes visited a Labcorp facility once per year on average.
[4] The Census ACS also provides information that would allow analyses at a more granular level than the entire country, such as county or metropolitan statistical area. However, the Chasworth Report does not rely on those data.
[5] Given that the 125,000 patients per day estimate included in the Sinning Deposition is for Labcorp PSC visitors, it would not be appropriate to further adjust for market share.

**Sources:**
[A] Expert Report of Sean Chasworth, *Luke Davis et al v. Laboratory Corporation of America Holdings*, March 23, 2021.
[B] Deposition of Joseph Sinning, February 2, 2021 at 35:2-6.

534

CONFIDENTIAL

JA1216



**Exhibit 3**

**Cumulative Number of California Labcorp PSCs with Kiosk Tablets Installed as of September 2018**

**Notes:**
[1] The date a tablet was installed at a PSC is taken as the "Horizon Prod Date" from the source below and aggregated on a monthly basis.
[2] The dataset lists installation dates for 287 of 291 Labcorp PSCs in California. There are 4 PSCs where the date is marked TBD.

**Source:**
Davis-LabCorp00000650 at "Hz Rollout" tab.

535

# EXHIBIT 50

Becca Wahlquist (State Bar No. 215948)
bwahlquist@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone:   (310) 712-6100
Facsimile:   (310) 712-6199

*Attorneys for Defendant*
*Laboratory Corporation of America Holdings*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE DAVIS and JULIAN VARGAS, individually and on behalf of all others similarly situated, and AMERICAN COUNCIL OF THE BLIND,<br><br>        Plaintiff,<br><br>    v.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS; and DOES 1 through 10,<br><br>        Defendants. | CASE NO. 2:20-CV-00893-FMO-KS<br><br>**DECLARATION OF BECCA WAHLQUIST IN SUPPORT OF LABORATORY CORPORATION OF AMERICA HOLDINGS'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>HR'G DATE:   MAY 27, 2021<br>TIME:   10:00 AM<br>LOCATION:   COURTROOM 6D<br>FAC FILED:   SEPTEMBER 3, 2020<br>TRIAL DATE: NOT YET SET |

CASE NO. 2:20-CV-00893-FMO-KS
DECLARATION
IN SUPPORT OF OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

JA1217

537

I, Becca Wahlquist, hereby declare and state, as follows:

1.      I am an attorney who has been duly admitted to practice before this Court and am a Partner of Kelley Drye & Warren LLP, attorneys of record for Defendant Laboratory Corporation of America Holdings ("Labcorp") in the above-captioned matter.  I submit this declaration in support of Labcorp's Opposition to Plaintiffs' motion for class certification.  I have personal knowledge of the facts set forth herein, and could and would testify competently thereto if called as a witness.

2.      Labcorp's opposition to Plaintiffs' motion for class certification relies on various deposition transcripts and various materials produced during expert and fact discovery.  I have detailed below the various materials that Labcorp will be relying upon with a reference to the item's exhibit number in the Joint Evidentiary Appendix.

3.      I have attached to the Joint Evidentiary Appendix as Exhibit 32 a true and correct copy of excerpts of the deposition transcript of Labcorp's 30 (b) (6) witness Joseph Sinning.  Mr. Sinning was deposed on February 2, 2021 by Jonathan Miller, counsel for the Plaintiffs.

4.      I have attached to the Joint Evidentiary Appendix as Exhibit 33 a true and correct copy of excerpts of the deposition transcript of Mark Wright.  Mr. Wright was deposed on March 4, 2021 by Benjamin Sweet, counsel for the Plaintiffs.

5.      I have attached to the Joint Evidentiary Appendix as Exhibit 34 a true and correct copy of excerpts of the deposition transcript of Kevin DeAngelo.  Mr. DeAngelo was deposed on March 3, 2021 by Jonathan Miller, counsel for the Plaintiffs.

6.      I have attached to the Joint Evidentiary Appendix as Exhibit 35 a true and correct copy of excerpts of the deposition transcript of plaintiff American Council of the Blind's 30 (b) (6) witness Claire Stanley.  Ms. Stanley was deposed

1                    CASE NO. 2:20-CV-00893-FMO-KS
DECLARATION
IN SUPPORT OF OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

JA1218

538

1   on December 7, 2020 by my partner Robert Steiner.

2       7.      I have attached to the Joint Evidentiary Appendix as Exhibit 36 a true

3   and correct copy of excerpts of the deposition transcript of John Harden.   Mr.

4   Harden was deposed on February 17, 2021 by my partner Robert Steiner.

5       8.      I have attached to the Joint Appendix as Exhibit 37 a true and correct

6   copy of excerpts of the deposition transcript of Robin Van Lant.  Ms. Van Lant was

7   deposed on February 17, 2021 by my partner Robert Steiner.

8       9.      I have attached to the Joint Evidentiary Appendix as Exhibit 38 a true

9   and correct copy of excerpts of the deposition transcript of Rachel Bradley

10  Montgomery.  Dr. Bradley Montgomery was deposed on April 15, 2021 by my

11  partner Robert Steiner.

12      10.     I have attached to the Joint Evidentiary Appendix as Exhibit 39 a true

13  and correct copy of excerpts of the deposition transcript of Sean Chasworth.  Mr.

14  Chasworth was deposed on April 16, 2021 by my partner Robert Steiner.

15      11.     I have attached to the Joint Evidentiary Appendix as Exhibit 40 a true

16  and correct copy of a document produced by Labcorp bates stamped Davis-

17  LabCorp00004748.

18      12.     I have attached to the Joint Evidentiary Appendix as Exhibit 41 a true

19  and correct copy of a document produced by Labcorp bates stamped Davis-

20  LabCorp00004749.

21      13.     I have attached to the Joint Evidentiary Appendix as Exhibit 42 a true

22  and correct copy of a document produced by Labcorp bates stamped Davis-

23  LabCorp00004750.

24      14.     I have attached to the Joint Evidentiary Appendix as Exhibit 43 a true

25  and correct copy of a document produced by Labcorp bates stamped Davis-

26  LabCorp00004751.

27      15.     I have attached to the Joint Evidentiary Appendix as Exhibit 44 a true

28

                        2              CASE NO. 2:20-CV-00893-FMO-KS
                                       DECLARATION
                                       IN SUPPORT OF OPPOSITION TO
                                       MOTION FOR CLASS CERTIFICATION

and correct copy of a document produced by Labcorp bates stamped Davis-LabCorp00004752.

16.   I have attached to the Joint Evidentiary Appendix as Exhibit 45 a true and correct copy of a document produced by Labcorp bates stamped Davis-LabCorp00004755.

17.   I have attached to the Joint Evidentiary Appendix as Exhibit 46 a true and correct copy of a document produced by Plaintiffs bates stamped PL206.

18.   I have attached to the Joint Evidentiary Appendix as Exhibit 47 a true and correct copy of American Council of the Blind's Supplemental Response to Labcorp's Request for Production of Documents No. 17.

19.   I have attached to the Joint Evidentiary Appendix as Exhibit 48 a true and correct copy of the Expert Report of Bruce Deal with Exhibits, dated March 8, 2021.

20.   I have attached to the Joint Evidentiary Appendix as Exhibit 49 a true and correct copy of the Rebuttal Expert Report of Bruce Deal with Exhibits, dated April 21, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this 21st day of April 2021, in Los Angeles, California.

Dated: April 21, 2021                KELLEY DRYE & WARREN LLP

By: /s/Becca Wahlquist
Becca Wahlquist (SBN 215948)
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Telephone:  (310) 712-6100
Facsimile:   (310) 712-6199

3                     CASE NO. 2:20-CV-00893-FMO-KS
                      DECLARATION
                      IN SUPPORT OF OPPOSITION TO
                      MOTION FOR CLASS CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Defendant*
*Laboratory Corporation of America*
*Holdings*

4

CASE NO. 2:20-CV-00893-FMO-KS
DECLARATION
IN SUPPORT OF OPPOSITION TO
MOTION FOR CLASS CERTIFICATION

JA1221

# EXHIBIT 51

1  Robert I. Steiner (admitted *pro hac vice*)
   rsteiner@kelleydrye.com
2  **KELLEY DRYE & WARREN LLP**
3  3 World Trade Center
   175 Greenwich Street
4  New York, NY 10007
   Telephone:  (212) 808-7800
5  Facsimile:  (212) 808-7897

6
   *Attorneys for Defendant*
7  *Laboratory Corporation of America Holdings*

8              **UNITED STATES DISTRICT COURT**
9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10 | LUKE DAVIS and JULIAN VARGAS,        | CASE NO. 2:20-CV-00893-FMO-KS
   | individually and on behalf of all others |
11 | similarly situated, and AMERICAN     | **DECLARATION OF ROBERT I.**
   | COUNCIL OF THE BLIND,                | **STEINER REGARDING MEET**
12 |                                      | **AND CONFER REQUIREMENT**
   |              Plaintiff,              | **PURSUANT TO ORDERS RE:**
13 |                                      | **CLASS CERTIFICATION AND**
   |      v.                             | **SUMMARY JUDGMENT**
14 |                                      | **MOTIONS**
15 | LABORATORY CORPORATION OF            |
   | AMERICA HOLDINGS; and DOES 1        | HR'G DATE:  MAY 27, 2021
16 | through 10,                         | TIME:         10:00 AM
   |                                      | LOCATION:   COURTROOM 6D
17 |              Defendants.             | FAC FILED:   SEPTEMBER 3, 2020
   |                                      | TRIAL DATE: NOT YET SET
18
19
20
21
22
23
24                                  CASE NO. 2:20-CV-00893-FMO-KS
                                    DECLARATION REGARDING MEET
25                                  AND CONFER REQUIREMENTS

I, Robert I. Steiner, hereby declare and state, as follows:

1.     I am an attorney who has been admitted to this Court *pro hac vice* and a partner at Kelley Drye & Warren LLP, attorneys of record for Defendant Laboratory Corporation of America Holdings ("Labcorp") in the above-captioned matter. I submit this declaration concerning the meet-and-confer requirements contained in this Court's Orders Regarding Motions for Class Certification ("Class Certification Order") and Summary Judgment Motions ("Summary Judgment Order") (Dkt. Nos. 30 and 31). I have personal knowledge of the facts set forth herein, and could and would testify competently thereto if called as a witness.

2.     On March 10, 2021, per the Class Certification and Summary Judgment Orders, the parties conducted their first meet-and-confer. That meet-and-confer lasted approximately twenty minutes.

3.     After that meet and confer, I emailed Plaintiffs' counsel Alison Bernal to inform her, among other things, that we would need to conduct a further review of the Summary Judgment Order to determine the appropriate procedures for the submission of cross-motions for summary judgment. I have attached to the Joint Appendix of Exhibits in Support of the Parties' Motion for Summary Judgment as Exhibit 52, the email thread between Alison Bernal and I concerning the March 10, 2021 meet-and-confer.

4.     On March 15, 2021, after conducting a further review of the Class Certification Order, Summary Judgment Order, and other prior decisions from Judge Olguin that related to class certification and summary judgment, including cross motions, I determined that the March 10, 2021 meet-and-confer was very likely not sufficient to fulfill the Court's meet-and-confer requirement. I concluded that additional meet-and-confers were necessary to properly address all of the issues that would be raised by the motions. In fact, some of the issues that were discussed during the March 10, 2021 meet-and-confer were raised for the first time and I was not in a position to properly respond to these newly raised issues.

1

CASE NO. 2:20-CV-00893-FMO-KS
DECLARATION REGARDING MEET
AND CONFER REQUIREMENTS

JA1223

544

5.      After making this determination, I reached out to Ms. Bernal and informed her of my view that additional meet-and-confers would be necessary.  I informed Ms. Bernal, based on my review of prior filings and orders of this Court, that the parties were required to create a single fully integrated joint brief for both class certification and both party's summary judgment motions.  I also informed Ms. Bernal that we had only begun to put together the factual support necessary for Labcorp's summary judgment motion, in as much as under the Court's Scheduling and Case Management Order Re: Class Actions & Representative Actions, such motions were not due for some months and that we intended to further develop our arguments and case law required for that motion consistent with the Scheduling Order.  In addition, the parties did not discuss during the March 10, 2021 meet-and-confer the testimony of the Labcorp witnesses who were deposed the week of March 1, 2021 as transcripts were not available prior to the March 10, 2021 meet-and-confer, and certainly did not discuss any experts Plaintiffs might rely upon if the Court granted their *ex parte* application to extend expert discovery.  Further, Plaintiffs raised an argument regarding Labcorp's filings with the Patent and Trademark Office during our March 10, 2021 meet-and-confer which was novel and we had not yet investigated its merit.

6.      Ms. Bernal, in response, disagreed with my position but agreed to an additional meet-and-confer on March 26, 2021 with a court reporter present to transcribe the meeting.  I have attached to the Joint Appendix of Exhibits in Support of the Parties' Motion for Summary Judgment as Exhibit 53, an email thread dated March 15, 2021 and March 16, 2021, that contains my correspondence with Ms. Bernal regarding the need for additional meet-and- confers.

7.      On March 25, 2021 at 6:00 PM PST, less than one day prior to our scheduled March 26 meet and confer, Plaintiffs served the expert reports of Sean Chasworth and Rachel Bradley Montgomery in a 191 page document.

2                         CASE NO. 2:20-CV-00893-FMO-KS
                          DECLARATION REGARDING MEET
                          AND CONFER REQUIREMENTS

8.      During the March 26, 2021 meet-and-confer, which began at 9:34 AM PST, my partner Becca Wahlquist and I informed Plaintiffs' counsel again that Judge Olguin has rigorous meet-and-confer requirements which were necessary to satisfy in part the joint evidentiary appendix obligation contained in the Class Certification and Summary Judgment Orders.   (Ex. 29, at JA0896:6-0898:5 [Transcript of 3.26.21 Meet and Confer].)   The parties had not developed the necessary factual record for their respective motions for summary judgment and class certification. For example: we did not have an opportunity to review Plaintiffs' expert reports; we still needed to discuss Plaintiffs' expert reports with our client; we still needed to depose Plaintiffs' experts; and we still needed to determine whether we would submit a rebuttal report, which was not due until April 29, 2021.   (Ex. 29, at JA0891:21-24, JA0904:2-0905:11 [Transcript of 3.26.21 Meet and Confer].)

9.      Despite these outstanding issues, Plaintiffs' counsel informed us that they were going to use Rachel Bradley's Montgomery's expert report in their motion for summary judgment.   (Ex. 29, at JA0901:17-19 [Transcript of 3.26.21 Meet and Confer].)   Additionally, Plaintiffs' counsel informed us that they were going to use Rachel Bradley Montgomery's and Sean Chasworth's expert reports in their motion for class certification. (Ex. 29, at JA0901:6-16, JA0908:19-JA0909:25 [Transcript of 3.26.21 Meet and Confer].) Plaintiffs' counsel proposed that we conduct an additional meet-and-confer the following week regarding their expert reports, after we had an opportunity to review and analyze them.   (Ex. 29, at JA0983:8-24 [Transcript of 3.26.21 Meet and Confer].)

10.      On March 31, 2021, the parties had an additional meet-and-confer. During that meet-and-confer, my partner Becca Wahlquist and I were informed by Plaintiffs that they intended to send us papers regarding class certification and summary judgment on April 7, 2021.   (Ex. 30, at JA1043:21-1044:2 [Transcript of 3.31.21 Meet and Confer].)   This created two issues.  First, there was a logistical

CASE NO. 2:20-CV-00893-FMO-KS
DECLARATION REGARDING MEET
AND CONFER REQUIREMENTS

issue regarding the receipt of the transcripts of the depositions of Plaintiffs' experts which were noticed for April 15, 2021 and April 16, 2021. (Ex. 30, at JA1042:13-1043:4, JA1044:4-5 [Transcript of 3.31.21 Meet and Confer].)   We needed to review the transcripts and incorporate them into our class certification and summary judgment papers which were to be due April 21, 2021, according to Plaintiffs' class certification and summary judgment schedule.   (Ex. 30, at JA1042:13-1043:4 [Transcript of 3.31.21 Meet and Confer].)   Second, there also was the issue of the rebuttal expert reports which were not even due until April 29, 2021, based on the revised schedule set by the Court when it granted Plaintiffs' *ex parte* application governing expert reports.   (Ex. 30, at JA1043:5-11 [Transcript of 3.31.21 Meet and Confer].)   Thus, the record was incomplete since we had not completed expert discovery at the time of the March 31, 2021 meet-and-confer.

11.   My partner Becca Wahlquist and I informed Plaintiffs' counsel that it was inconsistent with the Class Certification and Summary Judgment Orders to move forward with motions regarding class certification and summary judgment under these circumstances – i.e. expert discovery was not done at the time of our meet and confer and Plaintiffs confirmed they would be relying on their expert reports to support their motions.   (Ex. 30, at JA1033:21-1034:7, JA1035:5-JA1036:9, JA1036:20-JA1037:15, JA1039:2-24 [Transcript of 3.31.21 Meet and Confer].)

12.   On April 7, 2021, Plaintiffs' counsel served their moving papers for class certification and summary judgment, which relied on their experts' reports.

13.   On April 17, 2021, Plaintiffs' counsel served a Deposition Notice and Request for Production of Documents for our expert Bruce Deal.

1    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct. Signed this 21st day of April 2021, in

3  New York, New York.

4

5  Dated: April 21, 2021                    KELLEY DRYE & WARREN LLP

6
                                            By:   /s/ Robert I. Steiner
7                                           Robert I. Steiner (admitted *Pro Hac Vice*)
                                            rsteiner@kelleydrye.com
8                                           KELLEY DRYE & WARREN LLP
9                                           3 World Trade Center
                                            175 Greenwich Street
10                                          New York, NY 10007
11                                          Telephone:   (212) 808-7800
                                            Facsimile:   (212) 808-7897
12

13                                          *Attorneys for Defendant*
14                                          *Laboratory Corporation of America Holdings*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                          5              CASE NO. 2:20-CV-00893-FMO-KS
                                         DECLARATION REGARDING MEET
                                         AND CONFER REQUIREMENTS

1   Jonathan D. Miller (Bar No. 220848)
    jonathan@nshmlaw.com
2   Alison M. Bernal (Bar No. 264629)
    alison@nshmlaw.com
3   NYE, STIRLING, HALE & MILLER, LLP
    33 West Mission Street, Suite 201
4   Santa Barbara, California 93101
    Telephone: (805) 963-2345
5   Facsimile: (805) 563-5385

6   *Attorneys for Plaintiffs, Luke Davis, Julian*
    *Vargas, American Council of the Blind,*
7   *and the Proposed Class*

8               **UNITED STATES DISTRICT COURT**

9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11  LUKE DAVIS, JULIAN VARGAS, and        CASE NO.: 2:20-cv-00893-FMO-KS
    AMERICAN COUNCIL OF THE
12  BLIND, individually and on behalf of all   **EXHIBITS 27-29 TO**
    others similarly situated,             **PLAINTIFFS' MOTION FOR**
13                                         **CLASS CERTIFICATION**
                  Plaintiffs,
14                                         Hon.  Fernando Olguin
           v.                              Date:  May 27, 2021
15                                         Ctrm:  6D
    LABORATORY CORPORATION OF              Time:  10:00 a.m.
16  AMERICA HOLDINGS,
                                           FAC Filed: September 3, 2020
17               Defendant.                Trial Date: Not yet set

18

19

20

21

22

23

24

25

26

27

28

*[left margin vertical text:]* NYE, STIRLING, HALE & MILLER   33 WEST MISSION STREET, SUITE 201   SANTA BARBARA, CALIFORNIA 93101

# EXHIBIT 27



## PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

EXHIBIT A – Report of Sean Chasworth

This is a report pursuant to FRCP 26 regarding my analysis in the matter of Davis, et al, v. Laboratory Corporation of America.  If called as a witness, I would competently testify thereto. I make this declaration in support of Plaintiff's Motion for Class Certification.  If called as a witness could and would testify truthfully and competently to those facts.

I am a data analyst with Phillips, Fractor & Company, LLC ("PFC"), which offers consulting services to law firms, government agencies, and other organizations as well as expert witness and consulting services in support of litigation, primarily in the areas of statistics, economics, finance, and questionnaire related research.  I have worked with PFC and predecessor firms for over fifteen years, during which time I have performed database management, statistical reporting, and analysis on over one hundred databases.

I have given deposition testimony, testified in Federal District court, various administrative courts and arbitrations, and submitted numerous declarations for state and federal court actions regarding my opinions or methodology.  I have a bachelor's degree in mathematics from the University of Redlands and have passed numerous professional examinations.  Prior to my tenure at PFC, I was a mathematics teacher in California public schools, a pension analyst (for which I passed numerous Actuarial Examinations), and financial analyst (for which I passed examinations toward the Chartered Financial Analyst credential from the CFA Institute).  My current CV, and a list of recent testimony is attached in Exhibit B.

PFC (and its predecessor firms) has provided consulting and expert services on numerous litigation matters, including California wage and hour class action matters and has been retained by both plaintiffs and defendants. In many of these cases, I have consulted on data collection and analysis issues, to assist with the quantitative assessment of liability and class-wide economic losses.

We have been engaged by Nye, Stirling, Hale & Miller, LLP in this matter.  PFC is not engaged on a contingency basis for this case.  An engagement letter has been attached as Exhibit C.  My hourly rate for this engagement is $300 per hour, for both analysis and testimony.  Neither my compensation nor my opinions are dependent on the outcome of this litigation.



## PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

### Assignment and Preliminary Results

I was asked by Nye, Stirling, Hale & Miller, LLP to estimate the number of legally blind individuals who were denied independent access to LabCorp's services as a result of LabCorp's use of "Express Kiosks".

Based upon my analysis below, to a reasonable degree of certainty:

1. There are at least 87,500 legally blind class members nationwide.
2. There are at least 8,861 legally blind members of the California Minimum Statutory Damages class.
3. The damages to legally blind class members are at least $8,861,000 per year, in accordance with California's Disabled Persons Act, which prescribes a statutory penalty of $1,000 per access violation.
4. The damages to legally blind class members are at least $35,444,000 per year, in accordance with the Unruh Civil Rights Act, which prescribes a statutory penalty of $4,000 per access violation.

In performing this analysis, I have relied upon certain sources of data typically used in both research and commercial applications, employing standard calculation techniques in reaching these results that are typically performed by experts in statistics, economics, and social sciences. A list of documents that I have relied upon is attached as Exhibit D.

### Nationwide Populations of the Legally Blind

According to the US. Bureau of the Census 2019 American Community Survey (ACS), approximately 1.9% (3,755,672 out of a total of 197,503,214) of the U.S. Population age 18 to 64 years old, and approximately 6.0% (3,164,285 out of a total of 52,782,417) of the U.S. Population age 65 years and over 'have a vision difficulty'. This represents a total of approximately 2.8% (6,919,957 out of a total population of 250,285,631) of the over-18 population who 'have a vision difficulty'.

The National Federation of the Blind's "Blindness Statistics" states that in the United States, 4,034,600 people of ages 16 – 64, and 3,171,100 people age 65 and older, reported having a visual disability in 2016. This is 2.0% of the population aged 16 – 64, and 6.6% of the population aged 65 and over.

JA0722



PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

In 2016, the U.S. National Institutes of Health (NIH) press release reported that approximately 1 million Americans were legally blind (defined as vision of 20/200 vision or worse), with 3.2 million Americans having visual impairment (defined as 20/40 or worse vision with best possible correction) as of 2015.

This indicates that approximately 14.5% (or 1 million divided by 6,919,957) of people who are visually impaired are also legally blind.  The above documents are provided in Exhibit E.

A database prepared by Easy Analytics Software, Incorporated ("EASI Data"), a company which provides proprietary demographic and consumer information for both research and business applications, reports (as of 2019) an estimated 27,543,751 with 'Vision Trouble' in the United States, from a population of 328,144,740, or approximately 8.4% of the US population.

This indicates that, of those with approximately 3.6% (or 1 million divided by 27,543,751) who are reported as having 'Vision Trouble' in the EASI data are also legally blind.  This information is provided in Exhibit F.

According to Page 35 of the deposition of Joseph Sinning, Patient Services Director of LabCorp, the company services "...about 125,000 people a day across the country."  If the number of visually impaired people is similar to that reported in the US adult population, that would mean approximately 125,000 x 2.8% = 3,500 people with 'visual difficulties', and approximately 3,500 x 14.5% = 507.5 people who are legally blind are denied independent access each day. Assuming 260 weekdays in a typical year, the number of that times legally blind individuals would be denied independent access is 260 x 507.5 = 131,950 times per year.

According to a 2018 "Investor and Analyst Day" presentation, LabCorp receives approximately $7 billion in annual revenue in an $80 billion industry, or a share of approximately 8.75% of the United States lab market.  This document is provided in Exhibit E.

If I were to assume that only 8.75% of the legally blind population of the USA would be potential users of LabCorp services each year, and would be denied independent access by LabCorp, there would be approximately 1,000,000 x 8.75% = 87,500 people per year.

I was provided a Microsoft Excel file named "Davis-LabCorp00000515.xlsx" which contains a list of the addresses of LabCorp locations, including 1,795 locations in the United States.  From this

JA0723



PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

list, I identified 1,562 distinct ZIP codes, 1,222 distinct cities, towns, and Census Designated Places, and 542 distinct counties in the United States which contain a LabCorp facility.

35 of the 1,222 distinct cities appear to be 'communities' or similar subdivisions of other, larger cities, or were not found in our data.  To prevent duplicate counting of these areas, these 35 'cities' were removed from further analysis, leaving 1,187 cities.

Using the EASI Data referenced above, I calculated a total population of approximately 52,956,129 in the 1,562 distinct ZIP codes with at least one LabCorp location.  In addition, I calculated a total of approximately 4,450,986 with "Vision Trouble", which is 8.4% of the population of those ZIP codes.  Adjusting for the proportion of legally blind in the EASI Data gives approximately 3.6% x 4,450,986 = 160,235 people in the ZIP code area and legally blind.

Using the EASI Data referenced above, I calculated a total population of approximately 115,212,616 in the 1,187 analyzed cities with at least one LabCorp location.  In addition, I calculated a total of approximately 9,703,681 with "Vision Trouble", which is 8.4% of the adult population of those cities.  Adjusting for the proportion of legally blind in the EASI Data gives approximately 3.6% x 9,703,681 = 349,333 people in those cities and legally blind.

Using the EASI Data referenced above, I calculated a total population of approximately 225,928,175 in the 542 distinct counties with at least one LabCorp location.  In addition, I calculated a total population of approximately 18,793,502 with "Vision Trouble", which is 8.3% of the population of those counties.  Adjusting for the proportion of legally blind in the EASI Data gives approximately 3.6% x 18,793,502 = 676,566 people in those counties and legally blind.

References and data used for this analysis are attached as Exhibit F.1.

JA0724



**PHILLIPS,
FRACTOR
& COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

<u>California State-Wide Population of the Legally Blind</u>

The 2019 American Community Survey reports that approximately 1.5% of the California Population age 18 to 64 years old and approximately 6.0% of the U.S. Population age 65 years and over 'have a vision difficulty'. This represents a total of approximately 698,434 people with vision difficulties. Since these percentages are similar to nationwide measures, I will assume that national statistics are also appropriate for application to the State of California, or other geographic areas for purposes of this analysis.

Since approximately 14.5% (1 million out of 6.9 million) of Americans who reported as 'having a vision difficulty' on the ACS are also legally blind as reported by the NIH, that implies that approximately 698,434 x 14.5% = 101,273 people in California are legally blind.

If I were to assume that only 8.75% (based on LabCorp share of the United States lab market as noted above) of the legally blind population of California would be potential users of LabCorp services in a year and would be denied independent access by LabCorp, there would be approximately 101,273 x 8.75% = 8,861 people who were denied independent access each year.

Using the Microsoft Excel file named "Davis-LabCorp00000515.xlsx", referenced above, I identified 299 LabCorp locations in California, located in 238 distinct ZIP codes, 190 distinct cities, towns, and Census Designated Places, and 35 California Counties.

Nine of the 190 distinct cities in California appear to be 'communities' or similar subdivisions of other, larger cities. To prevent duplicate counting of these areas, these nine 'cities' were removed from further analysis, leaving 181 cities.

Using the EASI Data referenced above, I calculated a total population of approximately 9,670,828 in the 238 distinct ZIP codes with at least one LabCorp location. In addition, I calculated a total of approximately 790,613 with "Vision Trouble", which is 8.2% of the population of those ZIP codes . Adjusting for the proportion of legally blind in the EASI Data (referenced above) gives approximately 3.6% x 790,613 = 28,462 people in the ZIP code area and legally blind.

Using the EASI Data referenced above, I calculated a total population of approximately 6,201,701 in the 181 analyzed cities with at least one LabCorp location. In addition, I calculated a total of approximately 499,927 with "Vision Trouble", which is 8.1% of the adult population of

- 5 -



## PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

those cities.  Adjusting for the proportion of legally blind in the EASI Data (referenced above) gives approximately 3.6% x 499,927 = 17,997 people in those cities and legally blind.

Using the EASI Data referenced above, I calculated a total population of approximately 38,248,883 in the 35 distinct California counties with at least one LabCorp location.  In addition, I calculated a total population of approximately 3,114,995 with "Vision Trouble", which is 8.1% of the population of those counties. Adjusting for the proportion of legally blind in the EASI Data (referenced above) gives approximately 3.6% x 3,114,995 = 112,140 people in those counties and legally blind.

If I were to assume that only 8.75% of the population (based on LabCorp share of the United States lab market as noted above) of these areas who are legally blind and potential users of LabCorp services, and would be denied independent access by LabCorp, there would be approximately 28,462 x 8.75% = 2,490 people in ZIP codes with LabCorp facilities, 17,997 x 8.75% = 1,575 in cities with LabCorp facilities, and 112,140 x 8.75% = 9,812 in counties with LabCorp facilities who were denied independent access.

As it is possible that someone would potentially use a LabCorp facility that does not live in a ZIP code, city, or county which contains a LabCorp facility, the amounts of people calculated above is likely to be conservatively estimated.

References and data used for this analysis are attached as Exhibit F.2.

### Penalties for Denial of Independent Access under California Law

Under California's Disabled Persons Act, violations related to access for the disabled carry a statutory penalty of $1,000 per violation. Under the Unruh Civil Rights Act, civil rights violations related to access for the disabled carry a statutory penalty of $4,000 per violation.

Assuming that there are 8,861 people who are legally blind and would be potential users of LabCorp services in California, with each person having a single violation in a given year, the statutory penalty would total 8,861 x $1000 = $8,861,000 per year under California's Disabled Persons Act.  The statutory penalty under the Unruh Civil Rights Act would total 8,861 x $4000 = $35,444,000 per year.



PHILLIPS,
FRACTOR
& COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

As it is possible that more than 8.75% of the visually impaired population of California may be potential users of LabCorp services, or that an average person might have more than one such violation, the amounts calculated above are conservatively estimated.

Conclusions

It is my opinion, to a reasonable degree of certainty:

A nationwide class of legally blind people who may be denied independent access to LabCorp facilities ranges from at least 87,500 people to as many as 676,566 people in a particular year.

A California sub-class of legally blind people who may be denied independent access to LabCorp facilities ranges from at least 8,861 people to as many as 112,140 people in a particular year.

Damages to a California sub-class under the Disabled Persons Act would be at least $8,861,000 per year, and under the Unruh Civil Rights Act would be at least $35,444,000 per year.

I reserve the right to update or revise this preliminary analysis as I become aware of additional relevant information or identify any area where feasible updating or revision is necessary to substantially improve the accuracy or communication of my analysis and reported results.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 23rd day of March, 2021.

SEAN CHASWORTH

JA0727



**PHILLIPS,
FRACTOR
& COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

# SEAN C. CHASWORTH

December 2019

**Current Position**

Statistical, Database, and Pension Benefits consulting

**Education**

| | |
|---|---|
| B.A. 1991 | Mathematics, University of Redlands |
| 1992 | University of Redlands<br>California Preliminary Single Subject Teaching Credential |

**Professional Examinations Passed**

Administered by the CFA Institute
    -Level I Examination, Passed June 2009

Administered by the American Society of Pension Actuaries
    - Administrative and Qualification Issues of Retirement Plans: C-1
    - Administrative Issues of Defined Benefit Plans: C-2(DB)
    - Administrative Issues of Defined Contribution Plans C-2(DC)
    - Met examination requirements for the Qualified Pension Administrator (QPA) designation.

Administered by the Society of Actuaries and the Casualty Actuary Society
    - Probability and Statistics (Course 110)
    - Calculus and Linear Algebra (Course 100)

Administered by the Joint Board for the Enrollment of Actuaries
    - Mathematics of Compound Interest and Life Contingencies (Course 141/EA-1A)

Professional Certification – Microsoft Office User Specialist

3452 East Foothill Blvd. Suite 220
Pasadena, California 91107-3154
T: (626) 744-3540 ‖ O: www.rule26.com

JA0728

558



## PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

## Personal Data

Born in Los Angeles, California
Email address: schasworth@rule26.com

## Experience

2003 - present:   Consultant and Analyst
                  Phillips, Fractor & Company, LLC, Pasadena (formerly Phillips Fractor Gorman)

2003 - 2006:      Consultant and Analyst
                  Findlay, Phillips and Associates

1998 - 2003:      Actuarial Analyst and Pension Administrator
                  Kravitz, Inc., Encino, California

1992 - 1997:      Teacher, Hillside Junior High School, Simi Valley, California
                  Newbury Park High School, Newbury Park, California
                  Substitute Teacher for up to seven Ventura County school districts.

1995 - 1997:      Instructor, Sylvan Learning Center, Thousand Oaks, California

1989 - 2005:      Private Mathematics Instructor

## Memberships

American Statistical Association
American Association for Public Opinion Research

## Courses Taught

Mathematics: Algebra, Geometry, Trigonometry, Calculus, Matrix Algebra, Statistics
Computer Applications: Microsoft Excel, Microsoft Word
Science: Earth Science, Physics, Chemistry

*Sean Chasworth*                 *December 2019*                          *Page 2*    JA0729



## PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

**Awards and Honors**

University of Redlands Mathematics Department - Departmental Excellence Award, 1991
1987 Los Angeles County Academic Decathlon:  County Division Champion, 6 individual subject medals

**Presentations at Professional Meetings**

<u>Panelist</u>
"Careers for Math Majors", Mathematical Association of America, March 2000

## Sean Chasworth – Testimony List

**Deposition Testimony:**

| | |
|---|---|
| 3/10/2016 | Dilts, *et al* v. Penske Logistics, LLC, *et al*<br>United States District Court Southern District of California 08-cv-0318 |
| 4/11/2016 | Nangle, *et al* v. Peske Logistics, LLC, *et al*<br>United States District Court Southern District of California 11-cv-00807 |
| 7/27/2016 | Charles Ridgeway, *et al* v. Wal-Mart Stores, Inc. *et al*<br>United States District Court Northern District of California 3:08-cv-05221-SI |
| 10/19/2016 | Muhammed Abdullah v. U.S. Security Associates Inc., *et al*<br>United States District Court Central District of California 09-cv-09554 |
| 10/05/2017 | Wackenhut Wage and Hour Cases (Superior Los Angeles)<br>Superior Court of the State of California County of Los Angeles Judicial<br>Council Coordination Proceeding No. 4545 |
| 03/06/2018 | Ryan vs. JBS Carriers<br>Superior Court of the State of California County of Los Angeles BC624401 |
| 06/14/2018 | Gomez, Montes vs. USF Reddaway, Inc.<br>United States District Court Central District of California 2:16-cv-05572 |
| 06/04/2019 | William Jacobo vs. Ecolab Inc.<br>American Arbitration Association  01-18-003-2797 |
| 06/11/2019 | Cindy Castillo, et al vs. Bank of America National Association<br>United States District Court Central District of California 8:17-cv-00580 |
| 07/11/2019 | Robert Bankwitz vs. Ecolab Inc.<br>American Arbitration Association  01-18-0003-2812 |
| 11/04/2019 | Stephen Craig vs. Ecolab Inc.<br>American Arbitration Association  01-19-0000-1058 |
| 11/06/2019 | David Bojorquez vs. Ecolab, Inc.<br>American Arbitration Association  01-18-0004-4660 |

Page **1** of **2**

JA0731

561

## Sean Chasworth – Testimony List

12/12/2019        Mark Brewer vs. Ecolab Inc.
                  American Arbitration Association  01-19-0000-1056

**Arbitration and Other Testimony:**

11/09/2016        Charles Ridgeway, *et al* v. Wal-Mart Stores, Inc., *et al*
                  United States District Court Northern District of California 3:08-cv-05221-SI

06/13/2019        William Jacobo vs. Ecolab Inc.
                  American Arbitration Association  01-18-0003-2797

07/25/2019        Robert Bankwitz vs. Ecolab Inc.
                  American Arbitration Association  01-18-0003-2812

11/13/2019        David Bojorquez vs. Ecolab, Inc.
                  American Arbitration Association  01-18-0004-4660

01/07/2020        Mark Brewer vs. Ecolab Inc.
                  American Arbitration Association  01-19-0000-1056

06/17/2020        Blakeley vs. Ecolab Inc.
                  American Arbitration Association

07/28/2020        Anderson vs. Ecolab Inc.
                  American Arbitration Association

Page **2** of **2**

JA0732

G. Michael Phillips, Ph.D.

David T. Fractor, Ph.D.

Edward T. Garcia, M.S.
Robert K. Neff, CPA, ABV
Sean Chasworth
George Arzumanyan, CFA, CIMA®
Laurel J. Fish, M.S.



**PHILLIPS,
FRACTOR
& COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

Of Counsel

Dennis Halcoussis, Ph.D.
William W. Roberts, Ph.D.
A. Lynn Matthews, Ph.D.
Craig Kerr, Ph.D.
William Ingersoll, Ph.D.
H. Drew Fountaine, CPA, Ed.D.

Nye Stirling Hale & Miller, LLP
33 West Mission Street #201
Santa Barbara, CA  93101

<u>RE:  Luke Davis, Julian Vargas, American Council of the Blind, et al  vs.</u>
<u>Laboratory Corporation of America Holdings</u>
USDC Central District of Calif. case no.  2:20-cv-00893-FMO-KS

Dear Counsel,

This Agreement confirms that Phillips, Fractor & Company, LLC ("PFC" or "We" and "Our") will provide the services of Sean Chasworth; Laurel J. Fish, M.S.; G. Michael Phillips, Ph.D. (the "Experts"), and other professional staff, as needed, to Nye Stirling Hale & Miller, LLP ("Law Firm" or "Firm" or "You" and "Your") as consultant(s) in connection with the case referenced above (the "Litigation"), and on the terms and conditions herein.  The Firm represents Luke Davis, Julian Vargas, American Council of the Blind, and other plaintiffs ("Client") in the Litigation.

1. **Scope of Work:** You have asked PFC to provide statistical analysis and financial computations including work PFC determines to be necessary and advisable to accomplish these tasks plus deposition and/or trial testimony (collectively, the "Engagement").  From time to time, the Engagement may be modified and/or expanded in writing, and any such modification will be subject to the terms and conditions of this Agreement.

2. **Fees and Expenses:**  It is Our intention to perform this Engagement as efficiently and affordably as possible, recognizing potential budgetary constraints.  PFC's services, however, take a reasonable amount of time to render.  Our fees are billed on an hourly basis.  Mr. Chasworth's rate is $300 per hour, Ms. Fish' rate is $300 per hour, and Dr. Phillips' rate is $675 per hour.  Rates are subject to change on 30 days' notice.  Other personnel may be used in this Engagement, as appropriate, and typically rates for those persons may range between $300 to $675 per hour.  We will assign the appropriate personnel at PFC to render the service that comports with the level of expertise needed for this Engagement.  You acknowledge that PFC has made no promises or representations about the total amount of fees to be incurred by You under this agreement.

3. **Payment:** Payment for Our services is in no way contingent on the outcome of the Litigation, on the reaching of any particular result in Our work, on any opinion or testimony We may render, or on the nature of any of Our findings.  Accordingly, it is important that Our fees be paid promptly.  PFC will bill the Firm for its work on this Engagement on a monthly basis and fees are due on the date of the invoice.  Expenses reasonably incurred by PFC in this Engagement will be billed at Our cost and included on invoices.  Invoices shall be paid in full within 30 days.  Amounts over  60 days past due are subject to interest charges of 1.5 percent per month.  Please note, in the event the examining party

3452 East Foothill Blvd. Suite 220
Pasadena, California  91107-3154
T: (626) 744-3540 | O:  www.rule26.com

JA0733



**PHILLIPS,
FRACTOR
& COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

fails to pay Our fees and costs for depositions, You agree to guarantee payment which will be included on Your invoice.

You agree that You will review PFC's invoices upon receipt and will advise PFC of any objection to, or dispute with, the invoice or any time entry or item of work therein within 30 days of the invoice date. Any such objection or dispute not made in writing to PFC within 30 days of the invoice date is waived, and the fees and costs in the invoice are deemed to be accurate, correct and approved by the Firm. In the event You dispute a portion of an invoice, the undisputed portion shall still be paid in accordance with this paragraph.

A retainer of $7,500 must be paid prior to the commencement of any services (check payable to Phillips, Fractor & Company, LLC). The retainer includes a fee $1,000 which is not refundable. In Our sole discretion, We may hold the retainer until the end of the engagement, or apply it (or portions of it) to one or more invoices in the course of the Engagement. If all or any part of the retainer is so applied, You agree to replenish the retainer to the full original amount within 30 days of Our request to do so. Upon completion or termination of the Engagement, any amount of the retainer remaining after deduction of any fees and other charges which then remain unpaid will be promptly returned to You.

In addition, should it become necessary for us to expand the scope of our services, We may require an additional retainer payment. We may also require an additional retainer in advance of a major activity such as lengthy trial preparation or testimony or other matter that is likely to generate substantial work in a compressed period of time.

*PLEASE NOTE: All outstanding billings must be paid in full prior to the delivery of reports, declarations, or testimony (deposition and/or trial).* It is understood and agreed that timely payment for Our services and expenses will be solely the responsibility of the Firm. It is understood and agreed that You will pay all out-of-pocket expenses in connection with this matter.

4. **Termination of Work by PFC:** Without liability, PFC reserves the right, in its sole discretion, to suspend all work on this Engagement, including providing testimony, preparing reports or data (as well as withholding the provision thereof) and all other work, if amounts due for this Engagement are not paid within 30 days. In the event that We continue to provide services notwithstanding the existence of fees outstanding for more than 30 days, We do not thereby waive Our right to stop providing service at a later date in accordance with this paragraph.

PFC also reserves the right to terminate its work on this Engagement, without liability, if We believe that the Firm is requesting that PFC take actions or positions that We believe to be improper, or if the Firm is not reasonably cooperating with PFC, including, but not limited to, the failure to provide

JA0734



**PHILLIPS,
FRACTOR
& COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

information relevant to Our work in the Engagement.  Prior to termination pursuant to this paragraph, PFC shall provide written notice of its concern and intent to terminate in an effort to resolve the problem.  Termination of work under this Section 4 shall not relieve the Firm of its responsibility to pay all outstanding fees and costs incurred to the date of termination.

5. **Retention of Documents:** Upon termination of this Engagement, and unless otherwise instructed by You, or unless otherwise required by law or court order, PFC will discard, at its discretion, all non-original copies of paper documents provided to PFC by You, Client or anyone else in connection with this Engagement, and will retain original copies for a period of two (2) years, after which such documents may also be discarded.  PFC will retain electronic copies of documents for a period of four (4) years from the termination of the Engagement.

6. **Conflict Check:** Prior to beginning work on this matter, PFC will have undertaken a reasonable review of its records to determine PFC's relationships, if any, with persons or entities identified by You as parties to the Litigation or otherwise having a pecuniary interest in the Litigation, and will have concluded that no conflict exists that would, in PFC's professional opinion, prevent it from accepting and performing this Engagement, or would otherwise present a conflict of interest to PFC.  In the event such a conflict exists, PFC will work with You to obtain any necessary waiver of the conflict or otherwise resolve the conflict of interest, if practicable. In the event such a conflict arises during the course of this Engagement and no waiver or other resolution can be had, PFC reserves the right, without liability, to terminate this Engagement.

7. **Limitation of Liability:**  With exception for a claim for a breach of this Agreement, Client and the Firm agree that they shall not hold PFC or any of the Experts liable or responsible for any claims, liabilities, losses, damages or expenses incurred or allegedly incurred by either Client or Firm or both arising out of, or relating to, the Engagment or this Agreement, except to the extent such claim, liability, loss, damage or expense results solely from the negligence or bad faith conduct of PFC or the Experts.  In no event shall PFC be liable for any consequential, incidental, indirect, special or punitive damages, losses or expenses, and in no event shall the liability of PFC or any of the Experts, individually or collectively, whether in tort, contract, or otherwise exceed the amounts actually paid to PFC for the services rendered by PFC and/or any of the Experts  pursuant to this Agreement.

In the event Our work on this Engagement requires PFC to rely on any data or other information provided to PFC by You or the Client, whether in writing, electronic form or otherwise, all such information (the "Client Information") will be presumed by PFC to be accurate, correct, true, current, valid and reliable unless it is clear on the face of such information not to be so, or unless You or Client inform PFC in writing otherwise.  In the event Our work on this Engagement requires PFC to rely on any data or other information provided to PFC by any third party, including without limitation, other consultants, experts, vendors and the like, whether engaged by You or by PFC,  and whether in writing,

JA0735



**PHILLIPS, FRACTOR & COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

electronic form or otherwise, which We reasonably believe in good faith to be accurate, correct, true, current, valid and reliable, all such information (the "Third Party Information") is presumed by the Parties to be so. PFC assumes no responsibility, and shall not be held liable, for any claims, damages, costs, charges or expenses of any kind, brought or incurred by You and/or the Client arising from, caused by, related to, or otherwise in connection with the inaccuracy, falsity, invalidity, non-currency, or unreliability of either the Client Information or the Third Party Information.

8. **Force Majeur:** PFC shall not be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, acts of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

9. **Governing Law:** This Agreement shall be interpreted and controlled by the laws of the State of California.

10. **Arbitration:** In the event any dispute between You and PFC, or between Client and PFC, arising from or relating to this Engagement cannot be resolved informally, You, Client and PFC agree to forego the right to trial by jury and to resolve any and all such disputes between and/or among us, including the Experts or any other PFC employees or independent contractors who may have worked on the Engagement, and including but not limited to disputes over fees and charges or a breach of this Agreement, exclusively through private and confidential binding arbitration in Los Angeles, California, before a sole arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules, or, in the event neither the disputed claims or counterclaims respectively exceed $250,000, not including interest or attorneys' fees, then pursuant to the JAMS Streamlined Arbitration Rules. Judgment on the award may be entered in any court having jurisdiction.

11. **Attorney's Fees:** In any arbitration or other action arising out of, or related to this Agreement or the services provided under this Agreement, the prevailing party shall receive, in addition to any and all other damages and relief, reimbursement for its litigation expenses, including attorneys' fees, expert fees, collection fees, and other expenses, actually and reasonably incurred.

12. **Authority to Bind:** Each Party represents and warrants to the other Party that the person signing the Agreement on its behalf has the authority to do so, and that the signature that appears below binds it to the terms of the Agreement. The Firm further represents and warrants that it has the authority to bind Client to the terms and conditions of this Agreement insofar as any such term or condition affects the rights and/or obligations of Client, including, without limitation, the provisions of Section 7, Section 10, and Section 11 herein.

JA0736



**PHILLIPS,
FRACTOR
& COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

13. **Entire Agreement:** This Agreement constitutes the entire agreement between the Parties with respect to its subject matter, and any prior oral or written statements concerning its subject are merged herein for all purposes and are of no further force and effect.

14. **Deemed Acceptance Upon Commencement of Work:** If PFC agrees to commence work on this Engagement at Your request prior to the execution of this Agreement, the beginning of such work shall be deemed acceptance of the Agreement and each and every term herein, whether or not the Agreement is ever actually executed.

15. **Survival:** All provisions herein which, by their nature, are intended to survive performance of this Engagement shall survive such performance and termination of the Agreement.

If the foregoing comports with Your understanding of our agreement, please sign and date this Agreement and return it to Our office. After We receive Your signed letter and retainer payment, We will be able to commence work on this matter. By signing below, You acknowledge that You, the attorney, are responsible for the payment of services rendered by Phillips, Fractor & Company, LLC in compliance with the requirement expressed above. We look forward to working with You.

RE: Luke Davis, et al vs. Laboratory Corporation of America Holdings

PHILLIPS, FRACTOR & COMPANY, LLC        AGREED:

By: _Jeannie Wong_                      By: _Jonata D. Milli_
Jeannie Wong, Case Coordinator

February **23**, 2021                   Name (print) _Jonathan D. Miller_

Tax ID: 45-5551955                      Date: _Feb 23, 2021_

JA0737

Exhibit D – List of Documents Relied Upon

First Amended Class Action Complaint - Davis, et al, v. Laboratory Corporation of America, filed September 3, 2020.

Davis-LabCorp00000515.xlsx (List of LabCorp locations)

Investor Day Presentation 02-27-2018 FINAL No Animations.pdf

United States Bureau of the Census, American Community Survey, 2019

"Blindness Statistics", National Federation for the Blind, Update January 2019

"Visual impairment, blindness cases in US expected to double by 2050", National Institute of Health, May 19, 2016

Laboratory Medicine: A National Status Report, the Lewin Group for US Centers for Disease Control and Prevention, May 2008

Under the Microscope: Trends in Laboratory Medicine, the Lewin Group for the California Healthcare Foundation, April 2009

Deposition of Joseph Sinning, February 2, 2021

EASI Health Care Database, Easy Analytic Software, Inc., 2019 release

JA0738

**THIS DOCUMENT IS BEING PRODUCED**
**CONCURRENTLY IN NATIVE FORMAT**

JA0739

Blindness Statistics | National Federation of the Blind          file:////walnutfiles/Apps/CASES 2013 PFC_/Quest-LabCorp Cases/Repo...

Log In (Https://nfb.org/user/login)

NATIONAL FEDERATION
OF THE BLIND
Live the life you want
(https://nfb.org/)

| Donate (https://nfb.org/donate) | Join Us (https://nfb.org/get-involved/join-us) |

# Blindness Statistics

There are several ways to define blindness. Many people regard blindness as the inability to see at all or, at best, to discern light from darkness. The National Federation of the Blind takes a much broader view. We encourage people to consider themselves as blind if their sight is bad enough—even with corrective lenses—that they must use alternative methods to engage in any activity that people with normal vision would do using their eyes.

The United States Bureau of the Census question about "significant vision loss" encompasses both total or near-total blindness and "trouble seeing, even when wearing glasses or contact lenses."

The statutory definition of "legally blind" is that central visual acuity must be 20/200 or less in the better eye with the best possible correction or that the visual field must be twenty degrees or less.

There are no generally accepted definitions for "visually impaired," "low vision," or "vision loss."

Almost all statistics on blindness are estimated, which means that the numbers found in a sample are extrapolated to the entire population. United States government agencies—including the Bureau of the Census, the National Center for Health Statistics, and the Bureau of Labor Statistics—use sophisticated statistical techniques that lead to population estimates with great accuracy. Moreover, these techniques also provide the margin of error.

## Blindness among Children

### American Printing House for the Blind (2017)

Each year, the American Printing House for the Blind (APH) polls each state for data on the number of legally blind children (through age twenty-one) enrolled in elementary and high school in the US eligible to receive free reading matter in Braille, large print, or audio format. This is used to develop a "quota" of federal funds to be spent in each state for material in each alternative format.

Please note that the numbers quoted below from the APH Annual Report do not meet the standard definition of statistics. However, they do provide useful data that is worth including on this page. According to the APH,

"The specific purpose of the annual Federal Quota Census is to register students in the United States and Outlying Areas who meet the definition of blindness and are therefore eligible for adapted educational materials from APH through the Act to Promote the Education of the Blind.

Statements regarding student literacy, use of appropriate learning media, and students taught in a specific medium cannot be supported using APH registration data" (*APH News: December 2017 (http://www.aph.org/news/december-2017/)*).

JA0740

Case: 22-55873, 03/31/2023, ID: 12686644, DktEntry: 21-4, Page 214 of 287

Blindness Statistics | National Federation of the Blind                    file://///walnutfiles/Apps/CASES 2013 PFC_/Quest-LabCorp Cases/Repo...

Case 2:20-cv-00893-FMO-KS    Document 81    Filed 04/27/21    Page 23 of 304    Page ID #:3740

- Total number of students: 63,357
- By reporting agency:
  - Reported by state departments of education: 53,155 (83.9%)
  - Reported by residential schools for the blind: 4,940 (7.8%)
  - Reported by rehabilitation programs: 3,800 (6.0%)
  - Reported by multiple disability programs: 1,462 (2.3%)
- By primary reading medium:
  - Braille readers: 4,963 (7.8%)
  - Print readers: 20,460 (32.3%)
  - Auditory readers: 6,833 (10.8%)
  - Non-readers/Symbolic Readers: 20,718 (32.7%)
  - Pre-readers: 10,383 (16.4%)

American Printing House for the Blind, "Annual Report 2017: Distribution of Eligible Students Based on the Federal Quota Census of January 4, 2016 (Fiscal Year 2016)." Retrieved from http://www.aph.org/federal-quota/distribution-of-students-2017/ (http://www.aph.org/federal-quota/distribution-of-students-2017/).

## Disability Statistics, American Community Survey (2016)

The number of non-institutionalized males or females, ages four and under through twenty, all races, regardless of ethnicity, with all education levels in the United States who reported a visual disability in 2016.

Prevalence:

- Total: 706,400 (0.8%)
  - Girls: 337,700 (0.79%)
  - Boys: 368,700 (0.83%)

Erickson, W., Lee, C., von Schrader, S. (2017). Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI). Retrieved from Cornell University Disability Statistics website: www.disabilitystatistics.org (http://www.disabilitystatistics.org/).

## Blindness among Adults

These estimates (for adults age sixteen and older reporting significant vision loss, who were in the non-institutionalized, civilian population) are all derived from the American Community Survey results for 2016, as interpreted by Cornell University's Employment and Disability Institute (EDI), unless otherwise credited.

### Prevalence of Visual Disability (2016)

The number of non-institutionalized, male or female, ages sixteen through seventy-five +, all races, regardless of ethnicity, with all education levels in the United States reported to have a visual disability in 2016.

- Total (all ages): 7,675,600 (2.4%)
  - Total (16 to 75+): 7,208,700 (2.83%)
    - Women: 3,946,300 (3.01%)
    - Men: 3,262,300 (2.65%)
  - Age 16 to 64: 4,037,600 (2.0%)
  - Age 65 and older: 3,171,100 (6.6%)

JA0741

Blindness Statistics | National Federation of the Blind        file://///walnutfiles/Apps/CASES 2013 PFC_/Quest-LabCorp Cases/Repo...

Case 2:20-cv-00893-FMO-KS    Document 81    Filed 04/27/21    Page 24 of 304    Page ID #:3741

## Race or Ethnicity (2016)

The number of non-institutionalized, male or female, all ages, with all education levels in the United States reported to have a visual disability in 2016.

- White: 5,546,000 (2.4%)
- Black/African American: 1,215,600 (3.0%)
- Hispanic: 1,253,400 (2.2%)
- Asian: 250,500 (1.4%)
- American Indian or Alaska Native: 100,400 (3.8%)
- Some other race(s): 563,100 (2.1%)

## State Distribution (2016)

The number of non-institutionalized, male or female, all ages, all races, regardless of ethnicity, with all education levels in the United States reported to have a visual disability in 2016.

| State | Number |
|---|---|
| Alabama | 150,600 |
| Alaska | 17,600 |
| Arizona | 175,600 |
| Arkansas | 97,900 |
| California | 797,300 |
| Colorado | 107,700 |
| Connecticut | 61,200 |
| Delaware | 19,200 |
| District of Columbia | 16,400 |
| Florida | 544,700 |
| Georgia | 267,100 |
| Hawaii | 24,500 |
| Idaho | 43,500 |
| Illinois | 258,900 |
| Indiana | 159,800 |
| Iowa | 60,700 |
| Kansas | 67,900 |
| Kentucky | 152,000 |
| Louisiana | 155,900 |
| Maine | 30,800 |
| Maryland | 111,500 |

JA0742

Blindness Statistics | National Federation of the Blind       file://///walnutfiles/Apps/CASES 2013 PFC_/Quest-LabCorp Cases/Repo...

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 25 of 304   Page ID #:3742

| State | Number |
|---|---|
| Massachusetts | 129,800 |
| Michigan | 223,500 |
| Minnesota | 86,500 |
| Mississippi | 96,400 |
| Missouri | 153,900 |
| Montana | 21,800 |
| Nebraska | 39,700 |
| Nevada | 101,500 |
| New Hampshire | 28,600 |
| New Jersey | 163,700 |
| New Mexico | 65,200 |
| New York | 418,500 |
| North Carolina | 285,500 |
| North Dakota | 14,400 |
| Ohio | 280,100 |
| Oklahoma | 138,100 |
| Oregon | 104,500 |
| Pennsylvania | 298,500 |
| Puerto Rico | 218,400 |
| Rhode Island | 22,100 |
| South Carolina | 153,300 |
| South Dakota | 16,600 |
| Tennessee | 205,400 |
| Texas | 702,500 |
| Utah | 55,000 |
| Vermont | 14,100 |
| Virginia | 178,400 |
| Washington | 161,900 |
| West Virginia | 71,400 |
| Wisconsin | 110,300 |
| Wyoming | 14,500 |

JA0743

Blindness Statistics | National Federation of the Blind     file://///walnutfiles/Apps/CASES 2013 PFC_/Quest-LabCorp Cases/Repo...

## Educational Attainment (2016)

The number of non-institutionalized, male or female, ages twenty-one to sixty-four, all races, regardless of ethnicity, in the United States reported to have a visual disability in 2016. These numbers refer to the highest level of education attained by a given individual.

- Less than high school graduation: 847,000 (22.3%)
- High school diploma or a GED: 1,201,600 (31.6%)
- Some college education/associates degree: 1,151,500 (30.3%)
- Bachelor's degree or higher: 598,000 (15.7%)

## Income and Poverty Status (2016)

The annual earnings and poverty status of non-institutionalized persons aged twenty-one to sixty-four years with a visual disability in the United States in 2016.

- Median Annual Earnings: $38,500
- Median Annual Household Income: $41,300
- Number living below the poverty line: 1,048,600 (27.7%)

## Supplemental Security Income (2016)

The number of non-institutionalized persons aged twenty-one to sixty-four years with a visual disability in the United States who received SSI benefits in 2016 was 649,900 (17.1%).

## Health Insurance Status (2016)

The number of non-institutionalized persons aged twenty-one to sixty-four years with a visual disability in the United States in 2016.

- Uninsured: 471,900 (12.4%)
- Insured: 3,326,300 (87.6%)
  - Employer/Union: 1,351,100 (35.6%)
  - Purchased: 449,500 (11.8%)
  - Medicare: 801,400 (21.1%)
  - Medicaid: 1,486,200 (39.1%)
  - Military/VA: 208,800 (5.5%)
  - Indian Health Service: 38,700 (1.0%)

## Employment (US) (2016)

The number of non-institutionalized persons aged twenty-one to sixty-four years with a visual disability in the United States who were employed full-time/full-year in 2016 was 1,120,700 or 29.5%.

Therefore, for working age adults reporting significant vision loss, over 70% are not employed full-time.

Erickson, W., Lee, C., von Schrader, S. (2017). Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI). Retrieved from Cornell University Disability Statistics website: www.disabilitystatistics.org (http://www.disabilitystatistics.org/).

## Mobility

JA0744

Blindness Statistics | National Federation of the Blind      file:////valnutfiles/Apps/CASES 2013 PFC_/Quest-LabCorp Cases/Repo...

Case 2:20-cv-00893-FMO-KS    Document 81    Filed 04/27/21    Page 27 of 304    Page ID #:3744

There are very few reliable current statistics on the use of canes or dog guides in the United States. However, according to Perkins School for the Blind, "Most people who are visually impaired don't use a white cane. In fact, only an estimated 2 percent to 8 percent do. The rest rely on their useable vision, a guide dog or a sighted guide."

Perkins School for the Blind. (2015, October 15). "10 Fascinating Facts about the White Cane." Accessed on January 14, 2019, from https://www.perkins.org/stories/10-fascinating-facts-about-the-white-cane (https://www.perkins.org/stories/10-fascinating-facts-about-the-white-cane).

Guiding Eyes for the Blind estimates that "there are approximately 10,000 guide dog teams currently working in the United States. Another frequently cited statistic is that only about 2% of all people who are blind and visually impaired work with guide dogs."

Guiding Eyes for the Blind. (2019). "FAQs." Accessed January 14, 2019, from https://www.guidingeyes.org/about/faqs/ (https://www.guidingeyes.org/about/faqs/).

## Computer Use

For data on the preferences of screen reader software users, please see the report on the results of the October 2017 survey from WebAIM (http://webaim.org/) (http://webaim.org/)(Web Accessibility In Mind), Screen Reader User Survey #7 Results (https://webaim.org/projects/screenreadersurvey7/). WebAIM is a nonprofit organization based at the Center for Persons with Disabilities at Utah State University.

For data on the use of computer and internet technologies by "users with low vision", please see the report on the results of the September 2018 survey from WebAIM (https://webaim.org/), Survey of Users with Low Vision #2 Results (https://webaim.org/projects/lowvisionsurvey2/).

## Additional Resources

- American Foundation for the Blind, "Statistical Snapshots from the American Foundation for the Blind." Retrieved from http://www.afb.org/info/blindness-statistics/2 (http://www.afb.org/info/blindness-statistics/2).
- Bell, E. C., & Silverman, A. M. (2018). Rehabilitation and Employment Outcomes for Adults Who Are Blind or Visually Impaired: An Updated Report. Journal of Blindness Innovation and Research, 7(1). Retrieved from https://nfb.org/images /nfb/publications/jbir/jbir18/jbir080101.html (https://nfb.org/images/nfb/publications/jbir/jbir18/jbir080101.html). doi: 10.5241/8-148.
- Brault, Matthew W., United States Economics and Statistics Administration, United States Bureau of the Census. "Americans with disabilities: 2010." Current population reports. no. 131 (2012). Retrieved from https://www.census.gov /library/publications/2012/demo/p70-131.html (https://www.census.gov/library/publications/2012/demo/p70-131.html).
- Centers for Disease Control and Prevention. "Vision Health Initiative (VHI): Data & Statistics." Retrieved from https://www.cdc.gov/visionhealth/data/index.html (https://www.cdc.gov/visionhealth/data/index.html).
- National Center for Special Education Research, Institute of Education Sciences, U.S. Department of Education. Retrieved from http://ies.ed.gov/ncser/ (https://ies.ed.gov/ncser/).
- Eye Institute, "Blindness, Statistics and Data [NEI]." Retrieved from https://www.nei.nih.gov/eyedata/blind (https://www.nei.nih.gov/eyedata/blind).
- Blindness America, "Vision Problems in the US: Prevalence of Adult Vision Impairment and Age-Related Eye Disease in America." Last modified 2012. Retrieved from http://www.visionproblemsus.org/index.html (http://www.visionproblemsus.org/index.html).
- United States Bureau of the Census, "American FactFinder." Retrieved from http://factfinder2.census.gov/faces/nav/jsf /pages/index.xhtml (http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml).

JA0745

(Updated January 2019)



(https://nfb.org/)

**National Federation of the Blind**
200 East Wells Street *at Jernigan Place*
Baltimore, Maryland 21230

Phone 410-659-9314 (tel:+14106599314)
Email nfb@nfb.org (mailto:nfb@nfb.org)

 (https://give.org/charity-reviews/national/Blind-and-Visually-Impaired/National-Federation-of-the-Blind-in-

Baltimore-md-25)  (https://www.charitywatch.org/charities/national-federation-of-the-blind#ratings-and-metrics)

Subscribe to Our E-newsletter (https://nfb.org/resources/publications-and-media/imagineering-our-future)

Copyright © 2021 National Federation of the Blind (https://nfb.org/). All rights reserved.
Drupal Commerce by Acro Media (http://www.acromedia.com/)

JA0746

COVID-19

- Get the latest public health information from CDC    • Get the latest research information from NIH | Español
- NIH staff guidance on coronavirus (NIH Only)

NEWS RELEASES

Thursday, May 19, 2016

## Visual impairment, blindness cases in U.S. expected to double by 2050

*NIH-funded studies tease out trends by race, ethnicity and sex.*

With the youngest of the baby boomers hitting 65 by 2029, the number of people with visual impairment or blindness in the United States is expected to double to more than 8 million by 2050, according to projections based on the most recent census data and from studies funded by the National Eye Institute, part of the National Institutes of Health. Another 16.4 million Americans are expected to have difficulty seeing due to correctable refractive errors such as myopia (nearsightedness) or hyperopia (farsightedness) that can be fixed with glasses, contacts or surgery.

The researchers were led by Rohit Varma, M.D., director of the University of Southern California's Roski Eye Institute, Los Angeles, and published their analysis May 19th in JAMA Ophthalmology. They estimate that 1 million Americans were legally blind (20/200 vision or worse) in 2015. Having 20/200 vision means that for clear vision, you would have to be 20 feet or closer to an object that a person with normal vision could see from 200 feet away.



The findings suggest that there is a need for increased screening and interventions to identify and address treatable causes of vision loss. A slit lamp, with its high magnification, allows the eye care professional to examine the front of the patient's eye. *NEI*

Meanwhile, 3.2 million Americans had visual impairment in 2015 — meaning they had 20/40 or worse vision with best possible correction. Another 8.2 million had vision problems due to uncorrected refractive error.

"These findings are an important forewarning of the magnitude of vision loss to come. They suggest that there is a huge opportunity for screening efforts to identify people with correctable vision problems and early signs of eye diseases. Early detection and intervention — possibly as simple as prescribing corrective lenses — could go a long way toward preventing a significant proportion of avoidable vision loss," said NEI Director Paul A. Sieving, M.D., Ph.D.

Over the next 35 years, Varma and his colleagues project that the number of people with legal blindness will increase by 21 percent each decade to 2 million by 2050. Likewise, best-corrected visual impairment will grow by 25 percent each decade, doubling to 6.95 million. The greatest burden of visual impairment and blindness will affect those 80 years or older as advanced age is a key risk factor for diseases such as age-related macular degeneration and cataract.

The researchers analyzed data on visual impairment and blindness from six large studies: the Beaver Dam Eye Study (Beaver Dam,

JA0747

3/11/2021, 9:23 PM

Wisconsin), Baltimore Eye Survey and Salisbury Eye Evaluation Study (Maryland), the Chinese American Eye Study (Monterey Park, California), Los Angeles Latino Eye Study, and Proyecto VER (Nogales and Tucson, Arizona). They used the 2014 census and population growth projections to estimate the nationwide prevalence of vision impairment and blindness now and in 2050.

In terms of absolute numbers, non-Hispanic whites, particularly white women, represent the largest proportion of people affected by visual impairment and blindness, and their numbers will nearly double. By 2050, 2.15 million non-Hispanic white women are expected to be visually impaired and 610,000 will be blind. "Based on these data, there is a need for increased screening and interventions across all population, and especially among non-Hispanic white women," Varma said.

African Americans currently account for the second highest proportion of visual impairment, but that is expected to shift to Hispanics around 2040, as the Hispanic population — and particularly the number of older Hispanics — continues to grow. Hispanics have particularly high rates of diabetes, which is associated with diabetic eye disease, a treatable cause of visual impairment.

African Americans, meanwhile, are expected to continue to account for the second highest proportion of blindness. "African Americans are at disproportionately high risk for developing glaucoma, a potentially blinding eye disease that typically causes the loss of peripheral, but not central vision, so people tend to not realize that they are losing their vision and do not seek treatment," he said.

May is Health Vision Month. For more information about how to keep eyes healthy, visit https://nei.nih.gov/hvm.

The study was funded in part by NEI grants U10EY017337-05 and K23EY022949-01.

NEI leads the federal government's research on the visual system and eye diseases. NEI supports basic and clinical science programs that result in the development of sight-saving treatments and address special needs of people with vision loss. For more information, visit http://www.nei.nih.gov.

**About the National Institutes of Health (NIH):** NIH, the nation's medical research agency, includes 27 Institutes and Centers and is a component of the U.S. Department of Health and Human Services. NIH is the primary federal agency conducting and supporting basic, clinical, and translational medical research, and is investigating the causes, treatments, and cures for both common and rare diseases. For more information about NIH and its programs, visit www.nih.gov.

*NIH...Turning Discovery Into Health®*

## Reference

Varma, R et al, "Visual impairment and blindness in adults in the United States: Demographic and Geographic Variations from 2015 to 2050," JAMA Ophthalmology, DOI:10.1001/jamaophthalmol.2016.1284.

###

Institute/Center

National Eye Institute (NEI)

Contact

Kathryn DeMott
NEI
301-496-5248

JA0748

3/11/2021, 9:23 PM



LabCorp

Investor and Analyst Day

February 2018

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 31 of 304   Page ID #:3748

# LabCorp

# Forward Looking Statements and Use of Adjusted Measures

This presentation contains forward-looking statements including but not limited to statements with respect to estimated 2018 guidance and the related assumptions, the impact of various factors on operating and financial results, expected savings and synergies (including from the LaunchPad initiative and as a result of acquisitions), and the opportunities for future growth.

This presentation contains forward-looking statements which are subject to change based on various important factors, including without limitation, competitive actions and other unforeseen changes and general uncertainties in the marketplace, changes in government regulations, including health care reform, customer purchasing decisions, including changes in payer regulations or policies, other adverse actions of governmental and third-party payers, changes in testing guidelines or recommendations, adverse results in material litigation matters, the impact of changes in tax laws and regulations, failure to maintain or develop customer relationships, our ability to develop or acquire new products and adapt to technological changes, failures in information technology systems or data security, challenges in implementing business process changes, employee relations, and the effect of exchange rate fluctuations on international operations.

Actual results could differ materially from those suggested by these forward-looking statements. The Company has no obligation to provide any updates to these forward-looking statements even if its expectations change. Further information on potential factors, risks and uncertainties that could affect the operating and financial results of Laboratory Corporation of America Holdings (the "Company") is included in the Company's Form 10-K for the year ended December 31, 2016, and subsequent Forms 10-Q, including in each case under the heading risk factors, and in the Company's other filings with the SEC.

This presentation contains "adjusted" financial information that has not been prepared in accordance with GAAP, including Adjusted EPS, and Free Cash Flow, and certain segment information. The Company believes these adjusted measures are useful to investors as a supplement to, but not as a substitute for, GAAP measures, in evaluating the Company's operational performance. The Company further believes that the use of these non-GAAP financial measures provides an additional tool for investors in evaluating operating results and trends, and growth and shareholder returns, as well as in comparing the Company's financial results with the financial results of other companies. However, the Company notes that these adjusted measures may be different from and not directly comparable to the measures presented by other companies. Reconciliations of these non-GAAP measures to the most comparable GAAP measures are included in this presentation.

JA0750

2

580



**LabCorp**

**Enterprise
Strategic Overview**

**Dave King**
*Chairman and Chief Executive Officer*



# Who We Are

**LabCorp** is
**a Leading Global Life Sciences Company**
that is deeply integrated
in guiding patient care

**Our Mission** is to
**Improve Health and**
**Improve Lives**

**Our Strategic Objectives** are to:
**Deliver World-Class Diagnostics**
**Bring Innovative Medicines to Patients Faster**
**Use Technology to Improve the Delivery of Care**

JA0752

4

582





# Opens Attractive Growth Opportunities Across Multiple Global Markets

LabCorp

## Leadership in Large, Growing, Fragmented Markets

U.S. Clinical Lab Testing Market ~$80 billion

Global Addressable Outsourced R&D Spend ~$35 billion

Ex-U.S. Clinical Lab Testing Market ~$100 billion

Global Addressable Market ~$200 billion

JA0754

Source: Industry reports and company estimates

1. Includes 12-month estimate of Chiltern revenue on a proforma basis

Case 2:19-cv-09083-JWH-KS Document 21 Filed 04/27/21 Page 37 of 304 Page ID #:3754

# Creates a Differentiated Offering to Better Serve All Healthcare Stakeholders



**LabCorp Diagnostics**

- Patient database reaching ~50% of U.S. population
- Proprietary data sets with >30 billion lab test results across a growing menu of nearly 5,000 assays
- Broad physician, health system and managed care relationships
- Consumer engagement through ~1,900 PSC/retail locations, 5,000+ in-office phlebotomists
- Proprietary decision-support and reporting tools

**LabCorp**

- Global footprint with business in 127 countries; 60,000 employees
- Unmatched real-world data and patient intelligence
- Deep scientific and therapeutic experience
- Leader in Companion Diagnostics (CDx)
- Innovative technology-enabled solutions for customers

**Covance Drug Development**

- Serving the top 20 biopharma
- Serving high-growth emerging and mid-market segments through Chiltern
- Working on ~50% of clinical trials
- >175,000 unique investigators
- Involved in all top 50 best-selling drugs on the market
- Supported 70% of all CDx on the market today
- Robust technology suite for trial planning and execution

JA0755

7

585



Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 38 of 304   Page ID #:3755



Case 2:21-cv-00093 F V Q M C   Document 81   Filed 04/27/21   Page 39 of 304   Page ID #:3756

# Strategic Initiatives to Capitalize on Long-term Market Opportunities

**Transition to Value-Based Care**

- Improve efficiency in care delivery
- Reduce the overall cost of patient care
- Utilize advanced tools and analytics to deliver better outcomes via personalized medicine and population health

**Enhance the Drug Development Process**

- Address increased trial complexity, and competition for patients and investigators
- Greater need for scalable tools and processes to initiate and manage trials
- Increased sponsor demand for data-driven study design and execution, as well as access to relevant analytes, biomarkers and tests

**Embrace the Role of the Consumer**

- Increased interest in and influence over healthcare decision-making
- Technology advances driving expectation of convenience
- Consumer satisfaction increasingly important to other healthcare stakeholders

JA0757

9

587

# Differentiated Solutions and their Emphasis are Resonating with Customers

**LabCorp**

## Value-Based Care Solutions

|  | Reference Laboratory Testing | Outreach Laboratory Testing | Inpatient Laboratory Management |
|---|---|---|---|
| PAML and its Joint Venture Interests | ✓ | ✓ | |
| Mount Sinai Health System | ✓ | ✓ | |
| Novant Health | ✓ | ✓ | ✓ |

**Completed**
*3 marquee transactions* in 2017

## Streamlining Clinical Studies

Cumulative new orders won through the combination of LabCorp patient data and Covance capabilities:

| 2016 | 2017 |
|---|---|
| >$200 million | ~$500 million |

On track to deliver *$150 million* in cumulative new revenue from the acquisition of Covance through 2018

## Consumer Platform

Patients Seen in Denver
*LabCorp at Walgreens*

| |
|---|
| 28% |

Patients new to LabCorp

LabCorp PSCs in Walgreens stores are *attracting new patients*

Page ID # 3757   Page 40 of 304   Filed 04/27/21   Document 81

10



# Creates Long-term Shareholder Value

## Revenue[1]

10-Year CAGR: 10%

(In Billions)

| Year | Value |
|------|-------|
| 2007 | $4.1 |
| 2008 | $4.5 |
| 2009 | $4.7 |
| 2010 | $5.0 |
| 2011 | $5.5 |
| 2012 | $5.7 |
| 2013 | $5.8 |
| 2014 | $6.0 |
| 2015 | $8.5 ($6.2 Diagnostics, $2.3 Drug Development) |
| 2016 | $9.4 ($6.6 Diagnostics, $2.8 Drug Development) |
| 2017[2] | $10.4 ($6.9 Diagnostics, $3.6 Drug Development) |

**Drug Development** **Diagnostics**

### Record 2017 Results

- Record revenue of $10.2B
- Record EPS of $9.60
- Record free cash flow of $1.1B
- 24% increase in share price

**2018 FORTUNE** World's Most Admired Companies
**2017 FORBES** World's Most Innovative Companies

(1) 2007–2014 revenues excludes Covance results. 2008 revenue includes a $7.5 million adjustment relating to certain historic overpayments made by Medicare for claims submitted by a subsidiary of the Company
(2) Includes the estimated impact from adoption of the new revenue recognition accounting standard (ASC 606). See Appendix for details of the preliminary reconciliation of 2017 results

JA0759

11

Case 2:20-cv-10993-FMO-KS Document 81 Filed 04/27/21 Page 42 of 304 Page ID #:3759



JA0760



# Covance Drug Development
## Strategic Overview

**John Ratliff**
*Chief Executive Officer,*
*Covance Drug Development*

**Jonathan Koch**
*Group President of Clinical Development*
*and Commercialization Services,*
*Covance Drug Development*

LabCorp

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 43 of 304   Page ID #:3760





# The Drug Development Landscape

## Strong Market Trends and Client Demand

LabCorp

### Improving regulatory environment

### Venture funding remains solid

### Strong therapeutic growth, especially in oncology

### Significant innovation in emerging biotech segment

JA0762

JA0763



# Covance Growth Strategy

**Leveraging LabCorp/Covance Combined Strength, Utilizing Market Leading Assets, Demonstrating Clinical Leadership, Maximizing Tools and Technology**

LabCorp

## GROWTH STRATEGY

EMPLOYEES
PATIENTS
INVESTORS
CUSTOMERS

EXTRAORDINARY POTENTIAL

EXCEPTIONAL PEOPLE

ENERGIZING PURPOSE

## IMPROVE HEALTH, IMPROVE LIVES

DISCOVERY — Research, Preclinical
DEVELOPMENT — Phase I, Phase II, Phase III
COMMERCIALIZATION — Phase IV, RWE

ADVANTAGES: SCIENCE | PATIENT CENTRICITY | LOGISTICS | DATA

- Broaden Scientific Leadership
- Increase Patient-Centered Solutions
- Expand Core Services
- Portfolio Management and Monitoring

- Create Best-in-Class Patient Recruitment and Site Management Through Data
- Expand Global Delivery
- Launch Biotech Differentiated Offering
- Enter Adjacent Markets

- Lead Virtualization of Clinical Trials
- Apply Patient-Centric Technologies
- Embrace Alliances with New Partners
- Evolve Informatics and Analytics

JA0764







# Leveraging LabCorp-Covance Combined Strength

## Unique Patient-Centered Solutions and Data Insights

LabCorp

| Empowered Patients<br>*"Choosing to participate"* | Real World Lab Data<br>*Largest in the world* | The Right Patient<br>*LabCorp Data, Investigators* | Matched Patients<br>*Who and where they are...* |
|---|---|---|---|
| ***Empowered patients*** are searching for treatment alternatives and ***choosing to participate in clinical studies*** | ***Granular, structured, real world lab data*** *is collected and readily available for Covance's use* | Real world data is used to ***find the right patients for a clinical study***<br>Matching patients' physicians who have a pre-existing relationship with LabCorp ***enables more meaningful conversations***<br>***Known Covance investigators*** are identified around clusters of matching patients | The data identifies ***where the patients are, who they are,*** and ***who their physicians are***<br>Covance can ***reach out to patients directly,*** as well as ***contact physicians to inform them about specific patients*** who may be eligible for a given study |

# Leveraging LabCorp-Covance Combined Strength
Holistic Approach to Patient Intelligence

**LabCorp / Patient Data**
- ~115 million patient encounters annually
- ~1,900 patient service centers
- High-quality data, including diagnosis codes, demographics and lab results

**Protocols / Trial Insights / Clinical Labs Data**
- Covance supports ~50% of all clinical trials
- >50 million global patient lab results per year from central lab network

**Patient Survey / Voice of Patient**
- >200,000 patients have requested to be notified by Covance about relevant clinical studies; focused on increasing participation rate
- Obtaining actionable patient insights regarding trial participation

**Patient Intelligence**

FY.2 2018 8 FMC-5 Revenue's 5, Px 36 41627d P10 49 81M Page ID # 3766

JA0767

19

# Leveraging LabCorp-Covance Combined Strength

**Scientific Collaboration with Market Leading Companion Diagnostics (CDx) Capabilities**



- Supported more than **300** CDx, in vitro diagnostic and medical device studies
- Collaborated with over **40** clients on more than **165** CDx projects in 2017
- CDx-related net orders grew **~4x** from 2015 to **$244M** in 2017
- **~$135M** in CDx-related enterprise revenue in 2017; **3-year CAGR of ~20%**

## Covance Provides Comprehensive CDx Solutions For The Drug Life Cycle



**Drug Development:** Preclinical | Phase I | Phase II | Phase III | NDA Submission | Commercialization

**Biomarker/CDx Development:** Biomarker Development | CDx Assay & Feasibility | CDx Development & Validation | Regulatory Submission & CDx Launch

JA0768

20

598





**LabCorp**

Filed 04/27/21 Page 52 of 304 Page ID # 3769

# Expanding Clinical Capabilities
## Stronger Together with Chiltern

## Combined Offering Delivers Value



**Presence**
- Broad customer base with strong growth potential across all segments

**Therapeutic Capabilities**
- Broad therapeutic offering across all phases of development
- The most experienced central laboratory (e.g., biomarkers, companion diagnostics)

**Informatics**
- Clinical analytics and FSP capabilities and suite of technology offerings (Xcellerate® and Endpoint IVR)

**People**
- Global employee enhancement

## Biotech: Delivering A Differentiated Experience



CHILTERN.
A COVANCE COMPANY

- *Dedicated teams*
- *Collaborative engagement*
- *Personalized attention*
- *Data aggregation and insight*
- *Deep therapeutic and scientific expertise*

## Providing Industry Leading Breadth of Solutions



- Early Phase Development Solutions
- Phase I Sites/Adaptive Design
- Phase I-IV
- Biomarkers/CDx

- Central Lab/Esoteric testing
- Consulting Regulatory
- Commercial
- Covance MarketPlace
- Xcellerate



JA0770

22



# LaunchPad® Business Process Improvement Initiative
Re-engineering Processes and Integrating New Technology to Drive Margin Expansion

## Talent and Asset Optimization
- Aligning people and capabilities with client expectations
- Optimizing the global footprint

## Process Discipline and Productivity
- Process and system improvements
- Culture of continuous process improvement

## Delivery Transformation
- Transforming the delivery of clinical studies and lab services
- Positioning the company for the future of clinical trials

## Customer Centricity
- "Customer First" mindset
- Driving growth and loyalty through customer-centric investment

- *Global service delivery model (GSDM)*
- *Organizational design to enable seamless distribution of work globally*
- *Real estate consolidation*

- *Software-enabled process automation*
- *Rollout of new technology platforms*

- *Commercial process investments and improvements*
- *Differentiated, integrated solutions from Chiltern acquisition*

**Net Savings: $20M in 2017, and additional $130M over three years ending in 2020**
**After achieving $100M in cost synergies from LabCorp's acquisition of Covance**

JA0771

23

601

Case 2:22-cv-00893-FMO... Document... Filed 04/27/21 Page 54 of 304 Page ID #:377

# Maximizing Tools and Technologies
### Innovative Solutions Focused on Client Needs

**LabCorp®**

| PharmAcuity | Patient Recruitment | Endpoint | Xcellerate | Global Specimen Solutions | Patient Intelligence |
|---|---|---|---|---|---|
| Leverages proprietary and public data providing insights and guiding decisions; optimizes trial planning. Includes metrics benchmarking, trial forecasting, and protocol optimization. | Providing insights into site selection, patient recruitment, and resource allocation. Using custom analytics to leverage the power of Covance's unparalleled patient and investigator databases. | Best-in-class interactive response systems. Continuous innovation and investment including new high-value physical sample management solutions. | Most modern, end-to-end clinical trial solution. Decreases risk, increases patient safety and data quality. Includes advanced clinical data management, risk-based monitoring, and dashboards. | Reduces the time, cost and risk of specimen based research. Increases value of existing assets with advanced analytics, visualizations, and first-to-market patient consent mapping. | Voice of patient insights from industry leading patient panel. Understand patient view of trial participation, enhance protocol design and recruiting tactics. Creates patient-centric development approach. |






## *Contributed to $1B+ of Revenue Across Clinical Development in 2017*

24



**LabCorp**

## Key Takeaways

Strong book to bill of **1.36** and backlog of over **$7.1B** driving year-on-year revenue growth of 20% – 24% (**mid to high single digit organic growth**), including **improved** margins over the next 3 years

**Diagnostics and Drug Development combination creates differentiation from competition** through data, patient intelligence, and scientific collaboration

Transformative investments in **talent, solutions, and technology positioning Covance for growth**

JA0773

25

603



**LabCorp Diagnostics Strategic Overview**

**Gary Huff**
*Chief Executive Officer,*
*LabCorp Diagnostics*

Case 2:20-cv-00893-FMO-KS    Document 81    Filed 04/27/21    Page 56 of 304    Page ID #:3773

LabCorp
LP-2774

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 57 of 304   Page ID #:3774

# LabCorp Diagnostics At-a-Glance



## LabCorp

### Financial Strength

- Significant free cash flow
- Stable business with history of performance
- >$7 billion in revenue in 2017; 10-year revenue CAGR of ~6%
- Hundreds of thousands of client relationships
- ~1,600 managed care contracts

### Market Position

- Leading scientific innovation and ability to partner and acquire expertise
- Value creation with diagnostics and drug development combination

### Why customers choose LabCorp

- We **lower cost** and **improve quality**
- We **create value** with the combination of Diagnostics and Drug Development
- We are focused on providing an **exceptional experience**



### Expertise

- Unmatched depth and breadth of solutions
- Scientific, therapeutic, value-based care and IT expertise
- Experienced senior leadership
- 11 Centers of Excellence
- ~600 M.D. and Ph.D.

### Infrastructure

- Strong U.S. infrastructure
- ~1,900 Patient Service Centers
- Extensive test menu, including esoteric offering
- 3,100 couriers
- ~50% of U.S. population in patient database
- >65,000 digital interfaces

27

LA0775

605



# Creating Differentiated Value

## for our Consumers, Customers, and Employees

81    Filed 04/27/21    Page 58 of 304    Page ID #:3775



### Continual Innovation

- Venture investments
- Walgreens retail health partnership
- Proprietary technology to enhance the consumer experience
- 100 new tests per year (on average)



### Leadership

- Talented leadership, track record of execution
- Scientific strength
- Consistent, profitable growth
- Structured to be close to the customer



### Multiple Growth Opportunities

- Health systems and hospitals
- Managed care
- Independent physicians
- Companion diagnostics



### Data Powerhouse with IT Expertise

- ~50% of U.S population / >30 billion lab test results
- Big data platform
- Interfaces with over 600 EMR and laboratory information systems (LIS) vendors
- Holistic approach to patient engagement, including mobile



JA0776

28

606





# Leadership in a Stable, Growing, and Fragmented Market

LabCorp

JA0777

(1) Generally reimbursed as part of a bundled payment

Case 2:20-cv-00893-FMO-KS Document 81 Filed 04/27/21 Page 60 of 304 Page ID #:3777

**Well-Positioned to Capture the Addressable Market**

608

# Uniquely Positioned to Succeed in Value-Based Care

**LabCorp®**

Filed 04/27/21   Page 69 of 304   Page ID #:3785

## Beyond Lab Testing



- CDx, CaDx for optimal therapy
- Chronic disease programs with clinical decision support
- Data supports care management programs and population health
- Access to clinical trials

## Right Test, Right Patient



- Smart test design (i.e., cascades)
- M.D., Ph.D. access
- Cover gaps in care
- Result trending, global result search

## Lower Cost of Utilization

- Managed care networks, benefits
- Health system partnerships
- Consumer empowerment

*Powered by standardized lab systems and data, flexible data interfaces and feeds, and technology-enabled tools*

IA0786

38

# Offering Leading, Broad-Based Solutions in Value-Based Care

LabCorp

Page 69 of 304   Page ID #:3786

## Leading Laboratory Services

- National access
- Comprehensive test menu
- Sales and service organization
- Scientific innovation
- Power of scale

## Payer and Provider Collaboration

- Help stakeholders achieve total cost of care metrics in value-based care contracts
- Actionable lab results
- Global patient results data
- MACRA, HEDIS, and ACO quality metrics
- Care Intelligence® population health

## Clinical Decision Support

- Programs on key disease states
- Lab reports support care guidelines
- Developed by physicians
- Data monitoring drives cost-effective care management

## Drug Development Solutions

- Companion diagnostics leadership
- Potential provider revenue stream from increased participation in clinical trials
- Cost savings to patients and payers
- "Real World" data



JA0787

39

Case 2:20-cv-00893-FMO-KS Document 81 Filed 04/27/21 Page 70 of 304 Page ID #:3787

# Actionable Data for Every Stakeholder

**LabCorp**

JA0788

40

## Providers

- Identifies untreated problems
- Patient-specific recommendations based on current guidelines / standards of care delivered with lab results

## Payers

- Targeted data feeds
- Lower overall medical expenses through earlier disease identification

## Patients

- Educate patients about what their lab results mean
- Empower patients to participate in their own care
- Condition-specific care plans

## Care Management Team

- Real-time targeting of high risk patients
- Highlight outliers and likely gaps in care
- Metrics on provider performance




611





Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 73 of 304   Page ID #:3790

# LabCorp

## Major Academic Health System Case Study

### Multi-faceted relationship with Mount Sinai Health System



**Outreach Acquisition**
- Divesture of non-core asset
- Gained square footage by reducing infrastructure

**Academic Collaboration**
- Carved out molecular / genetics lab from acquisition
- Support of residency programs

**Reference Testing**
- Consolidation of lab partners
- Reduces expense, IT, and complexity

**Clinical Trials**
- ↑ number of studies offered by Covance

**Data for Accountable Care**
- Sharing standardized lab result data to empower population health
- Innovative Hepatitis C awareness and management program under development

**Financial Benefits**
- Redeploy capital, space, and IT resources
- Operations improvement through efficiencies and trials

Case Study

JA0791

43

614



Case Study



**LabCorp®**

# Multi-Pronged Approach to Deliver Value to an Accountable Care Organization (ACO)

Page 75 of 304    Page ID #:3792



**QUALITY PARTNERS NETWORK**

Clinically integrated network with 240 physicians

Multiple EHRs, multiple value-based contracts

High quality, cost effective lab service

Standardized, timely lab result data

Deployed Care Intelligence™ population health tool

High-cost and out-of-network lab providers

High risk and rising risk patient populations

Active patient management

### In 2016, for 16,000 commercial patients:

- $4.7M in total savings
- ↓ inpatient utilization 15%
- ↑ primary care visits double digits in high risk patients
- 90th percentile patient satisfaction

JA0793

45

616

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 76 of 304   Page ID #:3793



# Key Takeaways

**Uniquely positioned to succeed in value-based care** by lowering the cost of utilization, driving appropriate utilization, and providing value beyond lab testing

**Developing innovative tools, technology and business models** to further our value proposition for patients and health systems

Supporting health systems' transition to value-based care represents **a multi-billion dollar long-term growth opportunity**

JA0794

46



Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 77 of 304   Page ID #:3794

**Extending our Leadership in Companion Diagnostics**

**LabCorp**
A1795

**Steven Anderson, Ph.D.**
*Chief Scientific Officer,*
*Covance Drug Development*

**Marcia Eisenberg, Ph.D.**
*Chief Scientific Officer,*
*LabCorp Diagnostics*



# Precision Medicine and Companion Diagnostics (CDx)

## Key Drivers in Precision Medicine

▲ Genomic and proteomic biomarkers are key features of developing new therapies and diagnostics

- Define the disease biology
- Provide targets for new therapies

▲ A companion diagnostic is the ultimate biomarker test

- Co-developed and linked with a specific therapy
- Help identify patients most likely to respond
- Help identify patients who may have an adverse event
- Provide added value for how the diagnostic and therapy are used

**Personalized Medicines Top 30% of FDA Approvals for First Time in 2017[1]**



| 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|
| 21%  | 28%  | 27%  | 34%  |

(1) Source: Personalized Medicine Coalition.
*Personalized Medicine at FDA: 2017 Progress Report.*

JA0796

48

619



**LabCorp** Challenge ID 4-3797

# Unmatched Franchise Providing End-to-End Clinical Development and Commercial Lab Testing Solutions



Commercialization

| Drug Development | Preclinical | Phase I | Phase II | Phase III | NDA Submission |
|---|---|---|---|---|---|
| Biomarker/CDx Development | Biomarker Development | CDx Assay & Feasibility | CDx Development & Validation | Regulatory Submission & CDx Launch | |

▸ Bench to commercialization expertise

▸ Leaders in both in vitro diagnostic (IVD) and single lab PMA regulatory approaches

▸ Experience with 300+ IVD and medical device studies

▸ Supported **approximately 70%** of all FDA approved companion diagnostics on the market – including approvals for HER2, KRAS, EGFR, BRAF, ALK and PD-L1

• Recent examples in immuno-oncology, liquid biopsy and next generation sequencing

*End-to-end capabilities are a differentiator for development, trial support and commercialization*

JA0798

50

621

# Dedicated CDx Laboratory Combines Unmatched Expertise with Leading Technology

**LabCorp**

Page ID #:3798

▲ 36,000 sq. ft. facility in North Carolina

▲ Dedicated laboratory and staff for *development, validation, and transfer* of CDx assays

- Focus on Genomics and Molecular Pathology
- Associated GMP manufacturing capabilities





JA0799

51

# Two CDx Solutions Enable Flexible Collaboration with Customers



Submitted 04/27/21   Page 82 of 304   Page ID #:3799

## Single Site Pathway (ssPMA)

▲ Faster route for development and commercialization

▲ Develop and validate test on established IVD platform

▲ Laboratory service provider also leads the regulatory submission for regulatory clearance

▲ Initial launch as FDA-approved PMA IVD contingent on intended use of marker

▲ May subsequently partner with IVD manufacturer for kit development on same platform, allowing decentralization of testing

## IVD Pathway



*Current projects are split 75% IVD partnership pathway and 25% ssPMA pathway, with a growing interest in the ssPMA approach*

JA0800

52





**End-to-End Support for a New Oncology Therapy and Associated CDx Assay** Page 84 of 304 Page ID #:3807

**LabCorp**

For a recently approved immuno-oncology therapy, Covance and LabCorp Diagnostics collaborated to provide five distinct drug development services:

Research → Preclinical → Phase I → Phase II → Phase III → NDA Submission → Commercialization

**Drug Development**

**Prepared drug to go into man (first in human dosing)**
Covance BioPharm CMC assisted in the manufacture and qualification of drug lots

**PK / PD support in early Phase I studies**
Covance pre-clinical pharmacokinetic and pharmacodynamic work

**Biomarker evaluation to enroll patients in pivotal clinical trials**
Covance Central Lab expertise supporting targeted clinical trial participants

**Commercialized assay development**
LabCorp Diagnostics ensured that the diagnostic was prepared and commercially available simultaneous with the drug's launch

**Post-approval CMC to verify quality of the manufactured product for its intended audience**

*Demonstration of end-to-end capabilities that are a differentiator in Companion Diagnostics*

Case Study

JA0802

54

625

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 85 of 304   Page ID #:3802

# Capitalizing on Multiple CDx Growth Drivers

**LabCorp**

Increasing interest in precision medicine and use of biomarkers *extending beyond oncology* to other therapeutic areas

*Attractive expansion of client base* – collaborating with mix of large pharma, emerging pharma and biotech clients

*Technological advancements* enabled by multiplexing, such as Next Generation Sequencing, Gene Expression Profiling, and Proteomics

Interest in and use of the *single site PMA regulatory approach* drives improvements in efficiency, flexibility and cost

Comprehensive *commercial strategy,* including *global CDx partnerships*

JA0803

55

626



Key Takeaways

LabCorp and Covance have an **unsurpassed track record** in the **development and commercialization** of CDx assays

An increasing focus on precision medicine, with expansion beyond Oncology applications, provides a **significant growth opportunity in CDx**

**Dedicated resources** and **flexible approaches** to CDx development allow Covance and LabCorp to **provide solutions that meet client needs**

JA0804



**Break**

JA0805

Case 2:20-cv-00893-FMO-KS  Document 81  Filed 04/27/21  Page 87 of 304  Page ID #: 3804

**LabCorp**



**Unmatched Data, Powerful Insight**

**Lance Berberian**
*Chief Information Officer*

**Gabriela Feldberg**
*Head of Feasibility, Recruitment and Engagement,*
*Covance Drug Development*

**LabCorp**

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 88 of 304   Page ID #:3805



## Compelling Combination of Data and Tethered Relationships is a Key Competitive Advantage for the Enterprise

**LabCorp** Page ID #3808

**Our Data**
- Timely
- Standardized
- Precise
- Identified

**Our Relationships**
- Patients
- Physicians and Health Systems
- Investigators
- Pharmaceutical Companies
- EMR Providers

**Actionable**
- Assist with Closing Gaps in Care
- Recruit Patients Faster
- Design High Quality Trials
- Leverage Health System Data
- Support Precision Medicine Goals

JA0807

59

# Covance Offers a Suite of Differentiated Drug Development Tools for Trial Planning and Execution

**LabCorp**

Page ID #:3807





**endpoint**

- Pulse
- Drive



JA0808

**GLOBAL SPECIMEN SOLUTIONS**

- GlobalCODE
- snapTRACK
- LabCODE





**PharmAcuity™**

- Metrics and Benchmarking
- Trial Forecasting




**cellerate®**

- Clinical Data Hub
- Monitoring Solutions
- Data Management
- Insights

60

631

# LabCorp Diagnostics Offers Tools That Serve Key Customer Segments

| Service | Physicians / Health Systems | Consumers | Payers / Managed Care |
| --- | :---: | :---: | :---: |
| Guidance on Test Selection | ● | | |
| Placement of Electronic Orders (Portal and EMR) | ● | | |
| Mobile Optimized Reservations | | ● | |
| Multi-Channel Check-In | | ● | |
| Delivery of Electronic Test Reports (Portal and EMR) | ● | ● | ● |
| Post-Analytical Clinical Decision Support | ● | | |
| Population Health (Data Feeds and Tools) | ● | | ● |
| Test Result Trending | ● | | ● |
| Client Supplies Ordering | ● | | |
| Online Invoice Payment | ● | ● | |
| Hospital Reporting | ● | | |
| Payer Reporting | ● | | ● |

JA0809

61



# Power of the LabCorp Data for Trial Design, Site Selection, and Patient Recruitment

Label ID 4-3809, Page 92 of 304

JA0810

62



**Population Level Disease Analysis**
- Surveillance of disease spread to enable just in time recruitment
- Unlike other types of real world data, lab data can be easily accessed near real time



**Vast Test Menu**
- 30+ billion test results across thousands of diagnostic assays
- >2.5 million samples collected (>30% by LabCorp phlebotomists) and processed weekly across many diseases and therapeutic areas

**Real World Data**
- Not biased and represents people as they live with their disease
- Patient data is granular and identifiable

633



Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 93 of 304   Page ID #:3810

# Power of the Xcellerate Investigator Database

**LabCorp**

**Covance supports ~50%** of all clinical trials

## Standardized Site Rank

- Number of Patients
- Date of First Patient In
- Quality
- Lab Cancellations and Queries

## Investigator Performance Database

> 175,000 unique investigators
> 15,000 unique protocols JA0811

63

Case 3:20-cv-00993-FMO-KS   Document 81   Filed 04/27/21   Page 94 of 304   Page ID #:3811

# Covance **Value Proposition**

Exceeding Recruitment Goals for a Global Multi-Study Registration Program

**LabCorp**®

🔲 **Case Study**

## CLIENT CHALLENGE



Randomize 2,700 patients within a very narrow timeframe for a suite of registration studies

Get all sites across the globe up and running as quickly as possible

## UNIQUE SOLUTIONS

**>175k**
unique investigators

**>15k**
protocols

Leveraged Xcellerate® historical investigator database to identify and secure highest performing investigators in indication

Based on extensive feasibility outreach and site capacity assessment, efficiencies were identified that allowed effective overlapping of sites across the program resulting in accelerated site start-up and reduced clinical costs

**Key Performance Result: Achieved "first patient in" requirement ahead of schedule for all studies in the program. Beat historical industry performance across a number of key metrics:**

18% fewer weeks from final protocol to FPI

31% more patients/site/month

75% more high-performing sites

41% fewer non-performing sites

JA0812

64

Case 2:20-cv-00893-FMO-KS Document 81 Filed 04/27/21 Page 95 of 304 Page ID #:3813

# Ulcerative Colitis Example



JA0813



# Understanding the Impact of Study Design on the Available Patient Pool

Page 96 of 304   Page ID #: 3813

JA0814

66

75% reduction

- 51,814 patients between June 2016 and May 2017 identified
- 48,708 patients between 18 and 80 years old
- 20,288 without Crohn's Disease, IBD and UC Proctitis
- 20,146 without Malignancy, Inherited Immuno Syndrome, TB and HIV/AIDS
- 20,075 without Hepatitis B and C
- 13,950 with all relevant labs populated
- 13,750 with Neutrophil value >= 1.5x10^9/L and Platelet >=100x10^9/L
- 13,552 with Hemoglobin >= 8.5g/dL and Lymphocyte >500 cells/uL
- 13,516 with Total WBC >=3.0 x 10^9/L and Serum Creatine <=2xULN
- 13,227 with Alk Phos <=2xULN and ALT <=2xULN
- 12,980 with AST <=2xULN and Bilirubin <=3xULN

The protocol inclusion / exclusion criteria is applied to the patient pool and then matching patients are geo-located on the map

637



Filed 04/27/21   Page 97 of 304   Page ID #:3814

# Covance Data Insights Shown: Workload of Key Investigators

- Objective site performance data around the globe which includes 8+ pharma programs and 53 active UC studies
- Creates immediate 963 sites for targeted outreach
- 27 out of 1,054 (3%) of known investigators are _not_ in an active trial
- Investigator patient accrual per study drops as more studies are taken on – diminishing return from in-demand sites



| # Active Studies | # Investigators | Patients Per Investigator |
| --- | --- | --- |
| 9+ | 28 | 72 |
| 5-8 | 63 | 33 |
| 4 | 123 | 87 |
| 2-3 | 169 | 15 |
| 1 | 644 | 10 |
| 0 | 27 | 11 |

JA0815

67

638



# LabCorp/Covance Value Proposition
## Protocol Design to Maximize Patient Enrollment Opportunity

Case: 20-cv-09803 DJ-KS Document 41 Filed 04/27/21 Page 99 of 304 Page ID #:3816

**LabCorp**

🔲 **Case Study**

### CLIENT CHALLENGE



Study was looking for a small subset of patients which represented **<7% of patients**

Study to test if a drug reduced progression of kidney disease in patients with Type II diabetes

### UNIQUE SOLUTIONS

**>150** Million patients

**>30** Billion test results

Analyzed LabCorp de-identified patient data to discern whether small protocol changes could accelerate recruitment

Data helped to identify that making minor changes to the eGFR cutoff would increase the patient pool size therefore reducing recruitment timelines

**Result:** The eligible patient population increased by more than 50% without compromising the objectives of the trial

JA0817

69

640

# LabCorp/Covance Value Proposition

Rescued Patient Enrollment for a Study of a Rare Mutation

**LabCorp**

🔬 Case Study





## CLIENT CHALLENGE

- Difficulty identifying available sites as landscape changed rapidly driving increased competition
- Pharma's preferred sites were unavailable

Seeking patients with AML and a rare genetic mutation **<15% of AML patients**

## UNIQUE SOLUTIONS

**>150** Million patients

- Leveraged LabCorp database with de-identified health information on patients with the rare mutation
- Increased recruitment activities in the US leveraging the LabCorp sales force to reach out to physicians to gauge interest as investigators and to recruit AML patients

**Result:** With 274 sites across 28 countries, patient enrollment is on now on track for the initial milestone and has regained its advantage in the recruitment competitive landscape

JA0818

70



**LabCorp**

**LabCorp/Covance Value Proposition**
Piloting a Virtual Real World Evidence Study

📄 Case Study

### CLIENT CHALLENGE

Develop a less costly, "site-less" approach to conduct a study collecting survey and laboratory data

Study needed to be national in scope while reducing the patient travel burden

### UNIQUE SOLUTIONS

Developed a cross-enterprise virtual study model leveraging the Covance patient support call center, local LabCorp Patient Service Centers and Covance Central Labs to screen participants, collect lab specimens and analyze lab results, respectively

- Online screening, e-consent and enrollment
- Call center acting as virtual site coordinators
- Fully integrated project oversight and data management

**65**
LabCorp
Patient Service Centers
in the Pilot

**Result:** Conducted two successful pilot studies recruiting 315 patients across 65 Patient Service Centers. The pharma company is planning to scale up 10x from the pilot to a full national model. JA0819

71

642



# Setting Up for Long Term Success

Continuing to add real world data sources to *further accelerate patient recruitment*

Leveraging *rapidly growing LabCorp patient database* to gather *actionable patient insights* to inform study design and execution

Driving a *higher volume of patients through fewer sites* by leveraging deep relationships with key health systems

Utilizing *LabCorp's large network of Patient Service Centers to conduct virtual studies* dramatically reduces the patient burden

JA0820

72

643

Case 2:20-cv-00893-FMO-KS   Document 81   Filed 04/27/21   Page 103 of 304   Page ID #:3820



# Key Takeaways

**Unmatched combination of patient and investigator data,** which is **the right data** to guide the delivery of care, study design, site selection and patient recruitment

**Direct engagement through multiple channels** with patients, physicians, investigators, and health systems create a **holistic data strategy**

Significant **ongoing investment** in talent, technology and capabilities will increase the power of our differentiated data and informatics

JA0821

73

644