No. 22-55873

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

LUKE DAVIS, JULIAN VARGAS, and AMERICAN COUNCIL OF THE BLIND,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, DBA
(doing business as) Labcorp,

*Defendant-Appellant.*

---

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:20-cv-00893-FMO-KS · The Honorable Fernando M. Olguin

---

## EXCERPTS OF RECORD
## VOLUME 6 OF 8 – Pages 1215 to 1500

---

Robert I. Steiner
rsteiner@kelleydrye.com
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
212-808-7800

Becca J. Wahlquist
bwahlquist@kelleydrye.com
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, California 90071
213-547-4900

Glenn T. Graham
ggraham@kelleydrye.com
KELLEY DRYE & WARREN LLP
One Jefferson Road, 2nd Floor
Parsippany New Jersey 07054
973-503-5917

Attorneys for Appellant
LABORATORY CORPORATION OF AMERICA HOLDINGS

# EXHIBIT 4

## *-INTENTIONALLY LEFT BLANK-*

*-INTENTIONALLY LEFT BLANK-*

JA0017

*-INTENTIONALLY LEFT BLANK-*

JA0018

*-INTENTIONALLY LEFT BLANK-*

JA0019

*-INTENTIONALLY LEFT BLANK-*

*-INTENTIONALLY LEFT BLANK-*

JA0021

*-INTENTIONALLY LEFT BLANK-*

JA0022

*-INTENTIONALLY LEFT BLANK-*

JA0023

# EXHIBIT 5

DocuSign Envelope ID: 6DF52B6F-A442-4508-9CFE-98FEC57D507

# DECLARATION OF SHEILA DERRICK

I, Sheila Derrick, declare the following:

1. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called to do so under oath.

2. I live in Fort Worth, Texas.

3. I am legally blind and use screen magnification software to interface with my computer and VoiceOver software to interface with my phone.

4. In the past three years I have been a patient at LabCorp.

5. I am unable to independently check in using LabCorp's check-in kiosks or engage in any other services provided by these kiosks because they have not been made accessible to blind patients.

6. I have arrived at LabCorp in the past 3 years to find that no staff member was present at the front desk, forcing me to use the assistance of others to check in via LabCorp's kiosk.

7. If LabCorp's kiosks were VoiceOver compatible, I would be able to independently use them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: _2/15/2021_

DocuSigned by:

_Sheila Derrick_

6561C04142AC470

JA0024

1225

# EXHIBIT 6

## DECLARATION OF JOHN NUANES

I, John Nuanes, declare the following:

1. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called to do so under oath.

2. I live in Tujunga, California.

3. I am legally blind and use a screenreader and VoiceOver software to interface with my computer and phone.

4. In the past three years I have been a patient at LabCorp.

5. I am informed and believe that LabCorp's check-in kiosks offer no voice over abilities for users. Without such functionality, I would be unable to independently check in using LabCorp's check-in kiosks or engage in any other services provided by these kiosks because they have not been made accessible to blind patients.

6. When I have arrived at LabCorp in the past 3 years, my wife has had to check me in via LabCorp's kiosk.

7. If LabCorp's kiosks were screenreader and VoiceOver compatible, I would be able to independently use them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: _2/16/2021_ _____

DocuSigned by:

*John Nuanes*

0F0D85730D7343D...

JA0025

1227

# EXHIBIT 7

DocuSign Envelope ID: 7CF05B20-6C96-4877-A4E5-562DEB5533C6

## DECLARATION OF QIANA SWILLEY

I, Qiana Swilley, declare the following:

1. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called to do so under oath.

2. I live in Houston, Texas.

3. I am legally blind and use a screenreader and VoiceOver software to interface with my computer and phone.

4. In the past three years I have been a patient at LabCorp.

5. I am unable to independently check in using LabCorp's check-in kiosks or engage in any other services provided by these kiosks because they have not been made accessible to blind patients.

6. I have arrived at LabCorp in the past 3 years to find that no staff member was present at the front desk, forcing me to use the assistance of others to check in via LabCorp's kiosk.

7. My need to rely on others to assist in checking in at LabCorp has caused me to wait longer than other patients to check in.

8. If LabCorp's kiosks were screenreader and VoiceOver compatible, I would be able to independently use them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: _2/15/2021_

DocuSigned by:

*Qiana Swilley*

FB043E91515D4C1...

JA0026

1229

# EXHIBIT 8

DocuSign Envelope ID: 06EF4855-E39E-442F-85EG-3636A44E77EC

## DECLARATION OF WANDA WILLIFORD

I, Wanda Williford, declare the following:

1. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called to do so under oath.

2. I live in Trenton, New Jersey.

3. I am legally blind and use a screenreader and VoiceOver software to interface with my computer and phone.

4. In the past three years I have been a patient at LabCorp.

5. I am unable to independently check in using LabCorp's check-in kiosks or engage in any other services provided by these kiosks because they have not been made accessible to blind patients.

6. I have arrived at LabCorp in the past 3 years to find that no staff member was present at the front desk, forcing me to use the assistance of others to check in via LabCorp's kiosk.

7. If LabCorp's kiosks were screenreader and VoiceOver compatible, I would be able to independently use them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: 2/15/2021

DocuSigned by:

7AAF620DECC24E8...

JA0027

1231

# EXHIBIT 9

DocuSign Envelope ID: 7E427F68-C510-42EF-9BD4-B8C628D31CE3

## DECLARATION OF MARY FLANAGAN

I, Mary Flanagan, declare the following:

1. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called to do so under oath.

2. I live in Wake Forest, North Carolina.

3. I am legally blind and use a screenreader and VoiceOver software to interface with my computer and phone.

4. In the past three years I have been a patient at LabCorp.

5. I am unable to independently check in using LabCorp's check-in kiosks or engage in any other services provided by these kiosks because they have not been made accessible to blind patients.

6. I have arrived at LabCorp in the past 3 years to find that no staff member was present at the front desk, forcing me to use the assistance of others to check in via LabCorp's kiosk.

7. If LabCorp's kiosks were screenreader and VoiceOver compatible, I would be able to independently use them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: 2/16/2021

DocuSigned by:

*Mary Flanagan*

6EF6ABBBGD6C440...

JA0028

1233

# EXHIBIT 10

## DECLARATION OF DOMINICK PETRILLO

I, Dominick Petrillo, declare the following:

1. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called to do so under oath.

2. I live in Beverly, New Jersey

3. I am totally blind and use Jaws with my computer and VoiceOver software to interface with my phone.

4. In the past three years I have been a patient at LabCorp.

5. I am unable to independently check in using LabCorp's check-in kiosks or engage in any other services provided by these kiosks because they have not been made accessible to blind patients.

6. I have arrived at LabCorp in the past 3 years to find that no staff member was present at the front desk, forcing me to use the assistance of others to check in via LabCorp's kiosk.

7. If LabCorp's kiosks were VoiceOver compatible, I would be able to independently use them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: 2/18/2021

DocuSigned by:

*Dominick Petrillo*

3B37A4B39F0D4E4...

JA0029

1235

# EXHIBIT 11

```
                                                      Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4     LUKE DAVIS, JULIAN VARGAS, AND

 5     AMERICAN COUNCIL OF THE BLIND,

 6     INDIVIDUALLY AND ON BEHALF OF

 7     ALL OTHERS SIMILARLY SITUATED,

 8              Plaintiffs,         Case No.

 9        vs.                       2:20-cv-00893-FMO-KS

10     LABORATORY CORPORATION OF

11     AMERICA HOLDINGS,

12              Defendant.

13     _____/

14

15              Pursuant to Notice, the remote video

16        deposition of CLAIRE STANLEY was taken on

17        Monday, December 7, 2020, commencing at 10:00

18        a.m., before David C. Corbin, a Registered

19        Professional Reporter and Notary Public.

20

21

22

23

24

25              REPORTED BY:  David Corbin, RPR
```

```
                                                    Page 2
 1              A P P E A R A N C E S
 2        ON BEHALF OF THE PLAINTIFFS:
 3             MATTHEW HANDLEY, ESQUIRE
 4             Handley Farrah and Anderson, PLLC
 5             777 6th Street, N.W.
 6             Washington, DC  20001
 7             mhandley@hfajustice.com
 8
 9
10        ON BEHALF OF THE DEFENDANT:
11             ROBERT STEINER, ESQUIRE
12             Kelley Drye & Warren, LLP
13             101 Park Avenue
14             New York, NY  10178
15             rsteiner@kelleydrye.com
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
www.veritext.com
JA0031
212-279-9424
212-490-3430

1238

```
                                              Page 3
 1                    I N D E X

 2    Name of Witness

 3    Claire Stanley

 4    Examination:                          Page

 5    By Mr. Steiner                          4

 6

 7                  E X H I B I T S

 8     Exhibit 1 ACB Survey, June 2020        32

 9     Exhibit 2 Complaint                    34

10     Exhibit 3 Letter, 11/25/2020           84

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1         IT IS HEREBY STIPULATED AND AGREED that

2    the reading and signing of this deposition are not

3    waived.

4         COURT REPORTER:  This is David Corbin,

5         court reporter.  Due to the Government's

6         guidelines on social distancing, this

7         deposition is being conducted remotely.  If I

8         could have counsel stipulate and agree that the

9         swearing in of the witness will also be

10        conducted remotely.

11        MR. HANDLEY:  I agree.

12        MR. STEINER:  Yes, for the defendant, we

13        agree.

14                  CLAIRE STANLEY,

15   duly been sworn/affirmed to tell the truth, the

16   whole truth, and nothing but the truth, testifies as

17   follows:

18              E X A M I N A T I O N

19   BY MR. STEINER:

20        Q.   Good morning, Ms. Stanley.  My name is Rob

21   Steiner.  I'm a lawyer at Kelley, Drye and Warren,

22   and I represent Laboratory Corporation of America

23   Holdings in an action that was filed by Luke Davis,

24   Julian Vargas and the American Council for the

25   Blind.  Could you state your full name and address

Page 18

1    also assist with potential litigation if people are
2    being discriminated against because of their
3    blindness.  We also interact with federal agencies.
4    And we do quite a bit of lobbying on Capital Hill to
5    promote legislation that will positively impact the
6    lives of people who are blind or visually impaired.
7         Q.   And to whom do you report?
8         A.   My direct supervisor is Clark Rachfal, the
9    director of advocacy and governmental affairs.
10        Q.   Can you spell the last name for me,
11   please.
12        A.   R-A-C-H-F-A-L.
13        Q.   And does anyone report to you?
14        A.   No.
15        Q.   And as I understand it, and please if you
16   have a better way of describing it, feel free to
17   correct me, the ACB is an advocacy group for people
18   who are blind or visually impaired.  Is that fair?
19        A.   Yes.  But the addition is that we're a
20   membership organization of persons who are blind and
21   visually impaired who get together for all kinds of
22   activities across the United States.
23        Q.   And there are approximately 20,000
24   members; is that correct?
25        A.   Correct.

# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4   LUKE DAVIS and JULIAN VARGAS,    CASE NO.: 2:20-cv-00893
     individually on behalf of
 5   themselves and all others
     similarly situated,
 6
 7            Plaintiffs,
 8        v.
 9   LABORATORY CORPORATION OF
     AMERICA HOLDINGS; and DOES 1-10,
     inclusive,
10
11            Defendants.
     _____
12
13
14
15
16
17      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JOSEPH
18   SINNING, Laboratory Corporation of America Holdings
19   30(b)(6), Volume 1, taken on behalf of Plaintiffs, at
20   Cape Girardeau, Missouri, beginning at 10:05 a.m. and
21   ending at 3:55 p.m., on Tuesday, February 2, 2021, before
22   LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.
23
24
25
```

Page 2

1243

```
 1    APPEARANCES:
 2
 3    For Plaintiffs Luke Davis, Julian Vargas, and the
      Proposed Class:
 4
          NYE, STIRLING, HALE & MILLER, LLP
 5
          BY: JONATHAN D. MILLER, ESQ.
 6
              BENJAMIN SWEET, ESQ.
 7
              CALLUM APPLEBY, ESQ.
 8
          33 West Mission Street, Suite 201
 9
          Santa Barbara, California 93101
10
          (805)963-2345
11
          jonathan@nshmlaw.com
12
          ben@nshmlaw.com
13
          callum@nshmlaw.com
14
      For Plaintiff Luke Davis, Julian Vargas, and American
15    Council of the Blind:
16        HANDLEY FARAH AND ANDERSON PLLC
17        BY: MATTHEW K. HANDLEY, ESQ.
18        777 6th Street NW, 11th Floor
19        Washington, DC 20001
20        (202)559-2411
21        mhandley@hfajustice.com
22
23
24
25    Continued
                                              Page 3
```

```
 1    APPEARANCES (Cont.)

 2

 3   For Defendant:

 4        KELLY DRYE & WAREEN LLP

 5        BY: ROBERT I. STEINER, ESQ.

 6        101 Park Avenue

 7        New York, New York 10178

 8        (212)808-7800

 9        rsteiner@kelleydrye.com

10   Also Present:

11        SCOTT SLATER, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                    I N D E X
 2
 3     WITNESS                          EXAMINATION
 4     JOSEPH SINNING, 30(b)(6)
       Volume 1
 5
 6            BY MR. MILLER                      11
 7
 8                    EXHIBITS
 9                 JOSEPH SINNING
10     NUMBER          DESCRIPTION           PAGE
```

```
11     Exhibit 4   Plaintiff Julian Vargas's Amended    22
                   Rule 30(b)(6) Deposition Notice to
12                 Defendant Laboratory Corporation
                   Of America Holdings
13
       Exhibit 5   LabCorp Corporate Backgrounder       33
14
       Exhibit 6   Project Horizon Business/SME Working  45
15                 Group Homework Assignment 8/23/16
16     Exhibit 7   "Project Horizon" PSC Patient Self    54
                   Service Project Kickoff Meeting
17
       Exhibit 8   Deck entitled "LabCorp | Express™     82
18                 and LabCorp | PreCheck™"
19     Exhibit 9   LabCorp Express PSC Go-Live Guide     89
20     Exhibit 10  Spreadsheets                         101
21     Exhibit 11  Letter; Bates stamped               114
                   Davis-LabCorp00002068 to 2071
22
       Exhibit 12  Cost Summary; Bates stamped         121
23                 Davis-LabCorp00002986 to 2988
24     Exhibit 13  Project Horizon Non-Functional      123
                   Requirements; Bates stamped
25                 Davis-LabCorp00002055 to 2065
```

```
                                        Page 5
```

```
 1                    EXHIBITS (Cont.)
 2                     JOSEPH SINNING
 3    NUMBER             DESCRIPTION                    PAGE
 4    Exhibit 14  OLEA Brochure; Bates stamped          127
                  Davis-LabCorp00002876 to 2879
 5
      Exhibit 15  Aila Brochure; Bates stamped          132
 6                Davis-LabCorp00002836 to 2863
 7    Exhibit 16  Aila Quotation; Bates stamped         133
                  Davis-LabCorp00001758
 8
      Exhibit 17  Software Development Kit License       133
 9                Agreement; Bates stamped
                  Davis-LabCorp00002639 to 2643
10
      Exhibit 18  Armor Active Radius Stands            138
11                Brochure; Bates stamped
                  Davis-LabCorp00002788 to 2792
12
      Exhibit 19  Black & White photo; Bates            139
13                stamped Davis-LabCorp00004133
14    Exhibit 20  Express Triage Guide; Bates           151
                  stamped Davis-LabCorp00004327
15                to 4340
16    Exhibit 21  "Having Trouble Checking In?";        163
                  Bates stamped
17                Davis-LabCorp00001012 to 1013
18    Exhibit 22  ADA - Public Action Accommodation     143
                  Policy; Bates stamped
19                Davis-LabCorp00004296 to 4297
20    Exhibit 23  Screenshots; Bates stamped            164
                  Davis-LabCorp00003276 to 3296
21
      Exhibit 24  Letter dated November 25, 2020        148
22
      Exhibit 25  Comment Analysis; Bates stamped       177
23                Davis-LabCorp00000322 to 333
24    Exhibit 26  Screenshot; Bates stamped             188
                  Davis-LabCorp00004135
25


                                            Page 6
```

```
 1                    EXHIBITS (Cont.)
 2                    JOSEPH SINNING
 3    NUMBER              DESCRIPTION                PAGE
 4    Exhibit 26A  Screenshot; Bates stamped          189
                   Davis-LabCorp00004135
 5
      Exhibit 26B  Screenshot; Bates stamped          190
 6                 Davis-LabCorp00004136
 7    Exhibit 26C  Screenshot; Bates stamped          191
                   Davis-LabCorp00004137
 8
      Exhibit 26D  Screenshot; Bates stamped          192
 9                 Davis-LabCorp00004138
10    Exhibit 26E  Screenshot; Bates stamped          193
                   Davis-LabCorp00004139
11
      Exhibit 26F  Screenshot; Bates stamped          194
12                 Davis-LabCorp00004140
13    Exhibit 26G  Screenshot; Bates stamped          194
                   Davis-LabCorp00004145
14
      Exhibit 26H  Screenshot; Bates stamped          195
15                 Davis-LabCorp00004156
16    Exhibit 26I  Screenshot; Bates stamped          196
                   Davis-LabCorp00004157
17
      Exhibit 26J  Screenshot; Bates stamped          196
18                 Davis-LabCorp00004237
19    Exhibit 26K  Screenshot; Bates stamped          197
                   Davis-LabCorp00004238
20
      Exhibit 27   Phlebotomy Notes; Bates stamped    198
21                 Davis-LabCorp00004293 to 4295
22    Exhibit 28   Express Statistics; Bates stamped  202
                   Davis-LabCorp00002092
23
      Exhibit 29   Screenshot - LabCorp app           203
24
      Exhibit 30   Screenshot - LabCorp app           204
25

                                              Page 7
```

```
 1                    EXHIBITS (Cont.)

 2                   JOSEPH SINNING

 3     NUMBER              DESCRIPTION                 PAGE

 4     Exhibit 31   Defendant Laboratory Corporation    205

                    Of America Holdings's Responses and

 5                  Objections to Plaintiff Julian

                    Vargas's Amended Rule 30(b)(6)

 6                  Deposition Notice Topics

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 8
```

```
 1    Cape Girardeau, Missouri, Tuesday, February 2, 2021

 2                   10:05 a.m.

 3

 4         THE VIDEOGRAPHER:  Good morning.  We are

 5    on the record at 10:05 a.m. on February 2nd, 2021.      10:05:50

 6    Please note that the microphones are sensitive and

 7    may pick up whispering, private conversations, or

 8    cellular interference.  Audio and video recording

 9    will continue to take place unless all parties agree

10    to go off the record.                                  10:06:10

11         This is Media Unit 1 of the video-recorded

12    deposition of the PMK of Laboratory Corporation of

13    America Holdings, Mr. Joe Sinning, taken by counsel

14    for Plaintiff in the matter of Luke Davis and Julian

15    Vargas, et al. versus Laboratory Corporation of        10:06:30

16    America Holdings, et al. filed in the United States

17    District Court for the Central District of

18    California, Case No. 2:20-cv-00893.

19         This deposition is being held as a virtual

20    deposition via Zoom with the witness located in Cape   10:06:51

21    Girardeau, Missouri.

22         My name is Scott Slater from the firm

23    Veritext Legal Solutions, and I am the videographer.

24    The court reporter is Leslie Johnson from the firm

25    Veritext Legal Solutions.  I am not related to any     10:07:05
```

Page 9

1250

```
 1    party in this action nor am I financially interested      10:07:09
 2    in the outcome.
 3            Counsel and all present will now state
 4    their appearances and affiliations for the record.
 5    If there are any objections to proceeding, please         10:07:15
 6    state them at the time of your appearance, beginning
 7    with the noticing attorney.
 8            MR. MILLER:  Thank you.  Jonathan Miller
 9    for the plaintiffs.
10            MR. STEINER:  Rob Steiner for the                 10:07:24
11    defendant and the witness.
12            MR. SWEET:  Benjamin Sweet on behalf of
13    plaintiffs and the class.
14            MR. HANDLEY:  Matthew Handley on behalf of
15    the plaintiff.                                            10:07:41
16            MR. APPLEBY:  Callum Applyby on behalf of
17    the plaintiff.
18            THE VIDEOGRAPHER:  Thank you very much.
19            Will the court reporter please administer
20    the oath.                                                 10:07:42
21
22                JOSEPH SINNING,
23     having been first duly sworn, was examined and
24                testified as follows:
25                                                              10:07:59

                                                          Page 10
```

```
 1    BY MR. MILLER:                                          10:35:53
 2         Q    And, Mr. Sinning, this is the corporate
 3    background from LabCorp's website.  I just want to
 4    ask you a preliminary question.
 5              Have you ever reviewed any of LabCorp's       10:36:01
 6    marketing material similar to this document before?
 7         A    I have not seen this document before.
 8         Q    Let me just ask you a few questions, and
 9    let me know if you disagree based on your own
10    personal knowledge.                                     10:36:13
11              You can see in the second paragraph here,
12    in the last sentence, second sentence from the
13    bottom, it says "LabCorp serves hundreds of
14    thousands of customers around the world and provides
15    diagnostic drug development and technology-enabled       10:36:26
16    solutions for more than 160 million patient
17    encounters per year."
18              Do you agree that that's what LabCorp
19    accomplishes in its business, basically?
20              MR. STEINER:  Sorry, Jonathan.  Objection.    10:36:37
21    Beyond the scope.  Foundation.
22              THE WITNESS:  I agree that that's what's
23    printed here, so I would assume that it's correct.
24    But I don't have direct knowledge of that number.
25    / / / /
```

Page 34

```
 1        A     That is correct.                        10:38:15

 2        Q     Now, these patient service centers, what

 3   is their function within LabCorp?  What are they

 4   for?

 5              MR. STEINER:  Objection.  Vague.         10:38:37

 6              THE WITNESS:  They're there to provide a

 7   location to collect samples from patients based on

 8   what a physician has ordered, or an employer in some

 9   cases.

10   BY MR. MILLER:                                      10:38:53

11        Q     And that could be for a wide range of

12   diagnostic tests, correct?

13        A     That is correct.

14        Q     It could be, for example, blood tests.

15   That would be one example, right?                   10:39:01

16        A     Correct.

17        Q     Then there could be a series of diagnostic

18   tests run from those blood samples, correct?

19        A     Correct.

20        Q     And the patient service centers are the   10:39:18

21   access points by which the patients can go and

22   deliver their samples for LabCorp's diagnostic

23   testing, right?

24              MR. STEINER:  Object to the form.  Vague.

25              THE WITNESS:  They're one of many types of  10:39:29
```

Page 36

1253

```
 1   patients can access the diagnostic services that        10:40:46
 2   LabCorp offers, correct?
 3       A    That is correct.
 4       Q    Just returning to Exhibit 5 briefly.  If I
 5   could direct you to the second page, first              10:41:15
 6   paragraph, penultimate sentence starting with "The
 7   segment offers a growing menu of nearly 5,000 tests,
 8   including a wide range of clinical, anatomic
 9   pathology, kinetic, and genomic tests."
10           Do you see that, sir?                            10:41:36
11       A   I do.
12       Q    Is it true that the LabCorp patient
13   service centers provide access to those 5,000 types
14   of tests?
15           MR. STEINER:  Objection.  Beyond the            10:41:46
16   scope.
17           THE WITNESS:  Based on the order of the
18   physician, we would provide access to any test
19   offered through LabCorp.
20   BY MR. MILLER:                                           10:41:55
21       Q    But it is correct that LabCorp provides
22   approximately -- or nearly 5,000 different types of
23   diagnostic tests for patients; isn't that true?
24           MR. STEINER:  Object to the form.  Beyond
25   the scope.                                               10:42:06
```

Page 38

1254

```
 1              THE WITNESS:  That's what's written.  I        10:42:07

 2    don't have direct knowledge of the exact number of

 3    tests within the organization.

 4    BY MR. MILLER:

 5         Q    Do you have any reason or evidence to          10:42:11

 6    believe that that number that's referenced here is

 7    incorrect?

 8         A    I do not.

 9         Q    Are any of the patient service centers

10    that are located within the United States outfitted     10:42:30

11    with kiosks for purposes of checking in the patient?

12              MR. STEINER:  Object to the form.

13              THE WITNESS:  Most of our patient service

14    centers have a kiosk as one option of checking in

15    and for patients while they're coming into the PSC.     10:42:47

16    BY MR. MILLER:

17         Q    Do all the PSCs have kiosks?  You were

18    saying most.  Is there some subset that do not?

19         A    There are a few that do not for IT or

20    space reasons that we've not been able to outfit        10:43:02

21    them.

22         Q    How many of the kiosks within the United

23    States -- excuse me.

24              How many of the patient service centers in

25    the United States have kiosks that permit check-in      10:43:13
```

Page 39

1255

```
 1    processes for patients?                          10:43:19

 2         A    The last count I have is 1,853 of them.

 3         Q    And do you have an understanding of the

 4    number of patient service centers in California that

 5    have kiosks that allow a patient to check in?       10:43:34

 6         A    My understanding from the last count we

 7    did is there were 19 that did not out of that 299.

 8         Q    So, if I just subtract 19 from 299, I can

 9    get to the number of patient service centers in

10    California that have kiosk check-in?               10:44:01

11         A    Yes, sir.  I didn't want to try to do that

12    mental math, sorry.

13         Q    That's all right.

14              Now, LabCorp doesn't discriminate in

15    providing access to its services at patient service  10:44:13

16    centers, does it, sir?

17         A    Absolutely not.

18         Q    LabCorp seeks to serve all members of the

19    public who wish for services, including individuals

20    with disabilities, right?                          10:44:24

21         A    That is correct.

22         Q    And that includes individuals who are

23    blind or low vision, true?

24         A    Correct.

25         Q    And you would agree that LabCorp provides  10:44:32
```

Page 40

1256

```
 1   testing, wouldn't you?                          10:45:28
 2            MR. STEINER:  Object to the form.
 3            THE WITNESS:  Yes, sir.
 4   BY MR. MILLER:
 5        Q    How do you have that understanding?    10:45:32
 6        A    I have knowledge of having blind people
 7   come into the PSC and being serviced by our PSTs.
 8        Q    How do you have that knowledge?
 9        A    I've been in some locations when it was
10   transpiring as well as had conversations with people 10:45:46
11   about how the service had gone.
12        Q    So you yourself have actually observed
13   blind individuals coming into the patient service
14   center to obtain testing services?
15        A    I have on two occasions, yes.           10:46:02
16        Q    And then how many other occasions have you
17   been made aware that blind individuals accessed
18   patient service centers for diagnostic testing?
19        A    Only on two other occasions where we heard
20   about how the service went.                       10:46:19
21        Q    And where did those reports come from?
22        A    It was in conversations with
23   phlebotomists, making sure that they have a good
24   understanding of how to work with individuals.
25        Q    Well, LabCorp engaged in a project called 10:46:34
```

Page 42

1257

```
 1    Project Horizon; isn't that true?                        10:46:37
 2         A    That is our kiosk project, sir.
 3         Q    And that project began in the 2016 time
 4    frame; is that correct?
 5         A    Yes, sir.                                       10:46:48
 6         Q    And the purpose of the project was to
 7    implement patient self-service at the LabCorp
 8    patient service centers, right?
 9              MR. STEINER:  Object to the form.
10              THE WITNESS:  No.  The purpose was to           10:46:59
11    create a tablet self-check-in service as an option
12    for patients in our PSCs.
13    BY MR. MILLER:
14         Q    So, effectively, you were attempting to
15    create a self-check-in service for patients at each      10:47:09
16    one of your patient service centers; is that -- am I
17    correct?
18         A    It's a self-check-in option for patients.
19    They can either use the tablet or they can go to our
20    window and be serviced for the check-in purposes.        10:47:21
21         Q    But now patients can do other things at
22    the self-service center other than just check-ins;
23    isn't that true?
24              MR. STEINER:  Object to the form.
25              THE WITNESS:  They can make a payment on        10:47:32
```

Page 43

```
 1   account or on an NOBD, which is notice of balance        10:47:34
 2   due.  They can also do that at the front window.
 3   BY MR. MILLER:
 4        Q    But as it relates specifically to the
 5   kiosks that have been placed in the patient service       10:47:45
 6   center, they can make a payment.  That's another
 7   thing they can do other than to check in, right?
 8        A    Yes.  There is a credit card machine on
 9   the side of it.
10        Q    Can they change their appointments for the      10:47:55
11   future?
12        A    No, sir, they cannot.
13        Q    Is that part of the functionality that's
14   going to be rolled out eventually?
15        A    It's in a backlog, but it has not been          10:48:02
16   developed.
17        Q    But does the company have plans to roll
18   out the ability to schedule appointments through the
19   kiosk check-in -- or excuse me.
20             Does LabCorp have plans to allow patients       10:48:17
21   to make appointments through the kiosk?
22        A    It's an idea that's been discussed, but
23   there is no definitive plan as to when that may come
24   to fruition.
25        Q    As part of the Project Horizon, there was       10:48:32
```

Page 44

```
 1   a risk assessment done by LabCorp; isn't that true?        10:48:35
 2       A    That's my understanding.  I have not
 3   viewed the risk assessment.
 4       Q    And the risk assessment was done to review
 5   various risk scenarios that would prevent LabCorp          10:48:47
 6   from being successful in Project Horizon; isn't that
 7   correct?
 8             MR. STEINER:  Objection.  Beyond the
 9   scope.
10             THE WITNESS:  I have no knowledge of what        10:48:57
11   was done as part of that risk assessment.
12   BY MR. MILLER:
13       Q    Who made this risk assessment, to your
14   knowledge?
15       A    That would have been part of the steering        10:49:03
16   committee, is my understanding, that was developed
17   back then.
18             (Exhibit 6 marked for identification.)
19   BY MR. MILLER:
20       Q    I'm going to show you what we'll mark as          10:49:17
21   Exhibit No. 6.  This is a document that's been
22   produced by LabCorp starting at Bates stamp 55 and
23   continuing on through Bates stamp 63, labeled
24   "Project Verizon Business SME Working Group Homework
25   Assignment 8/23/16."                                       10:50:07
```

Page 45

```
 1    information?                                    10:53:46

 2             MR. STEINER:  Object to form.

 3    Speculation.

 4             THE WITNESS:  It would be the directors

 5    and managers of the sites within the divisions that   10:53:51

 6    would know that.

 7    BY MR. MILLER:

 8        Q    So here on the document, returning to

 9    Exhibit 6, it says "Mitigation strategy," "PIR/PST

10    required service patient.  Possibly offer a braille    10:54:21

11    option at the device."

12             You already indicated what a PIR is, so

13    what, for the record, is a PST?

14        A    PST is a patient service technician,

15    otherwise known as a phlebotomist.                     10:54:34

16        Q    To your knowledge, is any braille option

17    offered at any of the kiosks in patient service

18    centers throughout the United States?

19        A    No, sir, there is not.

20        Q    Do you know why not?                          10:54:52

21        A    We have the staff to service the patients,

22    and that's the direction we've chosen to go.

23        Q    Who made that decision?

24        A    It would have been Richard Porter and

25    Kevin DeAngelo back in the day.                        10:55:05
```

Page 49

1261

```
 1   really numbered.  Are you talking about where it          11:24:48
 2   says "CEP Scope Summary"?
 3        Q    Right.
 4        A    Okay.
 5        Q    And does CEP stand for capital expenditure       11:24:57
 6   proposal?  Is that your understanding of what it
 7   stands for?
 8        A    Based on what I'm seeing in front of me,
 9   yes, sir.
10        Q    And this was one of the slides that was          11:25:06
11   presented to you by LabCorp in 2016?
12        A    If it was this presentation, then yes.
13        Q    Did you come to have an understanding that
14   the Project Horizon requested a capital of
15   $22.4 million to implement it?                             11:25:21
16             MR. STEINER:  Objection.  Beyond the
17   scope.
18             THE WITNESS:  That's what I see written in
19   the slide.  I don't recall that exact conversation.
20   BY MR. MILLER:                                             11:25:33
21        Q    Have you ever come to that knowledge from
22   any other source other than a presentation?
23        A    No, sir.  I don't -- I don't have that
24   direct knowledge.
25        Q    And was it presented to you that there was       11:25:45
```

Page 67

1262

```
 1   a calculated tenure internal rate of return at        11:25:47
 2   28.9 percent and a payback of 3.6 years to recoup
 3   that expenditure?
 4        A    That's what I see written on the screen.
 5   Again, I don't recall that exact discussion back in     11:25:59
 6   2016.
 7        Q    As you sit here today, are you aware of
 8   whether the Project Horizon has recouped the initial
 9   outlay of money to implement the process?
10             MR. STEINER:  Objection.  Beyond the           11:26:14
11   scope.
12             THE WITNESS:  The only thing I'm aware of
13   is the tracking that we did to show that we saved
14   $14 million in -- I believe it was 2019.  We have
15   done no other tracking of the savings from the          11:26:29
16   project.
17   BY MR. MILLER:
18        Q    In 2019, what was the $14 million savings
19   from?  What expenditures were no longer necessary?
20        A    It was related to the transition of some      11:26:42
21   employees from full-time to part-time.
22        Q    Was that the PIRs?
23        A    It was not directly related to PIRs.  It
24   could have been phlebotomists as well as PIRs
25   because those are the staff members inside the PSC.     11:27:00
```

Page 68

1263

```
 1        Q    So there was a reduction of both PIRs and      11:27:02
 2   PSTs as a result of the implementation of Project
 3   Horizon?
 4             MR. STEINER:  Objection.  Misstates his
 5   testimony.                                                11:27:12
 6             THE WITNESS:  The placement of the tablets
 7   gave us efficiencies within the check-in process
 8   that allowed us to move people from full-time to
 9   part-time.
10   BY MR. MILLER:                                            11:27:28
11        Q    And, in 2019, there was a realized cost
12   savings for the company of $14 million as a result?
13        A    The documentation that I reviewed, yes,
14   that's what it showed.
15        Q    Now, returning here to Exhibit 7, in the       11:27:37
16   next paragraph it indicates that "The project
17   introduces preregistration and on-site walk-in
18   registration capabilities at all PSC locations to
19   improve patient experience, reduce labor in the
20   largest PSCs, and improve capacity in all patient        11:27:56
21   service centers."
22             Is that also your understanding of what
23   the project was being implemented for?
24        A    Yes, sir.
25        Q    And when it says "improved capacity in all     11:28:13
```

Veritext Legal Solutions
866 299-5127

JA0056

1264

```
  1    patient centers," is it your understanding that          11:28:15

  2    LabCorp can now see more patients as a result of the

  3    implementation of Project Horizon?

  4         A    It gives us the ability to capture the

  5    patient information up front without us having to        11:28:28

  6    manually type everything in.  So it increased our

  7    efficiencies and abilities to see more patients in

  8    some of our largest facilities.  Absolutely.

  9         Q    And have you seen an uptick in the amount

 10    of patients that LabCorp is able to service as a         11:28:44

 11    result of implementing Project Horizon?

 12         A    I don't have direct correlation of what

 13    patient volume was prior to Horizon versus after to

 14    be able to answer that question.

 15         Q    Who would be the person within LabCorp       11:29:01

 16    that you believe would have that information?

 17              MR. STEINER:  Objection.  Speculation.

 18              THE WITNESS:  Yeah.  I don't know who

 19    would have that because I'm not sure that there's

 20    been any of those type of studies done.              11:29:11

 21    BY MR. MILLER:

 22         Q    It goes on to say here in Exhibit 7 with

 23    respect to Project Horizon that "It also delivers

 24    improved appointment scheduling to drive increased

 25    utilization of appointments, improved payment           11:29:25
```

Page 70

1265

```
 1        A    That is correct.                              11:43:27
 2        Q    Do you know who Bart Coan is, listed there
 3   as a core team member?
 4        A    I do not know Bart.
 5        Q    Have you ever interacted with Mr. Coan in     11:43:36
 6   any capacity?
 7        A    No, sir.  I don't know who that individual
 8   is.
 9             (Exhibit 8 marked for identification.)
10   BY MR. MILLER:                                          11:43:43
11        Q    I'd like to show you what I'll mark as
12   next in order, Exhibit No. 8.  It's a document
13   produced by LabCorp labeled "LabCorp Express and
14   LabCorp Precheck."  It's five pages.
15        A    Right.                                        11:44:26
16        Q    Have you ever seen this document before,
17   Mr. Sinning?
18        A    Not that I recall, no.
19        Q    Were you ever made aware in your role as
20   patient service director as to any of the changes in   11:44:37
21   Project Horizon's scope?
22        A    Well, when I took my role as it exists
23   today, patient services director, this was done, to
24   my knowledge.  I don't recall seeing this as a
25   phlebotomy director in the north central division.      11:44:55
```

Page 82

1266

```
 1    center, gets a diagnostic test, and a bill is          12:04:55

 2    generated.  Patient returns a week later.

 3           Can they go to the kiosk and pay for the

 4    service they received the week prior?

 5       A    If they have the invoice number that was       12:05:03

 6    on the bill sent to them, then yes.

 7       Q    And, looking here again at Exhibit 9,

 8    there's a photograph here of the LabCorp Express

 9    check-in.

10           Is that generally what the units look like      12:05:26

11    throughout the patient service centers?

12       A    Yes, sir.

13       Q    And the device there in the lower

14    right-hand corner, is that the scanner?

15       A    No.  That's the tray that the cards go in      12:05:40

16    to be scanned.

17       Q    And that would be both the driver's

18    license and the insurance identification card?

19       A    Correct.

20       Q    And so, looking again at the photograph        12:06:00

21    here on Exhibit 9, this would be typical of what the

22    kiosks look like at each of the patient service

23    centers; is that right?

24       A    Yes.  Some will have a banner, and some

25    will not.  But yes, the design is exactly what you     12:06:12
```

Page 98

1267

```
 1    appointment via the cell phone that I think you're        01:03:24
 2    referring to.
 3    BY MR. MILLER:
 4         Q    I'm sorry.  So let me take it step by
 5    step.                                                      01:03:30
 6              On the website, you can make an
 7    appointment at a LabCorp facility, correct?
 8         A    That is correct.
 9         Q    And that technology on the website is
10    integrated with LabCorp's appointment scheduling           01:03:40
11    system, correct?
12         A    Yes.  It creates an appointment.
13         Q    Okay.  And then, once the individual has
14    an appointment, there can be check-in through the
15    smartphone, correct?                                       01:03:55
16         A    Yes.  If they provided us either their
17    email address or their telephone number for a text
18    message to send the link to.
19         Q    And that ability to check in through a
20    smartphone is also -- that technology is also              01:04:06
21    integrated with the kiosk technology that's
22    available either at the Express kiosk by the patient
23    or behind the counter?
24         A    Correct.
25         Q    And I just want to make sure that I'm            01:04:25
```

                                                    Page 112

```
  1    BY MR. MILLER:                                      01:06:57

  2        Q    I'd like to show you what I'll mark next

  3    in order Exhibit 11.  It's Bates stamped 2068

  4    through 2071.

  5             And my first question is one for           01:07:26

  6    identification as to whether you've seen this

  7    document before.

  8        A    No, I have not.

  9        Q    Do you know who Mike Doherty is?

 10        A    He's one of our IT security people.        01:07:49

 11        Q    Have you ever interacted with Mr. Doherty

 12    in your current role?

 13        A    Yes.  As we put equipment into certain

 14    places, we work with him on occasion to deal with

 15    wifi and, like I said, IT security stuff.          01:08:06

 16        Q    And you can see here on the -- I believe

 17    the third page of the document, 2070, it's signed by

 18    somebody named Bart?

 19        A    Yeah.  I don't know a Bart.

 20        Q    You've already indicated you don't know    01:08:27

 21    who Bart Coan is, correct?

 22        A    That's correct.

 23        Q    Turning to the substance of the email just

 24    briefly to see if any of it refreshes your

 25    recollection.  I'm on LabCorp 2068, the very first  01:08:38
```

```
 1    page in the penultimate paragraph, second from the        01:08:43

 2    bottom.

 3          I'd like to focus your attention to the

 4    sentence where it says "Even with those patients

 5    that were compliant."                                      01:08:54

 6      A    I'm trying to find that.

 7          MR. STEINER:  Where is that?

 8    BY MR. MILLER:

 9      Q    It's about three sentences into the

10    paragraph, the second to the last paragraph.  "Even        01:09:05

11    with those patients that were compliant."

12      A    I do see that.

13      Q    And the document says, "Even with those

14    patients that were compliant, this may create a

15    negative initial impression because the use of the         01:09:17

16    Express station is no longer seen as optional."

17          Again, the Express station was the kiosk

18    station.  Is that the way it's referred to within

19    LabCorp?

20      A    That is correct.                                    01:09:30

21      Q    It goes on to say, "With that in mind, I

22    think the patient's expectation then becomes that

23    this experience should be absolutely flawless, since

24    it is not optional."

25          Again, does that statement refresh your              01:09:44
```

                                                        Page 116

1270

```
 1    memory at all as to whether LabCorp ever indicated        01:09:46

 2    to any of its employees that the Express check-in

 3    station was not optional?

 4         A    No.  I don't recall that ever being

 5    communicated to us.                                        01:09:56

 6         Q    Have you ever investigated any type of

 7    similar statements?

 8         A    We've had a couple of complaints where a

 9    PST said "You need to use the tablet," even though

10    our training and protocols say that we're there to        01:10:09

11    service the patient.  I have seen that, and we've

12    addressed those in the divisions as they've come up.

13         Q    So, just so I'm clear, there have been

14    occasions where PSTs have directed patients that

15    they have to use the Express check-in tablet?             01:10:25

16         A    Yes.  In violation of our policy, yes.

17         Q    So that -- you would agree that would be a

18    violation of your LabCorp's internal policies if

19    such a directive was made?

20         A    Correct.                                         01:10:39

21         Q    In the next paragraph -- if you could go

22    to the last paragraph of this page.  It goes on to

23    say, "I'm certain there are a number of reasons why

24    the staff are immediately redirecting the patients

25    to the Express stations.  Employees really like the       01:11:01
```

Page 117

1271

```
 1    wait time report.  Employees were not adopting          01:11:07

 2    Horizon limited placement options for devices,

 3    et cetera.  However, in these locations, it seems

 4    that a greeter or an ambassador would truly help

 5    with the experience if the Express check-in is not      01:11:20

 6    optional, at least during some of the busier periods

 7    of the day."

 8              Again, do you know whether any greeters or

 9    ambassadors were ever hired by LabCorp following the

10    Project Horizon rollout?                                01:11:29

11              MR. STEINER:  Objection.  Asked and

12    answered.

13              THE WITNESS:  Yeah.  I'm not aware of that

14    being done specifically for that reason, no.

15    BY MR. MILLER:                                          01:11:58

16        Q    Has hiring of employees at the patient

17    service centers increased or decreased since the

18    rollout of the Project Horizon?

19              MR. STEINER:  Objection.  Beyond the

20    scope.                                                  01:12:01

21              THE WITNESS:  And, quite honestly, the

22    pandemic, you know, made a lot of changes in hiring

23    and everything.  So it would be very difficult to

24    draw any correlation at this time.

25    / / / /
```

Page 118

```
1              MR. STEINER:  Objection to the extent        01:25:34

2    there's no foundation.

3              THE WITNESS:  What I'm aware of is that

4    they have one that gives some additional

5    capabilities than the one that we have.  But that's   01:25:42

6    all I know at this time.

7    BY MR. MILLER:

8         Q    So I just want to be very clear.  You've

9    come to learn that Aila, A-I-L-A, has a kiosk that

10   has additional functionality and accessibility       01:25:56

11   features; is that right?

12        A    That is correct.

13        Q    And how did you come to learn that

14   information?

15             MR. STEINER:  Just to the extent -- let me   01:26:07

16   just caution the witness.  To the extent that any of

17   this calls for you to reveal communications with

18   counsel, I'm going to direct you not to answer the

19   question.

20             THE WITNESS:  Therefore, I cannot answer      01:26:18

21   the question.

22   BY MR. MILLER:

23        Q    Well, to your knowledge, outside of

24   anything you learned from counsel, does the existing

25   Aila product have all the accessibility -- or does    01:26:28
```

Page 130

1273

```
 1    it have accessibility features for individuals with      01:26:31

 2    disabilities to use the product independently?

 3            MR. STEINER:  Just object to the form.

 4            THE WITNESS:  Yeah.  Reask that, please.

 5    BY MR. MILLER:                                            01:26:50

 6       Q    Yeah.  No problem.

 7            So currently the patient service centers

 8    are equipped with kiosks that were provided at least

 9    in part by Aila.  The iPad itself was provided by

10    Aila?                                                     01:27:00

11       A    Yes.

12       Q    And did the product that Aila provided

13    have any features that would allow someone with

14    disabilities to use the kiosk independently?

15            MR. STEINER:  Objection to the form of the        01:27:13

16    question.

17            THE WITNESS:  When you say "disability,"

18    what kind of disability?

19    BY MR. MILLER:

20       Q    Let's start with a vision disability.            01:27:19

21       A    No.  We provide our employees to assist

22    with those individuals.

23       Q    Do you know one way or the other whether

24    LabCorp ever considered the cost of purchasing an

25    Olea, O-L-E-A, kiosk that was ADA-compliant as           01:27:55
```

Page 131

1274

```
 1   opposed to the cost of considering the Aila,           01:28:03

 2   A-I-L-A, kiosk and decided that it was an undue

 3   hardship to purchase one that was ADA-compliant?

 4           MR. STEINER:  Objection to the form of the

 5   question.  No foundation.  Legal conclusion.          01:28:14

 6           THE WITNESS:  I'm not aware of which ones

 7   were considered and why anything was chosen based on

 8   those guidelines.

 9           (Exhibit 15 marked for identification.)

10   BY MR. MILLER:                                         01:28:25

11       Q   I'm going to show you what I'll mark as

12   Exhibit No. 15.  Let me know, once you've had a

13   chance to review it.  It's, for the record, Bates

14   stamped 2836 through 2863.  And it's, again,

15   produced by LabCorp.                                   01:28:57

16       A   I have it up.  It's several pages.

17       Q   Yeah.  Now, focusing on the first page,

18   just to start with.

19           And my question is, is it your

20   understanding, Mr. Sinning, that this is the kiosk     01:29:34

21   product that was ultimately purchased by LabCorp to

22   put in its patient service centers?

23       A   It looks like it.  I'm just not sure if

24   it's a 12.9-incher or what those dimensions are.

25   But it does look like our device.                      01:29:53
```

                                                    Page 132

```
 1    LabCorp utilizes in its patient service centers        01:37:15

 2    comes from?

 3         A    I don't specifically know that answer, no.

 4              (Exhibit 19 marked for identification.)

 5    BY MR. MILLER:                                          01:37:25

 6         Q    If you'd take a look at Exhibit 19.

 7              You might want to just rotate that for

 8    your convenience so that it's in portrait mode.

 9              Can you see the exemplar that I'm looking

10    at right here?                                          01:38:00

11         A    Yes.  I do see the stand.

12         Q    It's, again, Bates stamped LabCorp 4133.

13              Is that an exemplar of what a kiosk looks

14    like at the patient service centers?

15         A    It is.                                        01:38:12

16         Q    And, outside of the iPad -- or strike

17    that.

18              Does the iPad actually go with the case

19    that surrounds the iPad?

20         A    Yes, sir, it does.                            01:38:21

21         Q    And is there any hole in that case for a

22    headphone jack?

23         A    No, sir, there is not.

24         Q    Do you know why not?

25         A    I know the headphone jack is used as part    01:38:31
```

                                                      Page 139

1276

```
 1    BY MR. MILLER:                                        02:52:24
 2         Q    Two patients walk into a PSC at the same
 3    time with one phlebotomist who is servicing another
 4    patient in the back.  Patient A is sighted and can
 5    go check in at the Express center kiosk.  Patient B    02:52:35
 6    needs to wait until the phlebotomist comes back to
 7    the window.  Patient A proceeds to the check-in
 8    location and checks in.  Who gets called first?
 9              MR. STEINER:  Objection to the
10    hypothetical.                                          02:52:48
11              THE WITNESS:  So, again, it all depends on
12    who gets signed in.  It could have easily been A or
13    B depending on who went to the kiosk first.
14    Somebody in that scenario is going to get service
15    second.                                                02:53:04
16    BY MR. MILLER:
17         Q    Let me make it more clear.
18              Two individuals walk into a patient
19    service center, Patient A and patient B.  Patient A
20    is sighted.  Patient B is blind.  Patient A walks in   02:53:12
21    and checks in at the kiosk, finishes the check in,
22    and sits down to wait.  Patient B still has to wait
23    for the phlebotomist to come back in from the back.
24    Who gets to check in first?
25              MR. STEINER:  Objection to the               02:53:30
```

Page 187

1277

```
 1    hypothetical.  Speculation.                              02:53:31
 2            THE WITNESS:  We're going to assist the
 3    person who hadn't checked in in getting them checked
 4    in.  And then we would take the first one that
 5    checked in in order.  They both arrived at the same    02:53:39
 6    time in your scenario.  Somebody is going to have to
 7    go second.
 8    BY MR. MILLER:
 9        Q    Right.  But in my scenario, it's going to
10    be Patient B, not Patient A, right, who is going to    02:53:48
11    have to go second?
12            MR. STEINER:  Objection to form.
13            THE WITNESS:  It would be.
14    BY MR. MILLER:
15        Q    Patient B is going to have to wait while      02:53:55
16    patient A gets service?
17        A    The first patient that checked in would be
18    first.
19            (Exhibit 26 marked for identification.)
20    BY MR. MILLER:                                          02:54:03
21        Q    Just a few more screenshots and we can
22    move on here.  You can set that exhibit aside.
23    Thank you very much.
24            I'm showing you what I'm marking next in
25    order Exhibit 26.  Let me know once you've had a       02:54:45
```

                                                  Page 188

1278

```
 1    are visual impaired during the check-in process at        03:50:12

 2    its patient service centers?

 3         A    There is nothing specific to visually

 4    impaired patients.  It's patients in general that we

 5    are there to either help them with the kiosk process      03:50:25

 6    directly or to assist them through helping them at

 7    the window.

 8         Q    Do you know whether LabCorp provides any

 9    training to its PIRs or PSTs to be able to assess

10    what the individual's disability is?                       03:50:38

11              MR. STEINER:  I'm sorry.  To assess what

12    their disability is?  Is that the question?

13              MR. MILLER:  Yes.  To assess what their

14    disability is.

15              MR. STEINER:  Object to the form.             03:50:51

16              THE WITNESS:  No.  We don't do any

17    training on assessing a disability.

18    BY MR. MILLER:

19         Q    Do you know whether LabCorp has any

20    policies that is provided to its PIRs or PSTs on how       03:50:59

21    to assess what disability an individual might have?

22         A    No, sir, we do not.

23         Q    Do you know whether LabCorp provides any

24    training to its PIRs or PSTs to assess what aids or

25    auxilliary services might assist an individual who         03:51:19
```

Page 227

1279

Project Horizon

Business / SME Working Group Homework Assignment   8/23/16

Risk Assessment Exercise

**When thinking about Project Horizon and the commitments made in the attached CEP….**

***When the Horizon solutions are deployed, what would prevent us from being successful?***

| Risk Scenario | Impacted Area | Mitigation Strategy |
|---|---|---|
| Patient arrives without insurance info on req or copy of insurance card | Patient Intake Labor | PIR/PST required to call client's office. Possibly deploy a system in which PST/PIR could input a SSN and retrieve both the plan info and eligibility info. |
| Patient arrives and cannot speak English/Spanish or another language that is offered on the device. | Patient Intake Labor | Offer a telephone or another translating service for patients with specific language need. |
| Patient arrives with seeing eye dog and is unable to check in at device. | Patient Intake Labor | PIR/PST required to service patient. Possibly offer a braille option at the device. |
| WIFI connectivity too slow or not enough bandwidth | Patient Experience Patient intake Labor | Ensure speed and bandwidth purchased for patient WIFI could support a high volume of patient devices at one time. |
| NOBD's currently pull only by patient name and date of birth. With this current system a patient could be notified of a past due balance that doesn't belong to them | Patient Experience | NOBD tied to a unique identifier for each individual patient. |
| Company shift towards smaller PSCS (lower # staff than ROI in CEP) | | close nearby small pscs due to increased capacity at 1 person sites. |
| Not integrated with touch. Clumsy handoff may result in more work for PST | | Ensure there is no duplication of data entry or validation of data behind the counter. |
| Patient does not pay for NOBD (past due) balances when presented as part of the patient self check-in process | Patient intake Labor Improved Capacity | Integrate the patient self check-in process with TOUCH so the PST can easily view the patient information that was entered (including NOBD) and allow for the interaction with the patient to be efficient |

JA0072

Confidential

Davis-LabCorp00000055

| | | |
|---|---|---|
| | | (in regards to collecting on the past due balance) and still realize some labor save and improved capacity within the PSC. |
| Patient elects to not provide credit card information as part of the patient self check-in process when the current service indicates there will be patient responsibility | Patient intake Labor<br><br>Improved Capacity | Integrate the patient self check-in process with TOUCH so the PST can easily view the patient information that was entered and allow for the interaction with the patient to be efficient (in regards to the credit card authorization process) and still realize some labor save and improved capacity within the PSC. |
| Patient declines to pay for current service via the patient self check-in process when the patient is not insured (Cash Sale scenario) | Patient intake Labor<br><br>Improved Capacity | Integrate the patient self check-in process with TOUCH so the PST can easily view the patient information that was entered and allow for the interaction with the patient to be efficient (in regards to the cash sale collection) and still realize some labor save and improved capacity within the PSC. |
| No cc capture up front. | | Significant risk to labor save ROI if CCC is not done by patient prior to intake. Mitigate by ensuring patient is matched to COR orders prior to arrival or in waiting room, present CCC at that time, do not prompt PST to re-approach on CCC |
| Wireless network issue that does not allow the patient to utilize the self check-in process | Patient intake Labor<br><br>Improved Capacity | Deploy card scan solutions and auto LPID/COR lookup behind front desk so PST can expedite the check-in process to ensure some labor save and improved capacity within the PSC – assumption is that if the wireless network has issues that the Touch system can still function (not sure if that is a correct assumption) |
| Patient self check-in process not functioning (e.g. - scanning issues) | Patient intake Labor<br><br>Improved Capacity | Deploy card scan solutions and auto LPID/COR lookup behind front desk so PST can expedite the check-in process to ensure some labor save and improved capacity within the PSC |
| Patient is unable to complete log-in (doesn't understand, has | Patient Intake Labor | Will need to develop an alert system for sites that may not have someone at the front desk.  For sites large enough to have |

JA0073

Confidential

Davis-LabCorp00000056

| | | |
|---|---|---|
| smartphone issues, connectivity issues, etc...) | | someone still at the front desk, ensure appropriate training so that they may assist. |
| Landlord will not allow public WiFi to be used in our leased space. | Patient Intake Labor | SE Division ran into this with our Walmart sites- they would not allow us to install patient WiFi as their IT team felt it interfered with their own operations. (Some physician clinics may have the same concern.) We will need to establish a protocol to ensure we do not violate lease agreements by installing WiFi. |
| Employees may perceive this as "big brother" watching them as they enter keystrokes into the system (automated wait times, etc...) | Union Activity | Develop strong messaging that proactively addresses this concern along with plans for labor reductions that do not include reductions in force. |
| Multiple COR orders available for Patient | Patient Intake | When PST selects Horizon patient, UI will be displayed with available COR orders. |
| No COR orders available | Patient intake | When PST selects Horizon patient PST must select Account and Physician and bill type at which point demographics are complete and OE screen can be presented |
| Patient presents with 2D barcode | Patient Intake | Horizon must be able to scan 2d barcode and present data to Touch. In addition any associated COR order must be marked as complete |
| Multi-Plan Carrier | Patient Intake | Exception flow for PST personnel enter text for multi-plan carriers |
| Horizon System down | Patient Intake | Revert to standard Touch flow |
| Patient with Standing Order | Patient Intake | Centralize Standing Orders. We will have to work out documentation ownership of s.o. request form, renewal forms, expiring reports, and confirmation reports. |
| Drop Offs | Patient Intake | Use current Touch flow |
| Insurance Carrier Mnemonic | Patient Intake | Horizon must automatically map insurance carrier to Labcorp mnemonic |
| Patient does not want to provide payment for NOBD based on self-service check-in data | PST interaction/Labor | Ensure the wording and options are clear and concise giving patient options to provide payment |
| System down for extended timeframe | PST Labor/Wait Time | Staff trained well to revert back to manual entry with patient interaction and credit card/NOBD collection |
| Too much data on each screen causing confusion for the patient | Patient satisfaction | Ensure each screen has limited data to help pt easily identify steps needed |

JA0074

Confidential

Davis-LabCorp00000057

| | |
|---|---|
| Ease of use, terminology and app/website failures | Need to be sure that terminology is familiar to the general public and that website is intuitive and has support and backup so that we do not have failures that cause patients to avoid the app/website for future use – include a phone contact # for patients if they experience a problem with the app – especially during the pilot and ramp up phase. |
| Pts with multiple orders | Provide an opportunity for patients to identify themselves as having multiple orders from different or the same physician (ie standing order and additional order). This will give our PSTs a heads up to look for multiple orders or request the order from the patient.  Need ability for PSTs to "see" testing ordered on COR orders if Pt has multiple orders.  Problem currently encountered is that some EMRs send multiple orders at one time for standing orders so patient could have 6 orders in the system but, they are all for a protime (for example) and PST has to open each order to confirm that it is not a separate order from the standing order. |
| Standing orders | Recognize standing order patients as one of our main opportunities – previous system setup was that standing orders were not included in cc auth – these patients should be included in cc auth and patient responsibility flagging<br>Provide an opportunity for patients to identify themselves as having a standing order.  Need ability to find a standing order that has been entered at any location.  Add these orders to COR (?) when entered so that they can be accessed from anywhere. |
| 1.   Bluecard process | a.   Pt responsibility information needs to be setup so that Blue Card policies are applied based on the patient's home plan and not the local Blue Card. I'm hoping this is being |

JA0075

Confidential                                                                 Davis-LabCorp00000058

addressed by the RCM team looking at the reimbursement info. BCBS – we have to bill to the local plan where the testing is performed – however, the policies (non-covered, etc) is based on the patient's plan so, if testing is performed in NC, we would bill NC BCBS but, if the Pt has BCBS Massachussets the payment would follow the policies for BCBS Massachussets.

2. Pt's ability to check financial responsibility prior to onsite at PSC

a. Some of our competitors are offering an option for patients to check their responsibility prior to having testing completed. Need to offer ability for patients to check their responsibility if their physician provides them with test codes and dx codes prior to their visit to the PSC.

3. Pts questions about financial responsibility

a. Need opportunity to direct patients if they have a question about financial responsibility. Build into the financial responsibility page to add the phone number to the payer for the patient to contact the payer if they have questions about their responsibility that has been provided.

JA0076

Confidential

Davis-LabCorp00000059

|  | | | Ensure that the pt responsibility form lists the CPT codes and dx codes provided by the client so that the patient can provide that information to their payer when they call. |
|---|---|---|---|
| 4. | Pts wondering why they did or didn't get a financial responsibility sheet | a. | Need to prepare a script for PSTs to let patients know that responsibility sheets are only provided to patients when we are able to check the financial responsibility online.  Some patients do not have financial responsibility based on their insurance and we also may not capture 100% of financial responsibility if we don't have connectivity (system down) or if the payer is not connected  - some third party administrators for example.  Need to be sure that patients understand that even though they didn't receive a sheet during the visit they may have some responsibility depending on their insurance. |
| 5. | Unexpected issues at PSCs | a. | Need option to "blackout" a particular PSC when the wait time has reached a certain timeframe (>45 min?) and/or a manual override for PSTs if they |

JA0077

Confidential                                                          Davis-LabCorp00000060

have a difficult pediatric or a single person PSC with a Pt that has had a medical emergency. If the manual override is exercised – need to alert PSC Supv and Mgr that a manual override has taken place so that they can check in with the site and send additional help if available.

6. Line management

a. This has been a problem at our busiest PSCs. If someone has an appt and is using Horizon, they will expect to be in a different "queue" than a walk-in who has not pre-registered. If the site is small and there aren't two individuals we need an option (either on the app) or through a standalone tablet for the horizon patients to check in without waiting in line or at least waiting in a different line

b. App check-in capability. Send the Pt a reminder to check-in 15 minutes prior to their appointment (?) – however, we need a time limit on how far in advance they can check in before they are at the PSC. Kind of like when you pay for parking at a kiosk and you have 5 minutes to leave the facility. My concern is that patients will check-in and

JA0078

Confidential

Davis-LabCorp00000061

show up 30 minutes later. So, maybe a requirement that they are at the PSC within 15 minutes of checking in (?) the check-in reminder should also give them an option to change their appointment time. This may help to lower the # of no shows for appointments.

Screen that shows the que (?) – I see this at Walgreens and have heard they are using it at Quest.  This may have already been asked as a user question to determine user acceptance – I'm not sure if this is good or bad but, if you did the mobile check-in and show up at the PSC and see your name on the queue then you wouldn't even need to go to the front desk when you arrive.  You would just wait for your name to be called.

1. Real time updates

   a. Need to be sure that when the patient enters their information – if they are using the app at the PSC it is available to the PST within a minute.  We are used to watching a spinning circle (maybe we make it a helix?) and then once it comes up with a confirmation that we are complete we expect the system to be updated,  This needs to be the case.  It can't take 5 minutes for the information to transfer from the app to the Touch system when a PST is ready to assist the patient this

JA0079

Confidential

Davis-LabCorp00000062

could be frustrating to both
parties if they have to wait.

JA0080

Davis-LabCorp00000063

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 94 of 408   Page ID #:3063

**Exhibit
P 7**



# "Project Horizon"
## PSC Patient Self Service
## Project Kickoff Meeting

### August 2016

**LabCorp**
Laboratory Corporation of America

1289

# Agenda

- Opening Remarks — Mark/Kevin/Mark
- Scope of the CEP — Kevin
  - Horizon Project Goals
  - Features with Tangible Benefits
  - Features with Intangible Benefits
- Phasing of the Project — Mark
  - Highest Value First
  - Incremental Deliveries
- Break
- Agile Development Process — Mark
  - Process Overview
  - Roles and Level of Involvement
  - Reporting and Oversight
- Demonstration of the Prototype — Horizon Dev Team
- Action Plan — Mark/Kevin
- Closing Remarks — Kevin/Mark

JA0082

**LabCorp** 2

Company Confidential - For internal use only

1290

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 96 of 408   Page ID #:3065

JA0083



**LabCorp**
Laboratory Corporation of America

# Opening Remarks

1291

# Patient as Consumer Business Drivers

## Competition



## Emerging Demand

## Wearables and monitoring




## Social/Analytics Market Trends

### LabCorp

Company Confidential - For internal use only

JA0084



# Consumer Self Service in a Mobile World

## Modern Self Serve Car Rental





- Option 1 – preferred account with reservation picks up car directly from the lot and leaves
- Option 2 – self serve kiosk scans DL and CC, pick your car on screen, pick up car in the lot and leave

## Old School Car Rental



- Wait in long line
- Fill out forms and show driver's license and credit card
- Wait for agent to ask questions and finish agreement
- Wait for car and then check paperwork again at exit

JA0085

**LabCorp** 5

Company Confidential - For internal use only

1293

# Consumer Self Service in a LabCorp PSC

An airline analogy

**We serve a diverse consumer market:**

- Many will embrace a mobile web app or installable mobile hybrid app to have everything ready before they arrive at PSC

- Many will embrace using a kiosk at the time they arrive, but will expect a very easy, intuitive experience to expedite their visit

- Some will still need personal attention at the counter, but we still need the speed and efficiency of new technology to capture and verify all consumer info



Check in on mobile




Check in at the kiosk



Check in at the counter



JA0086

Company Confidential - For internal use only

1294

# Consumer Self Service in a LabCorp PSC

One more travel analogy






"Express" customers get smart recommendations for appointment times and locations and fast pay options (stored cards) based on established account and preferences

Casual customers can still find best appointment and location options for them at the time without registering for an account but with easy data entry

Company Confidential - For internal use only

JA0087

1295

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 101 of 408   Page ID #:3070



# Scope of the CEP

JA0088

1296

# CEP Scope Summary



Project "Horizon"

PSC Patient Self Service

Capital Expenditure Proposal

Executive Summary

**Summary:**

This project requests capital of $22.4M with a calculated 10 year IRR of 28.9% and a payback of 3.6 years

This project introduces pre-registration and onsite (walk in) registration capabilities at all PSC locations to improve patient experience, reduce labor in the largest PSCs, and improve capacity in all patient service centers. It also delivers improved appointment scheduling to drive increased utilization of appointments, improved payment process to increase collections from patients, and improved patient engagement to increase clinical trials recruitment and email/cell phone capture.

Over 50% of the time needed by a LabCorp employee to create a patient order at a PSC is tied directly to patient data and payment information. The patient data provided includes basic patient demographics, insurance coverage, responsible party demographics and corresponding relationship(s) to the insured. Additional patient interaction is required to capture financial and payment information including balance(s) due, overdue balances (NOBD) and preferred methods of payment. The remaining time needed to complete the patient order is specific to the physician order itself and requires the capture of account ID, diagnosis codes and test orders.

The time needed and the labor required to complete the TOUCH order entry process at PSC and IOP locations can be reduced through Patient Self Service where patients are provided with multiple opportunities and multiple channels including mobile app, mobile web app, and tablet-based LabCorp supplied devices to pre-register, leverage "known patient" status or self-register upon arrival. The pre-registration and rapid check-in capabilities of the project also reduce the potential for extended patient wait-time prior to intake and improve the overall patient experience.

**Details:**

This project introduces pre-registration and onsite (walk in) registration capabilities at all PSC locations. The three primary capabilities follow.

Company Confidential - For internal use only

1297

# Project Horizon: Overview and Key Elements

JA0090

10



**Key Functional Elements**
- Introduction of "Known Patient" and Fast Pass Services
- New Waiting Room Experience
- Wait Time Suggestions
- Project Phoenix Leverage for Insurance and Demographic Validation

**Best in Class Consumer Experience Integration**
- Native Mobile Apps for Personal Media Devices and tablets
- Overhaul of Existing Patient Engagement Channels
- Component of Larger Consumer App Program

**Value Proposition**
- Labor Reduction
- Waste Reduction
- Improved Capacity
- Improved Patient Experience

**Project Horizon**
PSC Self Service

Case 2:20-cv-00893-FMO-KS  Document 79  Filed 04/27/21  Page 104 of 408  Page ID #:3073

# Consumer Mission and Project Goals

## Consumer Mission

**Transform LabCorp patient interaction into consumer engagement and solution the improved capabilities into a modern technology platform**

## High Level Project Goals

- Create technology that causes patients to request LabCorp

- Enhance the preference for LabCorp in the physician community

- Increase reach of patient recruitment for research

- Reduce labor in the Patient Service Centers by shifting data collection from employees to patients

- Improve cash flow from patients through improved billing and payment capabilities



JA0091

Company Confidential - For internal use only

1299

# Features with Tangible Benefits

- Patient Pre-registration through 3 channels:
  - Responsive website for mobile, tablet, computer
  - Installable mobile apps for iOS and Android
  - Tablet based "Express Check In" in the waiting room
- Pre-registration will include capture of patient demographics, insurance, and appropriate validation and eligibility checks
- Streamlined check-in options
- Pre-registration delivers labor savings
- Pre-registration delivers paper and toner savings



JA0092

Company Confidential - For internal use only

1300

# Additional Features with Intangible Benefits

- Patient Payment Options through 3 channels:
  - Responsive website for mobile, tablet, computer
  - Installable mobile apps for iOS and Android
  - Tablet based "Express Check In" in the waiting room
- Patient Payment Options will include capture of credit card for future charges and may include payment of existing invoices
- Patient Payment Options delivers improved collections

**LabCorp**

JA0093

Company Confidential - For internal use only

1301

# Additional Features with Intangible Benefits

- Improved Appointment Scheduling to show closest PSC locations to patient's current geo-location and estimated wait times for each location

- Improved inventory of available appointment slots optimized for patient convenience and PSC workflow

- Improved Appointment Scheduling delivers improved patient and physician preference for LabCorp



JA0094

Company Confidential - For internal use only

# Additional Features with Intangible Benefits

- Improved recruitment of patients for participation in research

- Improved creation of patient LabCorp accounts and patient engagement through capture of cell phone, email and password

- Improved patient satisfaction through free Wi-Fi in all PSC locations

- Improved patient satisfaction through easy electronic feedback on service during the visit



JA0095

Company Confidential - For internal use only

1303

# CEP Scope Summary

1. Multi-channel patient pre-registration
2. PSC patient queue management and Touch integration
3. Multi-channel payment options
4. Improved appointment scheduling and lab locator
5. Patient recruitment
6. Patient engagement through cell phone and email
7. Patient enrollment in portal
8. Free wi-fi in waiting rooms
9. Electronic feedback (NPS)



JA0096

Company Confidential - For internal use only

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 110 of 408   Page ID #:3079



# Project Phases

JA0097

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 111 of 408   Page ID
#:3080

# Timeline

## Patient Self Service for PSCs



- Benefits layer in multiple releases beginning 9 months after project launch
- Deployment to highest value locations first



JA0098

Company Confidential - For internal use only

# Phase I

## Deliver the highest tangible value first

Likely highest values to be addressed first will include:

- Patient identity capture and validation
- Patient insurance lookup or capture and verification
- Easy check in capabilities (I'm here)
- Patient queue management (place in line, call back, waiting time capture)
- Patient recruitment
- Free wi-fi



JA0099

Company Confidential – For internal use only

# Phase II

## Deliver the next highest tangible value second

Likely next highest values to be addressed will include:

- Patient estimate presentment and authorizations
- Patient payment method capture
- Patient invoice payment
- Patient enrollment in portal
- Pre-registration in portal?



Company Confidential - For internal use only

JA0100

1308

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 114 of 408   Page ID



# Phase III and beyond

## Deliver the next highest value following whether tangible or intangible

Likely next highest values to be addressed will include:

- Appointment scheduling with geo-location and wait times (maybe suggestions)
- Patient feedback (NPS scoring?)
- Registration and check-in improvements
- Payment improvements
- Portal integration

JA0101

Company Confidential - For internal use only

1309

Case 2:20-cv-00893-FMO-KS Document 79 Filed 04/27/21 Page 115 of 408 Page ID #:3084

JA0102



# Agile Development Process

1310

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 116 of 408   Page ID #:3085



## Scrum in 100 words

- Scrum is an agile process that allows us to focus on delivering the highest business value in the shortest time.

- It allows us to rapidly and repeatedly inspect actual working software (every two weeks to one month).

- The business sets the priorities. Teams self-organize to determine the best way to deliver the highest priority features.

- Every two weeks to a month anyone can see real working software and decide to release it as is or continue to enhance it for another sprint.

JA0103

Company Confidential - For internal use only

# The Agile Manifesto

JA0104



| | | |
|---|---|---|
| Individuals and interactions | over | Process and tools |
| Working software | over | Comprehensive documentation |
| Customer collaboration | over | Contract negotiation |
| Responding to change | over | Following a plan |

Source: www.agilemanifesto.org

Company Confidential - For internal use only

1312

Case 2:20-cv-00893-FMO-KS Document 79 Filed 04/27/21 Page 118 of 408 Page ID #:387

# Scrum in a Nutshell





JA0105

COPYRIGHT © 2005, MOUNTAIN GOAT SOFTWARE

Company Confidential - For internal use only

# Sprints

- Scrum projects make progress in a series of "sprints"
  - Analogous to Extreme Programming iterations
- Typical duration is 2–4 weeks or a calendar month at most
- A constant duration leads to a better rhythm
- Product is designed, coded, and tested during the sprint



JA0106

Company Confidential - For internal use only

# No Changes During a Sprint



Change

- Plan sprint durations around how long you can commit to keeping change out of the sprint



Company Confidential - For internal use only

JA0107

1315

Case 2:20-cv-00893-FMO-KS Document 79 Filed 04/27/21 Page 121 of 408 Page ID

# Scrum Framework



**Roles**
Product owner
ScrumMaster
Team

**Ceremonies**
Sprint planning
Sprint review
Sprint retrospective
Daily scrum meeting

**Artifacts**
Product backlog
Sprint backlog
Burndown charts

JA0108

LabCorp

Company Confidential - For internal use only

# The Daily Standup



- Parameters
  - Daily
  - 15-minutes
  - Stand-up
- Not for problem solving
  - Whole world is invited
  - Only team members, ScrumMaster, product owner, can talk
- Helps avoid other unnecessary meetings



Company Confidential - For internal use only

JA0109

# Everyone Answers 3 Questions

 What did you get done yesterday?

 What will you get done today?

 Is anything in your way?

- These are *not* status for the ScrumMaster
  - They are commitments in front of peers


LabCorp

JA0110

Company Confidential - For internal use only

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 124 of 408   Page ID

# The Sprint Review



- Team presents what it accomplished during the sprint
- Typically takes the form of a demo of new features or underlying architecture
- Informal
  - 2-hour prep time rule
  - No slides
- Whole team participates
- Invite the world

LabCorp

Company Confidential - For internal use only

JA0111

# The Innovation Cycle



Disruptive Innovation

Consumer Market Testing

Product Development

Company Confidential - For internal use only

LabCorp

JA0112



JA0113

# Demonstration of Prototype

1321



Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 123 of 458   Page ID #:2097



JA0115

35

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 129 of 456   Page ID #:2091



JA0116

36

JA0117
37

Great, Scott!
We found your information

Case 2:20-cv-00893-FMO-KS Document 79 Filed 04/27/21 Page 131 of 458 Page ID #:2190



Case 2:20-cv-00893-FMO-KS Document 79 Filed 04/27/21 Page 132 of 456 Page ID #:3101

Case 2:20-cv-00393-FMO-KS   Document 79   Filed 04/27/21   Page 133 of 438   Page ID #2102



JA0121

Case 2:20-cv-00393-FMO-KS Document 79 Filed 04/27/21 Page 135 of 456 Page ID #:3104



JA0122

42

Case 2:20-cv-00693-FMO-KS   Document 79   Filed 04/27/21   Page 135 of 458   Page ID #:3105

JA0123

43

Scott, you're checked in!

Please **remove your insurance card**, take a seat and we'll call you back shortly.

Okay

JA0124



# Action Plan

# Governance Structure – Roles and Information Flow

**Board of Directors - Quarterly Progress Updates**

**Executive Oversight - Quarterly Meetings Prior to the Board Update**

This committee is responsible for providing project oversight, identifying and clearing risks and roadblocks to the success of the project, and preparing for the quarterly progress updates to the Board of Directors.

**Project Steering Committee - Meets Monthly or As Needed**

The Project Steering Committee provides updates to the Executive Oversight Committee and helps the project Core Team set priorities. This Committee is responsible for steering the project in a manner that ensures the achievement of the project's Mission and Goals (including decision-making about time, resources and deliverables content).

**Core Team – Meets Weekly**

The Core team is also broken into two groups; one that supports Process Only and a second that supports Process / System changes. The Core Team's role is to manage the delivery of successful releases of production functionality to end users. This team will also manage communication to all impacted business and IT groups during the planning, testing and implementation phases of each release.

**Development Teams – Day-to-Day Work**

There will be 3 or more individual Development teams each working on an assigned deliverable. These teams will be made up of collaborative groups of both IT and business resources, including stakeholders from the Division and Corporate Operations. Based on priorities set by the Core Team, each Development Team will develop, test and implement deliverables. The business owners will have Subject Matter Experts and Process Owners working iteratively with IT solution architects and developers to design and perfect the look, feel and functionality of each deliverable in real time.

**MC – Monthly Updates**

The Corporate Management Committee will receive regular progress updates from the Project Steering Committee.

**OC – Monthly Updates**

The Operating Committee will receive regular progress updates from the Project Steering Committee.



JA0125

45

1333

# Governance Structure – Team Members





Case 2:20-cv-00893-FMO-KS Document 79 Filed 04/27/21 Page 140 of 408 Page ID

# Development Team Structure



JA0127

LabCorp

Company Confidential - For internal use only

# Stakeholder Team Structure



**Stakeholder Leadership**

Project Owner Corp Ops

Project Owner I.T.

**Business SME Team**

| Corp Ops SME | Div Phleb MGR | Div I.T. Mgr |
| Corp Ops SME | Div Phleb MGR | Div AR Dir |
| Corp Ops SME | Div Phleb MGR | RCM Patn Bill Dir |

**Business Operations Leadership Team**

| Corp Ops Director | Atl Division Director | N.C. Division Director |
| | MA Division Director | SE Division Director |
| | NE Division Director | W Division Director |

**Patient Advisory Board**

| Patient Advocate | NOQ - CMO | Legal |
| Corp Ops | Marketing | Compliance |
| RCM | IT | Contact Centers |

Company Confidential - For internal use only

**LabCorp**

JA0128

1336

# Modern Software Development Methodology





JA0129

49

1337

# Timeline

## Patient Self Service for PSCs



- Benefits layer in multiple releases beginning 9 months after project launch
- Deployment to highest value locations first



JA0130

Company Confidential - For internal use only

# Next Steps

1. Technical Kickoff Meeting — Aug 15th

2. Stakeholder Group Working Sessions — As scheduled

3. Development Team Sprint 0 — Aug 15th

4. Persona/Workflow Working Session — Aug 18th

5. Development Start Readiness Milestone — Early Sept

LabCorp

JA0131

Company Confidential - For internal use only

1339

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 145 of 408   Page ID #:3114

JA0132



# Closing Remarks

1340

Good afternoon everyone,

As some of you may not know, I was invited by Mike Doherty to visit some of the Northeast PSCs on Monday and Tuesday of this week to hear from some of the Divisional IT and PSC staff on the Horizon rollout.  We visited Somerset, East Brunswick, Freehold, and had a chance to have a tour of Raritan.  I want to thank Mike and the Divisional IT and PSC staff (Joe Campo's – "NY" and "Jersey", Kurt at Raritan, Komal at Somerset, Hathel (sp?) and Pamel (sp?) at Freehold) for being generous with their time, and so very open and willing to share their feedback on the Horizon rollout.

Mike and I collected a number of observations/feedback from the trip and I wanted to share those with you.  I have attempted to organize the information in a manner that hopefully is digestable, but fair warning - it is good amount of information.  Here are the groupings that I created -

- Key Takeaway from my perspective
- Top 3 or 4 Items to address from each location based on Division IT or staff prioritization (I asked them at each location if they could change 3 things what would they be)
- Remaining Feedback grouped by Application Flow/Issues, Hardware, Ergonomics, Logistics
- Suggestions and general comments I heard from patients in the field

I will share pics as soon as I can get them off my phone (my iPhone is being difficult at the moment ☺).  Mike, please chime in with anything that I missed.

**Key Takeaway from Bart's perspective (please note this opinion is based on visits at only these 3 sites and feedback from the members giving us the tour)**

In the sites that we visited, the vast majority of patients would proceed to the counter if the line at the counter line was less than 3 people.  The patients were redirected to check-in at the Employee Express station.  Most patients simply said ok, but many seemed visibly frustrated at the redirection, particularly the older patients.  Even with those patients that were compliant, this may create a negative initial impression because the use of Express station is no longer seen as optional.  With that in mind, I think the patient's expectation then becomes that this experience should be absolutely flawless since it is not optional.  So if they encounter any difficulty with the Express station (application, ergononmics, logistics), their frustration could become amplified.  I timed a number of the experiences in the East Brunswick location, and they ranged from 2 – 5 minutes.  That seemed like a long time to me, but I do think people very much want to figure it out, whatever issue they may be having.  As people asked for help or the PSTs came out to the front, they were usually able to get the patient through Employee Express quite quickly, although sometimes they ended up switching stations.

I'm certain there are number of reasons why the staff are immediately redirecting the patients to the Express Stations (employees really like the wait time report, employees were not adopting Horizon, limited placement options for devices, etc.).  However, in these locations, it seems that a greeter or ambassador would truly help with the experience if the Express check-in is not optional, at least during some of the busier periods of the day.  The staff we visited saw this as a need, but also understood we did not have budget for this.  They had some interesting suggestions, e.g. hiring students since summer is coming up, older volunteers.  I think this initial interaction with the patient sets the stage for remaining experiences with Horizon.

JA0133

Confidential

Davis-LabCorp00002068

1341

**Top 3 Items from Each Location**

Somerset
1.   They have to reboot several of Express stations 5 or 6 times daily because they freeze, won't scan, screen goes black, etc.  The newer stations they had at the end seemed to be much more stable.  They stated if they only had to reboot once/day, they would love the system.  Joe told me they have only returned 5 or 6 Express stations across the division, and it seemed to me they should return these stations given this behavior.  I do not think I really uncovered the reason these units had not been returned.
2.   Screen is too small, especially for the elderly – lots of trouble using ergonomically – several comments made as to why could the screens not be larger like kiosks in other retailers
3.   System flow is not easy for pediatric patients – they have put up signs on the tablets telling them to enter patient's name manually instead of scanning the driver's license (pic will be sent)
4.   Popup keyboard covers most of entry screen (pic will be sent)

East Brunswick
1.   Ability to do remote troubleshooting – Joe Campo – should explore what he would like to resolve remotely
2.   More consistent scanning of driver's license and insurance cards
3.   More intuitive experience with pictures – pointed again to kiosks in local retailers

Freehold
1.   Longer plug on Express station to give them more flexibility with placement
2.   Ability to address problems themselves instead of having to wait for IT, they want more self-sufficiency (Hathel)
3.   More stable stands, some ability to secure them to the wall – people tend to interact negatively with Express tablets when they become frustrated


**Remaining Feedback across locations**

Application Flow
- Need better system stability
- Patients seem to struggle on why they are here screen – perhaps change "labwork" to "blood work"
- Spanish would be very helpful
- Would really like to display names of patients on TV after they have checked in (patient queue) – patients sometime struggle with what to do after they have checked in.
- Does not read front of license intuitively
- Patient said they had checked in before, however, the system did not recognize them
- Medicare cards are not scanning
- Not easy to override when patient does not have email or does not want to enter
- Could we have ".yahoo.com" or ".gmail.com" option when entering email
- Images of insurance cards not always showing up in the patient queue

Logistics
- Need dual keys to reboot, but keys are often lost

JA0134

- Privacy seems to be a big issue if someone is behind patient during entry – heard from multiple staff that this is a concern that patients are raising

Hardware
- Trays come off too easily
- Would swivel (that pivots down) be possible for better privacy and easier data entry
- When assembling stands – incorrect allen wrenches were included – Joe had to tighten bolts with pliers
- Removing Express tablet head requires taking the top piece off as well to get USB power cord out – this was a two person job – this could pose some challenges when we rollout the payment devices

Ergonomics
- No counter at station for people to put their belongings while they check in (cane, purse, water bottles, etc.)
- Many people had to hunch over station to see what they were entering


**Suggestions and Additional Comments**

- Could we hire students or use elderly people as volunteers to help users through the Express tablet experience
- Seems inefficient to roll out Express stations now when the current heads are going to need to be replaced with heads with payment devices
- Concerned about next software push – lots of problems last time with iOS updates
- Person commented that they did not think the devices are ready for primetime yet
- Patients that were checked in tried to help other patients that were having a difficulty with Express stations
- Staff commented that we should be careful with Employee Express because patients may become too reliant on PSTs checking them in
- Do not feel their concerns and feedback are being heard, although they believe the concept is great
- Use TV in the lobby to help with messaging and instructions on how to use Express or Pre-check
- Have users just take a picture of the Medicare cards instead of entering manually when they can't be read, which tends to be error prone and the PSTs end up rekeying anyway
- There were some pretty tough comments about the Express stations from some of the older patients after they had become frustrated in East Brunswick location.  I'm not going to include in this email (you can see me if you want to hear them)

I do hope this helps in our process, but I also believe we should plan some more personal visits from IT to these locations since these are certainly our more challenging areas.  I look forward to your thoughts and considerations, and ways to incorporate some of this feedback in our plans for improvement.  I do ask that we not forward this information around until we all have had a chance to have some dialog on the observations.  Thanks!

Bart

JA0135

JA0136

Confidential

1344

Davis-LabCorp00002071

# EXHIBIT 13

1              UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   LUKE DAVIS, JULIAN VARGAS, and    ) Case No.
    AMERICAN COUNCIL OF THE BLIND,    ) 2:20-CV-00893-FMO-KS
5   individually, and on behalf of    )
    all others similarly situated,    )
6                                     )
                         Plaintiffs,  )
7                                     )
        v.                            )
8                                     )
    LABORATORY CORPORATION OF AMERICA )
9   HOLDINGS; and DOES 1 through 10,  )
                                      )
10                       Defendants.  )
    _____)

11

12

13           DEPOSITION OF JULIAN VARGAS

14     TAKEN REMOTELY VIA ZOOM VIDEO CONFERENCE

15          WEDNESDAY, FEBRUARY 10, 2021

16

17

18

19

20

21

22

23   REPORTED BY:  JANET MURPHY, CSR 9650
     JOB NO.:      210210JM
24

25

JA0137

DEPOSITION OF JULIAN VARGAS

```
1                  UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   LUKE DAVIS, JULIAN VARGAS, and    ) Case No.
    AMERICAN COUNCIL OF THE BLIND,    ) 2:20-CV-00893-FMO-KS
5   individually, and on behalf of    )
    all others similarly situated,    )
6                                     )
                         Plaintiffs,  )
7                                     )
        v.                            )
8                                     )
    LABORATORY CORPORATION OF AMERICA )
9   HOLDINGS; and DOES 1 through 10,  )
                                      )
10                       Defendants.  )
    _____)

11

12

13       DEPOSITION OF JULIAN VARGAS, taken remotely via

14       Zoom Video Conference, commencing at 11:01 a.m.

15       Pacific Standard Time on Wednesday, February 10,

16       2021, reported by Janet Murphy, CSR 9650, business

17       address 3510 Torrance Boulevard, Suite 102,

18       Torrance, California 90503.

19

20

21

22

23

24

25
```

2

JA0138

DEPOSITION OF JULIAN VARGAS

```
 1    APPEARANCES OF COUNSEL:

 2

 3    ATTORNEYS FOR PLAINTIFFS
      LUKE DAVIS, JULIAN VARGAS, AMERICAN
 4    COUNCIL OF THE BLIND, AND THE CLASS:

 5            NYE, STIRLING, HALE & MILLER, LLP
              BY:   BENJAMIN J. SWEET, ESQ.
 6                  CALLUM APPLEBY, ESQ.
              1145 Bower Hill Road
 7            Suite 104
              Pittsburgh, Pennsylvania 15243
 8            (412) 857-5350 / FAX (805) 284-9590
              E-MAIL:  ben@nshmlaw.com
 9                    callum@nshmlaw.com

10

              NYE, STIRLING, HALE & MILLER, LLP
11            BY:  JONATHAN D. MILLER, ESQ.
              33 West Mission Street
12            Suite 201
              Santa Barbara, California 93101
13            (805) 963-2345 / FAX (805) 284-9590
              E-MAIL:  jonathan@nshmlaw.com

14

15            HANDLEY FARAH & ANDERSON PLLC
              BY:  MATTHEW K. HANDLEY, ESQ.
16            777 6th Street NW
              11th Floor
17            Washington, DC 20001
              (202) 559-2411 / FAX (844) 300-1952
18            E-MAIL:  mhandley@hfajustice.com

19

20    ATTORNEYS FOR DEFENDANT
      LABORATORY CORPORATION OF AMERICA HOLDINGS:
21
              KELLEY DRYE & WARREN LLP
22            BY:  ROBERT I. STEINER, ESQ.
                  JEWEL K. TEWIAH, ESQ.
23            101 Park Avenue
              New York, New York 10178
24            (212) 808-7800 / FAX (212) 808-7897
              E-MAIL:  rsteiner@kelleydrye.com
25                    jtewiah@kelleydrye.com
```

3

JA0139

1348

DEPOSITION OF JULIAN VARGAS

```
 1                       I N D E X

 2

 3   DEPONENT              EXAMINED BY:              PAGE:

 4   JULIAN VARGAS         MR. STEINER              5, 74

 5                         MR. SWEET                  67

 6

 7

 8

 9           EXHIBITS MARKED FOR IDENTIFICATION:

10                       (NONE)

11

12

13

14

15          QUESTIONS UNANSWERED BY DEPONENT:

16            (MARKED WITH ^ IN TRANSCRIPT)

17                 PAGE      LINE

18                  18        18

19

20

21

22            INFORMATION REQUESTED:

23                       (NONE)

24

25
```

4

JA0140

1349

DEPOSITION OF JULIAN VARGAS

```
 1   PROCEEDINGS HELD VIA ZOOM; WEDNESDAY, FEBRUARY 10, 2021

 2                    11:01 A.M.

 3

 4      DEPOSITION OFFICER:  We are going on the record.

 5

 6                    JULIAN VARGAS,

 7          called as a deponent and sworn in by

 8          the Deposition Officer, was examined

 9               and testified as follows:

10

11      DEPOSITION OFFICER:  Mr. Vargas, would you please

12   raise your right hand.

13          Do you solemnly swear or affirm the testimony

14   you are about to give shall be the truth, the whole

15   truth, and nothing but the truth?

16      THE DEPONENT:  Yes.

17      DEPOSITION OFFICER:  Thank you.

18

19                    EXAMINATION

20   BY MR. STEINER:

21      Q.   Good morning, Mr. Vargas.

22          Can you state your full name and address for the

23   record.

24      A.   My name is Julian Vargas.  My current address is

25   13741 Oxnard Street, Apartment 9, Van Nuys, California
```

5

DEPOSITION OF JULIAN VARGAS

1    91401.

2         Q.   Have you ever been deposed before, Mr. Vargas?

3         A.   No.

4         Q.   Let me first tell you who I am and then give you

5    some instructions that will hopefully make the deposition

6    go more smoothly.

7              My name is Rob Steiner.  I'm a lawyer for

8    Laboratory Corporation of America Holdings, which I will

9    refer to in this deposition as "LabCorp."

10             You will understand that, correct?

11        A.    Correct.

12        Q.   I'm going to be asking you some questions today

13   about an action which you and Mr. Davis as well as

14   American Council of the Blind filed against LabCorp.

15             If at any point in time you don't understand any

16   of my questions, let me know that, and I will attempt to

17   rephrase the question in a way in which you can

18   understand it.

19             If you answer one of my questions, I will assume

20   you've understood it as asked.

21             If you need a break at any time, let me know

22   that, and I will accommodate you with a break.  I'll just

23   ask that you respond to any pending questions before

24   taking a break.

25             It's important that your answers be verbal.  The

6

JA0142

1351

DEPOSITION OF JULIAN VARGAS

1    court reporter can't take down a nod or a shake of the

2    head.  If you intend to say "Yes," you should say "Yes."

3    If you intend to say "No," you should say "No."

4           Let's try not to speak over each other.  I know

5    this is a little cumbersome.  It's hard when we're

6    in-person.  It's even more difficult when we're on video.

7    Let me finish my question, which will give your counsel

8    an opportunity to object if he sees fit, and then you can

9    answer it.  And I will try to let you finish your answer

10   before I ask another question.

11          Do you understand these instructions?

12      A.    Yes, I do.

13      Q.    Did you do anything to prepare for this

14   deposition here today?

15      A.    Just conferred with my counsel and talked about

16   these things.

17      Q.    And I'm not going to ask you what you discussed

18   with your counsel.

19          How long was your conference with your lawyer?

20      A.    We had two conferences, approximately a couple

21   of hours in length.

22      Q.    So both were a couple hours in length for a

23   total of about four hours, or two conferences for about

24   two hours?

25      A.    Each conference was about a couple hours in

7

JA0143

1352

DEPOSITION OF JULIAN VARGAS

```
 1  length, give or take.
 2      Q.   Did you review any documents in preparation for
 3  your deposition?
 4      A.   Yes.
 5      MR. SWEET:  I will caution Mr. Vargas to limit his
 6  answer to whether he viewed any documents.
 7  BY MR. STEINER:
 8      Q.   And did any of the documents that you reviewed,
 9  sir, refresh your memory as to any of the facts in this
10  case?
11      A.   Yes.
12      Q.   And what documents that you reviewed refreshed
13  your recollection?
14      A.   The documents related to the -- to the
15  deposition.
16      Q.   What documents were those, sir?
17      A.   I don't remember the names of them.  A lot of
18  them have titles with like letters and numbers and things
19  like that; but I believe it was the document that was
20  sent with regard to, you know, requesting a deposition
21  and detailing the complaint.
22      Q.   So did you review the allegations in the
23  complaint, sir?
24      A.   Yes, I did.
25      Q.   And did those allegations in the complaint
```

8

JA0144

1353

DEPOSITION OF JULIAN VARGAS

1    refresh your memory?

2        A.    Yes.

3        Q.    And other than reviewing the complaint in this

4    matter, did you review any other documents that refreshed

5    your recollection?

6        A.    I'm not sure what you mean by "other documents."

7        Q.    So did you review Responses to Requests to Admit

8    in this case?

9        A.    Requests to Admit?

10           I believe I did see something along those lines.

11       Q.    And did you review your answer to LabCorp's

12   counterclaim?

13       A.    Yes, I did.

14       Q.    Any other documents, sir, that you reviewed that

15   refreshed your memory?

16       A.    I don't recall.

17       Q.    Now, you said you met with counsel.

18           With whom did you meet?

19       A.    We met, of course, by phone or virtually; with

20   Ben Sweet and Jon Miller and Matt Handley.

21       Q.    Have you discussed your deposition here today

22   with Mr. Davis?

23       A.    I don't think so.

24       Q.    Have you ever spoken to Mr. Davis?

25       A.    I don't recall.

                                                        9

DEPOSITION OF JULIAN VARGAS

```
 1       Q.   Have you ever met Mr. Davis?

 2       A.   Not in-person, no.

 3       Q.   Do you know where Mr. Davis lives?

 4       A.   I do not.

 5       Q.   Have you spoken with Mr. Davis on the telephone?

 6       A.   No.

 7       Q.   And have you had any video chats with Mr. Davis?

 8       A.   No.

 9       Q.   Have you had any e-mails with Mr. Davis?

10       A.   Just to clarify, you're referring to Luke Davis?

11       Q.   That's correct.

12       A.   No.

13       Q.   Have you communicated with Luke Davis in any

14   manner whatsoever?

15       A.   No.

16       Q.   What is your understanding of Mr. Davis's role

17   in this litigation?

18       A.   My understanding is that he had a similar

19   experience to what I've experienced at LabCorp, the only

20   exception being that, from what I understand of his

21   condition, he needs to go there more frequently than I

22   do.

23       Q.   But just to be clear, you and Mr. Davis have not

24   at any point in time discussed the claims in this case,

25   correct?
```

10

JA0146

1355

DEPOSITION OF JULIAN VARGAS

```
 1        MR. SWEET:  Objection; asked and answered.
 2   BY MR. STEINER:
 3        Q.   You can answer, Mr. Vargas.
 4        A.   That's correct.
 5        Q.   Have you and Mr. Davis done anything to
 6   coordinate the supervision of counsel in this case?
 7        A.   No.
 8        Q.   What is your educational background, sir?
 9        A.   I attended high school and I've had some
10   vocational school training afterward.
11        Q.   When did you graduate from high school?
12        A.   1988.
13        Q.   And what vocational training did you take after
14   that?
15        A.   I took computer classes.
16        Q.   Did you get any degrees or certificates from
17   those computer classes?
18        A.   Yes.
19        Q.   What degrees or certificates did you get?
20        A.   Certifying that I had a basic knowledge and
21   understanding of the Windows operating system.
22        Q.   Any other computer certifications that you have?
23        A.   No.
24        Q.   Beyond high school and the computer class that
25   you took that certified that you had a basic
```

11

JA0147

DEPOSITION OF JULIAN VARGAS

```
 1   understanding of the Windows application, have you taken
 2   any other courses or classes?
 3       A.   No.
 4       Q.   After you graduated from high school, did you
 5   become employed?
 6       A.   Not right away.
 7       Q.   I just want to get a sense, Mr. Vargas, of your
 8   employment history.
 9            Could you just briefly describe for me where you
10   worked and when and what your job was.
11       A.   I don't recall specific dates; but I can tell
12   you that I've done work in telephone-related fields, such
13   as telemarketing, telephone customer service, support.
14            And then I became involved with assistive
15   technology and it's what I currently do now.  I teach and
16   present on the subject of assistive technology.
17       Q.   And when you talk about "assistive technology,"
18   you're talking about technology that assists those who
19   are blind or have visual impairments; is that right?
20       A.   That's correct.
21       Q.   Do you have a company that you work through,
22   sir?
23       A.   I currently just work through myself.
24       Q.   And how long have you been providing these
25   assistive technology services?
```

12

JA0148

DEPOSITION OF JULIAN VARGAS

```
 1      A.    Probably for the last 10 to 15 years.

 2      Q.    And to whom do you provide those services, sir?

 3      A.    Primarily to end users, people who are looking

 4  to become proficient and understanding of how to use the

 5  assistive technology that's found in mobile devices,

 6  which is what I specialize in.

 7      Q.    And is that assistive technology that is found

 8  in the iOS operating system?

 9      A.    Yes.

10      Q.    Are there any other operating systems in which

11  you train people how to use as it relates to assistive

12  technologies?

13      A.    Android as well as Windows, but I do very little

14  of that.  It seems like these days, most people are

15  interested in iOS.

16      Q.    And so just to understand the work that you do,

17  you provide training to people to familiarize them with

18  how to use iOS to help them, I guess, explore content

19  through applications; is that right?

20      A.    Yes, basically to learn how to use the built-in

21  accessibility on Apple devices so that they can make full

22  use of their device.

23      Q.    And is one of those capabilities in iOS

24  Text to Speech?

25      A.    Well, you might say screen reader.
```

13

JA0149

1358

DEPOSITION OF JULIAN VARGAS

1      Q.    Okay.  So one of the abilities that iOS

2  has is to verbalize what is on the screen; is that

3  correct?

4      A.    That's correct.

5      Q.    And are you compensated for the services that

6  you provide?

7      A.    Sometimes.

8      Q.    Other than the work that you've done in

9  assistive technology, just focusing on the last 10 to 15

10  years, have you had any other employment?

11      A.    No.

12      Q.    Now, I understand, sir, that you're blind or is

13  it visually impaired or is it the same thing?

14      A.    To me, the terms are interchangeable.

15      Q.    Okay.

16      A.    I prefer to use the word "blind" only because it

17  is the legal definition of my condition.  It doesn't

18  necessarily mean that I have no vision whatsoever.  It

19  just means that the law recognizes me as blind if my

20  vision is worse than 20 over 200.  Plus, I find that in

21  general, people understand the word "blind" more readily

22  when I describe my condition.

23      Q.    Do you distinguish between "blind" and "visually

24  impaired"?

25      A.    I'm not understanding the question.

14

JA0150

1359

DEPOSITION OF JULIAN VARGAS

```
 1      Q.   Sure.  Fair enough.
 2           Well, let me ask you, sir, you said -- I think I
 3  heard you say you're not totally blind; is that correct?
 4      A.   That's correct.
 5  MR. SWEET:  That misstates his testimony, Rob.
 6  MR. STEINER:  Pardon me?
 7  MR. SWEET:  That misstates his testimony.
 8  BY MR. STEINER:
 9      Q.   So if you could just describe for me, sir, are
10  you able to see shapes?  Are you able to see -- what is
11  it that you're able to see, generally?
12      A.   I can see light.  I can see shapes.  It really
13  depends on lighting.
14           My vision condition is one that degenerates
15  over time.  And over the last 15 to 20 years, I've
16  definitely been going through a noticeable degradation.
17  So I find myself using more and more blindness technique
18  and not so much relying on vision, because it's kind of a
19  changing thing and it's really affected by lighting
20  conditions and such.
21      Q.   Sir, are you able to see features in a room;
22  for instance, furniture, desks, things like that?
23      A.   It depends on the lighting and the contrast.  So
24  sometimes, yes; but most of the time, no.  I use my cane
25  to help me identify obstacles and such.
```

15

JA0151

1360

DEPOSITION OF JULIAN VARGAS

```
 1      Q.   You use a white walking cane; is that correct?
 2      A.   Yes.
 3      Q.   You're participating in this deposition from
 4   your home; is that correct?
 5      A.   Correct.
 6      Q.   And is there anyone in the room with you?
 7      A.   No.
 8      Q.   Do you live by yourself?
 9      A.   No.
10      Q.   Who else lives in the residence?
11      A.   My girlfriend.
12      Q.   Other than this litigation, sir, are you a party
13   to any other litigations?
14      A.   Yes.
15      Q.   What other litigations are you a party to?
16      A.   Currently I'm involved in the litigation with
17   Quest.
18      Q.   Does that litigation relate to the accessibility
19   of its kiosks?
20      A.   Yes.
21      Q.   Other than this litigation and the Quest
22   litigation, are you currently involved in any other
23   litigations?
24      A.   No.
25      Q.   Have you ever previously been a party to a
```

16

JA0152

1361

DEPOSITION OF JULIAN VARGAS

1    litigation, other than this litigation and the Quest

2    litigation?

3        A.   Yes.

4        Q.   What litigations have you been a party to?

5        A.   I've been a member of class settlements before

6    with the litigation that was brought on by organizations

7    such as the National Federation of the Blind.

8        Q.   Were you a named plaintiff in that case?

9        A.   No.

10       Q.   Are there any cases, putting aside cases in

11   which you may have received a notice to participate in a

12   class settlement, where you have been a named plaintiff?

13       A.   Yes.

14       Q.   What other cases, other than the Quest case and

15   this case?

16       A.   I don't have all the info with me, but I've been

17   involved in website accessibility litigation before.

18       Q.   Against whom?

19       A.   I don't remember at this moment.

20       Q.   Do you remember any of the parties that you sued

21   for website accessibility?

22       A.   Not at the moment, I don't recall.

23       Q.   How many such cases were you a party to?

24       A.   Possibly five or so.

25       Q.   Do you know where those cases were filed?

17

JA0153

1362

DEPOSITION OF JULIAN VARGAS

```
 1        A.    Some might have been here in California.  Others
 2   in Pennsylvania.
 3        Q.    Were you represented by the same counsel that's
 4   representing you in this case in those cases?
 5        A.    I believe one of the members was involved with
 6   the other law firm that represented me.
 7        Q.    Were those cases resolved, sir?
 8        A.    Yes.
 9        Q.    And did they resolve as a result of a
10   settlement?
11        A.    Correct.
12        Q.    Are you familiar with the terms of any of those
13   settlements?
14        A.    I don't recall at the moment.
15        Q.    Did you receive a monetary payment in any of
16   those cases?
17        A.    Yes.
18        Q.^   And how much have you received in total, sir?
19        A.    Well, I believe that information may --
20   I may not be able to talk about that because it's a
21   confidential agreement.  I'd have to confer with my
22   counsel on that.
23        Q.    We'll circle back to that.
24              You don't recall, sitting here today, whether
25   the terms of those agreements were confidential?
```

18

JA0154

1363

DEPOSITION OF JULIAN VARGAS

```
 1        A.    I believe that they were.

 2        MR. SWEET:   Objection; misstates testimony.

 3   BY MR. STEINER:

 4        Q.    What is your primary source of income, sir?

 5        A.    I receive Social Security and SSI and then

 6   whatever I earn when I can get a paid client.

 7        Q.    Other than the Quest case, this case, and the

 8   five or so cases involving website accessibility, have

 9   you been a named plaintiff in any other matters?

10        A.    No.

11        Q.    And you testified that there was a case in which

12   you participated in a class settlement; is that correct?

13        A.    That's correct.

14        Q.    And do you recall what the nature of that case

15   was?

16        A.    Website accessibility for target.com.

17        Q.    In any of the cases where you were a named

18   plaintiff, did you submit any declarations or sworn

19   statements to the court?

20        A.    I directed my counsel to submit anything that

21   was necessary for those cases.

22        Q.    Do you know, sir, whether or not you submitted

23   any sworn statements, declarations, affidavits in

24   connection with those cases?

25        A.    I believe so.
```

JA0155

DEPOSITION OF JULIAN VARGAS

```
 1      Q.    And do you recall anything about the content of
 2   those sworn statements that you submitted to courts?
 3      A.    I believe it was pretty much your
 4   run-of-the-mill information that you'd find in anything
 5   like that regarding the complaint.
 6      Q.    Okay.  Sir, I don't know what "run-of-the-mill
 7   information" is, so let me just see if you can describe
 8   for me any of the information that you recall submitting
 9   in a sworn declaration or affidavit to the court.
10      A.    I don't recall offhand.
11      Q.    When was the last website accessibility case
12   that was filed on your behalf?
13      A.    I don't recall.
14      Q.    And do you consider this case to be a website
15   accessibility case?
16      A.    No.
17      Q.    Prior to LabCorp introducing its kiosks, did you
18   attempt to use or use any LabCorp services?
19      A.    I don't recall.  I know that I have annual
20   physical exams, and oftentimes that involves going to a
21   lab, so it's quite possible that I might have at some
22   point in the past.
23      Q.    Can you identify any LabCorp patient service
24   centers that you visited prior to LabCorp introducing its
25   kiosks?
```

20

JA0156

1365

DEPOSITION OF JULIAN VARGAS

```
 1      A.   The only one that I recall was this one that
 2   we're discussing today.
 3      Q.   And that was a visit that you made on
 4   January 10th, 2020; is that correct?
 5      A.   Yes.
 6      Q.   And to the best of your recollection, that is
 7   the one and only time you have visited a LabCorp patient
 8   service center; is that correct?
 9      A.   Actually, there were two visits total to the
10   location.
11      Q.   When was the second visit?
12      A.   I think -- I mean, I'm not very good with the
13   dates; but if it's okay, I could just more or less
14   describe what the visits were.
15      Q.   Sure.
16      A.   I bel- -- basically after the experiences I've
17   had previously with this type of check-in kiosk and
18   difficulty getting assistance at these types of
19   locations, and since this blood test in question was
20   going to require me to come in fasting, I decided to
21   visit LabCorp, I believe it was a day or two prior to the
22   actual date of service, because I wanted to familiarize
23   myself with how to find it and to familiarize myself
24   with what the procedure was going to be when I got
25   there.
```

21

JA0157

1366

DEPOSITION OF JULIAN VARGAS

1        So when I went there, I found my way to the
2   window and got the attention of somebody there and
3   explained, you know, what I was there for and asked about
4   their check-in process; you know, would it involve a
5   kiosk, and if so, could somebody show me where the kiosk
6   was, because I wanted to know about it ahead of time, and
7   would it be accessible for a blind person to use
8   independently.
9        And at that point, I was told that the kiosk was
10  not accessible for a blind person to use independently,
11  so I would have to require a -- an attendant, you know, a
12  person there to help me, which they assured me would be
13  available.
14       So when I went in for service, I went in and I
15  had to wait in the line.  And then when it got to be my
16  turn, I went to the window and asked for assistance.  And
17  after another few minutes of waiting, someone came out
18  and took my cards, my medical insurance cards, and
19  basically signed me in.
20  Q.   And that was the January 10th date that you
21  handed your cards and got signed in by a LabCorp
22  attendant?
23  A.   Yes.
24  Q.   And you said you visited that facility a couple
25  days prior to January 10th; is that right?

                                                    22

JA0158

1367

DEPOSITION OF JULIAN VARGAS

```
1       A.    Yes.  I believe it was a day or two before.

2       Q.    The LabCorp facility that you visited, was that

3  at 15211 Vanowen Street in Van Nuys?

4       A.    Yes, that's correct.

5       Q.    And why did you choose to go to that particular

6  LabCorp facility?

7       A.    I went to that one because it was the closest

8  one to me.

9       Q.    How did you discover that that LabCorp facility

10 was the closest one to you?

11      A.    I believe I asked Siri to find me the nearest

12 location and that's what it returned.

13      Q.    And how did you get to that location?

14      A.    The day of the appointment, I believe I took a

15 paratransit service.

16      Q.    What about the couple days prior, when you went

17 to speak with the LabCorp representative?

18      A.    On that occasion I took the bus.

19      Q.    So other than those two occasions that you've

20 described, have you on any other occasions, either before

21 or after LabCorp introduced its kiosks, gone to a LabCorp

22 PSC?

23      A.    No.

24      Q.    And by "PSC," you understand I mean a patient

25 service center?
```

23

JA0159

1368

DEPOSITION OF JULIAN VARGAS

```
1     A.   I do now, yes.

2     Q.   On both occasions where you visited the

3 Vanowen Street LabCorp PSC, did you go by yourself or

4 were you with someone?

5     A.   I went myself.

6     Q.   And when you went on the 8th -- excuse me.

7          When you went on the 10th of January, did you

8 have a prescription for a service?

9     A.   Yes.

10    Q.   And what service were you seeking at LabCorp on

11 January 10th?

12    A.   It was a prescription from my physician for some

13 bloodwork that needed to be done as part of my annual

14 physical exam.

15    Q.   And what was the name of your physician that

16 made that prescription?

17    A.   Dr. Paul Diehl, spelled D-i-e-h-l.

18    Q.   And where is Dr. Diehl located?

19    A.   He is located in the city of West Hills,

20 California.

21    Q.   And when you went to the LabCorp patient service

22 center on Vanowen Street on the 10th, you were able to

23 check in with the LabCorp representative?

24    A.   I did, after waiting in line and then -- and

25 then -- yeah.  Then I had to wait additional, until they
```

24

JA0160

1369

DEPOSITION OF JULIAN VARGAS

```
 1   found somebody to take my information, since the kiosk
 2   was inaccessible.
 3       Q.   So you got to the LabCorp patient service center
 4   on the 10th and you waited in line at the counter; is
 5   that correct?
 6       A.   Yes.
 7       Q.   So there were other people waiting in line in
 8   front of you; is that correct?
 9       A.   I believe so.
10       Q.   Do you know how many other people were waiting
11   in the line in front of you?
12       A.   I could not see to tell.
13       Q.   And did you understand that those individuals
14   waiting in line in front of you were also waiting to
15   check in with a LabCorp representative?
16       A.   I don't know what they were there for.  I just
17   know they were in line ahead of me.
18       Q.   Did you overhear any of their conversations with
19   the LabCorp representative?
20       A.   No, I did not.
21       Q.   Did you hear any of those individuals sharing
22   any information about themselves with the LabCorp
23   representative?
24       A.   I did not.
25       Q.   Did you understand what any of those individuals
```

                                                    25

JA0161

1370

DEPOSITION OF JULIAN VARGAS

```
 1   that you were standing in line with were there for?
 2       A.   No, I did not.
 3       Q.   Did you hear what services they were seeking
 4   from LabCorp?
 5       A.   No, I did not.
 6       Q.   Did you hear anything about their medical
 7   condition?
 8       A.   No.
 9       Q.   And then when it was your turn in line and you
10   approached the counter, there was a LabCorp
11   representative there; is that correct?
12       A.   Yes.
13       Q.   And do you know whether that was a man or a
14   woman?
15       A.   I don't recall.
16       Q.   And did that individual ask for your
17   identification and insurance card?
18       A.   I basically told them that I was there to check
19   in and that I would need assistance with the check-in
20   process, since the kiosk was not accessible.
21       Q.   And did that person then ask you for your
22   insurance card and identification?
23       A.   I believe the person instructed me to wait and
24   that somebody would come out to assist me.
25       Q.   And did someone come out to assist you?
```

26

JA0162

1371

DEPOSITION OF JULIAN VARGAS

```
1        A.   Yes.

2        Q.   And did that person that came out to assist you

3   ask for your identification and insurance card?

4        A.   Yes.

5        Q.   And did that person then check you in, sir?

6        A.   Yes.

7        Q.   Other than providing that individual who came

8   out to see you with your identification and insurance

9   card, did the individual who you spoke with at LabCorp

10  ask you for any other information?

11       A.   No.  I basically told them that I was concerned

12  about giving information out loud in earshot of others.

13  So they told me that they didn't need me to say anything,

14  that they would get the information from the cards.

15       Q.   That they would get the information from the

16  cards?

17       A.   Yes.

18       Q.   So you were not required to say out loud any

19  personal information when you visited on January 10th,

20  correct?

21       A.   Well, I made it clear that I did not want to do

22  that, so they accommodated that.

23       Q.   And when you gave the individual your insurance

24  card and identification, did they take the cards and

25  identification and then return them to you at some later
```

27

JA0163

1372

DEPOSITION OF JULIAN VARGAS

1  point in time?

2      A.   Yes.

3      Q.   And do you know what they did with those cards

4  and identification?

5      A.   I have no idea, since I couldn't see what they

6  were doing and they walked away.

7      Q.   Understood.

8           Those cards and identification were returned to

9  you a short time later; is that correct?

10     A.   Yeah, after a few minutes.

11     Q.   And when you were asked for your cards and

12  identification, were you standing at the check-in counter

13  or were you sitting in a seat or somewhere else?

14     A.   I was still standing at the check-in counter,

15  but off to the side.

16     Q.   And between the time you first encountered

17  an individual at the desk and the time that your

18  identification was taken, approximately how long did you

19  wait?

20     A.   Restate the question?

21     Q.   Between the time that you approached the counter

22  for the first time and someone came and took your

23  identification information, how long were you waiting?

24     A.   So just to clarify, this is after I waited in

25  line?

                                                      28

                                              JA0164

1373

DEPOSITION OF JULIAN VARGAS

```
 1     Q.   Right.

 2          You waited in line, you told me; you spoke to

 3   someone; and they told you that someone would come out to

 4   assist you, correct?

 5     A.   Yes.

 6     Q.   So how long did it take for someone to come out

 7   and assist you?

 8     A.   Several minutes, like maybe three to five

 9   minutes.

10     Q.   And once your cards were taken from you, sir, to

11   check you in, how long did you wait to be called into the

12   back?

13     A.   Well, I waited several minutes while the cards

14   were taken and they did whatever they did with them.

15   Then when they came back out, I believe I waited another

16   few minutes before I was taken to the back.

17     Q.   So just so I understand this, sir, you waited in

18   line with other people who you believed were looking to

19   receive services from LabCorp, correct?

20     MR. SWEET:   Objection; misstates testimony.

21     THE DEPONENT:   There were --

22   BY MR. STEINER:

23     Q.   Is that right, sir?

24     MR. SWEET:   Objection again.

25     THE DEPONENT:   Well, I waited in line.  I don't know
```

                                                          29

JA0165

1374

                                    DEPOSITION OF JULIAN VARGAS

1    what those people were there for.  I just know I waited

2    in the line.

3    BY MR. STEINER:

4        Q.   And then once you got to the desk, you waited

5    another three to five minutes for someone to assist you;

6    is that correct?

7        A.   That's correct.

8        Q.   And then once that person assisted you, you

9    waited another three to five minutes to be called into

10   the back?

11       A.   Yeah.  Once the cards were returned to me, it

12   took another three to five to be called into the back.

13       Q.   So in total, how long were you at the LabCorp

14   facility on January 10th, 2020?

15       A.   From beginning --

16   MR. SWEET:  Hang on.

17            Are you asking about the entire time he was

18   there?

19   MR. STEINER:  Yes.  Let me clarify the question.

20       Q.   From the time you got to the facility to the

21   time you were called into the back, how long were you

22   waiting?

23       A.   Probably I would say roughly 20 minutes or so.

24       Q.   Do you know if anyone else there who checked in

25   at the kiosk waited more time or less time than you?

                                                          30

JA0166

DEPOSITION OF JULIAN VARGAS

```
 1        MR. SWEET:  Objection.
 2        THE DEPONENT:  I have no idea, because I didn't talk
 3   to anybody who was at the kiosk.
 4        DEPOSITION OFFICER:  Counsel, could you please
 5   restate your objection?  I heard you say "Objection," but
 6   if you said anything after that, I'm sorry, I missed it.
 7        MR. SWEET:  I did not.
 8        DEPOSITION OFFICER:  Thank you.  I'm sorry for
 9   interrupting.
10   BY MR. STEINER:
11        Q.   And when you were called into the back, you were
12   asked to sit down; is that correct?
13        A.   Yes, I was -- I got into the chair and I sat
14   down.
15        Q.   Was any additional information taken from you
16   when you were in the back of the facility?
17        A.   I don't believe so.
18        Q.   At what point did you provide your prescription
19   for services?
20        A.    In the beginning, when I made contact the first
21   time.
22        Q.   And you handed that prescription to a LabCorp
23   representative; is that correct?
24        A.   Yes, the person behind the desk.
25        Q.   And he or she took the information from you?
```

31

JA0167

1376

DEPOSITION OF JULIAN VARGAS

1      A.    They took the paper from me and then went to get

2   somebody to assist.

3      Q.    Did anyone at the facility ask you what the

4   prescription was for?

5      A.    No.

6      Q.    Did anyone ask you if you had any medical

7   conditions?

8      A.    I don't believe so.

9      Q.    When you were taken into the back, do you recall

10   having any conversation with the LabCorp technician?

11      A.    Other than just, you know, being guided and

12   perhaps like "Good morning" or salutations types of

13   things, I don't recall any other conversation.

14      Q.    So other than pleasantries, you had no

15   substantive conversation with anyone in the back?

16      A.    No, other than pleasantries and just "Okay.

17   Here's the chair.  Have a seat," that kind of thing.

18      Q.    Did you receive the results of your test?

19      A.    Those were sent to my doctor.

20      Q.    To the best of your knowledge, though, the test

21   that your doctor ordered was performed; is that correct?

22      A.    Yes.

23      Q.    And it was performed at the Vanowen Street --

24   excuse me.

25            It was based on the blood that was taken at the

                                                          32

JA0168

1377

DEPOSITION OF JULIAN VARGAS

```
 1   Vanowen Street location on January 10, 2020, correct?

 2       A.   Yes.

 3       Q.   Now, when you went to the facility on

 4   January 8th -- I'm sorry.  It's not January 8th.

 5            You said you went to the facility a few days

 6   before, a couple days before January 10th, right?

 7       A.   Yes.

 8       Q.   And that was the first time you had been there?

 9       A.   Correct.

10       Q.   And were you aware at the time you went a couple

11   days before January 10th that LabCorp was using kiosks?

12       A.   I wasn't aware specifically; but I know that

13   they were being used in many other places, including

14   other labs like them too.  So I just assumed that was the

15   case as well, and that was confirmed when I asked.

16       Q.   But when you walked in, sir, again, just because

17   of your blindness, you could not discern any kiosks in

18   the facility, could you?

19       A.   No, I could not.  That's why I asked to be

20   directed to it, if it was there.

21       Q.   And when you went to the counter, did you have

22   to wait in line on that first occasion that you went to

23   the location?

24       A.   I think I did, but it didn't seem to be as long

25   of a line.
```

                                                          33

DEPOSITION OF JULIAN VARGAS

1     Q.   And when you got to the counter, there was

2   someone there to help you; is that correct?

3     A.   Yes.

4     Q.   And can you tell me what you said to that person

5   and what the person said to you?

6     A.   I said "Hello."

7          And they asked the usual question, you know, did

8   I have a prescription or how could they help me.

9          So I explained to them that I would be coming in

10  there soon to have some bloodwork done that was requested

11  by a doctor, and that I did have a prescription for it,

12  and that -- I asked -- I told them that I wanted to

13  familiarize myself with things about their location since

14  it was going to be a fasting blood test and I didn't want

15  to have to do all that, you know, while I was also

16  hungry.

17         So I explained that I would need assistance.

18  And I asked if there is a check-in kiosk at this location

19  and, if so, could somebody direct me to it so I could

20  familiarize myself with where it's located, and is it

21  accessible so that a blind person can use it

22  independently.

23    Q.   And what did the representative say?

24    A.   They said that they do have a kiosk, but that

25  unfortunately, it was not something that a blind person

                                                    34

                                                         JA0170

1379

DEPOSITION OF JULIAN VARGAS

```
 1   could use independently, it wasn't set up for that; and
 2   that I would just need to come to the desk or the window
 3   there on the day of service and that somebody -- they
 4   would make somebody available to help me.
 5       Q.   And was that the extent of your conversation?
 6       A.   More or less.
 7       Q.   Well, do you recall anything else from your
 8   conversation that day prior to January 10th, 2020?
 9       A.   I think -- well, when they told me that it was
10   not accessible, I expressed disappointment and I
11   explained that they should make their kiosks accessible
12   so that a blind person could use it as well.
13           And they said they would -- they would take that
14   information, but that unfortunately, at this time, it
15   wasn't accessible.
16       Q.   And so the alternative that they offered you was
17   checking in at the desk, correct?
18       A.   Right.
19       Q.   I'm sorry.  I missed that.
20       A.   Yes.
21       Q.   Now, did you ask if you could check in at the
22   desk or they offered you the option to check in at the
23   desk?
24       A.   They offered it, being that the kiosk was
25   inaccessible, according to their description of it.  They
```

                                                          35

JA0171

DEPOSITION OF JULIAN VARGAS

1   said, but somebody would help me.  All I needed to do was

2   come to the window or the desk at the date of the

3   appointment, you know, the day that I needed the service,

4   and that they would make someone available to help me

5   with the check-in process.

6       Q.   And that's what happened on January 10th, when

7   you showed up for your actual appointment, correct?

8       A.   Yes.

9       Q.   Had someone asked you, sir, to visit the LabCorp

10  location to examine the kiosk?

11      A.   No.

12      Q.   You did that on your own?

13      A.   Correct.

14      Q.   Were you already a party to the Quest

15  litigation?

16      A.   I had talked to my counsel about that.  I don't

17  know how far that had gotten at that point, but yes, I

18  was involved in those talks.

19           And that is, I might add, part of the reason why

20  I went to LabCorp, was because I thought, well, maybe --

21  maybe they might be better-equipped for accessibility.

22      Q.   Before the complaint was filed in this matter,

23  sir, did you review it?

24      A.   Yes.

25      Q.   And did you think it was important to make sure

36

JA0172

1381

DEPOSITION OF JULIAN VARGAS

1   the complaint was accurate?

2       A.   Yes.

3       Q.   And do you believe, sitting here today, that the

4   allegations in the complaint are accurate?

5       A.   Yes.

6       Q.   And when you reviewed the complaint in

7   preparation for your deposition here today, did you

8   notice anything in it that you believed to be inaccurate?

9       A.   The only thing that I noticed was that it didn't

10  make reference to the previous visit that I had made, so

11  that's why I wanted to clarify that detail.

12      Q.   Understood.

13           And is it fair to say that on the date you

14  visited the LabCorp facility with your prescription, they

15  provided you with medical diagnostic testing services?

16      A.   Yes.

17      Q.   And no one at LabCorp ever refused to provide

18  you with those services; is that correct?

19      A.   Correct.

20      Q.   And no one at LabCorp told you that checking in

21  at the kiosk was the only option for checking in; is that

22  correct?

23      A.   No, I just understand it to be one of two

24  options available.

25      Q.   And the other option is to check in with a

37

JA0173

1382

DEPOSITION OF JULIAN VARGAS

1   person at the desk, correct?

2       A.   Yes.

3       Q.   And so you were never told that the only option

4   for checking in at LabCorp was to check in at the kiosk,

5   correct?

6       A.   Correct.

7       Q.   And since January 10, 2020, have you gone to any

8   other LabCorp patient service centers?

9       A.   No.

10      Q.   Since January 10, 2020, have you revisited this

11  same LabCorp patient service center?

12      A.   No.

13      Q.   So the one and only time that you went to

14  LabCorp to receive a service, you were checked in at the

15  desk, correct?

16      A.   That's correct, and that's because that's the

17  only time I -- the last time that my doctor has requested

18  bloodwork.

19      Q.   And when you visited the LabCorp patient service

20  center on January 10, 2020, you were not required to use

21  the kiosk to check in, correct?

22      A.   I was not required because -- well, I was not

23  required.

24      Q.   Okay.  And when you visited the LabCorp patient

25  service center on January 10, 2020, you were not required

                                                          38

JA0174

1383

DEPOSITION OF JULIAN VARGAS

1    to sign in through the kiosk, were you?

2         A.    No.

3         Q.    I am correct, you were not required?

4         A.    You are -- I was not required.

5         Q.    And when you visited the LabCorp patient service

6    center on January 10, 2020, you were not required to

7    register for your appointment at the kiosk, correct?

8         A.    No, I was a walk-in.

9         Q.    Were you required, sir, to register for your

10   appointment at the kiosk when you arrived on January 10,

11   2020?

12        A.    It was not required.

13        Q.    And you -- well, withdrawn.

14              Prior to filing this lawsuit, other than the

15   interactions that you had on January 10, 2020 -- excuse

16   me.  Let me strike that.

17              You said a couple days prior to January 10,

18   2020, you visited the location, you asked about the

19   kiosk, and you told the person you spoke to that the

20   kiosk should be made accessible to blind people; is that

21   right?

22        A.    Yes.

23        Q.    And the person that you spoke to said they would

24   pass along that suggestion; is that right?

25        A.    Yeah.  They agreed that it should be and that

                                                              39

                                                          JA0175


1384

DEPOSITION OF JULIAN VARGAS

```
 1   they would pass along the suggestion so that we would
 2   have both options available that everybody else has going
 3   to that location.
 4       Q.   Did you understand, sir, that sighted people
 5   also have the option to check in at the desk?
 6       A.   Yes, I do; but they also have the option to
 7   perhaps avoid a line and check in at a kiosk, which I did
 8   not have that option.
 9       Q.   Do you know if the kiosks ever get lines?
10       A.   I don't know.
11       Q.   And you said the first day that you were there,
12   prior to your January 10th visit, there was not a line;
13   is that correct?
14       A.   There -- I don't believe there was much of a
15   line.
16       Q.   Do you know on that day if there was a line at
17   the kiosks?
18       A.   I don't know because I don't know where the
19   kiosk is.
20       MR. SWEET:  Rob, we've been going for about an hour
21   now.  I think now is a pretty good time for a break.
22       MR. STEINER:  Okay.  Do you want to take five
23   minutes?
24       MR. SWEET:  That's fine.
25       MR. STEINER:  Thank you.
```

40

JA0176

1385

DEPOSITION OF JULIAN VARGAS

1          DEPOSITION OFFICER:  We're going off the record.

2               (A recess was held from 11:56 to 12:02.)

3          MR. STEINER:  We can go back on the record.

4          Q.   Mr. Vargas, you understand you're still under

5      oath, correct?

6          A.   Yes.

7          Q.   Do you have any knowledge or understanding as to

8      what the patient check-in process was at LabCorp prior to

9      the time it introduced its kiosks?

10         A.   I do not.

11         Q.   Do you know anything about the check-in process

12     at any other LabCorp location, other than the one you

13     visited?

14         A.   No.

15         Q.   When you visited the LabCorp location prior to

16     January 10th, a couple days prior, do you recall what

17     time of day it was?

18         A.   I believe it was in the afternoon.

19         Q.   Do you recall when in the afternoon?

20         A.   Like maybe around 3:00 or 4:00 in the afternoon,

21     give or take.

22         Q.   And when you visited on January 10th, do you

23     recall what time of day it was?

24         A.   That was early in the morning.

25         Q.   When you visited on January 10th, did anyone at

                                                          41

JA0177

1386

DEPOSITION OF JULIAN VARGAS

1  LabCorp ask you if you were blind?

2      A.   No.

3      Q.   Did anyone at LabCorp ask you if you were

4  visually impaired?

5      A.   No.

6      Q.   Did anyone ask you to fill out any forms or

7  provide any information which indicated to LabCorp that

8  you were blind or visually impaired?

9      A.   No.

10      Q.   To your knowledge --

11      A.   I believe --

12      Q.   Pardon me?

13      A.   I was going to say, I believe the fact that I

14  walk in with a long white cane and glasses, it indicates

15  to most people that I have a visual impairment.

16      Q.   Fair enough, sir.

17           You have worked with other people who are

18  visually impaired who do not use a long white cane,

19  correct?

20      A.   I don't recall, but I probably have.

21      Q.   Is it fair to say that it's not always obvious

22  whether someone is visually impaired or blind?

23      A.   Not always.

24      Q.   And so on this occasion, you certainly weren't

25  asked by anyone at LabCorp if you were visually impaired

42

JA0178

1387

DEPOSITION OF JULIAN VARGAS

```
 1   or blind?

 2       A.   No.

 3       Q.   And are you aware of any record that LabCorp

 4   would have indicating that you are visually impaired or

 5   blind?

 6       A.   No.

 7       Q.   Are you aware of any records LabCorp might have

 8   related to anyone else that may be visually impaired or

 9   blind?

10       A.   No, and I don't see why I would.

11       Q.   And why do you say you don't see why you would

12   be?

13       A.   Because why would I know if they have records on

14   anybody's visual impairment?

15       Q.   But you know they don't have any records on your

16   visual impairment, correct?

17       MR. SWEET:  Objection; misstates testimony.

18       THE DEPONENT:  To the best of my knowledge.

19   BY MR. STEINER:

20       Q.   Do you know how many blind or visually impaired

21   people use LabCorp services at its PSCs in a given year?

22       A.   I don't.

23       Q.   Do you know how many of the people who use

24   LabCorp services in a given year who are visually

25   impaired but not blind are able to use its kiosks?
```

43

JA0179

1388

DEPOSITION OF JULIAN VARGAS

```
 1       MR. SWEET:  Objection; compound.
 2       THE DEPONENT:  I don't know.
 3  BY MR. STEINER:
 4       Q.   Do you know if anyone else that day that you
 5  were there on January 10th checked in in the same manner
 6  that you checked in?
 7       A.   I don't.
 8       Q.   You don't know either way, correct?
 9       A.   Correct.
10       Q.   Is it fair to say, sir, that when you visited
11  the facility on January 10th in the morning, it was
12  busier than when you visited the facility in the
13  afternoon a couple days prior?
14       A.   Yes.
15       Q.   And had you checked in on January 8th -- I'm
16  sorry.  I keep saying the 8th.  My apologies, sir.
17       A.   That's okay.
18       Q.   Had you checked in the first time that you
19  visited the facility, is it fair to say that you believe
20  your wait time would have been shorter?
21       MR. SWEET:  Objection; calls for speculation.
22       THE DEPONENT:  I don't know.
23  BY MR. STEINER:
24       Q.   It may have been; you just don't know?
25       A.   That's correct.
```

44

JA0180

                            DEPOSITION OF JULIAN VARGAS

```
 1        MR. SWEET:  Same objection.

 2             Julian, I would just caution you to give me a

 3   second or two so that I can object where appropriate.

 4   Thank you.

 5   BY MR. STEINER:

 6        Q.   Is LabCorp within your health insurance network?

 7        A.   Yes.

 8        Q.   And is that Medicaid?

 9        A.   Medicare --

10        Q.   Medicare?

11        A.   -- and Medicaid.

12        Q.   And is Quest Diagnostics also within your health

13   insurance network?

14        A.   Yes.

15        Q.   On the day that you visited the LabCorp facility

16   on January 10th, do you know if people who checked in at

17   the kiosk spent more or less than 20 minutes to check in?

18        MR. SWEET:  Objection; lacks foundation.

19        THE DEPONENT:  I don't know.

20   BY MR. STEINER:

21        Q.   Sir, you rely on auxiliary aids and services to

22   receive goods and services; is that correct?

23        MR. SWEET:  Objection; calls for a legal conclusion.

24   BY MR. STEINER:

25        Q.   You can answer it, sir, if you understand the
```

                                                          45

DEPOSITION OF JULIAN VARGAS

```
 1   question.
 2       A.   What do you mean exactly by "auxiliary aids and
 3   services"?
 4       Q.   Do you know what auxiliary aids and services
 5   are?
 6       MR. SWEET:  Objection; calls for a legal conclusion.
 7       THE DEPONENT:  So I'm asking for you to clarify what
 8   you mean by that.
 9   BY MR. STEINER:
10       Q.   Yes.
11            And I'm just asking you, sir, what your
12   definition is.
13            Do you have a definition of what an "auxiliary
14   aid and service" is?
15       A.   If you're referring to screen readers, white
16   canes, and things of that nature, then yes.
17       Q.   A screen reader to your mind is a type of
18   auxiliary aid and service; is that right?
19       A.   Yes.  It assists me with getting information
20   that's on a screen and allows me to interact with a
21   device.
22       Q.   Do you use other types of auxiliary aids and
23   services, other than screen readers?
24       MR. SWEET:  Same objection.
25       THE DEPONENT:  So like I said, I use screen readers
```

46

JA0182

1391

DEPOSITION OF JULIAN VARGAS

```
 1   on my computers and mobile devices and I use a white cane
 2   to travel.
 3   BY MR. STEINER:
 4       Q.   Do you read Braille?
 5       A.   I do not.
 6       Q.   So if LabCorp had signs in Braille at its
 7   facilities, that would not be helpful to you?
 8       A.   Not to me personally, but other blind people
 9   would benefit from it.
10       Q.   You know there are certain blind people that do
11   read Braille and certain that don't, correct?
12       A.   Correct.
13       Q.   Does magnification software work for you as an
14   auxiliary aid?
15       A.   It used to when I was younger, but no longer.
16       Q.   What about large-print materials?  Do those work
17   for you as an auxiliary aid?
18       A.   No.
19       MR. SWEET:  Same objection.
20   BY MR. STEINER:
21       Q.   Do you ever rely on someone to read to you in
22   order to receive goods and services?
23       A.   Sometimes.
24       Q.   And in what circumstances would you rely on
25   someone to read to you in order to receive a good or
```

47

JA0183

1392

DEPOSITION OF JULIAN VARGAS

```
 1   service?

 2       A.   If the information is not available in an

 3   accessible format that I would be able to use my screen

 4   reader and knowledge of computers and mobile devices to

 5   be able to do myself.

 6       Q.   Would an example of that be if you went to a

 7   restaurant, for instance, and were given a menu?

 8       A.   Yes.

 9       Q.   And in that case, you would ask a waiter or

10   waitress to read the menu or point out certain things on

11   the menu; is that correct?

12       A.   Correct.

13       Q.   And you're comfortable relying on, at least in

14   that context, someone reading to you the content of

15   written material, correct?

16       MR. SWEET:  Objection; misstates his testimony.

17   BY MR. STEINER:

18       Q.   Is that correct, sir?

19       A.   I would prefer that the material be available in

20   a format that I can use myself.

21           And actually, since you bring up restaurants,

22   more and more of them have put their menus available

23   online.  And I find myself more often referring to those,

24   when I can get ahold of them, to familiarize myself with

25   a menu.
```

48

JA0184

                                      DEPOSITION OF JULIAN VARGAS

1       Q.   You have used the services of people reading the

2    material to you in order to get goods and services,

3    right?

4       A.   When there's no other alternative.

5       Q.   Okay.  Any other instances that you can think of

6    in getting a good or service where you have relied on

7    someone reading to you so that you can familiarize

8    yourself with the goods and services that are available?

9       A.   None other than when there is not an accessible

10   way that I can do it electronically.

11      Q.   You prefer to have access electronically,

12   correct?

13      A.   Yes.

14      Q.   Are you aware of others who prefer to have

15   access through someone reading them the material?

16      MR. SWEET:  Objection; calls for speculation, lack of

17   foundation.

18      THE DEPONENT:  I know people I guess you would say in

19   both camps.  I know a lot of people who prefer to do

20   things for themselves independently and use technology,

21   and there are some people who are more comfortable

22   getting something read to them.  It's a personal

23   preference thing.

24   BY MR. STEINER:

25      Q.   Have you used an app called Be My Eyes?

                                                              49

                                                          JA0185

1394

DEPOSITION OF JULIAN VARGAS

```
 1    A.    Yes.

 2    Q.    And as I understand it, that basically connects

 3  you with a person who acts as a qualified reader through

 4  the camera on your iPhone; is that right?

 5    A.    I would disagree with "qualified reader."  Those

 6  are volunteers who are not vetted.  Anybody could sign up

 7  to be a Be My Eyes volunteer and there's no process of

 8  training, nor is there a requirement to sign a

 9  nondisclosure agreement or anything like that.

10         So while I would use a service like Be My Eyes

11  for something basic, like "What color is this shirt?," I

12  would certainly not rely on Be My Eyes to help me to

13  obtain personal information on a document.

14    Q.    You've used Be My Eyes in a pharmacy before,

15  correct?

16    A.    I've used it in a pharmacy, but not for

17  prescriptions; for doing things like seeing the

18  expiration date on a gallon of milk or a jar of juice or

19  something like that.

20    Q.    Have you used it to determine what other

21  products that you might want to buy?

22    A.    Yes, for scanning grocery store shelves.

23    Q.    And do you continue to use Be My Eyes?

24    A.    Sometimes.

25    Q.    And in what instances do you use Be My Eyes?
```

50

JA0186

1    A.   Again, for things like reading an expiration

2    date, "What color is this shirt?," "Am I standing in

3    front of a Starbucks?," those kinds of things.  Something

4    that -- something that would get me quick visual

5    assistance, but not for anything that would require the

6    handling of confidential information.

7    Q.   When you visited the LabCorp on January 10th --

8    withdrawn.

9         Since filing this lawsuit, sir, have you

10   requested that LabCorp provide you with a specific

11   auxiliary aid?

12   MR. SWEET:  Objection; calls for a legal conclusion.

13   THE DEPONENT:  I have not.

14   BY MR. STEINER:

15   Q.   Since filing this lawsuit, have you communicated

16   with LabCorp requesting that it provide you with any

17   assistance in checking in at its patient service centers?

18   A.   No, because I haven't had to go to LabCorp since

19   then.

20   Q.   And I take it that on the one occasion that you

21   were at LabCorp on January 10th -- sorry.  Withdrawn.

22        Do you have any facts to indicate, sir, that

23   LabCorp intentionally discriminated against you?

24   A.   Well, the fact that they don't make their kiosks

25   accessible to a blind person feels like discrimination.

51

JA0187

1396

DEPOSITION OF JULIAN VARGAS

```
 1        Q.   Any other facts, sir, to indicate that LabCorp
 2   intentionally discriminated against you, other than the
 3   fact that its kiosks are not accessible to a blind
 4   person?
 5        A.   No, no other facts.
 6        Q.   Do you know anything about the process that
 7   LabCorp used to develop its kiosks?
 8        A.   No.
 9        Q.   Other than your own personal experience at
10   LabCorp on January 10th at the Van Nuys location, do you
11   know anything about LabCorp's check-in policies or
12   procedures?
13        A.   No.
14        Q.   Do you know anything about how LabCorp's other
15   facilities are operated in California or nationwide as it
16   relates to check-in procedures?
17        A.   No, because it's the only one I've been to.
18        Q.   And on the only occasion that you went to
19   LabCorp, you were able to receive the service that you
20   sought from them, which was medical diagnostic testing,
21   correct?
22        MR. SWEET:  Objection; misstates the testimony.
23   BY MR. STEINER:
24        Q.   Is that right, sir?
25        A.   I'm sorry.  Restate the question?
```

52

JA0188

1397

DEPOSITION OF JULIAN VARGAS

```
 1      Q.   Sure.

 2           On the one occasion that you went to LabCorp,

 3   you were able to receive its medical diagnostic testing

 4   services, correct?

 5      MR. SWEET:  Objection; misstates his testimony.

 6      THE DEPONENT:  Well, I went there to get a blood

 7   test, yes.

 8   BY MR. STEINER:

 9      Q.   And you got it, correct?

10      A.   I did, but I only had one method of interacting

11   with them.

12      Q.   Prior to filing the complaint in this action,

13   did you ever correspond with LabCorp and tell them they

14   were violating the Americans with Disabilities Act?

15      A.   No.

16      Q.   Prior to filing this lawsuit, did you ever

17   correspond with LabCorp and tell them they were violating

18   any laws?

19      A.   No.

20      Q.   Is the first time that you complained about

21   LabCorp's check-in procedures -- well, withdrawn.

22           Do you have any facts to indicate that

23   LabCorp has refused to make its kiosks independently

24   accessible to the visually impaired for financial

25   reasons?
```

53

JA0189

1398

DEPOSITION OF JULIAN VARGAS

```
1      A.   I assume that to make it accessible, they might
2  have had to pay a little bit more, although frankly, a
3  lot of today's kiosk systems are based on either iOS or
4  Android-type devices, all which come with built-in
5  accessibility.  And why LabCorp chose not to avail
6  themselves of that and make it available to those
7  customers I guess is beyond me.
8      Q.   So you don't know why they chose not to do
9  that, whether it was for financial reasons or any other
10 reason?
11     A.   I'm assuming it's financial.
12     Q.   Other than your assumption, sir, do you have any
13 facts to indicate that LabCorp chose not to make its
14 kiosks independently usable by those who are blind or
15 visually impaired for financial reasons?
16     MR. SWEET:  Objection; asked and answered.
17     THE DEPONENT:  I don't have hard facts.  I just have
18 the experience to rely on.
19 BY MR. STEINER:
20     Q.   Do you know what training LabCorp provides its
21 employees related to its check-in process?
22     A.   No.
23     Q.   And when you were at the facility on
24 January 10th, is it fair to say that you were treated
25 respectfully?
```

54

JA0190

1399

DEPOSITION OF JULIAN VARGAS

```
1     A.   Yes.  The people who I interacted with were
2   respectful.
3     Q.   They were helpful; is that correct?
4     A.   Yes.
5     Q.   They were able to see that you got the
6   blood-testing services that you were there to receive,
7   correct?
8     A.   Yes.
9     Q.   Have you ever used LabCorp's website?
10    A.   No.
11    Q.   Do you know whether LabCorp's website is
12  accessible to the visually impaired?
13    A.   I do not, since I haven't used it.
14    Q.   Have you ever used LabCorp's mobile application?
15    A.   No.
16    Q.   And I take it you don't know whether or not that
17  mobile application is accessible to people who are
18  visually impaired?
19    A.   Correct.
20    Q.   LabCorp served your counsel with what are known
21  as Requests for Admission.
22         Are you familiar with that document?
23    A.   Yes.
24    Q.   And did you review that document prior to the
25  submission of those responses?
```

55

JA0191

1400

DEPOSITION OF JULIAN VARGAS

```
 1      A.   Yes.

 2      Q.   And did you review it to make sure that it was

 3  accurate?

 4      A.   Yes.

 5      Q.   And LabCorp also filed a counterclaim against

 6  you; is that correct?

 7      MR. SWEET:  Objection --

 8  BY MR. STEINER:

 9      Q.   Are you aware of that, sir?

10      MR. SWEET:  -- calls for a legal conclusion.

11      THE DEPONENT:  I don't recall.

12  BY MR. STEINER:

13      Q.   You were able to check in for your service at

14  LabCorp on January 10th, 2020, correct?

15      A.   By going to the desk, yes.

16      Q.   And when you went to the LabCorp patient service

17  center on January 10, 2020, a LabCorp staff member

18  assisted you with the check-in process, correct?

19      MR. SWEET:  Objection; asked and answered.

20      THE DEPONENT:  Yes.

21  BY MR. STEINER:

22      Q.   And you were not denied any LabCorp product or

23  service when you went to the patient service center on

24  January 10, 2020, correct?

25      A.   I respectfully disagree.  I was denied the
```

56

JA0192

1401

DEPOSITION OF JULIAN VARGAS

1    opportunity to make use of the kiosk available to

2    everybody else who walks in there as an option to

3    announce my arrival and to check in and transact what I

4    needed to transact.

5        Q.   The product or service that you were there for,

6    sir, was blood testing, correct?

7        MR. SWEET:  Objection.

8        THE DEPONENT:  It is, but the check-in process is

9    also part of it.

10   BY MR. STEINER:

11       Q.   And you told me before that before you filed

12   this lawsuit, you never corresponded with LabCorp

13   regarding any legal violations; is that correct?

14       A.   Correct.

15       Q.   Sir, in Paragraph 4 -- well, actually, never

16   mind.  Withdrawn.

17            Do you have any facts to indicate that LabCorp

18   doesn't train its employees to respect the civil rights

19   or communicate effectively with people who are visually

20   impaired?

21       MR. SWEET:  Objection; calls for a legal conclusion.

22       THE DEPONENT:  I do not.

23   BY MR. STEINER:

24       Q.   Do you know whether the implementation of

25   LabCorp's kiosks enabled you to get seen sooner on

                                                        57

1402

DEPOSITION OF JULIAN VARGAS

```
 1   January 10th than you would have been seen if there were
 2   no kiosks there?
 3       MR. SWEET:  Objection; calls for speculation.
 4       THE DEPONENT:  I don't know.
 5   BY MR. STEINER:
 6       Q.   Are you a member of the American Council of the
 7   Blind?
 8       A.   No.
 9       Q.   You're aware that this lawsuit was brought as a
10   class action; is that correct?
11       A.   Yes.
12       Q.   And what does that mean to you?
13       A.   It means that this process makes it more
14   efficient and available for many blind people, who have
15   had a similar issue, to seek the -- the correction of the
16   issue without having to each independently hire their own
17   counsel.
18       Q.   Can you identify any other blind person who has
19   had a similar issue as you when it comes to checking in
20   at a LabCorp patient service center?
21       A.   "Identify," what do you mean?
22       Q.   The name of anyone.
23            Can you identify anyone who has had a similar
24   issue as you when it comes to checking in at a LabCorp
25   patient service center?
```

58

JA0194

1403

DEPOSITION OF JULIAN VARGAS

```
 1       A.   Nobody other than the other defendant named in
 2  this case.
 3       Q.   You mean the other plaintiff, Mr. Davis?
 4       A.   Yeah.  I'm sorry.
 5       Q.   That's okay.
 6       A.   I'm not good with my legal terms.
 7       Q.   And you told me before, you've never spoken to
 8  Mr. Davis, so you don't know anything about his personal
 9  experiences, do you, sir?
10       A.   No.
11       MR. SWEET:  Objection.
12  BY MR. STEINER:
13       Q.   Can you identify anyone, other than yourself,
14  who you claim was denied a LabCorp product and service
15  based on their visual impairment or blindness?
16       MR. SWEET:  Objection; misstates his testimony.
17       THE DEPONENT:  I know that there are a lot of people
18  who have had similar issues with these kiosks in various
19  places.  I'm not sure that they would all specifically be
20  LabCorp, but these kiosks are becoming more prevalent;
21  and unfortunately, they're not -- many of them are not
22  accessible.  So it's at various --
23  BY MR. STEINER:
24       Q.   I apologize, sir.  My question was a little bit
25  different.
```

59

JA0195

1404

DEPOSITION OF JULIAN VARGAS

```
 1      A.   Okay.

 2      Q.   I understand that these kiosks are becoming more

 3  prevalent.

 4           My question was:  Can you identify anyone who

 5  has been denied a product and service from LabCorp

 6  because they are visually impaired or blind?

 7      A.   What do you mean by "identify"?  Like state the

 8  name, or how do you mean exactly?

 9      Q.   Yes, state the name.

10      A.   No, I cannot.

11      Q.   Without telling me, sir, what was said, how

12  often do you speak with your counsel about this case?

13      A.   Frequently; at least maybe once or twice a

14  month.  And obviously, leading up to this deposition, a

15  little more often.

16      Q.   Are you aware, sir, that there is a mediation

17  scheduled in this case?

18      A.   Yes.

19      Q.   And do you know when that is scheduled for?

20      A.   I don't recall.

21      Q.   Have any settlement proposals from LabCorp been

22  communicated to you?

23      A.   Settlement proposals?

24           No.

25      MR. SWEET:  I would just caution the witness not to
```

JA0196

DEPOSITION OF JULIAN VARGAS

```
 1   disclose any communications with his counsel.
 2        THE DEPONENT:  Restate the question, please?
 3   BY MR. STEINER:
 4        Q.   I don't have a question pending, sir.
 5        A.   Okay.
 6        Q.   You're aware, sir, that in this case, you're
 7   seeking to certify what's known as a California subclass?
 8        MR. SWEET:  Objection; calls for a legal conclusion.
 9   BY MR. STEINER:
10        Q.   If you're not aware of it, just tell me you're
11   not aware of it and we can move on.
12        MR. SWEET:  Objection --
13        THE DEPONENT:  I am aware.
14        MR. SWEET:  -- calls for a legal conclusion.
15   BY MR. STEINER:
16        Q.   I didn't hear your answer, sir.
17        A.   Yes, I am.
18        Q.   And do you know what that California subclass
19   consists of?
20        A.   I'm not aware.  I mean, I'm sorry, I'm not
21   familiar.
22        Q.   Do you know who is purported to be included
23   within that California subclass?
24        A.   I believe all blind people in California.
25        Q.   Whether or not they went to a LabCorp patient
```

61

JA0197

1406

DEPOSITION OF JULIAN VARGAS

1   service center or not?

2       A.   I don't know.

3       Q.   And whether or not they went to a LabCorp

4   patient service center and were able to check in at the

5   desk, correct?

6       A.   I don't recall.

7       Q.   Does the California subclass include anyone that

8   was able to check in at the kiosk, notwithstanding their

9   visual impairment?

10      A.   I don't recall.

11      Q.   You don't recall or you don't know, sir?

12      MR. SWEET:  Objection; asked and answered.

13      THE DEPONENT:  (No response.)

14  BY MR. STEINER:

15      Q.   Do you know, sir, whether the California

16  subclass includes individuals who were able to check in

17  at the kiosk, notwithstanding their visual impairment?

18      MR. SWEET:  Same objection.

19      THE DEPONENT:  I don't recall.

20  BY MR. STEINER:

21      Q.   Do you recall if either the California subclass

22  or the nationwide class includes people who are visually

23  impaired but haven't visited a LabCorp facility with a

24  kiosk?

25      A.   I don't recall.

                                                        62

JA0198

1407

DEPOSITION OF JULIAN VARGAS

```
 1      Q.   And do you recall if either the nationwide class
 2   or the California subclass includes people who,
 3   regardless of their sight, prefer to check in at the
 4   desk?
 5      A.   I don't recall.
 6      Q.   You're aware there's also a request to certify a
 7   nationwide class of people?
 8      A.   Yes.
 9      Q.   And do you know who is included in that request?
10      A.   All blind people in the country.
11      Q.   And is it all blind people in the country,
12   regardless of whether or not they have actually visited a
13   LabCorp patient service center?
14      A.   I don't recall.
15      Q.   Do you recall if it is all blind people that
16   have visited a LabCorp patient service center or just
17   those that have attempted to use the kiosk?
18      A.   I don't recall.
19      Q.   Does the nationwide class include people who
20   visited a LabCorp patient service center but were able to
21   check in at the desk?
22      A.   I don't recall.
23      Q.   So the only thing that you can recall, sir, is
24   that the nationwide class includes all blind people in
25   the United States --
```

63

JA0199

1408

DEPOSITION OF JULIAN VARGAS

```
 1        MR. SWEET:  Objection.
 2   BY MR. STEINER:
 3        Q.   -- is that right, sir?
 4        MR. SWEET:  Objection.
 5             Rob, that's not the only thing he can recall.
 6        MR. STEINER:  Excuse me.  I didn't intend to suggest
 7   that was the only thing he can recall.
 8        Q.   The only thing, sir, that you can recall about
 9   the composition of the nationwide subclass is that it
10   includes all blind people in the United States?
11        A.   Yes.
12        MR. STEINER:  I wasn't trying to be pejorative,
13   Ben.
14        MR. SWEET:  No problem.
15        MR. STEINER:  And actually, could the reporter read
16   back my question and answer.
17        DEPOSITION OFFICER:  Yes.
18             (The record was read as follows:
19                  Q.   The only thing, sir, that you
20             can recall about the composition of the
21             nationwide subclass is that it includes
22             all blind people in the United States?
23                  A.   Yes.)
24   BY MR. STEINER:
25        Q.   And sir, does the nationwide class include
```

64

DEPOSITION OF JULIAN VARGAS

1   people who aren't blind but have some level of visual

2   impairment?

3        A.   Yes.

4        Q.   And what level of visual impairment do they have

5   to have in order to be included in the nationwide class?

6        A.   I don't recall.

7        Q.   Are you familiar with anyone who is visually

8   impaired who would be able to use, based on your belief,

9   LabCorp's kiosk?

10       MR. SWEET:  Objection; vague.

11       THE DEPONENT:  I'm not aware.

12   BY MR. STEINER:

13       Q.   How long, sir, have you been considered legally

14   blind?

15       A.   Since birth.

16       Q.   Can you identify, sir, the damages that you have

17   suffered as a result of your experiences at LabCorp on

18   January 10, 2020?

19       MR. SWEET:  Objection; calls for a legal conclusion.

20       THE DEPONENT:  The damage is that I was denied one of

21   two options to announce my arrival and transact with

22   LabCorp regarding my visit there.

23   BY MR. STEINER:

24       Q.   Did you suffer any financial harm?

25       MR. SWEET:  Objection; calls for a legal conclusion.

65

JA0201

1410

                                        DEPOSITION OF JULIAN VARGAS

```
 1  BY MR. STEINER:

 2      Q.   You can answer it, sir.

 3      A.   Okay.

 4           No.

 5      MR. STEINER:  Let's take five minutes.  I think I'm

 6  pretty much done.

 7      MR. SWEET:  Okay.  Sounds good.

 8      MR. STEINER:  Thanks, guys.

 9      THE DEPONENT:  Thanks.

10      DEPOSITION OFFICER:  We're going off the record.

11           (A recess was held from 12:43 to 12:51.)

12      DEPOSITION OFFICER:  We are back on the record.

13  BY MR. STEINER:

14      Q.   Mr. Vargas, I just have hopefully one or two

15  more questions.

16           Have you described to me, as best as you can

17  recall, everything that was said between you and the

18  LabCorp representative on the couple days prior to your

19  July 10th visit -- sorry -- your January 10th, 2020

20  visit?

21      A.   Yes.

22      Q.   And have you described for me, as best as you

23  can recall, everything that was said between you and the

24  LabCorp representative on the occasion of your

25  January 10th, 2020 visit?
```

                                                        66

JA0202

1411

DEPOSITION OF JULIAN VARGAS

```
 1      A.   Yes.

 2      Q.   And have you described to me, as best as you can

 3   recall, everything that you did on the occasion of your

 4   January 10, 2020 visit as it related to obtaining medical

 5   diagnostic testing services from LabCorp?

 6      MR. SWEET:   Objection; vague.

 7      THE DEPONENT:   Yes.

 8      MR. STEINER:   Mr. Vargas, thank you for your time.

 9   I don't have anything further.

10      THE DEPONENT:   Thank you.

11      MR. SWEET:   I'm going to ask some questions of our

12   own for Mr. Vargas.

13

14                       EXAMINATION

15   BY MR. SWEET:

16      Q.   Julian, thank you for taking the time today to

17   answer questions.  I appreciate your diligence.

18           I'm just going to ask you a few questions about

19   your role as a class representative in this litigation.

20           Okay?

21           Why did you want to serve as a class

22   representative in this litigation against LabCorp?

23      A.   Because I am ultimately seeking to help remove

24   access barriers to the world for people like myself, who

25   are blind.
```

67

JA0203

1412

DEPOSITION OF JULIAN VARGAS

1       Q.   I understand.

2            And what are your motivations in seeking to

3    represent a class of blind individuals?

4       A.   My motives are to, you know, again, help remove

5    these barriers to accessibility, so that blind people

6    like myself can transact and, you know, do the things we

7    need to do on a daily basis as independently as possible.

8       Q.   And do you have any financial motive in being

9    involved in the litigation as a class representative?

10      A.   Absolutely not.

11           And this is all about leveling the playing

12   field, making it so that blind people can avail

13   themselves of all the conveniences that are available to

14   everybody else.  I'm only seeking injunctive relief and

15   minimum statutory damages on behalf of the class.

16      Q.   And Julian, may I ask you, as far as your role

17   as a class representative in this litigation, what do you

18   see as your duties as a good class representative in this

19   class action?

20      A.   To supervise and direct counsel; to review and

21   approve of documents; to prepare and sit for a

22   deposition, such as this one; to be ready to appear

23   in-person at trial, if that's where it goes, or to

24   actively participate in settlement negotiations, if

25   that's where things go.

                                                        68

DEPOSITION OF JULIAN VARGAS

```
1       Q.   Thank you.
2            And what steps have you taken so far to satisfy
3   your role as a class representative?
4       A.   I've communicated with counsel regularly to keep
5   informed of details and developments in the case.  I've
6   spent time, you know, preparing for and ultimately making
7   this appearance here today.
8       Q.   Great.
9            How often would you say you have communicated
10  with your counsel, without disclosing any substance of
11  those discussions?
12      A.   I would say a good 15 to 20 times.
13      Q.   Great.
14           And can you tell me what laws this class action
15  is brought under?
16      A.   That would be the Americans with Disabilities
17  Act and other state and federal laws that govern
18  accessibility, such as the Rehabilitation Act, the
19  California Unruh Act, and things like that.
20      Q.   Great.  Thank you.
21           And can you tell me what court the case is
22  happening in?
23      A.   This is in the United States District Court in
24  Los Angeles, California.
25      Q.   And can you tell me who the judge is?
```

69

JA0205

                              DEPOSITION OF JULIAN VARGAS

 1        A.    The judge is Fernando Olguin.

 2        Q.    And Mr. Vargas, do you also understand that you

 3   are asserting a claim on behalf of blind Californians

 4   under California's Unruh Act?

 5        A.    Yes.

 6        Q.    And I believe you stated a moment ago that you

 7   were seeking only the minimum statutory damages for that

 8   claim; is that correct?

 9        A.    That's correct.

10        Q.    And so just to be crystal clear for the

11   record, are you seeking any additional compensatory

12   award for yourself in your individual capacity under

13   this Unruh Act claim, beyond the minimum statutory

14   damages?

15        A.    None whatsoever.

16        Q.    And you further understand that the California

17   subclass is asserting a claim on behalf of blind

18   Californians under the California Disabled Persons Act,

19   right?

20        MR. STEINER:  Objection; leading.

21        THE DEPONENT:  Yes.

22   BY MR. SWEET:

23        Q.    And do you understand that this claim seeks

24   minimum statutory damages of $1,000 per violation?

25        MR. STEINER:  Same objection.

                                                          70

                                                    JA0206


1415

DEPOSITION OF JULIAN VARGAS

```
 1   BY MR. SWEET:
 2       Q.   You can answer.
 3       A.   Yes.
 4       Q.   And just to be clear, are you seeking any
 5   additional compensatory award for yourself in your
 6   individual capacity under this Disabled Persons Act
 7   claim, beyond the minimum statutory damages?
 8       A.   No.
 9       Q.   I want to return to some of the testimony that
10   we heard from you earlier today.
11           I believe Mr. Steiner asked you about your
12   involvement in prior litigation with respect to website
13   accessibility.
14           Do you recall that discussion?
15       A.   Yes.
16       Q.   And you testified that to the best of your
17   recollection, there may have been up to five, quote,
18   "cases," end quote, that you were involved with; is that
19   right?
20       A.   Yes.
21       Q.   And is it your understanding that the term
22   "cases" can relate to lawsuits that are formally filed in
23   court as well as matters that were resolved via a demand
24   letter?
25           MR. STEINER:  Objection to the form.
```

71

JA0207

1416

DEPOSITION OF JULIAN VARGAS

```
 1   BY MR. SWEET:
 2       Q.   You can answer.
 3       A.   Yes.  I'm not very good with my legal terms.
 4   That's the reason I have counsel.  So I think it's
 5   absolutely possible.
 6       Q.   Thank you.  That's helpful.
 7            And you're not an attorney, are you, Mr. Vargas?
 8       A.   No.  I think that's obvious.
 9       Q.   You testified a little bit earlier today that
10   you made two trips to the LabCorp location in Van Nuys,
11   one a few days before the ultimate blood test you got on
12   January 10th of 2020; is that correct?
13       A.   Correct.
14       Q.   And do you have plans to return to that location
15   in the future?
16       A.   Yes.
17       Q.   And why would you return to the location?
18       A.   It, for one thing, is conveniently close to me.
19   So when I have to do things, especially like fasting
20   blood tests, I'm familiar with the location already and
21   it's not far away, so I can easily get to it.
22            Plus, I want to test and see if they're ever
23   going to make those kiosks accessible so that someday
24   people like myself have both options available that
25   everybody else has, as far as announcing their arrival
```

                                                    72

JA0208

1417

DEPOSITION OF JULIAN VARGAS

```
 1    and transacting with the lab regarding their visit.
 2         Q.   Thank you.
 3              A little bit earlier, you testified regarding
 4    the practices within LabCorp with regard to training.
 5              Do you recall that testimony?
 6         MR. STEINER:  Objection to the form.
 7         THE DEPONENT:  Yes.
 8    BY MR. SWEET:
 9         Q.   And is it fair to say that you have relied on
10    your counsel with regard to the allegations with regard
11    to training?
12         A.   Yes.
13         Q.   And is it also fair to say that you have relied
14    on your legal counsel to craft the class definition in
15    this matter?
16         A.   Yes.
17         MR. SWEET:  I'd like to go off the record for just a
18    few minutes.  I think I am complete, but I want to take a
19    couple moments.  So why don't we take a five-minute
20    break.
21         DEPOSITION OFFICER:  We are off the record.
22              (A recess was held from 1:01 to 1:03.)
23         DEPOSITION OFFICER:  We are back on the record.
24    BY MR. SWEET:
25         Q.   Do you recall earlier, Julian, giving some
```

73

JA0209

1418

DEPOSITION OF JULIAN VARGAS

```
 1   testimony about the reasons why you believe that the
 2   kiosk was inaccessible?
 3       A.   Yes.
 4       Q.   And is it fair to say that you relied on your
 5   counsel for developing reasons why the kiosks were
 6   inaccessible.
 7       A.   Yes.
 8       Q.   And do you recall giving testimony earlier today
 9   about whether the inaccessibility of the kiosks affected
10   other blind individuals?
11       A.   Yes.
12       Q.   And is it fair to say you've relied on
13   your counsel for developing the ways in which the
14   inaccessibility of the kiosks may have affected others?
15       A.   Yes.
16       MR. SWEET:  Thank you so much, Julian, for your
17   testimony today.  I have no further questions.
18       MR. STEINER:  Just a couple.
19
20                    FURTHER EXAMINATION
21   BY MR. STEINER:
22       Q.   Sir, just so I understand your testimony, you
23   have no facts yourself to indicate why the kiosks are
24   inaccessible; is that right?
25       A.   I do not, because I have no way of learning
```

74

JA0210

1419

DEPOSITION OF JULIAN VARGAS

1   about the kiosks, since it's not accessible to begin

2   with.

3      Q.   And you have no facts yourself to indicate how

4   the design of the kiosks has impacted other visually

5   impaired or blind people; is that correct?

6      A.   That's correct.  I rely on my counsel to do that

7   research.

8      MR. STEINER:  Thank you very much, sir.  I think

9   we're done.

10     MR. SWEET:  I think we're finished.

11     MR. STEINER:  Very good.  Have a good day.

12     MR. SWEET:  Thank you.  Take care.

13     THE DEPONENT:  Thank you.

14     DEPOSITION OFFICER:  The deposition is complete and

15  we're going off the record.  Thank you.

16

17          (Whereupon, at the hour of 1:05 p.m.,

18             the proceedings were adjourned.)

19                     -oOo-

20

21

22

23

24

25

75

JA0211

1420

DEPOSITION OF JULIAN VARGAS

```
 1                        REPORTER'S CERTIFICATE

 2

 3            I, the undersigned, a Certified Shorthand

 4    Reporter licensed in the State of California, do hereby

 5    certify:

 6            That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    the deponent in the foregoing proceedings, prior to

 9    testifying, was duly sworn; that a record of the

10    proceedings was made by me using machine shorthand which

11    was thereafter transcribed under my direction; that the

12    foregoing transcript is a full, complete, and true record

13    of said proceedings.

14            I further certify that I am neither financially

15    interested in the action nor a relative or employee

16    of any attorney or party to this action.

17            In witness whereof, I have this ____ day of

18    _____, 2021, subscribed my name.

19       _____  Reading and Signing was requested.

20       _____  Reading and Signing was waived.

21       __X__   Reading and Signing was not requested.

22       _____  Reading and Signing was provided.

23

24            _____

25            JANET MURPHY, CSR NO. 9650
```

76

JA0212

1421

*-INTENTIONALLY LEFT BLANK-*

JA0213

# EXHIBIT 14

                                                          Page 1

 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2                        -  -  -
 3      LUKE VARGAS, JULIAN
        VARGAS, and AMERICAN          :
 4      COUNCIL OF THE BLIND,
        individually, and on          :
 5      behalf of all others
        similarly situated,           :CASE NO.
 6                                      2:20-CV-00893-FMO-KS
            vs.                       :
 7
        LABORATORY CORPORATION OF     :
 8      AMERICA HOLDINGS; and DOES
        1 through 10,                 :
 9
10                        -  -  -
                 Tuesday, February 16, 2021
11                        -  -  -
12
13              Virtual Zoom Deposition of LUKE DAVIS,
14      on the above date at 10:01 a.m., before Rachel L.
15      Cicalese, a Registered Professional Reporter and
16      Certified Court Reporter.
17                        -  -  -
18
19
20
21
22
23
24

```
                                                        Page 2
 1    APPEARANCES:
 2                NYE STIRLING HALE AND MILLER, LLP
                  BY:  BENJAMIN J. SWEET, ESQUIRE
 3                1145 Bower Hill Road, Suite 104
                  Pittsburgh, PA  15243
 4                412-857-5350
                  Ben@nshmlaw.com
 5                Attorneys for Plaintiffs, Luke Davis and
                  Julian Davis
 6
                  NYE PEABODY STIRLING HALE AND MILLER, LLP
 7                BY:  JONATHAN D. MILLER, ESQUIRE
                  33 West Mission Street, Suite 201
 8                Santa Barbara, CA  93101
                  805-963-2345
 9                Jonathan@nshmlaw.com
                  Attorneys for Plaintiffs, Luke Davis, Julian
10                Vargas, and American Council of the Blind
11                KELLEY DRYE & WARREN, LLP
                  BY:  ROBERT I. STEINER, ESQUIRE
12                AND JEWEL TEWIAH, ESQUIRE
                  101 Park Avenue
13                New York, NY  10178
                  212-808-7800
14                Rsteiner@kelleydrye.com
                  Attorneys for Defendant, Laboratory
15                Corporation of America Holdings
16
17
18
19
20
21
22
23
24
```

1425

Page 3

1   DEPOSITION SUPPORT INDEX

2   DIRECTIONS NOT TO ANSWER:

    PAGES:  149, 150

3

4   REQUESTS FOR DOCUMENTS OR INFORMATION:

    PAGES:  None

5

6   STIPULATIONS AND/OR STATEMENTS:

    PAGES:  5, 75

7

8   MARKED QUESTIONS:

    PAGES:  None

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                      Page 4
 1                         INDEX
 2    LUKE DAVIS
 3    QUESTIONING BY:                       PAGE
 4    MR.  STEINER                          6,  141
      MR.  SWEET                            123
 5
 6
                          EXHIBITS
 7
      NAME                DESCRIPTION       PAGE
 8
      Davis 1             Amended Complaint  51
 9
      Davis 2             PL 0032-0033
10                        Patient Report     73
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Luke Davis

Page 5

```
 1                    (It was stipulated by and among

 2      counsel for the respective parties that signing,

 3      sealing, filing and certification are waived and

 4      that all objections, except as to the form of the

 5      question, are reserved until the time of trial.)

 6                         -  -  -

 7                    THE COURT REPORTER:  The attorneys

 8      participating in this deposition acknowledge that I

 9      am not physically present in the deposition room,

10      and that I will be reporting this deposition

11      remotely.

12                    They further acknowledge that, in

13      lieu of an oath administered in person, I will

14      administer the oath remotely.  The parties further

15      agree that if the witness is testifying from a

16      state where I am not a Notary, that the witness may

17      be sworn in by an out-of-state Notary.

18                    If any party has an objection to this

19      manner of reporting, please state so now.

20                    (No response.)

21                    THE COURT REPORTER:  Hearing none, we

22      can proceed.

23                         -  -  -

24                    LUKE DAVIS, having been duly sworn,
```

Luke Davis

                                        Page 6

 1   was examined and testified as follows:

 2   EXAMINATION

 3   BY MR. STEINER:

 4           Q.    Good morning, Mr. Davis.  Could you

 5   please state your full name and address for the

 6   record?

 7           A.    Luke Jackson Davis, 7724 Summerdale

 8   Avenue, Floor 1, Philadelphia, Pennsylvania  19111.

 9           Q.    Mr. Davis, have you ever been deposed

10   before?

11           A.    No.

12           Q.    Okay.  Let me give you some

13   instructions that hopefully will make the

14   deposition go smoothly for you, me, and the court

15   reporter.  I will be asking you some questions

16   today in a matter that you filed captioned Luke

17   Davis versus Laboratory Corporation of America

18   Holdings.

19           If at any point in time you don't

20   understand any of my questions, let me know, and I

21   will attempt to rephrase the question in a way in

22   which you understand it.  If you answer a question,

23   I'll assume that you understood it as asked.

24           If at any point in time you want a

Luke Davis

Page 7

1  break, let me know, and I will accommodate you with

2  a break.  I'll just ask that you answer any pending

3  question before you take a break.

4              The court reporter can't take down a

5  nod or a shake of the head.  So, if you intend to

6  say yes, you should say yes.  If you intend to say

7  no, you said say no.  You should avoid gestures or

8  things like uh-huh or uh-uh so the court reporter

9  can take down your answers.

10             Let's try not to talk over each

11  other.  This is a little bit cumbersome because it

12  is being done by video, but let me finish my

13  question, and then I will let you answer it and I

14  will try not to interrupt you as well.  This will

15  also give your attorney an opportunity to object to

16  any of my questions if he wishes.

17             Unless your counsel directs you not

18  to answer any of my questions, you are to answer my

19  questions as asked.

20             Do you understand these instructions,

21  sir?

22        A.    I do.

23        Q.    Sir, did you do anything to prepare

24  for your deposition today?

Luke Davis

                                                    Page 8

1            A.      I spoke and interacted with counsel.

2            Q.      And when did you do that?

3            A.      Yesterday and on Thursday.

4            Q.      And with whom did you speak

5    yesterday?

6            A.      Benjamin Sweet, Jon Miller, and Matt

7    Handley.

8            Q.      And approximately, how long was that

9    meeting?

10           A.      I believe it was about three hours.

11           Q.      And you said you also met with

12   counsel on Thursday; is that correct?

13           A.      That is correct.

14           Q.      And how long was that meeting?

15           A.      Approximately, three hours.

16           Q.      So, is it fair to say you have spent

17   a total of six hours preparing for your deposition

18   here today?

19           A.      In addition to time I spent reading

20   documents, yes.

21           Q.      And with whom did you meet on

22   Thursday, sir?

23           A.      Ben and Jon.  Ben Sweet and Jon

24   Miller.

Luke Davis

Page 9

```
 1          Q.    Mr. Handley was not present?

 2          A.    Correct.

 3          Q.    And I take it all of those meetings

 4    occurred either by phone or Zoom; is that right?

 5          A.    That is correct.

 6          Q.    Now, you said in addition to the

 7    approximately six hours that you spent meeting with

 8    counsel, you reviewed some documents; is that

 9    right?

10          A.    That is correct.

11          Q.    And what document did you review?

12          A.    The Complaint and discovery

13    information, discovery responses.

14          Q.    When you say discovery responses,

15    what specifically are you referring to?

16          A.    The responses that we provided to

17    you, we provided to LabCorp in response to

18    LabCorp's interrogatories.

19              MR. SWEET:  I think Rob may have

20    frozen.  He may be having some connection issues.

21              (Discussion held off the record.)

22              (Mr. Steiner lost connection.)

23              MR. MILLER:  Madam Court Reporter, I

24    don't know if you got my appearance, thanks.
```

Luke Davis

Page 10

1           MR. STEINER:  Could you read back the
2    last question and answer?
3              (A pertinent portion of the record
4    was read.)
5    BY MR. STEINER:
6        Q.    Mr. Davis, I apologize for the
7    interruption.
8              In addition to reviewing your
9    responses to LabCorp's interrogatories, did you
10   review any other documents?
11       A.    Not that I could recall.
12       Q.    When you reviewed the Complaint in
13   this matter, did you notice anything that was
14   inaccurate in it?
15       A.    No.
16       Q.    Was there anything in the Complaint
17   that you felt needed correction?
18       A.    Not to my recollection.
19       Q.    How much time did you spend reviewing
20   the Complaint, sir?
21       A.    About two hours.
22       Q.    Do you recall, sir, reviewing a
23   document that was Plaintiff's Responses to Request
24   to Admit?

Luke Davis

Page 11

```
 1          A.    Yes.
 2          Q.    And was there anything in that
 3   document that you felt needed correction?
 4          A.    No.
 5          Q.    And how much time did you spend
 6   reviewing that document, sir?
 7          A.    I would estimate about 20 minutes.
 8          Q.    Had you seen -- had you reviewed
 9   Plaintiff's Responses to Request to Admit prior to
10   preparing for your deposition?
11          A.    I do not recall.
12          Q.    You don't recall seeing them?
13          A.    I don't recall if I read them before.
14          Q.    In reviewing the Responses to
15   Plaintiff's Responses to Defendant's Request to
16   Admit, was there anything in there that you saw
17   that you believed was inaccurate?
18          A.    No.
19          Q.    You're at your home right now; is
20   that correct, sir?
21          A.    That is correct.
22          Q.    Okay.  And do you live by yourself or
23   with someone?
24          A.    By myself.
```

Luke Davis

Page 12

```
 1          Q.      And there is no one with you at the
 2     deposition today; is that correct?
 3          A.      That is correct.
 4          Q.      Have you ever spoken to Julian
 5     Vargas?
 6          A.      No.
 7          Q.      Have you ever had any e-mails with
 8     Mr. Vargas?
 9          A.      No.
10          Q.      Have you had any communications with
11     Mr. Vargas in any manner whatsoever?
12          A.      I have not.
13          Q.      Other than through counsel, are you
14     aware of any of the circumstances of Mr. Vargas'
15     Complaint as it relates to his interactions with
16     LabCorp?
17          A.      Only through the filed documents.
18          Q.      Do you have any understanding of what
19     Mr. Vargas' role is in this litigation?
20          A.      Yes.
21          Q.      What is your understanding of his
22     role in this litigation?
23          A.      My understanding is that he is
24     representing the California subclass.
```

Luke Davis

Page 13

1          Q.     Any other understanding of Mr.

2    Vargas' role?

3               MR. SWEET:   Objection.   Asked and

4    answered.

5    BY MR. STEINER:

6          Q.     You can answer it, sir.

7          A.     No.

8          Q.     Okay.  Have you and Mr. Vargas done

9    anything to coordinate the supervision of counsel

10   in this case?

11         A.     No.

12         Q.     Sir, what is your educational

13   background?

14         A.     I attended a private school in

15   primary school, and then in high school I was

16   home-schooled but administered by a K-12

17   institution.   After ninth grade I obtained a GED.

18         Q.     What is your date of birth, sir?

19         A.     2/1/80.

20         Q.     And when did you obtain your GED?

21         A.     To the best of my recollection, it

22   was either 1996 or 1998.

23         Q.     Okay.  Are you currently employed?

24         A.     I'm self-employed.

Luke Davis

Page 14

```
 1          Q.    What is your self-employment?
 2          A.    I am a musician and an audio
 3   technician, and also I do computer work -- computer
 4   network, support work.
 5          Q.    And for how long have you been
 6   self-employed?
 7          A.    Most of my life.
 8          Q.    What computer and network support
 9   work do you do?
10          A.    Various.  I support Windows
11   workstations in corporate environments.  I support
12   individuals who are blind with accessibility to
13   Windows and iPhone usage.  And I do remote
14   administration of servers and computer systems.
15   And I am also a programmer.
16          Q.    And you do that work on a consulting
17   basis, sir?
18          A.    Correct.
19          Q.    Do you have a company that you
20   consult through?
21          A.    I have worked through various
22   entities over the years, and I am a part owner in a
23   small information technology company.
24          Q.    What is the name of that company?
```

Luke Davis

Page 15

1          A.      Open Source Systems Limited.

2          Q.      And is that based in Philadelphia?

3          A.      It is.

4          Q.      And how long have you been part of

5    Open Source Systems Limited?

6          A.      I created it in June of 2020.

7          Q.      And prior to that time, were you

8    employed through any entity?

9          A.      I was not employed through any

10   entity.  I owned a couple of entities through the

11   years.

12         Q.      Okay.  Was that also doing computer

13   network support work?

14         A.      Yes.

15         Q.      Did you have any degrees or

16   certificates in computer network support work?

17         A.      No.

18         Q.      Now, sir, I understand that you are

19   visually impaired; is that correct?

20         A.      Yes.

21         Q.      Do you use the terminology blind to

22   describe your impairment?

23         A.      I am legally blind.

24         Q.      What does that mean from a

Luke Davis

Page 16

1    vision-rating standpoint?

2           A.    What do you mean by --

3           Q.    Let me just ask you:  Do you see

4    anything corrected or uncorrected?

5                 MR. SWEET:  Objection.  Vague.

6                 THE WITNESS:  I -- someone else was

7    trying to say something there.

8    BY MR. STEINER:

9           Q.    You can answer, sir.

10          A.    Can you repeat the question, please?

11          Q.    I am just trying to get a sense of

12   what your level of vision impairment is.  You

13   described being blind.  And I understand people

14   that are blind can sometimes also see shapes or

15   objects.  I am trying to understand what your level

16   of vision is.

17                MR. SWEET:  He said he's legally

18   blind.

19                MR. STEINER:  I understand that.  I

20   am just trying to get an understanding of what that

21   means, sir.

22                THE WITNESS:  I can sometimes see

23   light and some shapes.  Other times, I cannot.

24   BY MR. STEINER:

1439

Luke Davis

Page 17

1        Q.      Okay.  How long have you been legally

2    blind, sir?

3        A.      All of my life.

4        Q.      And is it the case, sir, that being

5    able to see some light or shapes in certain

6    conditions, has that been the case your entire

7    life, or has your blindness become progressively

8    worse over time?

9        A.      It has become progressively worse

10   over time.

11       Q.      Take the last five years for

12   instance, sir, is your level of -- is your ability

13   to see shapes and some light, has it basically

14   remained the same or has it progressively worsened

15   along the years?

16       A.      It has remained the same.

17       Q.      Other than this case, are you a party

18   to any other litigations?

19       A.      No.

20       Q.      Have you ever been a Plaintiff in

21   another litigation other than this case?

22       A.      Yes.

23       Q.      Okay.  And what case was that?

24       A.      That was -- I don't know the specific

1440

Luke Davis

Page 18

1    name of the case, but it was a case against Tenet

2    Healthcare.

3            Q.    And what was the nature of that case?

4            A.    That was a website accessibility

5    case.

6            Q.    Do you know when it was filed?

7            A.    I do not recall specifically.

8            Q.    Do you remember the year it was

9    filed?

10           A.    I don't recall specifically.  It may

11   have been 2016 or '17, but that is only a guess.

12           Q.    Do you know where that case was

13   filed?

14           A.    I no longer recall specifically.

15           Q.    Was the case resolved?

16           A.    It was.

17           Q.    Okay.  And do you know how it was

18   resolved?  Was it through settlement or trial or

19   some other way?

20           A.    It was resolved through settlement.

21           Q.    Was that a class action, or were you

22   the only Plaintiff in that case?

23           A.    That was a class action.

24           Q.    And I take it you had counsel

Luke Davis

Page 19

```
1    representing you in that case?

2           A.     Yes.

3           Q.     Who was the counsel that represented

4    you in that case?

5           A.     Ian Brown, Carlos Diaz.  We may have

6    had others, but that is to the best of my

7    recollection.

8           Q.     Are any of those individuals

9    affiliated with the firm that is representing you

10   in this case?

11          A.     Not to my knowledge.

12          Q.     Other than the case you filed against

13   Tenet Healthcare, have you been a Plaintiff in any

14   other cases?

15          A.     No, not to my recollection.

16          Q.     Have you been a defendant in any

17   cases?

18          A.     Not that I'm aware of.

19          Q.     For how long, sir, have you -- strike

20   that.

21                 Prior to LabCorp introducing its

22   kiosk, did you use or attempt to obtain any

23   services from LabCorp at a patient service center?

24          A.     Yes.
```

1442

Luke Davis

Page 20

```
 1          Q.     And when was the first such time that
 2     you used LabCorp at a patient service center?
 3          A.     I do not recall.
 4          Q.     Do you recall whether you had been
 5     using LabCorp patient service centers for several
 6     years prior to the time they introduced kiosks?
 7          A.     To the best of my recollection, I
 8     had.
 9          Q.     Had you been using LabCorp services
10     through its patient service center for more than
11     several years prior to its introduction of the
12     kiosks?
13               MR. SWEET:  Objection, vague.  You
14     can answer it, sir, if you understand it.
15               THE WITNESS:  I don't know how to
16     answer that.
17     BY MR. STEINER:
18          Q.     So, by several years, let's just give
19     it a number.  So, for approximately three years
20     prior to the time that LabCorp introduced its
21     kiosks at the patient service centers, were you
22     using LabCorp services?
23          A.     I believe so.
24          Q.     Okay.  Do you believe you had used
```

Luke Davis

                                                    Page 21

1    LabCorp services through its patient service

2    centers for more than three years prior to the time

3    it introduced its kiosks?

4           A.    To the best of my recollection, yes.

5           Q.    Okay.  For approximately how many

6    years?

7           A.    I'm not certain.  At least a few.

8           Q.    Okay.  At least a few years.

9                 What I am trying to understand, sir,

10   is just approximately how many years you had been

11   going to LabCorp prior to the time they introduced

12   their kiosks at the patient service center?

13                MR. SWEET:  Rob, you've asked the

14   question three times.

15                MR. STEINER:  I think I am entitled

16   to ask it this way.

17                You can answer it, sir.

18                THE WITNESS:  For an extended period,

19   my lab materials were taken by my primary care

20   physician and processed thereafter, I believe,

21   through LabCorp.  However, I don't recall exactly

22   when we switched from that happening to me

23   physically going to LabCorp facilities.  It may

24   have been, to the best of my recollection, in the

Luke Davis

Page 22

1   early two-thousands.  That is as precise as I can

2   be with that answer.

3   BY MR. STEINER:

4           Q.     Okay.  And can you estimate how

5   frequently on a yearly basis you would go to

6   LabCorp patient service centers prior to the time

7   it introduced its kiosks?

8           A.     To the best of my recollection,

9   between one and three times.

10          Q.     One and three times per year?

11          A.     Correct.

12          Q.     And what services were you getting

13  from LabCorp when you would go to a patient service

14  center prior to the introduction of the kiosk?

15          A.     I would sometimes make an

16  appointment.  I would sometimes -- I would always

17  check in.  I would get blood drawn and sometimes

18  would have urine collected as well.

19          Q.     And did you -- again, focusing on the

20  time prior to when LabCorp introduced kiosks --

21  would you go to the same patient service centers or

22  different ones?

23          A.     I believe I -- I don't know the

24  answer to that question.

1445

Luke Davis

Page 23

1          Q.    Can you recall -- can you recall any
2     of the patient service centers by name or address
3     that you went to prior to the time that LabCorp
4     introduced its kiosks?
5          A.    I believe I went to the Bustleton
6     Avenue location in Philadelphia, the address at
7     which I -- to the best of my recollection is 9331
8     Bustleton Avenue.  I went to the 101 East Olney
9     Avenue, Philadelphia location.  It is possible I
10    went to others, but I do not recall.
11         Q.    So, is it fair to say that you had
12    been to the Bustleton Avenue location multiple
13    times prior to the time that a kiosk was installed
14    at that location?
15         A.    Yes.
16         Q.    And you said the other location was
17    East Olney Avenue; is that correct?
18         A.    East Olney Avenue, yes.  O-L-N-E-Y.
19         Q.    And had you been to that location on
20    multiple occasions prior to the time that it
21    introduced the kiosks?
22         A.    To the best of my recollection, I had
23    been there at least once.
24         Q.    Is LabCorp within your health

Luke Davis

Page 24

1    insurance network, sir?

2         A.    Yes.

3         Q.    And what is your health insurance

4    provider?

5         A.    Keystone First of Pennsylvania.  They

6    sometimes go under the name Blue Cross.

7         Q.    And for how long has Keystone First

8    been your healthcare provider?

9         A.    As best as I can recall, since the

10   mid-1990s, although they operated under a different

11   name at the time.

12        Q.    Have you attempted to use or used

13   other testing laboratories where you've had to go

14   to a patient service center other than LabCorp?

15        A.    I have not.  My insurance company

16   requires me to use LabCorp, to the best of my

17   knowledge.

18        Q.    And is it because of your insurance

19   coverage having LabCorp in network that you choose

20   to go to LabCorp?

21        A.    Yes.

22        Q.    And I take it then if LabCorp were

23   not within your insurance network, you would use

24   another laboratory that was within your network; is

Luke Davis

Page 25

1    that correct?

2            A.    That does seem likely.

3            Q.    How far is the Bustleton Avenue

4    location from your home?

5            A.    I believe, to the best of my

6    knowledge, it is under four miles away.

7            Q.    And how far is the Olney Avenue

8    location from your home?

9            A.    To the best of my knowledge, it is

10   approximately two miles away.

11           Q.    How do you decide whether to go to

12   the Bustleton location or the Olney location?

13           A.    I usually prefer not to go to the

14   Olney location simply because of its situation with

15   regards to traffic and busyness of the streets in

16   the area.

17           Q.    When you say traffic, you are not

18   referring to traffic at the location but traffic to

19   get to the location; is that correct?

20           A.    I am talking about the traffic in the

21   proximity to the location.

22           Q.    Okay.  And do you take public

23   transportation to get to the LabCorp locations?

24           A.    No.

Luke Davis

                                                        Page 26

1          Q.     How do you get there?

2          A.     Various ways.  Sometimes by a

3    transport service.  Sometimes by Uber or Lyft.

4    Sometimes by having someone drive me.

5          Q.     Focusing on the time before LabCorp

6    introduced its kiosks, I want to talk to you about

7    the process for checking in.

8                 When you went to the Olney Avenue and

9    Bustleton Avenue locations, was the process the

10   same?

11         A.     To the best of my recollection, it

12   was.

13         Q.     And you would enter the facility; is

14   that correct?

15         A.     That is correct.

16         Q.     Okay.  No issues gaining physical

17   access to the facility; is that right?

18         A.     Not that I recall.

19         Q.     And then you would go up to the desk;

20   is that correct?

21         A.     I believe it is.  To the desk or

22   window.

23         Q.     And would you sometimes have to wait

24   in line at the -- to get up to the desk or window?

Luke Davis

Page 27

1          A.     I believe I did from time to time.

2          Q.     And were there times where you didn't

3     have to wait in line, and you could go and see

4     someone immediately?

5          A.     Yes.

6          Q.     Would it just depend on how busy the

7     patient service center was whether you had to wait

8     in line or was able to go up to the desk

9     immediately?

10               MR. SWEET:   Objection.

11               THE WITNESS:   I don't presume to know

12    why sometimes it was -- there was a line and

13    sometimes there wasn't.

14    BY MR. STEINER:

15         Q.     And when you did wait in line, were

16    you able to discern what the other people in the

17    line in front of you were there for?

18         A.     No.

19         Q.     Were you able to hear any of the

20    details about why they were visiting LabCorp that

21    day?

22         A.     I don't recall any.

23         Q.     And, again, sir, these questions all

24    focus on the time prior to the introduction of the

Luke Davis

Page 28

1    kiosks.

2                When you would go to the desk, sir,

3    or the window, what information would be taken from

4    you?

5         A.    Certainly my name, and if I had a

6    prescription, that would be taken.  If I was a

7    walk-in patient, I am sure they would have taken

8    other information such as my address and phone

9    number.  Other than that, I'm not certain.

10        Q.    And would they ask for your

11   identification?

12        A.    I don't recall.

13        Q.    Would they ask for your insurance

14   card?

15        A.    I'm sure that at least once they've

16   asked for my insurance card.  I don't know if they

17   had it on file thereafter.  However, that usually

18   happened at the internal registration desk, as far

19   as I know.  Not the lobby window.

20        Q.    And, again, focusing on the time

21   prior to the time of the kiosks being introduced,

22   it is your recollection that the information that

23   you would give at the window was your name, your

24   prescription, and perhaps your address and phone

Luke Davis

Page 29

1    number?

2            A.      That is correct.

3            Q.      Okay.  Do you recall whether, in

4    fact, you had to give your phone number at the

5    desk?

6            A.      I do not.

7            Q.      Do you recall whether, in fact, you

8    had to give your address at the desk?

9            A.      I do not.

10           Q.      When you would give your prescription

11   at the desk, would you describe to the -- the

12   individual to whom you were giving it to, what the

13   prescription was for?

14           A.      No.

15           Q.      You would just hand it over to the

16   person at the desk, correct?

17           A.      Correct.

18           Q.      And this process was the same at

19   both -- both LabCorp locations that you testified

20   going to, correct?

21           A.      To the best of my recollection, yes.

22           Q.      So, is it fair to say that the

23   prescription that you would hand over would be the

24   method of communicating to the individual at the

Luke Davis

Page 30

1    desk what service you were there for?

2           A.    On the occasions when I handed over a

3    prescription, yes.

4           Q.    Okay.  Were there also occasions

5    where the prescription was transmitted to the

6    LabCorp location electronically?

7           A.    Yes.

8           Q.    And, so, in those circumstances, they

9    would just look up your name and be able to tell

10   what service you were there for; is that correct?

11          A.    To the best of my knowledge, yes.

12          Q.    Other than the information that

13   you've described giving to the individual at the

14   desk, is there any other information that you had

15   to give -- again, prior to the introduction of the

16   kiosk -- to the individual at the desk?

17          A.    Not that I can recall.

18          Q.    And then after you would provide the

19   information to the individual at the desk, were you

20   asked to take a seat and wait to be called into the

21   back?

22          A.    Yes.

23          Q.    And would the time that you had to

24   wait vary?

1453

Luke Davis

Page 31

1          A.      It would vary.

2          Q.      Sometimes you'd be taken immediately

3    and sometimes you'd have to sit there for a little

4    bit, correct?

5          A.      It would often depend on whether I

6    had made an appointment or whether it was a

7    walk-in.

8          Q.      And if you had made an appointment,

9    would your wait be shorter generally?

10         A.      Yes.

11         Q.      And if you were a walk-in would the

12   wait be longer generally?

13         A.      It varied.

14         Q.      Sometimes when you were a walk-in,

15   did you not have to wait at all?

16         A.      Sometimes when I was a walk-in I,

17   would only have to wait a moment and -- yes.

18         Q.      And, again, focusing on the time

19   prior to the introduction of the kiosks, how did

20   you go about making an appointment at the LabCorp

21   location?

22         A.      To the best of my knowledge, back

23   then I was able to use the phone to make an

24   appointment as best as I can recall.

Luke Davis

Page 32

```
 1          Q.      And, so, you would call the location
 2     directly to make an appointment?
 3          A.      It's been a number of years since I
 4     did that, but as best as I can recall, that is how
 5     I did it.   If I made an appointment at all, that
 6     was how I did it.
 7          Q.      And when you would go to the LabCorp
 8     patient service center prior to the time they
 9     introduced the kiosks, would you have to fill out
10     any forms?
11          A.      I do not recall.
12          Q.      Other than providing your name and
13     prescription, was there any personal information
14     that you had to provide to the representative at
15     the desk prior to the introduction of the kiosks?
16               MR. SWEET:   Objection.   Asked and
17     answered.
18               THE WITNESS:   As I previously stated,
19     I believe that from time to time I may have been
20     asked for my phone number and address, but I'm
21     uncertain of that.
22     BY MR. STEINER:
23          Q.      Once you would be called into the
24     back, sir, when you checked in at the desk, what
```

1455

Luke Davis

Page 33

1    would happen next?

2            A.    After going into the back, I would

3    sit down at a provided chair at a desk that was

4    there, and they would review -- at least I believe

5    they would review -- the prescription and ask me

6    any questions they needed to ask me.  And after

7    that, it's possible they would ask me to sign a

8    document.  After that, they would direct me to a

9    room or in some cases escort me to a room to

10   actually perform the sample-taking.

11           Q.    You said it's possible in the back

12   you were asked to sign a document.  Do you recall

13   doing so?

14           A.    I'm not certain.  It is possible that

15   I was asked to sign a document.  I do not recall

16   for certain if that occurred.

17           Q.    If you had to sign a document, sir,

18   in that situation, how would you know what the

19   content of the document was that you were signing?

20               MR. SWEET:  Objection.  Calls for

21   speculation.

22               THE WITNESS:  Do I answer that?

23               MR. STEINER:  Yes, you can answer it,

24   sir.

Luke Davis

Page 34

1          THE WITNESS:  Based only on the

2    representative at the desk telling me what the

3    document was, whether it was a release or the like.

4    I would not know what the content was because the

5    documents were never provided to me in accessible

6    form.

7    BY MR. STEINER:

8          Q.    So, the documents you said were

9    provided to you in the back by a technician; is

10   that right?

11         A.    Yes.

12         Q.    Would the technician read the

13   document to you?

14         A.    No.

15         Q.    Did you ever ask the technician to

16   read the document to you?

17         A.    I do not recall.

18         Q.    You said in the back the technician,

19   to your knowledge, would sometimes ask you

20   questions; is that right?

21         A.    Yes.

22         Q.    And what questions were you asked in

23   the back?

24         A.    The only question I specifically

Luke Davis

Page 35

1    recall being asked at those times was whether I had
2    been fasting.
3            Q.    Whether you had or had not been
4    fasting; is that right?
5            A.    Correct.
6            Q.    And can you recall any other
7    questions being asked of you by the technician in
8    the back?
9            A.    As I think I mentioned earlier, I
10   believe they at least on some occasions asked to
11   see my insurance card and possibly my
12   identification at those times.  I do not recall
13   specifically what other questions they may or may
14   not have asked me.
15           Q.    And when you are in the back, sir, as
16   we've described it, it is just you and the
17   technician; is that correct?
18           A.    There are sometimes other staff
19   members around.
20           Q.    Was it sometimes the case, sir, that
21   the same person that checked you in at the desk
22   would be the person that would take you in the back
23   and take this additional information?
24           A.    To the best of my recollection, that

Luke Davis

Page 36

1    was sometimes the case.

2            Q.    And, so, sometimes the same person

3    that checked you in was the same person that did

4    the blood draw or the urine collection; is that

5    correct?

6            A.    I would not say that.

7            Q.    Were there occasions where the same

8    person that checked you in did the blood draw?

9            A.    I don't specifically recall.

10           Q.    When you would go to the desk, sir,

11   to check in, were you ever asked whether you were

12   blind or visually impaired?

13           A.    Not that I can recall.

14           Q.    Were you ever asked to fill out a

15   form indicating whether you were blind or visually

16   impaired?

17           A.    No.  However, I do believe that

18   information is indicated on my identification,

19   which they had.

20           Q.    And what is your -- what form of ID

21   do you use, sir?

22           A.    It's state identification called a

23   non-driver's license.

24           Q.    Do you know if LabCorp records

Luke Davis

Page 37

```
 1    whether or not you were blind or visually impaired
 2    based on that identification card?
 3           A.    I do not.
 4           Q.    Do you have any -- do you know how
 5    many blind or visually impaired people use LabCorp
 6    services at its patient service centers in a given
 7    year?
 8           A.    I do not.
 9           Q.    Putting aside visits to LabCorp
10    patient service centers, when you go to your own
11    medical provider, are you sometimes asked to fill
12    out forms?
13           A.    Yes.
14           Q.    Okay.  And how do you review the
15    information that is in those forms?
16           A.    Periodically, I have had someone with
17    me who has had to go through the forms and fill
18    them out on my behalf.  At other times the medical
19    staff at the locations have done that.
20           Q.    And on the occasions where the
21    medical staff has done that, do they read the forms
22    to you?
23           A.    Yes.
24           Q.    And then you provide verbal responses
```

Luke Davis

Page 38

1   to the questions and the forms?

2           A.    Yes.

3           Q.    And they record those responses, to

4   the best as you know, on those forms?

5           A.    Yes.

6           Q.    And has that been an effective way

7   for you to fill out forms, by relying on medical

8   staff to fill them out for you?

9                 MR. SWEET:  Objection.  Misstates his

10  testimony.

11                THE WITNESS:  I would not say it -- I

12  mean, I would not say it as ideal or accessible,

13  but it is effective in that the form is ultimately

14  filled out presumably to the satisfaction of the

15  medical personnel.

16  BY MR. STEINER:

17          Q.    Do you read braille, sir?

18          A.    I am only -- I read braille very

19  slightly.

20          Q.    You don't view yourself as

21  proficient?

22          A.    I'm not a proficient braille reader.

23          Q.    Are you able to read large-print

24  materials?

1461

Luke Davis

Page 39

1        A.      No.

2        Q.      Does magnification software help for

3    you to read print material?

4        A.      No.

5        Q.      Do you rely on screen-reading

6    software to read written material if it's

7    electronic?

8        A.      Yes.

9        Q.      Other than the instances where you've

10   relied on medical staff to read forms to you, are

11   there any other instances where you rely on someone

12   to read written material to you in order to make it

13   accessible to you?

14       A.      Yes.

15       Q.      What are those instances?

16       A.      Generally, in my personal and

17   business life, if I need material read and for

18   whatever reason I can't use electronic means to

19   scan and read it, I will find someone who can read

20   it for me or read as much of it as I need read to

21   comprehend it.

22       Q.      Other than having someone read

23   materials for you and using electronic software to

24   read electronic materials, are there any other ways

Luke Davis

Page 40

1    in which you are able to access written material?

2           A.    No, I do not believe there is any

3    other way for anyone to access material other than

4    those methods.

5           Q.    I am talking about you, sir.  You

6    said you are not proficient in braille.

7    Magnification software doesn't work for you;

8    large-print materials don't work.  I am trying to

9    understand other than using screen-reading software

10   and someone to read materials for you, are there

11   any other ways in which you are able to get written

12   content?

13          A.    Other than having someone read

14   materials to me or using an electronic scanning

15   device of some kind to take materials into

16   screen-reading software or other kinds of reading

17   software, I do not believe there is any other way,

18   other than recorded media, that I would be able to

19   read written material.

20          Q.    Now, at some point you are aware

21   LabCorp introduced electronic kiosks at its patient

22   service centers; is that correct?

23          A.    Yes.

24          Q.    And do you know when that happened as

Luke Davis

Page 41

1    it related to the patient service centers that you

2    visited?

3         A.    I do not.

4              MR. SWEET:  Rob, we have been going

5    for almost an hour now.  Can we take a short

6    ten-minute break?

7              MR. STEINER:  Sure.

8              MR. SWEET:  Thank you.

9              (Break taken.)

10             (A pertinent portion of the record

11   was read.)

12   BY MR. STEINER:

13        Q.    Sir, we are back on the record.

14             How did you learn that LabCorp

15   introduced kiosks to the patient service centers

16   that you were visiting?

17        A.    I found out by going to a patient

18   service center and being told by the staff at the

19   window that I was required to use the kiosk in

20   order to check in or register.

21        Q.    Which location was that that you were

22   going to?

23        A.    I believe Bustleton, that I told you

24   earlier, to the best of my recollection.

Luke Davis

Page 42

```
 1          Q.    And do you recall -- do you know how
 2  long the kiosk had been in place at the time that
 3  you were told that?
 4          A.    I do not.
 5          Q.    Do you know if you had been able to
 6  check in at the desk during the time that the
 7  kiosks were in place but prior to the time that you
 8  were told that at the Bustleton Avenue location?
 9                MR. SWEET:  Objection, vague.
10                THE WITNESS:  Please restate the
11  question.
12  BY MR. STEINER:
13          Q.    Sure.  You said there was a time that
14  you went to the Bustleton Avenue location and you
15  went to check in at the desk and the person at the
16  desk told you that you needed to check in at the
17  kiosk, correct?
18          A.    That is correct.
19          Q.    Okay.  Do you know whether there were
20  occasions prior to then that you had been to the
21  Bustleton Avenue location that you were able to
22  check in notwithstanding the fact that kiosks had
23  been installed?
24                MR. SWEET:  Objection.
```

Luke Davis

Page 43

1                    THE WITNESS:  I do not know that.  I

2    knew nothing of the kiosk until I was informed in

3    2016 by the staff at the window, I believe at the

4    location that I mentioned, that I needed to use the

5    kiosk.  That was the first time that I became aware

6    of them.

7    BY MR. STEINER:

8          Q.    And you believe that was in 2016?

9          A.    Yes.

10         Q.    Was it a man or a woman that gave you

11   this instruction, that you needed to use the kiosk

12   to check in?

13         A.    I do not recall.

14         Q.    Did you say anything in response?

15         A.    The best as I can recall, I said that

16   I had never heard of that and the representative

17   told me that that's how we do things now.  And I

18   then mentioned that I was blind and would I be able

19   to use the kiosk.  And the representative said that

20   they didn't know and said that the person who was

21   with me should help me.

22         Q.    Did the person at the desk offer to

23   help check you in?

24         A.    No.  In fact, I asked can you just

Luke Davis

Page 44

```
 1    check me in here and was told you can use the
 2    kiosk.  That was, I believe, a walk-in
 3    appointment -- sorry, a walk-in visit.
 4              Q.    Who was the family member that was
 5    with you?
 6              A.    To the best of my recollection, that
 7    was Karen Davis, my mother.
 8              Q.    After that occasion, did you ever
 9    attempt to check in at the desk?
10              A.    Yes, several times I attempted to
11    check in at desks at LabCorp locations and on each
12    occasion I was told that I had to use the kiosk.
13              Q.    And was that at both the Bustleton
14    location and Boyston (sic) location?
15              A.    Pardon me?
16              Q.    Was that both the Bustleton Avenue
17    location and the Olney location?
18              A.    It was at those locations, and I
19    believe also at a Frankford Avenue location, the
20    address of which I do not recall.
21              Q.    Are you aware, sir, that Mr. Vargas
22    has been deposed in this case?
23              A.    I am aware of that.
24              Q.    Okay.  And Mr. Vargas testified that
```

Luke Davis

Page 45

```
1    when he went to the LabCorp location the
2    representative offered him the option to check in
3    at the desk.  Are you aware of that?
4              A.    I am aware of that.
5              Q.    And -- okay.  Is it fair to say that
6    that is not consistent with your experience?
7              A.    That is correct.
8              Q.    I am going to read you some of
9    Mr. Vargas' testimony, and I just want to know if
10   this is consistent with your experiences at LabCorp
11   PSCs.  Okay, sir?
12             Mr. Vargas was asked, Question:  Now
13   did you ask --
14             MR. SWEET:  Rob, do you have an
15   exhibit to put this in front of the witness or --
16             MR. STEINER:  No, I will read it.
17   BY MR. STEINER:
18             Q.    Now, did you ask if you could check
19   in at the desk or they offered you the option to
20   check in at the desk?
21             Answer:  They offered it being that
22   the kiosk was inaccessible according to their
23   description of it, they said, but somebody would
24   help me.  All I needed to do was come to the window
```

Luke Davis

Page 46

1   or the desk at the date of the appointment, you

2   know, the day I needed the service, and they would

3   make someone available to help me with the check-in

4   process.

5                  Question:  And that was what happened

6   on January 10, when you showed up for your actual

7   appointment, correct?

8                  Answer:  Yes.

9                  Sir, is that consistent with your

10  experiences trying to check in at a LabCorp patient

11  service center?

12       A.    Not at all.

13       Q.    Mr. Vargas also testified, Question:

14  And no one at LabCorp told you that checking in at

15  the kiosk was the only option for checking in; is

16  that correct?

17                 Answer:  No, I just understand it to

18  be one of the two options available.

19                 Question:  The other option is to

20  check in with a person at the desk; is that

21  correct?

22                 Answer:  Yes.

23                 Is that consistent with your

24  experience at LabCorp?

Luke Davis

Page 47

1              MR. SWEET:  Objection.  What
2      experience?
3              MR. STEINER:  Is that experience
4      consistent with your experience at LabCorp PSCs?
5              THE WITNESS:  Can you describe the
6      experience again, please?
7      BY MR. STEINER:
8          Q.    Mr. Vargas testified.  The question
9      was:  No one at LabCorp told you that checking in
10     at the kiosk was the only option for checking in;
11     is that correct?
12             Answer:  No, I just understand it to
13     be one of two options available.
14             Question:  And the other option is to
15     check in with a person at the desk?
16             Answer:  Yes.
17             My question is, is Mr. Vargas'
18     experience checking in at a LabCorp PSC consistent
19     with yours based on his testimony?
20         A.    I do not believe so.  I was never
21     offered the option to check in at a desk after the
22     kiosks were made available.
23         Q.    Mr. Vargas also testified, Question:
24     And, so, you were never told that the only option

Luke Davis

Page 48

1    for checking in at a LabCorp was to check in at the

2    kiosk, correct?

3                    Answer:  Correct.

4                    Is that consistent with what you were

5    told, sir?

6            A.    It is not.  It is, in fact, exactly

7    opposite to what I was told.  I was told -- even I

8    believe in the Complaint we have the March item --

9    that I spoke to the representative at the window

10   and said I am blind; what am I supposed to do since

11   I can't use the kiosk.  The response was I don't

12   know.

13                   They never offered to take my

14   registration at the window or to even assist me

15   with the kiosk.

16           Q.    Mr. Vargas was asked, Question:  And

17   when you visited a LabCorp patient service center

18   on January 10, 2020, you were not required to use

19   the kiosk to check in, correct?

20                   Answer:  I was not required.

21                   Is that consistent with your

22   experiences in checking in at LabCorp patient

23   service centers?

24           A.    Not at all.

Luke Davis

Page 49

```
1              Q.    Mr. Vargas testified, Question:  And
2     when you visited the LabCorp patient service center
3     on January 10, 2020, you were not required to sign
4     in through the kiosk, were you?
5                    Answer:  No.
6                    Question:  Am I correct, you were not
7     required?
8                    Answer:  I was not required.
9                    Is that consistent with your
10    experiences at LabCorp patient service centers?
11             A.    It is not.
12             Q.    Okay.  Mr. Vargas testified,
13    Question:  Were you required, sir, to register for
14    your appointment at the kiosk when you arrived on
15    January 10, 2020?
16                   Answer:  It was not required.
17                   Sir, were you required to register
18    for your appointments at the kiosk when you went to
19    LabCorp patient service centers?
20             A.    I -- restate the question, sir.
21             Q.    Sure.  Let me read Mr. Vargas'
22    answer again.
23                   Question:  Were you required to
24    register for your appointment at the kiosk when you
```

1472

Luke Davis

Page 50

```
 1    arrived on January 10, 2020?

 2              Answer:  It was not required.

 3              My question to you, sir, is were you

 4    required to register at the kiosk when you would

 5    visit them on the dates and times that you

 6    described?

 7              MR. SWEET:  Objection to the form of

 8    the question.

 9              MR. STEINER:  You can answer, sir.

10              THE WITNESS:  I was required to

11    either check in or register at the kiosk on all

12    occasions subsequent to the first time that I spoke

13    of where they required me to use the kiosk.

14    BY MR. STEINER:

15         Q.    I take it your experience regarding

16    registering for an appointment is inconsistent with

17    Mr. Vargas', correct?

18              MR. SWEET:  Objection.  Misstates his

19    testimony.

20    BY MR. STEINER:

21         Q.    Is that correct, sir?

22         A.    My experience is inconsistent with

23    the experiences of Mr. Vargas that you have

24    described.
```

Luke Davis

Page 51

1          Q.     Okay.  Since the kiosks have been

2     introduced at LabCorp, to your knowledge, have you

3     ever been able to check in at the desk?

4          A.     No.

5          Q.     On how many occasions, sir, have you

6     asked to check in at the desk since the kiosks have

7     been installed?

8          A.     At least -- to the best of my

9     recollection, at least six.

10          Q.     Sir, in Paragraph 21 of the Amended

11     Complaint you describe your visits to LabCorp

12     patient service centers.  Are you familiar with

13     those allegations?

14          A.     Yes.

15          Q.     And you described on October 11, 2016

16     attempting to make an appointment via the web

17     browser but no patient -- no visit to a patient

18     service center; is that correct?

19          A.     That is not correct.

20          Q.     Let me --

21          MR. STEINER:  Jewel, can we put --

22     and we will make mark it as Davis Exhibit 1 -- the

23     Amended Complaint in front of the witness?

24          (Exhibit Davis 1, Amended Complaint,

Luke Davis

Page 52

1    was marked for identification.)

2    BY MR. STEINER:

3           Q.    Sir, I am going to ask you to review

4    Exhibit 1.  It should come up on your screen.

5           A.    It has not -- not in any accessible

6    form.

7                 MR. STEINER:  Jewel, can you let me

8    know when that's posted?  We can try to walk the

9    witness through that.

10                (Discussion held off the record.)

11                THE WITNESS:  I've read the document

12   or paragraph in question.

13                MR. STEINER:  Okay.  So, why don't we

14   go back on the record.

15   BY MR. STEINER:

16          Q.    Sir, we've put in front of you what

17   we've marked as Davis Exhibit 1, which is the

18   Amended Complaint in this matter.  And I understand

19   that off the record you've had an opportunity to

20   review Paragraph 21 and it's subparts; is that

21   correct?

22          A.    That is correct.

23          Q.    Is it fair to say, sir, that the

24   first time you identify in the Complaint being told

Luke Davis

Page 53

1    that a staff member could not help you check in was

2    for your October 5, 2018 visit?

3           A.    I believe that is the first time that

4    is identified in the Complaint; however, that is

5    not the first time it happened.  It happened on

6    prior occasions as well.  It is just not listed in

7    the Complaint.

8           Q.    Do you know why not?

9           A.    I do not know why not.

10          Q.    Prior to the October 5 date, there is

11   an allegation that you visited or tried to make an

12   appointment with LabCorp on October 11, 2016,

13   December 23, 2017, and March 28, 2018; is that

14   correct?

15          A.    To the best of my recollection, that

16   is correct.

17          Q.    Is it your testimony on each of those

18   occasions you attempted to check in at the desk and

19   were denied that opportunity?

20          A.    Actually, can you ask the former

21   question again, please?

22          Q.    Sure.  The Complaint identifies that

23   on the October 11, 2016 date, the December 23, 2017

24   date; and a March 28, 2018 date where it appears

Luke Davis

Page 54

1    that you visited a LabCorp location; is that
2    correct?
3           A.    On those occasions, I did visit a
4    LabCorp location, yes.
5           Q.    And the location was a patient
6    service center, correct?
7           A.    Yes, to the best of my knowledge.
8           Q.    And is it your testimony that on each
9    of those occasions you attempted to check in at the
10   desk and were told that you needed to check in at
11   the kiosk?
12          A.    Yes.
13          Q.    And you don't know why that
14   allegation is omitted from those paragraphs?
15          A.    I left the preparation of the
16   Complaint to counsel.
17          Q.    Did you review the Complaint before
18   it was filed, sir?
19          A.    I do not recall specifically if I
20   reviewed it prior to filing or immediately after
21   filing.
22          Q.    Is it your testimony, sir, that there
23   was a kiosk -- actually, let me ask you this:  The
24   October 11, 2016 visit, do you know what location

Luke Davis

Page 55

```
 1    that was to?
 2          A.    To the best of my recollection, that
 3    was the Bustleton Avenue location.
 4          Q.    Do you recall going to a location at
 5    5401 Old York Road?
 6          A.    I do not recall specifically going to
 7    that location, but I do not deny that it is
 8    possible that I did go to that location.
 9          Q.    What is AEMC Liver Disease
10    Transplant?  Do you know what that is, sir?
11          A.    I'm not sure what those initials
12    stand for.
13          Q.    Are you familiar with that medical
14    service provider?
15          A.    I -- to the best of my knowledge,
16    that is an affiliate or department or in some way
17    connected to Einstein Hospital or Einstein Network.
18          Q.    Do you know if there is a LabCorp
19    patient service location located at 5401 Old York
20    Road?
21          A.    I don't specifically recall that.
22          Q.    Do you recall ever going to a LabCorp
23    patient service center at 5401 Old York Road?
24          A.    I do not specifically recall that.
```

Luke Davis

Page 56

1          Q.    Do you know whether kiosks existed at

2     that location on October 11, 2016?

3                MR. SWEET:  Objection.

4                THE WITNESS:  Given that I don't

5     specifically remember whether I've gone to that

6     location, I can't speculate whether a kiosk existed

7     there.

8     BY MR. STEINER:

9          Q.    Is it your testimony that on

10    October 11 2016, you visited a LabCorp patient

11    service center and were told to check in at a

12    kiosk?

13                MR. SWEET:  Objection.

14    BY MR. STEINER:

15         Q.    You can answer, sir.

16         A.    Yes, sir.  That is my statement.

17         Q.    Do you recall, sir, going to a

18    LabCorp location in or around November 14, 2016 at

19    Bustleton Avenue?

20         A.    I do.  I believe that is a date that

21    I went to one, yes.

22         Q.    Is there any reason why that visit is

23    not referenced in the Complaint?

24         A.    Given that it was substantially

Luke Davis

Page 57

1   similar or identical to the prior visit with

2   regards to the kiosk, I did not find it necessary

3   to make note of it.

4          Q.    Okay.  So, is it your testimony that

5   on November 14, 2016 you visited the LabCorp

6   patient service center and were told you could only

7   check in at the kiosk?

8          A.    To the best of my recollection, that

9   is correct.

10         Q.    And your explanation for that not

11  being in the Complaint is because you felt it was

12  not necessary?

13         A.    I felt it substantially similar.  The

14  accessibility issues were substantially similar to

15  the prior event.

16         Q.    That prior event being the

17  October 11, 2016 event; is that correct?

18              MR. SWEET:  You actually misstated.

19              THE WITNESS:  That is correct.

20  BY MR. STEINER:

21         Q.    Do you recall going to that Bustleton

22  Avenue location in or around May of 2017?

23         A.    I do not specifically recall that

24  visit.

1480

Luke Davis

Page 58

1        Q.      Would it be your testimony, sir, if
2   medical records show that you visited a LabCorp
3   patient service center on May 9, 2017 at Bustleton
4   Avenue, that you were told on that occasion that
5   you needed to check in at the kiosk?
6        A.      Yes.
7        Q.      Again, is there a reason why that
8   allegation is not included in Paragraph 21 or
9   anywhere in the Complaint?
10       A.      As -- to the best of my recollection,
11  I did not include events that were substantially
12  identical or similar to the previous ones.
13       Q.      And, so, your testimony is that the
14  visit on May 9, 2017 was substantially the same as
15  the visit on October 11, 2016, correct?
16       A.      With regards to the inaccessible
17  kiosk and the inaccessible electronic systems, that
18  is to the best of my recollection.
19       Q.      With respect to being told that the
20  only way to check in was at the kiosk?
21       A.      Also the same.  I was never given any
22  option to do anything other than check in at a
23  kiosk subsequent to the October 11, 2016 date.
24       Q.      And just so I understand you

Luke Davis

Page 59

1   correctly, on at least six other occasions

2   subsequent to October 11, 2016 after being told

3   that you needed to check in at the kiosk, you

4   attempted to check in at the desk?

5           A.    Can you restate that, please?

6           Q.    Sure.  Just so I am understand your

7   testimony, you said that there were approximately

8   six times where you went to the desk and were told

9   that you needed to check in at the kiosk; is that

10  right?

11          A.    I believe I said that there were at

12  least six times and that is, I believe, correct to

13  the best of my knowledge.

14          Q.    Were there any times that you went to

15  a LabCorp patient service center and didn't ask to

16  check in at the desk?

17          A.    After having been repeatedly

18  instructed that the only way to check in was to do

19  so via the kiosk, there did come a time when I

20  began using the mobile check-in option and did not

21  then try to check in at the desk.

22          Q.    And when was that, sir?

23          A.    I believe that was approximately

24  around the October 2019 appointment and while the

Luke Davis

Page 60

1    mobile check-in option allowed me to check in, of

2    course, it did not give me access to any of the

3    other features that I understand the kiosks have.

4            Q.    What other features are those that

5    the mobile -- that the kiosks have to allow one to

6    check in?

7            A.    To the best of my knowledge, they

8    also include access to billing information and

9    possibly other services that since I can't use them

10   I don't know about.

11           Q.    Well, other than access to billing

12   information, what other access to information do

13   the kiosks give you access to that you have

14   knowledge of?

15           A.    Given that the kiosks are unavailable

16   to me given their inaccessibility, I do not know

17   what else they are capable of doing.  I do know

18   they are capable of more than just checking in for

19   walk-in appointments.

20           Q.    And you know that you are able to see

21   past-due bills; is that correct?

22           A.    That is my understanding, yes.

23           Q.    And have you ever had any past-due

24   bills that you needed to satisfy for LabCorp?

Luke Davis

Page 61

1          A.     Not to my knowledge.

2          Q.     That is not a functionality that you

3    needed to make use of at the kiosk; is that

4    correct?

5                 MR. SWEET:  Objection.  Misstates his

6    testimony.

7    BY MR. STEINER:

8          Q.     Is that correct, sir?

9          A.     Please restate the question.

10         Q.     Sure.  Is the payment of past-due

11   bills a functionality that you needed to make use

12   of at the kiosk?

13                MR. SWEET:  Same objection.

14                THE WITNESS:  To the best my

15   recollection, I have not needed to use that

16   specific functionality.  But, again, not knowing

17   what other functionalities are available, I can't

18   speculate whether I needed those functionalities

19   and could not access them.

20   BY MR. STEINER:

21         Q.     Now, the Complaint alleges in

22   Paragraph 21B that you visited a LabCorp patient

23   services center on December 17, 2017, correct?

24         A.     That is correct.

Luke Davis

Page 62

```
1        Q.    And your Complaint alleges that you
2   were accompanied by a family member.  Was that your
3   mother?
4        A.    To the best of my recollection, it
5   was.
6        Q.    And explain to me what the -- as far
7   as you understood it, what the check-in process was
8   at the kiosk?
9        A.    On that specific occasion, I
10  attempted to make an appointment online and was
11  unable to do so because of the inaccessibility of
12  the website at that time.  I was able to, to the
13  best of my recollection, have somebody make an
14  appointment for me, but when I went into the
15  LabCorp location, I was told that I could not check
16  in at the desk, that I was required to use the
17  kiosk.
18            So, at that time I went to the kiosk
19  and the person who was with me -- which to the best
20  of my recollection was my mother, Karen Davis --
21  was required to enter information into the kiosk on
22  my behalf.  And I was required to speak that
23  information out loud in a public waiting room.  And
24  I do believe that information included my name, my
```

Luke Davis

Page 63

```
 1   telephone number, my address, possibly other

 2   information such as my date of birth and other data

 3   that I would not have preferred to speak out loud

 4   in a public waiting room for privacy concerns.

 5          Q.    Do you carry identification with you?

 6          A.    In general, I do.

 7          Q.    Did you carry your insurance card

 8   with you?

 9          A.    I generally do.

10          Q.    Do you know whether the kiosk has the

11   capability to scan insurance information and

12   identification?

13          A.    It is my understanding that it does.

14          Q.    Is there a reason why you were

15   required to speak the information you state out

16   loud as opposed to simply scanning your

17   identification and your insurance card?

18          A.    I, in fact, wondered that same thing.

19   After it asked for the information that I

20   mentioned, it then asked to scan those cards or at

21   least my identification.  I, therefore, did not

22   understand why at the time it was asking me to

23   provide the information and then also scanning the

24   card where it could obtain the information.  But I
```

Luke Davis

Page 64

1    can't speculate as to how those systems operate.

2            Q.    Just so I am completely clear as to

3    your recollection of the process, you were asked to

4    have someone manually enter the information that

5    was on your identification and insurance card and

6    then subsequently scan the same information; is

7    that your testimony?

8            A.    I don't believe that is what I said.

9    The kiosk asked for various pieces of personal

10   information.  I know some of that information could

11   be available on or in the data contained in my

12   personal identification.  I don't recall whether my

13   insurance information was asked for or was obtained

14   from the card or how it was obtained in that

15   circumstance.

16           Q.    Let's just deal with the personal

17   information, the name, address, possibly date of

18   birth and telephone number.  Is it your testimony,

19   sir, that you were required to have someone

20   manually enter that information and then

21   subsequently scan the same information from your

22   identification card?

23           A.    Yes.

24           Q.    And it's your understanding that the

Luke Davis

Page 65

1    kiosk was programmed to operate in that manner?

2           A.    I cannot speculate how the kiosk was

3    programmed to operate.  I am testifying as to my

4    experience.

5           Q.    Is the information that you provided

6    to your mother at the kiosk the same information

7    that you had previously been providing when you

8    were able to check in at the desk?

9           A.    I do not recall specifically.

10          Q.    You testified previously that when

11   you checked in at the desk, you had to provide your

12   name and your prescription, correct?

13          A.    I believe that was my testimony, yes.

14          Q.    And then you said you possibly needed

15   to provide your telephone number and your address

16   but you weren't sure, correct?

17          A.    Correct.

18          Q.    And, so, you have an affirmative

19   recollection, though, sir, at the kiosk of having

20   to provide verbally to your family member your

21   address and telephone number, correct?

22          A.    To the best of my recollection, that

23   is the information that I had to provide.

24          Q.    And you provided that information to

1488

Luke Davis

Page 66

1    your mother to check you in?

2           A.    To the best of my recollection, yes.

3           Q.    Sir, your mother knows where you

4    live, correct?

5           A.    Correct.

6           Q.    She has your address, correct?

7           A.    To the best of my knowledge.

8           Q.    Okay.  And she calls you from time to

9    time?

10          A.    Yes.

11          Q.    So, she has your telephone number,

12   correct?

13          A.    She does.

14          Q.    So, why did you have to speak out

15   loud your address and telephone number to your

16   mother so she could keyboard it into the kiosk when

17   she already knew that information?

18          A.     In assisting me in that sort of

19   context, she does not assume or presume what

20   information I want entered.  I have various

21   telephone numbers and other information.  She just

22   asks and enters what I tell her to enter.

23          Q.    How many telephone numbers do you

24   have?

1489

Luke Davis

Page 67

```
 1          A.      At that time?
 2          Q.      Yes, October 11, 2016, which is the
 3    time that you've told me that you tried to first
 4    check in at the kiosk.
 5          A.      I believe I had two at that time, to
 6    the best of my recollection.
 7          Q.      Do you still have two telephone
 8    numbers?
 9          A.      I do still have two telephone
10    numbers.
11          Q.      Are they the same two telephone
12    numbers?
13          A.      They are.
14          Q.      Is one a cell phone and one a home
15    phone?
16          A.      They are.
17          Q.      And your mother calls you on both the
18    cell phone and home phone?
19          A.      To the best of my knowledge, yes.
20          Q.      And, so, when she was checking you in
21    at the kiosk, you don't recall whether you needed
22    to put in your cell phone or home phone into the
23    kiosk, do you?
24          A.      I don't recall what specific phone
```

Luke Davis

Page 68

1    number it asked for; and I don't recall what
2    specific phone number I gave it.
3             Q.    Do you recall if it asked for a phone
4    number at all?
5             A.    To the best of my recollection, it
6    asked for a phone number.
7                   MR. SWEET:  We need a break.  We have
8    been going an hour.  Let's take a break.
9                   MR. STEINER:  If you want to.
10                  MR. SWEET:  Let's take five minutes.
11                  (Break taken.)
12   BY MR. STEINER:
13            Q.    So, we are back on the record.
14                  On the occasion of your December 23,
15   2017 visit that is described in the Complaint, did
16   you have two addresses?
17            A.    I do not believe that I did.
18            Q.    But nonetheless, you had to tell --
19   speak out loud to your mother what address you
20   wanted her to put into the kiosk; is that correct?
21            A.    That is correct.  As an independent
22   blind person, I do not prefer to have people just
23   assume they know what information I prefer to
24   release.  It is my information, and I will do with

Luke Davis

Page 69

1    it as I see fit.  And, you know, I state which
2    information I want entered and that information is
3    what gets entered.
4           Q.    Did your mother ask you whether you
5    wanted to disclose your address to LabCorp?
6           A.    She asked me what questions the kiosk
7    asked her on my behalf.
8           Q.    Even when she knew the answer?
9           A.    She asked me the questions that the
10   kiosk asked her, and I gave her the information
11   that I wanted her to answer.
12          Q.    Now, the check-in process that you
13   described on December 23, 2017, was that the same
14   process via the kiosks that you experienced on
15   October 11, 2016?
16          A.    If you could give me a minute to
17   review the Complaint on that.
18          Q.    Sure.  That is in Paragraph A of --
19   21A.
20                MR. SWEET:  Is it 21A and 21B, Rob?
21                MR. STEINER:  No, I am just referring
22   to A, the October 11th visit.
23                MR. SWEET:  I believe your question
24   referred to the 2017 visit and the 2016 visit.

Luke Davis

Page 70

```
 1              MR. STEINER:  Sir, you can look at as
 2      much or as little of it as you'd like.
 3              MR. SWEET:  Please read carefully,
 4      Luke.
 5      BY MR. STEINER:
 6          Q.    Tell me when you are ready, sir.
 7          A.    Can I ask you to repeat the question,
 8      please?
 9          Q.    On the occasion of your October 11,
10      2016 visit to the LabCorp patient service center at
11      5401 Old York Road, did you work with your mother
12      to check you in in the same manner as you checked
13      in on December 23, 2017?
14          A.    To the best of my recollection, yes.
15          Q.    Okay.  And, so, I believe you
16      testified previously that when you went to the
17      LabCorp location at 5401 Old York Road on
18      October 11, 2016, you were told you needed to check
19      in at the kiosk, correct?
20          A.    For the record, you are stating that
21      address.  To the best of my recollection, it was a
22      different location, but I will assume that address
23      and answer that the check-in process to the kiosk
24      was equally as inaccessible and required the same
```

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 299 of 408   Page ID #:3268

Luke Davis

Page 71

```
1    sort of interaction as on the previous occasion.
2            Q.     Now, you testified previously to
3    going to a LabCorp location at 9880 Bustleton
4    Avenue on or around November 14, 2016.
5                   Do you recall that testimony?
6            A.     I do.
7            Q.     And when you went to the location on
8    that occasion, were you also directed to check in
9    at the kiosk?
10           A.     To the best of my recollection, I
11   was.
12           Q.     And were you required -- were you
13   with your mother?
14           A.     I do not recall who I was with, if I
15   was with anyone.
16           Q.     Were you able to check in at the
17   kiosk on that November 14, 2016 date?
18           A.     No.
19           Q.     How did you check in?
20           A.     I was not independently able to check
21   in at the kiosk.  I got assistance either from the
22   person who drove me there or from someone in the
23   waiting room.
24           Q.     But you don't recall which it was?
```

1494

Luke Davis

Page 72

1          A.     I do not.  I was not offered any

2    assistance from the LabCorp staff, however.

3          Q.     You were not offered any assistance

4    by the LabCorp staff on November 14, 2016 to check

5    in at the kiosk; is that correct?

6          A.     That is correct, to the best of my

7    recollection.

8          Q.     What do you mean, to the best of your

9    recollection?  Were you offered assistance or you

10   were not offered assistance?

11         A.     I was never offered assistance at any

12   time by LabCorp staff to use the inaccessible

13   kiosks.  I do not specifically recall on that date

14   who assisted me, but it was not LabCorp staff.

15         Q.     Okay.  And then on May 9, 2017, you

16   were at the Bustleton LabCorp PSC again, correct?

17              MR. SWEET:  Objection.

18              Rob, where are you pulling this

19   information from?

20              MR. STEINER:  I am pulling it from

21   the medical records that you produced.

22              MR. SWEET:  Very well.

23   BY MR. STEINER:

24         Q.     Is that correct, sir?

Luke Davis

Page 73

1          MR. SWEET:  Can you show the records

2   to Mr. Davis as you ask him questions?

3          MR. STEINER:  Jewel, let's post what

4   is Tab 7 in my binder.

5          MR. SWEET:  I don't see why it's a

6   memory test.

7          MR. STEINER:  I am not asking for a

8   memory test.  I am just trying to move the thing

9   along.

10          MR. TEWIAH:  Tab 7 is the May 9, 2017

11   visit?

12          MR. STEINER:  Yes.

13          MR. TEWIAH:  I will post it and send

14   it to the group e-mail.

15          MR. STEINER:  Sir, let me know when

16   you have that from your counsel.

17          MR. SWEET:  If you could let me know

18   when you have sent that.

19          (Exhibit Davis 2, PL-32 through 33, Patient

20   Report, was marked for identification.)

21          MR. STEINER:  While we are waiting,

22   can you make sure the witnesses are registered for

23   ExhibitShare on the Veritext site?

24          MR. SWEET:  Sure.

Luke Davis

Page 74

1          THE WITNESS:  I am going off audio
2     and go look at that.
3          MR. SWEET:  Is there a specific
4     provision you want him to check out, Rob?
5          MR. STEINER:  All I am going to ask
6     him is about the date of this instance.  You were
7     the one who raised the records issue.  I can
8     represent the records say the visit was on May 9,
9     2017 at 9880 Bustleton Avenue.
10         MR. SWEET:  I understand.  I just
11    think that if you are asking questions about visits
12    to specific locations on dates that were more than
13    four years ago, it is probably helpful to have the
14    documents in front of him.  That is all.
15         (Discussion held off the record.)
16    BY MR. STEINER:
17         Q.   Mr. Davis, you should have received a
18    document which we've marked as Davis 2.  It is
19    stamped BH032 to 033.  It reflects a laboratory
20    testing done by LabCorp on May 9, 2017 at 9880
21    Bustleton Avenue.
22         So, my question was, sir, is it your
23    testimony that when you visited that 9880 Bustleton
24    Avenue LabCorp PSC you were required to check in at

Luke Davis

Page 75

1    the kiosk?

2         A.    The document you sent me, at least in

3    the portion of it I was able to read accessibly,

4    indicate the date and my name, but I do not see the

5    address that you are mentioning.

6         Q.    The address, sir, just to orient you

7    -- and I don't know how best to do this, to be

8    frank is -- I am just representing to you it says

9    it.   It is at the top of the document.

10             MR. SWEET:  Let me make this easy for

11   you.  Luke and Rob, we will stipulate that the

12   document that is marked does list an address of

13   9880 Bustleton Avenue, Suite 220, Philadelphia,

14   Pennsylvania  19115.

15             MR. STEINER:  Thank you, Ben.  I

16   appreciate that.

17   BY MR. STEINER:

18        Q.    You, sir, understand that to be a

19   LabCorp patient service center, correct?

20        A.    Correct.

21        Q.    And it is your testimony that on the

22   date that you went to that LabCorp patient service

23   center, you were directed to use the kiosk; is that

24   correct?

Case 2:20-cv-00893-FMO-KS   Document 79   Filed 04/27/21   Page 304 of 408   Page ID #:3273

Luke Davis

Page 76

1          A.    To the best of my recollection, that

2    is correct.

3          Q.    Was it your mother that assisted you

4    checking in at the kiosk?

5          A.    I do not recall.

6          Q.    Were you required to provide personal

7    information to anyone in order to check in at the

8    kiosk on May 5 -- I am sorry -- on May 9, 2017?

9          A.    I was always required to provide

10   personal information when checking in at any kiosk

11   with someone filling in the information on the

12   kiosk.

13         Q.    Was there ever occasions where you

14   used the kiosk by simply scanning in your

15   identification and/or insurance card?

16              MR. SWEET:  Rob, do you mean him

17   alone or him with assistance?

18              MR. STEINER:  Sure.

19   BY MR. STEINER:

20         Q.    Were you ever to check in with

21   assistance at the kiosk simply by scanning your

22   identification and insurance information?

23         A.    I do not recall if there were any

24   occasions on which I was able to -- I was never

Luke Davis

Page 77

1   independently able to use the kiosk.  I do not
2   recall if there were any occasions on which I was
3   able to have the person assisting me just scan a
4   card to operate the kiosk without entering
5   information.  I do not recall.
6          Q.    And the personal information that you
7   contend that you were required to provide out loud
8   was your name, address, and phone number, correct?
9          A.    The personal information that I had
10  to speak out loud in the various waiting rooms, to
11  the best of my recollection, included some or all
12  of my name, address, and phone number.  I do not
13  recall specifically which of those pieces of
14  information were required at which times or if
15  other information was required such as my date of
16  birth, as I mentioned earlier, when I did the
17  walk-in visit on October 11, 2016.
18         Q.    On each occasion that you visited a
19  LabCorp patient service center, were you able to
20  get blood or urine drawn as prescribed by your
21  physician?
22         A.    Yes.
23         Q.    Can you identify the names of any of
24  the individuals you spoke to at a LabCorp patient